31
6/13/02

# ORIGINAL

## IN THE UNITED STATES DISTRICT COURT
## FOR THE MIDDLE DISTRICT OF PENNSYLVANIA

LEWIS JOHNSON,
    Plaintiff

    v.

ANTHONY PRINCIPI, Secretary of Veterans Affairs;
RODNEY KISCADDEN; ALICE FIDLER;
PEG WINTERS; IRVIN ERICKSON;
RAYMER KENT; and AMERICAN    FEDERATION
OF GOVERNMENT EMPLOYEES LOCAL 1966,
    Defendants

: No. 1:CV-00-1873
:
:
: (Judge McClure)
:
:
:
:
:
:
:

FILED
HARRISBURG, PA

JUN 1 2 2002

MARY E. D'ANDREA, CLERK
Per _____
Deputy Clerk

## FEDERAL DEFENDANTS' BRIEF IN
## SUPPORT OF THEIR MOTION FOR SUMMARY JUDGMENT

THOMAS A. MARINO
Assistant U.S. Attorney

KATE L. MERSHIMER
Assistant U.S. Attorney
228 Walnut St., 2nd Fl.
P.O. Box 11754
Harrisburg, PA 17108-1754
717-221-4482

Date:  June 12, 2002

## **Table of Contents**

Introduction . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1

Statement of Facts . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 3

      The Non-Selection Claim . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 4

      Racially Hostile Work Environment . . . . . . . . . . . . . . . . . . . . . . . . 9

      Alleged Interference with Workers Compensation Benefits . . . . . . . . . . 13

      Termination from Employment with the VA . . . . . . . . . . . . . . . . . . . 19

Argument . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 20

I.    TITLE VII IS THE EXCLUSIVE MEANS FOR FEDERAL EMPLOYEES
      ALLEGING EMPLOYMENT CLAIMS; THEREFORE, JOHNSON'S
      NON-TITLE VII CLAIMS SHOULD BE DISMISSED, AS SHOULD ALL
      DEFENDANTS EXCEPT SECRETARY PRINCIPI . . . . . . . . . . . . . . 20

      A.    Johnson's Non-Title VII Claims Should Be Dismissed . . . . . . . . 20

      B.    Because the Agency Head is the Only Proper Defendant
            in a Title VII Action, All Other Defendants Should Be
            Dismissed . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 22

II.   ALL OF JOHNSON'S TITLE VII CLAIMS, EXCEPT HIS NON-
      SELECTION CLAIM REGARDING THE HOUSEKEEPING AID
      POSITION, SHOULD BE DISMISSED DUE TO JOHNSON'S FAILURE
      TO SATISFY ALL TIME PREREQUISITES OR HIS FAILURE TO
      EXHAUST HIS ADMINISTRATIVE REMEDIES . . . . . . . . . . . . . . . 23

      A.    The Statutory and Regulatory Preconditions to Filing a
            Title VII Claim. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 23

      B.    Johnson Did Not Timely Pursue/Exhaust His EEO
            Remedies on Any of His Claims Except the Non-Selection
            Claim . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 26

III.    ALTERNATIVELY, SUMMARY JUDGMENT SHOULD BE ENTERED
        IN THE FEDERAL DEFENDANTS' FAVOR BECAUSE JOHNSON
        CANNOT ESTABLISH A DISCRIMINATORY ANIMUS TO SUPPORT
        HIS   HOSTILE   WORK   ENVIRONMENT,   RETALIATION,   AND
        CONSTRUCTIVE DISCHARGE CLAIMS  . . . . . . . . . . . . . . . . . . . . . . 27

IV.    JOHNSON HAS NO EVIDENCE THAT DEMONSTRATES THAT THE
        DECISION NOT TO SELECT HIM FOR THE HOUSEKEEPING AID
        POSITION ON EXTENDED CARE (19-13) IS PRETEXTUAL.  . . . . . . 32

## TABLE OF AUTHORITIES

**CASES**                                                                **PAGE**

Anderson v. Liberty Lobby, Inc.,
    477 U.S. 242 (1986) ...................................................................... 31

Arizmendi v. Lawson,
    914 F. Supp. 1157 (E.D. Pa. 1996) ............................................. 22

Big Apple BMW, Inc. v. BMW of North America, Inc.,
    974 F.2d 1358 (3rd Cir. 1992) ..................................................... 31

Bivens v. Six Unknown Named Agents,
    403 U.S. 388 (1971) ...................................................................... 21

Blaney v. United States,
    34 F.3d 509 (7th Cir. 1994) ................................................. 24, 26

Bolivar v. Director of the FBI,
    846 F.Supp. 163 (D.P.R. 1994) .................................................. 21

Brown v. General Services,
    425 U.S. 820 (1976) ............................................... 20, 22, 23, 24

Burlington Industrial, Inc. v. Ellerth,
    524 U.S. 742, 118 S.Ct. 2257, 141 L.Ed. 2d 633 (1998) ............. 28

Bush v. Lucas,
    462 U.S. 367 (1983) ............................................... 21, 22, 24

Carter v. Gibbs,
    909 F.2d 1452 (Fed. Cir.1990) ................................................... 24

Celotex Corp. v. Catrett,
    477 U.S. 317, Fed.R.Civ.P. 56 ............................................. 31, 32

DiPompo v. West Point Military Academy,
    708 F.Supp. 540 (S.D. N.Y. 1989) .......................................... 22, 23

Dynes v. Army Air Force Exchange Service,
    720 F.1495 (11th Cir. 1983) .................................................. 21, 22

Equimark Committee Finance Company v. CIT Finance Services Corporation,
    812 F.2d 141 (3d Cir. 1987) ...................................................... 31

Ezold v. Wolf, Block, Schorr and Solis Cohen,
        983 F.2d 509 (3rd Cir.1993)  ........................................................  32

Facha v. Cisneros,
        914 F. Supp. 1142 (E.D. Pa. 1996)  ......................................  24, 25

Faragher v. City of Boca Raton,
        524 U.S. 775, 118 S. Ct. 2275, 141 L. Ed. 2d 662 (1998)  ...........  28

Forest v. United States Postal Service,
        97 F.3d 137 (6th Cir. 1996)  ....................................................  25

Goosby v. Johnson & Johnson Medical Inc.,
        228 F.3d 313 (3rd Cir. 2000)  ..................................................  33

Guice-Mills v. Brown,
        882 F. Supp. 1427 (S.D.N.Y. 1995)  .........................................  25

Harris v. Forklift System, Inc.,
        510 U.S. 17, 114 S. Ct. 367, 126 L. Ed. 2d 295 (1993)  ...............  28

Jones v. Department of Health and Human Services,
        622 F. Supp. 829 (N.D. Ill. 1985)  ............................................  23

Keene Corp. v. United States,
        700 F.2d 836 (2nd Cir. 1983)  .................................................  24

Kennedy v. Runyon,
        933 F. Supp. 480 (W.D. Pa. 1996)  ..........................................  25

United States v. Kubrick,
        444 U.S. 111 (1979)  ..............................................................  24

Kubricki v. United States,
        829 F. Supp. 906  (E.D. Mich. 1993)  .......................................  26

Kwatowski,
        917 F. Supp. at 882  ...............................................................  24

Matsushita Electrical Industrial Co. v. Zenith Radio,
        475 U.S. 574 (1986)  ..............................................................  31

McAdams v. Reno,
        64 F.3d 1137 (8th Cir. 1995)  ..........................................  24, 25, 26

McDonnell Douglas Corp. v. Green,
411 U.S. 792 (1973) ....................................................................... 32

Meritor Savings Bank FSB v. Vinson,
477 U.S. 57 (1986) ....................................................................... 27

Mitchum v. Hurt,
73 F.3d 30 (3rd Cir. 1995) ............................................................ 21

National Railroad Passenger Corp. v. Morgan,
___ S. Ct. ___, 2002 WL 1270268 (U.S. June 10, 2002) ............................. 23

Reeves v. Sanderson Plumbing Products Inc.,
530 U.S. 2097 (2000) ................................................................... 33

Robinson v. City of Pittsburgh,
120 F.3d 1286 (3rd Cir. 1997) ...................................................... 29

Robinson v. Dalton,
107 F.3d 1018 (3rd Cir. 1997) ............................................ 20, 23, 24, 25, 26

Roth v. United States,
952 F.2d 611 (1st Cir. 1991) ....................................................... 21, 22

Schweiker v. Chilicky,
487 U.S. 412 (1988) ..................................................................... 21

Spence v. Straw,
54 F.3d 196 (3rd Cir. 1995) ....................................................... 21, 27

Texas Department of Community Affairs v. Burdine,
450 U.S. 248 (1981) ..................................................................... 32

Waiters v. Parsons,
729 F.2d 233 (3rd Cir. 1984) ...................................................... 21, 22

Weston v. Pennsylvania, ,
251 F.3d 420 (3rd Cir. 2001) ...................................................... 27, 28

Woodson v. Scott Paper Co.,
109 F.3d 913 (3rd Cir 1997) ........................................................ 35

## Introduction

This is an employment discrimination lawsuit filed by Lewis Johnson, a former employee of the Department of Veterans Affairs ("VA") at the Lebanon VA Medical Center. Johnson named as defendants Anthony Principi,[1] the Secretary of Veterans Affairs, plus Raymer Kent, Alice Fidler, Rodney Kiscadden, Irvin Erickson, current or former employees of the Lebanon VA Medical Center (the "federal defendants").

Johnson also had named the American Federation of Government Employees Local 1966 and Peg Winters, the Local's president, as defendants. By order dated September 17, 2001, this Court dismissed Johnson's claims against Local 1966 and Peg Winters for lack of subject matter jurisdiction because all claims arose from the union's duty of fair representation, which claim could not be pursued under Title VII.

In his six-count complaint, Johnson alleges a hostile work environment, constructive discharge, and other purported discriminatory treatment that adversely affected the terms and conditions of his employment due to his race and/or in retaliation for pursuing protected activities. Johnson also alleges a conspiracy to impair his rights under a labor union contract, violation of the Equal Protection Clause, conspiracy to violate his constitutional rights and privileges as a citizen, and outrageous conduct, the latter which we presume is a claim for punitive damages.

Johnson's claims concern four general matters. The first is his non-selection in 1998 to be a Housekeeping Aid in Extended Care, which would have been a

---

[1] Pursuant to Fed. R. Civ. P. 25(d)(1), Anthony Principi, Secretary of the Department of Veterans Affairs, has been substituted for Hershel W. Gober.

lateral move.  The second is an October 13, 1999 racial statement made by a co-worker and an incident a few days later involving a few alleged bumps by the same co-worker, which Johnson claimed created a hostile work environment.  The third matter involves Johnson's filing of Workers Compensation benefits following the verbal statement/bump incident and Johnson's allegation that the VA improperly "controverted" or processed it.  The final matter concerns Johnson's constructive discharge claim when the VA terminated Johnson after he had been absent from work on leave without pay for over a year and after his doctor said Johnson remained unable to return to work.

As explained below, the federal defendants are entitled to summary judgment on a number of grounds:

1.  Because federal employment is at issue, Johnson can pursue his claims only under Title VII, with all other constitutional, contract, or tort claims being barred.

2.  The only proper party in a Title VII claim is the Secretary of the VA sued in his official capacity, Anthony Principi, and all other individuals should be dismissed as defendants.

3.  Both Johnson's hostile work environment claim involving the verbal statement/bump incident with a co-worker and his interference with Workers Compensation benefits claim should be dismissed because Johnson did not timely file his federal lawsuit within ninety days of receiving notice of his right to sue.

4.  Johnson's constructive discharge claim should be dismissed because he never pursued his administrative remedies by seeing an EEO counselor nor by filing an EEO complaint.

5.  Alternatively, Johnson's hostile work environment claim should be dismissed on the ground in that he was not adversely affected in the terms and conditions of his employment; nor can Johnson establish discriminatory animus.

6. Likewise, Johnson's interference with Workers Compensation claim should be dismissed on the ground that Johnson cannot establish discriminatory animus.

7. Johnson's non-selection claim should be denied in that he has no evidence to overcome the VA's non-discriminatory reason for his non-selection.

## Statement of the Facts

The federal defendants have set forth the undisputed material facts at great length in its Statement of Material Undisputed Facts [hereinafter cited as "SMF"]. The government refers the Court to that document, with its citation to the record, for a thorough statement of the facts. Nevertheless, we summarize them here.

Johnson was an employee of the Department of Veterans Affairs ("VA") at its Lebanon Medical Center, known as the Lebanon MCVA. Johnson had been a Housekeeping Aid at the Wage Grade 2 level and had been working in the Environmental Management Services ("EMS"). SMF 1-2.

In the spring of 1998, the VA changed from providing medical services by "service lines," such as nursing services, medical services, psychiatry services, and social work services, to "product lines," such as extended care, acute care, and the like. With the change to product lines, the units were viewed as teams so that employees in different fields (such as nursing, social work, housekeeping) were hired by the product line manager. SMF 3.

Before going to "product lines," housekeeping aids worked within the Environmental Management Service ("EMS"). Most were assigned to work in various units while one group of housekeepers were assigned to work in common

3

areas.   When the VA switched to "product lines," housekeepers working on a particular unit were assigned to the product line their unit fell within.  Those housekeepers who worked in the common areas, however, stayed within EMS. SMF 4-5.

**The Non-Selection Claim**

In 1998, a full time position for a Housekeeping Aid at Wage Grade 2 in the Extended Care (19-3)[2] product line was posted so that individuals could apply for the position.  This position was posted under the provision of the Open and Continuance Vacancy Announcement and the VA/AFGE Master Agreement.  SMF 6-7.

To understand this type of posting, certain positions at the VA are entry level positions, frequently turned over positions, or require specific degrees (e.g. librarian). The Lebanon VA Medical Center thus negotiates yearly with the local union to post job openings on the "Open Continuous" list so that the position can be filled much more quickly.[3]  SMF 10.  Housekeeping Aid positions are one of the many positions placed on the Open Continuous list.  SMF 14.  Pursuant to the Master Agreement between the VA and the national union, positions on the Open Continuous list are filled competitively under Article 22 and seniority is <u>not</u> the deciding factor.  SMF 18-20, 23.

---

[2] The phrase "19-3" meant the opening was in Building 19, 3rd floor.

[3] If a position is not on the Open Continuous list, the union contract requires the job opening to be posted for three weeks, with an additional one-week period for supplementation.  In contrast, a position on an Open Continuance list is posted only for three days.  SMF 11-13.

4

In this case, Johnson believed that he should have been selected for the Extended Care (19-3) Housekeeping Aid position solely on the basis of his seniority alone. Johnson was mistaken and seniority was <u>not</u> the sole selection criteria. SMF 24. To explain his misunderstanding, when a position is competitively filled, eligible applicants are placed on one of three lists: 1) the new position is a promotion (a higher pay grade); 2) the new position is a reassignment (no change in pay); and 3) the new position is a change to a lower grade (decrease in pay). SMF 21. Should it ultimately turn out that only a list of reassignment eligibles is referred to the decision maker, merit promotion procedures under Article 22 still apply under the Open Continuous Announcement. SMF 22.

In contrast, under Article 12, Section 10, of the Master Agreement, reassignments are viewed as the involuntary moving of a person from one position to another, which are not to be used as punishment, harassment, or reprisal. Reassignments under Article 12 occur in "management-driven" situations where there are staff reductions and/or positions that are being eliminated. SMF 16. With the Lebanon VAMC, reassignments caused by reductions in force ("RIF") are done under Article 12 and are based on seniority. SMF 17.

Looking to Article 12, Johnson believed that since he ultimately was on a list of reassignment eligible candidates, the selection process should have been governed solely by seniority. Johnson was wrong and the provisions of Article 22 governing merit selection still controlled since the Housekeeping Aid position was on an Open Continuous list. Likewise, Johnson's reliance on a Memorandum of

Understanding between the Lebanon VAMC and the local union was mistaken in that the agreement was created solely for a RIF that the VA anticipated occurring. This Memorandum of Understanding was not an unending agreement but, rather, was specifically designed for persons who would be displaced as the result of that RIF. SMF 24-25.

Turning back to the particular facts of the vacancy, the Housekeeping Aid WG-2 position on Extended Care (19-3) was posted in early June 1998 and closed on June 9, 1998 under the Open Continuous Announcement. Lewis Johnson, Ronald Hull, and other VA employees, all who had Wage Grade 2 positions, indicated that they were interested in filling this vacancy. Johnson and Hull were Housekeeping Aids with the other employees being Food Service Workers. SMF 26-28.

The applicants' KSAOs (written questions and answers addressing knowledge, skills, abilities, and other factors) were reviewed by a three-person panel so that the applicants could be scored and ranked. After rating the ten applicants, on July 8, 1998, nine names were referred to the Manager of the product line. The decision on who to select was then delegated to the Nurse Manager of Extended Care (19-3) ,was Alice Fidler. SMF 29-30, 32, 39.

In making her decision, Ms. Fidler was not required to select the candidate who had the most seniority since the selection was being made under Article 22's merit selection provisions. On July 15, 1998, Ms. Fidler selected Ronald Hull. SMF 31, 33, 46.

6

When Ms. Fidler received the list of referred applicants from Personnel, she and Barbara Kohr, a Nurse Manager on the Hospice Unit who was assisting her in rating the applicants, focused on Hull and Johnson because they both had housekeeping experience and they were trained.  SMF 43-45.

Ms. Fidler selected Hull because of his experience and initiative, the latter demonstrated by his understanding of the risks of leaving broken items around patients suffering from dementia.  While Johnson had previously been a nursing assistant, Hull seemed to be more patient in dealing with the demented patients.  For example, the patients on her ward would do inappropriate things, such a void in a waste can.  Hull would clean it up and not make any remarks while Johnson would verbalize that he thought the staff should more closely watch the patients, which could not always be done.  In sum, Ms. Fidler thought Hull was best qualified and would fit in better with the team -- with the point of product lines being to build a team.  Ms. Fidler thought Hull had better people skills.  SMF 47-49.

In making her selection, Ms. Fidler did not use race at all.  Likewise, Ms. Kohr, who had assisted Ms. Fidler in the selection process, did not consider Johnson's race when selecting Hull.  Rather, she relied on Hull's 17 years of experience in housekeeping, the necessity of things truly being clean and just not looking clean, and the need to communicate to accomplish his job safely.  SMF 50-51.

Nevertheless, Johnson believed that Ms. Fidler did not select him due to his race.  When asked why he thought Ms. Fidler did not select him because of his race, Johnson testified that he based that on her conversation with him -- that she did not

think he (Johnson) worked as well with the patients and would not fit in with the team. Johnson personally did not think that was a basis for the job. SMF 58.

Johnson also relies upon an alleged statement made by Ms. Fidler *years before* the Housekeeping Aid selection. Specifically, Randall Houck, a former subordinate of Ms. Fidler, supposedly heard Ms. Fidler say "back in the early 90's" -- when a fellow wanted to come from Housekeeping into Nursing -- that she did not want any more of them on the floor. Houck took this statement to mean that she did not want him because he was black. Houck also stated that Peggy Cromer, a VA employee commented that Ms. Fidler was close to discriminating against the individual and that she should back off. SMF 52-53.

Ms. Fidler has denied ever making that statement in any form at all. Ms. Cromer cannot recall hearing Ms. Fidler making that statement; further, she did not recall Ms. Fidler making any disparaging remarks against African-Americans. Likewise, Wanda Miller, who Houck said was present when Ms. Fidler made the alleged statement, stated that she had not heard anyone, particularly Ms. Fidler, make any statements that they were trying to maintain a racial balance or that she did not want to hire too many African-Americans. Further, Ms. Kohr stated that she had never heard Ms. Fidler make any statements that she did not want to hire too many blacks. SMF 54-57.

Otherwise, Johnson has never seen Ms. Fidler discriminate against other African-Americans or make any discriminatory statements about Johnson's race or

8



anyone else's race and Johnson has no evidence of discriminatory animus by Ms. Fidler.  SMF 60.[4]

**Racially Hostile Work Environment**

On October 13, 1999 as he walked through a hallway, Johnson came upon Irv Erickson and Lewis Chandler, two fellow Housekeeping Aids in EMS.  Johnson stated that Erickson stopped him and told him that he (Erickson) wanted to tell him what people were saying about him.  Although Johnson says that he told Erickson that he did not want to hear it, Erickson told him that people are saying you are a white man in black skin.  SMF 61-63.

Before this time, Erickson and Johnson had interacted professionally, joking around a bit during morning meetings.  Sometimes Johnson and Erickson would speak in the hallways but most of it was on a professional level and occasionally on a joking or laughing level.  On one occasion, though, Johnson said that Erickson had belittled his work.  SMF 64.

Erickson admitted to making the statement to Johnson although he stated that they had been kidding around and that what he said was not "people" but Johnson's "brothers," i.e. black VA workers.  Erickson said that was not his point of view and that he had no ill feeling against Erickson.  Erickson further stated that he had been

_____

[4] Further, Johnson believes that to the extent anyone supported Ms. Fidler's non-selection of him, then they were a party to his complaint of discrimination -- with their being a conspiracy among the VA Secretary, the union and its president, and Mr. Kent to have the position filled competitively. SMF 59. Johnson has not provided any  evidence to support this vague allegation, however.

joking and kidding around and that he had joked in the past with Johnson. Erickson's long-time partner, Chandler, who is black, also stated that he had heard Erickson make the statement but that this was not a personal opinion of Erickson's. SMF 65-66.

A few days after the October 13th conversation, Erickson heard from Chandler that Johnson was going to file an EEO complaint against him. Thus, on October 18, 1999, Erickson went to the ward where Johnson was working to talk to Johnson and to explain that the comment had not come from him. Erickson said that he called out to Johnson that he wanted to talk to him and to ask him what was going on but that Johnson said that he did not want to talk to him -- with Johnson going into the nurses' bathroom at the clerk's office and locking the door. Erickson stated that no malice was intended. SMF 67-69.

The government notes that there is a dispute during this October 18, 1999 conversation whether Erickson touched Johnson. Erickson on one occasion said that he had no contact with Johnson and on another occasion, stated that they slightly bumped into each other. Johnson said, in contrast, that Erickson came up to him and for about 15 feet followed him and bumped his shoulder with Johnson's shoulder as he (Erickson) asked Johnson why he would not talk to him. This bumping only caused Johnson to stumble at first, but then he walked off. SMF 70.

As a result of th October 18th incident, Johnson submitted a "Report of Contact," which is a VA form, stating that he had been harassed by Erickson's action of stating that he (Erickson) wanted to talk to Johnson and asking why Johnson

would not talk to him -- including the shoulder bump.  Also on that day, Johnson saw

an EEO counselor and claimed that Erickson had made a racial remark about him

on October 13, 1999.  SMF 71-72.[5]

On October 18, 1999, Johnson's and Erickson's supervisor, Ronald

Kiscadden, met with Erickson to talk about the two incidents with Johnson.  Erickson

admitted that he had made the October 13, 1999 statement but that he was only

repeating what someone else had said.  As to the October 18, 1999 incident,

Erickson explained that he was only trying to talk to Johnson and that Johnson was

avoiding him.  SMF 73.

The following day, on October 19, 1999, Erickson went to the work area/

supply closet of Susie Habecker so that he could obtain some spray buff, which he

knew would be there.  The spray buff was not in the closet so Erickson went into the

shower room, the next door down, where he found the spray and filled his bottle.

Johnson happened to be working in that area at that time but Erickson did not know

it.   Erickson, however, did see Johnson.  SMF 74.

The next day, on October 20, 1999, Kiscadden and his supervisor, Mrs.

Carolyn McGuigan, met personally with Erickson and advised him to stay away from

Johnson.  Erickson was counseled that he should have no contact with Johnson in

the future unless it was work related and that any future substantiated complaints

---

[5] Johnson also claimed race discrimination had occurred regarding a prior
monetary team award and a 4-hour time off award.  During his deposition, however,
Johnson withdrew both of those claims.  SMF 71.

could result in disciplinary actions.  Kiscadden stated that Erickson was given this counseling on October 20, 1999, but that he could not explain why Erickson had signed it on November 15, 1999.  SMF 75.

Otherwise, we note that on November 16, 1999, Johnson sent a letter to Mrs. McGuigan asking what action had taken place regarding Erickson.  Johnson was advised in a November 17, 1999 letter that the issues had been addressed and that action had been taken to ensure the conduct would not be repeated. SMF 76.

Subsequently, Johnson filed an EEO complaint claiming that Johnson's conduct on October 13, 18, and 19, 1999, constituted a hostile work environment. On May 9, 2000, the VA dismissed Johnson's harassment claim concerning Erickson in that the allegations did not cause Johnson to be "aggrieved" as required by the Title VII regulations.  Johnson was notified that the letter constituted the final agency decision and that he had a right to appeal the decision to the EEOC within 30 days or that he could file a civil action in district court within 90 days of receipt of the final decision.  Johnson was also told in bold, capital letters that if he filed a civil action under Title VII, the civil action "**MUST BE FILED WITHIN NINETY (90) CALENDAR DAYS** of the date of receipt of this final agency decision...."  SMF 77-80.

Johnson received the final agency decision on May 10, 2000.  Johnson does not recall filing an EEOC appeal of this adverse decision and there is no evidence that Johnson did anything other than file this civil lawsuit.  Johnson filed this lawsuit

on October 24, 2000, which is more than 90 days after Johnson received the adverse final agency decision.  SMF 81-83.

**Alleged Interference with Workers Compensation Benefits**

Shortly after the incident where Erickson bumped Johnson, Johnson went out on sick leave and sought Workers Compensation benefits.  To do that, Johnson had to complete the appropriate paperwork so that the application could be submitted to the Officer of Workers Compensation Program ("OWCP").  SMF 85.

When seeking Workers Compensation benefits, there are two types of forms that can be submitted by an employee.  One form is a CA-1 form, which is for a traumatic injury.  The other form is a CA-2 form, which is for an occupational illness or disease.  Typically, a traumatic injury is a one-time incident. With an occupational illness or disease, it typically occurs over a period of time — such as long term exposure to tuberculosis where the employee eventually tests positive for the illness. SMF 86-88.

An emotional trauma suffered from harassment can be either an occupational illness or a traumatic injury depending on the particular facts.  The harassment can occur over a period of time where the employee eventually reaches a point that he/she cannot take it anymore (occupational) or can be a one-time incident that causes an immediate trauma (traumatic).  SMF 89.

One distinction between the two forms is that when a CA-1 traumatic injury form is filed, an employee is entitled to receive continuation of pay (known as COP)

for 45 days. If the CA-1 claim is eventually denied, then the employee will have to use sick or annual leave to reimburse the VA for the COP. If a CA-2 form for an occupational illness is completed for Workers Compensation benefits, the employee is not entitled to received COP. SMF 90, 92.

On or about October 26, 1999, Johnson came to the Human Resources Department to submit a Workers' Compensation claim and Joseph Stuckey, a Human Resources Specialist who handled Workers Compensation claims, assisted Johnson in completing the paperwork. It was Stuckey's opinion, based upon his conversation with Johnson, that a CA-1 traumatic injury form should be submitted for Johnson in that Johnson's claim of injury centered on the alleged physical assault incident by Erickson on October 18, 1999. Stuckey's opinion was bolstered by Johnson's entries in the CA-1 form that the cause of injury had been a physical assault by another employee that had occurred on October 18, 1999, at 10:20 a.m. in Building 1-3a. Accordingly, Stuckey assisted Johnson in filing a CA-1 form for benefits. 93, 95-96.[6]

In submitting any Workers Compensation claim, it is Stuckey's responsibility to provide the OWCP with information relevant to the claim -- be that evidence supporting or questioning whether the claim was work related. SMF 98. Further,

---

[6] On a related point, after Stuckey assisted Johnson in preparing his CA-1 claim, Stuckey learned that Johnson had also claimed that five days before the alleged assault that Erickson had made a racially insensitive remark to Johnson. This information did not alter Stuckey's belief that the CA-1 form was the proper form for Johnson to use in seeking Workers Compensation benefits. SMF 97.

14

pursuant to regulations, the VA may "controvert" a CA-1 claim in certain situations. In such cases, the employee is not entitled to receive COP.  SMF 91.

On November 1, 1999, Stuckey submitted Johnson's CA-1 form.  With that CA-1 form, Stuckey submitted a letter to the OWCP indicating that the VA was controverting Johnson's claim.[7] Stuckey also noted some factual discrepancies as follows:  While a confrontation had occurred between Erickson and Johnson -- with words exchanged -- neither a witness observed an assault, nor did a subsequent police investigation find evidence to support that an actual assault had occurred. Further, management had directed Erickson to have no contact with Johnson and that Erickson would not be assigned to work in proximity to Johnson's work area. Johnson was reassured that the situation had been neutralized.  SMF 99.

In his letter, Stuckey noted that Johnson had seen his primary care physician, who had recommended counseling.  Additionally, Johnson had entered into an Acute Partial Day Hospital Program at Philhaven and had provided a letter from Dr. Pakola that Johnson was unable to work until further notice.  Johnson had failed, however, to provide medical documentation to support his allegation of traumatic injury. Stuckey then noted that upon review of the information, it could not be concluded

---

[7] Although Stuckey does not recall specifically when he told Johnson that his claim had been controverted, Johnson knew of it at the latest by November 30, 1999. SMF 113.

that there was a causal relationship between the Erickson incident and Johnson's counseling. SMF 100-102.[8]

As to providing medical documentation, it is the employee's burden to provide such documents, with Johnson having been advised of this on October 26, 1999. SMF 103-106. When any employee submits a Workers Compensation claim, Stuckey gives them a copy of the "Injured Employee's Notification of Responsibilities" form that advises them that is their responsibility to provide supporting medical documentation. After any employee is given this form and advised of their responsibility to provide medical documentation, Stuckey does not subsequently contact the employee to request or to obtain medical documentation. SMF 107.

As noted above, there is no 45-day COP when a CA-1 form is controverted. Additionally, Johnson later claimed that the CA-1 form was the wrong form to file and that a CA-2 form should have been filed in the first place. Johnson, thus, never would have been entitled to receive COP benefits under a CA-2 claim. SMF 110-111.

_____

[8] On October 21, 1999, Raymer Kent received a fax from Philhaven where Johnson had signed a release on that same day, which release authorized only "disclosure" of the "Initial Evaluation/Admission Note." That same day, Kent received a phone call from John Sivley of Philhaven regarding Johnson. The release signed by Johnson did not authorize the release of medical documents concerning psychological evaluations and treatment notes. Regardless, nothing Sivley said lead Kent to believe that the Erickson incident was a work-related traumatic injury; rather, it sounded like Johnson had pre-existing problems. SMF 108-109.

On December 15, 1999, the Claims Examiner for the OWCP denied Johnson's CA-1 claim for benefits.  The Claims Examiner advised Johnson that the initial information of file was insufficient to establish a causal relationship between the medical condition and the incident of October 18, 1999, which Johnson had been advised of by letter dated November 5, 1999.  Subsequent information that Johnson provided, plus Dr. Pakola's November 5, 1999 CA-20 form revealed that Johnson had a preexisting condition, with Dr. Pakola entering a question mark by the question whether his condition was caused by his federal employment.  SMF 117.

At some point, Johnson believed that the wrong form had been used to submit his Workers Compensation claim and that a CA-2 (occupational illness) form should have been submitted.  Stuckey believed this occurred around the time that the OWCP denied the CA-1 claim.  Regardless, Stuckey met with Johnson, Dumas, and Mr. Kent on December 20, 1999, where they discussed the claim and advised Johnson and Dumas that they (Stuckey and Kent) would assist in submitting a CA-2 claim for Johnson, which they did. SMF 118-120.

On July 7, 2000, the Claims Examiner for the OWCP denied Johnson's CA-2 claim.  Johnson challenged the finding and a hearing took place on January 24, 2001.   On April 10, 2001, Johnson's CA-2 claim was again denied.  Johnson recently sought reconsideration of the April 10, 2001 decision but the VA is not aware of the Department of Labor's decision, if any, as of this date.  SMF 121-124.

At no time did Kent nor Stuckey take any action to "improperly" or "incorrectly" process, or to delay processing, any of Johnson's Workers Compensation requests

17

due to his race or in retaliation for his exercising his EEO rights or otherwise.  Nor was Johnson's CA-1 claim controverted due to Johnson's race or in retaliation for Johnson filing any EEO complaints.  Further, Stuckey did not dispute Johnson's CA-1 claim nor his CA-2 claim due to Johnson's race nor in retaliation for Johnson filing any EEO complaints.  Likewise, the decision to submit a CA-1 form initially on Johnson's behalf was because Kent and Stuckey believed that it was the correct form to use at the time; the decision was not motivated in the least by Johnson's race or in retaliation for Johnson exercising his EEO rights. SMF 125-127.

On February 5, 2000, Johnson saw an EEO counselor to claim that in retaliation for his having filed a prior EEO case, the VA had failed to follow guidelines in processing his Workers Compensation claim.  On April 13, 2000, Johnson filed a formal EEO complaint, which was docketed at 200H-1663. SMF 128-132.

On May 10, 2000, the VA issued its final agency decision regarding EEO complaint 200H-1663 and dismissed the claim because the denial of Workers Compensation benefits was solely the responsibility of the Department of Labor. Johnson was notified that the letter constituted the final agency decision and that he had a right to appeal the decision to the EEOC within 30 days or, he could file a civil action in district court within 90 days of receipt of the final decision.  Johnson again was also told in bold, capital letters that if he filed a civil action under Title VII, the civil action "**MUST BE FILED WITHIN NINETY (90) CALENDAR DAYS** of the date of receipt of this final agency decision...."  SMF 133-134.

Plaintiff received this final agency decision shortly around May 11, 2000. Johnson did not file an EEOC appeal but, rather, filed the current lawsuit on October 24, 2000, which was more than 90 days after he received the adverse final agency decision. SMF 135-137.

**Termination from Employment with the VA**

After Johnson's sick and annual leave ran out, Johnson was absent from work as of November 25, 1999, on leave without pay (LWOP). On August 4, 2000, a letter was sent to Johnson from his supervisor advising him that the maximum amount of leave without pay he could receive was one year such that it could not be authorized after November 24, 2000. In this same letter, the supervisor asked Johnson to provide certain medical information concerning his request to have his leave without pay continued through August 26, 2000. SMF 139-141.

In an August 16, 2000 letter, Johnson's treating physician, Dr. Pakola, responded. The letter also incorporated Dr. Pakola's earlier February 17, 2000 letter. Dr. Pakola's letters reflected his opinion that Johnson could <u>not</u> return to work at the Lebanon VAMC, with Johnson continuing to think that various people were plotting against him. SMF 142-143.

Subsequently, on October 24, 2000, the Lebanon VAMC proposed terminating Johnson from his Housekeeping Aid position due to his medical problems as supported by his physician's statement that Johnson was unable to return to VA employment. Johnson was advised that he had fourteen days to reply to this notice,

either orally, in writing, or both. On November 14, 2000, Johnson replied to the proposed termination letter requesting that he be permitted to continue to receive LWOP until his Workers Compensation claim was finalized. SMF 144-146.

On November 17, 2000, the Lebanon VAMC advised Johnson that he was being removed from VA employment effective November 30, 2000 due to his current medical condition and his inability to work. Johnson received the letter on December 2, 2000. Johnson was advised in the removal letter that he could appeal this decision to the Merit Systems Protection Board or under the negotiated grievance procedure, but not both. Johnson took neither action. Nor did Johnson see an EEO counselor to allege discrimination or retaliation. SMF 147-149.

### Argument

I.    **TITLE VII IS THE EXCLUSIVE MEANS FOR FEDERAL EMPLOYEES ALLEGING EMPLOYMENT CLAIMS; THEREFORE, JOHNSON'S NON-TITLE VII CLAIMS SHOULD BE DISMISSED, AS SHOULD ALL DEFENDANTS EXCEPT SECRETARY PRINCIPI.**

A.    **Johnson's Non-Title VII Claims Should Be Dismissed.**

Title VII of the Civil Rights Act of 1964, 42 U.S.C. §2000e et seq., establishes the exclusive and pre-emptive means by which a federal employee may bring a claim unlawful employment discrimination. Brown v. General Services, 425 U.S. 820, 829-35 (1976); Robinson v. Dalton, 107 F.3d 1018, 1020-21 (3rd Cir. 1997). The comprehensive procedural and substantive statutory scheme Congress has created to provide remedies for employees who have been discriminated against, see 5 U.S.C. §§7701-7703; 5 U.S.C. §§1201.151-1201.176, 29 C.F.R. §§1614.101-

1614.607, precludes all other constitutional and federal and state law claims challenging personnel actions in the federal workplace. Bush v. Lucas, 462 U.S. 367 (1983); Roth v. United States, 952 F.2d 611, 614-15 (1st Cir. 1991); Waiters v. Parsons, 729 F.2d 233, 236 n.7 (3rd Cir. 1984)(in the employment discrimination context, a federal employee's sole federal remedy is Title VII--affirming dismissal of 42 U.S.C. §§1981, 1983 claims); Dynes v. Army Air Force Exchange Service, 720 F.1495, 1498-99 (11th Cir. 1983); Bolivar v. Director of the FBI, 846 F.Supp. 163, 167 (D.P.R. 1994)(citing cases). See also Spence v. Straw, 54 F.3d 196, 202-203 (3rd Cir. 1995)(employee cannot bring equal protection claim because Rehabilitation Act provides exclusive remedy).

In Bush, 462 U.S. at 374-80, the Supreme Court carefully reviewed Bivens v. Six Unknown Named Agents, 403 U.S. 388 (1971), and its progeny. The Court concluded that it would not create a new judicial remedy for federal employees who were adversely affected for exercising their first amendment rights in light of the elaborate and comprehensive statutory and regulatory scheme governing federal employment, Bush, 462 U.S. at 381-90. Thus, a federal employee cannot pursue a constitutional claim arising out of an employment relationship, "no matter how meritorious" the claim is, nor when the existing remedies do not provide complete relief. Schweiker v. Chilicky, 487 U.S. 412, 423 (1988); Bush, 462 U.S. at 388; Dynes, 720 F.2d at 1498-99; Bolivar, 846 F.Supp. at 167. See also Mitchum v. Hurt, 73 F.3d 30 (3rd Cir. 1995)(in light of Title VII, an employee cannot seek damages for a Bivens claim). This is so because Congress, in the creation of the Civil Service

21

Reform Act, 5 U.S.C. §7101 et seq., with its "elaborate remedial scheme that has been constructed step by step, with careful attention to conflicting policy considerations," Bush, 462 U.S. at 388, is in the best position to balance the conflicting interests in providing job security, protecting employees from discrimination, and maintaining discipline and efficiency in the federal workplace. Id. at 385-89.

Applying these principles, Johnson cannot maintain any of his constitutional claims. Bush, 462 U.S. 367; Waiters v. Parsons, 729 F.2d at 236 n.7; Dynes, 720 F.2d at 1498-99. Nor can Johnson pursue an impairment with contract claim or any other non-Title VII claim. Brown, 425 U.S. at 835; Roth, 952 F.2d at 614-15; DiPompo v. West Point Military Academy, 708 F.Supp. 540, 544-47 (S.D. N.Y. 1989)(citing cases). Accordingly, this Court should dismiss all of Johnson's claims, except for his race discrimination and retaliation claims brought under Title VII.

**B.    Because the Agency Head is the Only Proper Defendant in a Title VII Action, All Other Defendants Should Be Dismissed.**

When a federal employee brings a discrimination claim under Title VII, the only proper defendant is the head of the agency, in his or her official capacity, and no one else. 42 U.S.C. §2000e-16(c); Arizmendi v. Lawson, 914 F.Supp. 1157, 1159 (E.D. Pa. 1996). To permit a plaintiff to take allegations of employment discrimination, then sue individuals in their individual capacity for violations of any number of federal and state statutes (plus tort claims like intentional infliction of emotional distress) would permit a plaintiff to circumvent the Supreme Court's

22

holding in <u>Brown</u>, 425 U.S. at 829-35.  That is, that Title VII is an employee's <u>sole remedy</u> for employment discrimination.  <u>See</u> <u>DiPompo</u>, 708 F.Supp. at 547 (citing cases).  Thus, other than Secretary Principi sued in his official capacity, Raymer Kent, Alice Fidler, Rodney Kiscadden, Irvin Erickson should be dismissed as defendants from this case.

II.    **ALL OF JOHNSON'S TITLE VII CLAIMS, EXCEPT HIS NON-SELECTION CLAIM REGARDING THE HOUSEKEEPING AID POSITION, SHOULD BE DISMISSED DUE TO JOHNSON'S FAILURE TO SATISFY ALL TIME PREREQUISITES OR HIS FAILURE TO EXHAUST HIS ADMINISTRATIVE REMEDIES.**

A.    <u>**The Statutory and Regulatory Preconditions to Filing a Title VII Claim**</u>.

As noted above, Title VII of the Civil Rights Act of 1964, 42 U.S.C. §2000e-16, provides the exclusive means by which a federal employee can raise employment discrimination claims.  <u>Brown</u>, 425 U.S. at 829-35; <u>Robinson</u>, 107 F.3d at 1020. Because an action is against the United States, a government employee alleging discrimination "must bring himself strictly within the terms defined by the sovereign in granting the right to sue." <u>Jones v. Dept. of Health and Human Services</u>, 622 F.Supp. 829, 830 (N.D. Ill. 1985)(citing <u>Sims v. Heckler</u>, 725 F.2d 1143, 1145 (7th Cir. 1983)).  <u>See also</u> <u>National Railroad Passenger Corp. v. Morgan</u>, ___ S.Ct. ___, 2002 WL 1270268 (U.S. June 10, 2002)(discrete claims of discrimination must be submitted to the EEOC within the mandated time lines). Failure to timely exhaust administrative remedies "dooms" a federal employee's Title VII claim, no matter how harsh the consequences.

This rule "draws upon the long-familiar proposition that 'limitations and conditions upon which the Government consents to be sued must be strictly observed and exceptions thereto are not to be implied.'" Id. (quoting Lehman v. Nakshian, 453 U.S. 156, 161 (1981)). See also United States v. Kubrick, 444 U.S. 111, 117-18 (1979); Keene Corp. v. United States, 700 F.2d 836, 841 (2nd Cir. 1983).

Through statutes and regulations, Congress has created an "elaborate remedial system" and "integrated scheme of administrative and judicial review" that is exclusive and pre-emptive. Brown, 425 U.S. at 829; Carter v. Gibbs, 909 F.2d 1452, 1456 (Fed. Cir.1990). The process for raising discrimination claims by federal employees is a "careful blend of administrative and judicial enforcement," with "rigorous administrative exhaustion requirements and time limitations." Brown, 425 U.S. at 833. Importantly, the Supreme Court has admonished courts to "leave the architecture of the federal personnel system to Congress." Carter, 909 F.2d at 1456; Facha v. Cisneros, 914 F.Supp. 1142, 1147-48 (E.D. Pa. 1996). See also Bush, 462 U.S. at 385-390.

Accordingly, federal employees asserting Title VII claims must, as a necessary prerequisite, exhaust their administrative remedies. Brown, 425 U.S. at 832; Robinson, 107 F.3d at 1020-21; McAdams v. Reno, 64 F.3d 1137, 1141 (8th Cir. 1995). This includes timely consulting with an EEO counselor, filing claims in the proper forum, and filing claims within the specified time limits. Robinson, 107 F.3d at 1020-21; McAdams, 64 F.3d at 1141; Blaney v. United States, 34 F.3d 509, 512-13 (7th Cir. 1994); Kwatowski, 917 F.Supp. at 882 (exhaustion includes complying

in a timely manner with the governing regulations)(citing <u>Jenson v. Frank</u>, 912 F.2d

517, 520 (1st Cir. 1990)); <u>Guice-Mills v. Brown</u>, 882 F.Supp. 1427, 1430 (S.D.N.Y.

1995).[9]

"The requirements for processing discrimination claims are complex and merit

careful attention by a claimant." <u>McAdams</u>, 64 F.3d at 1141; <u>Kennedy v. Runyon</u>,

933 F.Supp. 480, 484 (W.D. Pa. 1996).  Generally, an employee must seek relief

from the Equal Employment Opportunity (EE0) department of the employing agency

-- initiating contact with a counselor within 45 days of the allegedly discriminatory

event,[10] filing a formal EEO complaint within 15 days of receipt of the notice of the

right to file such a complaint, and bringing an action in federal court within 90 days

of receipt of notice of final agency action <u>or</u> after 180 days from the date of filing a

complaint when no decision has yet been reached.[11]   42 U.S.C. §2000e-16(c);

---

[9]The purposes of exhaustion requirements are to promote administrative efficiency; to permit the administrative agency to investigate, mediate, and correct its own errors; to encourage settlement of discrimination claims through conciliation and voluntary compliance; to provide courts with the benefit of an agency's expertise; and to serve judicial economy by having the administrative agency compile the factual record.  <u>Robinson</u>, 107 F.3d at 1320; <u>Facha</u> 914 F.Supp. at 1147; <u>Guice-Mills</u>, 882 F.Supp. at 1429.

[10] Under earlier regulations, the mandatory reporting period was 30 days. <u>Robinson</u>, 107 F.3d at 1021 (citing 29 C.F.R. §1613.214(a)(1)(i)(1990)). Presently, the reporting period is 45 days.  29 C.F.R. §1614.105(a)(1) (2002).

[11] Under prior statute, the filing date of a civil action was 30 days; it presently is 90 days.  <u>Forest v. United States Postal Service</u>, 97 F.3d 137, 139-40 (6th Cir. 1996).

29 C.F.R. §§1614.105(a)(1), 1614.106(b).  See also McAdams, 64 F.3d at 1141;

Robinson, 107 F.3d at 1020-21.

**B.    Johnson Did Not Timely Pursue/Exhaust His EEO Remedies on Any of
His Claims Except the Nonselection Claim.**

As noted above, Johnson has pursued four different matters in this

employment case: 1) nonselection for the Extended Care (19-3) Housekeeping Aid

position; 2) hostile work environment re Erickson's comment/bump; 3) retaliation in

processing his Workers Compensation claim; and 4) termination/constructive

discharge.

As to the hostile work environment claim involving Erickson, Johnson received

the VA's final agency decision dismissing his claim on May 10, 2000.  Johnson did

not file an EEOC appeal but, rather, filed this civil lawsuit on October 24, 2000,

which is more than 90 days after Johnson received the adverse final agency

decision.  As to the retaliation claim  involving Workers Compensation, Johnson

received this final agency decision shortly around May 11, 2000. Johnson did not file

an EEOC appeal but, again, filed the current lawsuit on October 24, 2000, which was

more than 90 days after he received the adverse final agency decision.   As such,

both claims should be dismissed.  See Johnson, 64 F.3d at 238; Blaney v. United

States, 34 F.3d 509, 512 (7th Cir. 1994).  See also Robinson, 107 F.3d at 1020-21

(in context of EEOC appeal, employee must file district court action within 30 days

[now 90 days] of the EEOC's decision); Kubricki v. United States, 829 F.Supp. 906

(E.D. Mich. 1993)(as a condition precedent to a Title VII action, the employee had

26

to appeal the MSPB's adverse ruling to the EEOC or a district court within 30 days of the MSPB decision; the employee's untimely appeal to the EEOC thus prevented the employee from pursuing a discrimination claim in district court).

As to Johnson's termination/constructive discharge claim, Johnson never even went to an EEO counselor about his claim, nor did he file a formal EEO complaint. This claim, likewise, is clearly barred due to Johnson's failure to comply with Title VII's administrative requirements.  See Spencer v. Straw, 54 F.3d 196, 202 (3rd Cir. 1995).

III.     **ALTERNATIVELY, SUMMARY JUDGMENT SHOULD BE ENTERED IN THE FEDERAL DEFENDANTS' FAVOR BECAUSE JOHNSON CANNOT ESTABLISH A DISCRIMINATORY ANIMUS TO SUPPORT HIS HOSTILE WORK ENVIRONMENT, RETALIATION, AND CONSTRUCTIVE DISCHARGE CLAIMS.**

Assuming Johnson could still pursue his hostile work environment, retaliation, and constructive discharge claims despite having failed to meet Title VII's time requirements, Johnson still could not prevail on these claims.

Turning first to his hostile work environment claim, a hostile work environment occurs when unwelcome sexual conduct unreasonably interferes with a person's performance or creates an intimidating, hostile, or offensive working.  Meritor Savings Bank FSB v. Vinson, 477 U.S. 57, 65 (1986).  "In order to be actionable, the harassment must be *so severe or pervasive* that it alters the conditions of the victim's employment and creates an abusive environment. Weston v. Pennsylvania, 251 F.3d 420, 425-26 (3rd Cir. 2001)(citing Meritor, 477 U.S. at 67; Spain v.

Gallegos, 26 F.3d 439, 446-47 (3rd Cir. 1994)(emphasis added).  As further noted by the Third Circuit:

> In Harris v. Forklift Sys., Inc., 510 U.S. 17, 114 S.Ct. 367, 126 L.Ed.2d 295 (1993), the Supreme Court clarified the elements of a discrimination claim resulting from a hostile work environment. In order to fall within the purview of Title VII, the conduct in question must be severe and pervasive enough to create an "objectively hostile or abusive work environment--an environment that a reasonable person would find hostile--and an environment the victim-employee subjectively perceives as abusive or hostile." Id. at 21-22, 114 S.Ct. at 370-71. In determining whether an environment is hostile or abusive, we must look at numerous factors, including "the frequency of the discriminatory conduct; its severity; whether it is physically threatening or humiliating, or a mere offensive utterance; whether it unreasonably interferes with an employee's work performance." Id. at 23, 114 S.Ct. at 371. The Supreme Court recently reaffirmed Harris' "severe and pervasive" test in Faragher v. City of Boca Raton, 524 U.S. 775, 783, 118 S.Ct. 2275, 2283, 141 L.Ed.2d 662 (1998), and Burlington Indus., Inc. v. Ellerth, 524 U.S. 742, 753, 118 S.Ct. 2257, 2265, 141 L.Ed.2d 633 (1998).

Weston, 251 F.3d at 426.

In this case, Erickson's conduct on October 13, 18, and 19, 1999, clearly does not amount to an objectively hostile or abusive work environment.  The October 13th conduct was Erickson making a single racial comment -- which he intended to be humorous although it did not turn out  to be so to Johnson.  The October 18th conduct was Erickson going to Johnson's work area, after learning that Johnson was going to file an EEO complaint, to explain that he had not personally made the statement and that he meant no malice.  During this brief conversation, which Johnson refused to enter into, there was, at best, a mere bumping of shoulders by the two men.  The October 19th incident was not even an incident.  Rather, Johnson simply had gone to an area where he knew there would be buffer spray -- but where

Johnson happened to be working -- and he obtained the spray. That Johnson perceived Erickson as harassing him by smiling is not a reasonable reaction.

Thus, what we have is infrequent conduct by a single employee. The conduct was not severe by any stretch of the imagination. The conduct consisted of a single offensive utterance -- with there being no physically threatening conduct (at least not through the eyes of a reasonable person). Further, by October 20, 1999, Erickson had been counseled in writing by his supervisors not to have contact with Johnson unless it was work related and that any future substantiated complaints could result in disciplinary actions. Without doubt, this *de minimis* conduct does not arise to the pervasive and severe conduct required to make out a Title VII claim of a hostile work environment.

Turning to Johnson's retaliation claim regarding the processing of his Workers Compensation claim, to establish discriminatory retaliation under Title VII, a plaintiff must demonstrate that: (1) he engaged in activity protected by Title VII; (2) the employer took an adverse employment action against him; and (3) there was a causal connection between his participation in the protected activity and the adverse employment action. Robinson v. City of Pittsburgh, 120 F.3d 1286, 1299-1300 (3rd Cir. 1997).

To the extent that Johnson had filed an EEO complaint of a hostile work environment, the government agrees that such constitutes a protected activity under Title VII. However, the VA did not take an adverse action against Johnson and there certainly is no evidence of a causal connection between Johnson filing an EEO

certainly is no evidence of a causal connection between Johnson filing an EEO complaint and the Lebanon VAMC controverting or otherwise disputing Johnson's Workers Compensation claims.

Obviously, an employer has a right to dispute an employee's Workers Compensation claim when the employer does not believe the injury suffered is causally connected to an incident at work or the work environment. The VA's disagreement with Johnson's entitlement to benefits is supported by the fact that Johnson has not prevailed at any level in the Department of Labor and the Office of Workers Compensation Programs (OWCP) as to either of his claims. See R. 338-42, R. 373-75. Johnson had more than enough opportunities to submit medical evidence to support his claim that his mental injuries were caused by his employment. See R.338-39, R. 373. Indeed, the record is still devoid of such evidence -- with his own treating physician/psychiatrist previously indicating that Johnson had a pre-existing problem and that he did not know if the injury was caused by his job. R. 255.[12]

Nor does Johnson have any evidence to establish a causal connection between the VA disputing his Workers Compensation benefits and his filing of an

---

[12] As to the issue of the VA "controverting" his CA-1 claim, the record establishes that the VA was correct in doing so due to Johnson's failure to provide the supporting medical documentation -- which was solely his responsibility to do. Regardless, the CA-1 claim was denied so Johnson never would have been entitled to continuation of pay (COP) for a 45-day period. Also, to the extent the claim always should have been submitted as CA-2 form, as Johnson claims, then again there is no harm because Johnson could not receive COP via a CA-2 claim.

controverting and/or disputing the Workers Compensation claims, deny that they ever considered Johnson's race, let alone the fact that he had filed a prior EEO complaint. Johnson has no evidence to establish the contrary and, as such, the VA is entitled to summary judgment o this point.[13]

As a final matter, we note that Johnson's constructive discharge/termination claim has absolutely no evidence to support any possible allegation that the discharge was discriminatory or retaliatory. To the contrary, Johnson's own doctor stated that Johnson could not return to work.

Pursuant to Celotex Corp. v. Catrett, 477 U.S. 317, 322 (1986), Fed. R. Civ. P. 56 "mandates the entry of summary judgment against a party who fails to make a showing sufficient to establish existence of an element essential to that party's case and on which that party will bear the burden of proof at trial." . As the Supreme Court stated in Celotex, a party moving for summary judgment need not, as a matter of course, support its motion with affidavits. The Court reasoned that "the impact of these subsections [Fed. R. Civ. P. 56 (a)-(e)] is that, regardless of whether the moving party accompanies its summary judgment motion with affidavits, the motion

---

[13] An issue of fact is genuine only if the evidence is such that a reasonable jury could return a verdict for the non-moving party. Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 247-248 (1986); Equimark Comm. Finance Company v. CIT Finance Services Corporation, 812 F.2d 141, 144 (3d Cir. 1987). Where the record taken as a whole could not lead a rational trier of fact to find for the non-moving party, summary judgment must be entered in favor of the movants. See Matsushita Elec. Indus. Co. v. Zenith Radio, 475 U.S. 574, 587 (1986). To defeat summary judgment, an opponent cannot merely discredit "the credibility of the movant's evidence; it must produce some affirmative evidence." Big Apple BMW, Inc. v. BMW of North America, Inc., 974 F.2d 1358, 1362-63 (3rd Cir. 1992).

may and should be granted <u>so long as whatever is before the district court</u> <u>demonstrates that the standard for the entry of summary judgment</u>, as set forth in Rule 56(c) <u>is satisfied</u>." 477 U.S. at 323 (emphasis added). Thus, the burden is on Johnson to establish how he has any evidence that could warrant a verdict in his favor on his termination/constructive discharge claim, which burden he cannot meet. Accordingly, the VA is entitled to summary judgment on this claim.

## IV.    JOHNSON HAS NO EVIDENCE THAT DEMONSTRATES THAT THE DECISION NOT TO SELECT HIM FOR THE HOUSEKEEPING AID POSITION ON EXTENDED CARE (19-13) IS PRETEXTUAL.

Title VII prohibits an employer from engaging in race discrimination against an employee. To establish such a claim, the Supreme Court devised a shifting burdens test in <u>McDonnell Douglas Corp. v. Green</u>, 411 U.S. 792 (1973).

Under this test, the plaintiff must first establish a prima facie case of discrimination. To do so he must offer sufficient evidence that he was: (1) a member of the protected class, (2) qualified for the position he sought, and (3) nonmembers of the protected class were treated more favorably. <u>See</u> <u>Ezold v. Wolf, Block, Schorr</u> <u>and Solis Cohen</u>, 983 F.2d 509, 522 (3rd Cir.1993). Once a plaintiff under Title VII establishes a prima facie case, the employer must come forward with a legitimate, non-discriminatory reason for the adverse employment decision. <u>See</u> <u>Texas Dept.</u> <u>of Community Affairs v. Burdine</u>, 450 U.S. 248, 254-56 (1981). If the employer is able to proffer a legitimate, nondiscriminatory reason for its actions, the plaintiff must demonstrate that the proffered reason was merely a pretext for unlawful

discrimination. <u>See</u> <u>Reeves v. Sanderson Plumbing Products Inc.</u>, 530 U.S. 2097 (2000); <u>Goosby v. Johnson & Johnson Medical Inc.</u>, 228 F.3d 313, 318-19 (3rd Cir. 2000).

In this case, plaintiff technically meets the elements of a prima facie case so that the inquiry then turns to why the selecting official made the decision he/she did. As explained by Ms. Fidler, although both men were qualified, she felt that Hull was better qualified, had better people skills, and would fit in better with the team. In that the provision of services was now by product line, so as to encourage team work, Ms. Fidler properly considered that quality in selecting Hull.

Further, Ms. Fidler had been able to observe both applicants -- with Hull having worked on her floor for about five or six weeks while they filled the vacancy. Ms. Fidler preferred Hull because of his experience and initiative, the latter which demonstrated his understanding of the risks of leaving broken items around patients suffering from dementia. While Johnson had previously been a nursing assistant, Hull seemed to be more patient in dealing with the demented patients. For example, the patients on Ms. Fidler's ward would do inappropriate things, such a void in a waste can. Hull would clean it up and not make any remarks while Johnson would verbalize that he thought the staff should more closely watch the patients, which could not always be done.

Johnson has no evidence to demonstrate that Ms. Fidler's decision was pretextual -- with himself never having seen Ms. Fidler discriminate against other African-Americans or make any discriminatory statements about Johnson's race or

33

anyone else's race.  SMF 60.  Having no evidence, therefore, Johnson relies on a statement that Ms. Fidler  supposedly had made years earlier.

Specifically, Randall Houck, a former subordinate of Ms. Fidler, supposedly heard Ms. Fidler say "back in the early 90's" -- when a fellow wanted to come from Housekeeping into Nursing -- that she did not want any more of them on the floor. Houck took this statement to mean that she did not want this individual because he was black.  Houck also stated that Peggy Cromer, a VA employee commented that Ms. Fidler was close to discriminating against the individual and that she should back off.  Houck testimony from EEOC hearing.  SMF 52-53.

In response, Ms. Fidler has denied ever making that statement in any form at all.  Ms. Cromer cannot recall hearing Ms. Fidler making that statement; further, she did not recall Ms. Fidler making any disparaging remarks against African-Americans. Likewise, Wanda Miller, who Houck said was present when Ms. Fidler made the alleged statement, stated that she had not heard anyone, particularly Ms. Fidler, make any statements that they were trying to maintain a racial balance or that she did not want to hire too many African-Americans.  Further, Ms. Kohr, who assisted Ms. Fidler in the selection process, stated that she had never heard Ms. Fidler make any statements that she did not want to hire too many blacks.  SMF 54-57.

This one statement, made years before the Housekeeping Aid selection in mid-1998, which is not supported by a single person, simply is too vague, attenuated, and distant in time to support finding that Ms. Fidler's selection of Hull over Johnson was discriminatory.  Nor is there any pattern of discriminatory conduct

between the statement and the selection decision to establish any sort of causal link. See Woodson v. Scott Paper Co., 109 F.3d 913, 920-21 (3rd Cir 1997)(discussing that two-year temporal gap between the protected activity and the termination supported causal link due to pattern of harassment during the time period ). Employees simply should not be able to pursue discrimination claims based upon one person's wisp of a recollection of a single statement made years earlier -- with absolutely no supporting evidence.

In sum, Johnson does not have any evidence upon which a reasonable jury could believe that Ms. Fidler's selection decision is pretextual. Accordingly, summary judgment should be entered in favor of the VA.

Respectfully submitted,

THOMAS A. MARINO
United States Attorney

KATE L. MERSHIMER
Assistant U.S. Attorney
228 Walnut St., 2nd Fl.
P.O. Box 11754
Harrisburg, PA 17108-1754
717-221-4482

Date: June 12, 2002

# IN THE UNITED STATES DISTRICT COURT
## FOR THE MIDDLE DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| **LEWIS JOHNSON,** | : | |
| **Plaintiff** | : | **No. 1:CV-00-1873** |
| | : | |
| **v.** | : | **(Judge McClure)** |
| | : | |
| **ANTHONY PRINCIPI, Acting Secretary of** | : | |
| **Veterans Affairs; et al.,** | : | |
| **Defendants** | : | |

## CERTIFICATE OF SERVICE

The undersigned hereby certifies that she is an employee in the Office of the United States Attorney for the Middle District of Pennsylvania and is a person of such age and discretion to be competent to serve papers.

That this 12th day of June, 2002, she served a copy of the attached

## FEDERAL DEFENDANTS' BRIEF IN
## SUPPORT OF THEIR MOTION FOR SUMMARY JUDGMENT

by placing said copy in a postpaid envelope addressed to the person hereinafter named, at the place and address stated below, which is the last known address, and by depositing said envelope and contents in the United States mail at Harrisburg, Pennsylvania.

Addressee:

Andrew J. Ostrowski, Esquire
4311 North Sixth Street
Harrisburg, PA 17110

KATE L. MERSHIMER
Assistant U.S. Attorney