● **ORIGINAL** ●

## IN THE UNITED STATES DISTRICT COURT
## FOR THE MIDDLE DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| **LEWIS JOHNSON,** | : | |
| **Plaintiff** | : | **No. 1:CV-00-1873** |
| | : | |
| **v.** | : | **(Judge McClure)** |
| | : | |
| **ANTHONY PRINCIPI, Secretary of Veterans Affairs;** | : | |
| **RODNEY KISCADDEN; ALICE FIDLER;** | : | |
| **PEG WINTERS; IRVIN ERICKSON;** | : | **FILED** |
| **RAYMER KENT; and AMERICAN    FEDERATION** | : | HARRISBURG, PA |
| **OF GOVERNMENT EMPLOYEES LOCAL 1966,** | : | |
| **Defendants** | : | JUN 1 2 2002 |

MARY E. D'ANDREA, CLERK
Per _____
Deputy Clerk

### FEDERAL DEFENDANTS'
### STATEMENT OF MATERIAL UNDISPUTED FACTS

Federal defendants, Anthony Principi,[1] the Secretary of Veterans Affairs, plus

Raymer Kent, Alice Fidler, Rodney Kiscadden, Irvin Erickson, by their counsel and

pursuant to Local Rule 56.1, hereby submit the following statement of material

undisputed facts in support of their motion for summary judgment.   Plaintiff is

advised that pursuant to Local Rule 56.1, all facts set forth in this statement will be

deemed admitted unless controverted by plaintiff with references to the record

supporting plaintiff's position.

**Non-Selection Claim**

    1.    Johnson was an employee of the Department of Veterans Affairs ("VA")

at its Lebanon Medical Center, known as the Lebanon MCVA.

---

[1] Pursuant to Fed. R. Civ. P. 25(d)(1), Anthony Principi, Secretary of the
Department of Veterans Affairs, has been substituted for Hershel W. Gober.

2.    Johnson had been a Housekeeping Aid at the Wage Grade 2 level and had been working in the Environmental Management Services ("EMS").

3.    By way of background, medical services used to be provided by "service lines," such as nursing services, medical services, psychiatry services, and social work services.  The VA then switched to "product lines," such as extended care, acute care, and the like.  Under product lines, employees in different fields (such as nursing, social work, etc.) fall within a product line, with hiring decisions being made by product line.  R. 1, 11 (Kent Decl., ¶4; Umlauf-Flashel Decl., ¶4).

4.    Before going to "product lines," housekeeping aids worked within the Environmental Management Service ("EMS").  They were then assigned to work in various units.  A group of housekeepers were assigned to work in common areas. R. 2, 17 (Kent,  ¶5; Umlauf-Flashel, ¶5).

5.    When the VA switched to "product lines," housekeepers working on a particular unit were assigned to the product line their unit fell within.  For example, if a housekeeper worked in the subacute unit, the housekeeper was assigned to the extended care product line, which is where the subacute unit fell.  Those housekeepers who worked in common areas, however, stayed within EMS.  R. 2, 17 (Kent,  ¶6; Umlauf-Flashel, ¶6).

6.    In 1998, a full time position for a Housekeeping Aid at Wage Grade 2 in the Extended Care (19-3) product line was posted so that individuals could apply for the position.  The phrase "19-3" meant the opening was in Building 19, 3rd floor. R. 2, 12 (Kent,  ¶7; Umlauf-Flashel, ¶7).

2

7.    The Extended Care (19-3) Housekeeping Aid position was posted under the provision of the Open and Continuance Vacancy Announcement and the VA/AFGE Master Agreement. R. 2, 12 (Kent, ¶8; Umlauf-Flashel, ¶8).

8.    The Master Agreement is the contract entered into by the Department of Veterans Affairs  and the American Federation of Government Employees union. R. 2, 12 (Kent, ¶9; Umlauf-Flashel, ¶9).

9.    The Master Agreement is supplemented by local agreements between the various VA centers and the local unions.  As to the Lebanon VA Medical Center, it had a Local Supplemental Labor Management Agreement between itself and Local 1966 of the AFGE. R. 2, 12 (Kent, ¶10; Umlauf-Flashel, ¶10).

10.    Due to certain positions being either entry level positions, frequently turned over positions, or requiring specific degrees (e.g. librarian), the VA Medical Center negotiates yearly with the local union to post job openings on the "Open Continuous" list. R. 3, 13 (Kent, ¶11; Umlauf-Flashel, ¶11).

11.    Under the Open Continuous list, individuals can advise the Human Resources Department of any positions they would be interested in and submit an application for any such positions -- with the individuals remaining on the list for the entire year.  Should a position actually become open, the Human Resources Department then notifies those individuals on the Open Continuous list of the opening and asks if the individual is interested in filling the particular position.  If the individual is interested in the opening, the Human Resources Department places the

3

individual on a list of applicants (if they qualify).  R. 3, 13 (Kent,  ¶12; Umlauf-Flashel, ¶12).

12.     When a position is placed on an Open Continuous list, any actual job opening is posted on a bulletin board for a brief period of time.  At that time, anyone else who sees the notice of the opening can apply if they like. R. 3, 13 (Kent, ¶13; Umlauf-Flashel, ¶13).

13.     If a position is not on the Open Continuous list, the union contract requires the job opening to be posted for three weeks, with an additional one-week period for supplementation.   By placing various job positions on the Open Continuous list, therefore, vacant positions can be filled much more quickly. Likewise, individuals interested in particular positions need only complete one application -- rather than an application for each opening. R. 3, 13 (Kent,  ¶14; Umlauf-Flashel, ¶14).

14.     Housekeeping Aid positions are one of the many positions placed on the Open Continuous list. R. 3, 14 (Kent,  ¶15; Umlauf-Flashel, ¶15).

15.     The Master Agreement between the VA and the national union addresses many topics, which are broken out into articles.  Relevant to Lewis Johnson's claims against the VA, Article 12 addresses "Details, Reassignments, and Temporary Promotions" and Article 22 addresses "Merit Promotion." R. 4, 14 (Kent, ¶16; Umlauf-Flashel, ¶16).

16.     Under Article 12, Section 10, reassignments are the moving of a person from one position to another, which are not to be used as punishment, harassment,

4

or reprisal. Reassignments under Article 12 occur in management-driven situations where there are staff reductions and/or positions that are being eliminated; therefore, these reassignments in this context are frequently involuntary. R. 4, 14 (Kent, ¶17; Umlauf-Flashel, ¶17).

17.    With the Lebanon VA Medical Center, reassignments caused by reductions in force ("RIF") under Article 12 are done based on seniority. Under Article 12 of the Local Supplement, seniority is defined as the employee's most recent entrance on duty as an employee of the Lebanon VAMC, with various "tie breakers" then identified. R. 4, 14 (Kent, ¶18; Umlauf-Flashel, ¶18).

18.    Article 22, sections 8 through 12, of the Master Agreement addresses vacancy announcements and competitive selection procedures, which is used for most position openings. (It does not apply, however, to shift changes and relocations, which is covered by Article 12).[2] All positions competitively filled under Article 22 are posted. See R. 42 (Article 22, Section 8, ¶A). R. 5, 14 (Kent, ¶19; Umlauf-Flashel, ¶19).

19.    Further, positions on the Open Continuous list are filled competitively under Article 22 with Open Continuous Announcements considered posted at all

---

[2] For example, if there is a nursing vacancy in the day shift in a unit within Acute Care, the vacancy will be posted and other nurses of the same wage grade within that unit -- but working a different shift -- can request to fill the position. If more than one nurse requests to fill that position pursuant to Article 12, Section 6 of the Master Agreement, the nurse with the most seniority typically is selected (although there can be exceptions to that). This is formally known as a Shift Change and Relocation, with the selection process of relying heavily on seniority being a past practice. R. 5, 15 (Kent, ¶19; Umlauf-Flashel, ¶19).

5

times.  See R. 45 (Article 22, Section 8, ¶H.2).  When a particular vacancy on the Open Continuous list actually will be filled, a notice of the opening and the deadline for submitting applications is posted.  R. 5, 15 (Kent, ¶20; Umlauf-Flashel, ¶20).

20.    Article 22 of the Local Supplement further defines the time limits and posting of positions under the Open Continuous announcements.  R. 5, 15 (Kent, ¶21; Umlauf-Flashel, ¶21).

21.    Under the competitive selection procedures of Article 22 of the Master Agreement, it is possible to have three effects on the employees: (1) where the new position is a promotion (a higher pay grade);  (2) the new position is a reassignment (no change in pay); and  (3) the new position is a change to a lower grade (decrease in pay).  As a result, when there is a vacancy, there may be three lists, or referral certificates, of employees: promotion eligibles, reassignment eligibles, and change to lower grade eligibles.    R. 5, 15 (Kent, ¶22; Umlauf-Flashel, ¶22).

22.    Should it ultimately turn out that only a list of reassignment eligibles is referred to the decision maker, merit promotion procedures under Article 22 still apply under the Open Continuous Announcement.  Such a list would not be a situation viewed as an involuntary reassignment or RIF (reduction in force) where seniority would be the only deciding factor.    R. 6, 16 (Kent, ¶23; Umlauf-Flashel, ¶23).

23.    The Housekeeping Aid position on Extended Care (19-3) that Johnson applied for was pursuant to an Open Continuous Announcement.  As such, the position was filled competitively under Article 22 and seniority was not the deciding

6

factor. Ronald Hull was selected to fill this vacancy. R. 6, 16 (Kent, ¶24; Umlauf-Flashel, ¶24).

24.    When Hull was selected for the Extended Care (19-3) Housekeeping Aid vacancy, Johnson believed that he (Johnson) should have been selected solely on the basis of his seniority alone. Johnson was mistaken and seniority was <u>not</u> the sole selection criteria. Rather, the selection was based on competitive selection principles under Article 22 and the Open Continuous list. R. 6, 16 (Kent, ¶25; Umlauf-Flashel, ¶25).

25.    Johnson also believed that a prior Memorandum of Understanding entered into by Union President Peg Winters and Lebanon VAMC Acting CEO Timothy Shea should control the selection process. Again, Johnson was mistaken, with that Memorandum of Understanding having been created for a reduction in force (RIF) that the VA previously had anticipated occurring. This Memorandum of Understanding was not an unending agreement but, rather, was specifically designed for persons who would be displaced as the result of that RIF. (This RIF occurred in June 1997). R. 6, 16 (Kent, ¶26; Umlauf-Flashel, ¶26); R. 55-58 (Winters Tr.) & R. 63.

26.    In 1998, Johnson applied for a Housekeeping Aid WG-2 position on Extended Care (19-3), i.e., Building 19, 3rd Floor, the Extended Care Product Line.

27.    Focusing on the selection process for the Housekeeping Aid WG-2 position on Extended Care (19-3), this position was on the Open Continuous list. Lewis Johnson, Ronald Hull, and other VA employees, all who had  Wage Grade 2

positions, indicated that they were interested in filling this vacancy. Johnson and Hull were Housekeeping Aids with the other employees being Food Service Workers. R. 17 (Umlauf-Flashel, ¶27).

28.    The opening was posted in early June 1998 and closed on June 9, 1998.

29.    Thereafter, the applicants' KSAOs (written questions and answers addressing knowledge, skills, abilities, and other factors) were reviewed by a three-person panel so that the applicants could be scored and ranked. Umlauf-Flashel, a Human Resources Specialist, was on this panel as the Human Resources representative, with there also being a representative from the union and a subject matter expert on the panel. R. 17 (Umlauf-Flashel, ¶29).

30.    After rating the ten applicants, nine names were referred to the Manager of the product line. The decision on who to select would then be delegated to the Nurse Manager. In this case, the Nurse Manager of Extended Care (19-3) was Alice Fidler. R. 17 (Umlauf-Flashel, ¶30).

31.    In making her decision, Ms. Fidler was not required to select the candidate who had the most seniority since the selection was being made under Article 22's merit selection provisions. There was no requirement that the applicants be interviewed. The only rule was that if one individual was interviewed, all applicants had to be interviewed. R. 17-18 (Umlauf-Flashel, ¶31).

32.    On July 8, 1998, Umlauf-Flashel sent the list of referred eligibles (who all happened to be eligible for reassignment since they all held Wage Grade 2

8

positions) to the Extended Care Manager. [Note: The list of referred individuals contains handwritten entries after each name indicating the individual's race. This information was added upon the request of the EEO officer <u>after</u> the selection process and after Johnson had filed an EEO claim of discrimination.] R. 18 (Umlauf-Flashel, ¶32); R. 93.

33.    On July 15, 1998, Ms. Fidler sent back her selection, which was Ronald Hull. R. 18 (Umlauf-Flashel, ¶33); R. 93.

34.    As to Hull, he initially had been employed as a Housekeeping Aid in EMS. Hull initially was a permanent employee of the VA although he worked part-time. R. 18 (Umlauf-Flashel, ¶34).

35.    The month before the Extended Care (19-3) vacancy had been posted, an Extended Care (Floater) position was posted. A floater is an individual who works in various locations of a product line -- depending on where the need is on any given day. R. 18 (Umlauf-Flashel, ¶35).

36.    Hull was selected to fill this vacancy in Extended Care in the latter part of May 1998 by Beulah Hadrick, Ms. Fidler's supervisor. R. 18 (Umlauf-Flashel, ¶36); R. 73-76 (Fidler Depo.).

37.    Hull was formally released to this position on June 7, 1998. By obtaining this position, Hull remained a permanent VA employee but now worked full-time. R. 19 (Umlauf-Flashel, ¶37).

38.    Whether Hull had been a part-time or a full-time employee at the time the Extended Care (19-3) opening became available, he still would have been

9

eligible for the position in that he was a permanent VA employee.  R. 19 (Umlauf-Flashel, ¶38).

39.    The selecting official for the Housekeeping Aid position on Extended Care (19-3), as noted above, was Alice Fidler, the Nurse Manager.  R. 68-70 (Fidler Tr.).

40.    Under the product lines, which had started in the spring of 1998, Ms. Fidler was the team leader of Extended Care (19-3) and now was in charge of the housekeepers, the physician assistants, the ward secretary, and, of course, the nurses.  Id.

41.    Prior going to product lines, a housekeeping position would have been filled by the EMS.  R. 71, 74-75 (Fidler Tr.).

42.    Due to the opening in Extended Care (19-3), Hull, one of the applicants for the position, was able to work for five or six weeks on the day shift on Extended Care (19-3), such that Ms. Fidler had been able to observe his work.  R. 72-76 (Fidler Tr.).  Ms. Fidler also had been able to observe Johnson somewhat when he had worked in her unit as a floater.  R. 84-85 (Id.).

43.    When Ms. Fidler received the list of referred applicants from Personnel, she focused most closely on Hull and Johnson because they both had housekeeping experience and they were trained.  R. 78, 80-81 (Id.).

44.    Ms. Fidler decided not to interview applicants because if you interviewed one, you had to interview all.  Since she and Barbara Kohr, a Nurse Manager on the Hospice Unit who was assisting her in rating the applicants, were both familiar with

10

Hull and Johnson's work and they were the only two people with experience, there was no need to interview everyone.  R. 87-88 (Id.).

45.    Ms. Fidler and Ms. Kohr, focusing on Hull and Johnson, then rated the two men based on their KSAOs, Supplementals (more specific information on housekeeping), and their (Fidler and Kohr's) float observations of them.  R. 82-85, 89-90 (Fidler Tr.); R. 94; R. 101-103 (Kohr Affid.).

46.    Ms. Fidler did not consider seniority as a factor; rather, she viewed her job as to pick the best qualified person.  R. 83-84 (Fidler Tr.).

47.    Ms. Fidler selected Hull because of his experience and initiative, the latter demonstrating understanding of the risks of leaving broken items around patients suffering from dementia.  R. 85-86 (Id.).

48.    While Johnson had previously been a nursing assistant, Hull seemed to be more patient in dealing with the demented patients.  For example, the patients on her ward would do inappropriate things, such a void in a waste can.  Hull would clean it up and not make any remarks while Johnson would verbalize that he thought the staff should more closely watch the patients, which could not always be done.  R. 86-87 (Id.).

49.    In sum, Ms. Fidler thought Hull was best qualified and would fit in better with the team -- with the point of product lines being to build a team.  Ms. Fidler thought Hull had better people skills.  Id.

50.    In making her selection, Ms. Fidler did not use race at all.  R. 39.

51.    Likewise, Ms. Kohr, who had assisted Ms. Fidler in the selection process, did not consider Johnson's race when selecting Hull. Rather, she relied on Hull's 17 years of experience in housekeeping, the necessity of things truly being clean and just not looking clean, and the need to communicate to accomplish his job safely. R. 103-105 (Kohr Affid.).

52.    Plaintiff's only allegation of any discriminatory animus on Ms. Fidler's part rests upon one statement by a Randall Houck, a former subordinate of Ms. Fidler.

53.    According to Houck, he heard Ms. Fidler say "back in the early 90's" -- when a fellow wanted to come from Housekeeping into Nursing -- that she did not want any more of them on the floor. Houck took this statement to mean that she did not want him because he was black. Houck also stated that Peggy Cromer, a VA employee commented that Ms. Fidler was close to discriminating against the individual and that she should back off. R. 123-127 (Houck EEOC testimony).

54.    Ms. Fidler has denied ever making that statement in any form at all. R. 91.

55.    Ms. Cromer cannot recall hearing Ms. Fidler making that statement; further, she did not recall Ms. Fidler making any disparaging remarks against African-Americans. R. 112-113 (Cromer Statement under Oath).

56.    Likewise, Wanda Miller, who Houck said was present when Ms. Fidler made the alleged statement, stated that she had not heard anyone, particularly Ms.

Fidler, make any statements that they were trying to maintain a racial balance or that she did not want to hire too many African-Americans. R. 118-119 (Miller Affid.).

57.    Further, Ms. Kohr stated that she had never heard Ms. Fidler make any statements that she did not want to hire too many blacks. R. 105.

58.    When asked why he thought Ms. Fidler did not select him because of his race, Johnson testified that he based that on her conversation with him -- that she did not think he (Johnson) worked as well with the patients and would not fit in with the team. Johnson did not think that was a basis for the job. R. 135-138.

59.    Further, to the extent that anyone supported Ms. Fidler's nonselection of him, then they were a party to his complaint of discrimination -- with there being a conspiracy among the VA Secretary, the union and its president, and Mr. Kent to have the position filled competitively. R. 139. Johnson has no evidence to support his vague allegation.

60.    Otherwise, Johnson has never seen Ms. Fidler discriminate against other African-Americans or make any discriminatory statements about Johnson's race or anyone else's race. R. 140.

61.    Johnson filed an EEO complaint concerning his nonselection for the Housekeeping Aid position on Extended Care (19-3). Having been unsuccessful at the administrative level, including the July 27, 2000 decision by the EEOC denying his appeal, Johnson filed the present lawsuit.

## Racially Hostile Work Environment

62.    On October 13, 1999 as he walked through a hallway, Johnson came upon Irv Erickson and Lewis Chandler, two fellow Housekeeping Aids in EMS.  R. 129-130.

63.    Johnson states that Erickson stopped him and told him that he (Erickson) wanted to tell him what people were saying about him.  Although Johnson says that he told Erickson that he did not want to hear it, Erickson told him that people are saying you are a white man in black skin.  R. 129-130.

64.    Before this time, Erickson and Johnson had interacted professionally -- joking around a bit during morning meetings.  Sometimes Johnson and Erickson would speak in the hallways but most of it was on a professional level and occasionally on a joking or laughing level.  On one occasion, though, Johnson said that Erickson had belittled his work.  R. 131-133.

65.    Erickson admitted to making the statement to Johnson although he stated that they had been kidding around and that what he said was not "people" but Johnson's "brothers," i.e. black VA workers.  Erickson did not say that this was his point of view and he had no ill feeling against Erickson.  Erickson further stated that he had been joking and kidding around and that he had joked in the past with Johnson.  R. 160-165; R. 185.

14

66.    Erickson's long-time partner, Chandler, who is black, also stated that he had heard Erickson make the statement but that this was not a personal opinion of Erickson's.  R. 186; R. 190.

67.    A few days later, Erickson heard from Chandler that Johnson was going to file an EEO complaint against him.  R. 165.

68.    On October 18, 1999, Erickson went to the ward where Johnson was working to talk to Johnson and to explain what he had said -- that the comment had not come from him.  R. 166, R. 185.

69.    Erickson said that he called out to Johnson that he wanted to talk to him and to ask what was going on but that Johnson went into the nurses' bathroom at the clerk's office and locked the door.  Erickson provided a statement that no malice was intended.  R. 167-168; R. 185; R. 187.

70.    There is a dispute whether during this October 18, 1999 conversation whether Erickson touched Johnson.  Erickson on one occasion said that he had no contact with Johnson and on another occasion, stated that they slightly bumped into each other.  R. 167, 174-75; R. 185.  Johnson said, in contrast, that Erickson came up to him and for about 15 feet bumped his shoulder with Johnson's shoulder as he (Erickson) asked Johnson why he would not talk to him.  This bumping only caused Johnson to stumble at first and then he walked off.  R. 133-134.

71.    On the same day, October 18, 1999, Johnson submitted a "Report of Contact," which is a VA form, stating that he had been harassed by Erickson's action

of stating that he (Erickson) wanted to talk to Johnson and asking why Johnson would not talk to him -- including the shoulder bump. R. 188-189.

72.    Also on that day, Johnson saw an EEO counselor and claimed that Erickson had made a racial remark about him on October 13, 1999. R. 195. [Parenthetically, Johnson also claimed race discrimination had occurred previously regarding a monetary team award and a 4-hour time off award. Id. During his deposition, however, Johnson withdrew both of those claims. R. 141-148.

73.    On October 18, 1999, Johnson's and Erickson's supervisor, Ronald Kiscadden, met with Erickson to talk about the two incidents with Johnson. Erickson admitted that he had made the October 13, 1999 statement but that he was only repeating what someone else had said. As to the October 18, 1999 incident, Erickson explained that he was only trying to talk to Johnson and that Johnson was avoiding him. R. 191.

74.    The following day, on October 19, 1999, Erickson went to the work area/ supply closet of Susie Habecker so that he could obtain some spray buff, which he knew would be there. The spray buff was not in the closet so Erickson went into the shower room, the next door down, where he found the spray and filled his bottle. Johnson happened to be working in that area at that time but Erickson did not know it. Erickson did see Johnson, however. R. 168-169.

75.    The following day, on October 20, 1999, Kiscadden and his supervisor, Mrs. Carolyn McGuigan, met personally with Erickson and advised him to stay away from Johnson. Erickson was counseled that he should have no contact with

16

Johnson in the future unless it was work related and that any future substantiated complaints could result in disciplinary actions. Kiscadden stated that Erickson was given this counseling on October 20, 1999, but that he could not explain why Erickson had signed it on November 15, 1999. R. 172-173, R. 175, R. 179, R. 182-183; R. 192.

76.    Concerning the October 18, 1999 Report of Contact form (form 119) that Johnson had submitted about Erickson talking to him and bumping him on October 18, 1999, Johnson sent a letter to Mrs. McGuigan on November 16, 1999 asking what action had taken place. R. 193. Johnson was told in a November 17, 1999 letter that the issues had been addressed and action had been taken to ensure the conduct would not be repeated. R. 194.

77.    As noted above, Johnson saw an EEO counselor on October 18, 1999 about the October 13, 1999 statement by Erickson. On November 17, 1999, Johnson was advised by the EEO counselor that she was closing the informal counseling on his claim of harassment by a co-worker that his supervisor allegedly had done nothing about and that he could file a formal EEO complaint if he desired. R. 195-200.

78.    Johnson did file a formal EEO complaint on December 20, 1999, which complaint was docketed as 200H-1532. Johnson alleged that the actions of Erickson amounted to a racially hostile work environment and that management had not taken any action to prevent the discrimination. R. 201-204.

79.    On May 9, 2000, the VA dismissed Johnson's harassment claim concerning Erickson in that the allegations did not cause Johnson to be "aggrieved" as required by the Title VII regulations.  R. 205-206.

80.    In the letter dismissing this claim, Johnson was notified that the letter constituted the final agency decision and that he had a right to appeal the decision to the EEOC within 30 days.  Johnson also was advised that if he did not file an EEOC appeal, he could file a civil action in district court within 90 days of receipt of the final decision; or, if he did file an EEOC appeal, he could file a civil action in district court within 90 days of the EEOC decision or after 180 days from the date of filing the EEOC appeal if no decision had been rendered.  Johnson was also told in bold, capital letters that if he filed a civil action under Title VII, the civil action "**MUST BE FILED WITHIN NINETY (90) CALENDAR DAYS** of the date of receipt of this final agency decision...."  R. 207-209.

81.    Johnson received the final agency decision on May 10, 2000.  R. 149.

82.    Johnson does not recall filing an EEOC appeal of this adverse decision and there is no evidence that Johnson did anything other than file this civil lawsuit. R. 150.

83.    Johnson filed this civil action raising the racial hostile work environment claim regarding Erickson and management's response to that matter on October 24, 2000, which is more than 90 days after Johnson received the adverse final agency decision.  See Complaint.

18

84.    Johnson's hostile work environment claim, therefore, is time barred.

**Alleged Interference with Workers Compensation Benefits**

85.    Shortly after the incident where Erickson bumped Johnson, Johnson went out on sick leave and sought Workers Compensation benefits.  To do that, Johnson would have to complete the appropriate paperwork so that the application could be submitted to the Officer of Workers Compensation Program ("OWCP").  R. 7, 20 (Kent. Decl., ¶30; Stuckey Decl., ¶¶4-5).

86.    When seeking Workers Compensation benefits, there are two types of forms that can be submitted by an employee.  One form is a CA-1 form, which is for a traumatic injury.  The other form is a CA-2 form, which is for an occupational illness or disease.  R. 7, 21 (Kent, ¶31; Stuckey, ¶6).

87.    Typically, a traumatic injury is a one-time incident.  It is immediate or time sensitive and results in an immediate impact to the employee.  It could result in a physical injury (i.e. tripping over a 2 x 4 board in a hallway) or psychological (i.e. September 11th).  R. 7, 21 (Kent, ¶32; Stuckey, ¶7).

88.    With an occupational illness or disease, it typically occurs over a period of time — such as long term exposure to tuberculosis where the employee eventually tests positive for the illness.  R. 8a, 21 (Kent, ¶33; Stuckey, ¶8).

89.    An emotional trauma suffered from harassment can be either an occupational illness or a traumatic injury depending on the particular facts.  The harassment can occur over a period of time where the employee eventually reaches

a point that he/she cannot take it anymore (occupational) or can be a one-time incident that causes an immediate trauma (traumatic).  R. 8a, 21 (Kent, ¶34; Stuckey, ¶9).

90.    When a CA-1 traumatic injury form is filed, an employee is entitled to receive continuation of pay (known as COP) for 45 days.  If the CA-1 claim is eventually denied, then the employee will have to use sick or annual leave to reimburse the VA for the COP.  R. 8a, 22 (Kent, ¶35; Stuckey, ¶10).

91.    Pursuant to regulations, the VA may "controvert" a CA-1 claim in certain situations.  In such cases, the employee is not entitled to receive COP.  R. 8a, 22 (Kent, ¶36; Stuckey, ¶11).

92.    If a CA-2 form for an occupational illness is completed for Workers Compensation benefits, the employee is not entitled to received COP.  R. 8a, 22 (Kent, ¶37; Stuckey, ¶12).

93.    On or about October 26, 1999, Johnson came to the Human Resources Department to submit a Workers' Compensation claim and Joseph Stuckey, a Human Resources Specialist who handled Workers Compensation claims, assisted Johnson in completing the paperwork.  R. 8a, 22 (Stuckey, ¶13; Kent, ¶38).

94.    By way of general background, in 1998, the VA had started the process in going to a "paperless" claim format.  In other words, either a CA-1 or a CA-2 form would be electronically prepared and then electronically transmitted to the Department of Labor for processing.  At the time Johnson came to submit a Workers Compensation claim, the form would be electronically prepared but could not be

electronically transmitted. As such, after the form was completed by the employee and his/her supervisor, Stuckey would have to print the form and then fax it to the Office of Workers Compensation ("OWCP"), Department of Labor, in Philadelphia, Pennsylvania. R. 22 (Stuckey, ¶14).

95.    It was Stuckey's opinion, based upon his conversation with Johnson, that a CA-1 traumatic injury form should be submitted for Johnson in that Johnson's claim of injury centered on the alleged physical assault incident by Erickson on October 18, 1999. Accordingly, Stuckey assisted Johnson in filing a CA-1 form for benefits. R. 23 (Stuckey, ¶15); R. 225-<u>226</u>.

96.    Stuckey's opinion was bolstered by Johnson's entries in the CA-1 form that the cause of injury had been a physical assault by another employee that had occurred on October 18, 1999, at 10:20 a.m. in Building 1-3a. R. 23 (Stuckey, ¶16); R. 225.

97.    On a related point, after Stuckey assisted Johnson in preparing his CA-1 claim, Stuckey learned that Johnson had also claimed that five days before the alleged assault that Erickson had made a racially insensitive remark to Johnson. This information did not alter Stuckey's belief that the CA-1 form was the proper form for Johnson to use in seeking Workers Compensation benefits. R. 27 (Stuckey, ¶17).

98.    In submitting any Workers Compensation claim, it is Stuckey's responsibility to provide the OWCP with information relevant to the claim -- be that

evidence supporting or questioning whether the claim was work related.  R. 27 (Stuckey, ¶18).

99.    On November 1, 1999, Stuckey submitted Johnson's CA-1 form with attachments.  R. 224-251.  With that CA-1 form, Stuckey submitted a letter to the OWCP indicating that the VA was controverting Johnson's claim.  R. 227-228. Stuckey also noted some factual discrepancies as follows:  While a confrontation had occurred between Erickson and Johnson -- with words exchanged -- neither a witness observed an assault, nor did a subsequent police investigation find evidence to support that an actual assault had occurred.  Further, management had directed Erickson to have no contact with Johnson and that Erickson would not be assigned to work in proximity to Johnson's work area.   Johnson  was  reassured  that  the situation had been neutralized.  R. 8b, 23 (Stuckey, ¶19; Kent, ¶40).

100.   In his letter, Stuckey noted that Johnson had seen his primary care physician, who had recommended counseling.  Additionally, Johnson had entered into an Acute Partial Day Hospital Program at Philhaven and had provided a letter from Dr. Pakola that Johnson was unable to work until further notice.  Johnson had failed, however, to provide medical documentation to support his allegation of traumatic injury.  Stuckey then noted that upon review of the information, it could not be concluded that there was a causal relationship between the Erickson incident and Johnson's counseling.   R. 8b, 24 (Stuckey, ¶20; Kent, ¶41); R. 228.

101.   Raymer Kent, the Human Resources Manager for the Lebanon VAMC reviewed this letter prior to Mr. Stuckey sending it to the OWCP and concurred with Mr. Stuckey's statements and assessment.  R. 9 (Kent, ¶42).

102.   As to controverting the CA-1 application for Workers Compensation benefits, this was done because Johnson had not provided medical documentation to support his claim that the Erickson incident had caused a traumatic injury.  Rather, Stuckey only had Dr. Brinser's prescription slip excusing Johnson from work through October 25, 1999, and recommending counseling and Dr. Pakola's October 22, 1999 letter advising that Johnson had been admitted to the Philhaven Acute Partial Day Hospital Program.   There was no documentation that Johnson had suffered a traumatic injury related to the Erickson incident at the Lebanon VAMC.  R. 9, 24 (Stuckey, ¶21; Kent, ¶43); R. 240-242, 246.

103.   It is the employee's burden to provide supporting documentation of which Johnson had been advised on October 26, 1999.  R. 9, 24 (Stuckey, ¶22; Kent, ¶43).

104.   Specifically, on October 26, 1999, when Johnson came to Stuckey's office for assistance in filing his Workers Compensation claim, Stuckey reviewed three forms with Johnson and discussed the provisions of each.  One was an "Orientation and Election of a Physician," where Stuckey and Johnson discussed Johnson's rights and benefits.  In that form, Johnson designated his primary care physician, Dr. Brinser, as the treating physician for his mental stress injury sustained on October 18, 1999.  R. 25 (Stuckey, ¶23); R. 222.

23

105.   Another form reviewed concerned the issues of outside employment and Johnson's obligation to perform light-duty work when able.  R. 25; R. 221.

106.   The third form reviewed was the "Injured Employee's Notification of Responsibilities."  Under paragraph 5 of this form, Johnson was notified that he had to promptly provide medical documentation from a private physician to support his claim and to be able to receive continuation of pay (COP).  Stuckey discussed this provision, along with the other provisions on the form, with Johnson; further, Johnson acknowledged receiving this form.  R. 25, R. 223.

107.   When any employee submits a Workers Compensation claim, Stuckey gives them a copy of the "Injured Employee's Notification of Responsibilities" form R. 223 and advises them that is their responsibility to provide supporting medical documentation.   After any employee is given this form and advised of their responsibility to provide medical documentation, Stuckey does not subsequently contact the employee to request or to obtain medical documentation.   R. 25 (Stuckey, ¶26).

108.  On October 21, 1999, Raymer Kent received a fax from Philhaven where Johnson had signed a release on that same day, which release authorized only "disclosure" of the "Initial Evaluation/Admission Note."  That same day, Kent received a phone call from John Sivley of Philhaven regarding Johnson.  The release signed by Johnson did not authorize the release of medical documents concerning psychological evaluations and treatment notes.  Regardless, nothing Sivley said lead Kent to believe that the Erickson incident was a work-related

24

traumatic injury; rather, it sounded like Johnson had pre-existing problems.  R. 9 (Kent, ¶44); R. 252-253.

109.  Related to this October 21, 1999, fax from Sivley to Mr. Kent, no medical documentation had come with the release; if it had, Stuckey was not advised of that nor given a copy of it.  Mr. Kent did advise Stuckey of the conversation but Stuckey does not recall when.   What Stuckey does recall is that the nature of the call had concerned the possibility of Johnson's return to work with the need to separate Johnson and Erickson from having contact with each other.  R. 26 (Stuckey, ¶27).

110.  As noted above, there is no 45-day COP when a CA-1 form is controverted.  In Johnson's case, the CA-1 form was ultimately denied and had Johnson been given COP, he would have had to reimburse the VA.  R. 26 (Stuckey, ¶28).

111.  Additionally, Johnson later claimed that the CA-1 form was the wrong form to file and that a CA-2 form should have been filed in the first place.  Johnson never would have been entitled to receive COP benefits under a CA-2 claim.  R. 11, 26 (Stuckey, ¶29; Kent, ¶50).

112.  As Johnson's Workers Compensation claim was processed by the Office of Workers Compensation Programs (OWCP), Department of Labor, Stuckey forwarded any CA-20 and CA-7 forms submitted by Johnson.  (These latter forms provide medical information from the treating doctor and supplemental information for payment of benefits if they subsequently are awarded).   For example, on

25

November 8, 1999, Stuckey forwarded a copy of the CA-20 form that Dr. Pakola had prepared on November 5, 1999. R. 26-27 (Stuckey, ¶31); R. 254-256.

113.  Although Stuckey does not recall specifically when he told Johnson that his claim had been controverted, Johnson knew of it at the latest by November 30, 1999. At about that point in time, Johnson was calling Stuckey or was coming by his office and he (Johnson) was accompanied by a William Dumas. R. 27 (Stuckey, ¶32).

114.  Due to the issue Dumas made about the lack of medical information, which Johnson should have provided, Stuckey sent Dr. Pakola a letter on November 30, 1999, requesting that he produce a copy of Johnson's medical records. R. 32 (Stuckey, ¶32); R. 257.

115.  On December 2, 1999, Johnson provided Stuckey with a copy of his discharge instructions. The discharge notes reflected that Johnson had had ongoing psychiatric concerns that were ongoing and beyond the scope of the alleged incident. Stuckey forwarded this information to the Claim Examiner at OWCP along with a letter advising him that he was obtaining Johnson's Philhaven records which would be forwarded upon receipt. R. 27 (Stuckey, ¶33); R. 258-260.

116.  In the interim, Stuckey continued to leave messages with the OWCP regarding Johnson's request to have a prompt decision. Stuckey also explained to Johnson that it was the OWCP, not the VA, that would make the decision as to whether he was entitled to Workers Compensation benefits. R. 27; R. 213-214.

117.   On December 15, 1999, the Claims Examiner for the OWCP denied Johnson's CA-1 claim for benefits.  The Claims Examiner advised Johnson that the initial information on file was insufficient to establish a causal relationship between the medical condition and the incident of October 18, 1999, which Johnson had been advised of by letter dated November 5, 1999.  Subsequent information that Johnson provided, plus Dr. Pakola's November 5, 1999 CA-20 form revealed that Johnson had a preexisting condition, with Dr. Pakola entering a question mark by the question whether his condition was caused by his federal employment.  R. 28 (Stuckey, ¶35); R. 261.

118.   At some point, Johnson believed that the wrong form had been used to submit his Workers Compensation claim and that a CA-2 (occupational illness) form should have been submitted.  Stuckey believed this occurred around the time that the OWCP denied the CA-1 claim.  Regardless, Stuckey met with Johnson, Dumas, and Mr. Kent on December 20, 1999, where they discussed the claim and advised Johnson and Dumas that they (Stuckey and Kent) would assist in submitting a CA-2 claim for Johnson. R. 9-10, 28 (Stuckey, ¶36; Kent, ¶¶45-46).

119.   As reflected in Stuckey's records, Stuckey took many steps to assist Johnson in gathering information and processing his CA-2 claim, which included driving to Philhaven to pick up a copy of Johnson's medical record which Stuckey had yet to receive in late December 1999.  R. 26, 28 (Stuckey, ¶¶30, 37); R. 213-220; R. 265-266.

120.  In late December 1999, a CA-2 claim (occupational illness) for Johnson was submitted to the OWCP.  R. 267-337.

121.  On July 7, 2000, the Claims Examiner for the OWCP denied Johnson's CA-2 claim.  R. 28 (Stuckey, ¶38); R. 338-342.

122.  Johnson challenged the finding and a hearing took place on January 24, 2001.  R. 29 (Stuckey, ¶39); R. 343-371.

123.  On April 10, 2001, Johnson's CA-2 claim was again denied.  R. 29 (Stuckey, ¶40); R. 372-375.

124.  Johnson recently sought reconsideration of the April 10, 2001 decision but the VA is not aware of the Department of Labor's decision, if any as of this date. R. 10, 29 (Stuckey, ¶41; Kent, ¶47).

125.  At no time did Kent nor Stuckey take any action to "improperly" or "incorrectly" process, or to delay processing, any of Johnson's Workers Compensation requests due to his race or in retaliation for his exercising his EEO rights or otherwise.  Nor was Johnson's CA-1 claim controverted due to Johnson's race or in retaliation for Johnson filing any EEO complaints. R. 10, 29 (Stuckey, ¶42; Kent, ¶48).

126.  Further, Stuckey did not dispute Johnson's CA-1 claim nor his CA-2 claim due to Johnson's race nor in retaliation for Johnson filing any EEO complaints. R. 29 (Stuckey, ¶43).

127.  Likewise, the decision to submit a CA-1 form initially on Johnson's behalf was because Kent and Stuckey believed that it was the correct form to use

at the time; the decision was not motivated in the least by Johnson's race or in retaliation for Johnson exercising his EEO rights.  R. 10, 29 (Stuckey, ¶44; Kent, ¶49).

128.    On February 5, 2000, Johnson saw an EEO counselor to claim that in retaliation for his having filed a prior EEO case, the VA had failed to follow guidelines in processing his Workers Compensation claim.  R. 376-378.

129.    On March 10, 2000, Johnson was advised of his rights and responsibilities regarding this EEO claim.  R. 379-383.

130.    On March 30, 2000, Johnson was advised that the informal counseling on his latest EEO claim was being closed.  R. 384-387.

131.    Johnson provided the EEO counselor with a correction to his EEO claim.  R. 388-390.

132.    On April 13, 2000, Johnson filed a formal EEO complaint, which was docketed at 200H-1663.  R. 391-396.

133.    On May 10, 2000, the VA issued its final agency decision regarding EEO complaint 200H-1663.  In that decision, Johnson was advised that his claim had been dismissed because the denial of Workers Compensation benefits was solely the responsibility of the Department of Labor.  R. 397-398.

134.    In the letter dismissing this claim, Johnson was notified that the letter constituted the final agency decision and that he had a right to appeal the decision to the EEOC within 30 days.  Johnson also was advised that if he did not file an EEOC appeal, he could file a civil action in district court within 90 days of receipt of

the final decision; or, if he did file an EEOC appeal, he could file a civil action in district court within 90 days of the EEOC decision or after 180 days from the date of filing the EEOC appeal if no decision had been rendered.  Johnson was also told in bold, capital letters that if he filed a civil action under Title VII, the civil action "**MUST BE FILED WITHIN NINETY (90) CALENDAR DAYS** of the date of receipt of this final agency decision...."  R. 400-401.

135.  Plaintiff received this final agency decision shortly around May 11, 2000. R. 151-152.

136.  Johnson did not file an EEOC appeal but, rather, filed the current lawsuit.  R. 152-153.

137.  Johnson filed this civil action challenging the processing of his Workers Compensation claim as being retaliatory on October 24, 2000, which is more than 90 days after he received the adverse final agency decision.  See Complaint.

138.  Johnson's retaliation claim regarding the processing of his Workers Compensation claim, therefore, is time barred.

**Termination from Employment with the VA**

139.  After Johnson's sick and annual leave ran out, Johnson was absent from work as of November 25, 1999, on leave without pay (LWOP).  R. 403.

140.  On August 4, 2000, a letter was sent to Johnson from his supervisor advising him that the maximum amount of leave without pay he could receive was one year such that it could not be authorized after November 24, 2000.  R. 403-405.

30

141.  In this same letter, the supervisor asked Johnson to provide certain medical information concerning his request to have his leave without pay continued through August 26, 2000.  Id.

142.  In an August 16, 2000 letter, Johnson's treating physician, Dr. Pakola, responded.  The letter also incorporated Dr. Pakola's earlier February 17, 2000 letter.  R. 408-411.

143.  Dr. Pakola's letters reflected his opinion that Johnson could not return to work at the Lebanon VAMC, with Johnson continuing to think that various people were plotting against him.  Id.

144.  On October 24, 2000, the Lebanon VAMC proposed terminating Johnson from his Housekeeping Aid position due to his medical problems as supported by his physician's statement that Johnson was unable to return to VA employment.  Johnson also was advised that he had been notified of his ability to apply for disability retirement but that Johnson had not done so.  Johnson was advised that he had fourteen days to reply to this notice, either orally, in writing, or both.  R. 412-414

145.  On November 13, 2000, a Personnel Management Specialist contacted Johnson's attorney, who verified that Johnson had received the VA's letter.  The attorney indicated that she would advise Johnson to apply for disability retirement and to respond to the proposed termination letter.  R. 415.

146.   On November 14, 2000, Johnson replied to the proposed termination letter requesting that he be permitted to continue to receive LWOP until his Workers Compensation claim was finalized.  R. 416.

147.   On November 17, 2000, the Lebanon VAMC advised Johnson that he was being removed from VA employment effective November 30, 2000 due to his current medical condition and his inability to work.  Johnson received the letter on December 2, 2000.  R. 417-419.

148.   Johnson was advised in the removal letter that he could appeal this decision to the Merit Systems Protection Board or under the negotiated grievance procedure, but not both.  Id.

149.   Johnson took neither action.  Nor did Johnson see an EEO counselor to allege discrimination or retaliation.

Respectfully submitted,

THOMAS A. MARINO
United States Attorney

KATE L. MERSHIMER
Assistant U.S. Attorney
228 Walnut St., 2nd Fl.
P.O. Box 11754
Harrisburg, PA 17108-1754
717-221-4482

Date:  June 12, 2002

## IN THE UNITED STATES DISTRICT COURT
## FOR THE MIDDLE DISTRICT OF PENNSYLVANIA

LEWIS JOHNSON,             :
     **Plaintiff**            :   **No. 1:CV-00-1873**
                          :
      **v.**                :   **(Judge McClure)**
                          :
ANTHONY PRINCIPI, Acting Secretary of  :
Veterans Affairs; et al.,       :
     **Defendants**        :

## CERTIFICATE OF SERVICE

The undersigned hereby certifies that she is an employee in the Office of the United States Attorney for the Middle District of Pennsylvania and is a person of such age and discretion to be competent to serve papers.

That this 12th day of June, 2002, she served a copy of the attached

## FEDERAL DEFENDANTS'
## STATEMENT OF MATERIAL UNDISPUTED FACTS

by placing said copy in a postpaid envelope addressed to the person hereinafter named, at the place and address stated below, which is the last known address, and by depositing said envelope and contents in the United States mail at Harrisburg, Pennsylvania.

Addressee:

Andrew J. Ostrowski, Esquire
4311 North Sixth Street
Harrisburg, PA 17110

_____
KATE L. MERSHIMER
Assistant U.S. Attorney