

ORIGINAL

# IN THE UNITED STATES DISTRICT COURT
## FOR THE MIDDLE DISTRICT OF PENNSYLVANIA

| | |
|---|---|
| LEWIS JOHNSON, : | |
|     Plaintiff : | No. 1:CV-00-1873 |
| : | |
|     v. : | (Judge McClure) |
| : | |
| ANTHONY PRINCIPI, Secretary of Veterans Affairs; : | |
| RODNEY KISCADDEN; ALICE FIDLER; : | |
| PEG WINTERS; IRVIN ERICKSON; : | |
| RAYMER KENT; and AMERICAN    FEDERATION : | |
| OF GOVERNMENT EMPLOYEES LOCAL 1966, : | |
|     Defendants : | |

FILED
HARRISBURG, PA

JUN 1 2 2002

MARY E. D'ANDREA, CLERK
Per _____
Deputy Clerk

## FEDERAL DEFENDANTS' RECORD IN
## SUPPORT OF THEIR MOTION FOR SUMMARY JUDGMENT:

### VOLUME I

**THOMAS A. MARINO**
**Assistant U.S. Attorney**

**KATE L. MERSHIMER**
**Assistant U.S. Attorney**
**228 Walnut St., 2nd Fl.**
**P.O. Box 11754**
**Harrisburg, PA 17108-1754**
**717-221-4482**

**Date:  June 12, 2002**

# INDEX

## Volume I

Declaration of Raymer A. Kent . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1

Declaration of Suzette A. Flashel Umlauf . . . . . . . . . . . . . . . . . . . . . . . . . . 11

Declaration of Joseph R. Stuckey, Jr. . . . . . . . . . . . . . . . . . . . . . . . . . . . . 20

Excerpt of Master Agreement between the Department of Veterans
      Affairs and the American Federal of Government Employees . . . . . . . 30

Winters Deposition (excerpts) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 52

Exhibit 9 of Winters Deposition . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 60

Fidler Deposition (excerpts) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 65

Housekeeping Aid list of Eligibles & Selection . . . . . . . . . . . . . . . . . . . . . . 93

Fidler Notes of Ratings . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 94

Rating Panel's Cutoff list . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 95

EEO Affidavit of Barbara Kohr . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 98

EEO Statement under Oath of Margaret Cromer . . . . . . . . . . . . . . . . . . . . 108

EEO Affidavit of Wanda Miller . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 115

EEOC Hearing Testimony of Randall Houck . . . . . . . . . . . . . . . . . . . . . . . 122

Johnson Deposition (excerpts) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 128

Erickson Deposition (excerpts) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 155

Kiscadden Deposition (excerpts) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 176

10/19/99 Voluntary Witness Statement of Irvin Erickson . . . . . . . . . . . . . . 185

10/19/99 Voluntary Witness Statement of L. Chandler . . . . . . . . . . . . . . . 186

10/19/99 Voluntary Witness Statement of Barbara Yeich . . . . . . . . . . . . . . 187

10/18/99 Report of Contact by Johnson . . . . . . . . . . . . . . . . . . . . . . . . . . . . 188

VA Police Report excerpt dated 10/19/99 . . . . . . . . . . . . . . . . . . . . . . . . . 190

10/18/99 Report of Contact by Kiscadden . . . . . . . . . . . . . . . . . . . . . . . . . 191

10/20/99 Counseling Statement to Erickson . . . . . . . . . . . . . . . . . . . . . . . 192

Letter, 11/16/99, Johnson to McGuigan . . . . . . . . . . . . . . . . . . . . . . . . . . . 193

Letter, 11/17/99, Kiscadden to Johnson . . . . . . . . . . . . . . . . . . . . . . . . . . . 194

EEO (Office of Resolution Management) Initial Referral Form . . . . . . . . . . 195

Letter, 11/17/99, Closing Informal Counseling . . . . . . . . . . . . . . . . . . . . . . 196

Letter, 11/17/99, Notice of Right to File a Discrimination Complaint . . . . . . 198

EEO Formal Complaint of Employment Discrimination [200H-1532]
    (Hostile Work Environment) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 201

5/9/99 Final Agency Decision on EEO Complaint 200H-1532
    with Appeal Rights . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 205

## Volume II

Claim for Worker's Compensation, Phone/Contact Notes . . . . . . . . . . . . . . 213

10/26/99 Acceptance of Light-Duty Certification Notice . . . . . . . . . . . . . . . 221

10/26/99 Rights and Benefits Certification Notice . . . . . . . . . . . . . . . . . . . . 222

10/26/99 Injured Employee's Notification of Responsibilities . . . . . . . . . . . . 223

Fax Cover Sheet, 11/1/99, of filing of CA-1 Claim . . . . . . . . . . . . . . . . . . . 224

Johnson's CA-1 Application (Employee's Notice of Traumatic Injury
    and Claim for Compensation) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 225

Letter, 11/1/99, Stuckey to Claims Examiner re Johnson's CA-1 Claim
    and materials accompanying the claim . . . . . . . . . . . . . . . . . . . . . . . . 228

Materials accompanying the CA-1 Claim and Stuckey's 11/1/99 Letter . . . . 229

Fax Transmission, 10/21/99, Sivley to Kent . . . . . . . . . . . . . . . . . . . . . . . . . . 252

Letter, 11/8/99, Stuckey to Claims Examiner providing CA-20 form . . . . . . 254

Attending Physician's Supplemental Report . . . . . . . . . . . . . . . . . . . . . . . . . 255

Letter, 11/30/99, Stuckey to Dr. Pakola requesting medical information . . . 257

Letter, 12/3/99, Stuckey to Claims Examiner . . . . . . . . . . . . . . . . . . . . . . . . 258

Philhaven Discharge Instructions . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 259

12/15/99 Dept. of Labor, OWCP Notice of Decision and Appeal Rights . . . 261

Fax Transmission, 12/28/99, Stuckey to Philhaven . . . . . . . . . . . . . . . . . . . 265

Authorization for Release of Information . . . . . . . . . . . . . . . . . . . . . . . . . . . 266

Fax Transmission, 12/30/99, Stuckey to Dept. of Labor of
    Johnson's CA-2 Claim . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 267

Letter,12/29/99, Stuckey to Claims Examiner re CA-2 Claim . . . . . . . . . . . 268

Johnson's CA-2 Claim (Notice of Occupational Disease and Claim for
Compensation) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 270

Materials accompanying CA-2 Claim . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 275

7/7/00 Dept. of Labor, OWCP, Notice of Disallowance of Claim
    and Notice of Appeal Rights . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 338

7/7/00 Dept. of Labor, OWCP Findings of Fact
    with Attached Memorandum . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 340

Letter, 1/31/02, Copy of OWCP Transcript of Hearing . . . . . . . . . . . . . . . . 343

Transcript of OWCP Proceedings . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 344

4/10/01, Dept. of Labor/OWCP: Decision of the Hearing Representative . . 372

2/15/00 EEO Initial Interview Sheet . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 376

3/10/00 EEO Notice of Rights and Responsibilities . . . . . . . . . . . . . . . . . . . 379

Negotiated Grievance Procedures Notice . . . . . . . . . . . . . . . . . . . . . . . . . 381

Permission to Extend Counseling . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 382

Role and Responsibilities of the EEO Counselor . . . . . . . . . . . . . . . . . . . . 383

3/30/00 Letter Closing the Informal Counseling . . . . . . . . . . . . . . . . . . . . . 384

Letter, 4/6/00, Resolution request change . . . . . . . . . . . . . . . . . . . . . . . . . 388

Johnson's Revised Resolution request . . . . . . . . . . . . . . . . . . . . . . . . . . . . 390

EEO Formal Complaint of Employment Discrimination [200H-1663]
    (retaliation re Workers Compensation claim) . . . . . . . . . . . . . . . . . . . . . 391

4/10/00 Final Agency Decision EEO Complaint and Appeal Rights
    in 200H-1663 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 397

Letter, 8/4/00, Request for Medical Information . . . . . . . . . . . . . . . . . . . . . 403

Letter, 8/16/00, Dr. Pakola to Kiscadden,
    attaching 2/17/00 Dr. Pakola letter . . . . . . . . . . . . . . . . . . . . . . . . . . . . 408

Letter, 10/24/00, Proposed Removal . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 412

11/13/00 Report of Contact with Johnson's attorney . . . . . . . . . . . . . . . . . . 415

Johnson's 11/14/00 Request for LWOP . . . . . . . . . . . . . . . . . . . . . . . . . . . 416

Letter, 11/17/00, Removal . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 417

# IN THE UNITED STATES DISTRICT COURT
## FOR THE MIDDLE DISTRICT OF PENNSYLVANIA

LEWIS JOHNSON,                                      :
      **Plaintiff**                              :   No. 1:CV-00-1873
                                                :
      **v.**                                    :   **(Judge McClure)**
                                                :
ANTHONY PRINCIPI, Secretary of Veterans Affairs;    :
RODNEY KISCADDEN; ALICE FIDLER;                     :
PEG WINTERS; IRVIN ERICKSON;                        :
RAYMOND KENT; and AMERICAN FEDERATION               :
OF GOVERNMENT EMPLOYEES LOCAL 1966,                 :
      **Defendants**                            :

## DECLARATION OF RAYMER A. KENT

1.     I am employed by the Department of Veterans Affairs ("VA")and am the Human Resources Manager at the VA Medical Center in Lebanon, Pennsylvania.

2.     I have been the Human Resources Manager at the Lebanon VA Medical Center since 1997; from 1982 to 1997, I was the Assistant Personnel Officer at the Lebanon VA Medical Center.

3.     As the Human Resources Manager, I am in charge of the Human Resources Department at the Lebanon VA Medical Center (also known as the Lebanon VAMC). Included within this Department are three Personnel Management Specialists, who service a block of product lines; specialists in charge of particular areas, including compensation and benefits; and clerical staff.

4.     By way of background, medical services used to be provided by "service lines," such as nursing services, medical services, psychiatry services, and social work services. The VA then switched to "product lines," such as extended care,

R.1

acute care, and the like. Under product lines, employees in different fields (such as nursing, social work, etc.) fall within a product line, with hiring decisions being made by product line.

5.   Before going to product lines, housekeeping aids worked within the Environmental Management Service ("EMS"). They were then assigned to work in various units. A group of housekeepers were assigned to work in common areas.

6.   When the VA switched to "product lines," housekeepers working on a particular unit were assigned to the product line their unit fell within. For example, if a housekeeper worked in the subacute unit, the housekeeper was assigned to the extended care product line, which is where the subacute unit fell. Those housekeepers who worked in common areas, however, stayed within EMS.

7.   In 1998, a full time position for a Housekeeping Aid at Wage Grade 2 in the Extended Care (19-3) product line was posted so that individuals could apply for the position. The phrase "19-3" meant the opening was in Building 19, 3rd floor.

8.   The Extended Care (19-3) Housekeeping Aid position was posted under the provision of the Open and Continuance Vacancy Announcement and the VA/AFGE Master Agreement.

9.   The Master Agreement is the contract entered into by the Department of Veterans Affairs and the American Federation of Government Employees union.

10.   The Master Agreement is supplemented by local agreements between the various VA centers and the local unions. As to the Lebanon VA Medical Center,

2

R.2

it had a Local Supplemental Labor Management Agreement between itself and Local 1966 of the AFGE.

11.    Due to certain positions being either entry level positions, frequently turned over positions, or requiring specific degrees (e.g. librarian), the VA Medical Center negotiates yearly with the local union to post job openings on the "Open Continuous" list.

12.    Under the Open Continuous list, individuals can advise the Human Resources Department of any positions they would be interested in applying for, on the list for the entire year.  Should a position actually become open, the Human Resources Department notifies those individuals on the Open Continuous list of the opening and asks if the individual is interested in applying for the particular position. If the individual is interested in the opening, the Human Resources Department places the individual on a list of applicants if they qualify.

13.    When a position is placed on an Open Continuous list, any actual job opening is posted on a bulletin board for a brief period of time.  At that time, anyone else who sees the notice of the opening can apply if they like.

14.    If a position is not on the Open Continuous list, the union contract requires the job opening to be posted for three weeks, with an additional one-week period for supplementation.   By placing various job positions on the Open Continuous list, therefore, vacant positions can be filled much more quickly.

3

R.3

15.    Housekeeping Aid positions are one of the many positions placed on the Open Continuous list.

16.    The Master Agreement between the VA and the national union addresses many topics, which are broken out into articles.  Relevant to Lewis Johnson's claims against the VA, Article 12 addresses "Details, Reassignments, and Temporary Promotions" and Article 22 addresses "Merit Promotion."

17.    Under Article 12, Section 10, reassignments are the moving of a person from one position to another, which are not to be used as punishment, harassment, or reprisal.  Reassignments under Article 12  occur in situations where there are staff reductions and/or positions that are being eliminated and, therefore, frequently are involuntary.

18.    With the Lebanon VA Medical Center, reassignments caused by reductions in force under Article 12 are done based on seniority.  Under Article 12 of the Local Supplement, seniority is defined as the employees most recent entrance on duty as an employee of the Lebanon VAMC, with various "tie breakers" then identified.

19.    Article 22, sections 8 through 12, of the Master Agreement addresses vacancy announcements and competitive selection procedures, which is used for

R. 1

most position openings. (It does not apply, however, to shift changes and relocations, which is covered by Article 12).[1]

20.    All positions competitively filled under Article 22 are posted. See Article 22, Section 8, ¶A.    Further, under Section 8, ¶H.2, Open Continuous Announcements are posted at all times. When a particular vacancy actually will be filled, a notice of the opening and the deadline for submitting applications is posted.

21.    Article 22 of the Local Supplement further defines the time limits and posting of positions under the Open Continuous announcements.

22.    Under the competitive selection procedures of Article 22 of the Master Agreement, it is possible to have three effects on the employees: (1) where the new position is a promotion (a higher pay grade); (2) the new position is a reassignment (no change in pay); and (3) the new position is a change to a lower grade (decrease in pay). As a result, when there is a vacancy, there may be three lists, or referral certificates, of employees: promotion eligibles, reassignment eligibles, and change to lower grade eligibles.

23.    Should it ultimately turn out that only a list of reassignment eligibles is referred to the decision maker, merit promotion procedures under Article 22 still

_____

[1] For example, if there is a nursing vacancy in the day shift in a unit within Acute Care, the vacancy will be posted and other nurses of the same wage grade within that unit -- but working a different shift -- can request to fill the position. If more than one nurse requests to fill that position, the nurse with the most seniority typically is selected (although there can be exceptions to that) pursuant to Article 12, Section 6 of the Master Agreement.

R.5

apply under the Open Continuous Announcement.  Such a list would not be a situation viewed as an involuntary reassignment or RIF (reduction in force) where seniority would be the only deciding factor.

24.    The Housekeeping Aid position on Extended Care (19-3) that Johnson applied for was pursuant to an Open Continuous Announcement.  As such, the position was filled competitively with seniority but one of many factors considered in making the decision.  Ronald Hull was selected to fill this vacancy.

25.    I am aware that after Hull was selected for the Extended Care (19-3) Housekeeping Aid vacancy, Johnson believed that he should have been selected solely on the basis of his seniority alone.  Johnson was mistaken and seniority was not the sole selection criteria.

26.    Johnson also believed that a prior Memorandum of Understanding entered into by Union President Peg Winters and Lebanon VAMC Acting CEO Timothy Shea should control the selection process.  Again, Johnson was mistaken, with that Memorandum of Understanding having been created for a reduction in force (RIF) that the VA previously had anticipated occurring.  This Memorandum of Understanding was not an unending agreement but, rather, was specifically designed for persons who would be displaced as the result of that RIF.  (This RIF occurred in June 1997).

27.    In October 1998, Lebanon VAMC staff sought advice from me concerning an incident that had occurred between Johnson and another employee,

6

R-6

Irv Erickson. On or about October 13, 1999, Johnson stated that Erickson had told him that his brothers were saying that he was a white man in black skin. Further, on or about October 18, 1999, Johnson claimed that Erickson had pushed or shoved him.

28. After each incident, I advised staff that they should try and keep Johnson and Erickson apart, assign them to work in different areas, try to calm down the situation, and gather all information relevant to the incidents.

29. It is my understanding that the VA police also investigated the allegations and concluded that there had been no assault by Kiscadden of Johnson.

30. Shortly after this incident between Erickson and Johnson, Johnson went out on sick leave and sought Workers Compensation benefits. To do that, Johnson would have to complete the appropriate paperwork so that the application could be submitted to the Officer of Workers Compensation Program ("OWCP").

31. When seeking Workers Compensation benefits, there are two types of forms that can be submitted by an employee. One form is a CA-1 form, which is for a traumatic injury. The other form is a CA-2 form, which is for an occupational illness or disease.

32. Typically, a traumatic injury is a one-time incident. It is immediate or time sensitive and results in an immediate impact to the employee. It could result in a physical injury (i.e. tripping over a 2 x 4 board in a hallway) or psychological (i.e. September 11th).

R.7

33.    With an occupational illness or disease, it typically occurs over a period of time — such as long term exposure to tuberculosis where the employee eventually tests positive for the illness.

34.    An emotional trauma suffered from harassment can be either an occupational illness or a traumatic injury depending on the particular facts.  The harassment can occur over a period of time where the employee eventually reaches a point that he/she cannot take it anymore (occupational) or can be a one-time incident that causes an immediate trauma (traumatic).

35.    When a CA-1 traumatic injury form is filed, an employee is entitled to receive continuation of pay (known as COP) for 45 days.  If the CA-1 claim is eventually denied, then the employee will have to use sick or annual leave to reimburse the VA for the COP.

36.    Pursuant to regulations, the VA may "controvert" a CA-1 claim in certain situations.  In such cases, the employee is not entitled to receive COP.

37.    If a CA-2 form for an occupational illness is completed for Workers Compensation benefits, the employee is _not_ entitled to received COP.

38.    When Johnson came to the Human Resources Department to submit a Workers' Compensation claim, Joseph Stuckey, a specialist in such matters, assisted Johnson in completing the paperwork.

39.    It was Mr. Stuckey's opinion, based upon his conversation with Johnson, that a CA-1 traumatic injury form should be submitted for Johnson in that

8

R. 8a

Johnson's claim of injury centered on the alleged physical assault incident by Erickson on October 18, 1999.  Accordingly, Mr. Stuckey assisted Johnson in filing a CA-1 form for benefits.

40.    On November 1, 1999, as Mr. Stuckey submitted Johnson's CA-1 application for benefits, Mr. Stuckey submitted a letter to the OWCP indicating that the VA was controverting Johnson's claim.  Mr. Stuckey first noted that while a confrontation had occurred between Erickson and Johnson -- with words exchanged -- neither a witness observed an assault, nor did a subsequent police investigation find evidence to support that an actual assault had occurred.  Further, management had directed Erickson to have no contact with Johnson and that Erickson would not be assigned to work in proximity to Johnson's work area.  Johnson was reassured that the situation had been neutralized.

41.    In this letter, Mr. Stuckey noted that Johnson had seen his primary care physician, who had recommended counseling.  Additionally, Johnson had entered into an Acute Partial Day Hospital Program at Philhaven and had provided a letter from Dr. Pakola that Johnson was unable to work until further notice. Johnson had failed, however, to provide medical documentation to support his allegation of traumatic injury.  Mr. Stuckey then noted that upon review of the information, it could not be concluded that there was a causal relationship between the Erickson incident and Johnson's counseling.

9

R-8b

42.    I reviewed this letter prior to Mr. Stuckey sending it to the OWCP and I concurred with Mr. Stuckey's statements and assessment.

43.    As to controverting the CA-1 application for Workers Compensation benefits, this was done because Johnson had not provided medical documentation to support his claim that the Erickson incident had caused a traumatic injury. It is the employee's burden to provide supporting documentation, of which Johnson had been advised.

44.    I note that on October 21, 1999, I received a fax from Philhaven where Johnson had signed a release on that same day, which release authorized only "disclosure" of the "Initial Evaluation/Admission Note." That same day, I received a phone call from John Sivley of Philhaven regarding Johnson. The release signed by Johnson did not authorize the release of medical documents concerning psychological evaluations and treatment notes. Regardless, nothing Mr. Sivley said lead me to believe that the Erickson incident was a work-related traumatic injury; rather, it sounded like Johnson had pre-existing problems.

45.    At some point, Johnson believed that the wrong form had been used to submit his Workers Compensation claim and that a CA-2 form should have been submitted. In fact, the OWCP eventually denied Johnson benefits under the CA-1 application.

46.    Accordingly, we assisted Johnson in preparing and submitting a CA-2 form for an occupational illness. The OWCP also denied the CA-2 claim.

10

R.9

47.    The grant or denial of Workers Compensation benefits is made by the Department of Labor through the OWCP.  I am aware that Johnson appealed the OWCP's denial of benefits but has not prevailed.  (I believe Johnson recently filed a motion for reconsideration or rehearing but I am unaware of it having been granted to date).

48.    At no time did I take any action, nor am I aware of any VA employee taking any action to "improperly" or "incorrectly" process, or to delay processing, any of Johnson's Workers Compensation requests due to his race or in retaliation for his exercising his EEO rights or otherwise.

49.    Likewise, the decision to submit a CA-1 form initially on Johnson's behalf was because we believed that it was the correct form to use at the time; the decision was not motivated in the least by Johnson's race or in retaliation for Johnson exercising his EEO rights.

50.    Concerning the controversion of Johnson's CA-1 form, which resulted in Johnson not receiving COP, had we filed the CA-2 form initially as Johnson believes we should have, Johnson never would have been entitled to any COP.

Pursuant to the penalties of perjury set forth at 28 U.S.C. §1746, I hereby state that the above is true and correct.

_Raymer A. Kent_

RAYMER A. KENT
Human Resources Director
Lebanon VAMC

11

R. 10

# IN THE UNITED STATES DISTRICT COURT
## FOR THE MIDDLE DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| **LEWIS JOHNSON,** | : | |
| **Plaintiff** | : | **No. 1:CV-00-1873** |
| | : | |
| **v.** | : | **(Judge McClure)** |
| | : | |
| **ANTHONY PRINCIPI, Secretary of Veterans Affairs;** | : | |
| **RODNEY KISCADDEN; ALICE FIDLER;** | : | |
| **PEG WINTERS; IRVIN ERICKSON;** | : | |
| **RAYMOND KENT; and AMERICAN FEDERATION** | : | |
| **OF GOVERNMENT EMPLOYEES LOCAL 1966,** | : | |
| **Defendants** | : | |

## DECLARATION OF SUZETTE A. FLASHEL UMLAUF

1.     I am employed by the Department of Veterans Affairs ("VA")and am a Human Resources Specialist at the VA Medical Center in Lebanon, Pennsylvania.

2.     I have been employed with the VA for 18 years and have been employed as a Human Resource Specialist for about 10 years.

3.     As a Human Resource Specialist, I assist the agency in handling all labor issues, employment issues, and disciplinary issues in the Extended Care product line, the Clinical Care Product line, and some miscellaneous other areas.

4.     By way of background, medical services used to be provided by "service lines," such as nursing services, medical services, psychiatry services, and social work services.  The VA then switched to "product lines," such as extended care, acute care, and the like.  Under product lines, employees in different fields (such as nursing, social work, etc.) fall within a product line, with hiring decisions being made by product line.

R-11

5.    Before going to product lines, housekeeping aids worked within the Environmental Management Service ("EMS").  They were then assigned to work in various units.  A group of housekeepers were assigned to work in common areas.

6.    When the VA switched to "product lines," housekeepers working on a particular unit were assigned to the product line their unit fell within.  For example, if a housekeeper worked in the subacute unit, the housekeeper was assigned to the extended care product line, which is where the subacute unit fell.  Those housekeepers who worked in common areas, however, stayed within EMS.

7.    In 1998, a full time position for a Housekeeping Aid at Wage Grade 2 in the Extended Care (19-3) product line was posted so that individuals could apply for the position.  The phrase "19-3" meant the opening was in Building 19, 3rd floor.

8.    The Extended Care (19-3) Housekeeping Aid position was posted under the provision of the Open and Continuance Vacancy Announcement and the VA/AFGE Master Agreement.

9.    The Master Agreement is the contract entered into by the Department of Veterans Affairs and the American Federation of Government Employees union.

10.    The Master Agreement is supplemented by local agreements between the various VA centers and the local unions.  As to the Lebanon VA Medical Center, it had a Local Supplemental Labor Management Agreement between itself and Local 1966 of the AFGE.

2

R-12

11.    Due to certain positions being either entry level positions, frequently turned over positions, or requiring specific degrees (e.g. librarian), the VA Medical Center negotiates yearly with the local union to post job openings on the "Open Continuous" list.  There typically are about 50 positions on the Open Continuous list each year.

12.    Under the Open Continuous list, individuals can advise the Human Resources Department of any positions they would be interested in and submit an application for any such positions -- with the individuals remaining on the list for the entire year.  Should a position actually become open, the Human Resources Department then notifies those individuals on the Open Continuous list of the opening and asks if the individual is interested in filling the particular position.  If the individual is interested in the opening, the Human Resources Department places the individual on a list of applicants (if they qualify).

13.    When a position is placed on an Open Continuous list, any actual job opening is posted on a bulletin board for a brief period of time.  At that time, anyone else who sees the notice of the opening can apply if they like.

14.    If a position is not on the Open Continuous list, the union contract requires the job opening to be posted for three weeks, with an additional one-week period for supplementation.  By placing various job positions on the Open Continuous list, therefore, vacant positions can be filled much more quickly.

3

R.13

Likewise, individuals interested in particular positions need only complete one application -- rather than an application for each opening.

15.    Housekeeping Aid positions are one of the many positions placed on the Open Continuous list.

16.    The Master Agreement between the VA and the national union addresses many topics, which are broken out into articles.  Relevant to Lewis Johnson's claims against the VA, Article 12 addresses "Details, Reassignments, and Temporary Promotions" and Article 22 addresses "Merit Promotion."

17.    Under Article 12, Section 10, reassignments are the moving of a person from one position to another, which are not to be used as punishment, harassment, or reprisal.  Reassignments under Article 12 occur in management-driven situations where there are staff reductions and/or positions that are being eliminated; therefore, these reassignments in this context are frequently involuntary.

18.    With the Lebanon VA Medical Center, reassignments caused by reductions in force ("RIF") under Article 12 are done based on seniority.  Under Article 12 of the Local Supplement, seniority is defined as the employee's most recent entrance on duty as an employee of the Lebanon VAMC, with various "tie breakers" then identified.

19.    Article 22, sections 8 through 12, of the Master Agreement addresses vacancy announcements and competitive selection procedures, which is used for most position openings.  (It does not apply, however, to shift changes and

4

R.14

relocations, which is covered by Article 12).[1] All positions competitively filled under Article 22 are posted.  See Article 22, Section 8, ¶A.

20.    Further, positions on the Open Continuous list are filled competitively under Article 22 with Open Continuous Announcements considered posted at all times.  See Article 22, Section 8, ¶H.2.  When a particular vacancy on the Open Continuous list actually will be filled, a notice of the opening and the deadline for submitting applications is posted.

21.    Article 22 of the Local Supplement further defines the time limits and posting of positions under the Open Continuous announcements.

22.    Under the competitive selection procedures of Article 22 of the Master Agreement, it is possible to have three effects on the employees: (1) where the new position is a promotion (a higher pay grade);  (2) the new position is a reassignment (no change in pay); and  (3) the new position is a change to a lower grade (decrease in pay).  As a result, when there is a vacancy, there may be three lists, or referral certificates, of employees: promotion eligibles, reassignment eligibles, and change to lower grade eligibles.

---

[1] For example, if there is a nursing vacancy in the day shift in a unit within Acute Care, the vacancy will be posted and other nurses of the same wage grade within that unit -- but working a different shift -- can request to fill the position.  If more than one nurse requests to fill that position pursuant to Article 12, Section 6 of the Master Agreement, the nurse with the most seniority typically is selected (although there can be exceptions to that).  This is formally known as a Shift Change  and Relocation, with the selection process of relying heavily on seniority being a past practice.

5

R. 15

23.    Should it ultimately turn out that only a list of reassignment eligibles is referred to the decision maker, merit promotion procedures under Article 22 still apply under the Open Continuous Announcement.  Such a list would not be a situation viewed as an involuntary reassignment or RIF (reduction in force) where seniority would be the only deciding factor.

24.    The Housekeeping Aid position on Extended Care (19-3) that Johnson applied for was pursuant to an Open Continuous Announcement.  As such, the position was filled competitively under Article 22 and seniority was not the deciding factor.  Ronald Hull was selected to fill this vacancy.

25.    I am aware that after Hull was selected for the Extended Care (19-3) Housekeeping Aid vacancy, Johnson believed that he should have been selected solely on the basis of his seniority alone.  Johnson was mistaken and seniority was not the sole selection criteria.  Rather, the selection was based on competitive selection principles under Article 22 and the Open Continuous list.

26.    Johnson also believed that a prior Memorandum of Understanding entered into by Union President Peg Winters and Lebanon VAMC Acting CEO Timothy Shea should control the selection process.  Again, Johnson was mistaken, with that Memorandum of Understanding having been created for a reduction in force (RIF) that the VA previously had anticipated occurring.  This Memorandum of Understanding was not an unending agreement but, rather, was specifically

6

R.16

designed for persons who would be displaced as the result of that RIF. (This RIF occurred in June 1997).

27.    Focusing on the selection process for the Housekeeping Aid WG-2 position on Extended Care (19-3) that Johnson had applied for, as previously noted, this position was on the Open Continuous list. Lewis Johnson, Ronald Hull, and other VA employees, all who had Wage Grade 2 positions, indicated that they were interested in filling this vacancy. Johnson and Hull were Housekeeping Aids with the other employees being Food Service Workers.

28.    The opening was posted in early May 1998 and closed on May 5, 1998.

29.    Thereafter, the applicants' KSAOs (written questions and answers addressing knowledge, skills, abilities, and other factors) were reviewed by a three-person panel so that the applicants could be scored and ranked. I was on this panel as the Human Resources representative, with there also being a representative from the union and a subject matter expert on the panel.

30.    After rating the ten applicants, nine names were referred to the Manager of the product line. The decision on who to select would then be delegated to the Nurse Manager. In this case, the Nurse Manager of Extended Care (19-3) was Alice Fidler.

31.    In making her decision, Ms. Fidler was not required to select the candidate who had the most seniority since the selection was being made under Article 22's merit selection provisions. I also note that there was no requirement that

7

R.17

the applicants be interviewed.   The only rule was that if one individual was interviewed, all applicants had to be interviewed.

32.    On July 8, 1998, I sent the list of referred eligibles (who all happened to be eligible for reassignment since they all held Wage Grade 2 positions) to the Extended Care Manager.  I would note that the list of referred individuals contains handwritten entries after each name indicating the individual's race. This information was added upon the request of the EEO officer _after_ the selection process and after Johnson had filed an EEO claim of discrimination.

33.    On July 15, 1998, Ms. Fidler sent back her selection, which was Ronald Hull.

34.    As to Hull, he initially had been employed as a Housekeeping Aid in EMS.  Hull initially was a permanent employee of the VA although he worked part-time.

35.    The month before the Extended Care (19-3) vacancy had been posted, an Extended Care (Floater) position was posted.  A floater is an individual who works in various locations of a product line -- depending on where the need is on any given day.

36.    Hull was selected to fill this vacancy in Extended Care in the latter part of May 1998 by Beulah Hadrick, Ms. Fidler's supervisor.

R.13

35.     The month before the Extended Care (19-3) vacancy had been posted, an Extended Care (Floater) position was posted.  A floater is an individual who works in various locations of a product line -- depending on where the need is on any given day.

36.     Hull was selected to fill this vacancy in Extended Care in the latter part of May 1998 by Beulah Hadrick, Ms. Fidler's supervisor.

37.     Hull was formally released to this position on June 7, 1998.  By obtaining this position, Hull remained a permanent VA employee but now worked full-time.

38.     Whether Hull had been a part-time or a full-time employee at the time the Extended Care (19-3) opening became available, he still would have been eligible for the position in that he was a permanent VA employee.

Pursuant to the penalties of perjury set forth at 28 U.S.C. §1746, I hereby state that the above is true and correct.

SUZETTE A. FLASHEL UMLAUF
Human Resource Specialist
Lebanon VAMC

9

R.19

# IN THE UNITED STATES DISTRICT COURT
## FOR THE MIDDLE DISTRICT OF PENNSYLVANIA

LEWIS JOHNSON,  :
      Plaintiff  :   No. 1:CV-00-1873
        :
      v.  :   (Judge McClure)
        :
ANTHONY PRINCIPI, Secretary of Veterans Affairs;  :
RODNEY KISCADDEN; ALICE FIDLER;  :
PEG WINTERS; IRVIN ERICKSON;  :
RAYMOND KENT; and AMERICAN FEDERATION  :
OF GOVERNMENT EMPLOYEES LOCAL 1966,  :
      Defendants  :

## <u>DECLARATION OF JOSEPH R. STUCKEY, JR.</u>

1.     I am employed by the Department of Veterans Affairs ("VA") and am a Human resources Specialist at the VA Medical Center in Lebanon, Pennsylvania.

2.     I have been a Human Resources Specialist at the Lebanon VA Medical Center for the past 5 years.

3.     As a Human Resources Specialist, I specialize in compensation and benefits. As such, I provide assistance processing forms and gathering information for claims under the Workers Compensation program, I provide retirement estimates and counseling, and I answer day to day questions about health insurance and benefits.

4.     In the latter part of October 1999, I became aware of an incident that had occurred between Johnson and another employee, Irv Erickson. My recollection of the incident was that on or about October 18, 1999, Johnson claimed that Erickson had pushed or shoved him.

R.20

5.    Shortly after this incident between Erickson and Johnson, Johnson went out on sick leave and sought Workers Compensation benefits.  To do that, Johnson would have to complete the appropriate paperwork so that the application could be submitted to the Officer of Workers Compensation Program ("OWCP"), Department of Labor.

6.    When seeking Workers Compensation benefits, there are two types of forms that can be submitted by an employee.  One form is a CA-1 form, which is for a traumatic injury.  The other form is a CA-2 form, which is for an occupational illness or disease.

7.    Typically, a traumatic injury is a one-time incident.  It is immediate or time sensitive and results in an immediate impact to the employee.  It could result in a physical injury (i.e. tripping over a 2 x 4 board in a hallway) or psychological (i.e. September 11th).

8.    With an occupational illness or disease, it typically occurs over a period of time — such as long term exposure to tuberculosis where the employee eventually tests positive for the illness.

9.    An emotional trauma suffered from harassment can be either an occupational illness or a traumatic injury depending on the particular facts.  The harassment can occur over a period of time where the employee eventually reaches a point that he/she cannot take it anymore (occupational) or can be a one-time incident that causes an immediate trauma (traumatic).

2

R. 21

10.    When a CA-1 traumatic injury form is filed, an employee is entitled to receive continuation of pay (known as COP) for 45 days.  If the CA-1 claim is eventually denied, then the employee will have to use sick or annual leave to reimburse the VA for the COP.

11.    Pursuant to regulations, the VA may "controvert" a CA-1 claim in certain situations.  In such cases, the employee is not entitled to receive COP.

12.    If a CA-2 form for an occupational illness is completed for Workers Compensation benefits, the employee is not entitled to received COP at all.

13.    On or about October 26, 1999, Johnson came to the Human Resources Department to submit a Workers' Compensation claim and I assisted him in completing the paperwork.

14.    By way of general background, in 1998, the VA had started the process in going to a "paperless" claim format.  In other words, either a CA-1 or a CA-2 form would be electronically prepared and then electronically transmitted to the Department of Labor for processing.  At the time Johnson came to submit a Workers Compensation claim, the form would be electronically prepared but could not be electronically transmitted.  As such, after the form was completed by the employee and his/her supervisor, I would have to print the form and then fax it to the Office of Workers Compensation Program  ("OWCP"), Department of Labor, in Philadelphia, Pennsylvania.

3

R.22

15.    It was my opinion, based upon my conversation with Johnson, that a CA-1 traumatic injury form should be submitted for Johnson in that Johnson's claim of injury centered on the alleged physical assault incident by Erickson on October 18, 1999.  Accordingly, I assisted Johnson in filing a CA-1 form for benefits.

16.    My opinion was bolstered by Johnson's entries in the CA-1 form that the cause of injury had been a physical assault by another employee that had occurred on October 18, 1999, at 10:20 a.m. in Building 1-3a.

17.    On a related point, after I assisted Johnson in preparing his CA-1 claim, I learned that Johnson had also claimed that five days before the alleged assault that Erickson had made a racially insensitive remark to Johnson.  This information did not alter my belief that the CA-1 form was the proper form for Johnson to use in seeking Workers Compensation benefits.

18.    I note that in submitting any Workers Compensation claim, it is my responsibility to provide the OWCP with information relevant to the claim -- be that evidence supporting or questioning whether the claim was work related.

19.    On November 1, 1999, I submitted Johnson's CA-1 form.  With that CA-1 form, I submitted a letter to the OWCP indicating that the VA was controverting Johnson's claim.  I also noted some factual discrepancies as follows:  While a confrontation had occurred between Erickson and Johnson -- with words exchanged -- neither a witness observed an assault, nor did a subsequent police investigation find evidence to support that an actual assault had occurred.  Further, management

4

R-23

had directed Erickson to have no contact with Johnson and that Erickson would not be assigned to work in proximity to Johnson's work area. Johnson was reassured that the situation had been neutralized.

20.    In my letter, I noted that Johnson had seen his primary care physician, who had recommended counseling. Additionally, Johnson had entered into an Acute Partial Day Hospital Program at Philhaven and had provided a letter from Dr. Pakola that Johnson was unable to work until further notice. Johnson had failed, however, to provide medical documentation to support his allegation of traumatic injury. I then noted that upon review of the information, it could not be concluded that there was a causal relationship between the Erickson incident and Johnson's counseling.

21.    As to controverting the CA-1 application for Workers Compensation benefits, this was done because Johnson had not provided medical documentation to support his claim that the Erickson incident had caused a traumatic injury. Rather, I only had Dr. Brinser's prescription slip excusing Johnson from work through October 25, 1999, and recommending counseling and Dr. Pakola's October 22, 1999 letter advising that Johnson had been admitted to the Philhaven Acute Partial Day Hospital Program. There was no documentation that Johnson had suffered a traumatic injury related to the Erickson incident at the Lebanon VAMC.

22.    It is the employee's burden to provide supporting documentation of which Johnson had been advised on October 26, 1999.

5

R-24

23.    Specifically, on October 26, 1999, when Johnson came to my office for assistance in filing his Workers Compensation claim, we reviewed three forms and discussed the provisions of each.  One was an "Orientation and Election of a Physician," where we discussed his rights and benefits.  In that form, Johnson designated his primary care physician, Dr. Brinser, as the treating physician for his mental stress injury sustained on October 18, 1999.

24.    Another form we reviewed concerned the issues of outside employment and Johnson's obligation to perform light-duty work when able.

25.    The third form we reviewed was the "Injured Employee's Notification of Responsibilities."  Under paragraph 5 of this form, Johnson was notified that he had to promptly provide medical documentation from a private physician to support his claim and to be able to receive continuation of pay (COP).  I discussed this provision, along with the other provisions on the form, with Johnson; further, Johnson acknowledged receiving this form.

26.    When any employee submits a Workers Compensation claim, I give them  a copy of the "Injured Employee's Notification of Responsibilities" form and advise them that is their responsibility to provide supporting medical documentation. After any employee is given this form and advised of their responsibility to provide medical documentation, I do not subsequently contact the employee to request or to obtain medical documentation.

6

R.25

27.    I am aware that on October 21, 1999, John Sivley from Philhaven faxed Raymond Kent, the Human Resources Manager at the Lebanon VAMC and my supervisor, with a limited release. No medical documentation had come with the release; if it had, I was not advised of that nor given a copy of it. While I recall Mr. Kent advising me of the conversation, I do not recall when he did so. As I recall, the nature of the conversation Mr. Kent had with me was that Sivley was discussing the possibility of Johnson's return to work with the need to separate Johnson and Erickson from having contact with each other.

28.    As noted above, there is no 45-day COP when a CA-1 form is controverted. In Johnson's case, the CA-1 form was ultimately denied and had Johnson been given COP, he would have had to reimburse the VA.

29.    Additionally, Johnson claims that the CA-1 form was the wrong form to file and that a CA-2 form should have been filed. Johnson never would have been entitled to receive COP benefits under a CA-2 claim.

30.    Because I handle a number of claims each year, I keep notes on various actions or events, in addition to retaining copies of documents forwarded to the OWCP. Documents that were previously bate-stamped as G-0416 through G-0419 and G-0498-G-0501 are copies of the entries I made in Johnson's Worker's Compensation claims under both the CA-1 claim and the CA-2 claim.

31.    Additionally, I forwarded any CA-20 and CA-7 forms submitted by Johnson. (These latter forms provide medical information from the treating doctor

7

R.26

and supplemental information for payment of benefits if they subsequently are awarded). For example, on November 8, 1999, I forwarded a copy of the CA-20 form that Dr. Pakola had prepared on November 5, 1999.

32.    Although I do not recall specifically when I told Johnson that his claim had been controverted, Johnson knew of it by November 30, 1999. At about that point in time, Johnson was calling me or was coming by my office and he was accompanied by a William Dumas. Due to the issue Dumas made about the lack of medical information, which Johnson should have provided, I sent Dr. Pakola a letter on November 30, 1999, requesting that he produce a copy of Johnson's medical records.

33.    On December 2, 1999, Johnson provided me with a copy of his discharge instructions. The discharge notes reflected that Johnson had had ongoing psychiatric concerns that were ongoing and beyond the scope of the alleged incident. I forwarded this information to the Claim Examiner at OWCP along with a letter advising him that I was obtaining Johnson's Philhaven records which would be forwarded upon receipt.

34.    In the interim, I continued to leave messages with the OWCP regarding Johnson's request to have a prompt decision. I also explained to Johnson that it was the OWCP, not the VA, that would make the decision as to whether he was entitled to Workers Compensation benefits.

8

R. 27

35.     On December 15, 1999, the Claims Examiner for the OWCP denied Johnson's CA-1 claim for benefits.  The Claims Examiner advised Johnson that the initial information of file was insufficient to establish a causal relationship between the medical condition and the incident of October 18, 1999, which Johnson had been advised of by letter dated November 5, 1999.  Subsequent information that Johnson provided, plus Dr. Pakola's November 5, 1999 CA-20 form revealed that Johnson had a preexisting condition, with Dr. Pakola entering a question mark by the question whether his condition was caused by his federal employment.

36.     At some point, Johnson believed that the wrong form had been used to submit his Workers Compensation claim and that a CA-2 (occupational illness) form should have been submitted.  I believe this occurred around the time that the OWCP denied the CA-1 claim.  Regardless, I met with Johnson, Dumas, and Mr. Kent on December 20, 1999, where we discussed the claim and advised them that we would assist in submitting a CA-2 claim for Johnson.

37.     As reflected in the documents bate-stamped G-0416 -- G-0417 and G-0418 -- G-0500, I took many steps to assist Johnson in gathering information and processing his CA-2 claim, which included driving to Philhaven to pick up a copy of Johnson's medical record which I had yet to receive in late December 1999.

38.     On July 7, 2000, the Claims Examiner for the OWCP denied Johnson's CA-2 claim.

9

R. 23

39.     Johnson challenged the finding and a hearing took place on January 24, 2001.

40.     On April 10, 2001, Johnson's CA-2 claim was again denied.

41.     I am aware that Johnson recently sought reconsideration of the April 10, 2001 decision but I am not aware of the Department of Labor's decision.

42.     At no time did I take any action to "improperly" or "incorrectly" process, or to delay processing, any of Johnson's Workers Compensation requests due to his race or in retaliation for his exercising his EEO rights or otherwise.  Nor did I controvert Johnson's CA-1 claim due to his race or in retaliation for Johnson filing any EEO complaints.

43.     Further, I did not dispute Johnson's CA-1 claim nor his CA-2 claim due to Johnson's race nor in retaliation for Johnson filing any EEO complaints.

44.     Likewise, the decision to submit a CA-1 form initially on Johnson's behalf was because I believed that it was the correct form to use at the time; the decision was not motivated in the least by Johnson's race or in retaliation for Johnson exercising his EEO rights.

Pursuant to the penalties of perjury set forth at 28 U.S.C. §1746, I hereby state that the above is true and correct.

JOSEPH R. STUCKEY, JR.
Human Resources Specialist
Lebanon VAMC

R.29

# Master Agreement
# between the
# Department of Veterans Affairs
# and the
# American Federation of
# Government Employees




## 1997



**Department of Veterans Affairs**

# TABLE OF CONTENTS

PREAMBLE...................................................................................................................................... 5

INTRODUCTION .............................................................................................................................. 5

    ARTICLE 1--RECOGNITION AND COVERAGE ............................................................. 7
    ARTICLE 2--GOVERNING LAWS AND REGULATIONS ................................................. 8

LABOR-MANAGEMENT COLLABORATION ............................................................................. 8

    ARTICLE 3--PARTNERSHIP ............................................................................................. 10
    ARTICLE 4--LABOR-MANAGEMENT TRAINING....................................................... 12
    ARTICLE 5--LABOR MANAGEMENT COMMITTEE ................................................... 13
    ARTICLE 6--ALTERNATIVE DISPUTE RESOLUTION ................................................ 15
    ARTICLE 7--TOTAL QUALITY IMPROVEMENT ........................................................ 26

EMPLOYEE RIGHTS AND PRIVILEGES .................................................................................. 26

    ARTICLE 8--CHILD CARE ................................................................................................ 28
    ARTICLE 9--CLASSIFICATION ....................................................................................... 30
    ARTICLE 10--COMPETENCE ........................................................................................... 31
    ARTICLE 11--CONTRACTING OUT ............................................................................... 32
    ARTICLE 12--DETAILS, REASSIGNMENTS, AND TEMPORARY PROMOTIONS ..................... 36
    ARTICLE 13--DISCIPLINE AND ADVERSE ACTION ................................................. 39
    ARTICLE 14--EMPLOYEE ASSISTANCE ...................................................................... 41
    ARTICLE 15--EMPLOYEE AWARDS AND RECOGNITION ....................................... 45
    ARTICLE 16--EMPLOYEE RIGHTS ............................................................................... 48
    ARTICLE 17--EQUAL EMPLOYMENT OPPORTUNITY ............................................. 55
    ARTICLE 18--FITNESS FOR DUTY ................................................................................ 58
    ARTICLE 19--FLEXIPLACE ............................................................................................. 62
    ARTICLE 20--HOURS OF WORK AND OVERTIME ..................................................... 69
    ARTICLE 21--INVESTIGATIONS .................................................................................... 71
    ARTICLE 22--MERIT PROMOTION ................................................................................ 87
    ARTICLE 23--OFFICIAL RECORDS ............................................................................... 89
    ARTICLE 24--OFFICIAL TRAVEL .................................................................................. 91
    ARTICLE 25--PARKING AND TRANSPORTATION ..................................................... 93
    ARTICLE 26--PERFORMANCE APPRAISAL SYSTEM ................................................ 99
    ARTICLE 27--REDUCTION IN FORCE ........................................................................ 106
    ARTICLE 28--SAFETY, HEALTH, AND ENVIRONMENT ......................................... 122
    ARTICLE 29--SILENT MONITORING .......................................................................... 123
    ARTICLE 30--STAFF LOUNGES ................................................................................... 124
    ARTICLE 31--TEMPORARY, PROBATIONARY, AND PART-TIME EMPLOYEES/JOB SHARING ... 128
    ARTICLE 32--TIME AND LEAVE .................................................................................. 141
    ARTICLE 33--TIMELY AND PROPER COMPENSATION .......................................... 142
    ARTICLE 34--TRAINING AND CAREER DEVELOPMENT ...................................... 145
    ARTICLE 35--UNIFORMS ............................................................................................... 146
    ARTICLE 36--UPWARD MOBILITY .............................................................................. 148
    ARTICLE 37--WITHIN GRADE INCREASES ............................................................... 153
    ARTICLE 38--WORKER'S COMPENSATION .............................................................. 155

UNION RIGHTS AND PRIVILEGES ......................................................................................... 155

    ARTICLE 39--AFFILIATIONS ........................................................................................ 156
    ARTICLE 40--ARBITRATION ........................................................................................ 161
    ARTICLE 41--DUES WITHHOLDING ........................................................................... 164
    ARTICLE 42--GRIEVANCE PROCEDURE....................................................................

R. 31

ARTICLE 43--LOCAL SUPPLEMENT ............................................................................ 169
ARTICLE 44--MID-TERM BARGAINING ...................................................................... 171
ARTICLE 45--OFFICIAL TIME ...................................................................................... 174
ARTICLE 46--RIGHTS AND RESPONSIBILITIES ...................................................... 177
ARTICLE 47--SURVEILLANCE .................................................................................... 180
ARTICLE 48--USE OF OFFICIAL FACILITIES ............................................................ 181

**TITLE 38** ............................................................................................................................ **184**

ARTICLE 49--TITLE 38 ADVANCEMENT ................................................................... 184
ARTICLE 50--CLINICAL RESEARCH .......................................................................... 185
ARTICLE 51--TITLE 38 NURSE PAY/SURVEY ........................................................... 186
ARTICLE 52--PHYSICAL STANDARDS BOARD ........................................................ 188
ARTICLE 53--PROFESSIONAL STANDARDS BOARD .............................................. 189
ARTICLE 54--PROFICIENCY ........................................................................................ 190
ARTICLE 55--TITLE 38 REPRESENTATION AT BOARDS ........................................ 191
OR HEARINGS ................................................................................................................ 191
ARTICLE 56--TITLE 38 VACANCY ANNOUNCEMENTS ......................................... 192
ARTICLE 57--VETERANS CANTEEN SERVICE ........................................................ 193

**GENERAL PROVISIONS** ..................................................................................................... **194**

ARTICLE 58--RESEARCH GRANTS .............................................................................. 194
ARTICLE 59--RESEARCH PROGRAMS & DEMONSTRATION PROJECTS ............. 195
ARTICLE 60--WAGE SURVEYS .................................................................................... 196
ARTICLE 61--DURATION OF AGREEMENT .............................................................. 197

**INDEX** ................................................................................................................................... **198**

R-32

# ARTICLE 12--DETAILS, REASSIGNMENTS, AND TEMPORARY PROMOTIONS

## Section 1 - General

A. A detail is the temporary assignment of an employee to a different position for a specified period of time with the employee returning to their regular duties at the end of the detail. Details are intended only for the needs of the Department's work requirements when necessary services cannot be obtained by other desirable or practicable means.

B. Details of one (1) week or more shall be recorded and maintained in the Official Personnel Folder.

C. The following procedures shall apply when offering noncompetitive details of ten (10) consecutive workdays or more to both classified and unclassified positions:

   1. The Department will canvass the qualified employees to determine if anyone wishes to be detailed. If the same number of volunteers as vacancies exist, they shall be selected.

   2. If more employees volunteer than vacancies exist, the Department will select from the qualified volunteers. Seniority will be the selection criterion.

   3. If there are no volunteers, then the least senior qualified employee(s) will be selected.

   4. If there are fewer volunteers than vacancies, then the volunteers will be selected and additional persons will be selected as in Paragraph C3 in this Section.

   5. Seniority shall be defined locally.

   6. The Department will notify the Union of all details.

D. The procedures in Paragraph C in this Section shall apply except in the following circumstances:

   1. When management can demonstrate that the position to which an employee must be detailed requires unique skills and abilities that are not possessed by any other qualified employee,

   2. When a bona fide medical or operational emergency requires or precludes the detail of a particular employee, and

   3. When the Department makes a detail to accommodate a substantiated medical or health problem.

E. Details of less than ten (10) consecutive workdays shall be on a fair and equitable basis, and procedures for such details will be a subject for local negotiations.

R.33

F. For details outside of the duty station, a case-by-case analysis must be done comparing the distance from the old duty station to the employee's residence versus the distance from the new duty station to the employee's residence. When a significant difference exists, the employee should be given duty time for travel commensurate with the new duty station.

## Section 2 - Temporary Promotions -Title 5

A. Employees detailed to a higher grade position for a period of more than ten (10) consecutive work days must be temporarily promoted. The employee will be paid for the temporary promotion beginning the first day of the detail. The temporary promotion should be initiated at the earliest date it is known by management that the detail is expected to exceed ten (10) consecutive work days. The ten (10) consecutive work day provision will not be circumvented by rotating employees into a higher-grade position for less than ten (10) days in order to avoid the higher rate of pay. For the purposes of this section, a General Schedule employee who performs the grade-controlling duties of a higher-graded position for at least 25% of his time, or a Wage Grade employee who performs higher-graded duties on a regular and recurring basis, shall be temporarily promoted.

B. Temporary promotions in excess of sixty (60) calendar days shall be filled through competitive procedures. Temporary promotions of less than sixty (60) days shall be made in accordance with Section 1 among qualified employees.

## Section 3 - Restriction on Lower-Graded Duties

Should the requirements of the Department necessitate a detail to a lower-level position, this will in no way adversely affect the detailed employee's salary, classification, or position of record.

## Section 4 - Representatives

Management will make every effort to avoid placing a Union representative on a detail that would prevent that official from performing their representational functions. The Department agrees to notify the appropriate Union office prior to placing any designated Union representatives on detail away from the representative's normal duty station.

## Section 5 - Voluntary Reassignment

Employees seeking voluntary reassignments shall be entitled to prompt and fair consideration.

## Section 6 - Shift Change and Relocation

The parties recognize that giving consideration to seniority promotes improved employee morale and productivity. However, the parties also recognize the paramount importance of effectively accomplishing the work. Employees may request to relocate from one area of the local installation to another (or from one shift to another) in the same position (PD#) within the same service with the same advancement potential. In filling such a

R.34



vacancy, seniority will be considered and the request will be granted if the employee has the requisite skills and abilities, provided such relocation would be consistent with effective and efficient staffing. Management reserves the right to make the assignments based on other good faith considerations in assuring effective management of the work force.

## Section 7 - Relocation Expenses

An employee whose duty station changes either involuntary or due to a promotion shall be entitled to relocation expenses in accordance with regulations.

## Section 8 - Voluntary Demotion/Downgrade

Prior to acting on an employee's request for a voluntary reduction in grade, the Department will assure that:

A. The employee has been fully apprised in writing about the effects of such an action, and

B. The employee has been given an explanation of other alternatives relevant to the particular case.

## Section 9 - Assignments of Duties for Medical Reasons

Employees recuperating from serious illness or injury and temporarily unable to perform their assigned duties as certified by a physician may voluntarily submit a written request to their supervisor for temporary assignment to duties commensurate with the disability and the employee's qualifications. The Department may require that such requests be reviewed by a Federal medical officer for appropriate recommendations. The Department will consider such requests in accordance with applicable rules and regulations and medical recommendations. The Department will, to the extent feasible, temporarily assign the employee to an appropriate vacancy or duties and responsibilities within his own service/section commensurate with the employee's disability and qualifications. Employees will continue to be considered for promotional opportunities for which they are otherwise qualified.

## Section 10 - Reassignments

A. Reassignments shall not be used as punishment, harassment, or reprisal.

B. The parties agree that reassignment is a subject more appropriate for local bargaining. General areas which should be addressed include but are not limited to: posting of job notices, submitting voluntary requests, consideration of requests, and notification of reassignments.

C. All leave previously requested and approved will be transferred with the employee.

## Section 11 - Local Negotiations

R.35



The parties at the local level may negotiate additional procedures for details and reassignments.

## Section 12 - Rotations

When the rotation of employees through higher-graded positions has the effect that compensation at the higher grade is avoided, the Department will comply with governmentwide regulations.

R.36

# ARTICLE 22--MERIT PROMOTION

## Section 1 - Purpose and Policy

The parties agree that the purpose and intent of the provisions contained herein are to ensure that promotions are made equitably and in a consistent manner. Promotions shall be based solely on job-related criteria, and without regard to political, religious, labor organization affiliation or nonaffiliation, marital status, race, color, sex, sexual orientation, national origin, nondisqualifying disabling condition, or age. This article sets forth the merit promotion system, policies, and procedures applicable to bargaining unit positions in the Department.

## Section 2 - Development of Career Pathways

A. The parties will explore various means of enhancing career opportunities including but not limited to career ladders, administration movement, broad banding, etc.

B. The parties are committed to establishing career ladder positions within the organization in those situations where positions and functions can be grouped in a way compatible with program and work considerations.

C. The parties agree to develop and implement career ladder positions through joint labor-management involvement. Labor and management will work together as follows:

    1. Participation will include bargaining unit representatives appointed by the Union.

    2. The parties will have appropriate personnel and classification support.

    3. Review will consider existing positions and work functions within the respective component in all job categories (i.e., professional, technical, administrative, clerical, wage grade).

    4. Consolidate/Revise existing positions and develop career ladder positions where appropriate. The parties will attempt to design career ladders which provide opportunities for both lateral movement between career ladder positions and promotion to higher grade career ladder positions.

## Section 3 - Career Ladder Plans

A. Career ladder positions help employees develop to successfully perform higher level duties through training and incremental assignment of more complex work. The responsibilities assigned to the entry levels of career ladder positions will involve more basic skills and knowledge compared to journey-level responsibilities. The responsibilities at each level of the career ladder position will be communicated to employees through the position description and career ladder plan.

    Career ladder plans will be tailored to the complexity of the job duties and will permit individuals to learn and assume the fuller range of duties.

R.37

71



B. A Career Ladder Plan will be established for each career ladder position. The Career Ladder Plan will outline the objective criteria for each grade level which an employee must meet in order to be promoted. A copy of the plan will be given to each employee upon entry into the career ladder and when the employee is promoted to a new level of the career ladder. The employee will also be advised of their earliest date of promotion eligibility.

When career ladder plans are established and/or revised, the Department will provide notice to the Union in accordance with Article 46, Rights and Responsibilities. The employee will be provided with a copy of any revised career ladder plan within 30 days of such revision.

## Section 4 - Career Ladder Advancement

A. At the time the employee reaches their earliest date of promotion eligibility, the Department will decide whether or not to promote the employee.

1. If an employee is rated as successful and is meeting the promotion criteria in the career ladder plan, the Department will certify the promotion which will be effective at the beginning of the first pay period after the requirements are met.

2. If an employee is not meeting the criteria for promotion, the employee will be given a written notice at least sixty (60) days prior to earliest date of promotion eligibility. The written notice will state what the employee needs to do to meet the promotion plan criteria. Should a Career Ladder Plan require only a three (3) month training period, the above notice shall be a reasonable period prior to the earliest date of promotion eligibility.

a. If the employee is making progress, the supervisor will ensure that the employee has the opportunity to acquire pertinent skills and knowledge and to demonstrate that they meet promotion requirements as soon as is feasible.

b. If the employee is experiencing problems, the provisions in Paragraph B of this Section are applicable.

3. In the event that the employee met the promotion criteria, but the appropriate management official failed to initiate the promotion timely, the promotion will be retroactive to the beginning of the first pay period after the pay period in which the requirements were met.

B. At any time a supervisor and/or employee recognizes an employee's need for assistance in meeting the career ladder advancement criteria, the supervisor and employee will develop a plan tailored to assisting the employee in meeting the criteria. The plan should include all applicable training, as well as any other appropriate support. At the request of the employee, the Union may provide assistance.

If a nonprobationary employee fails to meet the promotion criteria after the appropriate assistance, the Department may:

1. Provide the employee with additional time to meet the promotion criteria or

R.30



2. Assign the employee duties commensurate with their current grade.

The career ladder plan may end, and the employee will remain at the level they attained within the career ladder. The employee may be reinstated back into the career ladder plan non-competitively if the employee remains in the position covered by the Career Ladder Plan.

<p style="text-align:center">or</p>

3. The employee may be assigned to another position at the same grade and step.

C. If an employee is denied a career ladder promotion because of the unavailability of enough work at the next grade, management agrees that, if an employee performs the work of the higher-graded position for the required amount of time during a pay period to qualify for reclassification to the higher grade, the employee will be temporarily promoted for that entire pay period.

### Section 5 - Definitions

For the purpose of this Article, the definitions contained in Part 335 and other related parts of Title 5 Code of Federal Regulations shall be incorporated as a part of this Agreement except as otherwise defined in this Agreement.

### Section 6 - Applicability of Competitive Procedures

A. Promotions - Any selection for promotion must be made on a competitive basis unless it is excluded by Section 7 below.

B. Reassignments/Changes to Lower Grade - Any selection to a position that provides specialized experience (Job Qualification System for Trades and Labor Occupations, Handbook X-118C) that the employee does not already have and is required for subsequent promotion to a designated higher grade position and/or to a position with known promotional potential must be made on a competitive basis.

C. Details - Competitive procedures will be applicable to any selection for detail of more than 60 days to a higher grade position, to a position with known promotional potential, or a position which provides specialized experience (Job Qualification System for Trades and Labor Occupations, Handbook X-118C) required for subsequent promotion to a designated higher grade position.

D. Training - Competitive procedures will be applicable to selections for training when eligibility for promotion to a particular position depends on whether the employee has completed that training.

E. Appointments - Competitive procedures apply to the transfer of a Federal employee or to the reinstatement of a former Federal employee to a position above the highest grade previously held permanently (unless the position is a higher-graded successor position as described in Paragraph 7 D5 of Section 7 of this Article) or to a position at or

R.39

below that grade if the position has promotional potential above the highest grade previously held permanently. The employee must not have been demoted or separated for cause from the higher grade(s) and, when competitive procedures apply, be identified as a well-qualified candidate with eligible VA employees to be eligible for appointment. To the extent feasible, the same qualification standards and the same methods of evaluation will be applied to both VA employees and persons being considered for appointment to higher graded positions above the highest grade previously held permanently by transfer or reinstatement. If it is determined that these methods are not feasible, the parties will meet and confer on the methods to be utilized.

F. The procedures for vacancies filled under competitive actions are described in this Article.

## Section 7 - Applicability of Noncompetitive Actions

A. Promotions - The following promotions may be taken on a noncompetitive basis unless otherwise provided:

   1. Promotion of the incumbent in a position that is reclassified at a higher grade due to the accretion of additional duties and responsibilities and not as the result of a planned management action.

   2. Promotion of an incumbent or an individual entitled to re-employment rights to a position that is reclassified to a higher grade without significant change in duties or responsibilities either on the basis of a new classification standard or as the result of correction of an original classification error. When the incumbent of the upgraded position meets the legal requirements and qualification standards for promotion to the higher grade, the incumbent will be promoted.

   3. Promotion of an employee previously selected competitively for a lower step of a career ladder.

   4. Promotion after receiving priority consideration.

   5. Promotion of an employee when directed by authorized authorities (i.e., judges, arbitrators, FLRA, and other appropriate authorities).

   6. Agencies may noncompetitively reinstate, transfer, promote an employee up to the highest grade previously held on a permanent basis under career or career-conditional appointment, provided the employee was not demoted or separated from that grade for cause.

   7. Temporary promotions to a higher grade totaling sixty (60) days or less during any twelve- (12) month period. If a temporary promotion which was not expected to exceed sixty (60) days was originally made on a noncompetitive basis, any extension beyond 60 days must be made under competitive procedures.

   8. Career ladder promotions following noncompetitive conversion of a cooperative education student in accordance with the requirements of applicable OPM policy.

R-40

9. Promotion of an employee covered by an approved training agreement.

10. Promotion of an employee placed competitively in a trainee position.

11. Any other noncompetitive action authorized by law or existing government-wide regulation.

B. Reassignments/Changes to Lower Grade - A reassignment or change to lower grade to a position that does not provide specialized experience (Job Qualification System for Trades and Labor Occupations, Handbook X-118C) that the employee does not already have and is required for subsequent promotion to a designated higher grade position or to a position having no known promotional potential may be taken on a noncompetitive basis.

C. Details - The following details may be made on a noncompetitive basis:

1. Details of sixty (60) days or less to a higher grade position (see Article 12, Details, Reassignments and Temporary Promotions).

2. Details of sixty (60) days or less to a position at the same or lower grade with known promotional potential or to a position which provides specialized experience (Job Qualification System for Trades and Labor Occupations, Handbook X-118C) required for subsequent promotion to a designated higher-graded position.

3. Details to a position at the same or lower grade with no known promotion potential or to a position which does not provide specialized experience (Job Qualification System for Trades and Labor Occupations, Handbook X-118C) required for subsequent promotion to a designated higher graded position.

4. Details to unclassified duties.

D. Other Noncompetitive Actions:

1. Conversion of an employee from a temporary promotion to a permanent promotion in the same position and duty station provided the vacancy announcement for the temporary promotion indicated that the promotion could later become permanent.

2. Selection from an OPM-approved register.

3. Transfer of a Federal employee or reinstatement of a former Federal employee (including conversion to reinstatement from a temporary appointment) to a position at the same or lower grade than the highest permanent grade held under a career or career-conditional appointment provided the candidate was not demoted or separated for personal cause from a higher grade and also provided that the position does not have known promotional potential to a grade higher than the highest permanent grade held.

4. Reinstatement to the same career ladder position for which an employee was previously selected competitively or to a similar career ladder position having similar qualification requirements and having no greater known promotional potential.

R. 41

5.  Reinstatement of a former VA employee to a position which is the higher-graded successor to a position they previously held.  Such reinstatements may be made non-competitively when classification of the successor position is based on the establishment of a new position classification standard or the revision of a position classification standard.

6.  A position change permitted by reduction-in-force regulations.

7.  Consideration or selection of :

   a.  Disabled veterans under 5 CFR 315.604

   b.  Disabled veterans under 5 CFR 315.707

   c.  Cooperative education students (FPM Chapter 308)

   d.  Veterans Readjustment Appointments under 5 CFR 307.

   e.  Severely handicapped appointments under 5 CFR 213.3102 (u) and (t).

   f.  Schedule A & B Excepted Appointments

   g.  Any other noncompetitive action authorized by law or existing government-wide regulation.

E.  Additional procedures for noncompetitive details and reassignments are described in Article 12, Details, Reassignments, and Temporary Promotions.

### Section 8 - Vacancy Announcements and Areas of Consideration

A.  All positions to be competitively filled in the bargaining unit by actions covered by this Article shall be posted unless filled under Section 7 which provides for exclusions from coverage.  For the same type of vacancy (title, series, and grade), a certificate may be used for up to ninety (90) days to refer candidates without re-announcing the vacancy.

B.  Prior to considering candidates from outside the AFGE bargaining unit, the Employer agrees to first consider internal candidates for selection.

C.  Areas of Consideration:

The areas of consideration will be:

   FIRST - Facilitywide (including satellites) except:

   1.  This area may be made more narrow or expanded through mutual agreement.

   2.  Where evidence suggests that the area of consideration is not expected to produce at least three qualified candidates, it may be expanded.  The vacancy announcement will identify the expanded area of consideration.

R.42

3. For VA Headquarters unit positions, GS-12 and above, the area of consideration may be expanded.

However, in all cases, (1, 2, and 3 above), first and full consideration shall be given to any best qualified candidates within the facility (or more narrow area).

SECOND - Any other promotion candidate or candidate required to compete from other VA facilities.

THIRD -

1. Reassignments/demotions to positions with higher known promotion potential.

2. Reinstatements to positions at a higher grade or with higher known potential.

3. Transfers to positions at a higher grade or with higher known potential.

D. Consideration of VA employees as promotion or promotion-potential candidates outside the normal area of consideration for positions covered by this article will be considered as follows:

The employee can submit an application and supporting attachments, designated on the form, to the appropriate Human Resources Management (HRM) Office. The applicant should indicate thereon the specific position or types of positions, and location(s) for which the employee wants to be considered. To ensure full consideration, employees should include on their applications information relevant to the assessment criteria for the position in which they may be interested. In order to be considered for a particular vacancy, the employees must have the form on file with the HRM Office prior to closing of the announcement.

E. Consideration of VA Candidates for Reinstatement. When consideration is given to a former VA employee applying for reinstatement, noncompetitive referral will initially be made for: (a) positions at the last grade, (b) a position which is the higher-graded successor to a position they previously held, and (c) positions at any higher grade(s) the employee held permanently if the employee was not demoted or separated for cause from the higher grade. However, if vacancies do not exist at these grades, if requested by the employee, referral may be made to a lower-graded position. Last grade is defined as the grade of the last position held under a non-temporary appointment for reinstatement candidates. If applicants accept referral to the lower-level position, they must sign a statement that they fully understand and accept the referral. However, employees will also be informed that they do not have to accept a lower position in order to be reinstated. Consideration for bargaining unit positions above the last grade permanently held must be competitive.

F. Information on Vacancy Announcements.

Vacancy announcements will include, at a minimum:

1. Statement of nondiscrimination;

R. 43

77

2.  Announcement number and opening and closing dates;

3.  Position number(s), title(s), series, and grade(s);

4.  Number of vacancies to be filled;

5.  Promotional test to be used, if any; and, where applicable, positions in the "same-line-of-work";

6.  Geographic and organizational location;

7.  Time-in-grade requirements, if any;

8.  Area of consideration;

9.  Summary of qualification requirements and duties for the position;

10.  Hours of work and/or the availability of alternative work schedule options;

11.  If appropriate, a statement that the vacant position is a trainee position leading to a noncompetitive promotion and conditions for promotion;

12.  Permanent or temporary nature and duration, if temporary;

13.  Filing instructions;

14.  Name and telephone number of the personnel specialist or other individual to contact for specific assessment criteria and other information relating to the announcement; and

15.  The HRM office or the address where the application is to be submitted.

The Department agrees to standardize VA vacancy announcements to the extent feasible.

G.  Announcing Career Ladder Vacancies and Vacancies Covered by Training Agreements.

Career ladder vacancies and vacancies covered by training agreements may be announced at any or all grades.  The Union will be provided with written notice of any changes in the posting of these announcements, prior to being posted.

H.  Posting and Distribution of Vacancy Announcements.

The Department agrees to provide a copy of vacancy announcements to the Union at the time of or prior to postings.  In addition, the job analysis, without the rating guide, will be provided to the Union within the area of consideration.  The Department agrees to post vacancy announcements within the area of consideration and to make copies available to employees, upon request, in accordance with the following:

R-44

1. Individual vacancy announcements will remain open and posted for fifteen (15) workdays.

2. Open continuous announcements will remain posted at all times. When it has been determined that an open continuous vacancy will be filled, the cut-off notice will be posted in order for all interested employees to apply.

3. Scheduled Employee Absence of three (3) Weeks or Less: Employees temporarily absent on approved leave, detail, at training courses, or on official business, for periods not to exceed three (3) weeks may, upon their return, review position vacancies announced and closed during their absence, and make application for such vacancies in which they are interested. Such late applications must be submitted within three (3) workdays after return to duty and must be accompanied by a statement prepared and signed by the employee and also signed by their supervisor explaining the dates and reason(s) for the employee's absence. Employees filing delayed applications under this provision will be considered only for those vacancies for which a best-qualified list has not yet been prepared.

I. Amending Vacancy Announcements.

If a vacancy announcement has been posted and is later found to contain a substantial error concerning items listed in Section 8F, the announcement will be amended if the selecting official still intends to fill the position under the competitive process. The amendment should cite the change(s) and indicate whether or not the original applicants need to refile in order to be considered.

J. Vacancy Announcement/Locating Candidates.

The Union and each applicant will be notified in writing if an announcement is canceled and will be provided with a reason for the cancellation. However, such cancellations will not be used to compromise merit promotion principles.

### Section 9 - Knowledge, Skills, Abilities, and Other Characteristics

A. Definition:

KSAO stands for knowledge, skill, ability and other characteristics.

B. The parties agree that KSAOs developed for all current and future unit positions, and changes and modifications thereto, will be fair, job-related, applied equitably and uniformly, and established in accordance with law, higher authority rules and regulations, and this Agreement.

C. Changes to Established KSAOs:

KSAOs will be established by a panel which will conduct job analysis and other prescribed duties. The panel will normally include a bargaining unit employee chosen with the concurrence of the Union. Absent mutual agreement, Management will appoint panel members following discussions with the Union and informing the Union of the reason for its decision. Informational copies will be provided to the Union as part of the

R-45

79



vacancy announcements. If KSAOs for specific positions (i.e., position numbers) are changed after their initial establishment and used in a promotion action, the newly developed KSAOs will be sent to the Union in advance of any future vacancy announcements and handled by the parties in accordance with their bargaining obligations under Chapter 71, Title 5 USC.

D.  Procedures:

   1.  KSAOs will be developed by:

     a.  Identifying the major tasks/duties of the position through a job analysis based on information contained in the position description, Career Ladder Plan, qualification standards, and/or classification standards and

     b.  Identifying the worker characteristics and demonstrated abilities (KSAOs) needed to perform the job.

   2.  KSAOs are defined as follows:

   <u>Knowledge</u>:  A body of learned information used directly on the job.

   <u>Skill</u>:  A present competence to perform a skill, unlike an ability, involves observable, quantifiable, and measurable performance parameters such as typing and pipefitting.

   An <u>ability</u> is the power to perform an activity <u>at the present time</u>.  An ability is evidenced by the performance of some activity or work and should not be confused with an aptitude which is only a potential for performing an activity.  An aptitude cannot be determined or measured by information in applications.

   <u>Other Characteristics</u> must be directly observable or measurable and job-related.

   3.  For each announced vacancy in the bargaining unit, not less than three (3) and not more than eight (8) KSAOs will normally be identified.

     a.  KSAOs shall be measurable (degree of possession can be discerned) and reasonable (some candidates can be expected to possess them).  Any KSAOs which do not meet these criteria will be dropped.

     b.  The KSAOs developed will be reviewed to determine which ones are critical to successful job performance.  These KSAOs (at least two) will be designated as selection factors.

     c.  Task examples shall be developed for each KSAO.  The task examples shall be derived from, and consistent with, the official position description of record.  Task examples shall be identified in the vacancy announcement and fully documented and made part of the merit promotion package.

**<u>Section 10 - Panel for Competitive Action</u>**

R.46

A. <u>Panel Membership Requirements</u> - Subject to Section 10C., panels will be established for all competitive actions. Panel members shall be instructed in the tasks necessary to perform the panel's function.

Panels for bargaining unit positions will include two (2) bargaining unit employees chosen with the concurrence of the Union. Absent mutual agreement, Management reserves the right to appoint panel members following discussions with the Union and informing the Union of the reasons for its decision.

The parties recognize that some competitive actions may require larger or smaller panels. The Department may determine the necessary panel size.

Panel members will not be in competition for the vacancy(s) and must be at least the same grade or higher, if possible, than the vacancy to be filled.

A relative of an applicant may not serve on the panel.

Members of the panel should be familiar with the job requirements of the position(s) being filled.

B. <u>Panel Information</u> - The Department will provide the promotion panel with all of the necessary information for completing its function.

C. <u>Panel Responsibilities</u> - The Panel will:

1. Apply evaluation criteria to ensure that a well-qualified candidate is selected:

a. When there are eight (8) or fewer (nine (9) for two (2) vacancies, ten (10) for 3, etc.) qualified promotion candidates, they will be referred in order of entry on duty date at the current VA facility to the selecting official for consideration without rating and ranking.

b. When there are more than eight (8) qualified promotion candidates in the first area of promotion consideration, a Panel shall be convened.

c. Promotion candidates from outside the first area of promotion consideration shall be rated by the Panel if the candidates from the first area were rated and ranked.

d. The panel will evaluate each application in order to ascertain the relevancy of the candidate's background (including but not limited to work experience, awards, training, outside activities, etc.) to the KSAOs. Candidates will be evaluated on the extent to which they possess the KSAOs relevant to the position being filled. This assessment will be based on the applicant's description of the proportion of time spent performing relevant activities, the complexity of the activity, identifiable results, level of contacts involved in performing the work, or the scope of responsibilities and duties performed.

In making this evaluation, the task examples should not be taken as the only types of evidence which demonstrate possession of a KSAO.

R.47

2. Determining the Best Qualified List for Referral:

    a. First Area of Promotion Consideration.

      (1) The evaluation panel will review the listing of ranked promotion candidates to determine whether a meaningful break is present. The meaningful break is where:

        (a) The lowest ranking candidate above the break should be able to perform the job with substantially equal success as all candidates with higher scores, and

        (b) The highest ranking candidate below the break should not be able to perform with substantially equal success as those above the break.

      (2) Promotion candidates above the break will be placed on the best qualified list for referral. If there is no break and/or there are too many candidates above the break, the eight (8) highest ranking candidates will constitute the best qualified list and be referred in order of their entry on duty date at the facility.

    b. In order to be referred, candidates who have to compete under the procedures of this Article and who are outside the facility shall have a rating equal to or better than the meaningful break or cutoff established by the promotion candidates within the first area of promotion consideration.

    c. Length of service with VA shall serve as a tie breaker where one is necessary.

    d. A copy of any referral list forwarded to a selecting official will be provided to the Union.

D. Multiple Grade Levels or Locations

If an announcement pertains to more than one grade level or geographic location, a separate list of eligible persons will be developed for each grade level and location.

E. Documentation - The panel will document working notes. Notes may be annotated on worksheets used by the panel. The notes will serve as reference material to document the process by which the decision was made.

F. Confidentiality - The results of the panel's actions will be treated confidentially and in accordance with provisions of the Privacy Act.

G. Decisions - The panel will make its decision(s) by consensus


**Section 11 - Sources of Information on Candidates**

R.48

A. Any awards the applicants have received must be considered by the selection panel but only to the extent they are relevant to the rating factors/job elements for the position being filled.

B. Once applications are received and the selecting panel convened, no other information on a candidate may be gathered unless with the approval of the panel.

C. VA Form 5-46-76a, Employee Supplemental Qualifications Statement, is to be used, and it will be the primary source document used to evaluate qualifications and to rate and rank candidates.

  1. Employees are responsible for giving complete and accurate information and for submitting VA Form 5-4676a by close of business on the seventh calendar day after the closing date of the vacancy announcement. If the panel has not yet been convened, late supplementals will be accepted for bona fide reasons. If the form is not submitted within that time, the panel will consider only the information available from other sources described in this section.

  2. The SF-171, Personnel Qualifications Statement, may also be reviewed if available.

D. Interviews - If interviews are used, they must be job-related, reasonably consistent, and fair to all candidates. Also, if interviews are used, all candidates must be interviewed if reasonably available, in person or by telephone where circumstances warrant. If more than one management official is conducting the interview, a union representative may be present upon the employee's request.

## Section 12 - Selection

A. In the event of unanticipated vacancy(s) in the same position and location as the posted vacancy occurring within ninety (90) days of the selection, the selecting officer may make additional selections from the well-qualified candidates selected from the original vacancy announcement.

B. When a selection has been made, the Department will arrange a release date, notify the employee, and ensure that the appropriate personnel forms are processed. The effective date of a promotion action, other than promotion within a career ladder, will be the first day of the pay period in which the employee is scheduled to report. If an employee has been selected for promotion, has accepted the offer, and a reporting date has been established, and the resultant request for personnel action (SF-52) is not timely received and/or acted upon by the appointing official, the action shall be made retroactive to the reporting date.

C. Employees selected for career ladder positions will be promoted to the next higher grade level at the beginning of the first pay period after selection, provided time in grade and any other legal promotion requirements are met.

D. Management recognizes that it is important for maintaining high morale to try to select from within the facility when the candidates are equally qualified to those

R. 49

candidates available from outside sources.  Thus, management will agree to look closely at the relative qualifications of candidates from outside and within and shall exercise good faith in the selection.

E.  If the vacancy is one for which an under-representation exists and is a targeted occupation as identified in the Affirmative Employment Plan, and there are well qualified candidates whose selection would reduce the under-representation, then the selection official will give serious consideration to those individuals.

Upon request, the Union will be provided with  a written reason for selecting an outside candidate.

## Section 13 - Priority Considerations

A.  Definition - For the purpose of this article, a priority consideration is the bona fide consideration for noncompetitive selection given to an employee as the result of a previous failure to properly consider the employee for selection because of procedural, regulatory, or program violation.  Employees will receive one priority consideration for each instance of improper consideration.

B.  Processing - The procedures for processing a priority consideration shall be:

   1.  Employees will be notified in writing by the authorized management official of entitlement to each priority consideration.  Such notice will advise employees that if a vacancy is announced and posted and the employee wishes to exercise their priority consideration, the employee should submit the necessary application to HRMS with a written request that they wish priority consideration for the vacancy.

   2.  Priority consideration is to be exercised by the selecting official at the option of the employee for an appropriate vacancy.  An appropriate vacancy is one for which the employee is interested, is eligible, and which leads to the same grade level as the vacancy for which proper consideration was not given.

   3.  Prior to the evaluation of other applicants, the name(s) of the employee(s) requesting to exercise priority consideration will be referred to the selecting official.  The selecting official will make a determination on the request prior to evaluating other applicants.

   4.  The fact that the employee chooses to exercise a priority consideration does not preclude that employee from also filing an application through the regular posting process.

C.  Union Notification - In order to assure compliance with this section, the Union will be furnished statistics on priority considerations granted and exercised and the results.  Statistics will be kept and provided to the Union on a quarterly basis.  The Union will also be notified in writing of each individual priority consideration completed.

84

R.50



## Section 14 - Special Consideration

Employees who were downgraded without personal cause (i.e., where the downgrade was not due to misconduct, inefficiency, or at the employee's own request), may be eligible for special consideration. Re-promotion may be made to a grade previously held on a non-temporary basis or to an intervening grade. This applies only when the employee was downgraded in the Department and the re-promotion is to a grade formerly held in the Department.

Employees under this provision will receive a special consideration for each grade for which they were demoted or downgraded.

## Section 15 - Keeping Employees Informed

A. Employees who apply for and inquire about a specific promotion action will be given the following information by the personnel office or the selecting official:

1. Whether they met the minimum qualification requirements,

2. Whether they were in the group from which selection was made,

3. Who was selected, and

4. Upon request, the selecting official shall provide a verbal statement of the reason(s) why the employee was not selected and/or a written statement regarding what areas, if any, they should improve to increase their chances for future selection.

B. Upon request, an employee will be shown any record of production or any supervisory appraisal of past performance which has been used in considering them for promotion. An employee is not entitled to see records on another applicant unless they are the selecting official, a member of the selection panel, or otherwise officially involved in the promotion process, or they have the written consent of the subject of the record or is an agency official with a need to review the record.

However, an employee and/or the Union shall have access, consistent with law, government wide rule, or regulation, to all pertinent records used in the process of filling vacancies which are requested for the purpose of processing or filing a grievance, EEO complaint, or other appeal.

## Section 16 - Union Review of Competitive Actions

A. The Union will be permitted to conduct audits of promotion packages for all bargaining unit positions when it has reason to believe a discrepancy exists or when requested to do so by an employee.

B. The Union will provide the Department with the names of the Union representatives who are responsible for conducting audits. Any changes to the list of designated representatives will be sent to the Department in writing. The representative designated to conduct the audit will not have been an applicant for the promotion package being audited.

e. 51

C.  If the employee chooses to use the Union procedure, they must make a written request to the Union within 15 working days after the selection is posted on the biweekly promotion listing.  A Union request under Subsection (A) above must be made within the same time limits.

D.  The designated management official responsible for the package will make the pertinent records from the package available to the Union auditor within seven (7) working days of receipt of the audit request.  An auditor shall treat information confidentially and review it in HRMS in the presence of a management official.

E.  If, during the course of the audit, additional information is determined to be necessary, such information shall be secured from HRMS.

F.  Employees who elect to use the grievance procedure rather than the Union audit procedure must initiate action in accordance with Article 42, Grievance Procedure.

**Section 17. Reopener:**  The parties agree to a reopener of this article due to pending PAY VA issues.  This reopener applies only to those sections which would be directly affected by the PAY VA issue unless mutually agreed upon by the Parties.  Either party wishing to reopen must give written notice thirty (30) days prior to bargaining.

IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF PENNSYLVANIA

. . . . . . . . . . . . . .  .
LEWIS JOHNSON,              .
           Plaintiff .
                 .
        vs.        . No. 1:CV-00-1873
                 . (Judge McClure)
HERSHEL W. GOBER, ACTING   .
SECRETARY OF VETERAN       .
AFFAIRS, et al,            .
          Defendants.
. . . . . . . . . . . . . .  .

    Videotaped
    Deposition of:  FRANCES MARGARET WINTERS

    Taken by      :  Plaintiff

    Date          :  April 2, 2002, 1:24 p.m.

    Place         :  4311 North Sixth Street
                  Harrisburg, Pennsylvania

    Before        :  Gail D. McLucas, Notary Public
                  Registered Professional Reporter
                  -and-
                  Crystal M. Lyde, Videographer

APPEARANCES:

    ANDREW J. OSTROWSKI, ESQ.

        For - Plaintiff

    UNITED STATES DEPARTMENT OF JUSTICE
    By:  KATE L. MERSHIMER, ESQ.

        For - Defendant

    MARTIN R. COHEN

        For - For Union AFGE

    ALSO PRESENT:

        LEWIS JOHNSON

R-52

6

Exam./Ostrowski - Winters

1    that govern the practice allow us the

2    opportunity to bring people in who we think have

3    knowledge or information that is relevant or

4    material to our case to ask them what they may

5    or may not know about the facts involving the

6    case.  That's the reason that you're here today.

7    It's a question answer format.  Relatively

8    informal, but I will be asking you questions and

9    I'll be asking for your verbal responses to

10   those questions.  So before you answer any

11   questions, be sure that you've heard and

12   understood the question and if there is anything

13   that I can do before you respond to clarify,

14   restate the question, feel free to ask and I'll

15   be happy to accommodate you.  Okay?

16  A.   Okay.

17  Q.   And during the course of the deposition, should

18       there be anything that you wanted to ask me, you

19       can feel free so long as it's okay with your

20       counsel to ask me questions and I'll try to work

21       with you there.  Okay?

22  A.   Okay.

23  Q.   How are you currently employed?

24  A.   I'm employed at the Veterans Administration as a

25       licensed practical nurse.  I'm also the union

R-53

7

Exam./Ostrowski - Winters

1    president.

2  Q.  And how long have you been employed with the

3       Veterans Administration?

4  A.  It will be 29 years this June.

5  Q.  And how long have you been a licensed practical

6       nurse?

7  A.  Since -- more than 30 years.

8  Q.  And has your work assignment for the Veterans

9       Administration in Lebanon, have you been at the

10      Lebanon facility your entire time with the VA?

11  A.  Yes.

12  Q.  And that entire time have you been a licensed

13      practical nurse?

14  A.  Yes, until I became president of the union.

15  Q.  When did you become president of the union?

16  A.  That was five years ago, April.

17  Q.  And prior to then, what was your position?

18  A.  Would you repeat that?

19  Q.  Prior to when you became union president, how

20      were you assigned?

21  A.  I was a licensed practical nurse.

22  Q.  In what department is that?

23  A.  Nursing.

24  Q.  And who, in that position, was your supervisor?

25  A.  At the time, Fran Kunath.

R-54

32

Exam./Ostrowski - Winters

1    A.    Yes.

2    Q.    Do you know how long in relation to

3          October 13th?

4    A.    No, I don't.

5    Q.    Can you put it in terms of weeks or months,

6          even?

7    A.    I would say weeks.

8    Q.    Then on the fourth page of Exhibit 9, can you

9          tell me what that document is?

10   A.    This document I signed along with Mr. Shea when

11         the Lebanon VA Medical Center was going to do

12         RIF procedures.

13   Q.    When was that signed?

14   A.    I don't know the exact date.  Neither one of us

15         dated it, which was an error, which never

16         happened after that.

17   Q.    And do you know when the RIF procedures were?

18   A.    That I believe was 1997, 1998.

19   Q.    The bottom left, it says distribution or Dist.

20         "B".  Do you know what that means?

21   A.    No, I don't.

22   Q.    And what, again, was the purpose of this

23         memorandum of understanding?

24   A.    For RIF procedures.

25   Q.    How do you know, is that just your recollection

R-55

33

Exam./Ostrowski - Winters

1    that this was in connection with RIF procedures?

2  A.  Because the Lebanon VA was first facility to do

3      RIF procedures for our VISN.

4  Q.  For what?

5  A.  VISN 4.  This is the first hospital that they

6      talked about doing a RIF procedure at.

7  Q.  And who is Mr. Shea?  Was he with the VA?

8  A.  Yes.  He was acting, he was assistant director

9      and was acting CEO at the time.

10 Q.  Now, do you understand, do you have an

11     understanding under the union contract what

12     consideration is given to seniority in

13     reassignment or promotion decisions?

14 A.  Say that again, please.

15 Q.  Do you have an understanding under the union

16     agreement, under the master agreement and I can

17     show you a provision, of what consideration

18     seniority is given in reassignment or promotion?

19 A.  In reassignment, yes, but this was in regards to

20     RIF procedures.

21 Q.  Understood.

22 A.  It's two different things.  I believe you're --

23     this was totally RIF procedures.

24 Q.  Was this part of a larger document?

25 A.  No, not that I can recall, no.

R.56

34

Exam./Ostrowski - Winters

1   Q.   Now, is there, are there any other documents

2        that reflect or refer to the content of that

3        fourth page of Exhibit 9, such that we could

4        make a determination independent of your

5        testimony that this was part of negotiation

6        concerning RIF procedures?

7   A.   I don't understand it, no, I don't.

8   Q.   From what I understand, it's your recollection

9        that this MOU had to do with RIF procedures?

10   A.   Yes, that's correct for RIF procedures.

11   Q.   And you don't recall this as being part of any

12        larger document like an MEO or any other

13        RIF-related documents?

14   A.   No, I don't recall.

15   Q.   Are there any other documents that you're aware

16        of that refer to seniority determinations and

17        reassignments in connection with a RIF?

18   A.   Not that I can recall, no.

19   Q.   And what, did you actually sit and negotiate

20        this matter that's reflected on the fourth page

21        of Exhibit 9 with Mr. Shea?

22   A.   Yes.

23   Q.   Who drafted the content of the memorandum?

24   A.   Would be assistance of personnel.

25   Q.   Did it ever occur to you that the term RIF or

RS7

Exam./Ostrowski - Winters

1      reduction in force was not used in this MOU?

2  A.   No.  Because I knew it was for RIF procedure.

3  Q.   I'm just going to refer you to Article 12 of the

4       master agreement from 1997.

5           MR. COHEN:  I'd like to make kind of a

6       clarification if not an objection at this point.

7       The master agreement which you have in your hand

8       is a 100-page document.  It's long.  It's quite

9       complicated.  And outsiders to the union will

10      assume that a union officer like Ms. Winters or

11      other union officers somehow are masters of all

12      100 pages.  They are not and I think that should

13      be recognized as you question her.  Not only

14      that, but it would be inappropriate to put an

15      article in front of her and expect her to become

16      an expert in a minute.

17          MR. OSTROWSKI:  I'm just going to ask her

18      about it.  If she doesn't know anything, she

19      doesn't know anything.

20  BY MR. OSTROWSKI:

21  Q.   I'm going to read to you Section 10 under

22      reassignments.  It says, "The parties agree that

23      reassignment is a subject more appropriate for

24      local bargaining.  General areas which should be

25      addressed include, but are not limited to,

R-53

36

Exam./Ostrowski - Winters

1      posting of job notices, submitting voluntary

2      requests, consideration of requests and

3      notification of reassignments."  Do you have an

4      understanding that there is some consideration

5      given to seniority in general, not just in the

6      RIF process, but in general as it relates to

7      reassignment decisions?

8   A. Could you repeat that, please?

9   Q. Do you understand there to be, under the

10     agreement between the union and management, the

11     agreement that we are referring to, that there

12     is some consideration that's prescribed to be

13     given to seniority in reassignment decisions?

14  A. In reassignment decisions, yes.

15  Q. Now, do you have, are you familiar with the

16     issue regarding Mr. Johnson's reassignment or

17     his nonselection?

18  A. That was not a reassignment.  That was a

19     posting, a merit promotion.

20  Q. What's the difference?

21  A. How do I explain it?  The job was posted.  I

22     believe that's a posting there.  When you

23     post -- when a job is posted, a candidate is put

24     in for it and then they go through the merit,

25     they follow the procedures for the merit

R·59

8-6-98

To AFGE 1966

I would like the Union AFGE 1966 to conduct an Audit on my behalf. To see if their where any discrepancy that may have led to me no selection of the position of Housekeeping Aid in the Extended Care Product Line Area 14-3.

I would like to conduct this Audit as it is stated in our Master Agreement; Article 22 Merit Promotion Section 16 Union Review of Competitive Actions.

I would like to see the list of Union representatives who responsible for doing the audit.

*Lewis W. Johnson*   8-6-98

Received
Sep 10th 1998
JW



EXHIBIT
9

R.60

Lewis John
wied
Sep. 2, 19

Hello Peg

I would like a copy of the minutes of the union meeting on Aug 24th 1998. Also, I would like to see your copy of my audit request, and a written statement ~~it it was it~~ stating why I wasn't give the Audit information from the Union.

Lewis W. Johnson

Received this Request Sept 8. 1998 @ 9:00AM F.W.

R-61

**From The Desk of**
**LEWIS JOHNSON Sr.**

# Memo for the Record

13 October, 1998

**To:** Michael Brennan

**From:** LEWIS JOHNSON Sr.

**Date:** 10/13/98

**Re:** Informal Grievance

Subject: Admonishment for Absence on 27 Aug 98 Ref: Article 13, Sec 1, 6, 7

Article 32 Sec 2 para c, d h

On 21 Aug 1998, I verbally told Rodney K. Weekend Supervisor that I wanted to cancel my leave scheduled for Aug 31 to Sept 4 1998, Rodney granted my request. Rodney suggested that I put my requested cancellation in the Employee Time and Leave computer, I did this immediately. At this time he did not mention that my work schedule would be alter in anyway or that I would be working on my regular days off (RDO) When I arrived at work on the 28 Aug1998 to pick up my uniforms for work, I was told by Mike Brennan Daylight Supervisor that I was suppose to work the preceding day. I informed him at that time I had not been told of a work schedule change. He said that no one communicated that I had canceled my annual leave and that I should have been at work the preceding day. I asked Mike Brennan for annual leave and he said Okay. I had assumed that leave was approved until 14 Sept 1998, when I pulled up my Leave Used Summary on the computer and found the leave charged as AWOL. I was given no prior notification that the leave was changed to AWOL or the reason for the Admonishment.

Relief: I request that, my request for annual leave be reinstated and the AWOL be removed from my record. {Please reference Past Practices and Article 13 Section 1, 6 and 7, Article 32, Section 2 para c, d, and h. of the Master Agreement

Past Practices: On two previous occasions Mike Brennan asked me to use annual leave when he scheduled me incorrectly for nine days instead of 10 days this occurring in the months May and July.

Sign: *Lewis W. Johnson*
10-13-98

R-62

# Memorandum of Understanding

### Between
### VAMC Lebanon
### and
### AFGE Local 1966

### Seniority Determinations

The parties agree that the determination of seniority when used in reassignment decision, whether for the most or least senior the following definition will apply:

> The primary determining factor will be entrance on duty (EOD)at the VAMC Lebanon.
> In situations where there is an tie on EOD the next determining factor will be Service Computation Date (SCD) as defined in Federal Regulations.
> If both EOD and SCD are equal the employee(s) with the higher last 2 digits of their Social Security Number will be deemed to be more senior.


Frances M. Winters
President, AFGE Local 1966

Timothy P. Shea
Acting, CEO


Dist. "B"

R-63



**AMERICAN FEDERATION OF GOVERNMENT EMPLOYEES**
*AFFILIATED WITH THE AFL-CIO*

LOCAL 1966

V.A. MEDICAL CENTER
1700 S. Lincoln Avenue
Lebanon, PA 17042-7597

November 24, 1999

Raymer Kent
Human Resources Manager

A.F.G.E. is requesting an extension of time frame for the process of filing grievance and or appeals on

behalf of Lewis Johnson in reference to the following "Monetary/Group Award 1998" and the current

"Assault/Harassment".

Respectfully,

*Frances M Winters*

Frances M. Winters
President AFGE Local 1966

*Lewis Johnson found out about the Monetary/Group award 1998 - this past September 23, 1998 - F.M.W 11/24/99*

*A 30 day extension is approved beginning 11-22-99*

*Ray Kent*

R.64

IN THE UNITED STATES DISTRICT COURT

FOR THE MIDDLE DISTRICT OF PENNSYLVANIA

```
. . . . . . . . . . . . .
LEWIS JOHNSON,                    .
            Plaintiff            .
                                 .
            vs.                  .  Number 1:CV-00-1873
                                 .  (Judge McClure)
HERSHEL W. GOBER, ACTING.
SECRETARY OF VETERAN             .
AFFAIRS, ET AL.,                 .
            Defendants           .
. . . . . . . . . . . . .
```

Deposition  of:  ALICE E. FIDLER

Taken by      :  Plaintiff

Date          :  May 2, 2002, 2:02 p.m.

Place         :  Office of United States Attorney
                 Federal Building
                 228 Walnut Street
                 Harrisburg, Pennsylvania

Reporter      :  Glenda S. Travitz
                 Registered Professional Reporter
                 Notary Public


APPEARANCES:

        ANDREW J. OSTROWSKI, ESQUIRE

            For - Plaintiff

        UNITED STATES DEPARTMENT OF JUSTICE
        OFFICE OF UNITED STATES ATTORNEY
        By:  KATE L. MERSHIMER, ESQUIRE

            For - Defendants

R.65

5

Exam./Ostrowski - Fidler

1  Q.  How long have you lived in Lancaster?

2  A.  Thirty-eight years.

3  Q.  Where in Lancaster?

4  A.  1060 Nissley Road.  It's not right in the city.

5  Q.  It's East Hempfield Township?

6  A.  Yes.

7  Q.  That's where I grew up.

8  A.  Okay.  Are you a Hempfield graduate?

9  Q.  No.  Lancaster Catholic.  I lived out by

10     Rohrerstown Elementary School.

11 A.  Yes.  Okay.

12 Q.  You said you lived there for 38 years?

13 A.  Yes.

14 Q.  And how long were you employed by the

15     Department of Veterans Affairs?

16 A.  Fifteen years.

17 Q.  Was that all at the Lebanon Veterans

18     Administration?

19 A.  Yes, it was.

20 Q.  What did you do before your employment at the

21     VA?

22 A.  I worked for four years at Lancashire Hall.  It

23     was a nursing and rehab center.  I was

24     assistant director of nursing and director of

25     nursing.

R-66

6

Exam./Ostrowski - Fidler

1   Q.   When you were hired, it would have been 1985 or

2        so?

3   A.   It was 1981.  I worked there from 1981 to 1985.

4   Q.   In 1985 then you went to the VA?

5   A.   That's correct.

6   Q.   What position did you have when you went to the

7        VA?

8   A.   I was a staff nurse on the medical-surgical

9        unit.

10  Q.   Why don't you just kind of work through how you

11       progressed to your position that you held at

12       the time you retired.

13  A.   I was a staff nurse for five years on the

14       medical-surgical unit.

15            Then I was a head nurse on a gero-psych

16       unit.

17            Then I became a head nurse on a specialty

18       unit.  Half of it was gero-psych, and the other

19       half was dementia.

20  Q.   How long in each of those two positions?

21  A.   Let me think.  The head nurse on the gero-psych

22       unit was about seven years, and I was staff

23       nurse for five years.  So I was a head nurse on

24       this last unit for three years.

25  Q.   Your last position before your retirement was a

R-67

7

Exam./Ostrowski - Fidler

1        three-year position?

2    A.   Yes.

3    Q.   What specifically was that position?

4    A.   I was the nurse manager on a special care unit.

5    Q.   Just for that unit?

6    A.   We went product line, and that meant that the

7        team --  I was the nurse manager and a team

8        leader for that unit.  So I was also in charge

9        of the nursing department, the physician

10       assistant, the housekeeping people.  It was a

11       whole team concept, but I did the evaluations

12       on the psychologists and the physician

13       assistant and the nursing people.

14   Q.   When did you go to the structure --  What was

15       it?  The work unit?  What was the term again?

16   A.   Product line.

17   Q.   Product line.  When did you go to the product

18       line structure?

19   A.   In 1998.

20   Q.   And when in 1998?

21   A.   The spring of '98.  I would say around April of

22       1998.

23   Q.   How did that change your duties or your

24       authorities as it relates to housekeepers?

25   A.   Well, prior to that, I was in charge of the

R.68

8

Exam./Ostrowski - Fidler

1  nursing people on the unit.  Once we went to

2  product line, I was in charge of the

3  housekeeper, the ward secretary, the physician

4  assistant.  I was their team leader.

5      At that point I was able to hire the

6  people that were going to work on my team.

7  Prior to that, people were hired through

8  personnel or nursing service, and they were

9  just sent to your unit.  You didn't really have

10 much input into the people that were on your

11 unit.

12 Q.  So it sounds like when you went to product line

13     there was a lot of additional --

14 A.  Responsibility.

15 Q.  As opposed to a restructuring of

16     responsibilities.  Is that fair to say?

17 A.  Yes.

18 Q.  What was your area, your nurse manager area?

19 A.  It was 19-3.

20 Q.  That's a building and a floor; is that correct?

21 A.  Yes, that's correct.

22 Q.  How many nurses were on your floor?

23 A.  I had --  This is --  It's been several years

24     ago, so I'm not exactly sure.  I think I had

25     eight RNs, including myself.  I had 12 LPNs and

R.69

9

Exam./Ostrowski - Fidler

1    24 nursing assistants.

2    Q.    And those eight RNs, was that enough to cover

3    each of the three shifts?

4    A.    Yes.  We covered 24 hours a day seven days a

5    week.

6    Q.    And then there was a shift that you worked;

7    correct?

8    A.    Yes.

9    Q.    What was that?

10   A.    I worked 7:45 to 4:15.

11   Q.    Is that a standard daylight shift?

12   A.    Yes.

13   Q.    How long did you work that shift?

14   A.    As long as I was the nurse manager.  Now, I did

15   come in on off-tours.  That was my prerogative,

16   to come in and work part of a shift, do some

17   observation on four to twelve, come in at

18   night.  You know, I had leeway to set my

19   schedule however I deemed necessary to observe

20   what was going on.

21   Q.    How many nurse managers are there at the

22   Lebanon VA?

23   A.    In our product line, there were seven of us.

24   Q.    Your product line being --

25   A.    It was the extended care product line.

R.70

10

Exam./Ostrowski - Fidler

1  Q.    Was it broken down by building and floor?  Is

2        that how the --

3  A.    Yes.  Each floor had a nurse manager.  Some

4        floors had a nurse manager and a team leader.

5        It didn't necessarily mean that the nurse was

6        the team leader.  I was --  Several of us were

7        the nurse manager and the team leader, but some

8        units had the nurse for the nurse manager and

9        maybe a psychologist for a team leader.

10 Q.    What are your team leader responsibilities?

11 A.    Well, it's running the total show, managing the

12       entire team.

13 Q.    And that entire team as it existed in 19-3 was

14       you, your nursing staff, the housekeeping aids.

15       And who else was involved?

16 A.    Psychologist, the social worker, the physician.

17       This was all part of your team.  It was called

18       an interdisciplinary treatment team, an

19       interdisciplinary team.

20 Q.    What was the position that you held immediately

21       before the nurse manager position?

22 A.    I was just a nurse manager on the unit, but I

23       only managed the nursing personnel.

24 Q.    What unit was that?

25 A.    That was on 17-3.

R.71

18

Exam./Ostrowski - Fidler

1  Q.  So did Mr. Hummel leave before you went to

2      product line?

3  A.  I think so.

4  Q.  Did you switch to product line at some point

5      from when Mr. Hummel left until Mr. Johnson

6      came on?

7  A.  Yes, sir.

8  Q.  Prior to going to product line, what was your

9      understanding of how the housekeeping position

10     would have been filled?

11 A.  It would have been posted just like it was, and

12     the people in Environmental Management would

13     have chosen the person to fill the position.

14 Q.  How long of a period of time was it from the

15     time that Mr. Hummel left his position until

16     Mr. --  Is it Hull or Hall?  Hull, H-U-L-L?

17 A.  That's right.

18 Q.  -- until Mr. Hull took over the position?

19 A.  I'm not exactly sure.  He worked in the unit

20     out of the Environmental Management System.  I

21     think approximately five to six weeks that he

22     was assigned to that unit.

23 Q.  Mr. --

24 A.  Hull.

25 Q.  Assigned to that unit?

R.72

19

Exam./Ostrowski - Fidler

1   A.   Just to fill in temporarily.

2   Q.   So there was on the books a vacancy of

3        Mr. Hummel's position for five to six weeks?

4   A.   That's correct.

5   Q.   During that five- to six-week period, was

6        Mr. Hull the only person who filled that

7        position?

8   A.   I can't remember exactly, but I think he

9        covered the area most of the time.

10  Q.   I understood that before Mr. Hull was selected

11       for the position that he was a part-timer.

12  A.   He was a part-time employee.  He only worked

13       weekends.  Beulah Hadrick hired him full time

14       at the beginning of June.  At that moment I

15       can't tell you now if that was part of the --

16       if we were all under product line then at that

17       time or if it was still under the Environmental

18       Management Service.  But he was hired and

19       pretty well filled into that slot.  So I guess

20       what I'm saying is we must have been under

21       product line at that time.

22  Q.   When you say Beulah Hadrick hired him, what do

23       you --

24  A.   At that point she was --  Somebody other than

25       the team leaders was doing the hiring.  When he

R.73

20

Exam./Ostrowski - Fidler

1    went from part time to full time, she made the

2    selection.

3  Q.   Why wasn't that --  I mean why --  Strike that.

4         Did you talk to Beulah Hadrick at all

5    about that decision to fill the position?

6  A.   No.  I had no input in that.  She evaluated the

7    people that applied, and he got the position.

8  Q.   You're talking about filling that position --

9  A.   From part time to a full-time float position.

10  Q.   But a float position, was there a float

11    position assigned to extended care?

12  A.   Yes.

13  Q.   And was that --

14  A.   That was a new position that was created after

15    we went product line so that we would have

16    coverage for the seven units for annual leave

17    and call-ins and for project cleaning.  He was

18    hired by Beulah Hadrick into that float

19    position.

20  Q.   After you went product line, then you had three

21    positions in extended care?

22  A.   We had seven positions in extended care and one

23    float position.  So we had eight positions.

24  Q.   Before product line?

25  A.   With product line those were the positions we

R.74

21

Exam./Ostrowski - Fidler

1    had.  Before product line it was all handled

2    out of the Environmental Management.

3   Q.   Right.  But how many positions were there?

4   A.   That I don't know.

5   Q.   But there was a new float position created when

6        you went to product line?

7   A.   That's correct.

8   Q.   Mr. Hull was brought in to fill that position?

9   A.   By Beulah Hadrick.

10  Q.   When he was brought in to fill that position by

11       Beulah Hadrick, he was just being brought in to

12       fill the float position?

13  A.   That's correct.

14  Q.   What hours did he work?

15  A.   He worked six to 2:30 Monday through Friday.

16  Q.   And Mr. Hummel's position remained open?

17  A.   Yes.

18  Q.   Now, did Mr. Hull --  Were most of his

19       responsibilities dealing with the position

20       vacated by Mr. Hummel because that was vacant?

21  A.   Yes.

22  Q.   Ms. Hadrick, was she still there when you left?

23  A.   Yes.

24  Q.   Is she still there?

25  A.   No, she's not.

R.75

22

Exam./Ostrowski - Fidler

1   Q.   Do you know when she --   Did she retire?

2   A.   No.   She transferred to Texas.

3   Q.   Do you know when she transferred to Texas?

4   A.   February of 2001.

5   Q.   Do you have any idea why she transferred to

6        Texas?

7   A.   She got a better job.

8   Q.   With the federal government?

9   A.   Yes.   She's with the VA.

10           MS. MERSHIMER:   I'm sorry.   I didn't hear

11        your answer.   Why did she transfer?

12  A.   I think she got a promotion.

13  BY MR. OSTROWSKI:

14  Q.   Ms. Hadrick, is she also a caucasian female?

15  A.   No.   She's black.

16  Q.   Okay.   When Mr. Hull was working in the float

17        position before the decision was made, was he

18        working 19-3?

19  A.   Yes, primarily.

20  Q.   And how long was he working 19-3 before the

21        selection decision was made?

22  A.   Five to six weeks.

23  Q.   During that five to six weeks, you were there

24        too?

25  A.   Yes.

R.76

26

Exam./Ostrowski - Fidler

1      says housekeeping aid, it may be 2736A.  Do you

2      know what that means?

3  A.    No.

4          MS. MERSHIMER:  Where?

5          MR. OSTROWSKI:  Or 273LA.

6  BY MR. OSTROWSKI:

7  Q.    In box 14 it looks like possibly Comp 860.  Do

8      you know what that means?

9  A.    No, I don't.

10  Q.    Who is Scott Shreve, S-H-R-E-V-E?

11  A.    Scott Shreve was the product line manager.

12  Q.    Now, prior to June of 1998, did you know

13      Mr. Hull?

14  A.    Yes.  He worked weekends.

15  Q.    Did you actually ever meet him?

16  A.    When he was working weekends?

17  Q.    Yes.

18  A.    No.

19  Q.    What was his assignment prior to the full-time

20      float position?

21  A.    He worked out of Environmental Management, and

22      I think he was assigned different areas to

23      clean on weekends.

24  Q.    Was he ever assigned to do cleaning on 19-3?

25  A.    On the weekends when he was part time?

R.77

28

Exam./Ostrowski - Fidler

1   A.   Nothing.  Nothing in particular because I

2        didn't know who would qualify for the position.

3   Q.   Well, how long --  If you look at Exhibit 1,

4        July 15th, 1998 was the day that you made the

5        decision.  How long before that did you begin

6        your process of making that decision?

7   A.   It looks like it was only posted on July 8th.

8        I received this memo probably two or three days

9        before I made the selection.  You get the memo

10       with the names on, and then you decide how

11       you're going to go about making the selection.

12  Q.   How did you decide how you were going to go

13       about making the selection?

14  A.   Well, I knew Mr. Hull, and I knew Mr. Johnson,

15       and they both had housekeeping experience.

16       Those are the two that I looked at the most

17       closely.  Those are the two I looked at because

18       they were trained.

19  Q.   How long before --  How long was Mr. Hull a

20       housekeeping aid in a part-time position?

21  A.   I can't answer you that.  I don't know.  As I

22       said, he worked for the Environmental

23       Management.  I don't know the exact.

24            (Handwritten document entitled Interviews

25       Paper with attachments, four pages, was

R.78

30

Exam./Ostrowski - Fidler

1   position.

2  Q.   Who came up with the point system?

3  A.   The KSAOs, it's on there.  They are evaluated

4       zero to five.  Zero means you don't know

5       anything about the job.  Three means you're

6       average.  Five means you are outstanding.

7            They each had the same, which were threes;

8       and there were three components to it.  So they

9       came up with a point system of nine.

10  Q.   And they each had nine?

11  A.   Yes.  It was exactly the same.  The wording was

12       exactly the same on both.

13  Q.   That score of nine came to you when you had the

14       KSAOs?

15  A.   Yes, from the EMS supervisor.  They completed

16       that.

17  Q.   Who was the EMS supervisor at the time?

18  A.   Rodney Kiscadden, I believe.

19  Q.   Did you speak with Mr. Kiscadden about the

20       performance of either Mr. Johnson or --

21  A.   No.  I looked at what was on the KSAOs.

22  Q.   On Exhibit Number 1, I believe it is -- yes --

23       it says, "The candidates below are eligible for

24       reassignment to the above position."  Did the

25       nature of the action have any bearing on your

R.79

31

Exam./Ostrowski - Fidler

1    decision-making process?  What I'm trying to

2    specifically refer to is, when they call it a

3    reassignment, did that have any bearing on how

4    you made your decision?

5  A.    On who I selected to check their KSAOs?  Is

6        that what you're asking me?

7  Q.    No, that wasn't, but why don't you answer that

8        question.

9  A.    I looked at this list, and this was a

10       reassignment.  I was looking at people that

11       were trained in the housekeeping department,

12       and there were two that were.  The rest were

13       all food service people, and they then would

14       have had to go through a training program for

15       housekeeping.  So I looked at the two that were

16       already in the housekeeping department.

17 Q.    When you say this was a reassignment, what do

18       you mean?  I mean what's the significance of

19       the term reassignment to you?

20 A.    Well, this was not a promotion.

21 Q.    So what would apply then that didn't apply

22       otherwise?  A better way to ask the question,

23       what's the difference in process, in selection

24       process, between a reassignment and a

25       promotion?

R.80

32

Exam./Ostrowski - Fidler

1   A.   Probably --  I don't know.  For myself this was

2        the first reassignment I had.  I had never had

3        a promotion.  So I looked at this and chose the

4        people that had previous experience.

5   Q.   But earlier you said, Well, this was a

6        reassignment, so I did it this way.

7            Are there things that you do in a

8        reassignment context that are different than

9        what you would have done if it was a promotion?

10  A.   I don't know.  I never did a promotion.  So the

11       criteria may have been different.

12  Q.   I may be mistaken.  I certainly don't want to

13       put words in your mouth.  But I understood from

14       your answer that you had some notion of what

15       reassignment was when you said this was a

16       reassignment, that you had some familiarity

17       with the term reassignment and the procedures

18       involved with that action.  Is that not the

19       case?

20  A.   The case is I was looking for somebody to fill

21       a housekeeping position, and when I had the

22       choice of finding somebody that had experience,

23       those were the two I looked at first to see if

24       they met the criteria I was looking for.

25  Q.   The process of using the KSAOs, do you know if

R.81

33

Exam./Ostrowski - Fidler

1    that's spelled out in writing somewhere?

2  A.  I'm sure it is.  There's policies for

3    everything.

4  Q.  Did you have any familiarity with Mr. Johnson

5    when he was a nursing assistant?

6  A.  No, not really.

7  Q.  Did you know that he was a nursing assistant at

8    one point?

9  A.  Yes, I did.

10  Q.  I'm just going to point out a document to you.

11    Do you recognize any of the handwriting on that

12    document?

13  A.  No, I don't.

14  Q.  On the bottom left-hand corner of Exhibit 2, it

15    looks like a 2B3.  Is that your handwriting?

16  A.  No, that's not.

17  Q.  Now, the 1-5 next to supplemental and float

18    observations, what does that mean?

19  A.  You can make them from a one to a five for

20    their supplemental and for our observations.

21  Q.  That standard rating the supplemental --  What

22    was the supplemental?

23  A.  That was what they had written, what each

24    employee had written about how they could

25    handle the job.  It covers safety, knowledge,

R-82

34

Exam./Ostrowski - Fidler

1        ability.

2    Q.   And the nines, the two nines, they were numbers

3         that came to you?

4    A.   No.  They came out of the KSAO that the

5         supervisor --  They were threes, and there were

6         three components.  So they each --  Yeah,

7         that's how it came to me.

8    Q.   Did you know that Mr. Hull --  Do you know what

9         the letters EOD mean?

10   A.   Entry on duty date.

11   Q.   Were you aware of Mr. Hull's and Mr. Johnson's

12        entrance on duty dates?

13   A.   I did not check them.

14   Q.   Were you aware of them?

15   A.   No.

16   Q.   You weren't an union position, were you?

17   A.   No.

18   Q.   Were you aware of the union rules?

19   A.   Yes.

20   Q.   Did you ever consider seniority as a factor in

21        the decision?

22   A.   No.

23   Q.   Did you know that under reassignment the

24        seniority was supposed to be a factor in the

25        decision?

R.83

35

Exam./Ostrowski - Fidler

1    A.    It does not need to be a factor in my decision.

2         I need to pick the best qualified person for

3         the position, according to the union rules.

4    Q.    Did you check that?

5    A.    I knew that.  You get quite extensive union

6         training in a management position.

7    Q.    Now, you called the first page of Exhibit 2

8         Interviews Paper.  Why did you call it that?

9    A.    This was just for my records.  This only stayed

10        with me, and that's what I called it.

11        Mrs. Kohr and I sat down and looked at the two

12        pieces of paper and discussed our floating

13        observations and came up with the numerical

14        numbers here.  Then she helped me make the

15        final decision, or she agreed with my final

16        decision.

17   Q.    What float observations did you have on

18        Mr. Johnson?

19   A.    He was assigned then to our product line as a

20        float person.  He reported to me every morning

21        to either cover an unit that somebody had

22        called in or he was in charge of the project

23        cleaning if we were doing project cleaning.

24            So I did have some one-to-one observations

25        on Mr. Johnson and also just assigned him to

R.84

36

Exam./Ostrowski - Fidler

1      other areas to work.

2   Q.   Any problems?

3   A.   No.

4   Q.   What float observations did you have of

5        Mr. Hull?

6   A.   Well, Mr. Hull was on 19-3 for about five to

7        six weeks as the steady person there till this

8        position was filled.

9   Q.   You made a note -- I guess that's your note --

10       "Broken curtain rod.  Initiated work order."

11       What was that?

12  A.   Mr. Hull found a curtain rod that was broken.

13       He took the initiative to go to the secretary

14       and have it reported so it could be repaired

15       rather than coming -- and then came to tell me

16       that he had done so.

17            I thought this showed that he had

18       initiative and a good understanding of what was

19       at risk and safety and so forth.

20  Q.   Do you recall handwriting a note to Mr. Johnson

21       at one point in the past when he worked on your

22       unit?  I don't have it with me.  I'll just ask

23       you if you have any recollection of it.

24  A.   I handed out performance notes if people did a

25       good job occasionally.  This helped morale.  It

R.85

37

Exam./Ostrowski - Fidler

1   made the employee feel good about themselves.

2   I may have done that.  I don't remember.

3 Q.  Just to summarize the best you can, why did you

4   pick Mr. Hull over Mr. Johnson?

5 A.  According to the KSAO, according to the

6   numerical numbers, I felt that he would better

7   fit in with the team.  We were at that point

8   trying to build a team.  Product line was team

9   building.  I thought that he had better people

10   skills.

11       Mr. Johnson had been a nursing assistant.

12   Mr. Hull was not.  But Mr. Hull seemed to have

13   the patience to deal with the demented

14   patients.  You know, demented patients cannot

15   always be redirected, and they do some very

16   inappropriate things.  If they voided in the

17   waste can, he would clean it up and not make

18   any remarks.

19       Mr. Johnson felt that the -- would

20   verbalize that the staff needs to watch the

21   patients more closely so this doesn't happen.

22   You can't always do that.

23 Q.  To summarize it, would it be fair to say that

24   you felt that Mr. Hull would fit in better with

25   your team?

R.86

38

Exam./Ostrowski - Fidler

1  A.   I thought he was the best qualified and he

2       would fit in best with the other members of the

3       team.

4  Q.   And you knew that Mr. Johnson had been a

5       nurse's aide?

6  A.   I knew Mr. Johnson had been a nurse's aid. But

7       just because you're a nurse's aid, not

8       everybody can work with demented patients.

9  Q.   Are you aware of any volunteer work that

10      Mr. Johnson does or did?

11  A.   No.

12  Q.   Why didn't you schedule interviews?

13  A.   Because if you interview one, you have to

14      interview everybody.

15  Q.   So you would have had to interview all the

16      people on --

17  A.   All the people on here. When we discussed

18      this, Mrs. Kohr and I, since we both felt that

19      we knew Mr. Johnson and Mr. Hull, we wouldn't

20      interview.

21  Q.   What's Mrs. Kohr's position?

22  A.   She's a nurse manager on the hospice unit and

23      team leader.

24  Q.   Why was she involved in this?

25  A.   A peer as a sounding board so we would make

R 87

39

Exam./Ostrowski - Fidler

1    fair and equitable decisions.

2  Q.  Mr. Randall Houck, I'm sure you probably knew I

3       was going to address this.  He had given

4       testimony at one point during the course of an

5       EEO investigation.  First of all, do you know

6       Randall Houck?

7  A.  Yes, I do.

8  Q.  How do you know Randall Houck?

9  A.  Randall Houck worked for me for about seven

10      years.

11  Q.  In what position did he work for you?

12  A.  A nursing assistant.

13  Q.  He was a nursing assistant in 17-3?

14  A.  Yes.

15  Q.  Here's what he said in his testimony.  He said,

16      I worked for Alice Fidler for seven years on an

17      Alzheimer's floor, and during that time there

18      was an incident that came up where a black man

19      who was a janitor wanted to put in for the

20      position of nursing assistant on our floor.  He

21      was --  During that time I was speaking to

22      Alice Fidler, or she was speaking to me and

23      Wanda Miller and referring to the fact that

24      this fellow, this black man, had put in for the

25      job.  She made the statement --  I don't

R. 88

40

Exam./Ostrowski - Fidler

1    remember the exact words, but the impression

2    was quite clear to me.  It was along the line

3    that we didn't want any more of them on the

4    floor because we already had several of them on

5    the floor and we don't need no more trouble.

6          Do you have any recollection of --  Did

7    you ever see that or hear that testimony from

8    Mr. Houck before?

9  A.    No.

10  Q.    Was there during the time --  I guess you were

11        on an Alzheimer's floor.

12  A.    It was --

13  Q.    Was there a time when an African-American

14        janitor had applied for a nursing assistant

15        position?

16  A.    At that point I did not hire the nursing

17        assistants or the janitors.  So I would have

18        had no say on who came to the unit.

19  Q.    But was there a time when an African-American

20        male applied for a nursing assistant position

21        on the unit?

22  A.    I do not remember.

23  Q.    Other than the KSAOs, what other information

24        did you have to base your decision, your

25        selection decision, on?

R.89

41

Exam./Mershimer - Fidler

1  A.    I think I told you.  The KSAOs, the

2       supplemental that they had written, and

3       observations.

4  Q.    Are you aware of there being an affirmative

5       action policy that concerned housekeeping

6       positions?

7  A.    No.

8  Q.    You said that there was an African-American --

9       I think it was an LPN -- that you hired.  When

10      was that?

11  A.    It was in 1999.

12  Q.    How many total hirings did you make while you

13      were nurse manager of 19-3?

14  A.    Three.

15          MR. OSTROWSKI:  That's all the questions I

16      have.  Thank you.

17                    EXAMINATION

18  BY MS. MERSHIMER:

19  Q.    I have a couple of follow-up questions for you.

20          You referred to a document as "this," and

21      I want to be clear on the record which document

22      you're talking about.  You were asked the

23      question, Why didn't you interview the

24      applicants?  And you said if you interviewed

25      one you had to interview all of them.  Is that

R.90

42

Exam./Mershimer - Fidler

1       correct?

2  A.   That's correct.  That's a human resources --

3  Q.   You said you would have to interview all of

4      them on this.  When you said "this," were you

5      referring to Fidler Exhibit 1?

6  A.   (Indicating Exhibit 1.)

7  Q.   You're referring to all the individuals named

8      on Fidler Exhibit 1?

9  A.   Right.

10  Q.   That statement that Mr. Houck attributed to you

11      that the gist of it was you had enough blacks,

12      didn't want any more, did you make a statement

13      like that?

14  A.   No, I did not.

15  Q.   Any form like that at all?

16  A.   No, I did not.

17  Q.   Did you use race at all in making the selection

18      decision involving Mr. Hull and Mr. Johnson?

19  A.   No.

20  Q.   You had answered a question, Did you know

21      Mr. Hull before June 1998?  And I think you

22      said yes.  You said he worked weekends.  Did

23      you know who he personally was?

24  A.   I knew who he was.  He would sometimes be

25      assigned from the EMS to the unit if somebody

R.91

43

Exam./Ostrowski - Fidler

1      called in sick.

2  Q.   Also you had said something regarding Exhibit

3      1.  You had made the comment that it wasn't

4      posted until July 8th.

5  A.   That's what it says here.

6  Q.   I mean you used the word posted.  What I want

7      to clarify is I think there was testimony

8      before that the position posting had been

9      closed in June 1998.  So are you saying that --

10 A.   I got this.  I probably should --

11 Q.   Let me finish the question so it's clear for

12     the record.  On Fidler Exhibit 1 when you said

13     it was posted July 8, 1998, did you mean it

14     actually was dated July 8th, 1998, when you

15     received the list of people that would be

16     eligible for the position?

17 A.   Yes, that's what I meant.

18          MS. MERSHIMER:  I have nothing else.

19          MR. OSTROWSKI:  You reminded me of a

20     couple things I forgot to ask you about.

21               EXAMINATION

22 BY MR. OSTROWSKI:

23 Q.   You discussed the hiring decision with

24     Mr. Johnson after you made the decision; is

25     that correct?

R.92



# DEPARTMENT OF VETERANS AFFAIRS

# Memorandum



JUL 15 1998

VA MEDICAL CENTER
LEBANON, PA 17042

Date: July 8, 1998

From: Personnel Management Specialist (N121)

Subj: Certificate for position of Housekeeping Aid, WG-3566-2, Extended Care, 19-3, full-time
6 am to 2:30 pm, Monday through Friday, OC 98-38

To: ACOS for Extended Care (N500)

1. The candidates below are eligible for reassignment to the above position. Official personnel folders and other evaluation records are available for review. Supervisory appraisals are attached.

| Employee's Name | Present Position |
|---|---|
| Barbara Keisch - white | Food Service Worker, WG-2 |
| Luis Nazario - hispanic | Food Service Worker, WG-2 |
| Deborah Dove - white | Food Service Worker, WG-2 |
| Lewis Johnson - African-American | Housekeeping Aid, WG-2 |
| Virginia Galebach - white  HKA | Food Service Worker, WG-2 |
| Deborah O'Donnell - white | Food Service Worker, WG-2 |
| Keith Bender - white | Food Service Worker, WG-2 |
| Ramon Adorno - hispanic | Food Service Worker, WG-2 |
| Ronald Hull - white | Housekeeping Aid, WG-2 |

2. Please complete the endorsement below, indicating your action and return this certificate by   7-15-98

*Suzette A. Flashel Umlauf*
SUZETTE A. FLASHEL UMLAUF

Attachments

--------------------------------------------------------------------------

Date: 07 · 15 · 98

End. 1

TO: Human Resources (N121)

✓ I have selected   Ronald Hull        accepts 7/15/98  .

___ I would like to have the position filled on _____

___ Outside or other recruitment is requested.

_____
(Signature and Title)

**G-0367**

PG _1_ OF _13_

VA FCPM  2105



*Ficller*

**EXHIBIT**

GST  1  5-2-02

attachmt 1 page

R-93

I Interviews Paper

Johnson                                    Hull
KSAO Sup 9                                 KSAO Sup 9
1-5  Supplemental 4                        Supplemental 5
1-5  Float observations 4                  Float observations 5
               17.                                        19

                              Broken exhaust rod.
                              initiated work order.

                     Selected Tom Hull
               Human Resources notified

Fidler
EXHIBIT
2  5-2-02

G-0365

R.94

Housekeeping Aid, US - 3566-2
(19-3)                              OC 98-38

12              Lewis

11

11              prefer

9

8

8

8

8

8

6

Tom Loy

Francis M. Ufema

Linette A. Flashel Umbery

7/2/98

R.95

Mar 27 02 07:18a    Don Bailey    717 221 9600    p.4

*EOD 2/21/93*

INSERVICE PLACEMENT RATING SHEET FOR WAGE SYSTEM JOBS

**VA Veterans Administration**

IMPORTANT — Complete all items below if the Job Element procedure described in OPM Handbook X-118C is being followed. If the KSAO alternative procedure is used instead, complete ONLY the REVERSE SIDE of this form.

| | | | | | | | | |
|---|---|---|---|---|---|---|---|---|
| **POSITION APPLIED FOR** (Title, series, grade) | | | | | | | | **ANNOUNCEMENT NO.** OC 98-38 |
| NAME OF EMPLOYEE | HOUSEKEEPING AID, WG-3566-2 | | | | | **SOURCE OF INFORMATION** (e.g., SF 171, Item 31A; VA Form S-4676a, Item 5; Award, February 1983, etc.) | | **POINT VALUE** |

| JOB ELEMENTS (See crediting plan for more information about each element) | CHECK THE CATEGORY which best indicates the employee's capability based on how his/her total background relates to the quality levels for each job element. | | | | | | | |
|---|---|---|---|---|---|---|---|---|
| | SU-PERIOR 4 pts. | SATIS-FACTORY 3 pts. | ACCEPT-ABLE 2 pts. | WEAK BUT OF SOME VALUE 1 pt. | OF NO VALUE 0 pts. | | | |
| **(SCREENOUT)** Knowledge of proper cleaning procedures and proper uses of a variety of cleaning and sanitizing solutions | | | | | | | | 5 |
| Knowledge of housekeeping procedures required in isolation environments. | | | | | | | | 3 |
| Ability to work safely. | | | | | | | | 4 |
| | | | | | | | | |
| | | | | | | | | |
| | | | | | | | | |
| | | | | | | | | |
| | | | | | | | | |
| | | | | | | | | |
| | | | | | | | | |
| | | | | | | **TOTAL POINTS** | | 12 |

REMARKS

QUALIFIED
[ ] AT LEAST 2 PTS. ON SCREENOUT ELEMENT
[X] TOTAL SCORE = 2 X NUMBER OF ELEMENTS OR CRITERIA

NOT QUALIFIED
[ ] LESS THAN 2 PTS. ON SCREENOUT
[ ] TOTAL SCORE LESS THAN 2 X NUMBER OF ELEMENTS

POINTS

HIGH QUALITY FIGURE (Lowest score which indicates high quality for this vacancy) ▶

| SIGNATURE OF SME PANEL MEMBER | DATE 7/2/98 | SIGNATURE OF SME PANEL MEMBER | DATE 7/2 |
|---|---|---|---|
| SIGNATURE OF SME PANEL MEMBER | DATE | SIGNATURE OF SME PANEL MEMBER | DATE 7/2 |

SUPERSEDES VA FORM S-4677, OCT 1976 AND OCT 1970. WHICH WILL NOT BE USED.

VA FORM 5-4677

R.96

Mar 27 '02 07:18a    Don Bailey                          712 221 9600        p.5

*EOU 10/24/47*
*WG 2 HKA*

2

**INSERVICE PLACEMENT RATING SHEET FOR WAGE SYSTEM JOBS**

**VA Veterans Administration**

IMPORTANT — Complete all items below if the Job Element procedure described in OPM Handbook X-118C is being followed. If the KSAO alternative procedure is used instead. complete ONLY the REVERSE SIDE of this form.

| | | | | | | ANNOUNCEMENT NO. OC 98-38 | |
|---|---|---|---|---|---|---|---|

POSITION APPLIED FOR *(Title, series, grade)* HOUSEKEEPING AID, WG-3566-2

NAME OF EMPLOYEE ▇▇▇▇▇▇▇▇

| JOB ELEMENTS *(See training plan for more information about each element)* | CHECK THE CATEGORY which best indicates the employee's capability based on how his/her total background relates to the quality levels for each job element. | | | | | SOURCE OF INFORMATION *(e.g., SF 171, Item 21A; VA Form 5-4676a, Item 5; Award, February 1983, etc.)* | POINT VALUE |
|---|---|---|---|---|---|---|---|
| | SU-PERIOR | SATIS-FACTORY | ACCEPT-ABLE | WEAK BUT OF SOME VALUE | OF NO VALUE | | |
| | 4 pts. | 3 pts. | 2 pts. | 1 pts. | 0 pts. | | |
| *(SCREENOUT)* Knowledge of proper cleaning procedures and proper uses of a variety of cleaning and sanitizing solutions | | 1. | | | | | 4 |
| Knowledge of housekeeping procedures required in isolation environments. | | | | | | | 3 |
| 3. Ability to work safely. | | | | | | | 4 |
| 2. | | | | | | | |
| D. | | | | | | | |
| E. | | | | | | | |
| F. | | | | | | | |
| G. | | | | | | | |
| H. | | | | | | TOTAL POINTS | 11 |

REMARKS

QUALIFIED
☐ AT LEAST 2 PTS. ON SCREENOUT ELEMENT
☒ TOTAL SCORE = 2 X NUMBER OF ELEMENTS OR BETTER

NOT QUALIFIED
☐ LESS THAN 2 PTS. ON SCREENOUT
☐ TOTAL SCORE LESS THAN 2 X NUMBER OF ELEMENTS

POINTS

HIGH QUALITY FIGURE *(Lowest score which indicates high quality for this vacancy)* ▶

| SIGNATURE OF SME PANEL MEMBER | DATE 7/2/98 |
|---|---|
| SIGNATURE OF SME PANEL MEMBER *Dorothea A. Flasher Umlauf* | DATE 7/2/98 |
| SIGNATURE OF SME PANEL MEMBER *Tom Lono* | DATE 7/2/9 |
| SIGNATURE OF SME PANEL MEMBER *Francis M. Hoffer* | DATE 7/2/9 |

VA FORM 5-4677    SUPERSEDES VA FORM 5-4677, DEC 1976 AND OCT 1970, WHICH WILL NOT BE USED.

R.97

1

STATE OF NEW JERSEY
COUNTY OF SOMERSET
CASE NO. 98-2320

2

3

4    IN THE MATTER OF            :
     LEWIS JOHNSON,              :    AFFIDAVIT OF:
5                                :
                                 :    BARBARA KOHR
6        vs.                     :
                                 :
7    LEBANON VA MEDICAL CENTER.  :    **ORIGINAL**
     -----------------------------

8

B E F O R E:

9

        GREGORY JONES, EEO Investigator, at the

10

VETERANS ADMINISTRATION MEDICAL CENTER, Lyons, New

11

Jersey, on September 14, 1999, commencing at 10:00 a.m.

12

13

14

15

16

17

18

A L S O   P R E S E N T:

19

    BEULAH HADRICK (telephonically)

20

21

22

23

                NORTH JERSEY REPORTING SERVICE
24                      15 Warren Street
                Hackensack, New Jersey 07601
25                      (201) 489-1144          G-0342

R.98

1

1

2                          I N D E X

3

WITNESS                              DIRECT

4

BARBARA KOHR

5

  By: Mr. Jones                         3

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24                NORTH JERSEY REPORTING SERVICE
                      15 Warren Street
25              Hackensack, New Jersey 07601
                      (201) 489-1144                G-0343

                                                       R99

2

B. Kohr - Direct

1
2  B A R B A R A   K O H R, having been duly sworn, testifies as
3  follows:
4
5  DIRECT EXAMINATION BY MR. JONES:
6
7       Q       Ms. Kohr, who do you have in the room with you?
8  A    I have Beulah Hadrick with me.
9       MS. HADRICK:  I'm the same person that was in
10     with the other one.
11      Q       Please state your full name and spell it for
12  the record.
13  A    Barbara Ann Kohr, B-a-r-b-a-r-a A-n-n K-o-h-r.
14      Q       Do you have a representative?
15  A    Yes, Beulah Hadrick.
16      Q       Please state your position.
17      MS. HADRICK:  I'm the clinical manager for
18     extended care.
19      Q       Ms. Kohr, please state your position.
20  A    Nurse manager and team leader of hospice unit.
21      Q       Please state your race.
22  A    Caucasian.
23      Q       Please state your color.          G-0344
24  A    White.
25      Q       What was your working relationship with the

R.100

3

R. Kohr direct

1  complainant?

2  A    I -- he was a -- a float, but I really had no direct

3  involvement with this employee, either one of them.

4      Q    Mr. Lewis Johnson has alleged that he was not

5  selected to the position of housekeeper aide, WG-2, in

6  extended care ward 19-3, on July 15th, 1998, because of

7  discrimination on the basis of race, African-American, and

8  color, black.

9          Do you have any information that might pertain

10 to what led up to this complaint?

11 A    No, I do not.

12     Q    Were you the selecting official?

13 A    Alice Fidler and I made the selection.

14     Q    What input did you have in the selection

15 process?

16 A    I sat with her as we reviewed the supervisor appraisal

17 and also the supplement that the employee read --  or wrote.

18     Q    Did you make a recommendation to Ms. Fidler?

19 A    No.

20     We used the criteria that I just stated and did it

21 according to numbers.

22     And Mr. Hull's number was 19.          G-0345

23     And Mr. Johnson's was 17.

24     So the higher number got the -- got the position.

25     Q    And what kind of point system, what was the

R.-101

4

B. Kohr - irect

1   point system based on?

2   A     We used the point system of the supervisory category

3   ratings.

4           Q     How many points were assigned to each KSO?

5   A     Okay.

6           It was a total of five for each KSO the 5 -- final

7   total for Mr. Johnson was nine.  And the final total for Mr.

8   Hull was nine.

9           On the supervisory appraisal, they were equal on that

10  one.

11          Q     And how about the employee appraisal?

12  A     The supplement, Mr. Johnson got four and Mr. Hull

13  received a five.

14          Q     And what other criteria did you use?

15  A     He had been a float on 19-3.  And we used the float

16  observation there.

17          Q     Who was "he"?

18  A     Mr. Johnson also -- Mr. Johnson and Mr. Hull floated

19  there.

20          Q     What were the point assignments for the float

21  observations?

22  A     Four for Mr. Johnson and five for Mr. Hull.

23          Q     Why was Mr. Hull's higher than Mr. Johnson?

24  A     It was stated that Mr. Hull showed initiative,

25  particularly when work orders were needed.     G-0346

R.102

5

B. Kohr - irect

1      Q     Who was that stated by?

2  A   That was stated by the nurse manager in that unit.

3      Q     And her name would be?

4  A   Alice Fidler.

5      Q     Did you observe the work of Mr. Hull or Mr.

6  Johnson?

7  A   No, I did not.

8      Q     Did Ms. Fidler work on the weekends?

9  A   Did she work on the weekends?

10     Q     Yes.

11  A   No.

12     Q     Can you provide me with copies of the point

13  system that you used for the KSOs of the supplementals of

14  both the supervisor and the employees?

15  A   Yes, sir.

16     Q     As well as any other documentation that you

17  used to make the selection.

18  A   Yes, we did.

19     Q     My fax number is, the area code is (908)

20  580-3547.

21  A   Sorry 58 -- wait a minute 580.

22     Q     Yes, 3547?       **G-0347**

23  A   You said, 547, okay.

24     Q     Did you take Mr. Johnson's race into

25  consideration when you decided to choose the other candidate?

R.103

B. Kohr — Direct

1    A    No, I didn't.

2         Q    Did you take Mr. Johnson's color into

3    consideration when you decided to choose the other candidate?

4    A    No, I did not.

5         Q    Why was the other candidate chosen over Mr.

6    Johnson?

7    A    On his supplemental -- employee supplemental

8    statement, each employee writes when they applied for this

9    job.

10        Mr. Hull had 17 years of experience, which did not

11   come up on Mr. Johnson's.

12        And in addition to that, he went into great detail

13   under isolation environment, which is part two of the

14   supplement, knowledge of housekeeping procedures required,

15   isolation environment.

16        He had experience in the emergency room, in ICU.

17        He not only knew that the area had to be clean, but he

18   knew that even if it looked clean that it doesn't necessarily

19   -- that it was not necessarily clean.  He stated that here.

20        He also gave an example of how, if he couldn't get to

21   an area to do it completely right, he went back and did it.

22        In fact, he stated here he went back three times, at

23   one point, to finish completing an assignment there.

24        His understanding -- his ability the work safely.  He

25   went into detail, not only on things that he would know, like

R.104

B. Kohr - Direct

1  using floor signs for wet floors, but also that communication

2  is the biggest part of safety and that -- he stated he -- in

3  the possibility of getting hurt is -- very high communication

4  is the best part of safety.

5      He was also very experienced the MSDS, in fact, had

6  taught this.

7      Q    Right.

8  A   While he was in the service.

9      Q    Were you or Ms. Fidler concerned with

10 maintaining a racial balance in the extended care unit,

11 particularly ward 19-3?

12 A   No.

13     Q    Did you ever hear Ms. Fidler make any

14 statements to any employees stating that if she hired too

15 many blacks or African-Americans she would not be able to

16 maintain that racial balance?

17 A   No, sir.

18     Q    How did you perceive Mr. Johnson's work and his

19 job performance leading up to the vacancy announcement?

20 A   I didn't.

21     Q    Okay.

22 A   I went strictly on -- like I said, sir, I went

23 strictly on the supervisor appraisal and the employee

24 supplement.

25     Q    Is there any other documentation that you feel

R. 105

G-0349

8

R. Kohr - Direct

1    I should review that will support your position?

2    A    No, sir.

3        Q    Do you think Mr. Johnson possessed the

4    qualities to be selected for this position?

5    A    Do I think he -- I think he -- both did, sir.

6        I think both employees did.

7        Q    Is there anyone that can corroborate what you

8    have told me here today?

9    A    No.

10        MR. JONES:    This concludes the testimony of

11        Ms. Kohr.

12

13        (Whereupon this Affidavit is concluded.)

14

15

16

17

18

19

20

21

22

23

24

25        **G-0350**

R.106

B. Kohr - irect

1

2                          C E R T I F I C A T E

3

4

5          I, LAURA A. CARUCCI, License No. XIO2050, a Certified

6     Shorthand Reporter and Notary Public of the State of New

7     Jersey, certify that the foregoing is a true and accurate

8     transcript of my stenographic notes taken by me

9     telephonically at the place and the time hereinbefore set

10    forth.

11

12

13

14

15    My Commission Expires:
      MARCH 01, 2004

16

17    _____
      A Notary Public and Shorthand
      Reporter of the State of New Jersey

18

19

20

21

22

23

24

25                                        G-0351

                                              R-107

10

1          EQUAL EMPLOYMENT OPPORTUNITY INVESTIGATION
                   CASE NUMBER:  98-2320
2

3    IN THE MATTER OF
     LEWIS JOHNSON,

4         Complainant          STATEMENT UNDER OATH

5         Vs                   OF: MARGARET CROMER

6    LEBANON VA MEDICAL
     CENTER,
7         Respondent
     ---------------------

8

9

10        TRANSCRIPT of Statement Under Oath of MARGARET

11   CROMER, called for oral examination by the

12   Parties in the above-entitled action, said examination

13   being taken pursuant to Rules of Civil Practice and

14   Procedure by JANE E. CLANCY, C.S.R, a Notary Public

15   and Certified Shorthand Reporter of the State of New

16   Jersey, at the New Jersey Health Care Systems-Lyons,

17   151 Knollcroft Road, Building 16, Second Floor, Lyons,

18   New Jersey, on Friday, September 17, 1999, commencing

19   at approximately 8:50 a.m. pursuant to notice.

20

21                              **G-0304**

22

23        REPORTING SERVICES ARRANGED THROUGH:

24        NORTH JERSEY REPORTING SERVICE
               113A Johnson Avenue
25        Hackensack, New Jersey 07932
               (201) 489-1144         **ORIGINAL**

PG 1 OF 7

R.108

1     A P P E A R A N C E S:

2

3     GREGORY JONES
      EEO INVESTIGATOR
      OFFICE OF THE RESOLUTION MANAGEMENT

4     LYONS, NEW JERSEY 07939

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23     **G-0305**

24

25     PG 2 OF 2

R.109

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

I N D E X:

WITNESS                      DIRECT CROSS REDIRECT RECROSS

MARGARET CROMER

      BY: MR. JONES          4

**G-0306**

PG 3 OF 2

R.110

1    M A R G A R E T   C R O M E R, having been first duly

2    sworn according to law by the Notary, testified as

3    follows:

4    EXAMINATION BY

5    MR. JONES:

6        Q        Please state your full name?

7    A.    Margaret S. Cromer.

8        Q.    Miss Cromer, do you have a

9    representative?

10   A.    No, I don't.

11       Q.    Please state your position?

12   A.    Chief Education and Staff Development.

13       Q.    Please state your race?

14   A.    White.

15       Q.    Please state your color?

16   A.    White.

17       Q.    Ms. Cromer, Mr. Lewis Johnson has alleged

18   that he was not selected to a position of Housekeeping

19   A-WG-2, Extended Care, on Ward 19-3 on July 15, 1998,

20   because of discrimination on the basis of race,

21   African-American and his color, black.  Do you have any

22   information pertaining to this complaint?

23   A.    Not specifically.  Mr. Johnson, in passing him

24   in the hall, shared with me -- and he didn't even give

25   me the unit so I wasn't sure which unit -- that he felt

G-0307                    PG 4 OF 7

R-111

1  that he was being discriminated about not being chosen

2  for a position, but it wasn't anything in terms of

3  being personally involved with it.  I didn't know

4  anything prior to that.

5      Q.    Mr. Johnson stated in a letter of contact

6  on 8/26/98 that Miss Peg Cromer and two other witnesses

7  were standing in the hallway one day and overheard Miss

8  Alice Fidler make a statement that she did not want to

9  hire many blacks on her floor because she was afraid of

10  losing control, and he stated that Miss Peg Cromer,

11  Chief of Education and Staff Development was there, and

12  when the comment was made, she said to Miss Fidler that

13  she was bordering on discrimination with those

14  comments.  Do you remember such a conversation?

15  A.    I really don't.  Now, let me think.  I really

16  don't.  I don't keep details in my head because most

17  things people say I let pass through.  I would have

18  responded that way, but I don't remember the

19  conversation.  I'm not saying it didn't happen.  I

20  truly don't remember it.

21      Q.    Have you heard Miss Fidler in any other

22  conversations make disparaging remarks against African-

23  Americans or people of the color black?

24  A.    No, not that I know of.  I can't say that I have

25  and I'm really thinking.  I could not put any of those

G-0308

PG 5 OF 7

R-112

6

1    comments to Miss Fidler.  No, I couldn't.

2              MR. JONES:  Thank you.  This concludes

3    your testimony, Miss Cromer.

4              * * * * * * * * *

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24                        **G-0309**

25

PG _6_ OF _7_

R.113

C_E_R_T_I_F_I_C_A_T_E

I, Jane E. Clancy, a Certified Shorthand Reporter and Notary Public of the State of New Jersey, do hereby certify that the foregoing is a true and accurate transcript of my stenographic notes.

I further certify that I am neither attorney nor counsel for, nor related to, nor employed by any of the parties to the action in which this deposition was taken; furthermore, that I am not a relative or employee of any attorney or counsel employed in this case, nor am I financially interested in the action.

_____
Jane E. Clancy, C.S.R.
Certified Shorthand Reporter

G-0310

PG 7 OF 7    R-114

1

2

                                    STATE OF NEW JERSEY
                                    COUNTY OF SOMERSET
                                    CASE NO. 98-2320

3

4   IN THE MATTER OF            :
    LEWIS JOHNSON,              :   AFFIDAVIT OF:
5                               :
                                :   WANDA MILLER
6        vs.                    :
                                :
7   LEBANON VA MEDICAL CENTER.  :
    ----------------------------    # ORIGINAL

8

9   B E F O R E :

10          GREGORY JONES, EEO Investigator, at the

11  VETERANS ADMINISTRATION MEDICAL CENTER, Lyons, New

12  Jersey, on September 14, 1999, commencing at 10:10 a.m.

13

14

15

16

17

18

19

20

21

22

23              NORTH JERSEY REPORTING SERVICE
                        15 Warren Street
24              Hackensack, New Jersey 07601
                        (201) 489-1144          G-0312
25
                                                    R.115

1

<u>I N D E X</u>

<u>WITNESS</u>                                    <u>DIRECT</u>

WANDA MILLER

  By: Mr. Jones                                 3

NORTH JERSEY REPORTING SERVICE
15 Warren Street
Hackensack, New Jersey 07601
(201) 489-1144

G-0313

R-116

2

W. Miller - direct

1

2    W A N D A   M I L L E R, having been duly sworn, testifies as

3    follows:

4

5    DIRECT EXAMINATION BY MR. JONES:

6

7        Q      Please state your full name and spell it for

8    the record.

9    A      It is Wanda Miller, W-a-n-d-a M-i-l-l-e-r.

10        Q      Do you have a representative?

11    A      I'm not sure what you mean.

12        Q      Do you have anyone that can represent you or do

13    you have anyone that you would like to represent you in this

14    investigation?

15    A      I -- I would have the union, but I have nobody with me

16    right now, no.

17        Q      Do you need someone with you now?

18    A      No.

19        Q      Please state your position.

20    A      I'm a licensed nurse.

21        Q      Please state your race.

22    A      White.

23        Q      Please state your color.

24    A      White.

25        Q      Mr. Johnson had alleged, Mr. Lewis Johnson has

G-0314

R.117

3

W. Miller - direct

1  alleged, that his nonselection of the position of

2  housekeeping aide, WG-2, in extended care 19-3, on July 15th,

3  1998, was because of discrimination on the basis of his race

4  and his color, his race, African-American, and his color,

5  black.

6          Do you have any information pertaining to this

7  case?

8  A     No.

9          What was the date of this?

10         Q     July 15th, 1998?

11  A     No.

12         At that time I worked on 1-4B.

13         Q     Was that in extended care?

14  A     That was extended care, but it was sub-acute medicine,

15  it wasn't on the locked door.

16         Q     What was your working relationship with the

17  complainant?

18  A     He was a nurse -- he had been a nursing assistant on

19  the floor before he went into housekeeping.

20         Q     During the time of the vacancy or the time

21  before the selection, did you ever hear anyone in extended

22  care, in a supervisory or management staff, make a statement

23  that they were trying to maintain a racial balance in

24  extended care, particularly Ms. Alice Fidler?

25  A     No.

G-0315

R.118

4

W. Miller - direct

1        I -- I -- see, I don't even understand this.

2        I last worked with Alice and Lewis -- all of this --

3 it has been three-and-a-half years, I didn't -- I worked with

4 Alice Fidler.

5        Q    So you don't recall a conversation where Ms.

6 Alice Fidler might have made a statement that she didn't want

7 to hire too many African-Americans because she was trying to

8 maintain a racial balance on her ward?

9 A    No, I don't.

10      When I worked with Alice Fidler there were probably

11 three, maybe four or five, working with us at the time.

12      Q    When you say "four or five," four or five what?

13 A    African-American.

14      There were some Puerto Ricans working, one or two with

15 us at the time.

16      I mean now I really don't remember her saying that.

17      Q    Do you think that Mr. Johnson's color

18 influenced Ms. Fidler's decision not to select him for the

19 position?

20 A    That is not fair for me to say.  I wasn't even -- even

21 -- I didn't work over there when he was training on that

22 floor.

23      I -- I have no idea.  I -- it is not fair for me to

24 answer that.

25          MR. JONES:  this concludes the testimony of Mr.

R.119

W. Miller - direct

1   Wanda Miller.

2

3     (Whereupon this Affidavit is concluded.)

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

G-0317

R.120

6

W. Miller - direct

1

## C E R T I F I C A T E

2

3

4

5        I, LAURA A. CARUCCI, License No. XIO2050, a Certified

6   Shorthand Reporter and Notary Public of the State of New

7   Jersey, certify that the foregoing is a true and accurate

8   transcript of my stenographic notes taken by me

9   telephonically at the place and the time hereinbefore set

10   forth.

11

12

13

14

15   My Commission Expires:
     MARCH 01, 2004

16                                                              _____

17                                                              A Notary Public and Shorthand
                                                                Reporter of the State of New Jersey

18

19

20

21

22

23

24                                                 G-0318

25

R.121

EQUAL EMPLOYMENT OPPORTUNITY COMMISSION


In the Matter of:                    )
                                     )
LEWIS JOHNSON,                       )
                                     )
                                     ) EEOC Hearing #
            Complainant              ) 170-AO-8163X
v.                                   )
                                     ) Agency Case No.
HERSHEL GOBEL, Acting Secretary      ) 98-2320
DEPARTMENT OF VETERANS AFFAIRS       )
                                     )
            Agency                   )

                         Wednesday
                         July 26, 2000
                         Regional Counsel s Library
                         V. A. Medical Center
                         University & Woodlands Aves.
                         Philadelphia, Pennsylvania

     The above-entitled matter came on for hearing,
pursuant to notice at 9:00 a.m.

          BEFORE:  HON. DONNA NUTTER-RODWELL
                   Administrative Judge

APPEARANCES

**On behalf of the Agency:**

     CHRISTOPHER PERILLO, ESQUIRE
     Regional Counsel s Office
     V. A. Medical Center
     University and Woodland Avenues
     Philadelphia, Pennsylvania
     (215) 823-5800 Ext 7682

**On behalf of the Complainant:**

     WILLIAM DUMAS
     20 Dumas Lane
     Jonestown, Pennsylvania 17038

                OFFICIAL REPORTER
          Burke Court Reporting Company
              58 Woodhurst Drive
          Voorhees, New Jersey  08043
                (856) 627-7733

R. 122

42

1        WITNESS:  That's correct.

2        JUDGE RODWELL:  Okay.  Thank you, sir.  I am going to

3   let the Complainant, Mr. Johnson's, Representative, Mr.

4   Dumas question you; and after that, Mr. Perillo, the

5   Agency's representative may have some questions for you as

6   well; and I may have questions, too, at some point and

7   time.

8        Mr. Dumas, you may proceed, sir.

9                   DIRECT EXAMINATION

10  BY MR. DUMAS:

11       Q    Good morning, Mr. Houck.

12       A    Good morning.

13       Q    Thank you for coming down this morning in the

14  rain and so forth.  Mr. Houck, I m going to be extremely

15  brief.  I have in front of me an Investigative Report; and

16  in that Investigative Report, there's an indication that

17  you was privy to a conversation between yourself, and I

18  believe it was Wanda Miller and Alice Fidler; and Ms.

19  Fidler is alleged to have made certain statements.  Do you

20  recall that?

21       A    I believe Wanda Miller was the other person

22  present; I m not sure.

23       Q    How long have you known Ms. Fidler?

24       A    Since 1990, I believe.

25       Q    Do you have any animosity toward her?

                BURKE COURT REPORTING COMPANY
                       856-627-7733

R.123

43

1    A    No.

2    Q    You know, Mr. Houck, let me ask you this:

3    I do understand you had conversations with

4    someone regarding this particular matter, testifying, et

5    cetera, ...

6    MR. PERILLO:  Objection.  It s not a question, Judge.

7    Q    Okay.  Mr. Houck, did you discuss testifying in

8    this matter with anyone?

9    MR. PERILLO:  Objection.

10    JUDGE RODWELL:  Excuse me, what ...

11    MR. PERILLO:  It's his witness.

12    JUDGE RODWELL:  Okay.  I'm going to overrule that

13    objection.  I don't think that is leading.  Answer the

14    question, please.

15    WITNESS:  I'm not sure I understand the question.

16    JUDGE RODWELL:  Okay.  Can you explain.

17    Q    Have you discussed the possibility of testifying

18    in any hearing, tribunal or any like entity about these

19    matters?

20    A    Have I discussed testifying?

21    JUDGE RODWELL:  Have you talked to anyone about your

22    coming here and testifying here today?

23    WITNESS:  No; I have not.

24    JUDGE RODWELL:  Okay.  Go on.

25    Q    Have (sic) anyone suggested that you were not to

R. 124

44

1   testify about these matters?

2       A    I was -- I was told by the Administration of

3   Lebanon VA, by the local Union that I should be present

4   here.  I believe that's what you're searching for.

5       Q    Yes.  Mr. Houck, can you tell us the nature of

6   the conversation that you heard or that you were a party

7   to.

8       A    When?

9       Q    The conversation that's alluded to in your -- in

10  the Investigation regarding statements that's alleged to

11  have been made by Ms. Fidler regarding minorities or blacks

12  working on her floor.

13      A    Discussion that I heard -- overheard -- was back

14  in the early 90's when I worked for Ms. Fidler.  There was

15  a fellow that wanted to come from Housekeeping into

16  Nursing, and the comment I heard from Ms. Fidler was that

17  "We didn't want any more of them on this floor."

18      Q    Mr. Houck, when you -- during that conversation,

19  did it come to your mind what the term "them" meant or

20  referred to?

21      A    Do you want to know my opinion?

22      Q    Yes; I do.

23  MR. PERILLO:  Objection.

24  JUDGE RODWELL:  Overruled.

25      A    My opinion was that she meant this fellow's being

R.125

45

1    black; because he was black.  That's the only thing I

2    gathered from it.

3        Q    Mr. Houck, do you work in -- by -- according to

4    records, you worked for Ms. Fidler for maybe seven years in

5    the Housekeeping Unit?

6        A    Yes; that s correct.

7        Q    And this is where this person was trying to be

8    employed?

9        A    Pardon me?

10       Q    This black person you are referring to?

11       A    Yes; he was in Housekeeping and was trying to get

12   into Nursing.

13       Q    And this conversation that you overheard, it was

14   a loud conversation?  Was it just a conversation in passing

15   -- or just a normal conversation -- words exchanged?

16       A    This wasn't a conversation directed at me and

17   Wanda Miller.

18       Q    Mr. Houck, a second statement that's indicated in

19   this Investigative Report refers to a situation where an

20   individual was told, "What you just stated is bordering on

21   discrimination."  Do you recall that?

22       A    Yes; I do.

23       Q    Can you enlighten us, please?

24       A    Ms. Fidler went to Peggy Cromer, who's in Nursing

25   Education to see about this fellow coming into Nursing; and

R.126

46

1   she was told by Ms. Peggy Kroomer that "You're about this

2   close to discriminating against this gentleman; so it's

3   best that you back off."

4       Q    When you said, "she", who are you referring to?

5       A    Ms. Fidler.

6       Q    Mr. Houck, you indicated that this may have taken

7   place somewhere in the early ·90's.  Do you recall when in

8   the ·90's?

9       A    No; I don't remember.

10      Q    What is '95 or '96; or you just don't remember at

11  this point?

12      A    I really don't remember which -- which year it

13  was.

14      MR. DUMAS:  Thank you, Mr. Houck.  I have no more

15  questions of this witness.

16      JUDGE RODWELL:  Mr. Perillo.

17                      CROSS-EXAMINATION

18  BY MR. PERILLO:

19      Q    To whom was this -- Mr. Dumas asked you a

20  question.  To whom was this conversation directed at, where

21  you allegedly overheard this remark that Ms. Fidler made?

22      A    We were in the Dayroom where the patients

23  congregate at, and she was leaning over a half-door, and

24  she was discussing this with me and Wanda Miller.

25      Q    Discussing with who?

BURKE COURT REPORTING COMPANY
856-627-7733

R·127

IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF PENNSYLVANIA

. . . . . . . . . . . . . .
LEWIS JOHNSON,                    .
                     Plaintiff .
                                 .
          vs.                    . No. 1:CV-00-1873
                                 . (Judge McClure)
HERSHEL W. GOBER, ACTING         .
SECRETARY OF VETERAN             .
AFFAIRS, et al,                  .
                     Defendants. .
. . . . . . . . . . . . . .


          Deposition of:  LEWIS W. JOHNSON

          Taken by      : Defendants

          Date          : April 24, 2002, 9:00 a.m.

          Place         : 228 Walnut Street
                          Federal Building
                          Harrisburg, Pennsylvania

          Before        : Gail D. McLucas, Notary Public
                          Registered Professional Reporter


APPEARANCES:

          ANDREW J. OSTROWSKI, ESQ.

               For - Plaintiff

          UNITED STATES DEPARTMENT OF JUSTICE
          By:  KATE L. MERSHIMER, ESQ.

               For - Defendants


R.128

105

Exam./Mershimer - Johnson

1    Q.    On October 13th, 1999, you claim that

2          Mr. Erickson made a statement to you; is that

3          correct?

4    A.    Yes.

5    Q.    Can you tell me the context of how that

6          statement was made, what happened?

7    A.    What happened to make that statement happen or

8          just the statement?  What preceded the

9          statement?

10   Q.    What immediately preceded the statement?  On

11         October 13th, 1999, you came into contact with

12         Mr. Erickson.

13   A.    Right.

14   Q.    Is that correct?

15   A.    Right.

16   Q.    And was he with his partner at the time?

17   A.    Yes.

18   Q.    Who was his partner?

19   A.    Chandler, Lewis Chandler.

20   Q.    And Mr. Chandler is black?

21   A.    Yes.

22   Q.    What were Mr. Erickson and Mr. Chandler doing,

23         if you recall?

24   A.    They were standing on two different sides of the

25         hallway, the lobby.

R-129

106

Exam./Mershimer - Johnson

1 Q.  Were they talking, were they working, do you

2     recall?

3 A.  Chandler was talking to a woman.  Erickson was

4     standing between the bathroom and the clinic.

5 Q.  Now, you came upon them somehow.  Were you

6     walking through this area?

7 A.  I was walking.  I was coming down, there is a

8     cafeteria.  I was walking through the hallway

9     and I entered the lobby.  Chandler was on my

10     right next to the two elevators talking to a

11     female.  I walked past Chandler, didn't speak to

12     him, didn't acknowledge him.  Erickson was on my

13     left and Erickson was trying to say to me, I

14     want to tell you what people are saying about

15     you.  I told him I didn't want to hear it and I

16     started veering to my right and he cut me off or

17     one of the ways, I can't actually say he cut me

18     off from the right or the left.  But he cut me

19     off and put his arm, stopped me from moving to

20     state what he had to state to me.

21 Q.  What did he say?

22 A.  He said what people are saying to you, about you

23     is that you are a white man in black skin.  And

24     I pushed through his arms and went on.

25 Q.  Do you know why Mr. Erickson said that to you?

R.130

Exam./Mershimer - Johnson

1    MR. OSTROWSKI:   Object to the form.

2  A.    No.

3  BY MS. MERSHIMER:

4  Q.    Before he made that statement, what would you,

5        how would you describe your relationship with

6        Mr. Erickson?

7  A.    Professional.

8  Q.    Would you ever chat with him?

9  A.    Not prior to the June incident.

10 Q.    Prior to the June incident when he belittled

11       your work, you would talk to him?

12 A.    On occasions we'd have conversations in the

13       morning meeting and there was basically a group

14       thing where we all participated.  That was in

15       our morning meeting.

16 Q.    What would be discussed during the morning

17       meeting?

18 A.    Probably football or current events.

19 Q.    Other than -- did you joke around with

20       Mr. Erickson?

21 A.    During those meetings.

22 Q.    How about Mr. Chandler?

23 A.    During those meetings.

24 Q.    Did you ever joke around with him other than

25       those meetings like when you ran into each other

R.131

108

Exam./Mershimer - Johnson

1      in the hallways at work?

2  A.   Not prior to June that year.

3  Q.   I'm a little confused.  You said not prior to

4       June?

5  A.   Well, prior to June, occasionally, we would run

6       into each other and have some words about

7       something or what's going on.  Other than that,

8       I see him and we will say something or something

9       was going on.  We'll talk briefly cause normally

10      when we get assigned, we get assigned different

11      places in the VA.  We don't normally get

12      assigned together.

13 Q.   And then when you said you would have words with

14      him, you mean friendly words prior to June 1998?

15 A.   Well, most of it was on a professional level and

16      if there was anything other than that, he might

17      add some of his personal stuff into the

18      conversation.  When we are talking about

19      work-related things he would ask -- normally

20      they would add, I'd say on occasion, they would

21      add some other stuff to it.  I would probably

22      laugh to it, stuff like that there.  General

23      conversations just on passing and stuff like

24      that there.

25 Q.   Now, there was that comment that Mr. Erickson

R-132

109

Exam./Mershimer - Johnson

1    said to you on October 13th, 1999?

2  A.    Um-hum.

3  Q.    And I do want to clarify something, because I

4        couldn't quite follow.  You said there was an

5        incident where he belittled your work.  Was that

6        June of 1998 or 1999?

7  A.    1999.

8  Q.    And then there was another incident with

9        Mr. Erickson where you felt you were assaulted

10       on October 18th, 1999?

11 A.    Um-hum.

12 Q.    Can you tell me about that incident?

13 A.    He came to my work site where I was working and

14       said he wanted to talk to me.  I told him I

15       didn't want to talk to him.  I turned my back to

16       him, and he came behind me and started using his

17       shoulder and saying why don't you want to talk

18       to me.  Why don't you want to talk to me?

19       Something of that nature for about 15 feet and I

20       turned around and I went right past the nurse's

21       station into the bathroom and locked myself.  He

22       was steady in my ear talking to me.

23 Q.    Did you walk or did you run?

24 A.    I walked fastly.

25 Q.    Was it a bump with his shoulder?

R-133

110

Exam./Mershimer - Johnson

1   A.   It was a constant bump.  I think he was trying

2        to intimidate me to fight him or something.

3   Q.   Do you know how many times he bumped you, just

4        approximately?

5   A.   About 15 times both ways.  I can't, I can't say

6        15.  It wasn't more than 15 times.

7   Q.   Did this cause you to fall at all?

8   A.   Just stumble.

9   Q.   When you say stumble --

10  A.   When he initially did it, I'd stumble forward

11       like and then I'd start walking off.

12  Q.   We are going to take a lunch break soon, but I

13       want to finish up on this February 17th, 2000

14       letter, actually it's part of Exhibit 4.  On the

15       second page Dr. Pakola said that you were

16       feeling, first paragraph:  "Less depressed and

17       angry, but remain frustrated with thoughts that

18       particular individuals at the VA facility are

19       plotting against you."  Now, you indicated

20       before that you felt Mr. Kent and Mr. Stuckey

21       had plotted against you; is that correct?

22  A.   Yes.

23  Q.   Anybody else plotting against you?

24  A.   No, I just believe it's those two.

25  Q.   Mr. Kiscadden?                          R.13 d

Exam./Mershimer - Johnson

1   A.    Did I know at the time of the selection?

2   BY MS. MERSHIMER:

3   Q.    No, just ever, do you know what his position is?

4   A.    His position was Article 12 should apply.

5   Q.    What do you mean by that?

6   A.    When it came to reassignment, Article 12 of the

7         union contract should have applied to that

8         particular part of the merit promotional policy.

9   Q.    Do you believe that Ms. Flashel-Umlauf and Peg

10        Winters, the union president, take the position

11        that your selection should have been based on a

12        merit selection process and not seniority?  Did

13        they take that position, do you think they took

14        that position because of your race?

15  A.    No.

16  Q.    You feel that you weren't selected for the

17        housekeeping aide position on extended care

18        because of your race; is that correct?

19  A.    Yes.

20  Q.    And what do you base that opinion upon?

21  A.    My conversation with Alice Fidler.

22  Q.    Can you tell me about that conversation?

23  A.    I asked her why I wasn't selected.  She told me

24        two things.  That I didn't work well with the

25        patients and I wouldn't fit in with the team.

R. 135

121

Exam./Mershimer - Johnson

1    That Hall worked better with the patients than

2    me and I wouldn't fit in with the team.

3  Q.  She said that specifically, that you wouldn't

4    fit in with the team?

5  A.  Yes.

6  Q.  She didn't say that she felt that Mr. Hall would

7    fit in better with the team?

8  A.  My interpretation of what she said was I

9    wouldn't fit in with the team.

10  Q.  Why was that your interpretation of what she

11    said?

12  A.  Because I have been trying to remember how I

13    recall hearing that and she may have said Hall

14    fit better in the team than I do.  I just felt

15    like she is telling me that I wasn't going to

16    fit in the team and I don't see there was a

17    basis for that.  That wasn't the basis for the

18    job.

19  Q.  I'm sorry, I didn't follow that last part.

20    That's not a basis --

21  A.  I didn't think that was the basis for me getting

22    the job whether or not I could fit in with the

23    team.

24  Q.  So that was an improper criteria for her to use?

25  A.  Yes.

R. 136

122

Exam./Mershimer - Johnson

1   Q.   So why do you think, based on that conversation,

2        that Ms. Fidler did not want to select you

3        because of your race?

4   A.   Because it was, well, she had made a statement

5        prior about she didn't want too many blacks on

6        the floor.

7   Q.   When had she made that statement?

8   A.   I don't recall exactly when she made the

9        statement.  I was told that she made the

10       statement.

11  Q.   And who told you that she made that statement?

12  A.   Randy Houck.

13  Q.   H-o-u-c-k?

14  A.   I think that's it.  And I heard in passing

15       after -- I just didn't believe it.

16  Q.   Is that the only sort of statement regarding

17       somebody's race or reflecting discriminatory

18       animus that you've ever heard Ms. Fidler say or

19       heard somebody say about her?

20  A.   Yes.  I believe that was it.  I believe that was

21       it, I believe.

22  Q.   So any other reasons why you think she didn't

23       hire you because of your race?

24  A.   That's the only reason she gave me was the

25       things she said during that interview.

R. 137

123

Exam./Mershimer - Johnson

1    Q.    Are you claiming that the union and somebody in

2          management conspired to keep you from getting

3          this position as a housekeeping aide in extended

4          care because of your race?

5    A.    Am I claiming -- repeat the question again.

6    Q.    Are you claiming that persons in the union and

7          persons in management at the VA conspired to

8          keep you from getting this housekeeping aide

9          position because of your race?

10   A.    Yes.

11   Q.    And what do you base that on?

12   A.    I'm going to say yes and no.  The yes is part

13         when Alice Fidler made those statements to me.

14         And I can't say -- I would say yes.  I would say

15         yes the union participated in it, yes.

16   Q.    And what evidence do you rely upon that the

17         union participated in this conspiracy because of

18         your race?

19   A.    Failure to provide information in a timely

20         manner.  Not being straightforward with me in

21         response to my request to them as a union member

22         and not really taking no action in my behalf in

23         a timely manner.  They supported Alice Fidler.

24   Q.    Now, the vacancy for the housekeeping aide

25         position on extended care, that was posted as a

R-138

Exam./Mershimer - Johnson

1    actually signed.  So when, at the time I didn't

2    know it was a competitive position at the time.

3    At the time that I looked at the poster, I just

4    said I was putting in for the job.  I didn't

5    know it was a selection process, okay.

6  Q.  But then you did learn that it was --

7  A.  I did later learn it was a competitive process.

8  Q.  And you believe that Secretary Gober, the union,

9    Ms. Fidler, Mr. Kent and Ms. Winters, they all

10    conspired to make that position be a competitive

11    position so that you couldn't get that job due

12    to your race?

13  A.  Ms. Fidler stated to me in a conversation we

14    had, I believe that she didn't select me based

15    on race.  And that's who I felt at that time.

16    Wait a minute.  I'm not done.

17  Q.  Okay.

18  A.  And as the process went on and if everybody

19    supported her nonselection, then they are a

20    party to my complaint.

21  Q.  Do you today take the position that there was an

22    illicit agreement between Secretary Gober, the

23    union, Ms. Fidler, Mr. Kent and Ms. Winters to

24    post the vacancy as a competitive position so

25    that your seniority would not be a determinative

R.139

138

Exam./Mershimer - Johnson

1  Q.    And who gave you that award?

2  A.    Recreation Department, I believe.  It was

3        recommended by the Recreation Department, I

4        believe.

5  Q.    Do you know whether Ms. Alice Fidler was aware

6        of you having won that award or not?

7  A.    I can't say I was aware if she knew about it or

8        not.

9  Q.    So you don't know either way?

10 A.    No, I don't.

11 Q.    Have you ever seen Ms. Fidler discriminate

12       against any other African Americans?

13 A.    No.

14 Q.    Have you ever heard other than that one

15       statement by Mr. Houck that she has

16       discriminated against African Americans?

17 A.    No, I haven't.  No, I haven't.

18 Q.    And you never personally heard Ms. Fidler make

19       any statements about your race or the race of

20       others?

21 A.    No, I haven't.

22 Q.    I believe somewhere in all the paperwork I've

23       seen that you had taken the position that the

24       housekeeping aide position had been a targeted

25       position for affirmative action?

R.140

140

Exam./Mershimer - Johnson

1    Q.    -- that were sent to me yesterday?  One of the

2          other areas that you said that you felt you had

3          adverse action about was regarding the time off

4          award and/or a monetary award.  Were there

5          various awards that you felt you were entitled

6          to get that you didn't get because of your race

7          or because of retaliatory motive?

8    A.    No, not that I'm aware of, no.  I believe that

9          was the only one I was aware of.

10   Q.    Which one?

11   A.    The one that, the money award from July '98.

12   Q.    When was that monetary award issued?

13   A.    July '98.

14   Q.    How much money was involved?

15   A.    It was $750 involved.

16   Q.    And who received that award?

17   A.    Erickson and Chandler.

18   Q.    They split $750?

19   A.    All I know they got $250 apiece.

20   Q.    So somebody else got the third 250?

21   A.    I would assume.  It wasn't on that there award.

22   Q.    I'm sorry, what?

23   A.    It wasn't part of that.  Their names was

24         attached to that award package.

25   Q.    Do you know why they each received that $250

R. 141

141

Exam./Mershimer - Johnson

1      award, what they had done?

2  A.   Yes.  There was a statement attached to it they

3       did all this stuff for the department and

4       everything.

5  Q.   And you felt you should have been given that

6       award also?

7  A.   It was given out as a group award, a float group

8       award.  I was a member of the float group.  I

9       did everything they did in that float group

10      during that year.

11 Q.   I want to follow this.  Because it was called a

12      group float award, you were entitled to part of

13      the money?

14 A.   Yes.

15 Q.   And if it had been called something else like

16      award to some members of the group float, you

17      wouldn't have been entitled to the money?

18 A.   No.  The policy states when a group award is

19      given, there are certain entities of the group

20      who may be entitled to a larger amount than

21      others.  But the group gets to divide the award

22      up.

23 Q.   Who decides how much money the group gets?  How

24      do they divide that?

25 A.   I guess Mr. Firestine or whoever applied for the

R.142

142

Exam./Mershimer - Johnson

1    award to give the awards out.  I guess that's

2    the person.

3  Q.  And do you feel you weren't given part of this

4    monetary award because of your race?

5  A.  That's how I was, that was based on the

6    information that I was given.

7  Q.  What information were you given?

8  A.  Through Erickson.  He said him and another white

9    employee received the awards and when I asked

10    Chandler, he said he didn't know anything about

11    it.

12  Q.  I thought you told me that it was Erickson and

13    Chandler that got the award.

14  A.  That's right.

15  Q.  And Mr. Chandler is black?

16  A.  Yes.

17  Q.  I'm not following why you felt that you didn't

18    get the award because you're black?

19  A.  Okay.  I'm going to explain that to you.  Upon

20    investigation, I requested an investigation of

21    the awards.  And in doing that, because I didn't

22    file the complaint until I had the

23    investigation, I had the awards in front of me.

24    What happened was I was following, based on what

25    Erickson had told me, him and another white

R.143

Exam./Mershimer - Johnson

1      employee got the awards.  Because I asked

2      Chandler if he received anything, he said no.

3      So I sat down with Alice Fidler and Ray Kent was

4      on the phone.

5   Q.   Alice Fidler?

6   A.   Not Alice Fidler.  Peg Winters, the union

7      president and chief of human resources helped me

8      with this investigation.  And I asked them at

9      that time for the copies of the awards.  And at

10     that time, I didn't ask for them unsanitized

11     prior to filing my complaint.  Once I got the

12     paperworks, it came back sanitized.  So that

13     left me thinking what I learned from Erickson

14     that it was Erickson and the other white

15     employee who got the award because Chandler told

16     me no.  And I'm thinking that Chandler could be

17     lying to me.

18          So a year later, almost eight months later

19     in discovery, I got the information prior to the

20     administrative judge hearing.  I received the

21     paperwork and it was unsanitized and I realized

22     at that time that I filed my complaint wrong

23     because it was sanitized.  It was Erickson and

24     Chandler that got the award.  It was the wrong

25     complaint I filed but this was under

R.144

144

Exam./Mershimer - Johnson

1    investigation.  I was doing, and everybody knew

2    about it, but when I got the time off award in

3    September, nothing was sanitized, plus it was in

4    my mailbox and everybody's name who got a time

5    off award, it wasn't sanitized or anything and

6    it was just in my mailbox.  I got a four-hour

7    off award.  That's how it was engineered, how my

8    complaint was filed.  That's why it was filed

9    under race.  If I had known it was Chandler and

10   Erickson, I would have filed my complaint

11   differently.

12 Q.  How would you have filed it differently?

13 A.  Failure to award and based on the policy, the

14   awards policy.

15 Q.  Is it fair to say, and correct me if I'm wrong,

16   that as you sit here today that you were not,

17   you don't believe that you were denied part of

18   this monetary award due to your race?

19 A.  No, I would say no, it wasn't due to my race.

20 Q.  Are you claiming that you were entitled to some

21   sort of time off award that you didn't get?

22 A.  Monetary award.

23 Q.  I'm switching it, any time off awards that you

24   felt you should have gotten?

25 A.  No.  I received a time off award that I was

R.145

145

Exam./Mershimer - Johnson

1    supposed to get.

2    Q.    Did you feel it should have been for more time

3          than you got?

4    A.    No, I didn't have a problem with it.

5    Q.    You did have, as we said, a formal EEOC hearing

6          about this nonselection?

7    A.    Yes.

8    Q.    And Mr. Dumas was your representative?

9    A.    Yes.

10   Q.    And how did you feel he represented you?

11   A.    Poorly.

12   Q.    Did you write notes about that?

13   A.    Did I write notes about --

14   Q.    Feeling that he had poorly represented you?

15   A.    I may have written a note about that.

16   Q.    Why did you feel he poorly represented you?

17   A.    He wasn't prepared.

18   Q.    Did you share that with Mr. Dumas that you

19         thought he was unprepared?

20   A.    Yes.

21   Q.    What was his response?

22   A.    I can't recall, but I remember saying something

23         about him not being prepared.

24         (Johnson Deposition Exhibit #15 marked for

25   identification)

R.146

151

Exam./Mershimer - Johnson

1   A.    Yes.

2           (Johnson Deposition Exhibit #18 marked for

3           identification)

4   BY MS. MERSHIMER:

5   Q.    I handed you a document that's marked Exhibit

6           18.  Have you seen this document before?

7   A.    I may have seen it.

8   Q.    Do you know is this a copy of the initial

9           referral form for the EEO counselor that you saw

10          regarding the Erickson issue?

11  A.    Yes, it looks like it's concerning Erickson.

12  Q.    Issue one, it says harassment 10/13/99, on the

13          basis of race.  "Aggrieved states that his

14          co-worker made a racial remark to him with

15          regard to his race."  Correct?

16  A.    Yes.

17  Q.    Issue number two it says 9/23/99 award, basis

18          race.  "Aggrieved states that management gave

19          out a team award in 1998.  However, the

20          aggrieved stated that he was part of the team

21          and did not receive an award."  It was a

22          monetary award.  And that was because of race?

23  A.    Yes.

24  Q.    And I think we established earlier that you no

25          longer feel that you were denied that award

R.147

152

Exam./Mershimer - Johnson

1    based on your race?

2   A.    Yes.

3   Q.    Now, there is another issue that's indicated on

4         this form.  It says 9/99, aggrieved said about

5         three weeks ago the basis of the incident

6         indicated to be race, "Aggrieved received a

7         four-hour time off award but has --"

8             MR. OSTROWSKI:  "His peers."

9   BY MS. MERSHIMER:

10  Q.    "But his peers received an eight-hour time off

11        award.  I gather from what you said before that

12        you felt that the four-hour time off award was

13        appropriate?

14  A.    Yes.

15            (Johnson Deposition Exhibit #19 marked for

16        identification)

17  BY MS. MERSHIMER:

18  Q.    I've handed you a document that's been marked

19        Exhibit 19.  It's an October 21, 1999 letter to

20        you from Rosemary Geddie, EEO counselor.

21  A.    Yes.

22  Q.    And it's a notice of EEO complaint rights and

23        responsibilities; is that correct?

24  A.    Yes.

25  Q.    And on the third page it has your name,

R. 148

168

Exam./Mershimer - Johnson

1   Q.   I handed you a two-page document marked Exhibit

2        26.  Am I correct that this reflects a letter

3        dated April 13, 2000, addressed to you from Rosa

4        C. Franco, Regional EEO Officer?

5   A.   Yes.

6   Q.   This letter acknowledgments receipt of your

7        discrimination complaint; is that correct?

8   A.   Yes.

9   Q.   And you received a copy of this document?

10  A.   Yes.

11            (Johnson Deposition Exhibit #27 marked for

12       identification)

13  BY MS. MERSHIMER:

14  Q.   I've handed you a document that's marked Exhibit

15       27?

16  A.   Yes.

17  Q.   And it's the May 9th, 2000 letter directed to

18       you from Rosa C. Franco; is that correct?

19  A.   Yes.

20  Q.   And the subject is Final Agency Decision EEO

21       Complaint Case Number 200H, et cetera filed

22       December 16th, 1999?

23  A.   Um-hum.

24  Q.   Is that a yes?

25  A.   Yes.

R.149

171

Exam./Mershimer - Johnson

1    an EEOC appeal and I just want to verify that

2    you did not.  You're telling me you don't recall

3    one way or the other.  I thought what you did is

4    you just filed this civil lawsuit.  You had a

5    choice of going one way or the other.

6         MR. OSTROWSKI:  Civil lawsuit?

7         MS. MERSHIMER:  This current one that we're

8    having a deposition about.

9         MR. OSTROWSKI:  He didn't do that in 90

10   days, right?

11        MS. MERSHIMER:  Right.

12        MR. OSTROWSKI:  That would be the case.

13 A.   I don't recall.

14 BY MS. MERSHIMER:

15 Q.   Do you have any documents, possess any documents

16      that would reflect one way or another whether

17      you filed an EEO complaint or appeal?

18 A.   I don't recall.  I don't recall filing that or

19      not filing it.  I just don't recall filing it or

20      not filing it.

21           (Johnson Deposition Exhibit #28 marked for

22      identification)

23 BY MS. MERSHIMER:

24 Q.   I've handed you a document marked Exhibit 28.

25      Two-page letter from you to whom it may concern

R.150

203

Exam./Mershimer - Johnson

1    Q.    I hand you a two-page document marked Johnson

2          40.  It's a letter dated April 27th, 2000, from

3          Rosa C. Franco, the regional EEO officer, to

4          you.  The subject was ORM Notice of Receipt of

5          Your Discrimination Complaint ORM Case No.

6          200H-1663.  In this letter it indicates that

7          they acknowledge receipt of your discrimination

8          complaint that you had filed; is that correct?

9    A.    Yes.

10   Q.    And you received a copy of this letter?

11   A.    Yes.

12   Q.    Do you recall when you received a copy of this

13         letter?

14   A.    On or about April 27th, I would presume.

15               (Johnson Deposition Exhibit #41 marked for

16         identification)

17   BY MS. MERSHIMER:

18   Q.    I'm handing you a document that's been marked

19         Johnson Exhibit 41.  This is a May 10th, 2000

20         letter to you from Rosa C. Franco; is that

21         correct?

22   A.    Correct.

23   Q.    And the subject is the Final Agency Decision of

24         the EEO Complaint Case Number 200H-1663; is that

25         correct?

R.151

204

Exam./Mershimer - Johnson

1   A.   Correct.

2   Q.   Did you receive a copy of this letter?

3   A.   Yes.

4   Q.   Did you receive this on or about May 10th, 2000,

5        May 11, 2000?

6   A.   Around that time I received it.

7   Q.   Pardon me?

8   A.   I guess around that time I received it.

9   Q.   And it denied your EEO complaint; is that

10       correct?

11  A.   Correct.

12  Q.   Actually, it dismissed your complaint; is that

13       correct?

14  A.   Correct.

15  Q.   And maybe we discussed this, but your workers'

16       compensation, the CA-1 form that was submitted

17       on your behalf, the Department of Labor denied

18       that claim; right?

19  A.   Yes, they did.

20  Q.   And the CA-2 form, the Department of Labor

21       denied it; is that correct?

22  A.   They denied it, yes.

23  Q.   So when they dismissed your complaint and you

24       receive this letter, it tells you that you have

25       the right to file an appeal to the EEOC or to

R.152

205

Exam./Mershimer - Johnson

1    file a civil action in District Court; is that

2    correct?

3  A.    Right.

4  Q.    Which did you do?

5  A.    I believe I went with the civil action, I

6        believe.

7  Q.    Would that civil action be this lawsuit that we

8        are having this deposition about?

9  A.    I believe so.  Is that correct?

10        MR. OSTROWSKI:  I believe.

11 BY MS. MERSHIMER:

12 Q.    I'm just going to go through some documents,

13       have them marked as exhibits, but I just want to

14       confirm what these documents are.

15 A.    Okay.

16        (Johnson Deposition Exhibits #42, #43, #44,

17       #45, #46, #47, #48, #49 and #50 marked for

18       identification)

19 BY MS. MERSHIMER:

20 Q.    Mr. Johnson, I've handed you documents marked

21       Johnson Exhibits 42 through 50.  Looking first

22       at 42.

23 A.    Okay.

24 Q.    That's a February 10th, 2000 letter from Rosilyn

25       Harris?

R.153

232

COMMONWEALTH OF PENNSYLVANIA    )
                                )    SS
COUNTY OF YORK

    I, Gail D. McLucas, Registered Professional Reporter and Notary Public in and for the Commonwealth of Pennsylvania and County of York, do hereby certify that the foregoing deposition was taken before me at the time and place hereinbefore set forth, and that it is the testimony of:

LEWIS W. JOHNSON

    I further certify that said witness was by me duly sworn to testify the whole and complete truth in said cause; that the testimony then given was reported by me stenographically, and subsequently transcribed under my direction and supervision; and that the foregoing is a full, true and correct transcript of my original shorthand notes.

    I further certify that I am not counsel for or related to any of the parties to the foregoing cause, or employed by them or their attorneys, and am not interested in the subject matter or outcome thereof.

    Dated at York, Pennsylvania this 6th day of May, 2002.

> Notarial Seal
> Gail D. McLucas, Notary Public
> Spring Garden Twp., York County
> My Commission Expires Nov. 22, 2004

_Gail D. McLucas_

Gail D. McLucas, Notary Public
Registered Professional Reporter

    (The foregoing certification of this transcript does not apply to any reproduction of the same by any means unless under the direct control and/or supervision of the certifying reporter.)

R.154

IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF PENNSYLVANIA

. . . . . . . . . . . . . . . .
LEWIS JOHNSON,              .
               Plaintiff   .
                           .
           vs.             . No. 1:CV-00-1873
                           . (Judge McClure)
HERSHEL W. GOBER, ACTING   .
SECRETARY OF VETERAN       .
AFFAIRS, et al,            .
               Defendants. .
. . . . . . . . . . . . . . . .

    Videotaped
    Deposition of:  IRVIN D. ERICKSON

    Taken by    :  Plaintiff

    Date        :  April 9, 2002, 9:58 a.m.

    Place       :  4311 North Sixth Street
                   Harrisburg, Pennsylvania

    Before      :  Gail D. McLucas, Notary Public
                   Registered Professional Reporter
                   -and-
                   Albert Rodriguez,
                   Videotape Operator


APPEARANCES:

    ANDREW J. OSTROWSKI, ESQ.

        For - Plaintiff

    UNITED STATES DEPARTMENT OF JUSTICE
    By:  KATE L. MERSHIMER, ESQ.

        For - Defendant

    ALSO PRESENT:

        LEWIS JOHNSON
        LEWIS AROCHO, SR.

R.155

6

Exam./Ostrowski - Erickson

1    could do to help you understand it better, feel

2    free to stop and ask me and I'll be happy to

3    accommodate you.    Fair enough?

4  A.    Okay.

5  Q.    Anytime throughout the deposition, if you have

6    any questions of me about anything that pops

7    into your mind for whatever reason, your counsel

8    is free to tell you otherwise, but I don't have

9    any concerns whatsoever.    I don't want to make

10    it appear that I'm hiding anything from you or

11    trying to trick you into anything.    So if you

12    want to ask me for information or clarification

13    of where I'm going, what I'm after, what I'm

14    looking for, feel free to do so.    Okay?

15  A.    Okay.

16  Q.    How are you currently employed?

17  A.    I work for the VA Medical Center, Lebanon, PA.

18  Q.    How long have you been with the VA Medical

19    Center in Lebanon?

20  A.    Twenty-one years.

21  Q.    And what's your current position?

22  A.    I'm housekeeping aide.

23  Q.    How long have you been in that position?

24  A.    Twenty-one years.

25  Q.    And is that a wage-grade position?

R.156

Exam./Ostrowski - Erickson

1    A.    Yes, it is.

2    Q.    What wage grade?

3    A.    Wage grade 2-5.

4    Q.    Pardon me?

5    A.    Wage grade, 2-5.

6    Q.    As we go through a lot of times you'll probably

7          know what I'm going to ask before I'm done

8          asking it.  But if you can try to wait until my

9          question ends, because we have a video, audio

10         and stenographic record and it all needs to come

11         across clearly so when it's written in black and

12         white, we have clear breaks and clear answers

13         and clear questions.  Okay?

14   A.    Okay.

15   Q.    Wage grade two step five?

16   A.    Step five.

17   Q.    Tell me, just generally, what your

18         responsibilities are as a housekeeping aide.

19   A.    Basically, I wax floors.

20   Q.    Are you a supervisor?

21   A.    No.

22   Q.    Have you ever held any supervisory position with

23         the Lebanon VA?

24   A.    No.

25   Q.    Prior to -- what did you say 21 years?  Is that

R.157

10

Exam./Ostrowski - Erickson

1         or anything of that nature?

2    A.   Well, I'm a floater.  So my duties change all

3         the time.

4    Q.   Have you always been a floater?

5    A.   No.

6    Q.   How long have you been a floater?

7    A.   Probably since, on and off, I'm trying to think

8         when the ward I worked on closed, probably

9         floating maybe six years.

10   Q.   And describe for me what a floater does?

11   A.   A floater fills in for other people who call off

12        sick or on vacation and we take over their

13        areas.

14   Q.   Is that something that you wanted to do or how

15        did you get assigned to do that?

16   A.   At first, this is my ward.  I worked on a ward

17        for six and a half years.  And when the ward

18        closed, then I went in the float pool.

19   Q.   So your job assignment changed after six and a

20        half years because of a ward closed?

21   A.   Right.

22   Q.   Again, how long did you say you have been doing

23        the floater job?

24   A.   I'm saying at least six years and before that,

25        before I took a ward, I was on a ward for six

R.158

17

Exam./Ostrowski - Erickson

1   A.    No.

2   Q.    What, in particular, do you disagree with?

3   A.    Well, first we was not in the hallway.  We was,

4         my partner and I was high-speed buffing a

5         elevator lobby in Building 1, second floor.  We

6         come in there 5:00 that morning, scrub the

7         floor, wax it and then we was buffing it.

8             MS. MERSHIMER:  Are you done answering your

9         question on the differences?

10  A.    Yes.

11            MS. MERSHIMER:  I mean, are there any other

12        differences?

13  A.    Oh, yes.  This is totally bogus.

14  BY MR. OSTROWSKI:

15  Q.    Tell me everything that's bogus about this.  We

16        can go through it by sentence by sentence.  So I

17        think you covered the first sentence and your

18        difference with that sentence is that it did not

19        happen in the hallway, but happened in an

20        elevator lobby; is that correct?

21  A.    Correct.

22  Q.    Then it says, "Erickson stated to Johnson, hey,

23        Lewis, let me tell you what people are saying

24        about you."

25  A.    No.

R.159

18

Exam./Ostrowski - Erickson

1  Q.    No?

2  A.    No.  Mr. Chandler and I and Mr. Johnson, we

3        always, always kidded around.  We always kidded

4        and we was kidding around and we was laughing,

5        this and that, blah, blah and out of the humor

6        of the moment, I said what his other brothers

7        say about him.

8  Q.    So tell me what you, I mean, what was going on

9        at the time?  What were you kidding about?  Why

10       was Lewis there, first of all?

11 A.    I have no idea.

12 Q.    Was he working?

13 A.    I have no idea.  We was working.

14 Q.    And was there some conversation that was going

15       on prior to you saying anything to Lewis?

16 A.    No.  Mr. Chandler and I were doing our job.

17 Q.    But what were you, you said you were always

18       joking.  You were joking about something.

19 A.    Yes, we kidded around a lot.  We teased them a

20       lot.  At that time, the Philadelphia Eagles,

21       he's an Eagle fan, had a piss poor team and we

22       kidded about Lebanon Valley College is on their

23       schedule, that Swathmore University is on their

24       schedule, stuff like that.  And I'm a pseudo fan

25       and we always kidded about stuff like that.

R.160

19

Exam./Ostrowski - Erickson

1  Q.   Was that going on at this time?

2  A.   I don't recall exactly what we was kidding

3       around about, but I know we was kidding.

4  Q.   Did Mr. Johnson say anything that you can

5       recall?

6  A.   I don't recall.  I mean, he was kidding around

7       just the way we was.

8  Q.   And you don't recall what you were kidding

9       around about?

10  A.   No, I don't.

11  Q.   Then it says, "Johnson responds, I don't want to

12       hear it."  Do you --

13  A.   I don't remember him saying that.

14  Q.   And then it says Erickson then places his body

15       in Johnson's path to prevent him passing, shouts

16       to Chandler, hey, Lou, I'm going to tell Lewis

17       what people are saying about him."

18  A.   That didn't happened.

19  Q.   Did Mr. Chandler say anything at all during this

20       period of time?

21  A.   Mr. Chandler is a humorous person and he was

22       kidding around, probably more so than I was.

23  Q.   Do you remember what he was --

24  A.   I have no idea what we was kidding around about.

25  Q.   And how long -- let me just go on first.  Then

R.161

20

Exam./Ostrowski - Erickson

1  it says, "Chandler does not respond in any

2  manner."  I'm assuming if you didn't say I'm

3  going to tell Lewis what people are saying about

4  him, then he would have nothing to respond to?

5  A.  Exactly.

6  Q.  Then it says, "Erickson then stated to Johnson,

7  people are saying you are a white man in a black

8  man's skin."  You said that to him?

9  A.  I said his brothers, not people, I said his

10  brothers.

11  Q.  What do you mean his brothers?

12  A.  His other black employees.

13  Q.  And have people said that to you before?

14  A.  At the time it was said, myself, Mr. Chandler, a

15  few other, four other black gentlemen were

16  standing around shooting the bull and

17  Mr. Johnson was not liked by the black community

18  at the hospital whatsoever.

19  Q.  And do you have any understanding as to why?

20  A.  Well, just the comment was made.  One of them

21  stated exactly what was on here.

22  Q.  When, in relation to this incident,

23  October 13th, 1999, did you have that

24  conversation with the other African American

25  employees?

R. 162

21

Exam./Ostrowski - Erickson

1   A.   That was probably a couple days before.

2   Q.   Why were you talking about Lewis at that point?

3   A.   I wasn't.

4   Q.   When I say you, I mean, why was the group?

5   A.   The group?

6   Q.   Yes.

7   A.   I don't really know.  I mean, like I said, the

8       black community did not like Mr. Johnson.

9   Q.   And there was nothing discussed to give you any

10      indication as to why they did not like

11      Mr. Johnson?

12   A.   I couldn't tell you exactly what was going on as

13      far as where his name come up.  I don't recall.

14   Q.   So did you understand, then, that that statement

15      that Lewis is a white man in a black man's skin,

16      that that was a statement of disrespect or

17      dislike for Mr. Johnson, for Lewis?

18   A.   I assumed that was made by the black man who

19      said it for that reason.

20   Q.   That's how you understood it?

21   A.   That's how I understood it.  I don't hold that

22      theory at all.

23   Q.   When you said to Mr. Johnson that that's what

24      his brothers were saying about him, were you

25      telling him essentially that his brothers were

R.163

22

Exam./Ostrowski - Erickson

1     criticizing him, that they were expressing their

2     disrespect for him?

3  A.   Oh, not at all.

4  Q.   How were you saying --

5  A.   We was just kidding around and it just come out.

6  Q.   Why did you choose to say that to Mr. Johnson?

7  A.   I don't really know.  I didn't say it in

8     disrespect to Mr. Johnson whatsoever.  I just

9     stated what his fellow African American people

10    think about him.

11  Q.  Why?  Why did you care to say that to him?

12  A.  I don't know.  I was just kidding around.  At

13    the time the way we was kidding, it fit and it

14    was funny.  It was said in a funny way.

15  Q.  And then the statement says, "Johnson shoved his

16    way past Erickson and walked away quickly."

17  A.  That never happened.

18  Q.  What happened?

19  A.  He went away.  He went to the freight elevator

20    but he didn't shove his way past me because I

21    was holding a high-speed buffer and he wasn't

22    even close to me.  We had two high-speed buffers

23    and he was away from us.

24  Q.  So is it your recollection that you actually

25    your hands on the high-speed buffer at the time?

R.164

23

Exam./Ostrowski - Erickson

1    A.    That's right.

2    Q.    And then were you laughing afterwards as Lewis

3          walked away?

4    A.    Lewis was laughing and so was we, sure.

5    Q.    You said Lewis was laughing?

6    A.    Definitely.

7    Q.    Did you have any discussions later that day with

8          Mr. Chandler?

9    A.    No.

10   Q.    At some point after that, did you have -- what

11         did you next hear about this matter, then,

12         regarding your comment to Mr. Johnson?

13   A.    Couple days later I was informed that he was

14         filing an EEO complaint against me.

15   Q.    How did you become aware of that?

16   A.    My partner told me.

17   Q.    Did you ever have a discussion with Lynette Brea

18         from EEO?

19   A.    I ask her if it was true.

20   Q.    And what did she say?

21   A.    I don't think she was handling it.

22   Q.    Did you talk with anybody else about the fact

23         that Mr. Johnson intended to file a EEO

24         complaint?

25   A.    No.

R.165

24

Exam./Ostrowski - Erickson

1   Q.   Then what happened next?  Well, actually, what I

2        want you to do, I want you to read down the

3        Monday, October 18, 1999, incident at the bottom

4        of the first page continuing over onto the

5        second page.  Have you had a chance to review

6        that?

7   A.   Um-hum.

8   Q.   Now, you see that paragraph, the first paragraph

9        on the second page reference is 10:20 a.m.  Then

10       do you recall, generally, I'm not asking at this

11       point to agree or disagree with what's said, but

12       do you generally recall an encounter with

13       Mr. Johnson about, after you had learned that he

14       was filing an EEO complaint?

15   A.   I went down to his ward, yes.

16   Q.   And was that, then, was it in Building 1, Ward

17       3A?

18   A.   Yes.

19   Q.   In Lewis's work location?

20   A.   Yes.

21   Q.   And why did you go down there?

22   A.   Because I thought Lewis and I were friends and I

23       wanted to know what he was doing because I

24       didn't make the comment to him from me.  I made

25       it, told him what his brothers were saying about

R. 166

25

Exam./Ostrowski - Erickson

1      him.

2  Q.  And it says on here that there was a ward clerk

3      by the name of Barbara Yeich there?

4  A.  Um-hum.

5  Q.  Was she there, do you recall?

6  A.  Yes.

7  Q.  And it says, "Erickson entered the area and from

8      about 20 feet away shouted, hey, Lewis, I want

9      to talk to you."

10 A.  I don't shout.

11 Q.  Other than the shouting, is that accurate?

12 A.  I don't know for word to word, but possibly it's

13     close.

14 Q.  Did Mr. Johnson respond that he did not want to

15     talk to you?

16 A.  I don't recall he said anything.  He might have

17     said that, I don't know.

18 Q.  Did he begin walking in the opposite direction

19     from you?

20 A.  No.

21 Q.  Did you, at some point, come into contact with

22     Mr. Johnson?

23 A.  No.

24 Q.  Was there no contact, whatsoever?

25 A.  None.

R.167

26

Exam./Ostrowski - Erickson

1  Q.  And did you say to him, repeat to him I want to

2      talk to you and tell you what they are saying?

3  A.  I probably said I want to talk to you.  What's

4      going on?  That's it.

5  Q.  Did Mr. Johnson say to leave him alone and he

6      didn't want to hear what you had to say?

7  A.  Mr. Johnson beehived into the ladies bathroom at

8      the ward clerk's office and locked the door.

9  Q.  What did you do at that point?

10  A.  I turned around and left the ward.

11  Q.  Did you have any conversations with anybody?

12  A.  No.

13  Q.  Was there any back and forth between you and

14      Lewis Johnson?

15  A.  No.

16  Q.  Did you have any conversations with Barbara

17      Yeich after that?

18  A.  No.

19  Q.  Have you ever talked to Barbara Yeich --

20  A.  No.

21  Q.  -- about that matter?

22  A.  No.

23  Q.  Try to wait until I'm done my question.

24  A.  Sorry.

25  Q.  Go down to Tuesday, October 19, 1999.  Read the

R.168

Exam./Ostrowski - Erickson

1      9:30 entry.  Have you read that?

2  A.  Um-hum.

3  Q.  Do you recall what's reported there?

4  A.  Um-hum.

5  Q.  Is that accurate?

6  A.  No.

7  Q.  How is it inaccurate?  Well, I'll kind of walk

8      you through it.  The first sentence says you

9      appeared in Building 1, Ward 3-A, Lewis

10     Johnson's assigned work area.  Did that?

11  A.  Yes.

12  Q.  "Erickson looked directly at Johnson stopped and

13     smiled very broadly."

14  A.  No.  I went right in to open up the HAC room

15     door.

16  Q.  Open up the what?

17  A.  The HAC room door.

18  Q.  Is that like a supply closet?

19  A.  Yes.

20  Q.  Why did you go into his supply closet?

21  A.  I went into the supply closet to look for some

22     spray buff.

23  Q.  Why did you need to go into his supply closet

24     for that?

25  A.  Because in the building, the person who he was

R.169

28

Exam./Ostrowski - Erickson

1    covering, Susie Habecker, she's the only one

2    that used spray buff on her ward.  No other

3    housekeeper maintained their areas like she did,

4    so I knew she'd have some.

5  Q.  But you were in Lewis's supply --

6  A.  No, it was Susie Habecker's supply closet.

7    Lewis was just filling in for her.

8  Q.  He was working that floor at that time?

9  A.  At that time, yes.

10 Q.  And then at some point, you exited the work

11   closet?

12 A.  Yes.  Her spray buff was not in her HAC room, so

13   I come out and went into the shower room which

14   is the next door down.  That's where she kept

15   her high-speed buffer and her waxing supplies.

16 Q.  And was there some spray buff in there?

17 A.  Yes, there was.

18 Q.  Did you pick that up and leave?

19 A.  I filled my bottle I had, my spray bottle,

20   filled it up and left.

21 Q.  Where were you assigned at the time?

22 A.  I was high-speed buffing the fifth floor of

23   Building 1.

24 Q.  And does Ward 3A, does that mean third floor?

25 A.  Yes.

R.170

29

Exam./Ostrowski - Erickson

1    Q.    Did you know Lewis was working that area?

2    A.    I couldn't care less who was working that area.

3    Q.    But did you know?

4    A.    I didn't know that, no.

5    Q.    Did you see Lewis?

6    A.    He was standing in front of the nurse's station.

7    Q.    Like how far from you was he?

8    A.    Halfway down the hall.

9    Q.    Is that like 30, 40 feet or so?  I don't know

10         how long a hall is.

11   A.    I don't know, maybe 30, 40, 50 feet, maybe.

12   Q.    Did you and he make eye contact?

13   A.    I don't recall.

14   Q.    As a floater, did you receive different

15         assignments on varying days, like every day

16         would be something different?

17   A.    At that time, my assignment for almost the whole

18         winter was waxing floors.

19   Q.    In all buildings?

20   A.    In all the buildings.  We started in Building 1,

21         fifth floor and worked our way down and went to

22         the next area.

23   Q.    Then on, just read the first part of the

24         Wednesday, October 20th, 1999.  It indicates a

25         work assignment to Building 1, Ward 3, ICU.  The

R.171

30

Exam./Ostrowski - Erickson

1    second sentence says that you were assigned to

2    the same building and was moving furniture from

3    floor to floor; is that accurate?

4  A.  No.

5  Q.  What was your assignment?

6  A.  Myself, my partner, Louie and my other partner,

7    Norm Garland, we had four offices to move from

8    the third floor up to the fourth floor and

9    that's what we was doing.

10  Q.  Moving offices?

11  A.  Furniture and offices.

12  Q.  So that's pretty accurate, then; right?

13  A.  It's close.

14  Q.  As of Wednesday, October 20th, had you had any

15    discussions with Mr. Kiscadden about what had

16    transpired between you and Mr. Johnson?

17  A.  I was called to the office at 8:30 that morning,

18    yes.

19  Q.  On the 20th?

20  A.  I don't know exact date, probably the same day,

21    yes.

22  Q.  But you weren't called to the office on the day

23    where you made the remark to Mr. Johnson about

24    what his brothers were saying about him?

25  A.  No.

R.172

31

Exam./Ostrowski - Erickson

1   Q.   And you weren't called to the office on the day

2        that you encountered him in front of the nurse's

3        station where Barb Yeich was?

4   A.   No.

5   Q.   It was on this date, October 20th, when you were

6        called in?

7   A.   Yes.

8   Q.   What happened when you were called in?

9   A.   Well, they were more or less, informed me I was

10       to stay away from Mr. Johnson.

11  Q.   When you say they, who all was there?

12  A.   Rodney Kiscadden and Carolyn McGuigan.

13  Q.   Whose office did that happen in?

14  A.   Carolyn McGuigan's.

15  Q.   Go ahead and continue on with everything that

16       was discussed.

17  A.   They were just inform me that Mr. Johnson has

18       this thing against me and I was to stay away

19       from him.  I agreed.  As far as I was concerned,

20       I still did nothing to Mr. Johnson and they were

21       quite, more or less, upsetting me.

22  Q.   They were upsetting you?

23  A.   Yes.

24  Q.   How so?

25  A.   Because they are talking like I did something

R.173

37

Exam./Ostrowski - Erickson

1      to the area we was working.  We didn't call for

2      Johnson to come down to where we was working.

3      He come down, like I said before, we was kidding

4      around.

5              (Deposition Exhibit #20 marked for

6      identification)

7   BY MR. OSTROWSKI:

8   Q.   Here's a document marked as Exhibit 20.  Now

9        that's a statement.  Is that all your

10       handwriting?

11  A.   Yes, it is.

12  Q.   And did you prepare and sign that statement on

13       October 20th, 1999?

14  A.   Yes, I did.

15  Q.   The second paragraph says, "As far as 10," is

16       that supposed to be 18-99?

17  A.   Probably.

18  Q.   There you say, "As he walked away from me, we

19       slightly bumped into each other."  You hadn't

20       indicated to me that there was no --

21  A.   I don't recall.

22  Q.   Even after reading that --

23  A.   I don't know.  I don't recall.

24  Q.   And why did you prepare this voluntary witness

25       statement?

R.174

38

Exam./Ostrowski - Erickson

1   A.   Because the police asked me to.

2   Q.   You weren't asked, then, by McGuigan or

3        Kiscadden to prepare that?

4   A.   I don't think so.  I don't know.

5   Q.   Did you have any discussions with McGuigan or

6        Kiscadden after you spoke with the VA police

7        about the matter?

8   A.   No.

9   Q.   This is a document that we marked yesterday as

10       Exhibit 14.  Have you had a chance to look at

11       that document?

12  A.   Um-hum.

13  Q.   Is that your signature that appears on that

14       document?

15  A.   Yes, it is.

16  Q.   And is that your handwriting, 11-15-99?

17  A.   I suppose it is.

18  Q.   Do you recall signing that document?

19  A.   I don't recall, no.

20  Q.   Do you recall anything that happened after

21       October 20th of '99, when you had the

22       conversation with McGuigan and Kiscadden?

23  A.   Do I recall anything that happened after that?

24  Q.   Anything with respect to the situation regarding

25       Lewis Johnson?

R.175

IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF PENNSYLVANIA

. . . . . . . . . . . . . . . .
LEWIS JOHNSON,                  .
            Plaintiff  .
                               .
            vs.                . No. 1:CV-00-1873
                               . (Judge McClure)
HERSHEL W. GOBER, ACTING        .
SECRETARY OF VETERAN            .
AFFAIRS, et al,                 .
            Defendants.
. . . . . . . . . . . . . . . .


        Videotaped
        Deposition of:  RODNEY M. KISCADDEN

        Taken by    :  Plaintiff

        Date        :  April 8, 2002, 1:00 p.m.

        Place       :  4311 North Sixth Street
                       Harrisburg, Pennsylvania

        Before      :  Gail D. McLucas, Notary Public
                       Registered Professional Reporter
                       -and-
                       Crystal Lyde, Videographer


APPEARANCES:

        ANDREW J. OSTROWSKI, ESQ.

            For - Plaintiff

        UNITED STATES DEPARTMENT OF JUSTICE
        By:  KATE L. MERSHIMER, ESQ.

            For - Defendant

        ALSO PRESENT:

            LEWIS JOHNSON

R.176

6

Exam./Ostrowski - Kiscadden

1    questions verbally.  Before you answer a

2    question, it's important that you hear and

3    understand the question.  So if there are any of

4    my questions that are not clear and there's

5    anything I can do to make it clearer or help you

6    understand, stop me before you answer the

7    question and ask me.  Okay?

8  A.  Yes.

9  Q.  Fair enough?

10  A.  Yes.

11  Q.  And if, during the course of the deposition, you

12      have a question about anything, I have no

13      problem whatsoever to try to clarify anything,

14      any questions that you may have.  Okay?

15  A.  Sure.

16  Q.  How are you currently employed?

17  A.  I'm employed by the VA Medical Center, Lebanon,

18      Pennsylvania.

19  Q.  As what?  What's your position?

20  A.  Supervisor.

21  Q.  Supervisor of what?

22  A.  EMS.

23  Q.  And EMS is what?

24  A.  Environmental Management Service.

25  Q.  And how long have you been supervisor of

R.177

7

Exam./Ostrowski - Kiscadden

1        Environmental Management Service?

2   A.   Since 1990.

3   Q.   And who is your supervisor?

4   A.   Lori Dulac.

5   Q.   Lori Dulac?

6   A.   Yes.

7   Q.   Could you spell Dulac?

8   A.   D-u-l-a-c.

9   Q.   What is Ms. Dulac's position?

10  A.   Manager.

11  Q.   Manager of what?

12  A.   EMS.

13  Q.   Do you and she share the same title?

14  A.   No.

15  Q.   Maybe, what did you --

16  A.   Actually I'm the supervisor.

17  Q.   Are there other supervisors of EMS?

18  A.   Yes.

19  Q.   Are there different areas of responsibility

20       assigned to the different supervisors?

21  A.   We all basically have the same understanding

22       of --

23  Q.   The same areas of responsibility?

24  A.   Well, we do have an area that we cover.  But we

25       basically do the same job.

R.178

prepared?
A. Yes.
Q. And it says counseling October 20, 1999 and then I won't read the content of it. At the bottom of this document it has the name, looks like Irvin Erickson's signature. Do you recognize that as being his signature?
A. Yes.
Q. Were you in his presence when he signed this?
A. Yes.
Q. And he dated it November 15th, 1999. Do you know why it was dated November 15th, 1999?
A. No, I don't.
Q. When did you present him with this document?
A. That I don't remember. Should have been October 20th.
Q. It should have been October 20th when you presented it to him?
A. Yes.
Q. Is that your recollection or is that just based on, this says counseling October 20th, 1999?
A. That's when it should have been given to him, yes.
Q. And what did you do with this document after you received -- after Mr. Erickson signed it?

R. 179

39

Exam./Ostrowski - Kiscadden

1   A.    I don't remember what --

2   Q.    There's a facsimile script at the top of that.

3         Do you see that?  It says, November 15, '99.

4         Monday 1400 hours, Page 2.  Do you recognize

5         what fax machine that came from?

6   A.    No.

7               (Deposition Exhibit #15 marked for

8         identification)

9   BY MR. OSTROWSKI:

10  Q.    I hand you a document marked as Exhibit 15.

11        This is a report of contact.  Is that your

12        signature at the bottom of that page?

13  A.    Yes.

14  Q.    And it's dated October 18th, 1999.  Is this a

15        document that you prepared?

16  A.    Yes, it would have been, yes.

17  Q.    Now, what is the purpose or use of this form of

18        document?  Why did you fill this out and what

19        did you use it for?

20  A.    This would have been just a fact finding.

21  Q.    And you did then meet with Mr. Erickson on

22        October 18th?

23  A.    Yes.

24  Q.    And what did you do with this document after you

25        prepared it?

R.180

40

Exam./Ostrowski - Kiscadden

1  A.    Just kept it on file.

2  Q.    For what purpose?

3  A.    So I had a copy of it.

4  Q.    What did you, other than what's recorded on

5        here, is there anything more that you talked to

6        Mr. Erickson about at that time?

7  A.    No.  These are the only incidents he related to

8        me.

9  Q.    He being?

10 A.    Mr. Erickson.

11          (Deposition Exhibit #16 marked for

12      identification)

13 BY MR. OSTROWSKI:

14 Q.    I'm going to hand you a document marked as

15       Exhibit 16.  Is that a copy of your signature

16       that appears at the bottom, even though it's a

17       little hard to read?

18 A.    Yes, that's my signature.

19 Q.    Is this a document you prepared and sent to

20       Mr. Johnson?

21 A.    Yes.

22 Q.    Why did you prepare this document on

23       November 17th or send this on November 17th,

24       1999?

25 A.    This would have been a document instructed to

R.181

41

Exam./Ostrowski - Kiscadden

1    be -- by the personnel.

2  Q.    The line in there, "We are confident that you

3        can return to work without any concerns."  Why

4        did you put that in there?

5  A.    Because we were confident that he could return

6        to work.

7  Q.    Did he express some concerns about not being

8        able to return to work?

9  A.    By that time he was off work, so I would imagine

10        he would have had concerns, yes.

11  Q.    And what had been done to, what action had been

12        taken to ensure that whatever he was concerned

13        about would not be repeated?

14  A.    That counseling to Mr. Erickson.

15  Q.    Is it possible that the counseling form, I

16        believe in Number 13 --

17  A.    Fourteen.

18  Q.    Fourteen, correct.  Sorry.  Did you prepare that

19        several weeks after the incident?

20  A.    Did I prepare this counseling?

21  Q.    The form, several weeks after the incident?

22  A.    I would have prepared it on the date specified.

23  Q.    Well, there is two dates.

24  A.    And why Mr., I can't tell you why this is dated

25        by Mr. Erickson that particular date.  That I

R.182

42

Exam./Ostrowski - Kiscadden

1       don't know.

2    Q.    Well, is it possible, and I'm going to suggest

3          something and I'll let you respond to it, that

4          you didn't do anything and then you were

5          concerned because Mr. Johnson was concerned and

6          you got together with McGuigan and thought you

7          better make it look like you did something to

8          correct the situation well after the fact?

9    A.    No.  That wouldn't have been our policy, no.

10   Q.    On these documents, it looks like you contacted

11         Mr. Erickson on the 18th of October, based upon

12         Exhibit Number 15.

13   A.    Yes.

14   Q.    And then you prepared a counseling for him on

15         October 20th?

16   A.    Yes.

17   Q.    Now, were they both -- strike that.  So you

18         didn't, did you talk to Mr. Erickson at all

19         before there were two incidents, meaning, did

20         you talk to him after just the matter of the

21         comment that he made?

22   A.    No.

23   Q.    It was only after there was the alleged shoving

24         incident involved and then you talked to him

25         about both?

R.183

43

Exam./Ostrowski - Kiscadden

1    A.    That's correct.

2    Q.    And when you say, when you use the term

3          counseling, what do you mean counseling?

4    A.    That's the form of, what could you say, the

5          process of the disciplinary action.  Counseling

6          would be the first thing you do.

7    Q.    Would that, is that the first thing you do in

8          any case?

9    A.    Not always.

10   Q.    Like would it have been a different situation if

11         Mr. Erickson came up and punched Lewis Johnson

12         in the mouth?

13   A.    Definitely would have changed the scenario, yes.

14   Q.    And why would that change the scenario?

15   A.    That would be automatic dismissal.

16   Q.    Based upon what, the severity of the incident?

17   A.    Yes, based upon the severity.

18   Q.    Who makes that determination as to what

19         incidents or how severe any particular incident

20         is?

21   A.    We present those to personnel.  They let us know

22         how great severity of procedure we are supposed

23         to use.  But I also believe the union can get

24         involved also.

25              (Deposition Exhibit #17 marked for

R.18∠



**Veterans Administration**

# VOLUNTARY WITNESS STATEMENT

Statement of _Iewin Erickson_____, Date of Birth _____

and Social Security Number _____. Given on _____

to _____, at _____

in reference to Uniform Offense Report Number _____

10-13-99  Lewis Johnson came down to
1-2B where ~~he~~ Lewis Chandler and I
were doing wrong. He had no reason to
be down there, so all three of us were
kidding around, and as he was leaving
I said to him what his own brother
say about him. I did not tell him that
as my point of view, only what his
own brothers say about him. I have
no ill feeling against Johnson. I do
not stalk him.

As far as 10-18-99 I aproached Mr.
Johnson to explain what I said, as he
walked away from me we slightly
bumped into each other. No Mallace
was intended. I just wanted to explain
to him what was said.

I have read each page of this statement consisting of _____ pages(s) and I certify that the information

given is true to the best of my knowledge.                G-057

_Iewin Erickson_ (Declarant) Signature                    10-20-99  Date

_____ (Witness) Signature              _____ Date     R-185



**VOLUNTARY WITNESS STATEMENT**

Veterans Administration

Statement of _____ L. Chandler _____, Date of Birth _____

and Social Security Number _____. Given on _____ 10-19-99 _____

to _____ Officer SHFDC _____, at _____ Police office. _____

in reference to Uniform Offense Report Number _____ 99-10-19 @ 0930 _____

I heard Irv state that he heard that
someone said that he was "A white man
in black skin." This was not a personal opinion
against L. Johnson.

I have read each page of this statement consisting of _____ pages(s) and I certify that the information

given is true to the best of my knowledge.

**G-059**

_____ (signature) _____                              10-19-99

(Declarant) Signature                                Date

_____                                                _____

Date

R.18C

 

**Veterans Administration**                    **VOLUNTARY WITNESS STATEMENT**

Statement of _YEICH, BARBARA_ , Date of Birth ████████

and Social Security Number ████████ . Given on _OCT. 19, 1999_

to _OFFICER SABOL_ , at _____

in reference to Uniform Offense Report Number _____

On October 18, 1999 @ Approx. 1025, I was sitting @ my desk on 1-3A. Lewis Johnson approached my desk to speak with me and at that time was approached by Inv Erickson who came up to the side of Lewis and said, "I want to talk to you". at that point Lewis said "I don't have anything to say to you" and started to walk away from the desk with Inv following and the same statements were made again by both parties. Lewis turned to come down the hall with Inv following him and the same statements were made again by both parties. Lewis came to the opposite end of my desk with Inv following and both statements were made again. Lewis went into the bathroom and locked the door. Inv stood at the opposite end of my desk and said something to the effect - just because one of your brothers made a remark, and then he left.

I have read each page of this statement consisting of ____1____ pages(s) and I certify that the information

given is true to the best of my knowledge.                    **G-058**

_Barbara J. Yeich_
(Declarant) Signature                    _10/19/99_
                                         Date

                                                        R-187

_____
(Witness) Signature                     _____
                                         Date

page 1 of

## REPORT OF CONTACT

(NOTE: This form must be filled out in ink or on typewriter,
as it becomes a permanent record in veterans' folders.)

| VA OFFICE | IDENTIFICATION NOS. (C, XC, SS, XSS, V, K, etc.) |
|---|---|

LAST NAME - FIRST NAME - MIDDLE NAME OF VETERAN (Type or print)

Johnson Lewis

ADDRESS OF VETERAN

DATE OF CONTACT

10/18/99

TELEPHONE NO. OF VETERAN (Include Area Code)

PERSON CONTACTED

Erickson Irvin

ADDRESS OF PERSON CONTACTED

TYPE OF CONTACT (Check)

[X] PERSONAL  [ ] TELEPHONE

TELEPHONE NO. OF PERSON CONTACTED (Include Area Code)

BRIEF STATEMENT OF INFORMATION REQUESTED AND GIVEN

On or about 10:25 am, 10/18/99 on ward 1-3A I was harassed by Irvin Erickson.

I was walking up the hall to my Hac closet when I was approach by Irvin Erickson. He said "Hey, Lewis I want to talk to you." I said to Irvin "I don't want to talk to you." I turned around to walk the other way and he followed me. Then he started to say as I walked pass the nurse's station. "Why don't you want to talk to me." After I passed the nurse station he caught up to me and bump me with his shoulder. saying "why don't you want to talk to me." I said "I just don't want to" So I change direction to get him of my shoulder, but he stay on me, and kept repeating the same words, "why don't you want to talk to me. He continue to ride my

| DIVISION OR SECTION | EXECUTED BY (Signature and title) | |
|---|---|---|

Johnson

DEPOSITION
EXHIBIT 30
4-24-02 GDM

R.18

13-106/8372

Page 2

# REPORT OF CONTACT

Department of Veterans Affairs

(NOTE: This form must be filled out in ink or on typewriter, as it becomes a permanent record in veterans' folders.)

VA OFFICE

IDENTIFICATION NOS. (C, XC, SS, XSS, V, K, etc.)

LAST NAME - FIRST NAME - MIDDLE NAME OF VETERAN (Type or print)

Johnson Lewis

ADDRESS OF VETERAN

DATE OF CONTACT
10/18/99

TELEPHONE NO. OF VETERAN (Include Area Code)

PERSON CONTACTED

Erickson, Irvin

ADDRESS OF PERSON CONTACTED

TYPE OF CONTACT (Check)
☑ PERSONAL    ☐ TELEPHONE

TELEPHONE NO. OF PERSON CONTACTED (Include Area Code)

BRIEF STATEMENT OF INFORMATION REQUESTED AND GIVEN

"Continue"

Shoulder until I reach the opening in the nursing station. I then kept quiet and went in the restroom and lock myself in. Barbra Yaich was sitting at the nursing station when all this was going on.

R-189

DIVISION OR SECTION

EXECUTED BY (Signature and title)

Lewis W. Johnson  Housekeeping Aid

DEPARTMENT OF VETERANS AFFAIRS                                          Page    4
VA POLICE
UNIFORM OFFENSE REPORT
UOR# 99-10-19-0930

VA Facility                                              Date/Time Printed
LEBANON, PA                                              OCT 19, 1999@12:25
Automated VA Form 10-1393

YEICH STATED THAT JOHNSON WALKED BEHIND THE NURSES STATION AND LOCKED
HIMSELF IN THE BATHROOM. WITNESS STATEMENT IS ATTACHED TO THIS REPORT.
     ON 10-19-99 AT 1042 HOURS I APPROACHED IRV ERICKSON IN BLDG# 1
FIFTH FLOOR IN HIS OFFICE AREA. BEFORE ANY STAEMENTS WERE MADE I INFORMED
ERICKSON OF HIS RIGHTS, TO WHICH HE FULLY UNDERSTOOD. I BEGAN TO INTERVIEW
ERICKSON CONCERNING THIS MATTER. ERICKSON STATED THAT ON 10-13-99 AT 0800
HOURS HE CALLED JOHNSON OVER ONLY TO TELL HIM WHAT PEOPLE WERE SAYING ABOUT
HIM. ERICKSON STATED THAT THIS WHAT NOT HIS PERSONAL FEELINGS BUT ONLY WHAT
PEOPLE WERE SAYING. ERICKSON STATED THAT HE DID SAY "HEY LEWIS, THEY ARE
SAYING THAT YOU ARE A WHITE MAN IN BLACK SKIN". ERICKSON SAID THAT EMS
EMPLOYEE L. CHANDLER WAS THERE TO WITNESS THESE STATEMENTS.  ERICKSON
STATED THAT JOHNSON, CHANDLER AND HIMSELF WERE JOKING AROUND EARLIER THAT
MORNING. ERICKSON STATED THAT ON 10-18-99 AT 1025 HE DID IN FACT APPROACH
JOHNSON ON 1-3A ONLY TO CLEAR UP THE MISUNDERSTANDING BETWEEN THEM ON THE
STATEMENTS MADE. ERICKSON STATED THAT HE NEVER PUSHED HIS SHOULDER INTO
JOHNSON OR MADE ANY PHYSICAL CONTACT WITH JOHNSON. HE JUST WANTED TO TALK
TO JOHNSON TO CLEAR THINGS UP. SEE VOLUNTARY STATEMENT ATTACHED TO THIS
REPORT.
     ON 10-19-99 AT 1150 HOURS I INTERVIEWED L. CHANDLER CONCERNING THIS
MATTER. CHANDLER STATED THAT ERICKSON WAS ONLY TELLING JOHNSON WHAT OTHER
PEOPLE WERE SAYING ABOUT HIM. CHANDLER STATED THAT ERICKSON WASN'T VIEWING
HIS OWN PERSONAL FEELINGS ABOUT JOHNSON. SEE VOLUNTARY STATEMENT ATTACHED
TO THIS REPORT.
     AFTER HEARING THE TESTIMONY OF ALL INVOLVED AND MY INVESTIGATION, I
FIND THAT THE COMPLAINT FILED BY L. JOHNSON AGAINST I. ERICKSON IS
UNFOUNDED. NO FURTHER POLICE ACTION REQUIRED AT THIS TIME.


          DISPOSITION:

CASE CLOSED.




STEPHEN J JR SABOL    # 2987
INVESTIGATING OFFICER

R. 190

# REPORT OF CONTACT

NOTE: This form must be filled out in ink or on typewriter as it becomes a permanent record in veterans' folders.

VA OFFICE

VA Medical Center
1700 South Lincoln Avenue
Lebanon, PA 17042

DATE OF CONTACT
October 18, 1999

LAST NAME-FIRST NAME-MIDDLE NAME OF VETERAN (Type or print)

TELEPHONE NO. OF VETERAN

ADDRESS OF VETERAN

TYPE OF CONTACT    (Check)

X PERSONAL   · TELEPHONE

PERSON CONTACTED

TELEPHONE NO. OF PERSON CONTACTED

ADDRESS OF PERSON CONTACTED

BRIEF STATEMENT OF INFORMATION REQUESTED AND GIVEN

On October 18, 1999, I met with Environmental Management (EM) employee Irvin Erickson about separate harassment incidents occurring with EM employee Lewis Johnson.

Mr. Erickson told me that he did not originally make the statement "You are a white person in black skin," but only repeated that statement that was said about Mr. Johnson.

On the second incident, Mr. Erickson explained he wanted to talk to Mr. Johnson and Mr. Johnson was avoiding him and wouldn't talk to him. They might have brushed shoulders during this incident, but Mr. Erickson would not concur this happened.

EXECUTED BY (Signature and Title)

*Rodney Kiscadden*

RODNEY KISCADDEN
Acting Manager, Environmental Management

DIVISION OR SECTION

Operations Product Line/EM

Automated VA Form 119

R-191

OV-15-99 MON 14:00                                                    P. 02

Counseling – October 20, 1999

Carolyn McGuigan, Chief, Support Section, and Rodney Kiscadden, Acting Manager, Environmental Management (EM), met with EM employee Irvin Erickson concerning the incident between Erickson and Lewis Johnson.

Explained to Mr. Erickson that he will have no contact with Mr. Johnson in the future unless it is work related.

Mr. Erickson was also informed that any future substantiated complaints could result in disciplinary actions.

*Rodney M. Kiscadden*
RODNEY M. KISCADDEN
Acting Manager, EM

I acknowledge receipt of the original of this counseling.

Name: *Irvin D. Erickson*          Date: 11-15-99

G-086

R.192

Lewis W. Johnson
1025 HARMONY HILL DR.
LEBANON, PA. 17046
Home Phone 717-270-0454
Email NAWAYLEW@HOTMAIL.COM

*Copy 11/17/99*

November 16, 1999

CAROLYN MCGUIGAN
Chief of Support Section: (Leaf)
B2-10 N131
V.A. Med.Center Lebanon, Pa. 17042

Dear Mrs. Mcguigan

I would like to know what action was taken on the "Point of Contact" form #119 I wrote up for you on 10/18/99? This request for information will help my doctor, V.A., and myself to set up a time table for my safe return to work. I would appreciated a reply in (3) three days, after receiving this letter.
Enclosed is a self-addressed stamp envelope.

Sincerely,

*Lewis W. Johnson*    11-16-99

*cc : Rodney*

G-0644

R.193


Johnson
DEPOSITION
EXHIBIT ___
4-24-02   GN



**DEPARTMENT OF VETERANS AFFAIRS**
Medical Center
1700 South Lincoln Avenue
Lebanon, PA 17042

November 17, 1999                                In Reply Refer To: 595/N131

Mr. Lewis W. Johnson
1025 Harmany Hill Drive
Lebanon, PA  17046

Dear Mr. Johnson:

We addressed the issues you reported to us with the individual concerned and have taken action to ensure it is not repeated.

We are confident you can return to work without any concerns.

RODNEY M. KISCADDEN
Acting Manager, Environmental Management

R-194



Johnson
DEPOSITION
EXHIBIT #10
4-24-02 GDm

Office of Resolution Management, Lyons Field Office
Initial Referral Form

Date _10/18/99_

Name of Aggrieved: _Lewis Johnson_    Facility: _Lebanon_    SSN: _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_

Title/Grade/Step: _House Keeping_ And _WC-2_    Service/Division: _Env_

Agrees to Waiver of Anonymity: Yes_/No_ Date:_____

Home Address: _1025 Harmony Hill Dr._
City: _Lebanon_    State: _?_ Zip: _17046_

Day Phone: (717) _272-6621_    Evening Phone: (717) _270-0454_
    x - 4661  4659  6047
*Please indicate the most convient time to reach you: _____ a.m. / _____ p.m. What time in the day _____?

Reason For Contact

| Issue 1: Date of Incident: | 10/13/99 Harassment | Basis(es): race (African American) |

Aggrieved states that his co-worker made a racial remark to him in regards to his race

| Issue 2: Date of Incident: | 9/23/99 award | Basis(es): race (African American) |

Aggrieved stated that management gave out a team award in 1998. However, the aggrieved stated he was part of the team and did not receive an award (monetary)

| Issue 3: Date of Incident: | 9/99 (aggrieved said about 3wks ago) | Basis(es): race (African American) |

Aggrieved he received a 4 hour time off award, but his peers received an 8hr time off award

**G-0140**

| Issue 4: Date of Incident: | | Basis(es): |

Representative's name: _____    Representative's Phone: _____

Initial intake completed by: _L. Butchko_    Referred to: _Rosemary_    R. 19

Revised 12/4/98

Folder # _____

_2004-0542-99-5484_

 



Johnson
DEPOSITION
EXHIBIT #3/
4-24-02 GD:4



**DEPARTMENT OF VETERANS AFFAIRS**
**OFFICE OF RESOLUTION MANAGEMENT**
**LYONS, NEW JERSEY 07939**

November 17, 1999

*In reply refer to:*  ORM/08E

Lewis Johnson
1025 Harmony Hill Drive
Lebanon, PA  17046

Dear Mr. Johnson:

I am closing the informal counseling on the matter you presented to this office on October 18, 1999.  Your complaint is as follows:

Basis:                    Race (African-American)

Claim:                    (1.) You were harassed by a coworker and your supervisor did not do anything about it.  (2.) All the employees on your team received a monetary award except you.  (3.) All the employees on your team received an eight hour time off award and you received a four hour time off award.

Dates of Occurrence:    October 13, 1999, September 23, 1999, and September 1999.

Resolution: You would like for the employee who harassed you to be terminated.

Please notify me no later than ( November 29, 1999 ), If the above information is incorrect.

I am enclosing two copies of the Notice of Right to File a Discrimination Complaint (including VA Form 4939).  Please sign both copies as indicated by the "sign here tabs", retain one copy for your records and return the *ORM copy* to the following address:

> Department of Veterans Affairs
> Office of Resolution Management (08E)
> 151 Knollcroft Road, Building #16
> Lyons, New Jersey 07939          G-0132
> Attn:  *(Rosemary Geddie)*

**If you decide to file a formal complaint, you have 15 calendar days from receipt of this notice in which to do so.  Please do not mail the VA Form 4939 to me; your formal complaint must be mailed to one of the addresses listed on the first page of the attached Notice of Right to File a Discrimination Complaint.**

If you have any questions or need assistance, please call me on our toll free number at 1-888-737-3361.

R-196

Sincerely,

Rosemary Geddie)
EEO Counselor

Enclosures:  Notice of Right to File a Discrimination Complaint (VA Form 4939)

G-0133

R. 197



**DEPARTMENT OF VETERANS AFFAIRS**
**OFFICE OF RESOLUTION MANAGEMENT**
**LYONS, NEW JERSEY 07939**

November 17, 1999

*In Reply Refer to*: ORM/08E

**LEWIS JOHNSON**
1025 Garnett Street
Philadelphia PA  19145

**SUBJECT:  NOTICE OF RIGHT TO FILE A DISCRIMINATION COMPLAINT**

Dear Mr. Johnson:

1.  This letter is to notify you that on the above date, the final counseling was held in connection with the matter you presented to me on October 18, 1999.

2.  If you are not satisfied with the results of the EEO counseling and believe that you have been subjected to discrimination because of your race, color, religion, sex (sexual harassment or sexual orientation), national origin, age, disability or reprisal for prior EEO activities, you now have the right to file a formal complaint of discrimination. **If you decide to file a formal complaint, you must do so WITHIN FIFTEEN (15) CALENDAR DAYS OF YOUR RECEIPT OF THIS NOTICE.** Please note that if a complaint is filed on the basis of sexual orientation, you do not have appeal rights beyond the Department of Veterans Affairs.

3.  Attached is VA Form 4939, Complaint of Employment Discrimination.  If you choose to file a formal complaint at this time, please use this form and carefully read the instructions on the reverse side before completing it.  I am available to assist you in filling out this form and to answer any questions you may have about it.  If you require assistance, please contact me **immediately**.  Please note that the fifteen (15) calendar day time frame mentioned above will not be extended due to your desire to seek my assistance in completing this form.

4.  Any complaint you choose to file may be filed in person or by mail with the EEO Officer. You may also file it with the Secretary of Veterans Affairs or with the Deputy Assistant Secretary for Office of Resolution Management (DAS/ORM).  Their addresses are listed below:

Rosa C. Franco, Regional EEO Officer
Department of Veterans Affairs
Office of Resolution Management (08E)
151 Knollcroft Road, Building #16
Lyons, New Jersey 07939

**G-0126**

R. 198



Johnson
DEPOSITION
EXHIBIT 45
4-24-02 GPM




Secretary of Veterans Affairs
Department of Veterans Affairs
810 Vermont Avenue, NW
Washington, D.C.  20420

Office of Resolution Management (ORM)
Deputy Assistant Secretary (08)
810 Vermont Avenue, NW
Washington, D.C.  20420

5.   If you file a complaint with the Secretary or the DAS/ORM, **you should provide a copy to this ORM Field Office**.  Since the Secretary and the DAS/ORM will send your complaint to this ORM Field Office for initial processing, **failure to provide a copy to this ORM Field Office will only delay the processing of your complaint**.

6.   You must identify each event you are protesting and provide the date on which each event occurred.  Your complaint must be specific and limited to the events you discussed with me.  **Therefore, if there are any events that you have not discussed with me, please do so immediately**.  Regulations require that you provide the Department with an opportunity to resolve each event informally at EEO counseling.

7.   You are entitled to representation at every stage of the complaint process.  You may choose anyone to represent you, unless that person occupies a position within the VA that would create a conflict of interest.  If you do select a representative, you must inform this ORM Field Office of your representative's name and business address.

8.   If you are a member of the bargaining unit, you may have the right to dispute the events you discussed with me through the union grievance procedure.  Regulations provide that you may file a grievance or an EEO complaint about the events in dispute, but not both.  Should you file both, whichever you file first (a union grievance or an EEO complaint) will be considered your election to proceed in that forum.

9.   If you are complaining about a matter which may be appealed to the Merit Systems Protection Board (MSPB), you may file an EEO complaint or an MSPB appeal, but not both.  Whichever you file first (a formal EEO complaint or an MSPB appeal) will be considered your election to proceed in that forum.  If I can be of further assistance to you, please advise.

**G-0127**

| | | |
|---|---|---|
| **Issued by:** | Rosemary Geddie_____ | 11/17/1999_____ |
| | EEO Counselor | Date |

| | | |
|---|---|---|
| **Received by:** | _____ | _____ |
| | Aggrieved | Date |

R. 199

2

Z 400 655 102

US Postal Service
**Receipt for Certified Mail**
No Insurance Coverage Provided.
Do not use for International Mail *(See reverse)*

| | |
|---|---|
| Sent to Lewis Johnson | |
| Street & Number 1025 Garnett St | |
| Post Office, State, & ZIP Code Philadelphia PA 19146 | |
| Postage | $ |
| Certified Fee | |
| Special Delivery Fee | |
| Restricted Delivery Fee | |
| Return Receipt Showing to Whom & Date Delivered | |
| Return Receipt Showing to Whom, Date, & Addressee's Address | |
| TOTAL Postage & Fees | $ |
| Postmark or Date | 11-17-99 |

PS Form 3800, April 1995

G-0128

R. 200

DEC-22-1999  11:57     VA M&ROC

200H-1532

# COMPLAINT OF EMPLOYMENT DISCRIMINATION

**1. NAME (Last, First, middle initial) (Please print)**
Johnson, Lewis W.

**2. MAILING ADDRESS**
1025 Harmony Hill Dr.
Lebanon, PA 17046

**3a. WORK TELEPHONE NUMBER** *(Include Area Code)*
717 272-6621

**3b. HOME TELEPHONE NUMBER** *(Include Area Code)*
(717) 270-0454

**4. ARE YOU:**
☑ A VA EMPLOYEE
☐ AN APPLICANT FOR EMPLOYMENT
☐ A FORMER VA EMPLOYEE

**5a. JOB TITLE, GRADE AND SERIES**
Housekeeping Aid WG-2- 07336A

**5b. SERVICE/SECTION/PRODUCT LINE**
OPERATIONS management
ENVIRONMENTAL SERVICE

**6. NAME AND ADDRESS OF VA FACILITY WHERE DISCRIMINATION OCCURRED**
Lebanon VA MEDICAL CENTER
1700 So. Lincoln Ave
So. Lebanon, PA 17042

**INSTRUCTIONS:** For each employment related claim(s) that you believe was discriminatory, list the bases for your complaint: (list one or more): Race (Specify), Color (Specify), Religion (Specify), Sex (male or female), Sexual Orientation, National Origin (Specify), Age (Provide date of birth), Disability (Specify), and Reprisal for prior EEO activity or having opposed discrimination.

| 7. BASIS | 8. ISSUE(S) (What employment related claim(s) - personnel action(s), incident(s), or event(s), that caused you to file this complaint? Briefly, describe what happened below. Use an additional sheet of paper if necessary.) | 9. DATE OF OCCURRENCE (Include the most recent claim(s)) |
|---|---|---|
| RACE | See Attached documents | |

RECEIVED
DEC 20 '99

**10. WHAT RESOLUTION ARE YOU SEEKING?**
See Attachment

**11a. DO YOU HAVE A REPRESENTATIVE?**
☑ YES  ☐ NO

**11b. IF "YES," IS HE OR SHE AN ATTORNEY?**
☐ YES  ☑ NO

**11c. PROVIDE THE NAME, ADDRESS, AND TELEPHONE NUMBER OF YOUR REPRESENTATIVE**
Committee Against Discrimination
P.O. Box 1338     (717) 865-9633
Lebanon, PA 17038

**12a. HAVE YOU CONTACTED AN EEO COUNSELOR?**
☑ YES  ☐ NO

**12b. NAME OF EEO COUNSELOR**
Rosemary Geddie

**13. DATE OF INITIAL CONTACT WITH OFIM**
10-18-99

**14. NOTE:** If you contacted an EEO Counselor more than 45 calendar days after the Date(s) of Occurrence, item 9 above, or if this complaint is filed more than 15 calendar days after receipt of a Notice of Right to File a Discrimination Complaint from an EEO Counselor, you must explain why you were untimely in seeking EEO counseling or in filing your EEO complaint. Provide your explanation on a separate sheet of paper.

**16a. HAVE YOU FILED A UNION GRIEVANCE ON ANY OF THE ISSUE(S) LISTED ABOVE?**
☐ YES  ☑ NO

**15b. IF "YES," LIST THE ISSUE(S) AND DATE GRIEVANCE FILED**

**16a. HAVE YOU FILED AN APPEAL WITH THE MERIT SYSTEM PROTECTION BOARD (MSPB) ON ANY OF THE ISSUE(S) LISTED ABOVE?**
☐ YES  ☑ NO

**16b. IF "YES," LIST THE ISSUE(S) AND DATE FILED**

Johnson
DEPOSITION EXHIBIT #55
4-24-02  GUM
PENGAD 1-800-631-6989

**17a. HAVE YOU FILED THIS COMPLAINT WITH ANYONE ELSE?**
☐ YES  ☑ NO

**17b. IF "YES," PROVIDE THE NAME AND ADDRESS**

**18. SIGNATURE OF COMPLAINANT (Do not print)**
Lewis W. Johnson

**19. DATE**
12-16-99

VA FORM 4939

Lewis W. Johnson

Answer to item # 10, VA Form 4939, Complaint of Employment Discrimination

10. What resolution are you seeking?

As to the awards issue.

1. Same cash award as received by white employees for each instances.

2. Posting by computer, to each department employee, whenever awards are given.

As to assault/harrassment.

1. Maximum allowable monetary amount that can be awarded in these matters.

In that the Lebanon VA allowed this to happen and made no attempt to curtail the acts, nor in any way concerned about me as a black employee. This negative hostile environment must be eradicated.

2. A negotiated transfer to a nearby facility.

3. A written apology, to be posted, manually and by computer. Said apology to include a statement to the extent that racial harassment will not be condoned. Further it should encourage anyone finding themselves in a like situation to immediately file a complaint.

*Lewis W. Johnson*  12-16-

**G-098**

R.202

 

# FORMAL COMPLAINT OF
## DISCRIMINATION`

Lewis W. Johnson
1025 Harmony Hill Drive
Lebanon, PA 17046

**G-099**

I Lewis W. Johnson, am filing the following formal complaint alleging discriminatory acts based on race and color. The acts as alleged, having occurred at the Lebanon Veterans Administration Medical Center, where the complainant is employed; and has been since 1997, as a Housekeeping Aid. The complainant is a Black male and alleges that the discriminatory acts were due to his race.

Complainant alleges, in part, that over a period of days, from October 13, 1999 to October 19, 1999, he was assaulted, harassed and stalked by another employee, Irvin Erickson ( white male ), due to racially motivated reasons. He further alleges that the same employee, Erickson, used horrendous racially derogatory words toward him, that was not invited nor welcomed. That each of these acts occurred at Mr. Johnson's place of employment, Lebanon Veterans Administration Medical Center, while in the performance of his official duties.

At all times management, in particular Kiscadden and Mcguigan, had an affirmative obligation to provide a hostile free work environment for the complainant. After being informed of the incidents of assaults, harassment and stalking, management had an affirmative obligation to investigate and prevent these on going activities.

At no time did management take an active role in preventing acts of discrimination at their place of employment. However, their inaction, and disregarding of Mr. Johnson's complaint, encouraged the continued acts.

The acts of administration and management complained of, in part, are as follows:

1. Intimidating and/or encourages witnesses to "take sides" rather than telling the truth. When Mr. Kiscadden went to take a statement from Ms. Barbara Yeich, October 18, 1999, according to Ms. Barbara Yeich, who was a witness on the assault and harassment, Mr. Kiscadden first words were, " So whose side are you going to take. " In stead of simply taking her statement, his comment was a covert method of suggesting she be less than truthful.

2. On October 18, 1999, just after the assault, Carolyn Mcguigan, product line chief, was fully informed of the incidents but took no actions to prevent future occurrences.

3. Senior management attempted to force Mr. Johnson, on October 20, 1999, during the start of the work day, to work in building 1-ICU, in the area Mr. Erickson would be working

4. On October 20, 1999, Johnson was told by Ms. Mcguigan, arrangements would be made so that Mr. Erickson and he could "sit down, discuss this matter, shake hands and make up." I do not believe I should be forced to "make up" with a person whose animosity toward me is based on what I am rather than who I am. This was a slap in the face to me as a victimized person. Due to my present medical treatment, this meeting did not occur. Additionally, this was in contradiction to agency policy as set forth by executive directives.

R. 203

 

5. After 14 days in the day hospital, at Phil Haven Day Hospital, Johnson sent a letter to Ms. Mcguigan, requesting to know the outcome of his complaint on Mr. Erickson.

6. Johnson received a letter, dated November 17, 1999, from Rodney Kiscadden stating the issues were addressed, action were taken to ensure it would not be repeated and Johnson could return to work without concerns. This letter was thirty four days after the first act of discrimination against Johnson and thirty two days after Johnson's first complaint to management.

7. By the time management indicated to Johnson, the discriminatory acts would no longer occur, Johnson was and still is under doctors care.

Lewis W. Johnson   12-16-99

Lewis W. Johnson

G-0100

R.204



DEPOSITION
EXHIBIT # 27
4-24-02    GDM



**DEPARTMENT OF VETERANS AFFAIRS**
OFFICE OF RESOLUTION MANAGEMENT
151 Knollcroft Road Building 16
Lyons NJ 07939

*EEO Hearing #*
*170-AO-8428X*

**MAY 9 2000**

*Via Certified Return Receipt & Regular Mail*

In Reply Refer To: ORM/08E

Mr. Lewis Johnson
1025 Harmony Hill Drive
Lebanon, PA 17046

Subj: Final Agency Decision EEO Complaint Case Number 200H-0542-99-5484 filed
December 16, 1999

1. The purpose of this letter is to advise you of the disposition of your complaint of discrimination
filed on December 17, 1999 against officials of the Department of Veterans Affairs Medical Center,
Lebanon.

2. Your formal complaint raises two claims. The first is as follows:

(1) You were harassed on the basis of race (African American). In support of that claim, you
have identified the following events:

(a) A co-worker made a comment on 10/13/99 that "People are saying you are a white man
in a black man's skin;"

(b) That same co-worker elbowed you in the back on 10/13/99;

(c) That same co-worker smiled broadly at you several times on 10/19/99; and

(d) Management did not take what you consider appropriate and effective action when you
reported these events to them.

3. We have determined the claim you raise, Claim (1) does not meet procedural requirements, and is
therefore **DISMISSED** for the following reasons:

EEO regulations require that a complainant be "aggrieved" and provide for the dismissal of
complaints that fail to state a claim. 29 C.F.R. 1614.107 (a) (1). A complainant who fails to
allege facts which demonstrate that he or she has been aggrieved by the matter complained of
has failed to state a claim. Although the Commission's regulations do not define the term
"aggrieved," the Commission and the courts have held that an aggrieved employee is one who
has suffered a personal loss or harm with regard to a term, condition or privilege of employment
resulting from the action being challenged. *Trafficante v. Metropolitan Life Insurance Co.*, 409 U.S.
205 (1972); *Gatpandan v. Department of the Navy*, EEOC Docket No. 05900087 (1990). R. 205

G-02

We believe in the instant issue of this complaint, you fail to state a claim. You have not indicated you suffered a personal loss or harm with regard to a term or condition of employment. The singular comment from your co-worker telling you that another person or persons "are saying you are a white man in a black man's skin;" your being elbowed in the back on one day by a co-worker; your being smiled at one day by a co-worker and the fact that you were not satisfied by management's response to these interactions are not actions that rise to the level of creating a hostile or harassing work environment. No discipline action or other adverse action resulted from these two events. That is, there is no indication that above described events rise to the level of an actionable hostile working environment nor than that the interactions were more than an isolated occurrence. *Ferreira v. Espy*, EEOC Decision No. 0193429, October 22, 1993; *Diaz v. Department of the Air Force*, EEOC Request No. 05931049 (April 21, 1994); see also *Wildberger v. Small Business Administration*, EEOC Request No. 05960761 (October 8, 1998).

According, it is my decision to <u>DISMISS</u> the first claim you bring forward, Claim (1) in your complaint for failure to state a claim. Authority: 29 C.F.R. 1614.107 (a) (1) .

4. The second claim raised in your complaint is as follows:

(2) You were treated in a disparate manner based on race (African American) when in June and July of 1998, you were denied a monetary reward for a special project accomplished by the Environment Management Float Team of which you were a member.

5. We have determined the claim you raise, Claim (2), does not meet procedural requirements, and is therefore <u>DISMISSED</u> for the following reasons:

EEO regulations require a complainant to discuss all matters believed to be discriminatory with an EEO Counselor within a 45-calendar day time frame of the event alleged to be discriminatory. 29 C.F.R. 1614.107 (a) (1) provides, in part, as follows: An aggrieved person must initiate contact with an EEO Counselor within 45 days of the date of the matter alleged to be discriminatory or, in the case of a personnel action, within 45 days of the effective date of the action.

EEO regulations at 29 C.F.R. 1614.107 (a) (2) provide that an Agency shall dismiss a complaint or portion of a complaint that fails to comply with the applicable time limits unless the complainant shows that the 45 day contact period should be extended.

The record shows that you indicate that you became aware of non-receipt of the monetary award in February of 1999. When questioned by the EEO Counselor as to why you did not contact an EEO Counselor within a 45 day time frame regarding these awards, your first contact with an EEO Counselor being October 13, 1999, you indicated that you were aware of the EEO process but you did not think of bringing claim (2) forward until you were involved in the instant counseling.

Furthermore, the record shows that you had been in prior EEO counseling, commencing on July 20, 1998, and you filed an EEO Complaint on August 25, 1998.

R.206

G-03



After thoroughly considering the facts and circumstances of your case, your reasons for delay in contacting an official charged with EEO duties or an EEO Counselor within the mandated timeframe, that is that you did not think of bringing this matter to EEO Counseling until you had come forward on claim (1) of the instant complaint, is insufficient to warrant an extension of the time limit. It is therefore my decision to DISMISS issue (2) of your complaint for failure to timely contact an EEO counselor. Authority: 1614.105 (a) (2).

6. This constitutes the final agency decision on your discrimination complaint. If you are dissatisfied with this decision, you may appeal in accordance with the enclosed appeal rights. (Form EEOC 573) You have the right to appeal, within 30 days of receipt, a dismissal, final action or decision. Appeals may be mailed to:

<div align="center">

Equal Employment Opportunity Commission
Office of Federal Operations
P.O. Box 19848
Washington, DC 20036

</div>

Or hand delivered to:

<div align="center">

Equal Employment Opportunity Commission
Office of Federal Operations
Appellate Review Programs
1801 L Street N.W.
Washington, DC 20507

</div>

Or sent by fax to:

<div align="center">

(202) 663-7022

</div>

7. If you have any questions concerning the processing of your complaint, please contact Jessica Sedreddine, EEO Intake Specialist, at (908) 580-3507 or by fax (908) 580-3568.

ROSA C. FRANCO
Regional EEO Officer

cc: Charlene Szabo, FACHE CEO

G-04

R-207

## APPEAL RIGHTS

This Final Agency Decision may be appealed within **30 calendar days** of receipt of this decision.  The appeal should be addressed to: **Equal Employment Opportunity Commission (EEOC), Office of Federal Operations, P.O. Box 19848, Washington, D.C.  20036.**  If you decide to appeal this decision to EEOC, you should use EEOC Form 573, a copy of which is enclosed.

A copy of your appeal to the EEOC **must** also be sent to the VA Office of General Counsel at the following address: **Department of Veterans Affairs, Office of General Counsel (024), 810 Vermont Avenue, NW, Washington, D.C. 20420.**

Statements or briefs in support of your appeal must be submitted to the EEOC within 30 calendar days of the filing of the appeal.  **A copy of any such statement or brief, including any statements made on EEOC's "Appellant Docketing Statement," must also be sent to the VA Office of General Counsel at the above address.**  If you have an appeal with the EEOC, your appeal, and any subsequently filed statement or brief, must contain a statement certifying the date and method by which copies of these documents were served on the VA Office of General Counsel.

You should also submit a copy of the appeal to the Regional EEO Officer at the same time that you file the appeal with the EEOC at the following address: **Lyons Office of Resolution Management (08E), 151 Knollcroft Road, Building 16, Lyons, NJ  07939.**

## RIGHT TO FILE A CIVIL ACTION

You also have the right to file a civil action in an appropriate United States District Court.  A civil action may be filed:

Within 90 days of receipt of this final decision **if no appeal to EEOC has been filed; or,**

If an appeal is filed with the EEOC, within 90 days after receipt of EEOC's final decision on your appeal; or,

After 180 days from the date of filing an appeal with the EEOC if there has been no final decision by the EEOC

If you file a civil action, the head of the Department of Veterans Affairs must be named as the defendant.  The head of the Department of Veterans Affairs is **Mr. Togo D. West, Jr.**  Mr. West's official title is **Secretary of Veterans Affairs.**  Failure to provide the name and official title of the head of the Department may result in the dismissal of your case.

R-208

**G-07**



If you file a civil action under Title VII (discrimination due to race, color, religion, sex, national origin, or reprisal); or under the Rehabilitation Act of 1973, as amended, (discrimination due to disability), and if you do not have, or cannot afford the services of, an attorney, the Court may upon your request, appoint an attorney to represent you and permit the filing of the action without payment of fees, costs, or other security.  **The grant or denial of the request is within the sole discretion of the Court.**  Filing a request for an attorney does not extend the time in which to file a civil action.  Both the request and the civil action **MUST BE FILED WITHIN NINETY (90) CALENDAR DAYS** of the date of receipt of this final agency decision or, if this decision is appealed to the EEOC, within **NINETY (90) CALENDAR DAYS** of the date of receipt of the EEOC's final decision on the appeal.

 

## NOTICE OF APPEAL/PETITION
## TO THE EQUAL EMPLOYMENT OPPORTUNITY COMMISSION
### Office of Federal Operations

1. Appellant's name (Last, First, Middle):  (Please Print or Type)

2. Home/mailing address:

3. Name and address of attorney or other representative, if any:

| 4. Appellant's daytime telephone no. (include area code) | 5. Representative's telephone no. (if applicable) |
|---|---|

6. Has appellant filed a formal complaint with his/her agency?

[ ] NO   [ ] YES – indicate the agency's case number:_____

7. Name of the agency being charged with discrimination:

8. Location of the duty station or local facility in which the complaint arose:

9. Has a FINAL DECISION been issued by the agency, an Arbitrator, or MSPB on this complaint?

    [ ] YES (include the date the appellant RECEIVED it _____ and ATTACH A COPY.)

    [ ] NO

    [ ] This appeal alleges a breach of a settlement agreement

10. Has a complaint been filed on this same matter with the Commission, another agency or through any other administrative or collective bargaining procedure?

    [ ] NO  [ ] YES  (Indicate the agency or procedure, complaint/docket no., and attach a copy, if appropriate).

11. Has a civil action (lawsuit) been filed in connection with this complaint?   **G-09**

    [ ] NO  [ ] YES  (ATTACH A COPY OF THE CIVIL ACTION FILED)

| 12. Signature of the appellant or appellant's representative | 13. 13. Date: |
|---|---|

NOTICE: Before mailing this appeal, be sure to attach a copy of the final decision from which you are appealing, if one has been issued.  Any comments or brief in support of the appeal MUST be filed with the Commission AND with the agency within 30 days of the date this appeal is filed.  Making a knowing false statement on this form is punishable by law.  See 18 USC, § 1001 PRIVACY ACT STATEMENT ON THE REVERSE SIDE.

R-210

FOR EEOC USE ONLY        OFO DOCKET NUMBER:

# PRIVACY ACT STATEMENT

(This form is covered by the Privacy Act of 1974. Public Law 93-597. Authority for requesting the personal data and the use thereof are given below.)

1.  FORM NUMBER/TITLE/DATE:  EEOC Form 573, Notice of Appeal/Petition, April 1992.

2.  AUTHORITY:  42 U.S.C. §2000e-16.

3.  PRINCIPAL PURPOSE: The purpose of this questionnaire is to solicit information to enable the Commission to properly and efficiently adjudicate appeals filed by Federal employees, former Federal employees, and applicants for Federal employment.

4.  ROUTINE USES: Information provided on this form will be used by Commission employees to determine: (a) the appropriate agency from which to request relevant files; (b) whether the appeal is timely; (c) whether the Commission has jurisdiction over the issue(s) raised in the appeal, and (d) generally, to assist the Commission in properly processing and deciding appeals. Decisions of the Commission are final administrative decisions, and, as such, are available to the public under the provisions of the Freedom of Information Act. Some information may also be used in depersonalized form as a data base for statistical purposes.

5.  WHETHER DISCLOSURE IS MANDATORY OR VOLUNTARY AND EFFECT ON INDIVIDUAL FOR NOT PROVIDING INFORMATION: Since your appeal is a voluntary action, you are not required to provide any personal information in connection with it. However, failure to supply the Commission with the requested information could hinder timely processing of your case, or even result in the rejection or dismissal of your appeal.

**Send your appeal to:**

**The Equal Employment Opportunity Commission**
**Office of Federal Operations**
**P.O. Box 19848**
**Washington, D.C.  20036**

G-010    R.21v

Z 533 495 118

US Postal Service
**Receipt for Certified Mail**
No Insurance Coverage Provided.
Do not use for International Mail *(See reverse)*

| | |
|---|---|
| Sent to *Lewis Johnson* | |
| Street & Number | |
| Post Office, State, & ZIP Code *Lebanon PH 17046* | |
| Postage | $ |
| Certified Fee | |
| Special Delivery Fee | |
| Restricted Delivery Fee | |
| Return Receipt Showing to Whom & Date Delivered | |
| Return Receipt Showing to Whom, Date, & Addressee's Address | |
| TOTAL Postage & Fees | $ |
| Postmark or Date  5/10/00 | |

PS Form **3800** April 1995

G-06

R.212

# IN THE UNITED STATES DISTRICT COURT
## FOR THE MIDDLE DISTRICT OF PENNSYLVANIA

LEWIS JOHNSON,                    :
      Plaintiff                 :    No. 1:CV-00-1873
                                :
      v.                         :    (Judge McClure)
                                :
ANTHONY PRINCIPI, Acting Secretary of    :
Veterans Affairs; et al.,         :
      Defendants                :

## CERTIFICATE OF SERVICE

The undersigned hereby certifies that she is an employee in the Office of the United States Attorney for the Middle District of Pennsylvania and is a person of such age and discretion to be competent to serve papers.

That this 12th day of June, 2002, she served a copy of the attached

## FEDERAL DEFENDANTS' RECORD IN
## SUPPORT OF THEIR MOTION FOR SUMMARY JUDGMENT:

## VOLUME I

by placing said copy in a postpaid envelope addressed to the person hereinafter named, at the place and address stated below, which is the last known address, and by depositing said envelope and contents in the United States mail at Harrisburg, Pennsylvania.

Addressee:

Andrew J. Ostrowski, Esquire
4311 North Sixth Street
Harrisburg, PA 17110


                                KATE L. MERSHIMER
                                Assistant U.S. Attorney