41
7/30/02

# ORIGINAL

### IN THE UNITED STATES DISTRICT COURT
### FOR THE MIDDLE DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| **LEWIS JOHNSON** | : | **CIVIL ACTION NO. 1:CV-00-1873** |
| **Plaintiff,** | : | |
| | : | |
| **v.** | : | |
| | : | **JUDGE McCLURE** |
| **ANTHONY PRINCIPI,** | : | |
| **Secretary Of Veterans Affairs, et. al.,** | : | |
| | : | **JURY TRIAL DEMANDED** |
| **Defendants** | : | |

FILED
HARRISBURG,

JUL 2 9 200

MARY E. D'ANDRE
Per ___

### EXHIBITS OF PLAINTIFF IN OPPOSITION TO DEFENDANTS' MOTION FOR SUMMARY JUDGMENT

A.    Deposition of Raymer Kent

B.    Deposition of Rodney Kiscadden

C.    Deposition of Joseph Stuckey

D.    Deposition of William Dumas (to be supplied)

E.    Deposition Exhibits

F.    Appendix of Miscellaneous Exhibits

Respectfully submitted,

By _____
Andrew J. Ostrowski, Esquire
I.D. No. 66420
4311 North Sixth Street
Harrisburg, PA 17110
(717) 221-9500
Attorney for Plaintiff

Dated: July 29, 2002

EXHIBIT A

```
           IN THE UNITED STATES DISTRICT COURT
              FOR THE MIDDLE DISTRICT


Lewis Johnson,           :1: CV-01-1873
                         :
      Plaintiff          :
                         :
   vs.                   :
                         :
Hershel Gober Et.al,     :
                         :
      Defendant          :


DATE:                    April 8, 2002


PROCEEDINGS:             Video Deposition of
                         Raymer Kent


APPEARANCES:

   For the Plaintiff: Andrew Ostrowski
                      4311 North 6th St
                      Harrisburg, PA 17110

   For the Defendant: MERSHIMER Mershimer
                      228 Walnut Street
                      Harrisburg, PA  17108
```

010101

1  Kent, K-E-N-T.
2       LYDE:: Keep your hand up for
3  me please. Do you swear to tell the
4  whole truth and nothing but the truth
5  so help you God?
6       KENT: I do.
7       LYDE:: Thank you. Could I
8  have a voice check around the room
9  please?
10      MERSHIMER: Kate Mershimer,
11 representing the defendants.
12      KENT: Ray Kent.
13      MCLUCAS: My name is Gail
14 McLucas from the court reporting firm
15 Filius and McLucas.
16      OSTROWSKI: I'm Andy Ostrowski,
17 counsel for Plaintiff.
18      JOHNSON: Lewis Johnson,
19 complainant.
20      LYED: Thank you. Usual
21 stipulations?
22      MERSHIMER: Yes, we reserve all
23 objections other than the form of the
24 question. And the witness would like

010101

1       LYDE: Good morning, ladies and
2  gentlemen, please be advised that video
3  and audio is in operation. My name is
4  Crystal M. LYDE. My address is 4310
5  Hillsdale Road, Harrisburg, Pennsylvania,
6  17112. I've been contracted by PR Video
7  Incorporated to be the Operator for this
8  deposition. The case is in the United
9  States District Court for the Middle
10 District of Pennsylvania. The caption is
11 Lewis Johnson versus Hershel Gober Et.al.
12 The Docket Number is 1:CV-01-1873. The
13 date is April 8, 2002. The deposition is
14 being held in the law office of Andrew J.
15 Ostrowski, 4311 North 6th Street,
16 Harrisburg, Pennsylvania, 17110. The
17 video deposition is being taken on behalf
18 of Plaintiff Lewis Johnson. The
19 witness's name is Raymer Kent. The time
20 now is 10:09 a.m. Raise your right hand
21 please. State your name for the record
22 and spell it.
23      KENT: My name is Raymer Kent.
24 It's R-A-Y-M-E-R, middle initial A

010101

1  to read and sign the deposition.
2       LYDE: Okay.
3       OSTROWSKI: Okay, Mr. Kent, my
4  name is Andy Ostrowski. We met just a
5  second before we got on the record
6  today. You understand you are hear
7  today to give a deposition in
8  connection with a lawsuit that Lewis
9  Johnson has brought against the
10 Veteran's Administration and persons
11 associated with the Veteran's
12 Administration.
13      KENT: Yes.
14      OSTROWSKI: Have you given a
15 deposition before?
16      KENT: Not in federal court,
17 no.
18      OSTROWSKI: Okay. Well, as you
19 understand, we are in federal court.
20 We are in the litigation process and
21 during that process the rules authorize
22 those who are entitled to sit down and
23 take deposition from persons who we
24 believe have knowledge or information

010101

1  relevant to our lawsuit.  And you are
2  one person who's name surfaced in that
3  regard and for that reason we brought
4  you in here.  I made arrangements with
5  Ms. Mershimer to have you in here for a
6  deposition today.  It's a question and
7  answer session, relatively informal,
8  but all my, or most of my remarks to
9  you will be in the form of a question
10  to which I expect, you know, your
11  verbal response.  So, it's important
12  that you hear and understand the
13  questions and that when you answer, you
14  are responding to the question as you
15  understood it.  So if you don't, if a
16  question I ask is not clear, and
17  there's anything I can do to help you
18  to understand it better, I'll restate
19  it or re-ask it or clarify, just feel
20  free to stop me and ask me to do so and
21  I will be happy to, okay?
22       KENT:  Okay.
23       Q:  How are you currently
24  employed?

010101

1       A:  I'm employed by the
2  Veteran's Administration in the
3  Department of Veteran's Affairs as a
4  Human Resources Manager at the VA
5  Medical Center in Lebanon,
6  Pennsylvania.
7       Q:  Okay, how long have you
8  been Human Resources Manager for the VA
9  in Lebanon.
10       A:  As a Human Resources
11  Manager, since 1997.
12       Q:  Okay.  Prior to that, how
13  were you employed?
14       A:  I was employed as the
15  Assistant Personnel Officer at the VA
16  Medical Center in Lebanon from 1982 to
17  1997.
18       Q:  Okay.  And do you have a
19  background training or education in
20  Personnel related matters?
21       A:  Actually, my Bachelors and
22  Masters are in International Relations.
23       Q:  Okay.  How did you come to
24  the Veteran's Administration in

010101

1  Lebanon.
2       A:  Because I was a veteran.
3       Q:  Okay.  And could you
4  describe for me how the Human
5  Resources, is it the Human Resources
6  Office?  Is that…
7       A:  Uh-huh.
8       Q:  Okay, how is that office
9  set up in terms of it's administrative
10  structure?
11       A:  Well, there are at the
12  moment and since 1997, since I'm in
13  charge of the department, there are,
14  well, I'm the Manager of the
15  department, the only Supervisor.  There
16  are at least three Personnel Management
17  Specialists of equal grade that service
18  a block of product line units that are
19  divided up fairly equally.  There is a
20  Specialist in charge of Payroll, a
21  Specialist in charge of Nurse
22  Recruitment, a Specialist in charge of
23  Compensation and Benefits, and then
24  there are one, two, three, four, five

010101

1  clerical staff.
2       Q:  Okay, you said that the
3  three Personnel Management Specialists
4  have areas…
5       A:  Areas by the division of
6  units of, to make a fairly equal
7  workload.
8       Q:  Okay, and how, what are the
9  different units of work that you have
10  separated out?
11       A:  You mean units?  We've, by
12  units of work I mean organizational
13  units, like full, basically full
14  service to the organizational units.
15  Like one has acute care, one will have
16  an extended care, one will do the
17  operations section.  Then we'll piece
18  up little pieces like the cemetery will
19  be assigned to one to balance the
20  workload.
21       Q:  Okay.  But then they all
22  have the broad range of functions with
23  respect to each unit?
24       A:  Except for Payroll and

010101

Workman's Compensation. Basically are functionally aligned.

Q: And who is responsible, you say you have a Specialist assigned to do Workman's Compensation?

A: Specifically, yes.

Q: Who currently holds that position?

A: That's Joseph Stuckey.

Q: Okay, how long has Mr. Stuckey been in that position?

A: I think five years.

Q: Okay. And does he have staff in that position?

A: Assistant clerical support.

Q: Just office clerical support?

A: That's it, that's all.

Q: Okay. Does your office have any role or responsibility in handling administrative complaints of discrimination, EEO charges?

A: We support. There is an EEO officer for the Medical Center.

---

010101

It's a collateral duty assignment because we don't have that much workload.

Q: Who is the EEO Officer?

A: At the moment it's Wayne Reardon. Prior to Wayne Reardon, I think it was Steven Galarizo. And then prior to him, there was Samuel Alito.

Q: Alito, A-L-I-T-O?

A: A-L-I-T-T-O.

Q: And, who was in that position in '98 and '99?

A: I think it was Samuel Alitto. But I'm not, it could've been either Sam Alitto or Steven Galarizo. That was about the change-over period.

Q: How are EEO complaints, EEO charges handled within the Veteran's Administration?

A: There are EEO Counselors that are first point of contact. The EEO Officer for the Medical Center is more like a coordinator position to make sure that the people get the

---

010101

information, how to follow the process, but there are EEO Counselors that deal with the informal level of the complaint and then if the complaint is not resolved at the informal level, there's a formal system within. And a formal investigation and then a hearing if that, if the investigation doesn't lead to a resolution.

Q: And how much of those responsibilities derive from Human Resources Office?

A: It used to be, prior to 1996, all from Human Resources. So that was one of my assignments in Human Resources as Assistant Personnel Officer. But '96 the VA changed their system. At that time the Medical Center Director was the EEO Officer and the locality they assigned to them was more a conflict of interest. And they separated that out and made the EEO Officer a separate entity for a regional position, and then broke out

---

010101

the complaints process to make it a little bit more clear and unbiased.

Q: So after that reorganization, what did you say was '97…

A: '96

Q: After that point, the Human Resources Office had no official role?

A: That is not correct. We supported with information, Ray made arrangements to make sure people were cooperating with the process, but not direct.

Q: As far as processing an investigation you had no role in that?

A: No. We would just make sure, if I'd say if someone, an investigator wanted to come in, we would track down witnesses or something like that for them. Assist in the paperwork process, but no direct linkage.

Q: Would you say though that, not withstanding the change that the

010101

1  Human Resources Office knows pretty
2  much when there is a complaint of
3  discrimination that's pending?  When an
4  employee at the Veteran's
5  Administration, Lebanon, has a
6  complaint of discrimination?
7      A:  If, if, information is
8  requested in the process, we know.
9  However, for instance, if an employee
10 calls directly to an EEO Counselor, and
11 their out of Lyons, NJ, at the moment,
12 we don't necessarily know unless the
13 EEO Counselor calls us and asks us for
14 any information.
15     Q:  Well, what complaints of
16 discrimination of Lewis Johnson's do
17 you have personal knowledge of?
18     A:  Personal knowledge of a
19 complaint concerning non-selection for
20 promote, for reassignment, and then
21 there was a complaint concerning
22 alleged discrimination in the workplace
23 towards the end of his employment.
24     Q:  When did you first become

010101

1  aware of those matters?
2      A:  When I was contacted by an
3  investigator who asked for information.
4      Q:  When was, around the time
5  of the events complained to him?
6      A:  It would have been after,
7  but shortly after, it's the system's
8  design to keep track of it quickly.
9      Q:  While Mr. Johnson was still
10 employed?
11     A:  Yes.
12     Q:  With respect to the issue
13 of the non-selection, that was around
14 closer time to the non-selection issue?
15     A:  They're all pretty much
16 together.  There was not a lot of time
17 between these issues.
18     Q:  Now how did you become
19 aware of the issue regarding, not the
20 EEO issue, but more generally, the
21 issue concerning Mr. Johnson's not in
22 selection for the Housekeeping
23 position?
24     A:  Request for information

010101

1  about the promotion.
2      Q:  From whom did you receive
3  request for information?
4      A:  I think it was from either,
5  it could've been either the EEO
6  Counselor here or the EEO Coordinator
7  at the Medical Center.  Either one
8  could've asked for the copies.
9      Q:  You were aware that in
10 connection, you became aware of that in
11 connection with his EEO complaints, is
12 that correct?
13     A:  Yes.
14     Q:  And what kind of
15 information was requested from you?
16     A:  Information, copies of all
17 the documents about the promotion slash
18 reassignment.
19     Q:  Did you have any personal
20 involvement in any of the matters
21 relating to the reassignment issue?
22     A:  No.  Other than my signing
23 the announcements, etc.
24     Q:  And you do that pretty much

010101

1  as a matter of course?
2      A:  Every announcement unless
3  I'm not on duty.
4      Q:  Now, subsequent, actually
5  if you're, I'll just show you this to
6  refresh your recollection if you don't
7  have one.  This is the position vacancy
8  announcement for the position of
9  Housekeeping Aide.  You understand that
10 position to be the subject of Mr.
11 Johnson's concerns regarding non-
12 selection or non-reassignment for that
13 position?
14     A:  I can't verify that 100%.
15 The time frame is correct but these
16 things go up every time there is a
17 Housekeeping vacancy.
18     Q:  But you understood that it
19 was a Housekeeping position and it was
20 around the middle of 1998?
21     A:  Yes.
22     Q:  Mr. Johnson has indicated,
23 and there's some discussion of it
24 during Peg Winter's deposition last

010101

16

1 week that there was a meeting in
2 October, 1998 that you participated in,
3 I believe, by conference call, by
4 telephone?  Do you recall there being
5 such a meeting?
6          A:  I, I think you are
7 referring to a phone call that I had
8 from Peg Winters while she was having a
9 meeting.
10          Q:  Right.
11          A:  It was not a scheduled
12 meeting with myself.
13          Q:  But you participated then
14 in the conference call during their
15 meeting?
16          A:  No, I participated in the
17 telephone call to their meeting.
18          Q:  Your telephone call was
19 just to Peg Winters?  Is that what you
20 are saying?
21          A:  It may have been on speaker
22 phone.
23          Q:  What, what can you tell me
24 about that telephone call?

010101

17

1          A:  My recollection is the
2 telephone call was concerning whether
3 or not a Memorandum of Understanding
4 that was written during our RIF in
5 1997, had any bearing on the current
6 selection process.
7          Q:  And who raised that concern
8 with you?
9          A:  Mrs. Winters.
10          Q:  And why, did you have an
11 understanding as to why that was an
12 issue at that time?
13          A:  Yes, I think there was some
14 confusion as to whether or not
15 seniority was the determining factor
16 for reassignments or relocation, in
17 general, rather in specific referring
18 to the RIF.
19          Q:  And was there any, any
20 further discussion or resolution of
21 that question?
22          A:  Well, it was a verification
23 that both herself and I who negotiated
24 the Memorandum of Understanding

010101

18

1 determined that it was for the purposes
2 of the RIF only.
3          OSTROWSKI:  I'm going to show
4 you, this was a page of Exhibit 9, that
5 document we used during depositions
6 last week.  It's a Memorandum of
7 Understanding between the VMAC Lebanon
8 and A of GE Local 1966.  Let me know
9 when you are done viewing it.
10          KENT:  Yes, this was the
11 Memorandum of Understanding that I
12 think was under discussion at the time,
13 which was designed to assist in
14 reassignment of employees who were
15 dislocated during the time of the RIF.
16 We were riffing 117 employees at the
17 Medical Center and trying to find them
18 permanent positions within the Medical
19 Center rather than RIF.  So that's what
20 we had used at that time.  We had not
21 negotiated a local supplemental
22 contract and had not had that
23 definition in writing anywhere else.
24          Q:  Now, what, do you have any

010101

19

1 understanding of what role, in general,
2 not in connection with the RIF, but in
3 general, seniority plays in issues of
4 reassignment or promotion?
5          A:  It's defined in the
6 contract that seniority will be a
7 factor, among other factors when you
8 are looking at change in a work
9 location or reassignment of candidates.
10 The difference, change in work location
11 being the difference of movement within
12 the same position description,
13 generally within the same
14 organizational unit, like the Janitor
15 on Ward 19-1 to Janitor on Ward 19-2.
16 If they have the same position
17 description.  And reassignment meaning
18 from the same grade and titled
19 position, in other words, Housekeeping
20 Aide WG-2, from this place in the
21 organization to Housekeeping WG-2 of
22 that place, could be a different
23 position description, could be a
24 different organizational alignment.

010101                                                    20

1   Q:  Now there was some
2   indication, at least from Mr. Johnson,
3   that during the meeting with Peg
4   Winter's, in your telephone, in which
5   you participated by telephone, that
6   there was some discussion of there
7   having been a change in the selection
8   policy for the Housekeeping Aide
9   position.  Do you have any recollection
10  of that?
11       A:  The only change that
12  could've affected the selection would
13  have been the reorganization of
14  Housekeeping in 1997.  Prior to 1997 it
15  was a homogeneous unit, all
16  Housekeeping Aides were employed by
17  Environmental Management Service.  And
18  so that WG-2 Housekeeping Aide's pretty
19  much could move from point A to point B
20  within the Medical Center as a change
21  in work location.  Subsequent to the
22  1997 reorganization, Housekeeping Aides
23  were assigned directly to a product
24  line, as part of the product line

010101                                                    21

1   organization to keep all the staff
2   working as a team on a unit, reporting
3   to one supervisor rather than
4   supervisors in different organizational
5   segments.  So therefore, if a person
6   from Extended Care wanted to put in for
7   a job in Acute Care, they'd be crossing
8   organizational lines.  It would no
9   longer be a change of work location, it
10  would be a reassignment or promotion,
11  depending on the grade of position.
12       Q:  Is that the sense in which
13  it could have affected, that change
14  could have affected the selection
15  process…
16       A:  It could also, the other
17  difference it would have made was how
18  he would have found, if you were a
19  Housekeeping Aide, how you would have
20  found out about an opportunity to work
21  in a different area.  Prior to 1997, it
22  was one homogenous unit.  The
23  Housekeeping Aide Supervisors would
24  just hand out a notice, "We need

010101                                                    22

1   somebody on 19-2.  A guy there left.
2   Anybody want to go over to 19-2."
3   Change in work location.  Prior to '97
4   reorganization, subsequent to the
5   reorganization, since you had
6   Housekeeping in different
7   organizational units, the announcement
8   of opportunities was centralized
9   through HR.  HR anytime, any
10  Housekeeping Aide position became
11  vacant, HR would put up a notice like
12  you saw there that I signed that said,
13  "If you are interested in the position,
14  now's the time to let us know."
15       Q:  Okay, and at that point how
16  is the process conducted?
17       A:  It is a conglomerate
18  process.  That notice is a merit
19  promotion notice, it's a reassignment
20  notice, it's a change of lower grade
21  opportunity, this vacancy, this
22  position is open.  How you get there is
23  a variety of different ways.  So, under
24  the terms of the contract, we could

010101                                                    27

1   either be taking a, let's say food
2   service workers, who are WG-1 and
3   want to be promoted to a WG-2, and
4   putting them through the promotion
5   process to make a referral.  We could
6   take a, cooks, who say "I don't wanna
7   cook anymore.  I'd rather be a
8   Housekeeping Aide."  It's a change in
9   lower grade.  Separate referral.
10  Thirdly, most likely, would be
11  reassignment.  Saying a Housekeeping
12  Aide from Acute Care or a Housekeeping
13  Aide from Operations would like to work
14  in Extended Care, so they would also
15  give us their name.  And then we would
16  do three separate processes to refer
17  candidates.
18       Q:  And the process, as it
19  applies to a Housekeeping Aide applying
20  for a Housekeeping Aide position, is
21  that reassignment process?
22       A:  Unless their different,
23  there are different grades Housekeeping
24  Aides.  If it's the same grade, it's a

010101

24

1  reassignment then. At that point. If
2  a, candidates from Operations and
3  candidates from Acute Care are
4  interested in the Extended Care, they
5  would be, and they're all WG-2
6  Housekeeping Aides, they'd be put on
7  one list and referred over.
8      Q: And then that's a
9  reassignment process?
10     A: That's a reassignment list.
11 If there was somebody who's a cook
12 who's WG-4, they would be placed on a
13 change of lower grade list and referred
14 over, and then the merit promotion
15 would rate and rank candidates and
16 refer the highly qualified lower grade
17 employees on a separate list.
18     Q: And then at that point when
19 it's, if it's a WG-2 Housekeeping Aide
20 applying for a WG-2 Housekeeping Aide
21 position, is it processed, after
22 they're referred over conducted as a
23 reassignment process?
24     A: Yes.

010101

25

1      Q: And whatever factors apply
2  to a reassignment process then would
3  apply to the selection for that
4  position?
5      A: Yes.
6      Q: Including whatever,
7  whatever weight is given to seniority
8  in that process, correct?
9      A: Yes, under the terms of, I
10 think it's Article 12 or 13 of the
11 contract, that defines reassignment,
12 which says that it's a factor but other
13 good faith factors will be considered
14 in making a decision.
15     Q: Now, Mr. Johnson had
16 indicated that during your
17 participation in that meeting, the
18 October 1998 meeting, at some point you
19 had, you had become angry about
20 something. Do you recall that?
21     A: Well, if I remember
22 correctly, there was a District
23 Representative from AFG in the office
24 at the time. Her name was Joan Welsh,

010101

26

1  who has a tendency not to understand
2  and I think we were going around in a
3  circuitous path trying to verify that
4  when the Union President and I sat
5  down, the meeting was for the RIF.
6  That was the concern, that was the
7  issue at the time. It wasn't a
8  unending agreement that we had decide.
9      Q: So you're frustration, is
10 that a fair way to characterize it?
11     A: That stemmed from the fact
12 that the two of us who sat at the table
13 and negotiated were explaining it to
14 the District Representative who wasn't
15 there and wouldn't accept the answer
16 that the two of us who sat there and
17 negotiated and were getting there.
18     Q: What did you understand the
19 significance of this MOU to be in the
20 context of Mr. Johnson's complaint?
21     A: The significance, though he
22 was bringing to it was that this was
23 the only means of determining
24 reassignments.

010101

27

1      Q: And your response to that
2  would be that though this is not the
3  only means, whatever the contract says
4  about reassignments is what applies...
5      A: Takes precedence. You can,
6  you cannot supercede the National
7  Master Agreement by any local
8  agreement. This was specifically
9  designed for people who are displaced
10 and in limbo, as it were, waiting for
11 the RIF to happen, that we were trying
12 to transition into permanent positions
13 other ways, other areas in the medical
14 center that weren't being RIF'ed so
15 that they wouldn't have to be sent out
16 the door. Specifically for that
17 purpose.
18     Q: So if I could just try to
19 characterize what your response to the
20 concern with the MOU, was that it's not
21 this document that applies to this
22 reassignment, it's whatever the
23 National Agreement says about
24 reassignment that applies to this

010101                                                    2F

1   reassignment?

2        A:  Exactly.

3        Q:  Could you describe for me

4   the overall process of a processing a

5   Workmans' Compensation claim?  I know

6   that's kind of general and vague.

7        A:  Well, normally, the

8   supervisor was immediately informed of

9   an accident or a need to file a claim,

10  an illness or an accident.  The

11  supervisor had generally…

12       Q:  As you go through it I'm

13  going to stop and ask you questions as

14  we go.  You say normally the supervisor

15  is informed.  Now how, how is that

16  determined?

17       A:  Well, it's in our

18  administrative center policy that the

19  supervisor is supposed to be the first

20  point of contact, almost, it's life

21  saving emergent injury and then you're

22  going directly to healthcare.  The

23  supervisor is supposed to get involved,

24  escort the employee to our healthcare


010101                                                    29

1   unit for employees, for treatment, if

2   it's a traumatic injury, assist in the

3   paperwork.

4        Q:  What do you mean traumatic

5   injury?

6        A:  Two basic case lines in

7   compensation claims.  The one is a one-

8   time incident, you run your hand

9   through the meat slicer.  Trauma

10  injury.  Trip over the two by four that

11  was misplaced in the hallway and fall

12  down.  Traumatic injury.  It's

13  immediate, it's time sensitive, it

14  results in an immediate impact on an

15  employee.  The other one is

16  occupational illnesses or diseases.

17  And that is long, in other words,

18  instead of it being a one time issue,

19  it's spread over a period of time.  It

20  could be, for instance, exposure, you

21  routinely work on the TB unit and so

22  therefore you are constantly exposed to

23  Tuberculosis and eventually you go

24  positive and contract it.  That kind of


010101                                                    30

1   a long-term exposure to it.  Or for

2   instance, Carpal Tunnel.  It's a real

3   debatable claim but it's one that you

4   are constantly doing a certain work or

5   motion and eventually it causes a

6   problem, so that's occupational illness

7   or disease.

8        Q:  Now, is there any

9   difference in the further processing of

10  a claim?

11       A:  Absolutely.

12       Q:  Okay, well what?

13       A:  Traumatic injuries have

14  special provisions for them.  They have

15  a 45 day continuation of pain clause in

16  order to make sure that employees

17  immediately put out of work by

18  traumatic incident has pay and doesn't

19  have a break in pay until compensation

20  kicks in and processes the claim.  This

21  is 45 day COP, Continuation of Pay.

22  That does not apply to occupational

23  illnesses or diseases.  But, otherwise,

24  once compensation kicks in, either at


010101                                                    31

1   day 1 for occupational illnesses or

2   diseases or day 46 after 45 day

3   continuation of pay, they're basically

4   the same.  You are off work because of

5   the incident and the incident's

6   approved that it's related to

7   employment, you either get 66 2/3rds of

8   your salary if you are single, or 75%

9   if you have dependents.  Tax free

10  compensation depends.  Both claims are

11  handled through the Office of Workmans'

12  Compensation U.S. Department of Labor.

13       Q:  What about a claim of

14  emotional trauma sustained as a course

15  of, in this case harassment.  Would

16  that be properly processed as…

17       A:  If it was, see, if it's

18  harassment over a period of time, it's

19  over a period of time again.  Then it

20  becomes occupational illness or

21  disease.  If it's, let say, let's use

22  sexual harassment because it could make

23  it more immediate trauma.  A guy hits

24  on a girl. She automatically

32

1  emotionally responds.  One time, one
2  incident, one cause and effect, that
3  would be traumatic injury cause it's
4  related to one incident.  But if it's
5  just let's say, hostile work
6  environment, there's posting pictures
7  of the, girly pictures on the wall and
8  saying nasty things about girls and it
9  just builds up until it hits a boiling
10  point and they can't take it anymore,
11  that would be occupational illness and
12  disease.
13      Q:  So the same, so an
14  emotional injury, as in exposure to
15  conditions of employment, could be
16  characterized, fairly characterized as
17  either traumatic or the occupational
18  disease?
19      A:  For instance, 9/11, they
20  probably suffered from traumatic injury
21  and had emotional response.  One issue,
22  one incident, one response.
23      Q:  Have you processed any
24  claims?

33

1      A:  I wouldn't, it wouldn't go
2  through me anyway.
3      Q:  Okay, after, after the
4  supervisor's role, you said the
5  supervisor is kind of the immediate
6  contact in…
7      A:  To gather, to assist in
8  obtaining healthcare, to assist in the
9  completion of the basic claims forms,
10  to gather facts and information if
11  necessary.  We also assist in that
12  process, that's why we have a
13  designated Human Resource Specialist
14  for Compensation.  Carries a pager.
15  Somebody shows up at an employee urgent
16  care unit because of an injury, they
17  generally page him as well to make sure
18  that the process is handled.
19      Q:  And then once the immediacy
20  concerns are addressed, what then is
21  the process from there, as far as who's
22  responsible for submitting forms and
23  gathering information?
24      A:  Claims does the part of the

34

1  forms, supervisor does another part, HR
2  assists in the process, gets forms to
3  the doctors so the doctors can complete
4  their forms, gathers all the
5  information together and submits it to
6  the Department of Labor.
7      Q:  And is there a prescribed
8  period of time over which these initial
9  activities are to be handled?
10      A:  As quickly as possible.
11  There's no mandated time frame that you
12  must have it done on a certain time
13  frame.  More recently the VA has tried
14  to improve the process by putting some
15  milestones in the process to get
16  everybody goals to improve, but they
17  weren't in effect until a year or two
18  ago.
19      Q:  What are those milestones?
20      A:  Think at the moment they're
21  using fourteen days.
22      Q:  In order to get one
23  accomplished?
24      A:  Get a claim to the OWCP.

35

1      Q:  And what role does the
2  Administrative Agency have in
3  determining, making a determination as
4  to whether a situation is compensable?
5      A:  We don't make that ruling.
6  We supply the information.  They have
7  the - in which the ruling's based.
8      Q:  Your agency then is just
9  simply a conduit for information to
10  OWCP?
11      A:  We make sure the
12  information gets gathered, make sure
13  that it gets put together, we can
14  provide recommendations, but that's as
15  far as it goes.
16      Q:  What, when you say you can
17  provide recommendations, is that
18  something that under the applicable
19  rules or regulations is something
20  that's a prescribed function?
21      A:  Oh, absolutely, you can
22  enter in your objections to vote a case
23  being handled.  For instance, for
24  instance, if you faint on duty, and the

010101                                      36

1  fainting wasn't caused by the work,
2  that technically, by the regulations is
3  not compensable.  It happens more often
4  than you'd think.  People get sick and
5  they faint or their blood pressure goes
6  low and they get up too fast and they
7  just fall down.  If they just fall down
8  and hit the floor cause they fainted
9  because of their own health reasons,
10  it's not compensable.  It would be
11  something that we would controvert a
12  claim and say the cause of the thing
13  was not work-related.  They did not
14  trip on any obstruction, etc.  They
15  just collapsed on the floor.  So
16  therefore it's not covered by the
17  regulations.
18      Q:  Now you used the term
19  "controverted."  Is that, I understand
20  you know what "to controvert" means,
21  but is that a term of - as it applies
22  to...
23      A:  It's specifically in the
24  regulations.

---

010101                                      37

1      Q:  Is that a function that the
2  agency has under those regulations?
3      A:  It's an obligation that the
4  agency has to prevent fraud and abuse.
5      Q:  In, in your experience,
6  when a claim is controverted by the
7  agency, if you can put it in terms of
8  percentages, in what percentage of time
9  is that controversion upheld?
10      A:  I would say fifty fifty or
11  thereabouts.  The reason for
12  that is controversion can be based on a
13  person's viewpoint of events and the
14  document of events, it may not hold
15  that out and the OWCP is going to work
16  from what is documented in hand
17  writing.  In other words, a lot of
18  times a supervisor will say "that
19  really didn't happen here."  And a lot
20  of times we'll go and support those
21  controversions based on the
22  supervisors' information and the record
23  will uphold it and it will be proved.
24      Q:  Now, who's responsible for

---

010101                                      38

1  making the, the controversion decision?
2      A:  Generally, myself.
3  Ultimately.  They don't go out of the
4  office without being cleared through
5  me.
6      Q: We talked at that, you were
7  aware of Mr. Johnson raising a EEO
8  complaint concerning some incidents
9  that happened in the work place.  Other
10  than the non-selection issue.  What
11  more can you tell me about what you are
12  aware of?
13      A:  I was contacted by the
14      supervisors for advise on a
15  situation between Mr. Johnson and Irvin
16  Erickson, where they were blatantly
17  just not getting along.
18      Q:  And what, tell me as
19  specifically as you can, what
20  information was made known to you at
21  that time?
22      A:  The quote that I think is
23  in the record all over about white
24  person and black skin was made known to

---

010101                                      39

1  me and alleged push or shove incident.
2      Q:  Now, were both those
3  incidents made known to you the first
4  time you knew anything about anything
5  going on?  Do you understand my
6  question?
7      A:  Well, they were made known
8  to me the same day they occurred.
9      Q:  So, do you understand that
10  they occurred on different days?  What
11  I'm trying to get at, when you say...
12      A:  My memory is yes, they
13  occurred on different days.
14      Q:  And you became aware of
15  each of them as they occurred?
16      A:  Yes.
17      Q:  And with respect to, do you
18  know which of those happened first?
19      A:  The verbal statement.
20      Q:  And from whom did you learn
21  about that statement?
22      A:  I think it was Rodney
23  Kiscadden, the supervisor.
24      Q:  And what did, he simply

010101                                      46

1  reported you what happened?
2       A:  He asked for advice.
3       Q:  What, did you give him
4  advice?
5       A:  Yes.
6       Q:  What did you tell him?
7       A:  I told him that you know
8  for the immediate future he should try
9  to keep these people apart.  And then
10 refer both of them to employee
11 assistance, meanwhile do a fact finding
12 to find out exactly what happened.
13      Q:  What, is there, is there a
14 prescribed process for the fact finding
15 investigation?
16      A:  Generally a fact finding is
17 an informal investigation, it's
18 information that gathered by the first-
19 line supervisor, as to an incident.
20      Q:  And did he have any
21 response to what you had instructed or
22 advised?
23      A:  To my knowledge he did the
24 fact finding, talked to both parties

---

010101                                      41

1  and also he tried to separate the
2  parties by putting them on different,
3  assigning them different units.
4       Q:  And then when in relation
5  to that discussion did you learn about
6  there being the incident with the
7  alleged shoving?
8       A:  I think that was shortly
9  after the original advice.  Either same
10 day or the next day.  Says my memory is
11 anyway that they were separated and
12 there was contact between the two which
13 would have resulted in the alleged
14 shoving.
15      Q:  You learned about that
16 from…
17      A:  Rodney Kiscadden.
18      Q:  And what did you, was he
19 contacting you again for advice?
20      A:  Yes.
21      Q:  And what did you advise?
22      A:  Again, fact finding, keep
23 the complainants apart.  I think about
24 that same time I was, right in

---

010101                                      42

1  proximity, was hearing for the police
2  too.
3       Q:  What did you hear from the
4  police?
5       A:  I think the police were
6  involved in an investigation that was
7  initiated by Mr. Johnson.
8       Q:  Did you have conversations
9  with anybody from, was it the VA
10 police?
11      A:  The VA police, yes.
12      Q:  Did you have communications
13 with anybody from the VA police?
14      A:  Not directly because I
15 wasn't part of the incident.
16      Q:  How did you become aware
17 that the VA police were involved?
18      A:  Cause they called me to ask
19 who else they thought I should talk to
20 that may have been involved.
21      Q:  They asked who else you
22 thought they should talk to?
23      A:  Right, if there was anyone
24 else that they should talk to.  It was

---

010101                                      43

1  kind of their calling me secondarily
2  towards the end of their investigation.
3       Q:  Did you understand who they
4  had talked to?
5       A:  They explained to me that
6  they had talked to Mr. Johnson and the
7  alleged, well, Mr. Erickson who
8  allegedly assaulted him.
9       Q:  Have you talked to anybody
10 other than Mr. Kiscadden about the
11 matter?
12      A:  Mr. Stuckey who was
13 involved in processing the OWCP
14 complaint.
15      Q:  When did you first talk to
16 Mr. Stuckey about the matter?
17      A:  Probably the same days of
18 each, that the claim was filed.
19      Q:  And what did you talk to
20 him about?
21      A:  He was basically informing
22 me of what's going on.  We did discuss
23 I think which way was the proper way to
24 file the claim.  I suggested that he

010101                                             44

1  needs to clearly meet with Mr. Johnson
2  to get his definition of the incident
3  cause it could be one or the other,
4  depending on the definition of the
5  incident.
6       Q:  If a traumatic injury claim
7  is filed, and, you understand CA-1 and
8  CA-2?
9       A:  Uh-huh.
10      Q:  CA-1, is that the traumatic
11 injury claim?
12      A:  Uh-huh.
13      Q:  And CA-2 would be the
14 occupational disease.
15      A:  Right.
16      Q:  If a CA-1 claim is filed...
17      A:  Erroneously, you mean?
18      MERSHIMER:  Well let him ask
19 the question.
20      KENT:  I don't understand the
21 question.
22      OSTROWSKI:  Because I didn't
23 ask one yet.  But I'm trying to get to
24 one and I was going to get to that one

010101                                             45

1  but I think I was going to ask you a
2  different one first.  When a CA-1 is
3  filed, is there an automatic, the
4  salary continuous benefit?
5       A:  The COP?
6       Q:  Is that, what does COP mean
7  again?
8       A:  Continuation of Pay.
9       Q:  Is that automatic on the
10 filing of the CA-1?
11      A:  On the CA-1 it's part of
12 the process, yes.  It's so much part of
13 the process, but you cannot stop it
14 unless a controversion is filed and
15 approved.
16      Q:  But until that
17 controversion is filed and approved,
18 does that person continue to receive
19 pay?
20      A:  If they're off duty.
21      Q:  Now to the question of, I
22 think you're not going to understand
23 before I even ask you, but is there,
24 what happens if a CA-1 is filed when a

010101                                             46

1  CA-2 should have been?
2       A:  No, I understand cause it's
3  happened before.  The paperwork would
4  go to Office of Workmans' Compensation
5  and they make the determination.  If a
6  CA-1 is filed on an incident that
7  should have been occupational disease,
8  they will make a determination, they'll
9  inform you that you have to
10 retroactively go back and change from
11 continuation of pay to either sick
12 leave or leave without pay for
13 compensation purposes and correctly
14 file on the CA-2.
15      Q:  Now back to the EEO
16 complaint regarding the non-selection
17 issue.  Other than your being made
18 aware of what was going on with that,
19 did you have any continuing involvement
20 in that process?
21      A:  No, I was involved in the
22 EEO investigation, providing
23 information and I was questioned at the
24 EEO hearing.

010101                                             47

1       Q:  And over what period of
2  time did all of that occur?
3       A:  Oh, top of my head it's
4  about a year from beginning to the end
5  but I'm not absolutely sure of the time
6  frame.
7       Q:  Do you know, did the
8  processing of the non-selection EEO
9  issue, was that occurring at the time
10 of the harassment?
11      A:  I don't know.  All I know
12 is it was the same hearing.
13      Q:  What do you mean it was the
14 same hearing?
15      A:  Both were discussed at the
16 same hearing.
17      Q:  And prior to the hearing,
18 over what period of time did your
19 active involvement in providing
20 information occur?
21      A:  From the time that the
22 informal complaint, well actually from
23 the time the complaint would have gone
24 formal an investigator would have been

010101

48

1  assigned and requested information, I
2  don't know the exact time.
3       Q:  You can't tell me if it was
4  thirty to sixty days, ninety to a
5  hundred and twenty days, more than six
6  months?  Anything along those lines?
7  Generally?
8       A:  Only I can tell you that
9  generally the, you've got like 45 days
10 to file an informal complaint.
11 Informal complaints can run about 45
12 days without an extension.  If they get
13 an extension they can drag it even
14 longer and then there's the formal
15 complaint can be filed thirty days
16 after the notice of that the informal
17 process has not resolved it.  They can
18 take months and months before they even
19 become formal.
20      Q:  And then once it becomes
21 formal, is there another prescribed
22 time period for that to finish?
23      A:  There's like a time frame
24 that the investigator has to get it

010101

49

1  done and I can't remember if it's
2  ninety or a hundred twenty days.
3       Q After you became aware of
4  both incidents occurring between Mr.
5  Johnson and Mr. Erickson, what further
6  involvement did you have in any
7  communications regarding those back-
8  findings that you had advised?
9       A:  I don't exactly understand
10 that.
11      Q:  Yeah, it wasn't real clear.
12 You had two conversations with Mr.
13 Kiscadden about incidents between Mr.
14 Johnson and Mr. Erickson, correct?
15      A:  Yes.
16      Q:  In each instance, you were
17      informed of what happened and
18 you were asked to give advice as to
19 what to do, correct?
20      A:  Yes.
21      Q:  What did you, did you have
22 any follow-up in connection with either
23 of those incidents?  Did you contact
24 Mr. Kiscadden or did he contact you

010101

50

1  either for him to update you or for you
2  to ask him to update you?
3       A:  Other than the follow-up
4  when the, when he had separated Mr.
5  Erickson and Mr. Johnson, I don't
6  remember specifically, that would've
7  followed through with him for
8  information or at that point was the
9  information was coming from Mr. Stuckey
10 who would have more first hand
11 information since Mr. Johnson wasn't in
12 the workplace anymore.
13      Q:  When you first described
14 for me what you were contacted about, I
15 think you described it as there being
16 some personality dispute or some work,
17 I think you might have said personality
18 dispute between Mr. Johnson and Mr.
19 Erickson, is that…
20      A:  Generally characterizes it.
21      Q:  Now, how, why characterize
22 it as a personality dispute?
23      A:  Two individuals were not
24 getting along.  Mr. Johnson had stated

010101

51

1  that he can't stand to work with Mr.
2  Erickson or something to that effect to
3  Mr. Kiscadden.
4       Q:  And was that something that
5  you had learned in either your first or
6  second discussion with Mr. Kiscadden?
7       A:  From Mr. Kiscadden.
8       Q:  Any other reasons why you
9  termed it a personality dispute?
10      A:  Because it wasn't like I
11 can't stand working with everyone
12 there, it was with Mr. Erickson.
13      Q:  Did you have an
14 understanding of what, if there was any
15 pre-existing animosity between these
16 two employees?  Other than that
17 statement that you heard from Mr.
18 Kiscadden?
19      A:  No, not other than the
20 statement, didn't have any clear
21 information.
22      Q:  And when you were (strike
23 that).  What was the basis of the
24 advice that you gave Mr. Kiscadden in

010101                                              52

1  the how to handle those matters?

2      A:  A basis?

3      Q:  Meaning were you, were you

4  looking at it in terms of this is a

5  disciplinary situation or potential

6  disciplinary situation and here's what

7  needs to be done?  Or were you looking

8  at it in terms of this is a personality

9  dispute and we need to get this matter

10  resolved and put behind us?

11      A:  This is a on-the-job

12  incident that hadn't been determined as

13  to what it was yet and needed to have

14  more review to determine what it was.

15  The advice I gave to separate them was

16  to prevent any further expansion of the

17  - fight.

18      Q:  Now, is it fair to say

19  that, excuse me, is it fair to say that

20  when you were contacted regarding a

21  second incident that your original

22  advice wasn't listened to or was…

23      MERSHIMER:  I'm going to

24  object, excuse me, I'm going to object

010101                                              53

1  to the form of the question.  You can

2  go ahead and answer.

3      KENT:  Okay.  My original

4  advice was not to, my advice was to

5  keep them apart, try to calm down the

6  situation and from my understanding

7  they were separated.  Two different

8  units on a building.

9      OSTROWSKI:  So if they were, if

10  a couple days later, and there's an

11  alleged shoving incident between these

12  two employees, then one or the other

13  violated the instruction to stay away

14  from the other, correct?

15      MERSHIMER:  I'm going to object

16  to the form of the question.

17      KENT:  I don't know what Mr.

18  Erickson was told.  I didn't tell him.

19  I told the supervisor to assign them to

20  different units and that was done.

21      Q:  Just try to be real clear

22  on exactly what you told Mr., what you

23  told the supervisor because first you

24  told me, you told him to keep them

010101                                              54

1  apart, and now you tell me that you

2  said assign them to different units.

3  Which…

4      A:  Would keep them apart.

5  These people reported to the same area,

6  they picked up their keys in the same

7  area, they turned in their keys in the

8  same area.  The Medical Center is not

9  that huge that you are not going to run

10  into each other.  It's virtually a

11  physical impossibility to keep them

12  apart if they are going to work during

13  the same time frames of the day.

14      Q:  Haven't there been

15  investigations or, of workplace kind of

16  in the past where for example you

17  assign someone to the laundry area

18  while you conducted an investigation of

19  what was going on?

20      A:  Yes, for limited reasons.

21  We generally do that when there's an

22  allegation of patient abuse so that we

23  can prevent any possible recurrence,

24  while we find out what's going on.

010101                                              55

1  What happened.

2      Q:  So in that sense, I'm just

3  trying to understand further the basis

4  for the difference there.  By assigning

5  someone to laundry you can assure that

6  there will be no contact between the

7  patients and the employees?

8      A:  The patient and the

9  employee, yes.

10      Q:  As opposed to two co-

11  workers you can assign them to

12  different units but the chances are

13  they're still gonna have some contact?

14      A:  They're gonna rub shoulders

15  at shift change, etc.

16      Q:  What was the result of Mr.

17  Kiscadden's back findings with regard

18  to the two separate incidents between

19  Mr. Johnson and Mr. Erickson?  If you

20  understand, he found…

21      A:  Results, meaning what facts

22  were established?

23      Q:  Yes, what facts were

24  established?

010101                                    57

1    A:  Don't know them directly
2  because I didn't do the investigation.
3  Mr. Kiscadden would, I know it's in the
4  record on the OWCP forms, etc.  Claim
5  forms.  But I don't know that that's
6  anywhere in a defined document, it
7  would be just a fact finding opinion of
8  the supervisor anyway.
9    Q:  Now, do you have any reason
10 to disagree with the fact that Mr.
11 Erickson stated to Mr. Johnson
12 something to the effect that, "Hey
13 you're brothers say that you're a black
14 man in a white man's skin?"
15   A:  I wouldn't be able to tell
16 one way or the other.  I wasn't there.
17 Mr. Erickson never told me personally
18 that's what he said.  I wasn't involved
19 in the investigation.
20   OSTROWSKI:  Do you believe that
21 that happened?
22   MERSHIMER:  I'm going to object
23 to the form of that question, but go
24 ahead and answer it.


010101                                    58

1    A:  Absolutely, you need to
2  know what all the facts were that were
3  gathered as to what exactly happened
4  before you make a determination,
5  whether it would be disciplinary or not
6  result.
7    OSTROWSKI:  So the Veteran's
8  Administration maintains an employment
9  environment where somebody could say
10 "You're a no good fucking nigger" and
11 that would be tolerable conduct?  That
12 and other facts.
13   MERSHIMER:  Object to
14   KENT:  How do you know
15   MERSHIMER:  Wait, wait, let me
16 object to the form of the question.  Go
17 ahead.
18   KENT:  How do you come to that
19 conclusion?
20   Q:  Well because you're saying
21 that yeah, someone could say that and
22 there wouldn't be a problem but we
23 would have to do an investigation.
24   A:  What I'm saying, I'm saying


010101                                    57

1    KENT:  I think the record shows
2  that some sort of a comment about being
3  a white man in a black man's skin, that
4  piece happened.  As to what context,
5  etc., I don't know.
6    Q:  Now what, if you'll assume
7  that that has been an established fact,
8  should there be any consequence to Mr.
9  Erickson as a result of that?
10   A:  That's conjecture.
11 Besides, that in and of itself wouldn't
12 be enough information to determine.  If
13 I said something to you in the midst of
14 a joke and it's the punch line of the
15 joke, I don't think you'd be
16 disciplining me for it, you know,
17 delivering the punch line of a joke
18 even though it may be off color.
19 Context could have broad meaning.
20   Q:  So, if Mr., if Mr. Erickson
21 had said to Mr. Johnson, "You're
22 nothing but a no good fucken nigger,"
23 same result?  You would need to know
24 the context for what was said?


010101                                    59

1  that not do disciplinary action until
2  they know the facts of the case.  If
3  facts support discipline, discipline is
4  taken.
5    Q:  And somebody saying to
6  somebody else, "You're just a white man
7  in a black man's skin", it does not in
8  itself warrant disciplinary action?
9    A:  I can't make that
10 determination.  I can tell you that is
11 not common, that is acceptable in our
12 workplace.
13   Q:  And if it's, you can say
14 that's conduct that's not acceptable in
15 the workplace.  Is that what you said?
16   A:  Yes.
17   Q:  What do you do with conduct
18 that is inacceptable in the workplace?
19   A:  A variety of different
20 things, ranging from cease and desist
21 orders to counselings, to discipline,
22 to adverse actions.
23   Q:  Now is there a difference
24 between a counseling and discipline?

010101                                                          66

1     A:  Yes.

2     Q:  What's the difference?

3     A:  It's a formal level.

4  Discipline is formally recorded in your

5  official personnel folder.  It's a

6  permanent part of your permanent

7  record.  A counseling is a, between the

8  supervisor and the employee, if, it's

9  basically a building block for

10 discipline, as far as the progressive

11 process.

12    Q:  And is there a term,

13 something you're familiar with, called

14 an admonishment?

15    A:  An admonishment is the

16 first level of formal discipline.

17    Q:  And what is an

18 admonishment?

19    A:  It's a written censure

20 that's placed in your official

21 personnel folder for a time limited

22 period.

23    Q:  And is that discipline?

24    A:  Absolutely.

---

010101                                                          61

1     Q:  And counseling is not, not

2  formal discipline?

3     A:  Not formal discipline.

4     Q:  I'm going to hand you a

5  document marked as Exhibit 10, one

6  through nine was pretty short.  Could

7  you, if you've had a chance to review

8  that.

9     A:  Don't have to review it.  I

10 helped write it.

11    Q:  Can you tell me what that

12 is?

13    A:  That's a table of penalties

14 as attached to our discipline policy

15 for the Medical Center.

16    Q:  And this starts, it appears

17 that the most, the most minimal level

18 of discipline is an admonishment.

19    A:  Of formal discipline, yes.

20    Q:  Consistent with what we've

21 been discussing.

22    A:  Yes.

23    Q:  There's no, no notion of a

24 (strike that).  Now this covers at item

---

010101                                                          62

1  13 disrespectful conduct, "use of

2  insulting, abusive or obscene language

3  to or about other personnel" and it has

4  as the first level of discipline a

5  reprimand which I, can I assume that a

6  reprimand is a level above

7  admonishment?

8     A:  One level above.

9     Q:  And just so we get the

10 levels down, you have admonishment,

11 reprimand, five days, ten days,

12 discharge.

13    A:  Well, not five days, ten

14 days, but suspension of varying levels,

15 discharge.

16    Q:  Why didn't, now you

17 understand that (strike that).  How did

18 Mr. Kiscadden, if you have an

19 understanding, how did Mr. Kiscadden

20 learn about the matter where Mr.

21 Erickson said to Mr. Johnson something

22 to the effect that you're a white man

23 in a black man's skin?  Did you

24 understand what…

---

010101                                                          63

1     A:  Yes, I do understand the

2  question but I can't swear with any

3  honesty I know exact answer to that.

4     Q:  Do you know, I mean, do you

5  believe that Mr. Johnson came in and

6  reported that to him?

7     A:  I think so, but I can't,

8  like I said, I can't swear to that.

9     Q:  Why, on that fact alone,

10 was not item 13 at play in that

11 instance?

12    A:  Decisions like that are not

13 made based on that fact alone.

14    Q:  Are you aware that Mr.

15 Erickson was never disciplined for

16 making that statement to Mr. Johnson?

17    A:  No.

18    Q:  No, you're not aware or…

19    A:  No, I'm not aware.

20 Discipline for those lower levels can

21 be given by the immediate supervisor

22 directly.

23    Q:  Do you have any knowledge

24 or information indicating that Mr.

010101                                          68

1  Erickson was disciplined?
2      A:  No.
3      Q:  I'm going to hand you a
4  document marked as Exhibit 11.  Why
5  don't you just go ahead and view that.
6  I'm going to go ahead and give you
7  that.  Have you seen that document
8  before?
9      A:  Yes.
10     Q:  Am I in your way when I'm
11  up here?  Does this, November 1, 1999
12  letter to the Office of Workmans'
13  Compensation program from Joseph
14  Stuckey.  When did you first see this
15  letter?
16     A:  Sometime after November 1st,
17  don't know specifically when.
18     Q:  And does this letter, does
19  this contain a controversion?
20     A:  This letter is verification
21  that we weren't sure which way to file
22  the claim.
23     Q:  Well I'm going to refer you
24  specifically to the second page, it

010101                                          65

1  says, "After review of the information
2  provided, it cannot be concluded that
3  there is a cause of relationship
4  between the incident that occurred and
5  counseling that Mr. Johnson is
6  undergoing.  Therefore, it would be
7  suggested that this claim for traumatic
8  injury would be denied."  Is that, in
9  your experience, is that language a
10  controversion?
11     A:  No, generally we use the
12  word controversion, in fact we title it
13  "controversion".  In fact there's a
14  format right in the claim form to cite
15  controversion.
16     Q:  Now you said that this is,
17  this is evidence of there being some
18  confusion, I think that's what you
19  said.
20     A:  Confusion as to was it a
21  traumatic injury or was it a
22  occupational illness or disease.  We
23  did not not process the claims.
24     Q:  On my last question, the

010101                                          66

1  first  paragraph says right at the end
2  of it, "This claim is being
3  controverted based on the information
4  contained…"
5      A:  Oh there's the word.
6      Q:  So this is a controversion?
7      A:  Of the traumatic claim.
8      Q:  Now where, where does it
9  appear in here that there was some
10  confusion as to what information was
11  being, or how this claim was being
12  processed or how to process it?
13     A:  I can't specifically cite
14  it.  I just know that there was, that
15  was going on at the time.
16     Q:  And there's a reference in
17  here, at the second page, the paragraph
18  above the one that I read to you,
19  refers to Acute Partial Day Hospital at
20  Philhaven Hospital, "Mr. Johnson has
21  failed to provide medical documentation
22  to support his allegation of a
23  traumatic injury."  Do you know if Mr.
24  Johnson provided any medical

010101                                          67

1  documentation?
2      KENT:  Subsequently, medical
3  documentation was provided but I don't
4  know what time frame it was provided
5  in.
6      MERSHIMER:  I want to put an
7  objection on the record because you
8  only read part of the sentence.
9      OSTROWSKI:  Read the whole
10  thing then, I don't wanna…
11     MERSHIMER:  "There has been no
12  medical information provided from Dr.
13  Brinser's office to support that Mr.
14  Johnson sustained a traumatic injury,
15  causily related to the incident at the
16  Medical Center."
17     OSTROWSKI:  The only reason I
18  didn't read that whole sentence is
19  because that's not the sentence I was
20  reading.
21     MERSHIMER:  I'm sorry.
22     OSTROWSKI:  I was in the next
23  paragraph down.  Any additional, or
24  "Mr. Johnson has failed to provide

010101

1  medical documentation to support his
2  allegations…"
3      HERSHIMER:  "Of traumatic
4  injury."  You're right, I'm sorry.
5      OSTROWSKI:  Because I wanted to
6  ask in specific respect to the
7  Philhaven hospital information. If Mr.
8  Stuckey, or if an OWCP claim is being
9  processed, before it's admitted to
10 OWCP, how is medical information
11 gathered?
12     A:  The information gathered?
13 We, for instance, either the employee
14 who is filing the claim takes a medical
15 documentation form along to his doctor
16 or we are informed to send one directly
17 either to the employee or the doctor.
18     Q:  The copy of the document
19 marked as Exhibit 12.  If you look at,
20 this is a purports to be a faxed copy
21 of an authorization for release of
22 information from Philhaven to you.  And
23 signed by Mr. Johnson and a witness,
24 reportedly on October 21, 1999.

010101

1  Correct?
2      A:  Yes.
3      Q:  On the second page of that
4  document, is that the stamp at the
5  bottom, Received Human Resources
6  October 21, 1999, VA Medical Center,
7  Lebanon, PA.  Is that your office
8  stamp?
9      A:  Yes.
10     Q:  So if there's no medical
11 information…
12     A:  This came at the time of
13 the phone call.
14     Q:  Okay, tell me more, what do
15 you mean it came at the time of the
16 phone call?
17     A:  In my memory, this was
18 faxed when this counselor, John, I
19 can't remember exactly how that,
20     Q:  I think it's Snively?
21     A:  Swickley or Sickly or
22 Snickly or something like that, called
23 me.
24     Q:  And why did he call you?

010101

1      A:  He called at the request of
2  Mr. Johnson to discuss the issue is at
3  the VA's, what was going on, whether
4  the workplace would be modified, and
5  they asked questions.  He asked more
6  questions but he gave the information.
7  For instance he asked, would we try to
8  keep these employees apart if he was
9  returned to duty?  I think it says "2
10 of 2".  There wasn't anything else that
11 came with this.
12     Q:  I'm sorry, what were you…
13     A:  Two of two pages.  This
14 being page one, this being page two.
15     Q:  This is an authorization
16 for you to get information from
17 Philhaven concerning Mr. Johnson's
18 treatment, correct?
19     A:  Absolutely, but it isn't
20 any information.
21     Q:  Understood.  If OWCP needed
22 information, all they had to do was
23 call Philhaven and ask them to send it,
24 right, after processing a form?

010101

1      A:  Sure.  I mean, but it has
2  to be released by Mr. Johnson.
3      Q:  Right.  And, and that form,
4  you were saying, is authorizing the
5  release of it.
6      A:  Yes.  To my knowledge we
7  did get information from Philhaven.
8      Q:  But you said you didn't get
9  it until after the claim was
10 controverted?
11     A:  We didn't get, this letter
12 says we didn't get information to
13 support a traumatic injury.  It did not
14 say we did not get information to
15 support filing a claim.
16     Q:  Okay, so this is, this
17 sentence that we read about, failed to
18 provide medical documentation to
19 support his allegation of a traumatic
20 injury, that's an evaluative statement?
21     A:  Exactly.
22     Q:  Okay, not just a statement
23 of fact.  As we didn't get
24 documentation.

010101                                              72

1    A:  It doesn't say that we
2 didn't get information, it says we
3 didn't get information that in Mr.
4 Stuckey's opinion, supported traumatic
5 injury claim.
6    Q:  Now, Mr. Johnson indicated
7 at some point there were thirteen pages
8 of medical information faxed to you.
9 Do you have any recollection of that?
10    A:  I do have recollection of
11 getting medical information from
12 Philhaven.  I think it's part of the
13 file.
14    OSTROWSKI:  Okay.  That's all
15 the questions I have.  Thank you.
16    MERSHIMER:  I think I'd like to
17 ask some questions, but can we take a
18 break first?
19    OSTROWSKI:  Sure, sure can.
20    LYDE:  11:28 am we'll finish
21 for a break.
22    MERSHIMER:  Mr. Kent, oh, I'm
23 sorry.
24    LYED:  11:45 am, we're back on

010101                                              73

1 record.  Thank you.
2    MERSHIMER:  Mr. Kent, this
3 fourth page of Exhibit 9 that was the
4 Memorandum of Understanding, it's
5 signed by you and Ms. Winters.  Is that
6 correct?
7    KENT:  Yes, well actually, it's
8 signed by Ms. Winters and Timothy Shea,
9 who's the acting CEO at the time.
10    Q:  Okay, do you know when that
11 document was signed?
12    A:  Not exactly from memory.
13 It would have been when we were just,
14 when we announced the RIF, and had
15 placed people in temporary assignments,
16 pending the RIF, so would have been
17 '97, either, somewhere in '97, probably
18 November of '97 but that's just a
19 guess.
20    Q:  Okay.  Thank you.  You had
21 also talked about how there was a
22 reorganization of Housekeeping in 1997
23 where Housekeeping Aides were assigned
24 to different product lines.  Is that

010101                                              74

1 correct?
2    A:  Exactly.
3    Q:  Was, before that, all the
4 Housekeepers had been in something that
5 you referred to as EMS?
6    A:  Environmental Management
7 Service.
8    Q:  Did EMS remain after the
9 change in 1997?
10    A:  It remained as a unit for
11 centralized - and the laundry function,
12 as part of operations unit.
13    Q:  Now there was some
14 questions about the non-selection of
15 Mr. Johnson for a Housekeeping Aide
16 position?
17    A:  Yes.
18    Q:  And was that non-selection,
19 do you know who was the deciding
20 official?
21    A:  The head nurse would
22 normally be the interviewing official
23 recommending officially on paper.  The
24 deciding official would be the private

010101                                              75

1 line manager.
2    Q:  Okay, do you know, and if
3 you don't know, just tell me you don't
4 know.  Was Alice Fidler the selecting
5 official?
6    A:  She was the head nurse in
7 the unit where the position was vacant.
8 So she would have obviously been
9 involved and her opinion would have
10 been primary.
11    Q:  Okay, well whoever was the
12 selecting official for this
13 Housekeeping position that Mr. Johnson
14 didn't get, that's the underlying part
15 of this lawsuit.  Did that person have
16 to select Mr. Johnson based on
17 seniority?
18    A:  No.
19    Q:  How come?
20    A:  Mr. Johnson was referred as
21 a reassignment candidate.  Reassignment
22 candidates, under the terms of the
23 master agreement can be considered,
24 seniority is one of the factors that

010101                                          76

1  will be used when making a selection
2  for reassignment, but other good faith
3  criterion will be utilized in making
4  the selection.  Also, reassignment
5  wasn't the only certificate, I think
6  that was issued on this vacancy
7  announcement.  So they, the selecting
8  official could have used one of the
9  other lists of candidates.  There is
10 not in the contract a better definition
11 as to what's used.  It's not a
12 formalized process, the master
13 agreement eludes that if you want to
14 formalize it, you'd have to do that at
15 the local level.
16      Q:  Mr. Johnson had submitted
17 what was known as a CA-1 traumatic
18 injury form for Workmans' Compensation?
19 Is that correct?
20      A:  I think he submitted both,
21 CA-1 and the CA-2, eventually.
22      Q:  Okay.  Was the CA-1 granted
23 or denied?  Do you know?
24      A:  Both forms, to my knowledge

010101                                          77

1  were transmitted to OWCP in
2  Philadelphia and both claim, no claim
3  was approved.
4       Q:  And who was the one that
5  made the decision whether to grant
6  Workmans' Compensation benefits?
7       A:  The Office of Workman's
8  Compensation Programs in Philadelphia,
9  Pennsylvania.
10      Q:  Is there any, do you know
11 if there's any timelines that govern
12 how long they'll take to decide whether
13 to grant or deny a claim?
14      A:  They may have internal
15 guidelines but there's no - guidelines.
16      MERSHIMER:  That's all I have.
17      OSTROWSKI:  Thank you, I want
18 to follow-up, just a couple things I
19 didn't ask before.  Do you know a
20 gentleman by the name of William Dumas?
21      KENT:  Yes, he lives in
22 Lebanon, Pennsylvania, one time he
23 represented Mr. Johnson at the EEO
24 hearing in Philadelphia.

010101                                          78

1       Q:  Okay, did you have any
2  discussions at any point with Mr.
3  Dumas?
4       A:  During the intervening
5  period after the incidents had taken
6  place, during the EEO process, Mr.
7  Dumas would represent Mr. Johnson in
8  discussions with us.
9       Q:  Okay.  Do you recall
10 anything specific that you and he ever
11 discussed?
12      A:  Not off the top of my head.
13      Q:  Okay, and Mr. Dumas, he's
14 an African American male, correct?
15      A:  Absolutely.
16      Q:  Do you, well, I'll ask you
17 a different way.  He had indicated to
18 me that at one point you had said to
19 him and Mr. Johnson, "I'm tired of
20 doing things for you people."  Did you
21 ever make that statement to him?
22      A:  Absolutely not.
23      Q:  That's the only question I
24 have.  Oh, let me just follow up.  Do

010101                                          79

1  you recall any discussion where you,
2  you and he and perhaps Mr. Johnson were
3  discussing a perception that they were
4  not being cooperated with through the
5  VA?
6       A:  There may have been such a
7  discussion because those discussions
8  seem to go on and on.  Yes.
9       Q:  And did you ever make any
10 indication to him that anything along
11 the line that you had done enough for
12 them, that you couldn't do anything
13 more?
14      A:  I probably told them that
15 we had done all that we could do.  The
16 claim was now at the OWCP.  It was
17 their determination.  He had a hard
18 time understanding that we didn't make
19 the decisions on OWCP.
20      OSTROWSKI:  That's all I have.
21 Thank you.
22      MERSHIMER:  Just a follow-up.
23 Is Mr. Dumas, do you know, is he an
24 attorney?

010101

1          KENT:  I don't think he is.

2          MERSHIMER:  Okay.  That's it.

3          LYED::  11:52 am, the

4  deposition of Raymer Kent has

5  concluded.  Thank you.

6

EXHIBIT B

SHEET 1  PAGE 1

1   3

2       IN THE UNITED STATES DISTRICT COURT

3        FOR THE MIDDLE DISTRICT PENSYVLANIA

4   LEWIS JOHNSON,        :      1:CV-00-1873

5                          :

6              Plaintiff :

7                          :

8       vs                :

9                          :

10  HERSHEL W. GOBER,     :

11  Acting Secratary of   :

12  Veternans Affairs;    :

13  Et al.                :

14  VIDEO DEPOSITION:

15                        Rodney Kiscadden

16  DATE:               April 8, 2002

17  PLACE:

18              Andrew Ostrowski Office

19              4311 N. 6th Street

20              Harrisburg, Pa 17110

21  APPEARANCES:

22              Andrew Ostrowski

23              4311 N. 6th Street

24              Harrisburg, PA 17110

25              Kate L. Mershimer

26              U.S. Attorney's Office

27              228 Walnut Street

28              Harrisburg, PA 17108

*ORIGINAL*

PAGE 2

1       CRYSTAL LYDE: Good afternoon ladies and

2   gentlemen, please be advised the video and

3   audio is in operation.  My name is Crystal M.

4   Lyde, L Y D E, my address is 4310 Hillsdale

5   Road, Harrisburg, Pennsylvania, 17112. I've

6   been contracted by PR Video Incorporated to

7   be the operator for this deposition.  The

8   case is in the United States district court,

9   for the Middle District of Pennsylvania the

10  captain is Louis Johnson vs. Herschel Gober

11  et.al. The docket number is 1CD-011873. The

12  date is April 8, 2002.  The deposition is

13  being held at the law office of Andrew

14  Ostrowski, 4311 N. 6th St. Harrisburg,

15  Pennsylvania, 17110.  The video deposition is

16  being taken on behalf of plaintive Louis

17  Johnson. The witnesses name is Rodney

18  Kiscadden. Is that correct?

19      RODNEY KISCADDEN: Correct.

20      CRYSTAL LYDE: The time now is one of

21  1:04 PM.  Will you raise your right hand for

22  me please?  State your name for the record,

23  and spell it.

24      RODNEY KISCADDEN: The whole name or just

25  the last?

PAGE 3

1       CRYSTAL LYDE: The whole name, please.

2       RODNEY KISCADDEN: Rodney Kiscadden, R O

3   D N E Y, Kiscadden, is K -I- S- C-A -D -D- E-

4   N.

5       CRYSTAL LYDE: Do you so swear to tell

6   the whole truth nothing but the truth so help

7   you God.

8       RODNEY KISCADDEN: I do.

9       CRYSTAL LYDE: Thank you. May I have a

10  voice check around the room please.

11      KATE MERSHIMER: Kate Mershimer, counsel

12  for defendant, defendants.

13      RODNEY KISCADDEN: Rodney Kisscadden.

14      GALE MCLUCAS: Gale McLucas from the

15  court-reporting firm of Filuis & McLucas.

16      ANDY OSTROWSKI: Andy Ostrowski, counsel

17  for the plaintiff.

18      STUART JOHNSON: Johnson, Stuart Johnson.

19      CRYSTAL LYDE: Thank you.  Usual

20  stipulation.

21      KATE MERSHIMER: Yes, full reserve

22  objections, other than the form of question,

23  and a witness will reserve the right to read

24  and sign.

25      ANDY OSTROWSKI: Okay. Mr. Kiscadden, my

PAGE 4

1   name is Andy Ostrowski.  We were introduced

2   shortly before you sat down here today.  You

3   understand you're  here today to give a

4   deposition in connection with a lawsuit that

5   Louis Johnson has brought against the

6   Veterans Administration and persons

7   associated with the Veterans Administration.

8       RODNEY KISCADDEN: Yes.

9       ANDY OSTROWSKI: Okay, have you ever

10  given a deposition before?

11      A: No.

12      Q: All right, essentially what it is,

13  and I am sure you have probably had the

14  opportunity to review some of the details,

15  background with Miss Mershimer, but your name

16  has surfaced as someone who, we believe has

17  knowledge or information relevant or material

18  to Mr. Johnson's lawsuit. Under the rules

19  governing the federal litigation process,

20  we're entitled to call witnesses in to get

21  depositions as statements under oath.  You

22  know, for purpose, for, you know preparation

23  for trial, for use of trial, if we need to

24  use them for trial. It's a question answer

25  session, where I'll be asking you questions

SHEET 2  PAGE 5

1  and you'll be responding to my questions
2  verbally. Before you answer a question, it's
3  important that you hear and understand
4  question, so if any of my questions that are
5  not clear, and there's anything I can do to
6  make it clear, or help you understand, stop
7  me before you answer the question and ask me,
8  okay. Yes or a no.
9      A: Yes, Sir.
10     Q: Okay, and if during the course of the
11 deposition, you have a question about
12 anything, I have no problems whatsoever to
13 try and clarify anything, any questions you
14 may have. Okay?
15     A: Sure.
16     Q: Okay. How are you currently
17 employed?
18     A: I'm employed by the VA Medical
19 Center, in Lebanon Pennsylvania.
20     Q: As what? What's your position?
21     A: Supervisor.
22     Q: Supervisor of what?
23     A: EMS
24     Q: Okay, and EMS is what?
25     A: Environmental Management Service.

PAGE 6

1      Q: Okay. And how long have you been
2  supervisor of Environmental Management
3  Service?
4      A: Since 1990.
5      Q: Okay. And how, who is your, your
6  supervisor?
7      A: Lori Dulac.
8      Q: Lori Dulac? Could you spell Dulac?
9      A: D-U-L-A-C
10     Q: And what is Ms. Dulac's position?
11     A: Manager
12     Q: Manager of what?
13     A: EMS
14     Q: Okay. Do you and she share the same
15 title?
16     A: No.
17     Q: What did...
18     A: Actually I'm the supervisor.
19     Q: Supervisor. Okay, and are there other
20 supervisors of EMS?
21     A: Yes
22     Q: Okay, are there different areas of
23 responsibility assigned to the different
24 supervisors?
25     A: We all basically have the same

PAGE 7

1  understanding of.
2      Q: The same areas of responsibility?
3      A: Well, we do have an area that we
4  cover, but we basically do the same job.
5      Q: Okay, how many supervisors are their?
6      A: Three.
7      Q: Okay. And who are the other two?
8      A: Russell Tusick, and Kevin Walton.
9      Q: Okay. And are you familiar with the
10 first name, Carolyn McGguigan?
11     A: Yes, I'm familiar with her.
12     Q: And what is her position?
13     A: Retired.
14     Q: Okay. When did she retire?
15     A: I don't know that date.
16     Q: Okay. When she was with the Veterans
17 Administration what was her position?
18     A: Well, she was in charge of the EMS
19 and food service. I'm not sure exactly where
20 title was, because she was there many years
21 and she was a great, great woman.
22     Q: Okay.
23     A: I don't know.
24     Q: I'm sorry.
25     A: I don't know what exact title you

PAGE 8

1  would say.
2      Q: Okay, that's fair enough. Was she
3  your supervisor at the time?
4      A: Yes, she was.
5      Q: Okay. And the person who was there
6  now, what was the name of the, Lori Dulac.
7      A: Lori Dulac.
8      Q: Dulak. How long has Ms. Dulac been in
9  that position? Managers position?
10     A: Since July or August of last year.
11     Q: Okay, and prior to her being in that
12 position, who held that position?
13     A: Me.
14     Q: You were manager?
15     A: Yes.
16     Q: Okay. Why are you no longer manager?
17     A: She got the position.
18     Q: Did you get demoted?
19     A: I don't know if you want to say
20 demoted.  I guess you could say I went back
21 to my original position.
22     Q: How long...  I'm sorry  to interrupt
23 you. How long were you manager?
24     A: Between the time that Carolyn left
25 and Lori arrived, which I'm really not sure

1  of the time frame there.
2      Q: Okay, and were you filling that
3  position in an acting capacity?
4      A: Yes.
5      Q: Okay. So, after Ms. Mcguigan left,
6  there is a process of filling that vacancy,
7  and during that period of time you were
8  designated to serve in that position.
9      A: That is correct.
10     Q: Okay, did you apply for that
11  position?
12     A: Yes, I did.
13     Q: Okay. And, through the selection
14  process, Ms.Dulac got it, and you went back
15  to being the supervisor.
16     A: That is correct.
17     Q: Was Ms. Dulac a, was she supervisor
18  previously?
19     A: She wasn't from the VA.
20     Q: Oh, she wasn't, okay. Do you know,
21  was she with the federal government?
22     A: No.
23     Q: Okay, so other than that brief period
24  of time. At all times, at least since 1990,
25  you've been a supervisor in Environmental

PAGE 10
1  Management Services?
2      A: That is correct.
3      Q: Of the VA, okay.  Describe for me as
4  specifically as you can what your job
5  entails; what areas of supervision you have,
6  what employees are underneath you, what their
7  responsibilities are, things of that nature.
8      A: Supervise the house keeping people,
9  make sure they're taking care of the workers,
10  be responsible for, and I also do the
11  supplies, basically.
12     Q: What kind of supplies?
13     A: Making sure that the supplies are
14  being kept up to, up to their capacity. I
15  guess you could say.
16     Q: All supplies that use in housekeeping
17  services.
18     A: Yes and housekeeping services.
19  That's correct.
20     Q: Okay.   And how many housekeeping,
21  strike that, how many total employees are
22  there, employed in EMS?
23     A: Right now we have about 52, that's
24  including the supervisors and clerical staff.
25     Q: And how many housekeeping personnel?

PAGE 11
1      A: I would say about 47.   I'm not sure
2  exactly, at this particular time, cause there
3  are some vacancies.
4      Q: Okay, and so is it fair to conclude
5  that EMS, it's pretty much the housekeeping
6  department.
7      A: Definitely, yes.
8      Q: Okay, there's not, there's not
9  significant other areas of responsibilities
10  that are performed by EMS?
11     A: No, most of our job is housekeeping.
12     Q: Okay. Currently can you tell me how
13  many African-American house keepers, or
14  employees there are in housekeeping?
15     A: I don't know that figure right off
16  the top of my head.
17     Q: Okay. Can we estimate?  Is it?
18     A: I wouldn't want to say something that
19  is incorrect at the moment.
20     Q: I understand, we'll only hold you to
21  what you can say with certainty. Just the
22  ballpark, is less than five, more than five?
23     A: Could be less than five at this
24  particular time.
25     Q: Okay. And has that number, the

PAGE 12
1  overall number of the African American
2  employees, has that changed significantly
3  over any period of time?
4      A: Yes, it is up and down because of
5  the, the way we ran the weekend staff.
6      Q: Okay.  What was the highest number
7  you can ever recall?
8      A: I don't know.
9      Q: Okay.  And what do you mean, the way
10  we ran the weekend staff?
11     A: It used to be, we used to have part
12  time now we have, it's all full time.
13     Q: Okay, and when did that change take
14  place?
15     A: I don't know.
16     Q: You at some point in your, the course
17  of your work, supervised Mr. Johnson,
18  correct?
19     A: That's right. Yes.
20     Q: Okay. What kind of employee was he?
21     A: He was the average employee.
22     Q: Okay, no better, no worse than any
23  other employees?
24     A: No.  No.
25     Q: Are there any, can you identify

SHEET 4   PAGE 13

1  any instances where you considered Mr.
2  Johnson to have been a problem? As far as
3  quality of his work or the amount of
4  supervision that was required of him.
5      A: No.
6      Q: Okay. How, try to keep this as
7  confined to the extent you can, to the period
8  1998/1999. Okay. How were housekeeping
9  assignments conducted? From what I understand
10 housekeeping positions are performed, the
11 actual work is performed all over the VA.
12 Correct?
13     A: That's correct.
14     Q: Okay. How was it determined, how
15 those positions were, the day-to-day task,
16 were to be assigned? Did you do it by
17 building a floor unit?
18     A: You're saying, there are certain
19 areas in the hospital that certain
20 individuals do every day. They're assigned
21 that area.
22     Q: Okay, and that's how things are
23 conducted? Is that how all housekeeping
24 employees were assigned, two specific areas
25 for everyday?

PAGE 14

1      A: I would say 90% did have a relief
2  crew.
3      Q: Okay.  Is a relief crew, is that
4  what's called floaters?
5      A: Relief, floaters.
6      Q: When I use, when you use the term
7  floaters, is that anything other than someone
8  who fills in an area, that for some reason or
9  another, an employee is not; a regularly
10 scheduled employee is not in attendants on a
11 particular day.
12     A: That would describe it the best.
13     Q: Okay. How the buildings are there at
14 the Lebanon VA?
15     A: There's a lot of buildings, but if
16 you're say how many we clean, there's.
17     Q: How many do you clean?
18     A: Well, there's at least ten.
19     Q: Okay.
20     A: I could be wrong.
21     Q: And for each of those ten buildings,
22 are there staff that are regularly assigned
23 to those buildings, to do the cleaning
24 functions for those buildings?
25     A: Yes.

PAGE 15

1      Q: Is, is Irvan Erickson, is he still
2  employed at the VA?
3      A: Yes.
4      Q: Is he still in EMS?
5      A: Yes.
6      Q: And, what is his current position?
7      A: He's relief.
8      Q: Relief.  How long has he been doing
9  that?
10     A: I can't answer that. I don't know,
11 because he was on a ward.
12     Q: Okay, when, when, what ward was he
13 assigned to?
14     A: Last one I know of is 128.
15     Q: Okay, now why did his assignment
16 change from assignment to a ward, to a relief
17 assignment?
18     A: I don't know.
19     Q: Do you know when that occurred?
20     A: No.
21     Q: What kind of an employee is Mr.
22 Erickson?
23     A: Average.
24     Q: Average. Has he ever been
25 disciplined for anything?

PAGE 16

1      A:  The only thing I'm aware of is a
2  counseling that myself and Ms. McGuigan gave.
3      Q: And, what do you give him that
4  counseling for?
5      A: For the, the things that were done
6  towards Mr. Johnson.
7      Q: Okay. We'll talk more about that.
8  Let's talk about, I guess, about the things
9  that were done to Mr. Johnson. When you say
10 that, what things that were done to Mr.
11 Johnson are you talking about?
12     A: There was supposed to be, and I'm,
13 things that were quoted to him that weren't
14 supposed to, that were offensive to Mr.
15 Johnson.
16     Q: Okay.  Do you recall what that thing
17 was, or those things?
18     A: A white man in a black man's skin. I
19 think that's what the quote was.
20     Q: That's what Mr. Erickson said to Mr.
21 Johnson.  Is that your understanding?
22     A: That was my understanding.
23     Q: Okay. How did you learn about that?
24     A: I don't remember if Mr. Johnson told
25 me or somebody else. I'm not sure.

SHEET 5   PAGE 17

1    Q: Okay, and what did you do after you
2 heard that?
3    A: I'm not quite sure what happened. I
4 don't know all the sequence of events that
5 happened at that particular time.
6    Q: Okay. Maybe what we can do is I'll
7 give you a document that can maybe help us
8 work through some of this. I'm going to hand
9 you a document that is marked as exhibit
10 thirteen.   Why don't you go ahead and take a
11 few moments and review that document. Have
12 you ever seen that document before?
13    A: I don't remember if I've seen it or
14 not. I don't remember.
15    Q: Okay, have you ever seen anything in
16 writing from Mr. Johnson describing or
17 outlining some of the events that have
18 occurred over this period of time?
19    A: His report of contact.
20    Q: Okay, now this references on October
21 14, 1999, that Mr. Johnson met you near EMS
22 Office, and inquired, you know, what forms
23 were needed to make a complaint on a fellow
24 employee. Do you recall that occurring?
25    A: Yes, cause I did tell him to get

PAGE 18

1 point of contact or.
2    Q: Okay.  Did you have to check when
3 someone as to what needed to be done?
4 Because this has two different times 7:30 AM,
5 you made inquiry, and at 1:30, you informed
6 him that he would need a point of contact
7 form.
8    A: Right, that is correct.
9    Q: Okay.  What did you do, let me ask
10 you first, as of the time Mr. Johnson came to
11 you on that date, had you known anything
12 about what was alleged to have occurred,
13 between Mr. Johnson and Mr. Erickson?
14    A: I don't remember.
15    Q: Okay, and then what did you do from
16 7:30 until 1:30? Not everything you did, but
17 with respect to Mr. Johnson's contacting you.
18        KATE MERSHIMER:  I want to object
19 to form a question, and let me just explain,
20 put something on the record. We haven't
21 identified what exhibit thirteen is, but I
22 take it that it is a typed statement that was
23 prepared by Mr. Johnson himself.
24    ANDY OSTROWSKI: Correct.
25    KATE MERSHIMER: When I said, I object to

PAGE 19

1 the form the question, you said what to do
2 between 7:30 and 1:30, and the witness hasn't
3 said that those are necessarily the exact
4 times.
5        ANDY OSTROWSKI:  Okay.  Well let me
6 ask you, you recall there being a period of
7 time, from the point at which Mr. Johnson
8 first talked to you about the matter until
9 you got back to him about needing a point of
10 contact form, correct?
11    RODNEY KISCADDEN: Yes.
12    Q: Okay.  What did you do after Mr.
13 Johnson contacted you until the time where
14 you got back with him?
15    A: Contacted personnel.
16    Q: Okay, and who in personnel did you
17 speak with?
18    A: Tony Augustine.
19    Q: Tony Augustine?
20    A: Yes he's my personnel, well EMS's
21 personnel specialist.
22    Q: Okay, and what did you tell Mr.
23 Augustine?
24    A: That Mr. Johnson had complaint to
25 write up.

PAGE 20

1    Q: Okay, did you know, did Mr. Johnson
2 tell you what the complaint was about?
3    A: I don't remember.
4    Q: Okay, do you remember whether you
5 asked him what the complaint was about?
6    A:  No, I don't remember.
7    Q: What all did you talk to Mr.
8 Augustine about?
9    A: Just what form to put the complaint
10 on?
11    Q: Okay, you asked him a question he
12 answered the question, and that was it?
13    A: Yes. Correct.
14    Q: Okay, and did you have any
15 conversations with Mr. Kent, Raymar Kent.
16    A: None that I remember.
17    Q: If I suggest to you that, were you
18 aware that he was here for deposition this
19 morning?
20    A: I knew he was coming.
21    Q: During his deposition, we talked, he
22 testified, he recalled having two
23 conversations with you about matters between
24 Mr. Erickson and Mr. Johnson. Having
25 suggested that to you, does that refresh your

1  recollection or anything?
2      A: No, it doesn't.
3      Q: Okay, do recall having any
4  conversation with him about Mr. Johnson and
5  Mr. Erickson?
6      A: No, and I don't want to guess because
7  I recall Tony Augustine first.
8      Q: Okay, did you, other than that
9  conversation with Mr. Augustine about what
10 form to fill out, did you have any other
11 conversations with Mr. Augustine, about
12 matters occurring with Mr. Johnson and Mr.
13 Erickson?
14     A: No.
15     Q: Did you have any conversations with
16 anybody from human resources other than Mr.
17 Augustine concerning matters that occurred
18 between Mr. Erickson and Mr. Johnson?
19     A: No.
20     Q: And do you recall from whom you
21 learned the facts about what we alleged to
22 have happened on that day?
23     A: No, I know Mr. Johnson talked to me,
24 but I don't remember exactly all the things
25 that he said to me.

1      Q: Okay, now when do you remember Mr.
2  Johnson talking to you?
3      A: When he asked me for the form. I
4  mean, when he asked me what he has to do to
5  lodge a complaint.
6      Q: Okay, tell me as much as you can
7  recall, about what Mr. Johnson said to you,
8  about what happened.
9      A: That's, that I don't remember.
10     Q: Okay, did he, how many, strike that,
11 was there more than one time, strike that
12 too, the next entry, Friday October 15, 1999,
13 indicates that Johnson met with you in EMS
14 office. Do you recall their being subsequent,
15 after the time, the first time when Mr.
16 Johnson asked you what form he needed to fill
17 out, do you recall their being a subsequent
18 conversation between you and he, regarding
19 the facts of what happened?
20     A: I remember him giving me the rough
21 draft to be typed.
22     Q: Okay, and do, did you have an
23 understanding at that time, what the nature
24 of the complaint was?
25     A: No.

1      Q: Did you know that involved Irvan
2  Erickson?
3      A: Yes.
4      Q: Okay, so as of that Friday, October
5  15, 1999, did you not know what had what had
6  occurred between Mr. Erickson and Mr.
7  Johnson, what was alleged to have occurred
8  between them.
9      A:  I don't remember if I knew
10 everything.
11     Q: Okay, tell me what you did know.
12     A: I couldn't really say exactly
13 everything I did know at that time.
14     Q: Just tell me as much as you
15 can about what you did know. Understanding
16 that you don't recall exactly what you knew.
17     A: That would be hard at this point, to
18 know exactly what I knew at that point.
19     Q: Right, I'm not asking you tell me
20 everything exactly what you knew. Just tell
21 me, tell me as much as you can about what you
22 knew at that point. Do you understand, I am
23 asking you two different things? I understand
24 your answer already is that, you know, it's
25 hard for you to remember or, you don't

1  exactly recall everything, but I am asking
2  you to just sit here and tell me as much as
3  you can about what you recall. Well if it's
4  about such and such, and so and so.
5      A: I don't remember how much I knew.
6      Q: Okay.
7      A: Because, it went over such a period
8  of time, I don't know how much I knew at that
9  particular time.
10     Q: What, what do you mean over such a
11 period of time, do you mean from then until
12 today?
13     A: From then until the next, when Mr.
14 Johnson came back.
15     Q: Okay.
16     A: Because it was a weekend in between
17 there.
18     Q: Okay, maybe I can ask you this way, I
19 am sorry; I'm just trying to get it down as
20 specifically as I can. So I am going to ask
21 you what sounds like a lot of the same
22 questions, but I'm just trying to pin things
23 down. As of that weekend, how much did you
24 know about what went on?
25     A: That is the part I don't remember.

1     Q: Okay, after you found out what had
2 happened, or what was alleged to have
3 happened, what did you do next?
4     A: Talked to Carol Mcguigan and tried to
5 get all the facts together.
6     Q: Okay.
7     A: So that we can present them to
8 personnel.
9     Q: Okay, and what did you tell Miss
10 McGuigan when you talked to her?
11    A: I'm not, that there was a complaint
12 by Mr. Johnson. I don't know if I went into
13 anything specific.
14    Q: Okay, and what did she say?
15    A: To try to find out the facts and get
16 them to the personnel specialist.
17    Q: Okay. Did you understand at the time
18 at which you first spoke with Miss Mcguigan
19 about what was going on, that Mr. Johnson was
20 offended, or upset by what Mr. Erickson had
21 said to him?
22    A: I would say he was upset, yes.
23    Q: Okay, did you tell you he was upset
24 or were you reading his body language?
25    A: Not sure which way it was.

1     Q:   And when Mr. Johnson asked you, or
2 told to that he wanted to make a complaint on
3 a fellow employee, did you know what employee
4 he wanted to make a complaint on?
5     A: Yes, he told me, Mr. Erickson.
6     Q: Okay, as of the time, as of the time
7 he spoke with Ms. Mcguigan, had Mr. Johnson,
8 did that occur after you've seen the rough
9 draft of what he, what his complaint was?
10    A: I don't remember.
11    Q: Okay, is there any documents that you
12 are aware of that I could try to show you to
13 help you refresh your recollection of what
14 went on, back in this period of time, did you
15 ever prepare anything in writing?
16    A: No, I didn't. No.
17    Q: Okay, do you recall there being any
18 other documents that record information about
19 these matters that you could review to
20 refresh your recollection about any of this
21 stuff?
22    A: No.
23    Q: So, I'm stuck with what you remember
24 today, fair enough. Okay, after you had your
25 conversation with Ms. Mcguigan what did you

1 do next?
2     A: Gave the information to the personnel
3 specialist to find out what action to take
4 against Mr. Erickson.
5     Q: Okay, what information did you give
6 to the personnel specialist?
7     A: The comment that was made, the
8 alleged comment that was made against Mr.
9 Johnson.
10    Q: Okay, at that time he went to the
11 personnel specialist, had you spoken with Mr.
12 Erickson about what had occurred?
13    A: I don't remember.
14    Q: And after you gave the information to
15 the personnel specialist, what happened next?
16    A: Talked to Ms. Mcguigan, we decided on
17 a counsel.
18    Q: Okay, did you have any, when you gave
19 it to the, when you gave it to personnel
20 specialist, did you have any discussions with
21 the personnel specialist, was that Mr.
22 Augustine? Was it him again?
23    A: Yes, I believe so.
24    Q: Okay, what did you and he discuss?
25    A: For the, the alleged comment, and

1 that was about all I remember at that
2 particular time. He said that counseling, and
3 that we were supposed to include in the
4 counseling, that Mr. Erickson should stay
5 away from Mr. Johnson.
6     Q: Okay, and then you said that after
7 you spoke with Mr. Augustine. is his name
8 Augustine?
9     A: Yes.
10    Q: Okay, after he spoke with Mr.
11 Augustine you had another conversation with
12 Ms. Mcguigan, is that correct?
13    A: Yes.
14    Q: Okay, and what did you and she
15 discuss?
16    A: What I found out in personnel.
17    Q: Okay, and.
18    A: That was to right of the counseling.
19 Remember.
20    Q: What did she say?
21    A: Go ahead.
22    Q: Okay. Why did you go to Ms. Mcguigan
23 about it?
24    A: She's my boss.
25    Q: Did you need to do that in your

SHEET 8   PAGE 29

1  understanding of this process?
2      A: Yes, I like to always to keep my
3  supervisor informed of what's going on.
4      Q: Okay, and then after you spoke with
5  Ms. Mcguigan, what did you do next?
6      A: wrote up the counsel.
7      Q: And then what?
8      A: Presented it, well Ms. Mcguigan and I
9  presented it to Mr. Erickson.
10     Q: And how did that come about? Did he
11  come into one of your offices?
12     A: That part is, I don't remember how
13  that was handled.
14     Q: Okay
15     A: Or when.
16     Q: How, after you wrote up the
17  counseling, how long after that did you
18  actually talk to Erickson?
19     A: I don't remember.
20     Q: Okay. Over on the second page of that
21  document, on the first entry down to the
22  second paragraph, where it has 10:45 AM, it
23  says, Johnson met with the Mcguigan, and
24  explained everything that occurred with
25  Erickson from October 13, 1999, after that

PAGE 30

1  point Mcguigan summoned Kiscadden into her
2  office, and Kiscadden confirmed previous
3  complaints from Johnson regarding Erickson.
4  Do recall meeting with Mr. Johnson and Ms.
5  Mcguigan, at some point?
6      A: At this particular time, I don't
7  remember it.
8      Q: Okay.  And reading that doesn't help
9  you with your, refresh your recollection.
10     A: No, it doesn't.
11     Q: Okay, now did you, the paragraph
12  above that explains, and I'll summarize it
13  for you, I mean you're free to review it,
14  because I don't want to misstate anything in
15  it, but it essentially explains the situation
16  that Erickson got word that Louis Johnson was
17  going to write him up, do a complaint on him
18  or something, and approached him in front of
19  a nurse's station, and started kind of
20  shoving him with his shoulder, that's my
21  summary of it, whatever that says is what it
22  says. Are you aware of that having been an
23  allegation made by Mr. Johnson?
24     A: I had heard this, yes.  Yes, I did.
25     Q: Okay, and did you, at the time you

PAGE 31

1  heard that, you were already aware of the
2  remark that was alleged to have been made by
3  Mr. Erickson?
4      A: That's correct
5      Q: And did you separately speak with Ms.
6  Mcguigan about both matters?
7      A: I don't remember.
8      Q: Okay, and what did you do after you
9  heard about, strike that, how did you hear
10  about the second incident? The shoving
11  incident, is what I'll call it.
12     A: That I don't remember, how I found
13  out.
14     Q: When we talked about you doing your
15  fact finding, I don't know if that's what we
16  termed it, but you contacted Mr. Augustine,
17  and he said something about a counseling
18  would be appropriate. Was that before you
19  knew about the shoving incident and after
20  the, you knew about the remark, or was it
21  after both of them?
22     A: I don't remember when those
23  incidences occurred.
24     Q: Okay, what about, when did you
25  writing up the counseling occur in relation

PAGE 32

1  to those instances? Did it happen between
2  them or after both of them?
3      A: I don't remember.
4      Q: Okay, after you learned about the
5  shoving incident, what did you do?
6      A: I don't remember.
7      Q: I think I already asked but make
8  clear. Do you remember from whom you learned
9  about the shoving incident?
10     A: No
11     Q: I kind of have, I look like I have a
12  smirk on my face, I don't want to interpret
13  me laughing at you or anything, it just was
14  laughing, it's kind of a difficult when, not
15  recall anything, it makes my job harder, but.
16     A: Yes.  I understand.
17     Q: I'm not asking you change your
18  responses, as long as those are the honest
19  responses. On the next entry, Tuesday October
20  19, 1999, it indicates in that first
21  paragraph, that you had stated to Barbara
22  Yeich, Y-E-I-C-H, you had asked her, whose
23  side are you taking? See that, in the first
24  paragraph, in the last sentence. Yeich went
25  on to explain to Johnson that she was

1  extremely upset due to a conversation she had
2  with Kiskadden. Yeich stated the first thing
3  as her by Kiskadden was " so whose side are
4  you taking?"
5      A: Okay.
6      Q: Okay.
7      A: That has to do with, I was supposed
8  to go over and fact find for Ms. Yeich about
9  an alleged incident.
10     Q: Okay.
11     A: What she quoted there, I don't
12 remember saying that.
13     Q: Okay.
14     A: I don't know why I would've said
15 that.
16     Q: Okay, when you say, you were supposed
17 to be fact finding, did someone instruct you
18 on what to do or who to talk to?
19     A: I don't remember if it was, I don't
20 remember who instructed me, but I'd say
21 Carolyn McWade.
22     Q: Okay, and after you learned about the
23 alleged shoving incident, what did you,
24 strike that, when you did next talked to Mr.
25 Erickson after you learn about the alleged

1  shoving incident?
2      A: I don't remember.
3      Q: Did you talk to any other EMS
4  supervisors, about what was going on between
5  Mr. Erickson and Mr. Johnson?
6      A: No
7      Q: Okay, when you spoke to Ms. Yeich,
8  did you get a written statement from her?
9      A: No.
10     Q: Is there any reason why he didn't get
11 a written statement from her?
12     A: Because I knew that police were
13 already involved.
14     Q: When you do, how did you, strike
15 that, when did you become aware that the
16 police were involved?
17     A: That I don't remember.
18     Q: Okay, how did you become aware that
19 police were involved?
20     A: Carolyn told me.
21     Q: Okay, up until that time that the
22 police became involved, what is everything
23 you had done in your fact-finding process?
24     A: Before that I didn't do anything.
25     Q: Before you learned that the police

1  were involved?
2      A: Yes, I did no fact- finding.
3      Q: Okay, why hadn't done any fact-
4  finding?
5      A: I wasn't instructed to.
6      Q: Okay, but it talked about the matter
7  with Ms. Mcguigan?
8      A: Yes.
9      Q: And with personnel?
10     A: Yes.
11     Q: And did not do any fact finding then
12 until after you learned that the police were
13 investigating the matter?
14     A: Yes.
15     Q: The entry at the bottom of the page,
16 Wednesday, October 20 of 1999, indicates that
17 you had, that Mr. Johnson had come to you
18 concerned that he and Mr. Erickson were
19 assigned to the same building, do recall that
20 happening?
21     A: Yes.
22     Q: Okay, and tell you a recall about
23 that.
24     A: I believe since Mr. Johnson coming to
25 work at 7:45, he had been assigned to the

1  ICU, which is an 8:00 to 4:30 position. So he
2  would have previously known to come in at
3  that particular time.
4      Q: Okay,
5      A: And that's a priority, what would you
6  say, a priority position where it needed to
7  be filled ahead of time, so he would have
8  been assigned there, and that's why he would
9  have been in building one.
10     Q: Okay, do you recall him coming to you
11 and being concerned about being assigned to
12 that unit, that building?
13     A: Yes.
14     Q: Okay, and what you recall the basis
15 of his concern being?
16     A: Because Mr. Erickson was working in
17 the same building.
18     Q: Okay, and did Mr. Johnson indicate
19 you that he felt sick and that he wouldn't be
20 able to work?
21     A: I don't think that occurred right
22 away.
23     Q: Okay, when, did that at some point
24 occur?
25     A: Yes, I'm not sure; I don't remember

1  how the events transpired.
2      Q: But, you did have a conversation with
3  Mr. Johnson where he indicated he was feeling
4  ill and wanted to go home?
5      A: Yes.
6      Q: And did he communicate the basis for
7  his ill feeling as his having to work in the
8  vicinity of Mr. Erickson?
9      A: That is correct.
10     Q: Did you make, did you observed Mr.
11 Johnson, did he look like he didn't feel
12 well?
13     A: I'm not sure.
14     Q: Okay, when you say you're not sure,
15 is there's something about, because a lot of
16 your questions, a lot of your responses you
17 haven't recalled, this time he said you're
18 not sure. Is there something you observed
19 about him, but not sure if you look sick or.
20     A: He was just, what's the word,
21 concerned.
22     Q: Okay, and then Mr. Johnson says, I'm
23 reading at the bottom, Kiscadden stated to
24 Johnson, sit and calm down and I'll go and
25 talk to the chief about you going home on

1  sick leave. Did you recall having that
2  discussion with Mr. Johnson?
3      A: Yes.
4      Q: And who is the chief, is that Ms.
5  Mcguigan?
6      A: Yes.
7      Q: And then the, I'm on the third page,
8  it says, the second full sentence on that
9  page, Kiscadden returned and told Johnson it
10 was okay for him to go home on sick leave but
11 they wanted to talk to him first. Is that
12 accurate?
13     A: Yes.
14     Q: And who is the day, who wanted to
15 talk to Mr. Johnson before he left that day?
16     A: Carolyn and myself.
17     Q: What did you want to talk to him
18 about?
19     A: I'm not sure.
20     Q: Okay, and it also indicates on that
21 day, Wednesday, October 20, 1999, that the
22 police became involved on that day. Is that
23 consistent with your recollection, the day
24 that Mr. Johnson felt sick and wanted to go
25 home, that's a day when the police also

1  became involved?
2      KATE MERSHIMER: Object to the form of
3  the question.
4      ANDY OSTROWSKI: You can still answer.
5      KATE MERSHIMER: Yes, go ahead and
6  answer.
7      RODNEY KISCADDEN: Oh. As far as my
8  recollection, I would.
9      ANDY OSTROWSKI: Okay, that would be
10 correct?
11     A: That will be correct, sorry.
12     Q: As of that day, when Mr. Johnson
13 wanted to go home sick, what all had you talk
14 to Mr. Johnson about concerning his
15 interactions or involvement with Mr.
16 Erickson?
17     A: I don't remember everything that I
18 would have said.
19     Q: Did you understand, did you have any
20 understanding as to whether Mr. Johnson was
21 concerned for his  own personal safety?
22     A: Not sure he relayed the information
23 to me or not.
24     Q: Okay.
25     A: I know he was concerned about being

1  in the same building with Mr. Erickson.
2      Q: Okay, and, had Mr. Johnson come to
3  you on previous occasions about Mr. Erickson
4  harassing him?
5      A: That I don't remember.
6      Q: I'll just suggest something, do he
7  ever come to you and complain about Mr.
8  Erickson chastising him for the way he
9  performed his work or anything of that
10 nature?
11     A: There was one time that I remember
12 that may have suggested that it didn't seem
13 that his waxing was up to standards.
14     Q: Okay, and Mr. Johnson reported that
15 you?
16     A: Yes.
17     Q: Do you know when in relation to these
18 incidents that was?
19     A: No.
20     Q: was it before these matters?
21     A: Yes.
22     Q: What number did I put on that one?
23     KATE MARSHER: 13
24     ANDY OSTROWSKI: I'm going to hand you a
25 document marked as exhibit fourteen.  Is this

SHEET 11 PAGE 41

a document that you prepared?
RODNEY KISKADDEN: Yes.
Q: Okay, and does Counseling, October 20, 1999, and I won't read the content of it. At the bottom of this document, it has the name, looks like Irvan Erickson's signature, is that; do you recognize that as being his signature?
**A: Yes.**
Q: Okay, were you in his presence when he signed this?
**A: Yes.**
Q: Okay, and he dated it, November 15, 1999. You know why it was dated November 15, 1999?
**A: No, I don't.**
Q: When you do present him with this document?
**A: That I don't remember. It should've been October 20th.**
Q: It should have been October 20th, when you presented it to him?
**A: Yes.**
Q: Okay, is that your recollection, or is that just based on, it says counseling

PAGE 42

October 20, 1999.
**A: It's what I; it should have be given to him, yes.**
Q: Okay, and what did you do with this document after you received, after Mr. Erickson signed it?
**A: I don't remember what.**
Q: Okay, there is a facsimile script at the top of that. Do you see that? It says November 15, 1999, Monday 14:00, page two. Do you recognize what fax machine that came from?
**A: No.**
Q: I'm going to hand you a document marked as exhibit fifteen. The report of contact, is that your signature at the bottom of the page?
**A: Yes.**
Q: And it's dated October 18, 1999. Is this a document you prepared?
**A: Yes it would have been.**
Q: Okay, now what is the purpose or use of this form of document? I mean, why did you fill this out and what did you use this for?

PAGE 43

**A: This just would have been a fact finding.**
Q: Okay, and you did then meet with Mr. Erickson on October 18th?
**A: Yes.**
Q: Okay, and what did you do with this document after you prepared it?
**A: Just kept it on file.**
Q: Okay. For what purpose?
**A: So I had a copy of it.**
Q: Okay. What did you, other than, other than what's recorded here, is there anything more that you talked to Mr. Erickson about at that time?
**A: No, these are the only incidences that he related to me.**
Q: He being?
**A: Mr. Erickson.**
Q: Okay, I'm going to hand you a document marked as exhibit sixteen. Is that your copy of your signature that appears at the bottom, even though it's a little hard to read?
**A: Yes that's my signature.**
Q: Okay and is this a document that you

PAGE 44

prepared and sent Mr. Johnson?
**A: Yes.**
Q: Why did you prepare this document on November 17th, or send this on November 17, 1999?
**A: This would have been a document instructed to be, by the personnel.**
Q: Okay. The line in there, we are confident that you can return to work without any concerns. Why did you put that in there?
**A: Because we were confident he could return to work.**
Q: Did he express some concerns about not be able to return to work?
**A: By that time he was off work so I would imagine he would have had some concerns, yes.**
Q: Okay, and what had been done to, what action had been taken to sure that whatever he was concerned about would not be repeated?
**A: The counseling to Mr. Erickson.**
Q: Okay. Is it possible that the counseling form exhibit number thirteen?
**A: Fourteen.**
Q: Fourteen, correct, sorry. Did you

SHEET 12   PAGE 45

1 prepare that several weeks after the
2 incident?
3     A: Did I prepare this counseling.
4     Q: The form, several weeks after the
5 incident?
6     A: I would've prepared it on the date
7 specified.
8     Q: Well there's two.
9     A: And why Mr., I can't tell you why
10 this is dated by Mr. Erickson, that
11 particular date. That I don't know
12     Q: Okay. Is it possible, and I'm going
13 to suggest something, I'll let you respond to
14 it, that you didn't do anything, and then you
15 were concerned because Mr. Johnson was
16 concerned, and you got together with Mcquigan
17 and thought you better make it look like you
18 did something to correct the situation, well
19 after the fact.
20     A: No I wouldn't bend on policy.
21     Q: Okay, on these documents, I mean,
22 looks like you contacted Mr. Erickson on the
23 eighteenth of October, based upon exhibit
24 number fifteen.
25     A: Yes.

PAGE 46

1     Q: And then you prepared a counseling
2 for him on October 20th.
3     A: Yes.
4     Q: Did you talk to Mr. Erickson at all
5 before     there were two instances, meaning
6 did you talk to him after just a matter of
7 the comment that he made?
8     A: No.
9     Q: Okay. It was only after there was
10 the alleged shoving incident involved, then
11 you talked about both.
12     A: That's correct.
13     Q: Okay. And when you use the term
14 counseling, what do you mean by counseling?
15     A: That's the form of, what could you
16 say, price of the disciplinary action,
17 counseling would be the first thing you do.
18     Q: Okay. Is that the first thing you do
19 in any case?
20     A: Not always.
21     Q: Okay, like would have been a
22 different situation if Mr. Erickson came up
23 and punched Louis Johnson in the mouth?
24     A: Definitely would have changed the
25 scenario.

PAGE 47

1     Q: Okay, and why would that change the
2 scenario?
3     A: That would be automatic
4 dismissal.
5     Q: Okay.  Based upon what, the severity
6 of the incident?
7     A: Yes.
8     Q: Now who makes that determination as
9 to what incidence are or how severe any
10 particular incident is?
11     A: We present those to personnel.
12     Q:  Okay.
13     A:  They let us know how great the
14 severity of procedure were supposed to use.
15     Q: Okay.
16     A: But I also believe the union can get
17 involved, also.
18     Q: Okay. A document marked as exhibit
19 seventeen. That again, your signature that
20 appears on that document?
21     A: Yes.
22     Q: Now why on, why was this document
23 prepared?
24     A: I'm not sure who prepared this. You
25 mean this document?

PAGE 48

1     Q: Yes.
2     A: I don't know.
3     Q: In the designation N137, after your
4 name, what is tat reference to?  That your
5 position?
6     A: Position?
7     Q: N137.
8     A: Oh there, that is mail code.
9     Q: Okay, for your specific mailbox.
10     A: EMS.
11     Q: Okay. And N21, is that just human
12 resource office?
13     A: Yes, that would be human resources
14 mail code.
15     Q: Okay, and again can you, do you have
16 any explanation as to why, after two months,
17 this is a document that you prepared?
18     KATE MERSHIMER:  I want to object
19 to the form the question because I think he
20 said, and I might be wrong, that he didn't
21 prepare it, perhaps I'm wrong.
22     ANDY OSTROWSKI: Okay. I thought he
23 corrected himself. Did you prepare this
24 document?

SHEET 13  PAGE 49

1      RODNEY KISKADDEN: That I don't
2 remember, I don't remember this document.
3      Q: Okay, do you have any idea as to
4 what was going on two months after the
5 incidents that led you to prepare this
6 document, or that led you to sign this
7 document, anyway?
8      A: Yes, I don't remember this document,
9 even though I did sign it. I don't remember
10 it.
11      Q: Okay. There was a statement in one of
12 the investigation reports that I wanted to
13 just ask you about briefly.   I think it was
14 in one of the EEO investigation reports and
15 if I don't find the specific reference, I'll
16 just ask you generally. There was a comment
17 to the effect that, you had in the past,
18 determined that Mr. Johnson was a little
19 hyper sensitive, is, I think, the word used.
20 Did you ever give that information to
21 anybody?
22      A: Not in my recollection.
23      Q: Okay, this is in, it's in, I'll show
24 it to you, I'm not the mark it, EEO
25 counselors report, I don't need to read all

PAGE 50

1 the information in, but it does say Mr.
2 Kiskadden said that Mr. Johnson gets a little
3 hyperactive at times and he did not feel that
4 Mr. Erickson's behavior warranted
5 termination.  It's right at the bottom of
6 that page.
7      A: was that a phone conversation?
8      Q: I don't know, think you said that you
9 don't recall ever saying that, correct, or do
10 you, after looking at that.
11      A: Yes I don't remember how this
12 would've been.
13      KATE MERSHIMER: Can I see the document,
14 please.
15      ANDY OSTROWSKI:  Yes sure, but do you
16 recall ever saying anything like that to
17 anybody. That Mr. Johnson gets a little
18 hyperactive.
19      RODNEY KISKADDEN: No, I don't remember
20 saying that.
21      Q: Okay, do you recall, did you ever
22 have that thought, that you thought Louis
23 Johnson might be a little hyperactive or over
24 reactive to situations?
25      A: No, because I don't try to, you know,

PAGE 51

1 tag people with any, because I'm not a
2 doctor, I'm not, I'm just a supervisor and.
3      Q: Okay.
4      A: people do get hyperactive over
5 situations, whether I would say that about a
6 person, no.
7      Q: Okay, is there any chance that you
8 did you didn't do certain things, you didn't
9 take more prompt, or firm action concerning
10 what Mr. Erickson had done, because you
11 thought that Mr. Johnson might be over doing
12 it with what he was saying about the matter.
13      A: Well we went to personnel to find
14 out, you know, how strenuous the severity of
15 punishment, and that's the greatest
16 punishment, they say, do the counseling.
17      Q: Okay, and did you go to human
18 resources after each of the incidents or just
19 after both of them?
20      A: I don't remember. I don't know if it
21 was after one or both.
22      Q: Okay, but there was only one
23 counseling of Mr. Erickson.
24      A: Yes. One counseling.
25      Q: And that was based on both incidents.

PAGE 52

1      A: Yes.
2      Q: Okay. Do you recall in summer of
3 1998, when Mr. Johnson applied for
4 housekeeping vacancy that was over in, I
5 think it was in acute care, and he wasn't
6 given a position, do you have recollection of
7 those matters?
8      A: Yes I remember the incident.
9      Q: Okay. Was there a practice in place,
10 that you are aware of, that if there was a
11 vacancy open in a position, at the same
12 grade, hat persons within that position, it
13 was first offered to persons in that position
14 informally, to see if they wanted to take a
15 reassignment, or a change of status, to move
16 into an open position?
17      A: At that particular time, the decision
18 to hire people on certain wards was done by
19 the ward people, because they were not part
20 of our service anymore.
21      Q: Okay. But are you aware of that
22 practice, like if there was a housekeeping
23 vacancy in EMS before it was posted and
24 announced generally, would other housekeepers
25 have been able to, you know, bid into that

1  position, without having to go through the
2  normal promotion, or reassignment, or
3  application    process?
4      A: Yes if we handle.  Okay, I'll
5  explain, if there is an opening for a certain
6  area because somebody retired, like in a
7  certain building, a certain ward, we post it
8  within our department, senior person gets the
9  area.
10     Q: Okay. And is that still a practice?
11     A: It is now. When we were divided, when
12 a position opened up, it would be the
13 decision of manager of that department.
14     Q: To, as to how to fill the position?
15     A: Yes that's correct.
16     Q: Okay. Are you aware of situations in
17 other departments, where housekeeping
18 vacancies had been created either through
19 either a retirement, I think was the example
20 that you used, and the positions were filled
21 by opening up to other housekeepers, to take
22 the position before it was formally posted.
23 Has that happened in other units?
24     A: Oh yes.
25     Q: Okay. And in those situations it's,

1  before it's formally posted, the housekeepers
2  who are allowed to fill those positions, it's
3  filled on the basis of seniority?
4      A: that's correct.
5      Q: And has that practice ever changed?
6      A: No.
7      Q: Do recall their being an a wall given
8  to Louis Johnson in August 1998?
9      A: Yes I remember an a wall was given to
10 him.
11     Q: And how did that come about?
12     A: I don't know I wasn't involved.
13     Q: Okay. Do you know who was involved in
14 that?
15     A: Not sure at this time, no.
16     Q: Okay. Did you having the discussions
17 with Louis around that time about him having
18 scheduled leave and then canceling it, and
19 there was something in that process that led
20 to this whole a wall situation?
21     A: I don't remember.
22     Q: Okay. What is your role as supervisor
23 in EMS, in the processing of an employees
24 worker's compensation claim?
25     A: I don't know that I have really any.

1      Q: Okay. Well do you keep forms in your
2  office?
3      A: No, he would get them from personnel.
4      Q: Do you recall having any discussions
5  with Louis Johnson about his workers
6  compensation claim?
7      A: Not that I can remember.
8      Q: Did you have any conversations with
9  Joseph Stucky about Mr. Johnson's worker's
10 compensation claim?
11     A: If he filed for a worker's
12 compensation claim, there probably was a part
13 in there that I was supposed to fill out.
14     Q: Okay. Do you recall ever filling one
15 out?
16     A: At this particular time I don't
17 recall it.
18     Q: Okay.  I'm going to give you a copy
19 of a document marked as exhibit eighteen.
20 This, on the second page of this document,
21 does it bare your signature?
22     A: Yes.
23     Q: Okay. Did you prepare this form?
24     A: This is a form that, it's probably in
25 the computer.

1      Q: Okay, but there's some handwritten
2  information, and some x's in boxes, and some
3  blanks that were filled in.  Did you fill any
4  of this information out?
5      A: That would have been the supervisors
6  report, yes.
7      Q: Okay. So this is something that was
8  prepared by you?
9      A: Yes, because it's, yes, it's a
10 supervisor's report, so I would have had to
11 fill this report out.
12     Q: Okay, and do you know if you prepared
13 a narrative of the incident, or the basis of
14 the report?
15     A: No, I would, I would've just filled
16 this out.
17     Q: Okay.
18     A: I don't know about a narrative.
19     Q: Okay. Let me take a couple minute
20 break here, and will probably wrap up pretty
21 quick.
22     CRYSTAL LYDE:  2:34 PM, will take a
23 short break.
24 It's 2:43 PM.   We're back on video, audio,
25 and record.

SHEET 15   PAGE 57

1      ANDY OSTROWSKI: Okay, I'm just a show
2  you, I didn't make copies because it's rather
3  lengthy, identify them in terms of numbers,
4  as were assigned by your attorneys, 0G-01712
5  thru, did I say 0712, thru 0740, and I'm only
6  going to ask you about 0712 thru 0716.
7  That's a form that's a completed CA2, and on
8  the second page of that 0713, is that you are
9  signature again?
10      RODNEY KISKADDEN: Yes.
11      Q: Okay, and then if you just flip
12  through, because above your signature there's
13  a line where you're requested to verify
14  certain information, and then you say, see
15  attached.  Do you see that?
16      A: Yes.
17      Q: Okay. Can you tell me if the
18  information following the form is what was
19  submitted?  If you recall.
20      A: To the best of my knowledge.
21      Q: Okay. That's all the questions I have
22  for you. Thank you.
23      KATE MERSHIMER: Just a follow up
24  question. The form you just looked at, 0712
25  thru 0713, did you personally, focusing on

PAGE 58

1  page 0713, did you personally complete this
2  form? That you recall.
3      RODNEY KISKADDEN: Probably this, I was
4  probably in presence. I was present at that.
5      Q: Would you recall, do you recall, yes
6  or no, whether Mr. Stucky, Joseph Stucky
7  possibly helped you t prepare this form?
8      A: Most likely, yes.
9      Q: Is it possible he prepared this form
10  and you just reviewed it and signed it?
11      A: It's possible; we probably did
12  together in an office setting.
13      Q: Okay, and how about with exhibit
14  eighteen, that second page, you had said that
15  you had prepared this form?  What I want to
16  know is are you sure that you prepared.
17      A: With Mr. Stucky, possibly but it is
18  unclear to me.
19      Q: Okay.
20      A: Usually we don't fill these forms out
21  without personnel specialist or somebody from
22  the office at least assisting us if we're not
23  sure of some, make sure we're filling out the
24  right forms.
25      Q: Okay. Now you had said that EMS had

PAGE 59

1  gone through a change, at some point, in
2  where the housekeepers were assigned.  Is
3  that correct?
4      A: Yes, the housekeepers were assigned
5  to the product lines for a length of time.
6  I'm not sure of the length of time at this,
7  for a couple years they were assigned with
8  the product line.
9      Q: Okay. I just want see if I understand
10  this. There was a period of time when EMS,
11  all the housekeepers were assigned to EMS,
12  and they were given certain floors of
13  buildings to work in or possibly float
14  around. Is that correct?
15      A: There was a time when the product
16  lines were in charge of their housekeeper and
17  we just had the, I don't know how I can say
18  this, general areas.
19      Q: Okay.  I have nothing further.
20      ANDY OSTROWSKI: I don't either. Thank
21  you, sir.
22      RODNEY KISKADDEN: Okay.
23      CRYSTAL LYDE:  2:49 PM.  The deposition
24  with Rodney Kiskadden has concluded.  Thank
25  you.

● ●

## P.R. VIDEO, INC

**0**

0712 [3] 57:5,6,24
0713 [3] 57:8,25 58:1
0716 [1] 57:6
0740 [1] 57:5
0g-01712 [1] 57:4

**1**

1:04 [1] 2:21
1:30 [3] 18:5,16 19:2
10:45 [1] 29:22
128 [1] 15:14
13 [2] 29:25 40:23
14 [1] 17:21
14:00 [1] 42:10
15 [5] 22:12 23:5 41:13,14 42:10
17 [1] 44:4
17108 [1] 1:27
17110 [3] 1:19,23 2:15
17112 [1] 2:5
17th [1] 44:4
18 [1] 42:19
18th [1] 43:4
19 [1] 32:20
1990 [2] 6:4 9:24
1998 [2] 52:3 54:8
1998/1999 [1] 13:8
1999 [14] 17:21 22:12 23:5 29:25 32:20 35:16 38:21 41:4,14,15 42:1,10,19 44:5
1cd-011873 [1] 2:11

**2**

2:34 [1] 56:22
2:43 [1] 56:24
2:49 [1] 59:23
20 [4] 35:16 38:21 41:4 42:1
2002 [2] 1:15 2:12
20th [3] 41:20,21 46:2
228 [1] 1:26

**4**

4:30 [1] 36:1
4310 [1] 2:4
4311 [3] 1:18,22 2:14
47 [1] 11:1

**5**

52 [1] 10:23

**6**

6th [3] 1:18,22 2:14

**7**

7:30 [3] 18:4,16 19:2
7:45 [1] 35:25

**8**

8 [2] 1:15 2:12
8:00 [1] 36:1

**9**

90% [1] 14:1

**A**

able [3] 36:20 44:14 52:25
above [2] 30:12 57:12

accurate [1] 38:12
acting [2] 1:10 9:3
action [4] 27:3 44:19 46:16 51:9
actual [1] 13:11
actually [2] 6:18 29:18
acute [1] 52:5
address [1] 2:4
administration [3] 4:6,7 7:17
advised [1] 2:2
affairs [1] 1:11
african [1] 12:1
african-american [1] 11:13
afternoon [1] 2:1
ahead [4] 17:10 28:21 36:7 39:5
al [1] 1:12
allegation [1] 30:23
alleged [3] 18:12 21:21 23:7 25:2 27:8,25 31:2 33:9,23,25 46:10
allowed [1] 54:2
already [4] 23:24 31:1 32:7 34:13
american [1] 12:1
amount [1] 13:3
andrew [3] 1:17,21 2:13
andy [14] 3:16,16,25 4:1,9 18:24 19:5 39:4,9 40:24 48:22 50:15 57:1 59:20
announced [1] 52:24
another [2] 14:9 28:11
answer [7] 4:24 5:2,7 15:10 23:24 39:4,6
answered [1] 20:12
anybody [3] 21:16 49:21 50:17
anyway [1] 49:7
appearances [1] 1:20
appears [2] 43:21 47:20
application [1] 53:3
applied [1] 52:3
apply [1] 9:10
approached [1] 30:18
appropriate [1] 31:18
april [2] 1:15 2:12
area [5] 7:3 13:21 14:8 53:6,9
areas [7] 6:22 7:2 10:5 11:9 13:19,24 59:18
around [3] 3:10 54:17 59:14
arrived [1] 18:25
assigned [16] 6:23 13:16,20,24 14:22 15:13 35:19,25 36:8,11 57:4 59:2,4,7,11
assignment [3] 15:15,16,17
assignments [1] 13:9
assisting [1] 58:22
associated [1] 14:7
attached [1] 57:15
attendants [1] 14:10
attorney's [1] 1:25
attorneys [1] 57:4
audio [2] 2:3 56:24
august [2] 8:10 54:8
augustine [13] 19:18,19,23 20:8 21:7,9,11,17 27:22 28:7,8,11 31:16
automatic [1] 47:3
average [1] 12:21 15:23,24
aware [10] 16:1 20:18 26:12 30:22

31:1 34:15,18 52:10,21 53:16
away [2] 28:5 36:22

**B**

back [7] 8:20 9:14 19:9,14 24:14 26:14 56:24
background [1] 4:15
ballpark [1] 11:22
barbara [1] 32:21
bare [1] 55:21
based [4] 41:25 45:23 47:5 51:25
basically [3] 6:25 7:4 10:11
basis [4] 36:14 37:6 54:3 56:13
became [3] 34:22 38:22 39:1
become [2] 34:15,18
behalf [1] 2:16
behavior [1] 50:4
believe [4] 4:16 27:23 35:24 47:16
bend [1] 45:20
best [2] 14:12 57:20
better [2] 12:22 45:17
between [11] 8:24 18:13 19:2 20:23 21:18 22:18 23:6,8 24:16 32:1 34:4
bid [1] 52:25
black [2] 11:16 18
blanks [1] 56:3
body [1] 25:24
boss [1] 28:24
both [7] 31:6,21 32:2 46:11 51:19,21,25
bottom [6] 35:15 37:23 41:5 42:16 43:22 50:5
boxes [1] 56:2
break [2] 56:20,23
brief [1] 9:23
briefly [1] 49:13
brought [1] 4:5
building [7] 13:17 35:19 36:9,12, 17 40:1 53:7
buildings [6] 14:13,15,21,23,24 59:13

**C**

c-a [1] 3:3
ca2 [1] 57:7
call [2] 4:20 31:11
called [1] 14:4
calm [1] 37:24
came [4] 18:10 24:14 42:11 46:22
canceling [1] 54:18
capacity [2] 9:3 10:14
captain [1] 2:10
care [2] 10:9 52:5
carol [1] 25:4
carolyn [5] 7:10 8:24 33:21 34:20 38:16
case [2] 2:8 46:19
cause [2] 11:2 17:25
center [1] 5:19
certain [9] 13:18,19 51:8 52:18 53:5,7,7 57:14 59:12
certainty [1] 11:21
chance [1] 51:7
change [6] 12:13 15:16 32:17 47:1 52:15 59:1

changed [3] 12:2 46:24 54:5
charge [2] 7:18 59:16
chastising [1] 40:8
check [2] 3:10 18:2
chief [2] 37:25 38:4
claim [4] 54:24 55:6,10,12
clarify [1] 5:13
clean [2] 14:16,17
cleaning [1] 14:23
clear [3] 5:5,6 32:8
clerical [1] 10:24
code [2] 48:8,14
come [7] 29:10,11 35:17 36:2 40:2, 7 54:11
coming [3] 20:20 35:24 36:10
comment [5] 27:7,8,25 46:7 49:16
communicate [1] 37:6
compensation [4] 54:24 55:6,10, 12
complain [1] 40:7
complaint [12] 17:23 19:24 20:2,5, 9 22:5,24 25:1 26:2,4,9 30:17
complaints [1] 30:3
complete [1] 58:1
completed [1] 57:7
computer [1] 55:25
concern [1] 36:15
concerned [8] 35:18 36:11 37:21 39:21,25 44:20 45:15,16
concerning [3] 21:17 39:14 51:9
concerns [3] 44:10,13,17
conclude [1] 11:4
concluded [1] 59:24
conducted [2] 13:9,23
confident [2] 44:9,11
confined [1] 13:7
confirmed [1] 30:2
connection [1] 4:4
considered [1] 13:1
consistent [1] 38:23
contact [5] 17:19 18:1,6 19:10 42:16
contacted [4] 19:13,15 31:16 45:22
contacting [1] 18:17
content [1] 41:4
contracted [1] 12:6
conversation [5] 21:4,9 22:18 26:25 28:11 33:1 37:2 50:7
conversations [5] 20:15,23 21:11, 15 55:8
copies [1] 57:2
copy [3] 43:10,21 55:18
correct [26] 2:18,19 9:9,16 10:2,19 12:18 13:12,13 18:8,24 19:10 20:13 28:12 31:4 37:9 39:10,11 44:25 45:18 46:12 50:9 53:15 54:4 59:3,14
corrected [1] 48:23
couldn't [1] 23:12
counsel [4] 3:11,16 27:17 29:6
counseling [10] 16:2,4 28:2,4,18 29:17 31:17,25 41:3,25 44:21,23 45:3 46:1,14,14,17 51:16,23,24
counselors [1] 49:25

## P.R. VIDEO, INC

couple [2] 56:19 59:7
course [2] 5:10 12:16
court [2] 1:1 2:8
court-reporting [1] 3:15
cover [1] 7:4
created [1] 53:18
crew [2] 14:2,3
crystal [9] 2:1,3,20 3:1,5,9,19 56: 22 59:23
current [1] 15:6
currently [2] 5:16 11:12

**D**

d-u-l-a-c [1] 6:9
date [6] 1:15 2:12 7:15 18:11 45:6, 11
dated [4] 41:13,14 42:19 45:10
day [13] 13:20 14:11 21:22 38:14, 15,21,22,23,25 39:12
day-to-day [1] 13:15
decided [1] 27:16
decision [2] 52:17 53:13
defendant [1] 3:12
defendants [1] 3:12
definitely [1] 11:7 46:24
demoted [2] 8:18,20
department [3] 11:6 53:8,13
departments [1] 53:17
deposition [10] 1:13 2:7,12,15 4:4, 10 5:11 20:18,21 59:23
depositions [1] 4:21
describe [2] 10:3 14:12
describing [1] 17:16
Designated [1] 9:8
designation [1] 48:3
details [1] 4:14
determination [1] 47:8
determined [2] 13:14 49:18
different [5] 6:22,23 18:4 23:23 46: 22
difficult [1] 32:14
disciplinary [1] 46:16
disciplined [1] 15:25
discuss [2] 27:24 28:15
discussion [1] 38:2
discussions [3] 27:20 54:16 55:4
dismissal [1] 47:4
district [4] 1:1,2 2:8,9
divided [1] 53:11
docket [2] 2:11
doctor [1] 51:2
document [33] 17:7,9,11,12 29:21 40:25 41:1,5,18 42:5,14,20,23 43: 7,20,25 44:3,6 47:18,20,22,25 48: 17,24 49:2,6,7,8 50:13 55:19,20
documents [3] 26:11,18 45:21
doing [3] 15:8 31:14 51:11
done [9] 16:5,9,10 18:3 34:23 35:3 44:18 51:10 52:18
down [6] 4:2 12:4 24:19,23 29:21 37:24
draft [2] 22:21 26:9
Jue [1] 33:1
dulac [9] 6:7,8,8 8:6,7,8 9:17
dulac's [1] 6:10

dulak [1] 8:8
during [3] 5:10 9:7 20:21

**E**

each [2] 14:21 51:18
eeo [2] 49:14,24
effect [1] 49:17
eighteen [2] 55:19 58:14
eighteenth [1] 45:23
either [2] 53:18,19 59:20
employed [4] 5:17,18 10:22 15:2
employee [12] 12:20,21 14:9,10 15: 21 17:24 26:3,3
employees [7] 10:6,21 11:14 12:2, 23 13:24 54:23
ems [18] 5:23,24 6:13,20 7:18 10: 22 11:5,10 15:4 17:21 22:13 34:3 48:10 52:23 54:23 58:25 59:10,11
ems's [1] 19:20
enough [2] 8:2 26:24
entails [1] 10:5
entitled [1] 4:20
entry [4] 22:12 29:21 32:19 35:15
environmental [1] 5:25 6:2 9:25
erickson [41] 15:1,22 16:20 18:13 20:24 21:5,13,18 23:2,6 25:20 26: 5 27:4,12 28:4 29:9,18,25 30:3,16 31:3 33:25 34:5 35:18 36:16 37:8 39:16 40:1,3,8 42:6 43:4,13,18 44: 21 45:10,22 46:4,22 51:10,23
erickson's [2] 41:6 50:4
essentially [2] 4:12 30:15
estimate [1] 11:17
et [1] 1:12
et.al [1] 2:11
even [2] 43:22 49:9
events [3] 17:4,17 37:1
everyday [1] 13:25
everything [8] 18:16 23:10,13,20 24:1 29:24 34:22 39:17
exact [2] 7:25 19:3
exactly [6] 7:19 11:2 21:24 23:12, 16,18,20 24:1
example [1] 53:19
exhibit [10] 17:9 18:21 40:25 42: 15 43:20 44:23 45:23 47:18 55:19 58:13
explain [3] 18:19 32:25 53:5
explained [1] 29:24
explains [2] 30:12,15
explanation [1] 48:16
express [1] 44:13
extent [1] 13:7
extremely [1] 33:1

**F**

face [1] 32:12
facsimile [1] 42:8
fact [3] 31:15 33:8,17 35:2,3,11 43: 1 45:19
fact-finding [1] 34:23
facts [4] 21:21 22:19 25:5,15
fair [3] 8:2 11:4 26:24
familiar [2] 7:9,11
far [2] 13:2 39:7
fax [1] 42:11

federal [2] 4:19 9:21
feel [2] 37:11 50:3
feeling [2] 37:3,7
fellow [2] 17:23 26:3
felt [2] 36:19 38:24
few [1] 17:11
fifteen [2] 42:15 45:24
figure [1] 11:15
file [1] 43:8
filed [1] 55:11
fill [9] 21:10 22:16 42:24 53:14 54: 2 55:13 56:3,11 58:20
filled [5] 36:7 53:20 54:3 56:3,15
filling [4] 9:2,6 55:14 58:23
fills [1] 14:8
filuis [1] 3:15
find [5] 25:15 27:3 33:8 49:15 51: 13
finding [6] 31:15 33:17 35:2,4,11 43:2
firm [2] 3:15 51:9
first [14] 7:10 18:10 19:8 21:7 22: 15 25:18 29:21 32:20,23 33:2 38: 11 46:17,18 52:13
five [3] 11:22,22,23
flip [1] 57:11
float [1] 59:13
floaters [3] 14:4,5,7
floor [1] 13:17
floors [1] 59:12
focusing [1] 57:25
follow [1] 57:23
following [1] 57:18
food [1] 7:19
form [32] 2:22 18:7,19 19:1,10 20: 9 21:10 22:3,16 39:2 42:23 44:23 45:4 46:15 48:19 55:23,24 57:7, 18,24 58:2,7,9,15
formally [1] 53:22 54:1
forms [4] 17:22 55:1 58:20,24
found [1] 25:1 28:16 31:12
fourteen [1] 40:25 44:24,25
frame [1] 9:1
free [1] 30:13
friday [2] 22:12 23:4
front [1] 30:18
full [3] 3:21 12:12 38:8
functions [1] 14:24
further [1] 59:19

**G**

gale [2] 3:14,14
gave [5] 16:2 27:2,14,18,19
general [1] 59:18
generally [2] 49:16 52:24
gentlemen [1] 2:2
gets [1] 3:18
give [6] 4:3 16:3 17:7 27:5 49:20 55:18
given [6] 4:10 42:2 52:6 54:7,9 59: 12
giving [1] 22:20
gober [2] 1:9 2:10
god [1] 3:7
got [6] 8:17 9:14 19:9,14 30:16 45:

16

governing [1] 4:19
government [1] 9:21
grade [1] 52:12
great [3] 7:21,21 47:13
greatest [1] 51:15
guess [4] 8:20 10:15 16:8 21:6

**H**

hand [5] 2:21 17:8 40:24 42:14 43: 19
handle [1] 53:4
handled [1] 29:13
handwritten [1] 56:1
happen [1] 32:1
happened [9] 17:3,5 21:22 22:8, 19 25:2,3 27:15 53:23
happening [1] 35:20
harassing [1] 40:4
hard [3] 23:17,25 43:22
harder [1] 32:15
harrisburg [5] 1:19,23,27 2:5,14
hat [1] 52:12
head [1] 11:16
hear [2] 5:3 31:9
heard [4] 17:2 30:24 31:1,9
held [2] 2:13 8:12
help [5] 3:6 6:6 17:7 26:13 30:8
helped [1] 58:7
herschel [2] 2:10
hershel [1] 1:9
highest [1] 12:6
hillsdale [1] 2:4
himself [2] 18:23 48:23
hire [1] 52:18
hold [1] 11:20
home [5] 37:4,25 38:10,25 39:13
honest [1] 32:18
hospital [1] 13:19
house [2] 10:8 11:13
housekeeper [1] 59:16
housekeepers [6] 52:24 53:21 54: 1 59:2,4,11
housekeeping [13] 10:16,18,20, 25 11:5,11,14 13:8,10,23 52:4,22 53:17
human [4] 21:16 48:11,13 51:17
hyper [1] 49:19
hyperactive [4] 50:3,18,23 51:4

**I**

icu [1] 36:1
idea [1] 49:3
identified [1] 18:21
identify [2] 12:25 57:3
ill [2] 37:4,7
imagine [1] 44:16
important [1] 5:3
incidence [1] 47:9
incidences [2] 31:23 43:15
incident [15] 31:10,11,19 32:5,9 33:9,23 34:1 45:2,5 46:10 47:6,10 52:8 56:13
incidents [4] 40:18 49:5 51:18,25
include [1] 28:3
including [1] 10:24

P.R. VIDEO, INC

**incorporated** [1] 2:6
**incorrect** [1] 11:19
**indicate** [1] 36:18
**indicated** [1] 37:3
**indicates** [4] 22:13 32:20 35:16 38:20
**individuals** [1] 13:20
**informally** [1] 52:14
**information** [12] 4:17 26:18 27:2, 5,14 39:22 49:20 50:1 56:2,4 57:14,18
**informed** [2] 18:5 29:3
**inquired** [1] 17:22
**inquiry** [1] 18:5
**instances** [3] 13:1 32:1 46:5
**instruct** [1] 33:17
**instructed** [3] 33:20 35:5 44:7
**interactions** [1] 39:15
**interpret** [1] 32:12
**interrupt** [1] 8:22
**introduced** [1] 4:1
**investigating** [1] 35:13
**investigation** [2] 49:12,14
**involved** [12] 23:1 34:13,16,19,22 35:1 38:22 39:1 46:10 47:17 54:12,13
**involvement** [1] 39:15
**irvan** [3] 15:1 23:1 41:6

### J

**job** [4] 7:4 10:4 11:11 32:15
**johnson** [75] 1:3 2:10,17 3:18,18, 18 4:5 12:17 13:2 16:6,9,11,15,21, 24 17:16,21 18:10,13,23 19:7,13, 24 20:1,24 21:4,12,18,23 22:2,7, 13,16 23:7 24:14 25:12,19 26:1,7 27:9 28:5 29:23 30:3,4,16,23 32: 25 34:5 35:17,24 36:18 37:3,11, 22,24 38:2,9,15,24 39:12,14,20 40: 2,14 44:1 45:15 46:23 49:18 50:2, 17,23 51:1 52:3 54:8 55:5
**johnson's** [3] 4:18 18:17 55:9
**joseph** [2] 55:9 58:6
**july** [1] 8:10

### K

**kate** [12] 1:24 3:11,11,21 18:18,25 39:2,5 40:23 48:18 50:13 57:23
**keep** [3] 13:6 29:2 55:1
**keepers** [1] 11:13
**keeping** [1] 10:8
**kent** [2] 20:15,15
**kept** [2] 10:14 43:8
**kevin** [1] 17:8
**kind** [6] 10:12 12:20 15:21 30:19 32:11,14
**kiscadden** [17] 1:14 2:18,19,24 3: 2,2,3,8,13,25 4:8 19:11 30:12 37: 23 38:9 39:7
**kiskadden** [10] 33:2,3 41:2 49:1 50:2,19 57:10 58:3 59:22,24
**kisscadden** [1] 3:13
**:nowledge** [4] 4:17 57:20
**known** [2] 18:11 36:2

### L

**ladies** [1] 2:1
**language** [1] 25:24
**last** [4] 2:25 8:10 15:14 32:24
**laughing** [2] 32:13,14
**law** [1] 2:13
**lawsuit** [2] 4:4,18
**learn** [2] 16:23 33:25
**learned** [6] 21:21 32:4,8 33:22 34: 25 35:12
**least** [3] 9:24 14:18 58:22
**leave** [1] 38:1,10 54:18
**lebanon** [2] 5:19 14:14
**led** [3] 49:5,6 54:19
**left** [3] 8:24 9:5 38:15
**length** [2] 59:5,6
**lengthy** [1] 57:3
**less** [2] 11:22,23
**lewis** [1] 1:3
**likely** [1] 58:8
**line** [3] 44:8 57:13 59:8
**lines** [2] 59:5,16
**litigation** [1] 4:19
**little** [5] 4:3,22 49:18 50:2,17,23
**lodge** [1] 22:5
**long** [7] 6:1 8:8,22,23 15:8 29:17 32:18
**longer** [1] 8:16
**look** [4] 32:11 37:11,19 45:17
**looked** [1] 57:24
**looking** [1] 50:10
**looks** [2] 41:6 45:22
**lori** [6] 6:7,8 8:6,7,25
**lot** [4] 14:15 24:21 37:15,16
**louis** [5] 2:10,16 4:5 30:16 46:23 50:22 54:8,17 55:5
**lyde** [9] 2:1,4,20 3:1,5,9,19 56:22 59:23

### M

**machine** [1] 42:11
**made** [6] 18:5 27:7,8 30:23 31:2 46:7
**mail** [2] 48:8,14
**mailbox** [1] 48:9
**man** [1] 16:18
**man's** [1] 16:18
**management** [5] 5:25 6:2 10:1
**manager** [6] 6:11,12 8:14,16,23 53:13
**managers** [1] 8:9
**many** [9] 7:5,20 10:20,21,25 11:13 14:16,17 22:10
**mark** [1] 49:24
**marked** [6] 17:9 40:25 42:15 43: 20 47:18 55:19
**marsher** [1] 40:23
**material** [1] 14:17
**matter** [9] 19:8 35:6,13 46:6 51:12 52:24
**matters** [7] 20:23 21:12,17 26:19 31:6 40:20 52:7
**mcguigan** [1] 7:10
**mcguigan** [19] 9:5 16:2 25:4,10, 18 26:7,25 27:16 28:12,22 29:5,8, 23 30:1,5 31:6 35:7 38:5 45:16
**mclucas** [3] 3:14,14,15

### M

**mcwade** [1] 33:21
**mean** [7] 12:9 22:4 24:10,11 30:13 42:23 45:21 46:14 47:25
**meaning** [1] 46:5
**medical** [1] 6:18
**meet** [1] 43:3
**meeting** [1] 30:4
**mershimer** [1] 1:24 3:11,11,21 4: 15 18:18,25 39:2,5 48:18 50:13 57:23
**met** [3] 17:21 22:13 29:23
**middle** [2] 1:2 2:9
**might** [4] 48:20 50:23 51:11
**minute** [1] 56:19
**miss** [4] 4:15 25:9,18
**misstate** [1] 30:14
**moment** [1] 11:19
**moments** [1] 17:11
**monday** [1] 42:10
**months** [2] 48:16 49:4
**morning** [1] 20:19
**most** [2] 11:11 58:8
**mouth** [1] 46:23
**move** [1] 52:13
**ms** [6] 6:10 8:8 9:5,17 16:2 26:7, 25 27:16 28:12,22 29:5,8 30:4 31: 5 33:8 34:7 35:7 38:4
**ms.dulac** [1] 9:14
**much** [6] 11:5 22:6 23:14,21 24:2, 5,8,23
**myself** [2] 16:2 38:16

### N

**n137** [2] 48:3,7
**n21** [1] 48:11
**name** [12] 2:3,17,22,24 3:1 4:1,15 7:10 8:6 28:7 41:6 48:4
**narrative** [2] 56:13,18
**nature** [3] 10:7 22:23 40:10
**near** [1] 17:21
**necessarily** [1] 19:3
**need** [4] 4:23 18:6 28:25 49:25
**needed** [4] 17:23 18:3 22:16 36:6
**needing** [1] 19:9
**next** [8] 22:12 24:13 25:3 27:1,15 29:5 32:19 33:24
**none** [1] 20:16
**normal** [1] 53:2
**nothing** [2] 3:6 59:19
**november** [6] 41:13,14 42:10 44:4, 4
**number** [7] 2:11 11:25 12:1,6 40: 22 44:23 45:24
**numbers** [1] 57:3
**nurse's** [1] 30:19

### O

**oath** [1] 4:21
**object** [4] 18:18,25 39:2 48:18
**objections** [1] 13:22
**observed** [2] 37:10,18
**occasions** [1] 40:3
**occur** [2] 26:8 31:25 36:24
**occurred** [6] 15:19 17:18 18:12 21:17 23:6,7 27:12 29:24 31:23 36:21

### O

**occurring** [2] 17:24 21:12
**october** [15] 17:20 22:12 23:4 29: 25 32:19 35:16 38:21 41:3,20,21 42:1,19 43:4 45:23 46:2
**offended** [1] 25:20
**offensive** [1] 16:14
**offered** [1] 52:13
**office** [7] 1:17,25 2:13 17:22 22: 14 30:2 48:12 55:2 58:12,22
**offices** [1] 29:11
**okay** [200] 3:25 4:9 5:8,10,14,16,24 6:1,5,14,19,22 7:5,7,9,14,16,22 8: 2,5,11,16 9:2,5,10,13,20,23 10:3, 20 11:4,8,12,17,25 12:6,9,13,20, 22 13:6,8,14,22 14:3,13,19 15:12, 15 16:7,16,23 17:1,6,15,20 18:2,9, 15 19:5,12,16,22,24 20:1,4,11,14 21: 3,8 22:1,6,10,22 23:4,11,14 24:6, 15,18 25:1,6,9,14,17,23 26:6,11, 17,24 27:5,10,14,24 28:6,10,14,17, 22 29:4,14,20 30:8,11,25 31:8,24 32:4 33:5,6,10,13,16,22 34:7,18, 21 35:3,6,22 36:4,10,14,18,23 37: 14,22 38:10,20 39:9,24 40:2,14 41:3,10,13,24 42:4,8,22 43:3,6,9, 11,19,25 44:8,18,22 45:12,21 46:9, 13,18,21 47:1,5,12,15,18 48:9,11, 15,22 49:3,11,23 50:21 51:3,7,17, 22 52:2,9,21 53:4,10,16,21 54:3,9, 16,22 55:1,14,18,23 56:1,7,12,17, 19 57:1,11,17,21 58:13,19,25 59:9, 19,22
**one** [13] 2:20 15:14 22:11 29:11 36: 9 40:11,22 49:11,14 51:21,22,24 55:14
**only** [6] 11:20 16:1 43:15 46:9 51: 22 57:5
**open** [2] 52:11,16
**opened** [1] 53:12
**opening** [2] 53:5,21
**operation** [1] 2:3
**operator** [1] 2:7
**opportunity** [1] 4:14
**original** [1] 8:21
**ostrowski** [17] 1:17,21 2:14 3:16, 16,25 4:1,9 18:24 19:5 39:4,9 40: 24 48:22 50:15 57:1 59:20
**other** [18] 3:22 6:19 7:7 9:23,19 12:23 14:7 21:8,10,16 26:18 34:3 43:11,12 52:24 53:17,21,23
**out** [16] 21:10 22:17 25:1,15 27:3 28:16 31:13 42:24 51:14 55:13,15 56:4,11,16 58:20,23
**outlining** [1] 17:17
**over** [7] 10:2 13:11 17:18 24:7,10 29:20 33:8 50:23 51:4,11 52:4
**overall** [1] 12:1
**own** [1] 39:21

### P

**pa** [3] 1:19,23,27
**page** [11] 29:20 35:15 38:7,9 42:10, 17 50:6 55:20 57:8 58:1,14
**paragraph** [4] 29:22 30:11 32:21, 24

## P.R. VIDEO, INC

stuart [2] 3:18,18
stuck [1] 26:23
stucky [4] 55:9 58:6,6,17
stuff [1] 26:21
submitted [1] 57:19
subsequent [2] 22:14,17
suggest [3] 20:17 40:6 45:13
suggested [2] 20:25 40:12
summarize [1] 30:12
summary [1] 30:21
summer [1] 52:2
summoned [1] 30:1
supervise [1] 10:8
supervised [1] 12:17
supervision [2] 10:5 13:4
supervisor [13] 5:21,22 6:2,6,18,
  19 8:3 9:15,17,25 29:3 51:2 54:22
supervisor's [1] 56:10
supervisors [6] 6:20,24 7:5 10:24
  34:4 56:5
supplies [4] 10:11,12,13,16
supposed [7] 16:12,14 28:3 33:7,
  16 47:14 55:13
surfaced [1] 14:16
swear [1] 3:5

### T

tag [1] 51:1
talked [11] 19:8 20:21 21:23 25:4,
  10 27:16 31:14 33:24 35:6 43:13
  46:11
task [1] 13:15
tat [1] 48:4
ten [2] 14:18,21
term [2] 14:6 46:13
termed [1] 31:16
termination [1] 50:5
terms [1] 57:3
testified [1] 20:22
there's [10] 5:5 11:8,8 14:15,16,18
  37:15 45:8 56:1 57:12
third [1] 38:7
thirteen [3] 17:10 18:21 44:23
though [2] 43:22 49:9
three [1] 7:6
title [3] 6:15 7:20,25
today [4] 4:2,3 24:12 26:24
together [3] 25:5 45:16 58:12
tony [3] 19:18,19 21:7
top [2] 11:16 42:9
total [1] 10:21
towards [1] 16:6
transpired [1] 37:1
trial [3] 4:23,23,24
tried [1] 25:4
truth [2] 3:6,6
try [5] 5:13 13:6 25:15 26:12 50:25
trying [2] 24:19,22
tuesday [1] 32:19
tusick [1] 7:8
two [10] 7:7 13:24 18:4 20:22 23:
  23 42:10 45:8 46:5 48:16 49:4
typed [2] 18:22 22:21

### U

u.s [1] 1:25

unclear [1] 58:18
under [2] 4:18,21
underneath [1] 10:6
understand [11] 4:3 5:3,6 11:20
  13:9 23:22,23 25:17 32:16 39:19
  59:9
understanding [7] 7:1 16:21,22
  22:23 23:15 29:1 39:20
union [1] 47:16
unit [2] 13:17 36:12
united [2] 1:1 2:8
units [1] 53:23
until [7] 18:16 19:8,13 24:11,13 34:
  21 35:12
up [15] 10:14,14 12:4 19:25 29:6,
  16 30:17 31:25 34:21 40:13 46:22
  53:12,21 56:20 57:23
upset [4] 25:20,22,23 33:1
usual [1] 3:19

### V

va [6] 5:18 9:19 10:3 13:11 14:14
  15:2
vacancies [2] 11:3 53:18
vacancy [4] 9:6 52:4,11,23
verbally [1] 5:2
verify [1] 57:13
veterans [3] 4:6,7 7:16
veterans [1] 1:11
vicinity [1] 37:8
video [5] 1:13 2:2,6,15 56:24
voice [1] 3:10
vs [2] 1:7 2:10

### W

wall [3] 54:7,9,20
walnut [1] 1:26
walton [1] 7:8
wanted [9] 26:2,4 37:4 38:11,14,
  24 39:13 49:12 52:14
ward [3] 15:11,12,16 52:19 53:7
wards [1] 52:18
warranted [1] 50:4
waxing [1] 40:13
way [5] 12:5,9 24:18 25:25 40:8
wednesday [2] 35:16 38:21
weekend [4] 12:5,10 24:16,23
weeks [2] 45:1,4
whatever [2] 30:21 44:19
whatsoever [1] 5:12
whether [4] 20:4 39:20 51:5 58:6
white [1] 16:18
whole [4] 2:24 3:1,6 54:20
whom [2] 21:20 32:8
will [5] 2:21 3:23 39:11 56:20,22
within [2] 52:12 53:8
without [3] 44:9 53:1 58:21
witness [3] 3:23 19:2
witnesses [2] 2:17 4:20
woman [1] 7:21
word [3] 30:16 37:20 49:19
work [13] 12:17 13:3,11 17:8 35:25
  36:20 37:7 40:9 44:9,12,14,15 59:
  13
worker's [3] 54:24 55:9,11
workers [2] 10:9 55:5

working [1] 36:16
worse [1] 12:22
would've [4] 33:14 45:6 50:12 56:
  15
wrap [1] 56:20
write [2] 19:25 30:17
writing [3] 17:16 26:15 31:25
written [2] 34:8,11
wrote [2] 29:6,16

### X

x's [1] 56:2

### Y

y-e-i-c-h [1] 32:22
year [1] 8:10
years [2] 7:20 59:7
yeich [5] 32:22,24 33:2,8 34:7

# EXHIBIT C

IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT

Lewis Johnson,                :1: CV-01-1873

        Plaintiff            :

    vs.                      :

Hershel Gober Et.al,          :

        Defendant            :

DATE:                    April 9, 2002

PROCEEDINGS:             Video Deposition of
                         Joseph Stuckey, Jr.

APPEARANCES:

    For the Plaintiff: Andrew Ostrowski
                       4311 N. 6th Street
                       Harrisburg, PA 17110

    For the Defendant: Kate Mershimer
                       228 Walnut St., 2nd Fl.
                       P.O. Box 11754
                       Harrisburg, PA 17108

                                            1

Harrisburg United States Attorney's
Office. I think we already have my
number and address for the record. And
just technically, the deposition started
at 11:49am. I understand there's a
difference with the computer but just
want it on the record.

    STUCKEY: I'm Joseph Stuckey,
Junior. I'm an employee at the Lebanon
VA Medical Center in Lebanon,
Pennsylvania.

    McLucas: My name is Gail McLucas
from the court reporting firm, Filius and
McLucas.

    OSTROWSKI: I'm Andrew Ostrowski,
attorney for Plaintiff.

    JOHNSON: Lewis Johnson,
Plaintiff.

    RODRIGUEZ: Very well, then we'll
begin.

    OSTROWSKI: And, we're going to
add the reserve...

    MERSHIMER: We're going to
reserve all objections other than the
form of the question and the witness

    RODRIGUEZ: Good morning ladies
and gentlemen. I'm to advise you that
the video and audio are in operation.
Today's date is April 9, 2002. Camera
time now is 11:39. My name is Albert
Rodriguez. My address is 4146 Spruce
Park, Lebanon, PA, 17046. I've been
hired by the PR Video to take this video
deposition for the Plaintiff. This case
is in the United States District Court
for the Middle District of Pennsylvania.
It is docketed at 1:CV-00-1873. Caption
is Lewis Johnson versus Hershel Johnson
Gober Et.al. The deponee is Joseph
Stuckey. Mr. Stuckey, please raise your
right hand. Do you understand that this
is a legal proceeding and do you swear to
truthfully answer the questions asked of
you?

    STUCKEY: Yes, I do.

    RODRIGUEZ: Would counsel please
identify themselves and provide their
address and phone number for the record.

    MERSHIMER: Kate Mershimer,
Assistant U.S. Attorney for the

                                            2

reserves the right to, excuse me, read
and sign.

    OSTROWKSI: Mr. Stuckey, my name
is Andy Ostrowski. We were introduced
about an hour ago when you first sat down
here. I apologize for making you wait a
little bit. We had some problems with
our copier. You understand you are here
today to give a deposition in connection
with the lawsuit that Lewis Johnson has
brought against the Veteran's
Administration of People and the people
associated with the Veteran's
Administration.

    STUCKEY: Yes sir.

    Q: Have you give depositions in
the past?

    A: Yes sir.

    Q: How are you currently
employed?

    A: I'm a Human Resources
Specialist at the Lebanon VA Medical
Center.

    Q: And how long have you held

1    A:  Approximately five years.

2    Q:  Prior to your employment with

3  the, in the Human Resources Office at the

4  Veteran's Administration in Lebanon, how

5  were you employed?

6    A:  I was employed by the VA

7  Medical Center as a cook.

8    Q:  And how long total were you

9  with the VA Medical Center?

10    A:  I now have 25 years.

11    Q:  And you were a cook for, how

12  long were you cook for?

13    A:  Approximately 20 years.

14    Q:  How did you go from being a

15  cook to working in Human Resources.

16    A:  There was an open position

17  that was posted on the bulletin board and

18  I put in for the position and I qualified

19  and was accepted.

20    Q:  What were the qualifications

21  for that position?

22    A:  You had to have typing

23  skills, skills dealing with manuals and

24  there was a list of qualifications for

25  the position.

5

1  training did you have prior to starting

2  with your Human Resources position?

3    A:  I have background as a

4  National Guards person where I was in

5  management positions, I was a union

6  representative, a union steward and a

7  past union president at the facility and

8  I also had some additional training as,

9  when I got into my position from the

10  Department of Labor in Philadelphia.

11    Q:  Okay.  That was after you got

12  into your position?

13    A:  Yes sir.

14    Q:  Well what did that training

15  involve?

16    A:  It was about a week long

17  course, I think it was like an

18  introduction to Human Resources, how to

19  process claims and things like that.

20    Q:  When you say how to process

21  claims, do you mean OWCP claims?

22    A:  Yes sir.

23    Q:  And is that, has that been a

24  responsibility of yours since you started

25  with the Human Resources?

1    Q:  Who is your current

2  supervisor?

3    A:  My current supervisor now?

4    Q:  Yes.

5    A:  Raymer Kent.

6    Q:  And how long has Mr. Kent

7  been your supervisor?

8    A:  My immediate supervisor for 5

9  years.

10    Q:  Since, at all times since you

11  have been in that position?

12    A:  Yes, yes sir.

13    Q:  So, you started in that

14  position in 1997, is that correct?

15    A:  Yes.

16    Q:  And do you have a specific

17  area of responsibilities?

18    A:  Yes I do.  I'm responsible

19  for the Workers' Compensation program,

20  I'm also responsible for Retirement

21  Estimates and Counselings, as well as I

22  handle day-to-day questions concerning

23  health insurance and benefits, along

24  those lines.

25    Q:  And what orientation or

6

1    A:  Yes sir.

2    Q:  Okay.  Can you just give me

3  an overall schedule, what's involved in

4  processing a Workers' Compensation claim?

5    A:  Okay, in October of 1998, the

6  VA Agency went to a paperless form,

7  electronic filing of the CA-1's and CA-

8  2's, as well as 7's and 8's.  They

9  weren't, at that point they didn't have

10  the interface to electronically transmit

11  them to the department of labor.

12  However, they were using them in the

13  computer to process them, to complete

14  them.  Part of that process was that the

15  employee, well actually, the employee is

16  initially supposed to report to the

17  Urgent Care Facility for initial

18  treatment.  Once they do that, the

19  employees down in Urgent Care create what

20  they call a stub file for the CA-1 or the

21  CA-2.  They ask the employee information,

22  such as the employee's supervisor, home

23  address, telephone numbers, things like

24  that.

25    Q:  Who's respon...

1  creating the stub file?

2      A:  The employees in the Urgent
3  Care Facility, the emergency room.  They
4  are responsible for creating and
5  inputting the data for the stub file.

6      Q:  Okay.  Is that all done
7  electronically?  I'm sorry to interrupt.

8      A:  Yes sir.  It's all done on
9  the computer, it's called the ASSIST
10  program, and like I said, it's a VA
11  software program.  Once the claim is
12  filed, put in the stub file, once that is
13  created, then the employee has the
14  responsibility to go in and complete
15  their portion of it.  The initial page,
16  the first page, I think it's the first 16
17  questions or so, are, the answers come
18  from directly from the employee.  After
19  the employee has done their portion of
20  that, then it automatically, an email
21  automatically gets generated to the
22  supervisor that they have listed when
23  they created the stub file and then that
24  supervisor has the responsibility to go
25  in and complete their portion of the

9

1  file, of the form.  When Mr. Johnson
2  submitted his form, again, we were not
3  electronically transmitting them down to
4  the Department of Labor so we had to
5  print them off and, on paper, and paper
6  file, actual paper copy of it, and then
7  we had to fax them down to the Department
8  of Labor.  That was the way they were
9  being transmitted when Mr. Johnson had
10  his incident.

11      A:  Okay.  Now, you said
12  something about a CA-7 and CA-8.  What
13  are those?

14      Q:  A CA-7 form is a claim for
15  compensation.  It's the initial claim
16  that gets sent in.  There's information
17  on that form such as the employee's
18  health insurance, life insurance, whether
19  or not the employee has dependants or not
20  because they need that information
21  because Workers' Compensation from the
22  Department of Labor is based on 66 2/3%
23  if they do not have dependants versus 75%
24  if they do have dependants.  So that
25  information is all submitted on the CA-7,

10

1  the initial CA-7 form.  The CA-8 form is
2  a follow-up form for continual
3  compensation and traditionally I send in
4  the form, usually every two weeks if the
5  employee is off on long term.  So that
6  enables a constant paycheck for the
7  employee from the Department of Labor.

8      Q:  Okay, and, were you going to
9  say something else?

10      A:  Yes I was.  Initially when a
11  CA-1 filed, the employee is normally
12  entitled to continuation of pay for 45
13  days and those are calendar days.  They
14  run consecutively.  But there are some
15  speculations around that continuation of
16  pay and when the agency can not pay that
17  COP.

18      Q:  Okay, now, I think I
19  understand.  The CA-1 form is a claim for
20  traumatic injury.  Is that correct?

21      A:  That's correct.

22      Q:  And a CA-2 for occupational
23  disease or more progressive type of
24  injuries.  Is that also correct?

25      A:  That is also correct.

1      Q:  And those two are initial
2  applications for benefits.  Is that…

3      A:  Those two are initial
4  applications to, initial submissions to
5  report an injury or illness.

6      Q:  They are your claim forms?

7      A:  That is correct.

8      Q:  And then, in my
9  understanding, the CA-7 and CA-8 are
10  forms that you submit during the ongoing
11  receipt of benefits to continue to
12  receive benefits?

13      A:  To continue to receive
14  compensation.  Yes sir.  The CA-7 starts
15  the compensation and the CA-8 continues
16  the compensation.

17      Q:  Okay.  And are there forms
18  3,4,5 and 6?

19      A:  There's a 2A which is a claim
20  for recurrence.  I don't think there's a
21  3,4,5, or 6 but, I'm trying to think, if
22  there are, we don't use them and if there
23  are those forms, they're not electronic.

24      Q:  So, then, I think you stated
25  that in, at the time

1  processed his claim for benefits, you
2  were using the electronic filing system
3  but you did not have the electronic
4  transmission system?
5       A:  That is correct.
6       Q:  So what would happen is the
7  employee would have to come in, sit down
8  in front of the computer, type in certain
9  information and then you would have to
10 print it out to sign and transmit.  Is
11 that?
12      A:  To sign it and fax it.
13      Q:  Okay.  Now what, what is done
14 by the employee at the time of sitting
15 down at the computer terminal?
16      A:  They input the information
17 that's on the front page of the CA-1.
18 The first of the 16 questions.
19      Q:  And the forms, let me show
20 you the documents.  Did you write 21 on
21 yours?  Let me see that document that you
22 have there.  I'm going to mark this one,
23 this March 25th 2000 correspondence from
24 Lewis Johnson to George Irvin, EEO
25 Counselor and Exhibit 21.  That you can

13

1  complete the form?
2       A:  In the hard copy there was,
3  there's nothing in the electronic copy.
4       Q:  Mr. Johnson had indicated to
5  me that on the back of both of these on
6  the hard copy, there was supposed to be
7  instructions for completing the form.  Is
8  that…
9       A:  On the hard copy I believe
10 there is instructions, yes.
11      Q:  And those instructions are
12 there for what purpose?
13      A:  To, actually to assist the,
14 an employee to fill out the forms.
15      Q:  And, how, what instru, are
16 there electronic instructions for the
17 employee?
18      A:  No, not that I'm aware of.
19      Q:  So, how, when an employee
20 comes in to sit down and then fill out
21 the forms electronically, how…
22      A:  The supervisors were all
23 given training on how to help, to assist
24 the employees to fill out the forms,
25 and/or I will offer my assistance to help

1  just set aside for the time being.  I'm
2  going to give you another document, I'm
3  going to mark it as 22.  And you had
4  docum, mark that Exhibit number 22.  I'm
5  just going to ask you to take a look at
6  that, to tell me what that document is.
7       A:  Okay, the first page is a CA-
8  2.  It's actually a receipt that Mr.
9  Johnson submitted a claim to his
10 supervisor and the bottom sheet is a CA-1
11 which also says that Mr. Johnson
12 submitted the claim for a traumatic
13 injury.
14      Q:  Okay, and these are the
15 actual, these are a page of the forms,
16 correct?
17      A:  This is the third page of
18 both forms, that's correct.
19      Q:  And, these are the actual
20 ones signed and submitted by Mr. Johnson.
21 Is that correct?
22      A:  That's correct.
23      Q:  Now the, on the form, a hard
24 copy of this form, is there instructions
25 to assist the employee and to how to

14

1  an employee fill out the form.
2       Q:  Did you have, do you recall
3  the actual processing of Mr. Johnson's
4  forms, pretty much what you're here to
5  testify about today.
6       A:  Yes.
7       Q:  He had indicated to me that,
8  that there was a Mr. Robert Dennis that
9  had contacted him to instruct him to go
10 to your office for the purpose of, of
11 processing the Workers' Compensation
12 forms.  Do you recall that?
13      A:  I don't know who, I don't
14 know if Mr. Dennis sent him to my office
15 or not.  Mr. Dennis, being a union rep, a
16 union stewart, union representative, I do
17 know that I traditionally either will
18 have the supervisor help the employee or
19 I will assist the employee to do that.
20      Q:  And is there a prescribed way
21 that it's supposed to be done?
22      A:  You have to go in under your
23 own, we have a system at the VA, it's a
24 mainframe, it's called D&CP or Vista.
25 It's a computer system where it

program is loaded onto. So once the stub file is created, any employee has the ability to go in and call up their case and complete the CA-1 or CA-2 forms.

Q: And how is that, is that password protected?

A: Absolutely. It's password protected by first of all, the employee has to submit the password to get into the D8CP or the Vista system and before the electronic signature at the end, the employee has to have electronic signature to sign off on it.

Q: And is that, how are those passwords assigned?

A: They're assigned from IRM, our Information Resource Management Service and Mr. Johnson should have had one, actually all employees have one. They're used to also do things such as request Leave, such as read mailman messages, things like that. It's our actual mainframe system at the VA.

Q: Okay, and so is there a password for each OWCP claim? Or is it

17

the employee's password that their claim is processed under?

A: It's the employee's password that the claim is processed under. The computer actually knows which employee is in there trying to get at their particular file. And it's protected in such a way that, because of the privacy, that it will not allow another employee to look at another employee's file. It will also only allow the supervisor, who is named as the employee's supervisor, to look at that file and to do any changes or any input into that file. So for example, if Mr. Johnson did not list you as his supervisor, you could not go in there and do anything to that CA-1 form or that CA-2 form.

Q: I'm going to hand you a copy of the document marked Exhibit 23. If you could tell me what that document is.

A: Yes, this is an Injured Employee's Notification of Responsibilities. It's a locally generated form that we've, that we've

18

come up with. Actually, it was already in place when I took over my current position. I just continued to use it. What it says basically is, it outlines some of the responsibilities and benefits of the Employee's Compensation Act, it also lists some of the employee's responsibilities that are outlined in a Medical Center memorandum as to their responsibility to report the injury immediately to their supervisor, to obtain medical care, and things like that.

Q: And what is the purpose, where is a copy of this document kept?

A: This particular document is reviewed with the employee whenever there's appears to be a claim that's going to be submitted to the Department of Labor for lost time or lost wages and it's kept in a file that I maintain on the individual that was injured.

Q: Okay, and who, who's responsible for making the determination that, how an initial claim for benefits

is going to be processed, meaning which, is it going to be a CA-1 or a CA-2. Who makes that determination?

A: The employee, based on the injury of the employee, that's what determines whether or not the CA-1 or CA-2.

Q: Okay. And, but who, do you understand that in Lewis Johnson's case, he originally processed, it was originally processed under a CA-1. That's correct. Who made that decision, that determination?

A: When he went down to Urgent Care, one of the questions is whether or not it's an illness or an injury. So one of the nursing staff down there would have determined at that point, based on the information received from the employee, whether or not it was a CA-1 or a CA-2. And that's what would have been entered.

Q: But at the point when Mr. Johnson, I guess he came to your office?

A: Yes.

Q: Okay, what information did you know about everything that had gone on with Mr. Johnson? As far as the background for his claim.

A: I did not know anything, what went on about the injury until I met with Mr. Johnson.

Q: And when did you meet with Mr. Johnson?

A: When the CA-1 was completed, I forget what the date is. That was the initial, that was our initial meeting when we met.

Q: I think I actually have that, I'll show you a copy of the document we marked as Exhibit 18. Do you recognize that document?

A: Yes sir.

Q: And that that is the CA-1 form that was originally processed by Mr. Johnson, correct?

A: Yes.

Q: And on the third page of that document, is a signature at the bottom. Is that your signature?

21

this alleged assault?

A: Once Mr. Johnson came to my office to complete this form, a lot of the information came as to what was, what occurred on this date. And also, then, after I did, after I got some, the police reports and after I talked with Mr. Kiscadden, and Mrs. McQuigin, then it was brought up there was some other, there was possibly another incident that occurred prior to this.

Q: Okay. And when did you talk to, get the police reports and talk to Mrs. McQuigin, and Mr. Kiscadden?

A: It was a few days after this. I was trying to round up as much information as I could. It was a few days after Mr. Johnson had completed his form because I wanted to submit everything to the Department of Labor at one time.

Q: So what is your process after a form is completed?

A: Normally, this would be all the information that we would have, along

23

A: Yes it is.

Q: Okay. And, you said that the first time you met with Mr. Johnson is when you had information about the incident, correct?

A: Yes.

Q: And would that be October 26th of 1999?

A: Yes, that's when we completed the form.

Q: Okay, now what, at the time of the completion of this form, what information did you have about Mr. Johnson's situation? The basis for his claim?

A: At this particular time, on the 26th, I was informed of the physical assault that happened to him, alleged to have happened, Done to him by a Mr. Irv Erickson.

Q: Did you know anything else, about a history of the problems between Mr. Erickson and Mr. Johnson?

A: No, I did not.

Q: And how did you know about

22

with the medical documentation that was taken during the visit down in Urgent Care. So that's normally what gets filed with the forms, just the initial medical documentation as well as this form here, or any other pertinent information that the Department might need to make a decision on a claim.

Q: And what, why were you, after the completion of this form, then you had conversations with, where you got information from the police and you had conversations with Mr. Kiscadden and Ms. McQuigin. Why were you, what were you doing during that process?

A: Because there was a lot more information that needed, that needed to be submitted with the claim itself so that the Department of Labor had the full picture of what was being alleged here.

Q: And, so who made the determination that the Department of Labor needed to have more information?

A: I normally make that decision. I mean, they're sitting down

1  there behind the desk trying to make a
2  determination about a claim based on the
3  information that I provide them.  And
4  it's my responsibility as an agency
5  representative to provide them with as
6  much information as I can concerning the
7  claim.
8      Q:  So you knew that there was
9  more to it than just the matter of the
10  one incident?
11      A:  The alleged physical assault
12  caused by another employee at 10:20am,
13  yes.
14      Q:  And what more did you know
15  was involved?
16      A:  Again, I got a copy of the
17  police reports and I read over the police
18  reports, I also read over the witness
19  statements that were provided to the
20  police.  And I submitted all of that
21  data, all that information to the
22  Department of Labor for them to use.
23      Q:  Okay.  And did you understand
24  at the time that Mr. Johnson was not
25  claiming to have been injured in the

25

1  all that information, all this, this
2  bigger story came to light.
3      Q:  Okay, well what about, what
4  did you know about Mr. Johnson not being
5  able to return to his work?
6      A:  Doctor Brinzer had put him
7  off duty.  I had known that.  And he had
8  referred him to some outpatient care at
9  Philhaven.  That was, we received a
10  letter from, I think it was a Doctor, I
11  don't recall, Doctor Picolla?
12      Q:  Picolla.
13      A:  It was Doctor Picolla stating
14  that Mr. Johnson was unable to return to
15  work at this time.
16      Q:  And what did you do after
17  learning of that?
18      A:  Again, I gathered all the
19  information that I could, and if the form
20  was not processed by then, I believe, if
21  the form was not processed by then, I
22  attached any of the information that I
23  have already been in receipt of, from
24  Doctor Brinzer's office, I attached the
25  script and the referral to Philhaven, and

1  actual assault?
2      A:  That's not what the CA-1,
3  that's not what was reported on the CA-1
4  sir, no, I did not understand that.
5      Q:  Okay, well where's the injury
6  reported on the CA-1?
7      A:  Number 13.
8      Q:  Okay, "which causes stress
9  and strain".  And who is that information
10  input by?
11      A:  Mr. Johnson.
12      Q:  But you were, despite knowing
13  that, despite seeing that, you went and
14  did additional investigation.
15      A:  I did not do any
16  investigation, I just gathered the
17  reports from the investigations to submit
18  with the claim.  If there was a physical
19  assault, the police department was
20  looking to file charges against the
21  employee.  Or, there was also some
22  concern about what developed out of that
23  as to keeping two employees apart and Mr.
24  Johnson returning to duty at some time,
25  at some point.  So, as I was gathering

26

1  all that information was put together in
2  a package to be sent down to the
3  Department of Labor.
4      Q:  And is it, the determination
5  as to whether to submit it as a CA-1 or a
6  CA-2, I mean, at the time that Mr.
7  Johnson (strike that).  At the time an
8  employee sits down at the computer, do
9  they know what form they are processing?
10      A:  Again, based on the
11  information that they received down in
12  Urgent Care, Urgent Care staff down there
13  determines whether or not it's a
14  traumatic injury or an occupational
15  illness, based on the information they
16  received.  Now Mr. Johnson did not go to
17  the Urgent Care area, as the policy
18  states for him to do.  He went to his
19  private attending physician, which was
20  Doctor Brinzer, who, that's in his
21  rights, within his rights in the Federal
22  Employee Compensation Act to do that.
23  Once I received the information from Mr.
24  Johnson as to what happened, I stated in
25  Number 13, a physical assault caused by

1 another employee, that was what
2 determined how the, which form was going
3 to be filed.
4      Q:  But the difference in
5 processing a CA-1 and a CA-2 is based
6 upon the nature of the injury.  Is that
7 correct?
8      A:  Correct.
9      Q:  And under, I mean, what's the
10 difference when you describe in terms of
11 the nature of the injury, what's the
12 difference between a claim that's
13 processed on a CA-1 versus a claim that
14 is processed on a CA-2?
15      A:. I'm sorry, I don't understand
16 the question.
17      Q:  How do you define traumatic
18 injury, such as to process a CA-1?
19      A:  The Federal Employee
20 Compensation Act defines the traumatic
21 injury and also the occupational illness.
22      Q:  And what about stress and
23 aggravation as a result of work
24 environment?
25      A:  If it's a one time

29

1      Q:  Well at that point, when it
2 came to the point of there being more
3 allegations, why, why wasn't it submitted
4 as a CA-2?
5      A:  Again, based on the
6 information in Number 13 where it was a
7 physical assault, that's what Mr. Johnson
8 was, said was the initial problem and the
9 problem.  I didn't realize that Mr.
10 Johnson had a problem with something that
11 happened prior to this date of 10/18
12 until well into this process, until
13 probably a month after this was already
14 submitted to the Department of Labor.
15      Q:  Okay, but I thought you said
16 that you were gathering information from
17 the police and from his supervisors?
18      A:  Yes.
19      Q:  You didn't learn in the
20 course of that that there was some
21 allegations of racially incentive, a
22 remark made to Mr. Johnson that…
23      A:  There were allegations, they
24 were allegations, yes.  Did I realize
25 that it affected Mr. Johnson to the

1 occurrence, which this started out to be,
2 a one time occurrence, then a CA-1 would
3 be processed irregardless if it's stress,
4 strain, a cut finger, a cut toenail.
5      Q:  And, this form does say,
6 "nature of injury traumatic mental stress
7 and strain".  Is that still consistent
8 with filing as a CA-1?
9      A:  Yes.
10      Q:  Because all you knew was
11 that, at the time, allegedly one incident
12 involved in it.
13      A:  Yes.
14      Q:  But then, during the course
15 of your gathering information, didn't you
16 determine that there was more involved in
17 it than just one incident?
18      A:  There was more allegations.
19 I don't know whether or not those
20 incidents actually took place.  But there
21 were more allegations.
22      Q:  And did you make those more,
23 those allegations part of your processing
24 of this claim?
25      A:  Yes, they were a part of it.

30

1 effect that we should have submitted a
2 CA-2?  No.
3      Q:  But you did realize that
4 there were allegations, you realized that
5 before you submitted the CA-1, correct?
6      A:  I had all the information
7 from the police reports and the witness
8 statements but I didn't realize that
9 there was, that Mr. Johnson was claiming
10 anything other than the physical assault
11 that happened on the 18th of October.
12      Q:  Okay.  Did you ask him?
13      A:  When we sat down initially to
14 complete this form, I tried to help him,
15 I tried to assist him in getting the
16 information that we needed to determine
17 whether or not this should have been a
18 CA-1 or a CA-2.  And that's what, based
19 on his comments and remarks and the
20 information that he provided, that's why
21 we submitted a CA-1.
22      Q:  Okay, and, but he didn't, you
23 said that there's no, no instructions for
24 the employee on the computer.
25      A:  No, there is not.

Q: Did you have, separately have
discussions with Mrs. McQuigin and Mr.
Kiscadden about the injuries for this
claim?

A: I did talk with Mr. Kiscadden
and Mrs. McQuigin, yes.

Q: Why did you talk to them?

A: Well, I wanted to ensure that
when I was preparing my letter to the
Department of Labor that they were aware
that we were responding and doing the
things that we needed to do as an agency
to keep the two employees separated so
that when Mr. Johnson was ready to return
to duty, he could do so as quickly as
possible.

Q: So, you realized that there
was enough of a situation between these
two employees that necessitated Mr.
Johnson being out of work and, you know,
warranted intervention before he could
return to work.  Is that fair to say?

A: Yes.

Q: Okay.  And then how long
after October 26th, 1999, which is the

33

date that you signed this, did you submit
the actual form for processing?

A: I'm not positive, but I think
it was submitted on November 1st.  And it
should have been there, there should be a
fax.

Q: Actually I have the letter
here to that I need to show you at this
point.  This is a document that we
previously marked as Exhibit 11.  Take a
moment and review that.

A: Okay, I'm familiar with it.

Q: And is this, the second page
of that letter, Exhibit 11, is that your
signature?

A: Yes sir.

Q: Now, this, what all (strike
that).  And  in submitting this claim
your controverting the claim, correct?

A: I was, I am disputing the
claim, not so much, and that's why, I'm
disputing the claim and that's why I
submitted all the information.  There's
only certain things that you can do to
controvert a claim.  And one of the

34

things that's listed in the Federal
Employee's Compensation Act to controvert
a claim is a lack of medical evidence,
lack of medical documentation.  So at
this point, I did not receive additional
medical documentation other than Doctor
Brinzer's note and because of that, I
provided all this information, plus it
was controverted based on the lack of
medical documentation this is for.

Q: Okay, so when you use the
term "lack of medical documentation",
you're saying an actual, you actually
didn't receive documentation?

A: Other than the original
script from Doctor Brinzer's office at
which I submitted with this, with the CA-
1 packet, I don't think there was very
much information from, in fact, I know
there was not very much information from
Philhaven received.  Actual sound
information, other than, I think I might
have, Doctor Picolla's letter might have
gone down with this packet, I'm unsure of
that, we'd have to look in the packet and

see.

Q: Was there information, here's
a document marked as Exhibit 12 that we
looked at yesterday as well.  That is a
release that was signed by Mr. Johnson on
October 21, 1999 releasing, authorizing
Philhaven to release information to the
VA.  It was directed to Mr. Kent.  I
mean, what more did you need to get the
information from Philhaven?

A: It's the employee's
responsibility to provide the medical
documentation.  And we received no
medical documentation from Philhaven
because of this.

Q: Why didn't you request it?

A: It's the employee's
responsibility to provide it.

Q: Well, doesn't the employee
complete his responsibility when he
authorizes a release of information?

A: No, it's the employee's
responsibility to provide it.

Q: So because Mr. Johnson did
not actually go and gather the documents

1  and collect them and put them in an
2  envelope and bring them to your office,
3  the lack of medical documentation,
4  despite the fact that the VA had a
5  release, an authorization for release of
6  information, the absence of that
7  documentation is his fault?
8     A: It's the employee's
9  responsibility to provide medical
10  documentation to support it.
11     Q: Well, what do you mean
12  provide medical documentation?
13     A: Whether he needs to ask his
14  doctor for it physically, whether he
15  needs to have them mail it to me or fax
16  it to me, it's his responsibility or his
17  or her responsibility to provide it.
18     Q: Well did you, prior to
19  November 1, 1999, did you go to Mr.
20  Johnson and say "I haven't received the
21  medical documentation?"
22     A: Mr. Johnson was informed when
23  we went over his Injured Employee's
24  Notification of Responsibilities on the
25  26th that it's his responsibility to

37

1  from Philhaven, correct?
2     A: Yes.
3     Q: And despite knowing that, and
4  you still chose not to contact Mr.
5  Johnson, you just decided to controvert
6  his claim because he didn't have the
7  documents, correct?
8     A: I have, I deal with about 200
9  claims a year. It's told, when we go
10  over the Notification of Employee's
11  Responsibility, it's their responsibility
12  to provide it.
13     Q: Have you ever contacted
14  anybody to request documentation?
15     A: No, not after the initial
16  Injured Employee's Notification of
17  Responsibility. I make them, the
18  employee's perfectly aware of the fact
19  that it's their responsibility to submit
20  it to the Department of Labor. Or at
21  least submit it to me so that I can
22  submit it to the Department of Labor.
23     Q: What is a CA-16?
24     A: That's a Department of Labor
25  form that is used by some agencies to

1  provide it.
2     Q: Why don't you answer my
3  question though.
4     A: I probably did not go back to
5  him and ask him to provide any more, I
6  don't think so.
7     Q: And yet you are going to
8  controvert his claim based on an absence
9  of documentation when any absence of
10  documentation could have been remedied by
11  picking up the telephone and saying,
12  "Lewis, are you going to provide us with
13  any documentation?" Right?
14     A: If he would have provided us
15  with the medical documentation, it would
16  have been submitted.
17     Q: If you would have asked him
18  for the medical documentation, he would
19  have had an opportunity to provide it
20  correct?
21     A: Perhaps he would have had the
22  opportunity to provide it.
23     Q: And you knew you did not have
24  medical documentation despite the fact
25  that you had a release for information

38

1  authorize treatment to a private
2  physician.
3     Q: And what is a CA-20?
4     A: A CA-20 is a report that
5  comes from the physician, I forget the
6  exact title of it, but it's a
7  physician's, Attending Physician's Report
8  of Treatment, I believe is the title.
9     Q: The document over there
10  marked as Exhibit 21, you had a chance to
11  review that before we started the
12  deposition, correct?
13     A: Yes, I did.
14     Q: He, this indicates that,
15  we'll go through it paragraph by
16  paragraph. Let's start with the second
17  paragraph. It indicates that on October
18  26th he arrived at 8:30 in the Human
19  Resources Office and indicated he was
20  there to, because of the assault. And
21  you replied, "You're here to put in a
22  claim because you were assaulted." Is
23  that…
24     MERSHIMER: I'm sorry, just for
25  the record, that "he" is Lewis Johnson.

OSTROWSKI:  He is Lewis Johnson, yes.

MERSHIMER:  Otherwise it's just going to read just as blank he and…

OSTROWSKI:  Okay.  Is that, is what he said in the first paragraph accurate, consistent with your recollection?

STUCKEY:  I'm not sure of the exact words but yes, Mr. Johnson did come to my office and we did discuss his claim and putting in for a claim.

Q:  And at that point, you said that there was, the medical, the nurses, the Medical Office, the…

A:  Urgent Care.

Q:  Urgent Care.  Urgent Care was supposed to have made a determination as to what form was to be used, but Mr. Johnson didn't go to Urgent Care.

A:  Correct.

Q:  So, in the absence in, and you said he was authorized not to go to Urgent Care, correct?  There wasn't a problem…

41

A:  Yes.

Q:  And, when you create a stub file, does that then dictate how a claim is processed?

A:  Right, whether or not it's a CA-1 or a CA-2.

Q:  And at the time Mr. Johnson came to you, what was all the information that you had about what happened to him?

A:  The initial information that's on the, that's contained on the CA-1, there was a physical assault.

Q:  But I understood that we were saying that at the time, the first day he came to you was on October 26th, 1999.

A:  Yes.

Q:  So, the first time he came to you, you didn't have the CA-1 form.

A:  That's correct.

Q:  Because that's what he was going to sit down and fill out, correct?

A:  Yes sir.

Q:  So only had, and you were responsible then for determining what form he was going to fill out?

A:  The Federal Employee Compensation Act says he can seek private attending physician.  However, our policy does state that he report to Urgent Care initially for treatment, for triage, not triage but initial evaluation.

Q:  And is that typically when someone breaks a bone or gets a cut or…

A:  That's our policy, that's what it says per policy.

Q:  Now, in, when an employee doesn't go to Urgent Care, how is that determination made as to what form to submit?

A:  Okay.  I have the ability to go into the computer and create a stub file.  So does every supervisor at our facility.  As well as the Urgent Care folks.

Q:  I missed the very beginning.

A:  I have the ability to go in there and create, I have the access to go in and create a stub file.

Q:  Did you create a stub file with respect to this claim?

42

A:  Yes.

Q:  Okay.  And, you had the opportunity when he came in to ask him questions about what happened and what he was there for, right?

A:  Yes.

Q:  Okay, then the next paragraph, is that accurate?

A:  Which one are we at sir?

Q:  The one, "I was instructed…" Yeah.

A:  Other than the fact that he stated however his computer was not yet connected but he would type the claim anyways, I don't understand what that means.  We were already up and running with the ASSIST program for one year.  Again, I told you earlier that we initiated it in October of 1989…

Q:  '98.

A:  I mean, I'm sorry, yes, '98 and this being October '99, we've already had it in place for one year.

Q:  But you still couldn't do the submission electronically?

1  A:  We could not do the
2 electronic submission, that's correct.
3  Q:  Then the next paragraph, he
4 references concerning the CA-1 form, "I
5 was given a form CA-1 Revenue," or
6 whatever that is, "Revised November
7 1989."  What is that form?
8  A:  If Mr. Johnson completed the,
9 once Mr. Johnson completed his CA-1 form,
10 I printed it out for his signature and I…
11  Q:  Okay, is that CA-1 Revised
12 November 1989, is that the last page of
13 the CA-1 form?
14  A:  No, it's the first, actually
15 it's, the three pages of the CA-1.
16  Q:  Right but you know he's
17 talking about the document that was
18 already signed.
19  A:  Oh, I'm sorry, yes, this is,
20 you're right, you're correct, yes, it is
21 the third page.  That would've been the
22 receipt saying that Mr. Johnson has filed
23 a CA-1 form with the agency.  And that's
24 for his protection so that someone can't
25 say it was buried in someone's desk and

45

1 it was never submitted.  You have
2 timeframes in which to send, in which to
3 file claims with the Department of Labor.
4 So this is a receipt so to speak that he
5 filed a claim with the agency.
6  Q:  And then, from the bottom of
7 that first page, over onto the top of the
8 second page, "Mr. Stuckey informed me
9 that he would run the forms over to my
10 supervisor, Rodney Kiscadden, for his
11 signature."  Is that accurate?
12  A:  Right.
13  Q:  Now why, what's the purpose
14 of going over to have the Supervisor sign
15 the forms?
16  A:  I have to have signed forms
17 of the CA-1's before I can fax them down
18 to the Department of Labor.
19  Q:  Aren't you, isn't one of the
20 requirements also to have a narrative
21 summary of what went on?
22  A:  It's not a requirement, no.
23  Q:  Now, on the second paragraph
24 on the second page, the first full
25 paragraph, it indicates that "Mr. Stuckey

46

1 should have given me the form to complete
2 and submit to my immediate supervisor."
3 Is that accurate?
4  A:  That is not accurate.  As I
5 told you before, we were already using
6 the ASSIST program for one year and that
7 was the VA's determination to use that
8 system and that was the new system that
9 they were using.  We were not using paper
10 forms any longer.
11  Q:  Okay.  Now, excuse me, the
12 second full paragraph on that page talks
13 about John Snidely contacting Ray Kent to
14 explain the nature of the injury and to
15 recommend a treatment.  Did you, were you
16 aware that Mr. Kent had spoken with Mr.
17 Snidely?
18  A:  Yes, I was.
19  Q:  And how did you become aware
20 of that?
21  A:  Mr. Kent called me into his
22 office to discuss it.
23  Q:  And when did he call you in
24 his office to discuss it?
25  A:  I don't know the date.  It

1 was, it was, I don't know the date.
2  Q:  Was it before Mr. Johnson
3 came to you?
4  A:  I don't recall, sir.  We had
5 numerous discussions concerning the case
6 and I just don't recall if it was before
7 or after Mr. Snidely, or after Mr.
8 Johnson came to my office.
9  Q:  So you can't say whether it
10 was before or after, you simply don't
11 recall?
12  A:  That's correct, I can't say
13 for sure, no.
14  Q:  What did, you said that Mr.
15 Kent called you to his office?
16  A:  Yes.
17  Q:  When Mr. Kent called you to
18 his office, what did Mr. Kent say?
19  A:  To the best of my
20 recollection, we discussed, I think he
21 informed me that Mr. Johnson had, was
22 going to file a claim because of the
23 incident that happened with Mr. Erickson
24 and basically gave me a brief outline of
25 what happened.

47

Q: And said that Mr. Johnson was going to file the claim?

A: Well, that's what the normal procedure is, I mean, if it was a Workers' Comp and Mr. Johnson was out on lost time, which is what he was, and he could not return to work, he would, he would be required to file a form with the Department of Labor.

Q: Okay, now, what I want to focus in on is, I'm trying to get as specifically as you recall what that conversation was with Mr. Kent. And you said that Mr. Kent said that Mr. Johnson was going to file a claim. Is that correct?

A: That was somewhat adlib, I don't recall, I don't recall the exact words or the exact things that happened on each day that Mr. Kent and I discussed this claim.

Q: But you do, I'm sorry, did I?

A: I just said "claim"

Q: I'm sorry to interrupt you. But you did, are you clear that Mr. Kent

49

that he spoke with Mr. Snidely?

A: Again, Mr. Kent and I had several conversations concerning this case, so I don't recall specifically what was said. He probably just gave me a background of what was happening and what the conversation was from Mr. Snidely from Philhaven.

Q: Was there any separate discussion about Mr. Johnson, Mr. Johnson's employment or anything like that?

A: No.

Q: If you could just kind of go through and tell me everything that you've ever talked about with Mr. Kent, well not everything you've ever talked about, let's keep it limited to this 1999 timeframe. Everything, all the conversations that you had with Mr. Kent about Lewis Johnson or this claim?

A: Mr. Kent and I would probably just have discussions concerning what was happening in the status of the claim. Mr. Snidely was making contact with Mr.

called you in to talk about it?

A: Absolutely.

Q: And after Mr. Johnson spoke with you and filled out the CA-1, did Mr. Kent have any reason to call you in?

A: After we had filled out the form?

Q: Yes.

A: No, there was no reason for him to call me then.

Q: So, based upon this review of these facts, does that refresh your recollection at all as to whether Mr. Kent contacted you, called you in before Lewis Johnson had come to your office about submitting a claim?

A: It would be my best recollection that it was probably before Mr. Johnson and I spoke, since there was such a big time period between the time Mr. Snidely called and the time of October 26th when we filed the claim.

Q: And what else did you and Mr. Kent discuss during the first time that you talked about it, when he told you

50

Kent and was not talking directly with me, so when Mr. Kent heard from Mr. Snidely, he relayed that information to me so that I was aware of what was going on.

Q: And what else did you and Mr. Kent talk, you said you talked to him several times, I think was the word that you used.

A: Besides the progression of the case, such as getting the police reports, the things like that that were being, that were going to be submitted for the claim.

Q: And then, let's continue on then with Exhibit 21. Well now before we do that, the time when you spoke with Mr. Kent about him speaking with Mr. Snidely, did you discuss, in what detail did you discuss what Mr. Kent had talked to Mr. Stidely about, or Snidely?

A: It was information again about Mr. Johnson returning to work and to make sure that we had the employees were going to be separated and what we

1  were going to have in place, or what
2  management was going to have in place to
3  make sure that there wasn't going to be
4  any further confrontations or any of them
5  two individual employees getting
6  together. We were going to try to keep
7  them separated as much as we could.
8      Q: Now, down in the following
9  paragraph, that would be the last full
10  paragraph on that page, "Beginning on or
11  about November 23rd, 1999", do you recall
12  meeting with a gentleman by the name of
13  William Dumas?
14      A: Yes.
15      Q: And tell me about what you
16  recall?
17      A: Mr. Dumas and Mr. Johnson
18  came into my office several times and
19  again, we always had conversations
20  relating to Mr. Johnson's claim.
21      Q: Okay, and did you understand
22  why they came to your office on that
23  date?
24      A: I remember them coming to my
25  office, again, several times, and I'm not

53

1  sure if this, if November 23rd was the
2  date or not that they came to my office,
3  but if they did come to my office on that
4  particular date, it was, we probably
5  talked about the controversion as listed
6  here.
7      Q: Now, did he, he does have a
8  couple of, he being Lewis Johnson, and
9  this is his narrative statement, a couple
10  of quotes that appear to be attributed to
11  you. And one is that the controversion
12  was "a Philadelphia OWCP controversion."
13  That should be a closed quote there I
14  guess. Is that?
15      A: I don't know what he was
16  getting at during that, that sentence.
17  If there was a controversion done on the
18  claim, it would have gone down to the
19  Regional Office of the Department of
20  Labor which is in Philadelphia. If
21  that's what he's getting at, that
22  would've been correct. It would've been
23  submitted to the Department of Labor in
24  Philadelphia, the Regional Office.
25      Q: Right, but…

54

1      A: This is where the claim was.
2      Q: I think what, and I'm purely
3  speculating based upon the language, but,
4  he appears to be saying that you told him
5  that it was OWCP in Philadelphia that was
6  controverting the claim and not you.
7      A: They are the ones that make
8  the decision on the claims. I do not. I
9  do not make a decision whether or not the
10  claims are accepted or denied. The
11  agency does not.
12      Q: Well why in your November 1,
13  1999 correspondence, Exhibit 11, I think
14  I have it for you there, okay in the
15  first paragraph, the last sentence, you
16  say, "This claim is being controverted
17  based on the information obtained during
18  a review of the incident."
19      A: Again, controversion, I
20  probably should have used the word
21  "disputed" which is now in the new
22  software versus "controverted" because
23  again, the Federal Employee's
24  Compensation Act, FECA, only allows
25  certain reasons to controvert a claim.

1  So, the language in this letter probably
2  should have said "disputed" or
3  "questioned" versus the word
4  "controverted."
5      Q: Okay, well what will, in any
6  case…
7      A: It's the agency's
8  responsibility to make the Department of
9  Labor aware of any inconsistencies or
10  anything that we feel they should have,
11  pertinent information about the claim.
12  It is the agency's responsibility to do
13  that because we are their eyes and ears.
14  They just sit there and decide the claim
15  based on the information that's submitted
16  to them.
17      Q: Now, what was your basis, I
18  mean you say this claim is being
19  controverted based on the information
20  obtained during a review of the incident.
21  What is that?
22      A: The allegations made by Mr.
23  Johnson, and those are the witnesses and
24  things that were obtained in the police
25  report were all sent down with this

letter. So all that information, I would
have expected the Department of Labor to
look at and review all that information.

Q: Well, but I'm asking you what
you were referring to when you said "This
claim is being controverted based on the
information obtained during a review of
the incident?"

A: And again, it's all the
information from the witnesses, the
witness statements, the police report and
all the information that was sent down to
them. And the proper word should have
been probably "disputed" versus
"controverted."

Q: Well, what in that
information were you disputing?

A: The allegations made by Mr.
Johnson and those from the witnesses were
different.

Q: Okay. What in particular do
you recall as being different?

A: The actions of the two
employees that were involved for one, the
police report that did not substantiate

57

everything that was said or alleged.

Q: Now, during this period of
time did you have a statement from a Barb
Yike? Do you recall?

A: I believe so, yes.

Q: Okay, and what was her, how
did her statement conflict with what Mr.
Johnson said?

A: The information that was in
her statement, I believe was
substantiated some of the allegations of
Mr. Johnson. The wording was different
but it did substantiate that something
allegedly happened on that, between those
two individuals on that unit.

Q: Okay. And what information
that Mr. Johnson provided hadn't been
disputed, was not consistent with what
anything, what anybody else had said?

A: Again, the statement of Mr.
Erickson, the wordage, some of the
wordage that Mr. Johnson stated in his
witness statement versus what witness
statements were from Mr. Erickson, I
think that's pretty much what I used as

58

basis.

Q: So, you believe Mr. Erickson
over Mr. Johnson?

A: No, I wanted the Department
of Labor to understand and have
everyone's witness statements, and make
the determination themselves. I did not
believe anyone over anyone.

Q: Well you were disputing
something. You were obviously…

A: I was disputing the disparity
in the witness statements and the
statements, yes.

Q: And doth saying that you
believe the white witness over the black
witness?

STUCKEY: No…

MERSHIMER: Objection to the form
of the question.

OSTROWKSI: Maybe, the only thing
I've heard you say that you're disputing
is that Mr. Erickson said one thing, Mr.
Johnson said another.

A: It's not in my place to be
the judge of whether or not the claim is

accepted or denied. It's just in my
place as an agency representative to
submit all the information that I have
concerning the case.

Q: Wait, I thought you said, I
thought you specifically said, you're
responsibility is to make an evaluation,
give a recommendation.

A: It's the agency's
responsibility to submit the information
and suggest to the Department of Labor or
to point out irregularities or all the
information that we know at the agency,
but again, it's by no means my, or the
agency's responsibility to determine
whether or not the claim is accepted or
denied.

Q: And the only irregularity or
disparity that you were able to tell me
about is the disparity between the
alleged perpetrator's statement and Mr.
Johnson's statement?

A: And the police found in their
investigation, found no grounds for
criminal arrest of any of the individuals

59

1  and just the information that was there
2  as a whole.  I mean, after I reviewed
3  everything.
4      Q:  Now, did you talk to Mr. Kent
5  about your controversion or dispute of
6  Mr. Johnson's information before you
7  submitted the October or November 1st,
8  1999 letter?
9      A:  I don't recall if I did or
10  did not talk to him about it.
11      Q:  Were you, were you aware at
12  the time that Mr. Johnson had a pending
13  EEO complaint arising out of his non-
14  selection for a Housekeeping Aide
15  position back in 1998?
16      A:  I, I don't know if I was
17  aware of it at that time or not.
18      Q:  Were you aware that he had
19  filed an EEO complaint about (strike
20  that).  Were you aware that he had
21  commenced EEO proceedings regarding the
22  Irvin Erickson incident?
23      A:  Eventually I was notified by
24  Mr. Irvin from the EEO who had some
25  questions for me, yes.

61

1  controverting the claim because
2  "something was amiss".  Did you say that
3  to Mr. Dumas and Mr. Johnson?
4      A:  I might have said words to
5  that effect, yes.  I'm not sure if those
6  are the exact words I used.
7      Q:  But if that fairly
8  characterizes what you said, what was…
9      A:  There was some disparity,
10  yes.
11      Q:  And is that anything more
12  than what we've already talked about?
13      A:  No.  No.
14      Q:  And there was no, did you say
15  anything at that point that "well,
16  because you didn't give me medical
17  documentation" or anything?  Rate that as
18  an issue?
19      A:  I don't recall on that
20  particular date.  It might have surfaced
21  that day also.
22      Q:  And then it says that they
23  requested to have the CA-1 withdrawn and
24  an explanation to OWCP and have a CA-2
25  submitted for benefits and that you

1      Q:  Now, about either of those
2  complaints that, out of the Housekeeping
3  Aide non-selection or the matter
4  regarding Irvin Erickson, were you aware
5  of either of those, can you say one way
6  or the other as of November 1, 1999?
7      A:  I would say, at that point,
8  November 1, 1999, I would not have been
9  aware of that.
10      Q:  What facts were you thinking
11  about that made you make that
12  determination?
13      A:  Because of how quickly we
14  filed the claim, October 26th to November
15  1st.  I don't know why that would have
16  ever surfaced, an EEO, excuse me, the
17  fact that he was pursuing any EEO
18  avenues, I don't know why that would have
19  surfaced to my office.  I don't normally
20  deal with that.  I normally deal with
21  Workers' Comp and Retirement.
22      Q:  Now, back to Exhibit, bear
23  with me here, that Exhibit on page 2, in
24  its last full paragraph, it indicates
25  that Mr. Stuckey explained OWCP was

62

1  refused to submit the CA-2.  Did you have
2  a discussion of that nature?
3      A:  It was my belief yet, that, I
4  guess I'm using these dates as reference,
5  it was my belief yet if we had this
6  conversation on this day, that I still
7  believe that we filed the correct form.
8  And I still believe to this day that the
9  CA-1 was the correct form to use.  To
10  further substantiate that I did notify, I
11  did have contact with Mr. Anthony McFeely
12  and discussed the issue after this date,
13  and I don't remember the exact date I had
14  that discussion with Mr. McFeely, the
15  claims examiner.  And he substantiated
16  the fact that he thought that we had
17  submitted the proper form, the CA-1 form.
18      Q:  Okay.  Who's Mr. McFeely?
19      A:  He's the claims examiner that
20  handled the CA-1 decision, the decision
21  on the CA-1 form.  Claims Examiner,
22  Department of Labor.
23      Q:  And he denied the claim,
24  right?
25      A:  Eventually it was denied,

1 yes.

2      OSTROWSKI:  Now, just, if I can

3 just do it in general terms, if you

4 suppose that on day 1, the male

5 supervisor says to the female employee,

6 if you go to bed with me, you know, I'll

7 give you a promotion.  And then, on that

8 day she reports something to another

9 supervisor that she objected to that

10 concern, then the following three days

11 she was forced to work in the same

12 environment as that, that supervisor and

13 then on the fifth day the supervisor

14 approached her and threatened her not to,

15 not to say or do anything more about what

16 she had done.  And then on the sixth day

17 that employee comes to your office to

18 file an OWCP claim, claiming stress and

19 strain.  What would you recommend to her

20 as far as what form to file?

21      MERSHIMER:  I'm going to object

22 to that question, the form of the

23 question, that is just so long, so many

24 parts, and hypothetical.  I mean he can

25 answer it but I'm just putting that

65

1 objection on the record.

2      OSTROWSKI:  Okay.

3      STUCKEY:  I would probably ask

4 the employee some additional questions to

5 try to get some more  background, some

6 more information but if it was over a

7 period of time, if this happened over

8 more than one time, traumatic injury is

9 one time, if it happened more than one

10 time, the stress that he or she felt, it

11 would have been probably a CA-2

12 submitted.

13      Q:  Then it goes down to the last

14 paragraph on Page 2 on Exhibit 21, you

15 recall there being a subsequent

16 discussion with Mr. Dumas and Mr. Johnson

17 and yourself?

18      A:  Again, there several

19 discussions with Mr. Dumas and Mr.

20 Johnson and myself, yes.  But again,

21 based on the information here, they said

22 it was November 30th, on or about that

23 time we had a discussion concerning the

24 CA-7.

25      Q:  Did you, what was that

66

1 discussion?  What can you tell me about

2 that discussion?

3      A:  What I told them at that time

4 was this.  The A-7 form, I don't,

5 traditionally I don't submit the CA-7

6 form until the claim has been

7 adjudicated, one way or the other.  I

8 don't do it because what traditionally

9 happens is the CA-7's sit down with the

10 Department of Labor and they get pushed

11 under a pile and then when the claim is

12 accepted or denied, well when the claim

13 is accepted, when they go for payment of

14 that form, they traditionally do not

15 have, they do not go back in the file and

16 look for any CA-7's or CA-8's that were

17 submitted.  So what I found to be a lot

18 easier for the employee and a lot faster

19 for the employee to receive compensation

20 was to wait until the claim was accepted

21 or denied, actually accepted again, I

22 apologize.  To wait for the claim to be

23 accepted and then submit the form to them

24 so that they have them and everything is

25 right there on their pile and they know

67

1 exactly what's in front of them and for

2 compensation purposes.

3      Q:  And is this, there was a

4 statement at the bottom of that page.

5 Mr. Stuckey again told me "the claim was

6 being held off by Philadelphia".

7      A:  The claim gets decided by the

8 Department of Labor at the Philadelphia

9 Regional Office, period.

10      Q:  But did you indicate that it

11 was being held up?

12      A:  By being held up I meant they

13 have not made a decision.  That's what I

14 probably would have told them.  They did

15 not make a decision yet.

16      Q:  Is there a normal or average

17 turnaround time in processing a CA-1

18 claim?

19      A:  No.  The Department of Labor

20 I think has standards but they're really

21 way out there, I mean they're, they can

22 take forever to adjudicate one.

23      Q:  And, if you can tell me, in a

24 number of claims where you have made a

25 controversion recommendation, or have

1 disputed the claim, what percentage of
2 those cases have your recommendation been
3 gone with?
4      A:  Not having exact, not having
5 the records in front of me to research, I
6 would say probably fifty fifty.  And
7 again, that's based on information that I
8 provide them to look at the claim.  It's
9 not unusual for them to go back to the
10 employee once, maybe twice, sometimes
11 three times and ask them additional
12 information.  To try to seek additional
13 information from the employee.  So it's
14 been my practice to try to get all the
15 information to them so that they can make
16 a determination right up front.  Because
17 we're talking about employees that don't
18 have money here.
19      Q:  Okay.  Do you need a break or
20 anything?
21      A:  No, I'm fine.
22      OSTROWSKI:  Anybody?  Well why
23 don't we take five minutes.
24      RODRIGUEZ:  We're going to take a
25 break.  The time now is 12:53, video is

69

1 the right times.
2      Q:  So that quote is just flat
3 wrong?
4      A:  Yes.
5      OSTROWSKI:  Then, the next
6 sentence, Mr. Dumas asked Mr. Stuckey
7 about the need for additional medical
8 reports at which Mr. Stuckey replied,
9 "Lewis has failed to provide me with any
10 medical reports."  Did you state that?
11      MERSHIMER:  Excuse me, for the
12 record, it says, "Lewis has failed to
13 provide me with any additional medical
14 reports."
15      OSTROWSKI:  Oh, I'm sorry, I
16 didn't, my oversight.
17      STUCKEY:  I would guess that I
18 said that if I didn't have the medical
19 documentation, yes.
20      Q:  And (strike that).  Let's
21 move down to the next paragraph.  It says
22 that the Federal Employee's Compensation
23 Act states that he's supposed to be
24 informed of any controversion of his
25 claim and detail of why it's being

1 being suspended.
2      MERSHIMER:  It's really 1:02, but
3      OSTROWSKI:  When we go back on,
4 just say what the video shows and then
5 what the clock shows because our video is
6 off and that's the problem.  Okay?
7      RODRIGUEZ:  We are now resuming
8 video.  Camera time is 1:14.  Actual time
9 is 1:25.  Please begin.
10      OSTROWSKI:  Okay, thank you.
11 Sorry, it took longer than usual there.
12 Had to make copies of some things again.
13 Let's continue on with Exhibit 21, the
14 March 25th 2000 correspondence that Mr.
15 Johnson sent to Mr. Irvin.  The second
16 paragraph, no, let's stick with that
17 first paragraph on page 3.  It indicates
18 in the middle of the paragraph that you
19 stated that you thought it may be the
20 wrong form but it's okay, there will not
21 be a problem with that.  Did you have
22 that, did you make that statement?
23      A:  No, that's not correct.  As I
24 stated earlier, I still contend to this
25 day that we submitted the proper forms at

70

1 controverted.  Is that accurate?
2      A:  I'm not exactly sure if it
3 does say that, but again, we go back to
4 the, to the usage of words.  The Federal
5 Employee's Compensation Act does outline
6 what a controversion, for what reasons a
7 claim can be controverted.  I don't know
8 if it says, if it does say that the
9 employee needs to be notified.
10      Q:  Okay.  That whatever the
11 regulations say about that is what
12 governs it?
13      A:  It's what governs it, yes
14 sir.
15      Q:  Now the following paragraph
16 indicates that there was an additional
17 encounter between you, Mr. Johnson and
18 Mr. Dumas on December 13th 1999.  Do you
19 have a recollection of that?
20      A:  Not that particular date but
21 again, we did have several conversations.
22      Q:  And, the notion of
23 controversion, is that, under the
24 regulations, and again the regulations
25 will be the authority on the issue, but,

1  do the regulations provide for
2  controversion?
3      A:  Yes.
4      Q:  And, who, under the
5  regulations, makes the controversion
6  decision?
7      A:  I think the agency, if I'm
8  correct, I believe the agency has the
9  right to controvert, which goes back to
10  the continuation of pay and, excuse me,
11      Q:  The agency in this case being
12  the VA?
13      A:  Lebanon VA Medical Center.
14      Q:  And why, I mean, wasn't, you
15  said before that you're November 1st 1999
16  letter, Exhibit 11, was not an actual
17  controversion.  Is that…
18      A:  It was controverted based on
19  the fact that I didn't have the medical
20  documentation.  What I was outlining was
21  actual more of a dispute or more of a
22  dispute than anything.  More of a, what
23  word am I looking for, I was more or less
24  disputing it more than anything, or at
25  least making them aware of the

73

1  he didn't know before November 30th 1999
2  that his claim was being controverted?
3      A:  I don't recall informing Mr.
4  Johnson that it was being controverted
5  before this date.
6      Q:  Before what date?
7      A:  Before…
8      Q:  November 30th 1999?
9      A:  Yes.
10      Q:  Why?
11      A:  I don't know why.  I don't
12  have a reason.  I don't have an
13  explanation.
14      Q:  Okay.  Is there any practice,
15  normal practice that you have when you
16  are controverting a claim?
17      A:  Normally I notify the
18  employee.
19      Q:  In what period of time?
20      A:  As soon as I determine based
21  on the information I received from, the
22  information that goes back and forth with
23  the employee and myself, as soon as I
24  determine that there is a reason for
25  controversion, such as not having medical

75

1  information that was…
2      Q:  But you, you, as a
3  representative of the agency, the agency
4  can controvert.
5      A:  Yes and that again, we can
6  controvert it and that's what authorizes
7  us not to pay the Continuation of Pay,
8  which is the first 45 days of pay.  That
9  comes out of the agency's operating
10  budget.  Just like an employee that was
11  working every day that they missed.
12      Q:  And this was a CA-1 so the
13  whole Continuation of Pay issue would
14  have been…
15      A:  Relevant.
16      Q:  Relevant, yes.  And in doing
17  this, then you were saying that you
18  weren't going to continue Mr. Johnson's
19  pay, correct?
20      A:  That's correct.
21      Q:  And then if the regulations
22  provide that within ten days
23  controversion the employee is supposed to
24  be noticed, or (strike that).  Why
25  didn't, why didn't Mr. Johnson know, if

74

1  documentation, so on and so forth.
2      Q:  And what's the purpose of
3  notifying the employee of those reasons?
4      A:  I don't know what the Act,
5  what the reasons for the Act were.
6      Q:  Well, what do you understand
7  the purpose to be?  Is it so in case
8  there's issue, factual information that
9  was missed, the employee has an
10  opportunity to provide it then?
11      A:  Yes, I would, yes, I would
12  agree with that.
13      Q:  And you said you just have no
14  reason to explain why you didn't notify
15  Mr. Johnson of that?
16      A:  I do not, no.
17      Q:  Did anything that Mr. Kent
18  say to you have anything to do with your
19  controversion or failing to notify Mr.
20  Johnson of your controversion?
21      A:  I probably discussed the
22  issue with Mr. Kent.  I would imagine I
23  would have.
24      Q:  And what did he say?
25      A:  Not, again, not remembering,

1 I mean, totally remembering
2 conversations, I would assume that if I
3 sent the letter, if I sent a letter to
4 the Department of Labor that Mr. Kent
5 supported that decision to do that. May
6 I just state that the official of the
7 OWCP record is maintained by the Office
8 in Philadelphia. And when I allowed Mr.
9 Johnson and Mr. Dumas to look at the
10 record that I had on file in my office,
11 what that is is anything that I processed
12 to the Department of Labor, that was not
13 the official record. The official record
14 is maintained by the Department of Labor.
15     Q: Well what was your purpose in
16 wanting to clarify that?
17     A: I didn't have anything to
18 hide from the two gentlemen that were
19 asking for information.
20     Q: Okay. I'm just reviewing,
21 I'm on the, it might have been the
22 paragraph that we were on, December 13th
23 1999. Let me go through it here. Is
24 there, there was some mention in the
25 paragraph beginning "On or about December

77

1 back to earlier testimony where I said
2 that's the employee's responsibility to
3 provide that medical documentation to
4 support his claim.
5     Q: Look at document, what's the
6 last one that I marked, 23. I'm going to
7 give you a document marked as Exhibit 24.
8 Does this document bear your signature?
9     A: Yes it does.
10     Q: And it's two thirds of the
11 way down the page under a signature of
12 witness, Joseph, is it R, Stuckey?
13     A: Yes.
14     Q: How, what was the purpose of
15 this document?
16     A: After several meetings with
17 Mr. Johnson and Mr. Dumas, and we had the
18 discussion concerning medical
19 documentation and the lack of submission
20 of that documentation. I think I, well I
21 know I asked Mr. Johnson to sign a
22 release of information from, for
23 Philhaven for his records so that I could
24 submit that with, I believe at this point
25 we were going to start and start to

1 13th 1999", that the controversion
2 decision is supposed to be a supervisor's
3 decision as opposed to your decision, is
4 that…
5     A: The agency representative.
6 An agency representative.
7     Q: Any agency representative?
8     A: That's what the law says.
9     Q: Now I'm in the last paragraph
10 on that page and you might have been
11 doing what I was doing you, it says,
12 "Indicated in the controversion letter
13 that I failed on several occasions to
14 provide him with the requested release of
15 information form." Did you, I'm looking
16 through the November 1st 1999 letter.
17 Did you ever say to Mr. Johnson in any
18 form that part of your decision was based
19 upon him not providing you with the
20 release of information form?
21     A: Yes, I'm, oh, I'm sorry. I
22 don't think I ever addressed the Release
23 of Information Form. I just addressed
24 the medical issue form. There was no
25 medical documentation. Again, I'll go

78

1 submit the CA-2 form. Because it is
2 dated twelve twenty-eight.
3     Q: What did you do with this
4 form after Mr. Johnson signed it?
5     A: It was faxed over to
6 Philhaven for the release of his medical
7 records.
8     Q: Faxed by who, you?
9     A: Yes, I would assume it was
10 faxed by myself. I believe what actually
11 took place is that there was probably a
12 telephone conversation to someone at
13 Philhaven to request medical
14 documentation and then it looks like
15 Philhaven faxed this form to me,
16 completed it and faxed it to me for
17 signatures from Mr. Johnson and myself so
18 that we could get it back over to
19 Philhaven so that they could release his
20 documents.
21     Q: Now was that the same
22 information that was used for the CA-1?
23     A: This information was, this
24 was requesting all medical documentation
25 that Philhaven had on Mr. Johnson.

Q:  You were requesting that Philhaven provide it to you?

A:  Provide it to me for processing to the Department of Labor.

Q:  Now why, I mean, before, here's you doing what you didn't do back in the CA-1, right?

A:  Because of the actions and the confrontations that we had, not confrontations, but the discussions that Mr. Dumas and Mr. Johnson had with me, again, somewhere along the line, I'm not sure if this, if I was contacted by Philhaven or if I contacted them or if this is what was necessary to process his, the claim to the Department of Labor.  But somewhere along the line, Mr. Johnson was well aware that he needed medical documentation and Mr. Dumas, that they need medical documentation to submit with the CA-2.  Somewhere, I'm not exactly sure at this point again, it's been a couple years, what transpired, but this form was needed by Philhaven to release those documents.

81

took it over to the supervisor?

A:  Absolutely not.  Mr. Kiscadden's signature is at the bottom. The only way that you can get an electronic signature on that form is to fill it out, is to have the supervisor complete it under his codes.  I can not sign for Mr. Kiscadden.  If I were to have filled this form out, it would have my signature on it, electronic signature.

Q:  But, how do you know that's an electronic signature?  I mean there's all kinds of…

A:  At number 37, because I know how the program works, because I had training in the ASSIST program and that is an electronic signature.  That's directly related to the ASSIST program and the way this form's filled out.

Q:  Well how about on the first page, that "See Attached" down at the bottom where it says "Witness Statement", is that electronic?

A:  The name of the witness is submitted by Mr. Johnson at number 16.

Q:  Okay, and they were really directed to you?

A:  Yes, they were.

Q:  And in doing that, in Mr. Johnson in that instance, signing that form and authorizing the release of that information to you, he had done everything that's required of him under the regulations or the rules governing the process, right?

A:  Yes.

Q:  One issue on the, I think it was Exhibit 18, yeah.  You have that?

A:  Yes.

Q:  On the second page at item 34, it states, "Does your knowledge of the facts about this injury agree with the statement that the employee and their witness?"  And it says, "yes."  So that, I mean why did you say, it's not, this is the form that's filled out, it's the second page of the CA-1 and it's the form that's completed by the supervisor.

A:  Right.

Q:  But you completed it and you

82

Q:  But then it says "See Attached."

A:  I wrote that "See Attached" because I had a witness statement from Ms. Yiche.

Q:  Okay, and up in the middle of the page there's an arrow that's pointing a signature from there, from the signature line down to another line.  Is that, that's someone wrote in, right?

A:  That's my arrow because Mr. Johnson signed the form at the wrong spot.

Q:  And the handwriting typecode 75700 or Source Code 0280?

A:  That's my manual, that's codes that are used by the Department of Labor that I had to manually place onto the form prior to some of the software patches and the improvements to the ASSIST program which I don't have to do that any longer.

Q:  But then over on the second page, I thought that earlier you had said that you actually took this over to Mr.

1  Kiscadden to get him to sign?

2      A:  I took the, once Mr.

3  Kiscadden completed his portion, the

4  Human Resources printer was the only one

5  that was set up to take these forms off,

6  out of the ASSIST program.  So what, once

7  Mr. Kiscadden completed his form, I had

8  to manually print it out on the Human

9  Resources printer and I hand-carried it

10 over to Mr. Kiscadden to sign so that I

11 could fax it over to the Department of

12 Labor.

13     Q:  And so that's his signature

14 on the second page?

15     A:  That is his written signature

16 with the electronic signature code, "ES"

17 in front of Kiscadden, signifying

18 electronic signature.

19     Q:  Okay.  Were you trying to

20 tell me before that that, the handwritten

21 portion or what looks like handwritten

22 was an electronic signature?

23     A:  No, I was not.  This portion

24 here, where it says,

25 "/ES/Kiscadden/Rodney", in front of his

85

1  handwritten signature is an electronic

2  signature code in the ASSIST program, run

3  through DACP/VISTA.  Sorry, if I implied

4  that I did not mean that.

5      Q:  Okay.  But then, so at the

6  time this signature, this form was signed

7  by everybody, the statement was made that

8  at number 34, "Does your knowledge of the

9  facts about this injury agree with the

10 statements of the employee and/or

11 witness?"  "Yes."

12     A:  That was the form signed by

13 Mr. Kiscadden, yes.  He agreed to, the

14 information that he had, that he had, was

15 to the best of his knowledge true.

16     Q:  And then it says at number

17 35, "if the employee agency controverts

18 continuation of pay, state the reason in

19 detail."  Nothing indicated there.

20     A:  And again, this is the form

21 that the supervisor would only have input

22 and he did not controvert continuation of

23 pay.  I did as the agency representative.

24     Q:  And you did that after having

25 discussions with Mr. Kent about the

86

1  matter, right?

2      A:  Yes.

3      Q:  Where is this whole notion of

4  you being the agency representative

5  spelled out?

6      A:  I guess it's unwritten,

7  something unwritten because FECA doesn't

8  determine what an agency, they might by

9  definition determine what an agency

10 representative is.  I don't know what the

11 agency representative definition for the

12 Federal Employee's Compensation Act is.

13 But I run the Workers' Compensation

14 program at the facility.  That's the job

15 I was hired to do.

16     OSTROWSKI:  Well the whole

17 program contemplates the supervisor as

18 being the representative of the agency,

19 correct?

20     MERSHIMER:  Object to the form of

21 the question.

22     OSTROWSKI:  I wouldn't agree with

23 that, no.  But this form, this second

24 page of this report where it asks whether

25 your knowledge of the fact about this

1  injury agree with statements of the

2  employee and asks if the employing agency

3  controverts continuation of pay, state

4  the reason in detail.  That's all headed

5  at the top, Official Supervisor's Report,

6  correct?

7      A:  Official Supervisor's Report,

8  correct.

9      Q:  I'm back to Exhibit 21, the

10 May 25th 2000 letter, page 4 at the top

11 it references, December 21, 1999, a

12 meeting or encounter between yourself,

13 Mr. Dumas, and Mr. Johnson, do you have a

14 recollection of that?

15     A:  Again, we had several

16 meetings, I just assume that the dates

17 are correct, without referencing any of

18 my records.

19     Q:  Now what, why was there a

20 process then of having a CA-2 form

21 prepared?

22     A:  Mr. Dumas and Mr. Johnson

23 demanded that a CA-2 be submitted and so

24 we submitted the form.

25     Q:  Had there been a denial of

the claim submitted under the CA-1?

A: I believe at this time there was. Again, without looking at my records I deem at this time the denial was already rendered by the Department of Labor.

Q: And on the second paragraph of that page, it references December 23, 1999 telephone conversation between yourself and Mr. Johnson. Do you have a recollection of that?

A: I do have a recollection of what went on. Mr. Kiscadden was on annual leave. Initially it was thought that he was going to submit some information concerning some, some narrative concerning that and then after some discussion with myself, it was decided that I would submit a cover letter instead of him providing documentation. I would just submit a cover letter outlining that we have already filled out a CA-1 and that there's other information that went down with that CA-1 and that we were gonna be

89

received from Philhaven there was some information in there that appears that Mr. Johnson had some issues prior to the claim for compensation and prior to the claim of the alleged injury that occurred with Mr. Erickson. Again, I just wanted to provide them with some additional information so that they could use the information to determine causal relationship between the injury that was alleged and the actual injury, or the actual claim.

Q: I mean, weren't you at this point, you were trying to get the claim denied.

A: There was a pre-existing condition, it appeared that there was a pre-existing condition that I was making the Department of Labor aware of.

OSTROWSKI: Here's a document that I don't have copies of, marked as Exhibit 26. In December 29th 1999 a letter to you from the Department of Labor, OWCP Claims Examiner. Why don't you just review it.

submitting the information along with the CA-2. The reason I wanted to do that was because they would give the CA-2 a new claim number. They would not give it the same claim number as the CA-1 and therefore all the information concerning the allegations and what went on, they would not have that unless we provided that. And I wanted to give them a snapshot of what we were providing as a CA-2.

Q: Okay. And did you provide, did you prepare a cover letter to submit with the CA-2?

A: Yes I did.

Q: I don't have a, I may need two copies of this. Document that I'm going to mark as Exhibit 25. Why did you, why did you choose, why did you say in this letter, "it appeared as if Mr. Johnson had had psychiatric concerns that have been ongoing and are far beyond the scope of the alleged work-related incident."

A: Because in the notes I

90

RODRIGUEZ: We're going to stop and suspend video in order to switch tapes.

OSTROWSKI: Okay.

RODRIGUEZ: The time now is 1:42 camera time, 1:52 actual time.

RODRIGUEZ: Resuming the video recording. The time now is 1:43pm camera time, 1:58, 1:53pm actual time.

OSTROWSKI: This was shown to your counsel. Copy of what I marked as Exhibit 26. And then just for purposes of the record, that was a December 29, 1999 letter?

STUCKEY: Yes, sir.

Q: And that's the transmittal letter for the CA-2 that was prepared and submitted, correct?

A: It's the cover letter that I submitted with the CA-2, yes.

Q: In that you're also making several recommendations as to reasons to deny Mr. Johnson's claim, correct?

A: Yes.

Q: And do you, is this whole

1  notion of you making recommendations, I
2  mean we have this issue with this concept
3  of controversion, which as I understand
4  it, and correct me if I'm wrong, but as I
5  understand it, it's something that
6  applies to the CA-1 continuation of pay
7  provision.  Is that correct?
8      A:  Yes, more than anything, yes.
9      Q:  And does it have a purpose or
10  effect beyond the continuation of pay?
11     A:  Sure.  Controver, the new
12  software program allows for the, and uses
13  the word dispute.  Does the agency
14  dispute the claim?  So the new software
15  program put in the wordage that
16  previously was known as, perceived as,
17  controverted.
18     Q:  And does that new, did the
19  regulations provide for the notion of
20  disputing claims?
21     A:  I'm not sure if it's listed
22  in the Federal Employee's Compensation
23  Act or not as a definition or as what
24  outlines what can be disputed.  Again, it
25  could be perceived by agency personnel as

93

1  December 29th 1999 submission that the
2  events that happened on October 13th and
3  18th did not happen?
4      A:  No, by no means.  Why, no.
5  Why would I, all the reports were there,
6  all the police reports were there.  I'm
7  not contending that they did not happen.
8      Q:  And just clarify the basis of
9  your dispute for me.  Restate it in…
10     A:  Again based, again, as the
11  letter states, there's some
12  inconsistencies as what was being said by
13  the employee versus the person that was
14  supposed to cause the situation, as well
15  as witness statements, as well as the
16  investigation reports and I was making
17  the Department of Labor aware that there
18  was some inconsistencies because this is
19  going to be looked at as a new claim, by
20  a new claims examiner.  Same claims
21  examiner will not look at this one that
22  looked at the original one.  It will be
23  assigned to someone else.
24     Q:  And before a decision, you
25  make a decision, or before you take the

1  anything that they don't feel, anything
2  that they feel with the claim that the
3  Department of Labor needs to know about,
4  needs to be made aware of.  If you don't
5  supply a lot of the information to the
6  Department of Labor, as I said
7  previously, they send another letter out
8  to the employees as well as the agency
9  requesting additional information.  I've
10  made it a practice to submit all this
11  information up front so that they have a
12  snapshot of what's going on and to let
13  them decide whether or not they need more
14  information.  At this, this only speeds
15  up the adjudication of the claims.
16  Again, trying to look out for the
17  employees because I don't feel that the
18  employees should be an injured employee
19  and not have money coming in,
20  compensation coming in.  And it takes
21  long enough for the Department of Labor
22  to adjudicate a claim.  Just trying to
23  speed up the process.
24     Q:  So, are you, were you
25  contending in your submission in the

94

1  action of expressing your controversion
2  or dispute of a claim, is that something
3  that you review with Mr. Kent?
4      A:  Not always, no.
5      Q:  In this case, did you review
6  those with Mr. Kent?
7      A:  I believe I did.  I believe
8  we discussed it, yes.  Because of all the
9  information that was being transmitted
10  back and forth between him and Mr.
11  Snidely, and to make sure that we had as
12  much factual information that we could
13  provide the Department of Labor so that
14  they could make a decision.
15     Q:  And at the time of that
16  December 29, 1999 letter, were you aware
17  of Mr. Johnson's administrative
18  complaints of discrimination?
19     A:  I don't think I was at this
20  time yet.  No.  That surfaces later when,
21  after this claim was submitted when the
22  claims examiner who was Ms. Roselyn
23  Harris contacted my office and asked me
24  if I was aware of the EEO allegations and
25  I said I was not and I was not provided

1  with any information concerning the EEO.
2  And then I was, I think that's when, I
3  know that's when she sent me all the
4  information that was sent down to the
5  Department of Labor from Mr. Johnson, Mr.
6  Dumas, and it's listed in, the records
7  are in the CA-2 folder in big font so,
8  that's what I received from the
9  Department of Labor, outlining a whole
10  list, I believe there was twenty-some
11  allegations by Mr. Johnson concerning EEO
12  complaints.

13      Q:  About your processing?

14      A:  Actually, that was about
15  different individuals and different
16  things that happened at the facility.

17      Q:  Okay, like what?

18      A:  There was an incident where
19  an employee was alleged to have called,
20  told Mr. Johnson he was going to work his
21  black ass off or something to that
22  effect.  There was some other incidents
23  concerning the job that he didn't get.
24  There were some incidents in there
25  listing the fact that the Federation of

97

1  forms prepared and ready to be faxed to
2  the Department of Labor at this point, on
3  this date.  I do know that I was going to
4  include Mr. Johnson's narrative because
5  that was important to the claim and
6  again, about Mr. Kiscadden's narrative,
7  again I'll refer back to the testimony I
8  gave earlier that after Mr. Kiscadden was
9  going to provide us with some narrative,
10  we had decided that we were, that I was
11  just going to provide a cover letter for,
12  to place on top of the CA-2 submission.

13      Q:  But did the rules call for
14  the provision of narrative statement by
15  the supervisor?

16      A:  I'm not sure what the CA, if
17  the CA-2 does necessitate a narrative by
18  the supervisor.  You could look at a CA-2
19  if need be and down that list to see
20  what…

21      Q:  Now, continuing on page 4 on
22  Exhibit 21, did you ever have the second
23  or the second to last paragraph.  It
24  says, "Mr. Kent then made the derogatory
25  racial statement, We have done enough for

1  Government Employees did not do anything
2  to help Mr. Johnson's cause pertaining to
3  an EEO issue, there was an issue there
4  about, I'm trying to think of some
5  different ones.  Mr. McCraken, again a
6  union representative, that did not do,
7  did not represent Mr. Johnson properly I
8  believe was the, there was a whole list
9  of allegations.

10      Q:  Back to Exhibit 21, the March
11  25th 2000 letter.  The, was there some,
12  do you recall there being, I'm in the
13  middle of a page, December 28th, 1999,
14  the issue of there being a narrative or
15  supposed to have been a narrative from
16  Mr. Kiscadden.  Do you recall, well I'll
17  read on, it says, "When brought to Mr.
18  Stuckey's attention, he retrieved my
19  narrative from his desk drawer," drawel,
20  I think it should be drawer, "and then
21  stated, Oh I forgot to include it."  Do
22  you recall that?

23      A:  When Mr. Dumas and Mr.
24  Johnson came to my office, I'm not sure
25  if I was actually, if I actually had the

98

1  you people and will do no more."  Did you
2  ever hear that before?  That that
3  statement was made?

4      A:  No.

5      Q:  This is the first you've ever
6  heard of any of that?

7      A:  Yes.

8      Q:  The, then the final paragraph
9  references a Charlene Szabo, S-Z-A-B-O?

10      A:  Yes.

11      Q:  Did you have, who is Ms.
12  Szabo?

13      A:  Ms. Szabo is the Chief
14  Executive Office of the facility.

15      Q:  And did you have any
16  conversations with Ms. Szabo about Lewis
17  Johnson?

18      A:  I did not.

19      Q:  Let me just look through my
20  documents here.  I think I'm going to,
21  I'm about to wrap up with you.  When was
22  the last time you spoke with Mr. Kent
23  about Lewis Johnson?

24      A:  I have no idea.  I mean when
25  the claim was moving forward, when the

1  CA-1 claim and the CA-2 claim were moving
2  forward, when Mr. Dumas and Mr. Johnson
3  would come to my office, Mr. Kent would
4  ask me occasionally how, you know what's
5  happening or what's going, or what has
6  the OWCP decided.  After that period of
7  time when the claim was waiting for
8  adjudication by the Department of Labor,
9  Mr. Johnson and Mr. Dumas frequented my
10 office every two weeks to drop off any
11 additional medical documentation, the
12 C20's that they had and also to submit
13 the CA-8 forms for compensation, which if
14 you review the file, we, I think there
15 was, I don't know how many there were,
16 but we were submitting them every two
17 weeks to compensation.  Compensation will
18 not pay out any of that money, any
19 compensation money until the claim is
20 adjudicated.  However, we did submit the
21 claims because that's what Mr. Dumas and
22 Mr. Johnson had preferred, so that's what
23 we did, even though it was, again, as I
24 stated earlier in my testimony, it would
25 be probably best to wait until the end to

101

1  to give the Department of Labor whatever
2  was demanded by Mr. Dumas.  At this
3  point, we were requesting information
4  from Philhaven, once again, to process
5  his claim.
6       Q:  And that was a month after
7  you submitted the claim though, right?
8       A:  Again, Mr. Dumas and Mr.
9  Johnson were in my office pretty
10 continually for awhile.
11      Q:  And in there you reference
12 the fact that you had a release of
13 information?
14      A:  Yes.
15      Q:  And what release of
16 information are you referring to?
17      A:  The initial, we don't have it
18 here I don't think, it's not listed as
19 any exhibit.  When, as part of the
20 process for reviewing the employee's
21 benefits at the beginning when we find
22 out that it's a lost time claim, or
23 there's going to be medical expenses
24 incurred, part of that process, I go over
25 the Federal Employee's Compensation Act

1  submit everything at one time.  But I did
2  submit them forms for them every two
3  weeks.  For Mr. Johnson every two weeks.
4       Q:  What's the number of the last
5  document, number 26?
6       A:  Yes.
7       Q:  Here's a document marked as
8  Exhibit 27, again I have to make copies.
9  This is a November 30, 1999 letter from
10 you to Dr. Picolla at Philhaven.  Take a
11 moment and review that.
12      A:  Okay.
13      Q:  Why did you prepare that
14 letter on November 30, 1999?
15      A:  Mr. Johnson and Mr. Dumas
16 were visiting my office regularly, about
17 every week or so and Mr. Dumas was quite
18 demanding of things that he wanted for
19 myself to do to file Mr. Johnson's claim.
20 Although I felt that Mr. Dumas did not
21 know the workings of the Federal
22 Employee's Compensation Act and the
23 process that was necessary to file those
24 claims, and what took place, I made every
25 effort that I could make to provide and

102

1  with the employee as well as the
2  responsibility of the employee.  Again,
3  what they are entitled to do, what their
4  rights are, and I asked them to select a
5  physician at that point in time.  When
6  the employee selects that physician, at
7  the bottom of that form is a statement
8  that says, "The employee hereby releases
9  all the information to the Human
10 Resources Management Office for
11 processing of his Workers' Compensation
12 claim to the Department of Labor."
13 That's the release of information that I
14 was referring to.
15      OSTROWSKI:  That's all the
16 questions I have.
17      MERSHIMER:  Okay, I have some
18 questions for you.  Let's use this
19 Exhibit 26.  Well this was the December
20 29, 1999 letter that you sent to the
21 Department of Labor claims examiner.  Is
22 that correct?
23      STUCKEY:  Yes.  I'm sorry, yes.
24      Q:  Now, and this I believe you
25 said was the cover letter that you sent

1 along with the CA-2 form?

2     A: Yes.

3     Q: Now you said you would

4 provide as much information to the

5 Department of Labor as possible so they

6 could process claims quicker.

7     A: Yes.

8     Q: And that was to benefit the

9 employee?

10    A: Yes.

11    Q: Now, you also would indicate

12 to the Department of Labor if you felt

13 that the claim, that the agency wanted to

14 dispute the claim?

15    A: Yes.

16    Q: So the extent an agency

17 disputes a claim, that's not to the

18 benefit of the employee?

19    A: No, it's not.

20    Q: You were asked a question

21 regarding an Exhibit 24.  You on there?

22    A: Yes.

23    Q: Now Exhibit 24 is an

24 Authorization for the Release of

25 Information document.

105

1 on by Mr. Johnson and Mr. Dumas, we

2 changed gears, so to speak, and we

3 actively went after that documentation.

4 Mr. Johnson at that point was already

5 reporting his pro, not his progress, but

6 he was reporting that he had doctor's

7 appointments on this date, on this date

8 and this date and we should be receiving

9 documentation from Philhaven.  So, with

10 that in mind, knowing the fact that we

11 should be receiving something from

12 Philhaven, we went after that information

13 from Philhaven to process a CA-2 form,

14 claim.

15    Q: And my question is, who, I

16 understand then that you then actively

17 sought this information.  Who's

18 obligation was it to provide the

19 information to process the CA-2?

20    A: It's the employee's

21 responsibility to provide medical

22 documentation.  It's stated, when we

23 initially do the paperwork it's on the

24 Notification of Employee's

25 Responsibilities, it's listed there who's

1     A: Yes.

2     Q: It's got the stamp on it,

3 it's right here.

4     A: Yes.

5     Q: Somewhere on page it says G-

6 0422.  And the signatures of your

7 signature and Mr. Johnson's signature,

8 dated December 28th 1999.

9     A: Yes.

10    Q: Now, I don't want to misstate

11 any testimony, I'm just trying to make

12 sure I understand it.  I thought you were

13 asked a question whether the, whether the

14 signing of that release for Mr. Johnson

15 would satisfy everything he had to do to

16 provide information to process the CA-2?

17    A: Again, I will elude to

18 Exhibit 27 which was the initial letter

19 that went to Philhaven on November 30th.

20 Somewhere along the line with the

21 communication that was going on,

22 Philhaven required a release of

23 information signed by Mr. Johnson before

24 they would release any information to me.

25 Because of all the demands that were put

106

1 responsibility it is.

2     Q: Okay, you've answered my

3 question.  Can you take a look at Exhibit

4 21?

5     A: If I can find it.  Yes.

6     Q: When was the first time you

7 ever saw Exhibit 21?

8     A: Today.

9     Q: Now Mr. Johnson's CA-1 form

10 was denied.  Is that correct?

11    A: That's correct.

12    Q: By the Department of Labor?

13    A: Yes.

14    Q: And the Department of Labor

15 denied the CA-2 form for Mr. Johnson?

16    A: Yes.

17    Q: If you had filed the CA-2

18 form the very first time, let's say you

19 hadn't file the CA-1 form, you just went

20 straight to put the CA-2 form, would Mr.

21 Johnson have been entitled to any

22 continuation of pay anyway?

23    A: No.

24    Q: The agency disputed the CA-1

25 form for Mr. Johnson.  Is that correct?

1      A:  Yes.

2      Q:  And the agency disputed the

3  CA-2 form for Mr. Johnson?

4      A:  Yes.

5      Q:  And did you have a role in

6  disputing that?

7      A:  Yes.

8      Q:  Did you dispute either of

9  those forms because of Mr. Johnson's

10  race?

11      A:  No, absolutely not.

12      Q:  Did you dispute either of

13  those forms because you wanted to

14  retaliate against Mr. Johnson for filing

15  an EEO complaint?

16      A:  I had no reason, in fact I

17  had no knowledge of him filing the EEO

18  complaint and I had no reason to do that,

19  no.  These forms were filed prior to my

20  notification, in fact like I said, my

21  conversation with Mr. Irvin, and I don't

22  recall exactly when those took place, but

23  these forms were filed I believe well

24  before that.

25      MERSHIMER:  I don't have anything

109

1  further.

2      OSTROWKSI:  Nor do I.

3      RODRIGUEZ:  Suspending video

4  operation, camera time is 2:07, actual

5  time is 2:16.

6

110

# EXHIBIT D

# EXHIBIT E

# N O T I C E

## RECEIPT OF APPLICATIONS FOR THE POSITION OF

## HOUSEKEEPING AID – Full-Time
## WG-3566-2
## 6 am to 2:30 pm
## Monday through Friday
## Extended Care (19-3)

## WILL CLOSE ON

## JUNE 9, 1998

### UNDER THE PROVISIONS OF THE OPEN AND CONTINUOUS VACANCY ANNOUNCEMENT AND THE VA/AFGE MASTER AGREEMENT.

### CONTACT HUMAN RESOURCES, x4055 FOR APPLICATION UNDER OPEN CONTINUOUS

**RAYMER A. KENT**
**HUMAN RESOURCES MANAGER**



DEPARTMENT OF
VETERANS AFFAIRS

# Memorandum


HUMAN ... NS

JUL 15 1998

Date: July 8, 1998

From: Personnel Management Specialist (N121)

VA MEDICAL CENTER
LEBANON, PA 17042

Subj: Certificate for position of Housekeeping Aid, WG-3566-2, Extended Care, 19-3, full-time
6 am to 2:30 pm, Monday through Friday, OC 98-

To:
ACOS for Extended Care (N500)

1. The candidates below are eligible for reassignment to the above position.
Official personnel folders and other evaluation records are available for
review. Supervisory appraisals are attached.

| Employee's Name | Present Position |
|---|---|
| Barbara Keisch - white | Food Service Worker, WG-2 |
| Luis Nazario - hispanic | Food Service Worker, WG-2 |
| Deborah Dove - white | Food Service Worker, WG-2 |
| Lewis Johnson - African-American | Housekeeping Aid, WG-2 |
| Virginia Galebach - white HKA | Food Service Worker, WG-2 |
| Deborah O'Donnell - white | Food Service Worker, WG-2 |
| Keith Bender - white | Food Service Worker, WG-2 |
| Ramon Adorno - hispanic | Food Service Worker, WG-2 |
| Ronald Hull - white | Housekeeping Aid, WG-2 |

2. Please complete the endorsement below, indicating your action and return
this certificate by  7-15-98

*Suzette A. Flashel Umlauf*
SUZETTE A. FLASHEL UMLAUF

Attachments
--------------------------------------------------------------------

End. 1                                              Date: 07·15·98

TO: Human Resources (N121)

___ I have selected  Ronald Hull   accepts 7/15/98   .

___ I would like to have the position filled on _____

___ Outside or other recruitment is requested.

EXHIBIT
2
PENGAD-Bayonne, N.J.

*Allen E. Fidderler*
(Signature and Title)

G-0367

PG 1 OF 13

VA FORM  2105                                   attachment 18ru

HM 00-77-52, 9-15-77

(2) Written tests will not be used unless required or approved by the Civil Service Commission and/or Assistant Administrator for Personnel for in-service placement actions.

(3) When there are special placement factors which are not adequately covered by the minimum qualification standards and which are essential to successful perform- ance in the position to be filled, they will be published in the promotion announcement as selective placement factors and, as such, will constitute a part of the minimum qualification standards for the position. Selective placement factors must comply with the provisions of FPM chapter 335, subchapter 3-5, and be approved by the Director or his designee.

c. <u>EVALUATION PROCEDURES</u>. Personnel Service will review the qualifications of each employee who applies for promotion con- sideration. If the employee meets the basic minimum qualifica- tions as outlined in the promotion announcement, the rating will then be on the following criteria:

(1) <u>Experience and Education</u>. Experience and education may be used as an evaluation factor when there is a clear and positive relationship to the position to be filled. Credit can only be given for related experience and educa- tion that would qualify the employee for the position for which applied. The value to be assigned for experience and education is described in detail in Attachment "A" for nonsupervisory positions and Attachment "B" for supervisory positions.

(2) <u>Training, Self-Development, and Outside Activities</u>. Pertinent training, self-development, and outside activities which would increase an employee's potential for effective performance in the position to be filled will be given appropriate credit.

(3) <u>Appraisal of Performance</u>. Supervisory appraisal or appraisals will be obtained on all candidates as follows:

(a) For nonsupervisory positions, VA Form 5-4667, Appraisal of Employee for Promotion to Nonsupervisory or First Level Supervisory Position, will be obtained.

(b) For first level supervisory positions, VA Forms 5-4667 and 5-4669, Qualifications Analysis and Assess- ment of Potential for Supervisory Positions, will be obtained.

G-0396

EXHIBIT
3

7

(c)  For second or higher level supervisory posi-
tions, VA Forms 5-4668, Appraisal of Employee for
Promotion to Supervisory Position Above First
Level, and 5-4669 will be obtained.

Personnel officials, in conjunction with concerned operating
officials, will establish the pattern of rating factors on
the appraisal and assessment forms that is characteristic
of the position to be filled prior to initiation of apprais-
al procedures.  The candidate's immediate supervisor will
rate the indicated factors on the appropriate forms and
the ratings will be reviewed by the next higher level
supervisor within the appropriate service.  Differences in
evaluation will be resolved before the forms are submitted.
Appraisals of performance on VA Forms 5-4667, 5-4668, and
5-4669 WILL BE SHOWN to the employee prior to forwarding
to the Personnel Office.  The only exception to this re-
quirement will be when an employee is on extended leave
and it would delay the filling of a position.  In these
instances, the evaluation should be discussed with the
employee immediately upon return to duty.  An appraisal,
performance and/or potential, will be used for a period
of 90 days when the employee is being considered for a
position having the same elements rated.  However, if an
employee has had a job change during this 90-day period,
then a new appraisal form will be obtained.

(4).  Awards-Achievement and Suggestion.  To the extent
feasible, an employee's participation in the awards pro-
gram will be assessed in terms of demonstrated or implied
initiative, resourcefulness, or planned ability as related
to the requirements of the position to be filled.  No
point values will be assigned for awards.

d.  REFERRAL AND SELECTION

(1)  Upon completion of the evaluation and ranking process,
the Personnel Office will certify alphabetically the names
of the five highest ranking "Highly Qualified" candidates
to the selecting official for final consideration.  If
there are more than five "Highly Qualified" candidates,
then the five highest ranked candidates will be referred.
An additional name will be added for each additional
vacancy being filled.  Should a referred candidate decline
consideration after being interviewed, then the name of
the next "Highly Qualified" candidate will be added to the
original referral list.

G-0397

8

HM 00-77-52, 9-15-77

(2)   All referred candidates will be interviewed by the selecting official.  However, if a candidate is on extended leave and this would unduly delay the filling of the position, the selecting official may make a decision without interviewing the candidate.  A notation to this effect must be made part of the selecting official's decision on the referral list.  Candidates from other VA installations will not be required to report for interview unless they indicate a desire to do so at their own expense.  It will be optional with the selecting official whether or not a candidate will be reinterviewed if referred and interviewed for an IDENTICAL position within a 90-day period.  Such a candidate is considered for the position even though the interview is not required.

(3)   The official personnel folders and all other pertinent records will be made available to the selecting official during the selection process.

(4)   The selecting official will be the chief of service having the vacancy.

e.   NOTIFICATION OF DECISION TO EMPLOYEES.  After selection has been made, each employee who filed application for the position will be given the following information:

Whether or not the employee was found eligible on the basis of the minimum requirements specified in the promotion announcement; whether the employee was rated "Highly Qualified" or "Qualified;" whether or not the employee was in the group referred for selection consideration; the name of the individual selected for the job.

If an employee in the group referred for selection desires information as to the reason for nonselection, the selecting official will discuss with the employee the reasons for nonselection.

f.   RELEASE OF EMPLOYEES.  Employees selected for promotion will normally be released to a new assignment at the beginning of the first pay period following a minimum of at least 2 weeks from the date of selection.  Where unusual circumstances justify a longer period, the employees will be promoted to the new assignment but detailed to their former position until they can be released.  In these cases, the approval of the Director is required.

G-0398

HM 00-77-52, 9-15-77

10.  <u>TRAINING OF SUPERVISORS</u>.  Selecting officials will be responsible for developing basic supervisory training plans of at least a 40-hour duration for newly selected supervisors during their first 6 months in the new position.  An additional 40 hours of supervisory training will be provided during the next 18 months.  Specific training plans will be prepared outlining the training, and progress reports will be provided when training is completed.  These records of training will be filed in official personnel folders.  Training may be provided by any method to include on-the-job training, classroom training, assigned readings, attendance at Civil Service Commission and other supervisory courses, etc.  Personnel Service will be responsible for insuring that training plans are developed within 30 days of an employee's entrance into a first-line supervisory position and will further follow-up to insure that training is accomplished and progress reports provided.

11.  <u>KEEPING EMPLOYEES INFORMED</u>.  Employees will be furnished a copy of this plan and are encouraged to seek the counsel of their supervisor and/or Personnel Office staff members concerning the following items:

    a.  What jobs are in the employee's career ladder?

    b.  What the employee can do to improve chances for promotion?

    c.  What experience, education, or training would be useful or needed in meeting qualification requirements for higher level positions?

    d.  What the employee may do if in a job with limited promotion opportunities?

All selections made under this plan will be announced in the Employee Bulletin which is published bimonthly and distributed to all employees.

12.  <u>PERIODIC REVIEW OF PLAN</u>.  A comprehensive review of this plan will be made at least annually, usually in the month of December.  Service chiefs, supervisors, employees, and labor organizations are encouraged to submit suggestions, within the framework of Civil Service regulations, at any time for improvement of this policy.  Any changes made in the plan will usually be published in January of each year.  Suggestions should be submitted, in writing, to the Chief, Personnel Service.

13.  <u>GRIEVANCES</u>.  Employee grievances under the merit promotion program will be processed under the provisions of the standard

G-0399

HM 00-77-52, 9-15-77

VA grievance procedures. If an employee feels that either a specific action taken or the plan or local policy is unfair or improper, the procedures outlined in the VA grievance procedure should be followed. Employees may obtain specific information on filing a grievance from the Personnel Office, Building 1, Room 31.

14. REFERENCES:

   MP-5, part I, chapter 335
   FPM  chapter 335
   VA Employee Letter, "Merit Promotion Program"

15. RESCISSION:

   HM 00-75-15, 3-14-75, same subject
   However, VA Employee Letter 00-71-2, dated June 30, 1938, October 4, 1971
   is still current and should be filed with this memorandum.

16. DATE OF COMPLETE REISSUANCE:   September 1980  (05)

HARRY W. FLUSSI
Director

Attachments 2

DIST. "C" plus 150 copies to Personnel for new employees

G-0400

HM 00-77-52
September 15, 1977

Attachment A

<u>MERIT PROMOTION RANKING PROCEDURE</u>

<u>NONSUPERVISORY POSITIONS</u>

I.  <u>EXPERIENCE</u>

--Experience will be carefully evaluated as to quality and
will be placed in one of three groups.  "A" - High Quality;
"B" - Very Good; and "C" - Acceptable.  Examples of ex-
perience at the various levels will be filed with each pro-
motion announcement and will be subject to review by candi-
dates for promotion.

--Points will be assigned for appropriate experience as
follows:

POINTS

--For meeting the minimum qualification require-
ments as outlined in the Promotion Announcement
and appropriate Civil Service Qualification
Standards:                                                   NONE

--For each year above the minimum at the "A" level       3

--For each year above the minimum at the "B" level       2

--For each year above the minimum at the "C" level       1

--When excess experience is totaled for each level,
full credit will be given on a month-by-month basis.

--Experience above the minimum will be credited providing
it was acquired within 10 years of the closing date of
the promotion announcement.

--Any employee may request the Personnel Office to fully
explain the quality assignment given to their experience
under the provisions of this promotion plan.  They will
be entitled to see the ranking sheet used in rating and
ranking their experience.  However, an employee CANNOT
ask to see the ranking sheet of any other employee.

MAXIMUM POINTS IN THIS SECTION FOR EXPERIENCE IS:  30

II. <u>SUPERVISORY APPRAISAL OF PERFORMANCE</u>

--VA Form 5-4667 will be used for each special evaluation.
Exception: unless one is on file dated within 90 days of

G-0401

A-1

EM 00-77-52, 9-15-77
Attachment A

the date announcing the job vacancy and having the same
elements rated.

--For each position to be filled, only the significant
elements required for successful performance in that posi-
tion will be identified. There should be no position re-
quiring the rating of all elements on the appraisal forms.

--For each appropriate item a point value will be assigned
as follows:

| Performance Level | Point Value |
|---|---|
| A | 0 |
| B | 10 |
| C | 20 |
| D | 30 |
| E | 40 |

If 75 percent of the required elements are rated "E" the
supervisor preparing the evaluation will be required to
attach a written justification giving specific examples
of outstanding work for each element rated "E." However,
if an employee has received an outstanding performance
rating, quality increase, or superior performance award
within the preceding 12 months, referral to such an award
would be sufficient.

MAXIMUM POINTS IN THIS SECTION FOR SUPERVISORY APPRAISAL IS: <u>40</u>

III.  EDUCATION AND TRAINING

--Additional credit will be granted for education and/or
training as follows, providing such education and training
was not used to initially qualify for the position. To
be creditable, the education and/or training must be of
value in better qualifying the candidate for the position
for which applying and must have been acquired within the
last 10 years.

--For each completed pertinent course totaling 3 semester
hours or equivalent beyond the high school level:  1 POINT

--For each 3 clock hours of attendance at lectures, seminars
and other verifiable training which is directly related and
pertinent to the position and line of work of position for
which applying:  1/3 POINT

HM 00-77-52, 9-15-77
Attachment A

--Evidence of attendance must be submitted to the Personnel
Office.  No credit will be given for on-duty training
where management has the right to determine and select
who will attend.

--Education and training is defined as self-development
activities which employees do on their own for their
own development, based on desire to learn, improve and
advance their career.

--It is the employee's responsibility to provide evidence
to document completion of education and training programs.
This can be accomplished by permitting the Personnel Of-
fice to verify training records or by providing a copy
for filing in the official personnel folder.

MAXIMUM POINTS IN THE SECTION FOR EDUCATION AND TRAINING:  <u>10</u>

IV.  <u>GROUPING AND RANKING</u>

--The grouping and ranking of general schedule and wage grade
candidates will be accomplished as follows:

--All eligibles will be placed in one of two groups:  "Highly
Qualified" or "Qualified."

--Eligibles will be ranked according to the score obtained by
totaling points earned under Sections I, II, and III.

--If five eligibles or less attain a rating of 30 or more, all
in this group will be identified as "Highly Qualified."

--If more than five eligibles attain a rating of 30 or more,
the five eligibles receiving the highest scores will be
identified as "Highly Qualified."  All other eligibles
will be identified as "Qualified."

**G-0403**

A-3

VETERANS ADMINISTRATION HOSPITAL 595    HOSPITAL MEMORANDUM ~~00-77~~ 52
Lebanon, Pennsylvania  17042                                                05-14

                                              September 15, 1977

## MERIT PROMOTION POLICY

1.  **PURPOSE**:  To set forth policies and procedures for filling
noncentralized positions in the competitive service at this
facility.  Excepted positions, such as physician, dentist, nurse,
and nurse anesthetist, are not covered by these procedures.
This plan does not apply to Canteen employees.  However, the
filling of certain noncentralized positions such as assistant
service chiefs requires VA Central Office concurrence before
final promotion action may be taken.  This plan does not cover position
which are not included in a unit of recognition under the Federal Service
Labor Management Relations Statute. These positions are covered under a
2.  **POLICY**          separate plan

> a.  Selection for promotion and reassignment or detail to
> positions with known promotion potential will be made with-
> out regard to age, race, creed, color, religion, national
> origin, political belief, sex, nondisqualifying physical
> handicap, marital status, or membership or nonmembership in
> a labor organization.

> b.  Selecting officials and others engaged in the promotion
> process will make certain that nepotism, favoritism, or
> preselection are not involved in any promotion action taken
> under this plan.

> c.  This plan does not restrict management's authority to
> fill positions by means other than promotion, such as re-
> assignment, appointment, transfer, demotion, or reinstatement,
> or to change at any time from one method to another or to use
> any combination of methods.

3.  RESPONSIBILITY

> a.  Operating officials and supervisors are responsible for:

>> (1)  Assisting in the development of promotion plans,
>> evaluation of guidelines, and rating criteria.

>> (2)  Explaining the promotion program to employees.

>> (3)  Assisting employees in their development by counsel-
>> ing, guidance, and training.

>> (4)  Preparing objective evaluations of employees and
>> discussing the evaluations of past performance with the
>> employee concerned.  The only exception to the discussion
>> of evaluations of performance with employees will be
>> when the employee is on extended leave and it would delay

copy forwarded VACO (054) 9-26-77    G-0390

EXHIBIT
4

HM 00-77-52, 9-15-77

the filling of a position.  In these instances, the evaluation should be discussed with the employee immediately upon return to duty.

(5)  Insuring that employees who they supervise are informed of promotion opportunities and submitting names of absent employees for consideration when the employee has indicated an interest in the position to be filled.

(6)  Applying careful and objective judgment in the selection process.

b.  The Chief, Personnel Service, will:

(1)  Provide general administration of the promotion plan.

(2)  Participate with operating officials in carrying out the requirements of this policy and in establishing and applying the evaluation methods.

(3)  Determine the eligibility of applicants.

(4)  Remind employees of their responsibility to furnish information regarding current qualifications.

(5)  Inform all employees at least annually concerning the acceptance of voluntary applications at other VA hospitals.

c.  Employees are responsible for furnishing information to update their qualifications records, for submitting applications for promotion consideration on a timely basis, and for advising supervisors of the positions in which they are interested in the event such position vacancies are announced during their absence.

4.  POSITIONS COVERED BY THE PLAN.  All General Schedule and Wage System positions at this health care facility are covered except for the following category:  positions centralized to the Administrator or the Chief Medical Director and positions in the "Excepted" Service; i.e., Title 38 and Canteen Service positions.  (**)

5.  CAREER PROMOTIONS.  Career promotion is the promotion of an employee without announcement of the vacancy and processing under competitive promotion procedures if the employee was initially selected from a Civil Service register or by competitive promo-

**Also excluded are positions which are not included in a unit of recognition under the Federal Service Labor Management Relations Statute; i.e., positions which are supervisory or managerial in nature, involve personnel work of other than a clerical nature, or other sensitive positions which are excluded from the units of recognition.

G-0391

MM OO-77-52, 9-15-77

tion procedures and the fact that the initial selection could lead to promotion was made known to all potential candidates. Such career promotions, as defined in Federal Personnel Manual 335, may be made of employees assigned as follows:

   a.  Career ladder positions. These will include:

Clerk DMT, GS-2/3/4
Clerk Stenographer, GS-3/4
Clerk Typist, GS-2/3
Corrective Therapist, GS-6/8
Dietitian, GS-5/9
Food Service Worker, WG-1/2
Housekeeping Aid, WG-1/2
Laundry Worker, WG-1/2
Licensed Practical Nurse, GS-3/5
Manual Arts Therapist, GS-6/8
Medical Aid, (Sterile Supplies), GS-2/3
Medical Radiology Technician, GS-4/5

Medical Technician, GS-4/5/3
Medical Technologist, GS-5/7
Messenger/Mail Clerk, GS-2/3
Nursing Assistant, GS-2/4
Occupational Therapist, GS-6/8
Pharmacist, GS-9/11
Physical Therapist, GS-6/8
Psychologist, GS-11/13
Recreation Therapist, GS-6/8
Rehabilitation Technician, (Alcohol), GS-4/6
Social Worker, GS-9/11
Telephone Operator, GS-2/3

   b.  Trainee position

   c.  Apprentice position

   d.  Understudy position

   e.  Position filled below the established grade level

   f.  Training or Executive Development agreements

   g.  Position which is reconstituted in a higher grade

6.  <u>EXCEPTIONS FROM THE PLAN</u>.  Provided the incumbent meets legal and other requirements, promotion as an exception to competitive promotion procedures may be authorized under the following conditions:

   a.  Promotion to positions upgraded without significant change in duties and responsibilities on the basis of either a new classification standard or the correction of a classification error.

   b.  Repromotion to a grade or position from which employees were demoted in the VA without personal cause, and not at their request. Promotion under this provision may also be made to intervening grades.

   c.  Position change in a reduction-in-force which results in an employee receiving a higher pay rate because of pay-

fixing policy

d.  A temporary promotion limited to 120 days or less

e.  Promotion of an employee exercising reemployment rights or restoration rights after military service when the old position was upgraded during an individual employee's absence

f.  Promotion of an employee who failed to receive proper consideration in a previous promotion action

g.  Promotions resulting from additional duties and responsibilities accruing to a position in which the incumbent continues to perform the same basic function when such addition was not due to planned management action.  In these cases, full documentation must be made part of the promotion action.

7.  <u>AREA OF CONSIDERATION</u>

a.  For all positions, the minimum area of consideration will be this hospital.

b.  Voluntary applications for the specific position to be filled which are received from VA employees at other installations will be included in the minimum area of consideration. Additionally, supervisory referrals by VA Central Office program officials will be considered with others from within the minimum area.

c.  Employees applying for vacancies at other VA facilities, as a result of extending their area of consideration, will be required to submit a current SF-171, Personal Qualifications Statement.  The employee should describe on the SF-171 in a comprehensive manner, all present and past experience, education, training, awards, self-development and outside activities. The employee should submit this completed form to the local Personnel Officer in sufficient time to insure referral to the facility where a vacancy exists prior to the closing date specified in the announcement.  Local Personnel staff will provide advice and assistance in the proper completion of the SF-171 to assure that all relevant information is shown.  The Personnel Office will secure appropriate supervisory appraisals to forward along with the employee's application.  Official personnel folders will not be forwarded to other facilities or requested except in very unusual circumstances.  Use of official personnel folders after serving the purpose will be returned within 5 workdays after receipt.

G-0393

4

HM 00-77-52, 9-15-77

8.   EXTENDING THE AREA OF CONSIDERATION.   The area of consideration will not be extended when there are two "Highly Qualified" candidates available in the minimum area.  An essential consideration for extending the minimum area of consideration must be a bona fide interest in seeking additional "Highly Qualified" candidates.  When such additional candidates are desired, the area of consideration will be extended as follows:

   a.  For grades GS-6 and below, the extension may be limited to the commuting area.

   b.  For grades GS-7 and above, the area will be systematically extended; i.e., statewide, regionwide, and/or nationwide, until a sufficient number of "Highly Qualified" candidates are obtained.  A sufficient number will be considered no more than five.  For positions of assistant chiefs of services, the area of consideration will be nationwide and will include referrals of eligible candidates from the management personnel inventory file.

9.   PROCEDURES

   a.  METHOD OF LOCATING CANDIDATES

      (1)  Promotion opportunities will be announced by publishing a "Promotion Vacancy Announcement" and posting on official bulletin boards for a minimum of 7 calendar days.  Official bulletin boards are located as follows:

         Elevator lobby   - Ground floor, Building 1
         Main Corridor    - First floor, Building 17
         Elevator lobby   - First floor, Building 18
         Elevator lobby   - First floor, Building 2
         Lobby area       - First floor, Building 19
         Corridor         - Entrance to Canteen, Building 22

      In addition, copies will be forwarded to all services and three copies will be provided to any employee organization having exclusive recognition at the hospital. The deadline for applying will be specified in each announcement; however, it will always be posted for a minimum of 7 calendar days.

      (2)  To be considered for an advertised vacancy, employees will be required to apply by submitting VA Form 5-4078, Application for Promotion or Reassignment, before the closing date of the promotion announcement.  The bottom portion of the form will be completed by Personnel Service and will indicate if the employee is qualified and

G-0394

HM 00-77-52, 9-15-77

will be included in the group of employees to be eval-
uated for the position. If the employee is not qualified,
Personnel Service will check the application form in the
appropriate block indicating the reason for not qualifying
and return it to the employee.

(3) Immediate supervisors will be responsible for in-
suring that employees absent on leave during the entire
period for which the announcement is posted are nominated
for consideration.

(4) The Personnel Office will enter into the competition
the names of any qualified employees with restoration
rights who are currently in the military service.

(5) Concurrent and equal consideration will be given
applications voluntarily submitted by VA employees at
other installations.

(6) _Entrance Level Positions_. A current listing of
entrance level positions will be posted on all official
bulletin boards so that interested employees may apply
at any time for consideration for any of these positions
through noncompetitive action. Each time this listing
is revised, it will be coordinated with the union. Any
employee applying for consideration for an entrance level
position will be given consideration for the first posi-
tion that becomes vacant providing the minimum qualifi-
cation requirements are met for the entrance level posi-
tion for which applied.

b. _QUALIFICATION REQUIREMENTS_

(1) All candidates must meet the minimum requirements
of qualification standards established for the position
by the VA or Civil Service Commission. For wage grade
positions, all candidates must meet the qualifying screen-
out element in CSC Handbook 118C, "Ability To Do The
Job." If employees do not meet this requirement, they
will be rated ineligible. If wage grade employees meet
this requirement, then they will be rated and ranked for
promotion consideration using the same procedures estab-
lished for general schedule nonsupervisory or supervisory
positions. An employee's service or time-in-grade must
satisfy any promotion requirement established by law or
regulation. All qualification standards and information
on requirements are available in the Personnel Service
for review.

Housekeeping Aid, WG-3566-2
(19-3)                        OC 98-38

12                LEWIS
11
11
            prefer
9
8
8
8
8
8
6

Tom Lay
Francis M. Uffne
Surgtte A. Flashel Umlauf
7/2/98

EXHIBIT
5

HKH WG-
EOD 2/21/93

## Veterans Administration — INSERVICE PLACEMENT RATING SHEET FOR WAGE SYSTEM JOBS

**IMPORTANT** — Complete all items below if the Job Element procedure described in OPM Handbook X-118C is being followed. If the KSAO alternative procedure is used instead, complete ONLY the REVERSE SIDE of this form.

| NAME OF EMPLOYEE | POSITION APPLIED FOR *(Title, series, grade)* | ANNOUNCEMENT NO. |
|---|---|---|
| ████████ | HOUSEKEEPING AID, WG-3566-2 | OC 98-38 |

| JOB ELEMENTS *(See creating plan for more information about each element)* | CHECK THE CATEGORY which best indicates the employee's capability based on how his/her total background relates to the quality levels for each job element. | | | | | SOURCE OF INFORMATION *(e.g., SF 171, Item 21A; VA Form S-4676a, Item S; Award, February 1983, etc.)* | POINT VALUE |
|---|---|---|---|---|---|---|---|
| | SU-PERIOR 4 pts. | SATIS-FACTORY 3 pts. | ACCEPT-ABLE 2 pts. | WEAK BUT OF SOME VALUE 1 pt. | OF NO VALUE 0 pts. | | |
| *(SCREENOUT)* Knowledge of proper cleaning procedures and proper uses of a variety of cleaning and sanitizing solutions | | | | | | | 5 |
| Knowledge of housekeeping procedures required in isolation environments. | | | | | | | 3 |
| Ability to work safely. | | | | | | | 4 |
| | | | | | | | |
| | | | | | | | |
| | | | | | | | |
| | | | | | | | |
| | | | | | | | |
| | | | | | | | |
| | | | | | | | |

| REMARKS | | TOTAL POINTS | 12 |
|---|---|---|---|

QUALIFIED
- [ ] AT LEAST 2 PTS. ON SCREENOUT ELEMENT
- [X] TOTAL SCORE = 2 X NUMBER OF ELEMENTS OR BETTER

NOT QUALIFIED
- [ ] LESS THAN 2 PTS. ON SCREENOUT
- [ ] TOTAL SCORE LESS THAN 2 X NUMBER OF ELEMENTS

| HIGH QUALITY FIGURE *(Lowest score which indicates high quality for this vacancy)* ▶ | POINTS |
|---|---|

| SIGNATURE OF SME PANEL MEMBER | DATE | SIGNATURE OF SME PANEL MEMBER | DATE |
|---|---|---|---|
| Suzette A. Flashil Unbug | 7/2/98 | Tom Lowe | 7/2/98 |
| SIGNATURE OF SME PANEL MEMBER | DATE | SIGNATURE OF SME PANEL MEMBER | DATE |
| | | | 7/2/98 |

2.

*EOD* 10/24/97
WG 2 HKA

**VA | Veterans Administration**    **INSERVICE PLACEMENT RATING SHEET FOR WAGE SYSTEM JOBS**

IMPORTANT — Complete all items below if the Job Element procedure described in OPM Handbook X-118C is being followed. If the KSAO alternative procedure is used instead, complete ONLY the REVERSE SIDE of this form.

| NAME, EMPLOYEE | POSITION APPLIED FOR (Title, series, grade)  HOUSEKEEPING AID, WG-3566-2 | | | | | ANNOUNCEMENT NO.  OC 98-38 | |
|---|---|---|---|---|---|---|---|

| JOB ELEMENTS (see cleaning plan for more information about each element) | CHECK THE CATEGORY which best indicates the employee's capability based on how his/her total background relates to the quality levels for each job element. | | | | | SOURCE OF INFORMATION (e.g., SF 171, Item 21A; VA Form S-4676a, Item 5; Award, February 1983, etc.) | POINT VALUE |
|---|---|---|---|---|---|---|---|
| | SU-PERIOR  4 pts. | SATIS-FACTORY  3 pts. | ACCEPT-ABLE  2 pts. | WEAK BUT OF SOME VALUE  1 pt. | OF NO VALUE  0 pts. | | |
| (SCREENOUT)  Knowledge of proper cleaning procedures and proper uses of a variety of cleaning and sanitizing solutions | | | | | | | 4 |
| Knowledge of housekeeping procedures required in isolation environments.  3. | | | | | | | 3 |
| Ability to work safely.  2. | | | | | | | 4 |
| 3. | | | | | | | |
| 4. | | | | | | | |
| 5. | | | | | | | |
| 6. | | | | | | | |
| 7. | | | | | | | |
| 8. | | | | | | | |
| 9. | | | | | | | |

| REMARKS | | TOTAL POINTS | 11 |
|---|---|---|---|

QUALIFIED

☐ AT LEAST 2 PTS. ON SCREENOUT ELEMENT

☒ TOTAL SCORE = 2X NUMBER OF ELEMENTS OR BETTER

NOT QUALIFIED

☐ LESS THAN 2 PTS. ON SCREENOUT

☐ TOTAL SCORE LESS THAN 2X NUMBER OF ELEMENTS

HIGH QUALITY FIGURE (Lowest score which indicates high quality for this vacancy) ▶   POINTS

| SIGNATURE OF SME PANEL MEMBER  *Bridgette A. Flashel Umlauf* | DATE  7/2/98 | SIGNATURE OF SME PANEL MEMBER  *Tom Love* | DATE  7/2/98 |
|---|---|---|---|
| SIGNATURE OF SME PANEL MEMBER | DATE | SIGNATURE OF SME PANEL MEMBER  *Frances M. Uffner* | DATE  7/2/98 |

VA FORM S-4677    SUPERSEDES VA FORM S-4677, DEC 1976 AND OCT 1970.

Interviews Paper

| Johnson | | Hull | |
|---|---|---|---|
| KSAO Sup | 9 | KSAO Sup | 9 |
| 1-5 Supplemental | 4 | Supplemental | 5 |
| 1-5 Float observations | 4 | Float observations | 5 |
| | (17) | | (19) |

Broken curtain rod
initiated work order.

Solicited from Hull
Human Resources notified.

EXHIBIT
6
PENGAD-Bayonne, N.J.

Housekeeping Aid, U.S. 3566-2
(19-3)                                    OC 98-38

12                        Lewis
11
11
                 prefer
9
8
8
8
8
8
_____
        6



Tom Lay
Francis M. Umbay
Surjette A. Flashel Umbay
                    7/2/98

HKA WG-2
EOD 2/21/93

## VA Veterans Administration — INSERVICE PLACEMENT RATING SHEET FOR WAGE SYSTEM JOBS

IMPORTANT -- Complete all items below if the Job Element procedure described in OPM Handbook X-118C is being followed. if the KSAO
tive procedure is used instead. complete ONLY the REVERSE SIDE of this form.

| JOB ELEMENTS (See crediting plan for more information about each element) | POSITION APPLIED FOR (Title, series, grade) HOUSEKEEPING AID, WG-3566-2 | | | | | ANNOUNCEMENT NO. OC 98-38 | |
|---|---|---|---|---|---|---|---|
| | CHECK THE CATEGORY which best indicates the employee's capability based on how his/her total background relates to the quality levels for each job element. | | | | | SOURCE OF INFORMATION (e.g., SF 171. Item 21A; VA Form 5-4676a, Item 5; Award. February 1983, etc.) | POINT VALUE |
| | SU-PERIOR 4 pts. | SATIS-FACTORY 3 pts. | ACCEPT-ABLE 2 pts. | WEAK BUT OF SOME VALUE 1 pt. | OF NO VALUE 0 pts. | | |
| (SCREENOUT) Knowledge of proper cleaning procedures and proper uses of a variety of cleaning and sanitizing solutions | | | | | | | 5 |
| Knowledge of housekeeping procedures required in isolation environments. | | | | | | | 3 |
| Ability to work safely. | | | | | | | 4 |
| | | | | | | | |
| | | | | | | | |
| | | | | | | | |
| | | | | | | | |
| | | | | | | | |
| | | | | | | | |
| REMARKS | | | | | | TOTAL POINTS | 12 |

QUALIFIED

☐ AT LEAST 2 PTS. ON SCREENOUT ELEMENT

☒ TOTAL SCORE = 2 X NUMBER OF ELEMENTS OR BETTER

NOT QUALIFIED

☐ LESS THAN 2 PTS. ON SCREENOUT

☐ TOTAL SCORE LESS THAN 2 X NUMBER OF ELEMENTS

HIGH QUALITY FIGURE (Lowest score which indicates high quality for this vacancy) ▶     POINTS

| SIGNATURE OF SME PANEL MEMBER Suzette A. Flishil Umlauf | DATE 7/2/98 | SIGNATURE OF SME PANEL MEMBER Tom Lou | DATE 7/2/98 |
|---|---|---|---|
| SIGNATURE OF SME PANEL MEMBER | DATE | SIGNATURE OF SME PANEL MEMBER Francis M Iffn | DATE 7/2/9 |

SUPERSEDES VA FORM 5-4677, DEC 1976 AND OCT 1970.

VA FORM 5-4677

2

*EOI) 10/24/9_*
*WG 2 HKA*

## Veterans Administration — INSERVICE PLACEMENT RATING SHEET FOR WAGE SYSTEM JOBS

IM␣␣TANT — Complete all items below if the Job Element procedure described in OPM Handbook X-118C is being followed. If the KSAO
alt␣␣ive procedure is used instead, complete ONLY the REVERSE SIDE of this form.

NAME OF EMPLOYEE ███████

POSITION APPLIED FOR *(Title, series, grade)*
HOUSEKEEPING AID, WG-3566-2

ANNOUNCEMENT NO.
OC 98-38

| JOB ELEMENT(S) *see rating plan for more information about each element* | CHECK THE CATEGORY which best indicates the employee's capability based on how his/her total background relates to the quality levels for each job element. | | | | | SOURCE OF INFORMATION *(e.g., SF 171, Item 21A; VA Form 5-4676a, Item 5; Award, February 1983, etc.)* | POINT VALUE |
|---|---|---|---|---|---|---|---|
| | SU-PERIOR  4 pts. | SATIS-FACTORY  3 pts. | ACCEPT-ABLE  2 pts. | WEAK BUT OF SOME VALUE  1 pt. | OF NO VALUE  0 pts. | | |
| (SCREENOUT) Knowledge of proper cleaning procedures and proper uses of a variety of cleaning and sanitizing solutions | | | | | | | 4 |
| Knowledge of housekeeping procedures required in isolation environments. | | | | | | | 3 |
| Ability to work safely. | | | | | | | 4 |
| | | | | | | | |
| | | | | | | | |
| | | | | | | | |
| | | | | | | | |
| | | | | | | | |
| | | | | | | | |

| REMARKS | | TOTAL POINTS | 11 |
|---|---|---|---|

QUALIFIED
☐ AT LEAST 2 PTS. ON SCREENOUT ELEMENT
☒ TOTAL SCORE = 2 X NUMBER OF ELEMENTS OR BETTER

NOT QUALIFIED
☐ LESS THAN 2 PTS. ON SCREENOUT
☐ TOTAL SCORE LESS THAN 2 X NUMBER OF ELEMENTS

QUALITY FIGURE *(Lowest score which indicates high quality for this vacancy)* ▶   POINTS

| SIGNATURE OF SME PANEL MEMBER | DATE | SIGNATURE OF SME PANEL MEMBER | DATE |
|---|---|---|---|
| *Neslett A. Flashel Umlauf* | 7/2/98 | *Tom Love* | 7/2/98 |
| SIGNATURE OF SME PANEL MEMBER | DATE | *Frances M. Ugla* | 7/2/98 |

Suzette

Accepted Standard Form 52
U.S. Office of Personnel Management
FPM Supp. 296-33, Subch. 3

# REQUEST FOR PERSONNEL ACTION

**PART A - Requesting Office** (Also complete Part B, Items 1, 7-22, 32, 33, 36, and 39)

| 1. Action Requested | 2. Request Number |
|---|---|
| Recruitment | 98-22 |

**3. For Additional Information Call** (Name and Telephone Number)
Donna Moore, Secretary, Extended Care (N500)

**4. Proposed Effective Date**

| 5. Action Requested By (Typed Name, Title, Signature, and Request Date) | 6. Action Authorized By (Typed Name, title, signature, and Concurrence Date) |
|---|---|
| Beulah Hadrick, R.N. Clinical Manager for Extended Care  *Beulah Hadrick* | Scott T. Shreve, D.O. ACOS for Extended Care |

**PART B - For Preparation of SF 50** (Use only codes in FPM Supplement 292-1. Show all dates in month-day-year order.)

| 1. Name (Last, First, Middle) | 2. Social Security Number | 3. Date of Birth | 4. Effective Date |
|---|---|---|---|
| Hull, Ronald A. | 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 | 12-1-53 | 6-7-98 |

**FIRST ACTION**

| S-A. Code | 5-B. Nature of Action |
|---|---|
| 893 | Reassignment Promotion |

| S-C. Code | 5-D. Legal Authority |
|---|---|
| DSMPFM | Reg. 307.103 |

5-E. Code    5-F. Legal Authority

**SECOND ACTION**

| 6-A. Code | 6-A. Nature of Action |
|---|---|
| 781 | Change in Work Schedule |

| 6-C. Code | 6-D. Legal Authority |
|---|---|
| UXM | 5 USC 6101  #158 |

6-E. Code    6F. Legal Authority

**7. FROM: Position Title and Number**    HKA
Housekeeping Aid    Perm PT

**7. TO: Position Title and Number**    HCA
Housekeeping Aid    FT Perm.    2-73CA

| 8. Pay Plan | 9. Occ Code | 10. Grade or Level | 11. Step or Rate | 12. Total Salary | 13. Pay Basis |
|---|---|---|---|---|---|
| WG | 3566 | 1 | 2 | 9.35 | PH |

| 12A. Basic Pay | 12B. Locality Adj | 12C. Adj. Basic Pay | 12D. Other Pay |
|---|---|---|---|
| 9.35 | | 9.35 | ¢ |

**14. Name and Location of Position's Organization**
EMS. Operations
32 hr/pp · 4    PT

| 15. Pay Plan | 17. Occ Code | 18. Grade or Level | 19. Step or Rate | 20. Total Salary/Award | 21. Pay Basis |
|---|---|---|---|---|---|
| WG | 3566 | 02 | 01 | $ 9.07 | PH. |

| 15A. Basic Pay | 15B. Locality Adj | 15C. Adj. Basic Pay | 15D. Other Pay |
|---|---|---|---|

**14. Name and Location of Position's Organization**    Comp 510
Department of Veterans Affairs Medical Center
Extended Care
Lebanon, PA 17042    EMS.    FT

**EMPLOYEE DATA**

| 23. Veterans Preference | 24. Tenure | 25. Agency Use | 26. Veterans Preference for RIF |
|---|---|---|---|
| 3  1 - None  5 - 10-Point/Other 3 - 5-Point  6 - 10-Point/Compensable/30% | 2  0 - None  2 - Conditional 1 - Permanent  3 - Indefinite | | ☐ YES  ☒ NO |

| 27. FEGLI | 28. Annuitant Indicator | 29. Pay Rate Determinant |
|---|---|---|
| C | | |

| 30. Retirement Plan | 31. Service Comp. Date (Leave) | 32. Work Schedule | 33. Part-Time Hours Per Biweekly Pay Period |
|---|---|---|---|
| K | 10-3-81 | FT | |

**POSITION DATA**

| 34. Position Occupied | 35. FLSA Category | 36. Appropriation Code | 37. Bargaining Unit Status |
|---|---|---|---|
| 2  1 - Competitive Service  3 - SES General 2 - Excepted Service  4 - SES Career Reserved | N  E - Exempt N - Nonexempt | | 3165 |

| 38. Duty Station Code | 39. Duty Station (City - County - State or Overseas Location) |
|---|---|
| 595 | Lebanon, Lebanon County, Pennsylvania |

| 40. AGENCY DATA 1A POS. | 41. NEW POSITION | 42. REGRADED POSITION | 43. VICE | 44. QUALIFICATION STANDARDS USED |
|---|---|---|---|---|

| 45. EDUCATIONAL LEVEL | 46. YR DEGREE ATTAINED | 47. Academic Discipline | 48. FUNCTIONAL CLASS | 49. CITIZENSHIP 1-USA 8-OTHER | 50. Veterans Y-YE |
|---|---|---|---|---|---|

EXHIBIT 7

**PART C - Reviews and Approvals** (Not to be used by requesting office)

| 1. Office/Function | Initials/Signature | Date | Office/Function | Initials/Signature |
|---|---|---|---|---|
| A. Position Authorized | | | D. English Language Proficiency | |
| B. Classification | G-0368 | | E. Drug Testing Position ☐ YES ☐ NO | |
| C. Placement | | | F.  Coded NM 6/1/98  12/21 | |

**2. Approval:** I certify that the information entered on this form is accurate and that the proposed action is in compliance with statutory and regulatory requirements.

Signature
RAYMER A. KENT
HUMAN RESOURCES MANAGER

Approval Date

No. 5525  P. 2/3    Nov. 29, 1999  12:00PM

RETURN TO HUMAN RESOURCE
N121 NLT 6-16-98

**VA Department of Veterans Affairs**

## SUPERVISORY APPRAISAL OF EMPLOYEE FOR PROMOTION

### SPECIALIZED CATEGORY APPRAISAL WITH NARRATIVE

| NAME OF EMPLOYEE | APPRAISER'S NO. |
|---|---|
| LEWIS JOHNSON | OC. 98-38 |

| PRESENT POSITION AND GRADE | POSITION APPLIED FOR (Title and grade) |
|---|---|
| HKA WG-2 | HOUSEKEEPING AID, WG-3566-2 |

| CURRENT ORGANIZATION | ORGANIZATIONAL LOCATION OF POSITION |
|---|---|
| EMS - OPERATIONS | Extended Care – 19-3 |

**INSTRUCTIONS:** The information furnished on this form will be important in determining the degree to which the employee possesses the Knowledge, Skills, Abilities, and Other characteristics (KSAO's) which are required for performance in the position being filled. In Column II below, the supervisor and/or reviewer will indicate beside the Rating Factor (KSAO) or Job Element listed in Column I, the number of the Category Rating (0 to 5) which best describes the employee's performance with respect to the Rating Factor (KSAO) or Job Element. If the employee's current job does not include any of the KSAO's in the Rating Factor or Job Element and, therefore, performance in them has not been observed, mark "0" in Column II, for each Rating Factor or Job Element.

give specific examples which show how the employee's performance justifies the Category Rating assigned. If more space is required, use additional sheets of paper and include the name of the supervisor at the top of each sheet and identify the appropriate Rating Factor or Job Element. This form may be used for comments by the supervisor followed by those of the reviewer or separate forms may be used for each. If separate forms are used for the supervisor and the reviewer, the supervisor's appraisal should be made available to the reviewer during the review process.

### CATEGORY RATINGS

**5** Employee's performance exceeds expectations to such an extent that it warrants special mention for placement consideration.

**4** Employee has demonstrated the Rating Factor (KSAO) or Job Element to a degree that is clearly above that expected of a fully competent employee and you would expect the employee to display the same degree of ability in the position applied for.

**3** Employee has demonstrated the Rating Factor (KSAO) or Job Element to the full extent expected of a thoroughly competent employee and you would recommend the employee with confidence for another position in which the Rating Factor (KSAO) or Job Element is important.

**2** Employee's performance relative to the Rating Factor (KSAO) or Job Element is acceptable but you would have some reservations about recommending the employee for another position in which the Rating Factor (KSAO) or Job Element is important.

**1** Employee's performance relative to the Rating Factor (KSAO) or Job Element exhibits some definite weaknesses.

**0** Unable to appraise. (When this category is used, the reasons *e.g., current job does not include the KSAO's in this Rating Factor or Job Element.)

| COLUMN I<br>RATING FACTOR (KSAO) OR JOB ELEMENT | COLUMN II<br>CATEGORY | COLUMN III<br>NARRATIVE: Specific examples of what the employee has or has not done to cause merit in and this rating. |
|---|---|---|
| 1. Knowledge of proper cleaning procedures and proper uses of a variety of cleaning and sanitizing solutions. | 3 | Mr. Johnson has been trained according to established procedures outlined in EMS Procedure manual. |
| 2. Knowledge of housekeeping procedures required in isolation environments. | 3 | Trained according to procedure #15, Isolation cleaning. |

EXHIBIT
PENGAD-Bayonne, N.J.

G-0374

RETURN TO HUMAN RESOURCES
N121 NLT 6-16-98

# Department of Veterans Affairs

## SUPERVISORY APPRAISAL OF EMPLOYEE FOR PROMOTION
### SPECIALIZED CATEGORY APPRAISAL WITH NARRATIVE

| NAME OF EMPLOYEE | PRESENT POSITION AND GRADE | CURRENT ORGANIZATION |
|---|---|---|
| LEWIS JOHNSON | HKA WG-2 | EMS - OPERATIONS |
| ANNOUNCEMENT NO. 98-018 | POSITION APPLIED FOR (Title and grade) | ORGANIZATIONAL LOCATION OF POSITION |
| | HOUSEKEEPING AID, WG-3566-2 | Extended Care - 19-3 |
| | | Extended Care - 19-3 |

**INSTRUCTIONS:** The information furnished on this form will be important in determining the degree to which the employee possesses the Knowledge, Skills, Abilities, and Other characteristics (KSAO's) which are required for performance in the position being filled. In Column II below, the supervisor and/or reviewer will indicate beside the Rating Factor (KSAO) or Job Element listed in Column I, the number of the Category Rating (0 to 5) which best describes the employee's performance with respect to the Rating Factor (KSAO) or Job Element. If the employee's current job does not include any of the KSAO's in the Rating Factor or Job Element and, therefore, performance in lieu has not been observed, mark "0", in Column II, for each Rating Factor or Job Element.

give specific examples which show how the employee's performance justifies the Category Rating assigned. If more space is required, use additional sheets of paper and include the name of the supervisor at the top of each sheet and identify the appropriate Rating Factor or Job Element. NOTE: This form may be used for comments by the supervisor followed by those of the reviewer or separate forms may be used for each. If separate forms are used for the supervisor and the reviewer, the supervisor's appraisal should be made available to the reviewer during the review process.

1. Employee's performance relative to the Rating Factor (KSAO) or Job Element to the full extent expected of a thoroughly competent employee and you would recommend the employee with confidence for another position in which the Rating Factor (KSAO) or Job Element is important.

2. Employee has demonstrated the Rating Factor (KSAO) or Job Element to a degree that is clearly above that expected of a fully competent employee and you would expect the employee to display the same degree of ability in the position applied for.

3. Employee's performance exceeds expectations to such an extent that it warrants special mention for placement consideration.

### CATEGORY RATINGS

5. Employee's performance relative to the Rating Factor (KSAO) or Job Element is acceptable but you would have some reservations about recommending the employee for another position in which the Rating Factor (KSAO) or Job Element is important.

1. Employee's performance relative to the Rating Factor (KSAO) or Job Element exhibits some definite weaknesses.

0. Unable to appraise. (When this category is used, cite reasons - e.g., current job does not include the KSAO's in this Rating Factor or Job Element.)

| COLUMN I<br>RATING FACTOR (KSAO) OR JOB ELEMENT | COLUMN II<br>CATEGORY | COLUMN III<br>NARRATIVE: Specific examples of what the employee has or has not done to cause me to award this rating. |
|---|---|---|
| 1. Knowledge of proper cleaning procedures and proper uses of a variety of cleaning and sanitizing solutions. | 3 | Mr. Johnson has been trained in procedures outlined in EMS procedure manual. |
| 2. Knowledge of housekeeping procedures required in isolation environments. | 3 | Trained according to procedure #15, Isolation cleaning. |

G-0374

RETURN TO HUMAN RESOURCES
N121 NLT 6-16-98

**Department of Veterans Affairs**

# SUPERVISORY APPRAISAL OF EMPLOYEE FOR PROMOTION
## SPECIALIZED CATEGORY APPRAISAL WITH NARRATIVE

| NAME OF EMPLOYEE | CURRENT ORGANIZATION |
|---|---|
| LEWIS JOHNSON | EMS - OPERATIONS |
| ANNOUNCEMENT NO. OC-98-18 | ORGANIZATIONAL LOCATION OF POSITION |
| THE SENIOR POSITION AND GRADE: HKA WG-2 | Extended Care - 19-3 |
| POSITION APPLIED FOR (Title and grade): HOUSEKEEPING AID, WG-3566-2 | |

**INSTRUCTIONS:** The information furnished on this form will be important in determining the degree to which the employee possesses the Knowledge, Skills, Abilities, and Other characteristics (KSAO's) which are required for performance in the position being filled. In Column II below, the supervisor and/or reviewer will indicate beside the Rating Factor (KSAO) or Job Element listed in Column I, the number of the Category Rating (0 to 5) which best describes the employee's performance with respect to the Rating Factor (KSAO) or Job Element. If the employee's current job does not include any of the KSAO's in the Rating Factor or Job Element and, therefore, performance in them has not been observed, mark "0" in Column II, for each Rating Factor or Job Element.

give specific examples which show how the employee's performance justifies the Category Rating assigned. If more space is required, use additional sheets of paper and include the name of the supervisor at the top of each sheet and identify the appropriate Rating Factor or Job Element. NOTE: This form may be used for comment by the supervisor followed by those of the reviewer or separate forms may be used for each. If separate forms are used for the supervisor and the reviewer, the supervisor's appraisal should be made available to the reviewer during the review process.

## CATEGORY RATINGS

**5** Employee's performance exceeds expectations to such an extent that it warrants special mention for placement consideration.

**4** Employee has demonstrated the Rating Factor (KSAO) or Job Element to a degree that is clearly above that expected of a fully competent employee and you would expect the employee to display the same degree of ability in the position applied for.

**3** Employee has demonstrated the Rating Factor (KSAO) or Job Element to the full extent expected of a thoroughly competent employee and you would recommend the employee with confidence for another position in which the Rating Factor (KSAO) or Job Element is important.

**2** Employee's performance relative to the Rating Factor (KSAO) or Job Element is acceptable, but you would have some reservations about recommending the employee for another position in which the Rating Factor (KSAO) or Job Element is important.

**1** Employee's performance relative to the Rating Factor (KSAO) or Job Element exhibits some definite weakness.

**0** Unable to appraise. (When this category is used, the reasons - e.g., current job does not include the KSAO's in this Rating Factor or Job Element.)

| COLUMN I RATING FACTOR (KSAO) OR JOB ELEMENT | COLUMN II CATEGORY | COLUMN III NARRATIVE: Specific examples of what the employee has or has not done in cause rate to used this rating. |
|---|---|---|
| 1. Knowledge of proper cleaning procedures and proper uses of a variety of cleaning and sanitizing solutions. | 3 | Mr. Johnson has been trained according to EMS procedures outlined in EMS procedure manual. |
| 2. Knowledge of housekeeping procedures required in isolation environments. | 3 | Trained according to procedure #15, Isolation cleaning. |

G-0374



**Department of Veterans Affairs**

# SUPERVISORY APPRAISAL OF EMPLOYEE FOR PROMOTION
## SPECIALIZED CATEGORY APPRAISAL WITH NARRATIVE

RETURN TO HUMAN RESOURCES
N121 NLT 6-16-98

| NAME OF EMPLOYEE | PRESENT POSITION AND GRADE | CURRENT ORGANIZATION |
|---|---|---|
| LEWIS JOHNSON | HKA WG-2 | EMS - OPERATIONS |

| ANNOUNCEMENT NO. | POSITION APPLIED FOR (Title and Grade) | ORGANIZATION LOCATION OF POSITION |
|---|---|---|
| OC 98-18 | HOUSEKEEPING AID, WG-3566-2 | Extended Care - 19-5 |

INSTRUCTIONS: The information furnished on this form will be important in determining the degree to which the employee possesses the Knowledge, Skills, Abilities, and Other characteristics (KSAO's) which are required for performance in the position being filled. In Column II below, the supervisor and/or reviewer will indicate beside the Rating Factor (KSAO) or Job Element listed in Column I, the number of the Category Rating (0 to 5) which best describes the employee's performance with respect to the Rating Factor (KSAO) or Job Element. If the employee's current job does not include any of the KSAO's in the Rating Factor or Job Element and, therefore, performance in them has not been observed, mark "0" in Column II, for each Rating Factor or Job Element.

give specific examples which show how low the employee's performance justifies the Category Rating assigned. If more space is required, use additional sheets of paper and include the name of the supervisor at the top of each sheet and identify the appropriate Rating Factor or Job Element. NOTE: This form may be used for comments by the supervisor followed by those of the reviewer or separate forms may be used for each. If separate forms are used for the supervisor and the reviewer, the supervisor's appraisal should be made available to the reviewer during the review process.

## CATEGORY RATINGS

5    Employee's performance exceeds expectations to such an extent that it warrants special mention for placement consideration.

4    Employee has demonstrated the Rating Factor (KSAO) or Job Element to a degree that is clearly above that expected of a fully competent employee and you would expect the employee to display the same degree of ability in the position applied for.

3    Employee has demonstrated the Rating Factor (KSAO) or Job Element to the full extent expected of a thoroughly competent employee and you would recommend the employee with confidence for another position in which the Rating Factor (KSAO) or Job Element is important.

2    Employee's performance relative to the Rating Factor (KSAO) or Job Element is acceptable but you would have some reservations about recommending the employee for another position in which the Rating Factor (KSAO) or Job Element is important.

1    Employee's performance relative to the Rating Factor (KSAO) or Job Element exhibits some definite weaknesses.

0    Unable to appraise. (When this category is used, the reason - e.g. current job does not include the KSAO's in this Rating Factor or Job Element.)

| COLUMN I | COLUMN II | COLUMN III |
|---|---|---|
| RATING FACTOR (KSAO) OR JOB ELEMENT | CATEGORY | NARRATIVE: Specific examples of what the employee has or has not done to cause me to used this rating. |
| 1.  Knowledge of proper cleaning procedures and proper uses of a variety of cleaning and sanitizing solutions. | 3 | Mr. Johnson has been trained according to established procedures outlined in EMS procedure manual. |
| 2.  knowledge of housekeeping procedures required in isolation environments. | 3 | Trained according to procedure #15, Isolation cleaning. |

G-0374

8-6-98

To AFGE 1966

I would like the Union AFGE 1966 to conduct an Audit on my behalf. To see if their where any discrepancy that may have led to me no selection of the position of Housekeeping AID in the Extended Care Product Line Area 14-3.

I would like to conduct this Audit as it is stated in our Master Agreement ; Article 22 Merit Promotion Section 16 Union Review of Competitive Actions.

I would like to see the list of Union representatives who responsible for doing the Audit.

Lewis W. Johnson    8-6-98

Received
Sept 10th 1998
FW

PENGAD-Bayonne, N.J.

EXHIBIT
9

Lewis Joh
week
Sep. 2, 19

Hello Peg

I would like a copy of the minutes of the union meeting on Aug 24th 1998. Also, I would like to see your copy of my audit request, and a written statement ~~that it was it the~~ stating why I wasn't give the audit information from the union.

Lewis W. Johnson

Received this Request Sept 8. 1998 @ 9:00AM F.W.

**From The Desk of LEWIS JOHNSON Sr.**

# Memo for the Record

13 October, 1998

**To:**     Michael Brennan

**From:**   LEWIS JOHNSON Sr.

**Date:**   10/13/98

**Re:**     Informal Grievance

Subject: Admonishment for Absence on 27 Aug 98 Ref: Article 13, Sec 1, 6, 7

Article 32 Sec 2 para c, d h

On 21 Aug 1998, I verbally told Rodney K. Weekend Supervisor that I wanted to cancel my leave scheduled for Aug 31 to Sept 4 1998, Rodney granted my request. Rodney suggested that I put my requested cancellation in the Employee Time and Leave computer, I did this immediately. At this time he did not mention that my work schedule would be alter in anyway or that I would be working on my regular days off (RDO) When I arrived at work on the 28 Aug1998 to pick up my uniforms for work, I was told by Mike Brennan Daylight Supervisor that I was suppose to work the preceding day. I informed him at that time I had not been told of a work schedule change. He said that no one communicated that I had canceled my annual leave and that I should have been at work the preceding day. I asked Mike Brennan for annual leave and he said Okay. I had assumed that leave was approved until 14 Sept 1998, when I pulled up my Leave Used Summary on the computer and found the leave charged as AWOL. I was given no prior notification that the leave was changed to AWOL or the reason for the Admonishment.

Relief: I request that, my request for annual leave be reinstated and the AWOL be removed from my record. {Please reference Past Practices and Article 13 Section 1, 6 and 7, Article 32, Section 2 para c, d, and h. of the Master Agreement

Past Practices: On two previous occasions Mike Brennan asked me to use annual leave when he scheduled me incorrectly for nine days instead of 10 days this occurring in the months May and July.

Sign, *Lewis W. Johnson*

10-13-98

# Memorandum of Understanding

### Between
### VAMC Lebanon
### and
### AFGE Local 1966

### Seniority Determinations

The parties agree that the determination of seniority when used in reassignment decision, whether for the most or least senior the following definition will apply:

The primary determining factor will be entrance on duty (EOD)at the VAMC Lebanon.

In situations where there is an tie on EOD the next determining factor will be Service Computation Date (SCD) as defined in Federal Regulations.

If both EOD and SCD are equal the employee(s) with the higher last 2 digits of their Social Security Number will be deemed to be more senior.

Frances M. Winters
President, AFGE Local 1966

Timothy P. Shea
Acting, CEO

Dist. "B"

AMERICAN FEDERATION OF GOVERNMENT EMPLOYEES
AFFILIATED WITH THE AFL-CIO

LOCAL 1966



V.A. MEDICAL CENTER
1700 S. Lincoln Avenue
Lebanon, PA 17042-7597

November 24, 1999

Raymer Kent
Human Resources Manager

A.F.G.E. is requesting an extension of time frame for the process of filing grievance and or appeals on

behalf of Lewis Johnson in reference to the following "Monetary/Group Award 1998" and the current

"Assault/Harassment".

Respectfully,

*Frances M Winters*

Frances M. Winters
President AFGE Local 1966

*Lewis Johnson found out about the Monetary/Group Award 1998 - this past September 23, 1998 - F.M.W. 11/24/99*

*A 30 day extension is approved beginning 11-22-99*

April 19, 1994
Attachment

## RANGE OF PENALTIES FOR STATED OFFENSES

The following is a partial listing of the most common offenses, excerpted from VHA Supplement, MP-5, Part II, Chapter 8. The entire listing is available in the Human Resources Management Service Office, Building 1, Ground Floor, Room 31.

| Nature of Offense | 1st Offense | | 2nd Offense | | 3rd Offense | |
|---|---|---|---|---|---|---|
| | Minimum | Maximum | Minimum | Maximum | Minimum | Maximum |
| 1. Unexcused tardiness unauthorized absence | Admonishment | Reprimand | Reprimand | 10 days | 10 days | Discharge |
| 2. Leaving job, VA premises or job to which assigned during working hours, without proper permission. | Admonishment | Reprimand | Reprimand | 5 days | 10 days | Discharge |
| 3. Loafing, willful idleness or waste of time. | Admonishment | Reprimand | Reprimand | 10 days | 10 days | Discharge |
| 4. Smoking in unauthorized places or carrying of flammables, e.g., matches, in explosive areas. | Admonishment | Reprimand | Reprimand | 10 days | 10 days | Discharge |
| 5. Endangering the safety of or causing injury to yourself or other personnel through carelessness or negligence. | Admonishment | Discharge | 10 days | Discharge | Discharge | Discharge |
| 6. Failure to report personal injury or accident. | Admonishment | Reprimand | Reprimand | 10 days | 5 days | 15 days |
| 7. Failure to safeguard confidential matter. | Admonishment | Reprimand | Reprimand | 10 days | 10 days | Discharge |
| 8. Deliberates failure or unreasonable delay in carrying out instructions. | Admonishment | Reprimand | 3 days | 10 days | 10 days | Discharge |

| No. | Offense | | | | | |
|---|---|---|---|---|---|---|
| | where safety of patients, beneficiaries, members of the public, employees or property is not endangered. | | | | | |
| 10. | Sleeping on duty where safety of patients, beneficiaries, members of the public, employees, or property is endangered. | 5 days | Discharge | Discharge | | Discharge |
| 11. | Abuse of patients or beneficiaries. | Reprimand | Discharge | 10 days | Discharge | Discharge |
| 12. | Fighting, threatening, attempting or inflicting bodily injury to another; engaging in dangerous horseplay. | Reprimand | Discharge | 10 days | Discharge | Discharge |
| 13. | Disrespectful conduct, use of insulting, abusive, or obscene language to or about other personnel. | Reprimand | Discharge | 10 days | Discharge | Discharge |
| 14. | Insubordination – deliberate refusal to carry out any proper order from, or insolent, abusive or obscene language toward, immediate or other supervisor having responsibility for the work of the employee; willful resistance to same. | Reprimand | Discharge | 10 days | Discharge | Discharge |
| 15. | Reporting to or being on duty while under the influence of alcohol. | Reprimand | 10 days | 15 days | Discharge | Discharge |
| 16. | Reporting to or being on duty while under the influence of a drug or controlled substance. | 15 days | Discharge | Discharge | | |

| Offense | | | | | | |
|---|---|---|---|---|---|---|
| ...eft... to take drug... t, as ... d. | Admonishment | Discharge | 1st | Discharge | Discharge | |
| Sexual harassment. | Reprimand | Discharge | 5 days | Discharge | 10 days | Discharge |
| Indebtedness – ...of good faith in ...ng just financial ...gations ... | Admonishment | | Admonishment | Reprimand | 5 days | Discharge |
| Theft of Government ...erty. | Reprimand | Discharge | 10 days | Discharge | Discharge | |
| Intentional ...fication, ...atement, or ...airment of material ... | Reprimand | Discharge | 10 days | Discharge | Discharge | |
| Participation in ...ype of "prohibited" ...de activities ... | Admonishment | Discharge | 10 days | Discharge | | |
| Entering into ...nal financial ...actions, accepting ...e forms of goods, money, ...ces, purchases at discount, ...tainment, or similar favors) ...patients or beneficiaries ... | Reprimand | Discharge | Discharge | | | |
| ...iscrimination based ...e, color, sex, ...on, national origin, ...arital status, ...cal affiliation, ...dicap. | Reprimand | Discharge | 5 days | Discharge | 10 days | Discharge |

03/27/00  16:03  ☎717 228 6022          VAMC LEBANON                      ☒030

1-CE-1



# DEPARTMENT OF VETERANS AFFAIRS
### Medical Center
### 1700 South Lincoln Avenue
### Lebanon, PA 17042

November 1, 1999                                    In Reply Refer To:  595/121

United States Department of Labor
Office of Workers' Compensation Program
3535 Market Street
Philadelphia PA 19104

Dear Claims Examiner:

Enclosed please find a claim for a Traumatic Injury being submitted by Mr. Lewis Johnson, SSN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, that was alleged to have occurred on September 18, 1999. The cause of injury provided on the CA-1 alleges that Mr. Johnson was "physically assaulted by another employee who caused stress and strain". This claim is being controverted based on the information obtained during a review of the incident.

This incident was reported to the supervisor on October 18, 1999, and a Report of Contact was initiated. In an effort to defuse the situation, Mr. Rodney Kiscadden immediately assigned the two employees involved to separate areas of the medical center. Mr. Kiscadden also counseled the employee involved and ordered the employee not to have any contact with Mr. Johnson. A witness statement that has been provided indicates that a confrontation had occurred and words were exchanged between Mr. Johnson and another employee, but does not indicate that an assault occurred. An official police investigation was conducted concerning the incident and there was no evidence found to support that an actual assault had occurred during the confrontation. I have enclosed a copy of the police report for your review.

On October 22, 1999, Mr. Johnson spoke with Mr. Raymer Kent, Human Resources Manager, about the incident. During the meeting, Mr. Kent informed Mr. Johnson that the supervisor had ordered the other employee involved in the incident to refrain from making any contact with Mr. Johnson. Mr. Kent also assured Mr. Johnson that the other employee would not be assigned to work in proximity to Mr. Johnson's assigned area.

On the date of the incident, Mr. Johnson requested and was granted Annual Leave for the remaining two and a half-hours of his shift. Mr. Johnson returned to work the following day, October 19, 1999, and worked a full 8-hour day without incident. On the following day

*ATTACHMENT E - 4 PAGES , 1 OF 4 PAGE*

*Exh I*
*11*

03/27/00   16:05   ☎717 228 6022          VAMC LEBANON                              ☑031

1-CE-2

Wednesday, October 20, 1999, Mr. Johnson reported for duty and it was reported that Mr. Johnson was sitting in his vehicle in the parking lot refusing to report to his assigned workplace. When police officers arrived, they concluded that this was an administrative matter and contacted the appropriate personnel. A meeting was held with Mr. Johnson and product line management and Mr. Johnson was reassured that the situation was neutralized. At the conclusion of this meeting Mr. Johnson requested and was granted Annual Leave after working three hours of his assigned shift. Mr. Johnson did not request Sick Leave after either of these incidents.

Later the same day on October 20, 1999, Mr. Johnson made an appointment with his primary care physician, Earl Brinser, DO who excused him from work until Monday October 25, 1999. Written on a prescription slip submitted by Mr. Johnson, Dr. Brinser recommended counseling for Mr. Johnson. There has been no medical information provided from Dr. Brinser's office to support that Mr. Johnson sustained a traumatic injury causally related to the incident at the medical center.

On October 22, 1999, Mr. Johnson was admitted to the Acute Partial Day Hospital Program at Philhaven Hospital. Mr. Johnson provided a letter from Richard Pakola, MD, stating that he was enrolled in this program and will be unable to report to work until further notice. Mr. Johnson has failed to provide medical documentation to support his allegation of a traumatic injury. Any additional medical documentation will be processed immediately to facilitate easy adjudication of this claim.

After a review of the information provided, it can not be concluded that there is a causal relationship between the incident that occurred and the counseling that Mr. Johnson is undergoing. Therefore it would be suggested that this claim for Traumatic Injury would be denied.

If I can be of further assistance or additional information is needed I may be contacted at (717) 272-6621, Extension 4060.

Sincerely,

JOSEPH R. STUCKEY, JR.
Personnel Management Specialist

Enclosures

ATTACHMENT E - 4 PAGE 1 - 4 OF 4 PAGES

03/27/00   15:56   717 228 6022          VAMC LEBANON
OCT-21-1999  11:22   FROM-                                      T-248   P.002/002   F-480
                                                                              ☑026
                                                                              Fax

  

Philhaven                      283 ____ ____ Road
                               P.O. Box 40
                               Mt. Gretna, PA 17064
                               (717) 273-6871

## AUTHORIZATION FOR RELEASE OF INFORMATION

I do hereby consent and authorize Philhaven to receive from/disclose to:

Name            **V A Hospital Raymer Kent**
Address         **Miss McWiggins X 4661**
Phone Number    **272-6621**                      Fax Number

information from my medical record(s) related to my identity, diagnosis, prognosis and treatment (including diagnosis and/or treatment for mental health, drug/alcohol abuse and/or HIV-related information). The specific information to be received/disclosed includes:
(Please mark an X in the correct column for each document)

| Receive | Disclose | | Receive | Disclose | |
|---------|----------|--|---------|----------|--|
| ☐ | ☐ | Discharge Summary | ☐ | ☑ | Initial Evaluation/Admission Note |
| ☐ | ☐ | Social History | ☐ | ☐ | Psychological Evaluation/Summary |
| ☐ | ☐ | Immunization Record | ☐ | ☐ | Homebound Instruction Report |
| ☐ | ☐ | History & Physical | ☐ | ☐ | Patient Data Form |
| ☐ | ☐ | Outpatient Treatment Summary | ☐ | ☐ | Referral/Treatment Summary |
| ☐ | ☐ | Discharge Instructions | ☐ | ☐ | Psychiatric Evaluation/Summary |
| ☐ | ☐ | Alcohol and Other Drug Consult | ☐ | ☐ | Laboratory Reports |
| X | X | Other (list specific items): | | | **Verbal/written communication, testing results** |

I understand this information is to be used for the purpose of: (check as many as apply)  ☐ Diagnosis  ☐ Continuity of care  ☐ Treatment planning  ☐ Discharge planning  ☐ Other:

> *This information is being disclosed from records whose confidentiality may be protected by Pennsylvania Law, Act 63, and/or Pennsylvania P.L. 817, and/or Federal Public Law 93-282, and/or Code of Federal Regulations, 41 (Drug and Alcohol treatment records), and/or Act 148, (Confidentiality of HIV-related Information Act). I understand the nature of this release and understand that I have the right to inspect material that is to be released. I understand that I may revoke this authorization at any time by notifying Philhaven.*

> *This authorization shall be effective immediately and shall expire in one year from the date hereof or on _____, 20___ and is valid for all medical record documentation during the effective period.*

I understand that I have the right to request a copy of this authorization and that I may revoke my consent at anytime by written notice to Philhaven.  Check one:  ☐ patient accepted copy   ☑ patient declined copy

X _Laurie M Johnson_                    X _10/21/99_          X _Self_
Patient's Signature                       Date                  Relationship to Patient (to be completed only when
(or parent/guardian for child under 14 years of age)           parent/guardian or person with Power of Attorney
                                                               authorizes release for the patient)

X _John Sroley_                          X _10/21/99_
Signature of Witness                      Date

### THIS PORTION TO BE COMPLETED WHEN PATIENT IS UNABLE TO GIVE WRITTEN CONSENT
We, the undersigned, do verify that the above authorization has been read to the patient and that he/she understands the nature of the release and freely gives his/her verbal consent for release of the above information. The patient has also been informed that he/she may verbally revoke this authorization at any time.

_____              _____
Signature of Witness/Date                 Signature of Witness/Date

Auth. for Release of Info.             Patient Name: _Laurie Johnson_
PC-135A      01-99      G-0206         Patient Number: _124 287_
                                       Date of Birth:

ATTACHMENT I - 3 pages - 2 OF 3 PAGE

03/27/00   15:55   717 728 6022        VAMC LEBANON                              Ø025

OCT-21-1999  11:22     FROM-                                    T-249  P.001/002  F-480

                                                                                FAX-1

# Fax Transmission From:

Philhaven Lebanon
204 Hathaway Park
Lebanon, PA 17042        Telephone: 717-274-9777        Fax: 717-274-9815

Date/Time: _10/21/99_                    # of pages to follow cover sheet:

To: _Mr Koot_

                                          Special Instructions: Please list documents being
_Confidential Yes __X__        No_____     faxed.

_VA - HR_
         Organization

_____

       Fax Number

_____

    Telephone Number

From: _John Swley_

Philhaven Lebanon
204 Hathaway Park
Lebanon, PA 17042   Telephone: 717-274-9777
Fax: 717-274-9815

*  *  *

The information contained in this facsimile message is privileged and confidential information
intended for the use of addressee listed above. If you are neither intended recipient or the
employee or agent responsible for delivering information to the intended recipient, you are
hereby notified that nay disclosure, copying, distribution, taking of any in reliance on the content
of this telecopied information is strictly prohibited.

Please call sender as soon as possible at the telephone number indicated above to verify receipt
of the fax or to report problems with the transmission.

If you have received this copy in error, please immediately notify the sender by telephone at the
number indicated above, arrange for destruction of the documents.

                                          RECEIVED
                                     HUMAN RESOURCES

G-0205                                   OCT 2 1 1999

                                     VA MEDICAL CENTER
                                     LEBANON, PA  17042

**Time Line As Provided by**
**Lewis W. Johnson**

### Wednesday, October 13, 1999

8:00 AM  Johnson (black male) meets Chandler (black male) and Erickson (white male) in the hallway of building #1.  Erickson stated to Johnson, " Hey Lewis, let me tell you what people are saying about you. "  Johnson responds I don't want to hear it."  Erickson then places his body in Johnson's path to prevent him passing, shouts to Chandler, " Hey Lou, I'm going to tell Lewis what people are saying about him. "  Chandler does not respond in any manner.  Erickson then stated to Johnson, " People are saying you are a white man in a black man's skin. "  Johnson shoves his way past Erickson and walks quickly away.  As Johnson leaves he hears Erickson loudly laughing.

2:00 PM  Near the Environmental Management Services ( EMS ) office, Johnson meets Chandler in one of the tunnels.  Johnson stated to Chandler, " I am going to make a complaint on what Erickson said to me. "  Chandler replied, "  You got to do what you got to do, I understand.".  Johnson then stated, " Someone will probably talk to you. "  They then parted, going in different directions.

### Thursday, October 14, 1999

(7:30 AM)  During the morning Johnson met his supervisor, Rodney Kiscadden, near the EMS office.  Johnson inquires what forms were needed to make a complaint on a fellow employee.  Kiscadden indicated he did not know but would find out and let Johnson know, during the course of day.

(1:30 PM)  Kiscadden informed Johnson that he would need a ' Point of Contact ' form to file a written complaint on an employee.

(2:00 PM)  Johnson obtained a ' Point of Contact ' form from the Nursing Station in building 1-3A.

### Friday, October 15, 1999

(2:30 PM)  Johnson met with Kiscadden in the EMS office.  Johnson explained the nature of the complaint and told Kiscadden he had a 'rough draft' that needed to be typed. Kiscadden then left the office at which time Glenn Definbach ( a Housekeeping Aid ), who had been sitting in an adjacent office, came out and asked Johnson, " What's going on with you, Irv and Louis and this racial remark? "  Johnson asked Definbach, " What did you hear? "  Definbach explained to Johnson, he had over heard a conversation between Erickson, Chandler and Ms. Lynette Brady ( EEO personnel ), concerning a racial remark made toward Johnson.

### Monday, October 18, 1999

(8:30 AM)  While at his assigned work location, Johnson telephoned the Office of Resolution Management ( ORM ) and explained to Ms. Mitchell, who answered the telephone, the incident concerning the racial remark by Erickson, which occurred on October 13, 1999. Ms.Mitchell stated she would forward the complaint to a Counselor, who would contact Johnson.

Exhibit 13

(10:20 AM)  Johnson was in building #1, ward 3A, his assigned work location, standing at the Nursing Station, holding a conversation with Ward Clerk, Barbara Yeich. Erickson entered the area and from about twenty feet away shouted, " Hey Lewis. I want to talk to you. "  Johnson responded, " I don't want to talk to you. "  Johnson began walking in the opposite direction from Erickson.  A few seconds later, Johnson felt a slight blow to the middle of his back.  Glancing over his shoulder, Johnson realized Erickson had caught up to him and was using his shoulder to cause these blows to Johnson's back. Each blow to Johnson's back caused him, Johnson to stumble. Again, over and over, Erickson repeated, " I want to talk to you and tell you what they are saying. "  Each time Johnson responded, " Leave me alone, I don't want to hear it. "  This occurred approximately fifteen feet in one direction and fifteen feet in the opposite direction, until they again arrived at the Nursing Station.  On arriving again at the Nursing Station, Johnson ran through the opening to the Nursing Station, to a nearby bathroom and locked himself in.  After an unknown amount of time, Johnson existed the bathroom, figuring Erickson had left the area. On realizing Erickson was no longer in the area, Johnson telephoned Carolyn Mcguigan, his department chief and was told by her secretary to report to Mcguigan's office at 10:45 AM.  After speaking to this secretary, Johnson called ORM and explained he had just been assaulted.  Ms. Mitchell told Johnson someone would contact him.

(10:45 AM) Johnson met with Mcguigan and explain everything that had occurred with Erickson from October 13, 1999 up to that point.  Mcguigan summoned Kiscadden into her office and Kiscadden confirmed previous complaints from Johnson regarding Erickson.  Mcguigan completed a ' Point of Contact ' form and Johnson left the office.

### Tuesday, October 19, 1999

(8:15 AM )  Johnson reported to his assigned work area, building #1, ward 3A.  Johnson and Yeich discussed what occurred the previous day.  Yeich, during this conversation stated she had seen everything that had occurred including Erickson hitting Johnson.  Yeich went on to explain to Johnson that she was extremely upset due to a conversation she had with Kiscadden. Yeich stated the first thing asked her by Kiscadden was, " So, whose side are you taking? "

(9:30 AM)  Erickson appeared in building #1, ward 3A, Johnson's assigned work location. Erickson looked directly at Johnson, stopped and smiled very broadly.  Erickson then went into the work closet assigned to Johnson.  Erickson existed the work closet, smiled again at Johnson and went into the shower room.  Johnson went over to close the door to the work closet, which had been left open by Erickson.  Erickson then came out of the shower, again smiled broadly at Johnson and left the area.  Johnson noticed something in Erickson's hand but did not see what it was.  Johnson immediately called the Veterans Administration Police and reported all that had occurred.  Johnson was instructed to come to the police station in order to make a full report.

(9:45 AM)  Johnson arrived at the VA police station and gave a full report as to every thing that had occurred, beginning October 13, 1999.

### Wednesday, October 20, 1999

(7:45 AM)  Johnson arrived at work and was informed he was assigned to building #1, ward 3, ICU.  He was also informed that Erickson was assigned to the same building and was moving furniture from floor to floor.  Johnson stated that's not right or words to that affect and began to cry.  Johnson stated he felt sick and requested sick leave in order to go home. Kiscadden stated to Johnson, " Sit and calm down and I'll go talk to the chief about you going home on sick

leave. " As Kiscadden left, Definbach, who was in the next room, came out and inquired if Johnson was okay. Kiscadden returned and told Johnson it was okay for him to go home on sick leave but "they" wanted to talk to him first. Johnson asked to be allowed to wait in his van. Prior to going to his van, Johnson called Robert Dennis, union steward, and asked him to meet him at his van because he, Johnson needed help. A few minutes later, Dennis arrived at Johnson's van, at which time Johnson explained that his supervisors were forcing him to work in the same location as Erickson. Dennis stated to Johnson he would go talk with them. Dennis returned and stated senior VA management had informed him that Erickson would not bother him again. At that point a police officer arrived at the van; the officer and Dennis escorted Johnson to building #1, ward 3-ICU. As the police officer and Dennis began to leave, Johnson was told Erickson would be coming to his assigned area to remove furniture. Johnson began to shake and asked the two men not to leave. Dennis, who only then learned that Erickson would be working in the same area, made a telephone call. Johnson do not known who Dennis called. Dennis and Johnson returned to building # 2, where they were met by Chief of Police Dennis Herb, Chief of Operations Muratits, Chief of Support Carolyn Mcguigan and Kiscadden. Kiscadden explained to the group, in detail, what had been occurring between Erickson and Johnson, since October 13, 1999. Johnson was told the incidents were very serious but however, Erickson would not bother him, Johnson again. Johnson was told he could be assigned to another building, if he so desired. Mcguigan stated to Johnson, " You can go home on sick leave but when you return I want you to sit with Mr. Erickson, talk about this, shake hands and make up."

    (3:30 PM) Johnson visited his doctor, Earl Brinser, 405 Cumberland Street, Lebanon, PA 17042. After this session with Dr. Brinser, Dr. Brinser referred Johnson to Phil Haven Mental Health Facility. Further, Dr. Brinser gave Johnson three prescription slips, dated October 20, 1999, with his medical instructions, to wit:

    1. Excused from work from October 21, 1999 through October 24, 1999 and to return to work on October 25, 1999. This slip had a notation, " Unable to work " It was signed by Dr Brinser.

    2. A prescription for medication, dated October 20, 1999, to include two refills. This was signed by Dr. Brinser.

    3. A statement dated October 20, 1999, suggesting treatment, his findings and the cause. The statement as written by Dr. Brinser, " Counseling. Re stress, tension, fear, work related issues."

## Thursday, October 21, 1999

    (5:30 AM) Telephoned EMS and reported off as per doctors instructions.
    (10:00 AM) Went to Phil Haven Outpatient Clinic for an initial evaluation. Therapist also faxed a medical report to Mr. Kent. Recommended for Day Hospital.

## Friday, October 22, 1999

    ( 9:00 AM) Went to Day Hospital at Phil Haven Mental Health Facility. Instructed by Pakola ( Phil Haven ) recommended not to return to until after treatment.
    ( 4:00 PM) Met with Raymer Kent and gave him medical notes from Dr.Brinser and Dr. Pakola ( Phil Haven ). The only conversation was why I was unable to handle these problems.

<div align="center">END OF REPORT</div>

<div align="right">*Lewis W. Johnson*</div>

5-99 MON 14:00

P. 02

Counseling – October 20, 1999

Carolyn McGuigan, Chief, Support Section, and Rodney Kiscadden, Acting Manager, Environmental Management (EM), met with EM employee Irvin Erickson concerning the incident between Erickson and Lewis Johnson.

Explained to Mr. Erickson that he will have no contact with Mr. Johnson in the future unless it is work related.

Mr. Erickson was also informed that any future substantiated complaints could result in disciplinary actions.

*Rodney M. Kiscadden*
RODNEY M. KISCADDEN
Acting Manager, EM

I acknowledge receipt of the original of this counseling.

Name: *Irvin D Erickson*          Date: 11-15-99

G-086

Exh 14

NOV-15-99 MON 14:00                                                                P. 02

<u>Counseling – October 20, 1999</u>

Carolyn McGuigan, Chief, Support Section, and Rodney Kiscadden, Acting Manager,
Environmental Management (EM), met with EM employee Irvin Erickson concerning the
incident between Erickson and Lewis Johnson.

Explained to Mr. Erickson that he will have no contact with Mr. Johnson in the future unless it is
work related.

Mr. Erickson was also informed that any future substantiated complaints could result in
disciplinary actions.

RODNEY M. KISCADDEN
Acting Manager, EM

I acknowledge receipt of the original of this counseling.

Name: _Irvin D. Erickson_____    Date: _11-15-99_____

G-086

Exh 14

# REPORT OF CONTACT

**NOTE: This form must be filled out in ink or on typewriter as it becomes a permanent record in veterans' folders.**

A Medical Center
700 South Lincoln Avenue
Lebanon, PA 17042

IDENTIFICATION NOS. (C,XC,SS,XSS,V,K, e

LAST NAME-FIRST NAME-MIDDLE NAME OF VETERAN (Type or print)

| ADDRESS OF VETERAN | DATE OF CONTACT |
| --- | --- |
| | October 18, 1999 |
| | TELEPHONE NO. OF VETERAN |
| PERSON CONTACTED | |
| | TYPE OF CONTACT    (Check) |
| ADDRESS OF PERSON CONTACTED | X PERSONAL  · TELEPHONE |
| | TELEPHONE NO. OF PERSON CONTACTED |

BRIEF STATEMENT OF INFORMATION REQUESTED AND GIVEN

On October 18, 1999, I met with Environmental Management (EM) employee Irvin Erickson about separate harassment incidents occurring with EM employee Lewis Johnson.

Mr. Erickson told me that he did not originally make the statement "You are a white person in black skin," but only repeated that statement that was said about Mr. Johnson.

On the second incident, Mr. Erickson explained he wanted to talk to Mr. Johnson and Mr. Johnson was avoiding him and wouldn't talk to him. They might have brushed shoulders during this incident, but Mr. Erickson would not concur this happened.

| DIVISION OR SECTION | EXECUTED BY (Signature and Title) |
| --- | --- |
| Operations Product Line/EM | *Rodney Kiscadden*<br>RODNEY KISCADDEN<br>Acting Manager, Environmental Management |

Automated VA Form 119

Exhibit 15



DEPARTMENT OF VETERANS AFFAIRS
Medical Center
1700 South Lincoln Avenue
Lebanon, PA 17042

November 17, 1999

In Reply Refer To: 595/N131

Mr. Lewis W. Johnson
1025 Harmany Hill Drive
Lebanon, PA 17046

Dear Mr. Johnson:

We addressed the issues you reported to us with the individual concerned and have taken action to ensure it is not repeated.

We are confident you can return to work without any concerns.

RODNEY M. KISCADDEN
Acting Manager, Environmental Management

G-054



# Department of
# Veterans Affairs

# Memorandum

**Date:** December 15, 1999

**From:** Acting Manager, E.M.(N137)

**Subj:** Verification of witness statement.

**To:** Human Resources Manager (N121)

I have reviewed the witness statement of Barbara Yeich dated October 19, 1999 that was sent to the Department of Labor and is currently in the OWCP folder of Mr. Lewis Johnson. I verify that the information provided by Ms. Yeich in that statement is consistent with the information she provided when I spoke with her concerning this incident. I am not aware of any other witness statements that may have been provided by Ms. Yeich.

*Rodney M. Kiscadden*
RODNEY M. KISCADDEN

**Federal Employee's Notice of
Traumatic Injury and Claim for
Continuation of Pay/Compensation**

**U.S. Department of Labor**
Employment Standards Administration
Office of Workers' Compensation Programs

N[

Employee: Please complete all boxes 1 - 15 below. Do not complete shaded areas.
Witness: Complete bottom section 16.
Employing Agency (Supervisor or Compensation Specialist): Complete shaded boxes a, b, and c.

**Employee Data**

1. Name of employee (Last, First, Middle)
JOHNSON, LEWIS W

3. Date of birth    Mo.   Day   Yr.
07   04   56

4. Sex
☒ Male  ☐ Female

5. Home telephone
(717) 270-0454

2. Social Security Number
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

7. Employee's home mailing address (Include city, state, and ZIP code)
1025 Harmony Hill Drive

Lebanon, PENNSYLVANIA   17046

6. Grade as of
date of injury  Level 2    Step 03

8. Dependents
☒ Wife, Husband
☒ Children under 18 years
☐ Other

**Description of Injury**

9. Place where injury occurred (e.g. 2nd floor, Main Post Office Bldg., 12th & Pine)

1-3a

10. Date injury occurred
Mo.   Day   Yr.
10   18   99

Time
10 : 20   ☒ a.m.
☐ p.m.

11. Date of this notice
Mo.   Day   Yr.
10   26   99

12. Employee's occupation
housekeeping aid

13. Cause of injury (Describe what happened and why)
a phisical assault caused by another employeein bldg.1-3a on oct.18@10:20 which
caused stress and strain.

14. Nature of injury (Identify both the injury and the part of body, e.g., fracture of left leg)
traumatic mental stress and strain.

a. Occupation code

b. Type code   c. Source code
0700   0280

OWCP Use - NOI Code

*Lewis W. L. Johnson*    10/26/99
**Employee Signature**

15. I certify, under penalty of law, that the injury described above was sustained in performance of duty as an employee of the
United States Government and that it was not caused by my willful misconduct, intent to injure myself or another person, nor by
my intoxication. I hereby claim medical treatment, if needed, and the following, as checked below, while disabled for work:

☒ a. Continuation of regular pay (COP) not to exceed 45 days and compensation for wage loss if disability for work continues
beyond 45 days. If my claim is denied, I understand that the continuation of my regular pay shall be charged to sick
or annual leave, or be deemed an overpayment within the meaning of 5 USC 5584.

☐ b. Sick and/or Annual Leave

I hereby authorize any physician or hospital (or any other person, institution, corporation, or government agency) to furnish any
desired information to the U.S. Department of Labor, Office of Workers' Compensation Programs (or to its official representative).
This authorization also permits any official representative of the Office to examine and to copy any records concerning me.

Signature of employee or person acting on his/her behalf _____   Date _____

Any person who knowingly makes any false statement, misrepresentation, concealment of fact or any other act of fraud to obtain compensation
as provided by the FECA or who knowingly accepts compensation to which that person is not entitled is subject to civil or administrative
remedies as well as felony criminal prosecution and may, under appropriate criminal provisions, be punished by a fine or imprisonment or both.

**Have your supervisor complete the receipt attached to this form and return it to you for your records.**

**Witness Statement**

16. Statement of witness (Describe what you saw, heard, or know about this injury)

*see attached*

Name of witness
barbara yeich

Signature of witness

Address

City                                      State          ZIP Code

Date signed

Form CA-1

 

**Official Supervisor's Report: Please complete information requested below:**

## Supervisor's Report

**17. Agency name and address of reporting office (Include city, state, and ZIP code)**

VAMC Lebanon

1700 S. Lincoln Ave.

Lebanon, PENNSYLVANIA

| OWCP Agency Code |
|---|
| 4265 |

OSHA Site Code

ZIP Code
17042

**18. Employee's duty station (Street address and ZIP code)**

Same

ZIP Code

**19. Regular work hours** From 06:00 ☒ a.m. ☐ p.m. To 02:30 ☐ a.m. ☒ p.m.

**20. Regular work schedule** ☐ Sun. ☒ Mon. ☒ Tues. ☒ Wed. ☒ Thurs. ☒ Fri. ☐ Sat.

**21. Date of injury** Mo. 10 Day 18 Yr. 99

**22. Date notice received** Mo. 10 Day 26 Yr. 99

**23. Date stopped work** Mo. 10 Day 20 Yr. 99 Time : ☐ a.m. ☐ p.m.

**24. Date pay stopped** Mo. 10 Day 20 Yr. 99

**25. Date 45 day period began** Mo. 10 Day 20 Yr. 99

**26. Date returned to work** Mo. Day Yr. Time : ☐ a.m. ☐ p.m.

**27. Was employee injured in performance of duty?** ☒ Yes ☐ No (If "No," explain)

**28. Was injury caused by employee's willful misconduct, intoxication, or intent to injure self or another?** ☐ Yes (If "Yes," explain) ☒ No

**29. Was injury caused by third party?** ☐ Yes ☒ No (If "No," go to item 31.)

**30. Name and address of third party (Include city, state, and ZIP code)**

**31. Name and address of physician first providing medical care (Include city, state, ZIP code)**

Dr. Brinser

405 Cumberland ST.

Lebanon, PENNSYLVANIA 17042

**32. First date medical care received** Mo. 10 Day 20 Yr. 99

**33. Do medical reports show employee is disabled for work?** ☒ Yes ☐ No

**34. Does your knowledge of the facts about this injury agree with statements of the employee and/or witness?** ☒ Yes ☐ No (If "No," explain)

**35. If the employing agency controverts continuation of pay, state the reason in detail.**

**36. Pay rate when employee stopped work** $ _____ Per _____

## Signature of Supervisor and Filing Instructions

**37.** A supervisor who knowingly certifies to any false statement, misrepresentation, concealment of fact, etc., in respect of this claim may also be subject to appropriate felony criminal prosecution.

I certify that the information given above and that furnished by the employee on the reverse of this form is true to the best of my knowledge with the following exception:

**Name of supervisor (Type or print)**
KISCADDEN, RODNEY

**Signature of supervisor**
/ES/ KISCADDEN, RODNEY    *Rodney Kiscadden*

**Date**
Oct 26, 1999@09:33:29

**Supervisor's Title**
Acting Manager

**Office phone**
4656

**38. Filing instructions**
☐ No lost time and no medical expense: Place this form in employee's medical folder (SF-66-D)
☐ No lost time, medical expense incurred or expected: forward this form to OWCP
☒ Lost time covered by leave, LWOP, or COP: forward this form to OWCP
☐ First Aid injury

Form CA-1
Rev. Sept. 1993

## Disability Benefits for Employees under the Federal Employees' Compensation Act (FECA)

The FECA, which is administered by the Office of Workers' Compensation Programs (OWCP), provides the following benefits for job-related traumatic injuries:

(1) Continuation of pay for disability resulting from traumatic, job-related injury, not to exceed 45 calendar days. (To be eligible for continuation of pay, the employee, or someone acting on his/her behalf, must file Form CA-1 within 30 days following the injury; however, to avoid possible interruption of pay, the form should be filed within 2 working days. If the form is not filed within 30 days, compensation may be substituted for continuation of pay.)

(2) Payment of compensation for wage loss after the 45 days, if disability extends beyond such period.

(3) Payment of compensation for permanent impairment of certain organs, members, or functions of the body (such as loss or loss of use of an arm or kidney, loss of vision, etc.), or for serious disfigurement of the head, face, or neck.

(4) Vocational rehabilitation and related services where necessary.

(5) Full medical care from either Federal medical officers and hospitals, or private hospitals or physicians, of the employee's choice. Generally, 25 miles from the place of injury, place of employment, or employee's home is a reasonable distance to travel for medical care; however, other pertinent facts must also be considered in making selection of physicians or medical facilities.

At the time an employee stops work following a traumatic, job-related injury, he or she may request continuation of pay or use sick or annual leave credited to his or her record. Where the employing agency continues the employee's pay, the pay must not be interrupted until:

(1) The employing agency receives medical information from the attending physician to the effect that disability has terminated;

(2) The OWCP advises that pay should be terminated; or

(3) The expiration of 45 calendar days following initial work stoppage.

If disability exceeds, or it is anticipated that it will exceed, 45 days, and the employee wishes to claim compensation, Form CA-7, with supporting medical evidence, must be filed with OWCP. To avoid interruption of income, the form should be filed on the 40th day of the COP period. Form CA-3 shall be submitted to OWCP when the employee returns to work, disability ceases, or the 45 days period expires.

For additional information, review the regulations governing the administration of the FECA (Code of Federal Regulations, Title 20, Chapter 1) or Chapter 810 of the Office of Personnel Management's Federal Personnel Manual.

## Privacy Act

In accordance with the Privacy Act of 1974 (Public Law No. 93-579, 5 U.S.C. 552a) and the Computer Matching and Privacy Protection Act of 1988 (Public Law No. 100-503), you are hereby notified that: (1) The Federal Employees' Compensation Act, as amended (5 U.S.C. 8101, et seq.) is administered by the Office of Workers' Compensation Programs of the U.S. Department of Labor. In accordance with this responsibility, the Office receives and maintains personal information on claimants and their immediate families. (2) The information will be used to determine eligibility for and the amount of benefits payable under the Act. (3) The information collected by this form and other information collected in relation to your compensation claim may be verified through computer matches. (4) The information may be given to Federal, State, and local agencies for law enforcement and for other lawful purposes in accordance with routine uses published by the Department of Labor in the Federal Register. (5) Failure to furnish all requested information may delay the process, or result in an unfavorable decision or a reduced level of benefits. (Disclosure of a social security number (SSN) is voluntary; the failure to disclose such number will not result in the denial of any right, benefit or privilege to which an individual may be entitled. Your SSN may be used to request information about you from employers and others who know you, but only as allowed by law or Presidential directive. The information collected by using your SSN may be used for studies, statistics, and computer matching to benefit and payment files.)

## Receipt of Notice of Injury

This acknowledges receipt of notice of injury sustained by:
(Name of injured employee)

_Lewis Johnson_

Which occurred on (Mo., Day, Yr.)   _10-18-99_

At (Location)

_Bldg. #1, 3rd Floor_

| Signature of Official Superior | Title | Date (Mo., Day, Yr.) |
|---|---|---|
| _Joseph R Strichey Jr._ | _Personnel Management Specialist_ | _10-26-99_ |

Form CA-1

DEPARTMENT OF VETERANS AFFAIRS                          Page   4
VA POLICE
UNIFORM OFFENSE REPORT
UOR# 99-10-19-0930

VA Facility                                    Date/Time Printed
LEBANON, PA                                     OCT 19, 1999@12:25
Automated VA Form 10-1393

YEICH STATED THAT JOHNSON WALKED BEHIND THE NURSES STATION AND LOCKED
HIMSELF IN THE BATHROOM. WITNESS STATEMENT IS ATTACHED TO THIS REPORT.
       ON 10-19-99 AT 1042 HOURS I APPROACHED IRV ERICKSON IN BLDG# 1
FIFTH FLOOR IN HIS OFFICE AREA. BEFORE ANY STAEMENTS WERE MADE I INFORMED
ERICKSON OF HIS RIGHTS, TO WHICH HE FULLY UNDERSTOOD. I BEGAN TO INTERVIEW
ERICKSON CONCERNING THIS MATTER. ERICKSON STATED THAT ON 10-13-99 AT 0800
HOURS HE CALLED JOHNSON OVER ONLY TO TELL HIM WHAT PEOPLE WERE SAYING ABOUT
HIM. ERICKSON STATED THAT THIS WHAT NOT HIS PERSONAL FEELINGS BUT ONLY WHAT
PEOPLE WERE SAYING. ERICKSON STATED THAT HE DID SAY "HEY LEWIS, THEY ARE
SAYING THAT YOU ARE A WHITE MAN IN BLACK SKIN" ERICKSON SAID THAT EMS
EMPLOYEE L. CHANDLER WAS THERE TO WITNESS THESE STATEMENTS.  ERICKSON
STATED THAT JOHNSON, CHANDLER AND HIMSELF WERE JOKING AROUND EARLIER THAT
MORNING. ERICKSON STATED THAT ON 10-18-99 AT 1025 HE DID IN FACT APPROACH
JOHNSON ON 1-3A ONLY TO CLEAR UP THE MISUNDERSTANDING BETWEEN THEM ON THE
STATEMENTS MADE. ERICKSON STATED THAT HE NEVER PUSHED HIS SHOULDER INTO
JOHNSON OR MADE ANY PHYSICAL CONTACT WITH JOHNSON. HE JUST WANTED TO TALK
TO JOHNSON TO CLEAR THINGS UP. SEE VOLUNTARY STATEMENT ATTACHED TO THIS
REPORT.
       ON 10-19-99 AT 1150 HOURS I INTERVIEWED L. CHANDLER CONCERNING THIS
MATTER. CHANDLER STATED THAT ERICKSON WAS ONLY TELLING JOHNSON WHAT OTHER
PEOPLE WERE SAYING ABOUT HIM. CHANDLER STATED THAT ERICKSON WASN'T VIEWING
HIS OWN PERSONAL FEELINGS ABOUT JOHNSON. SEE VOLUNTARY STATEMENT ATTACHED
TO THIS REPORT.
       AFTER HEARING THE TESTIMONY OF ALL INVOLVED AND MY INVESTIGATION, I
FIND THAT THE COMPLAINT FILED BY L. JOHNSON AGAINST I. ERICKSON IS
UNFOUNDED. NO FURTHER POLICE ACTION REQUIRED AT THIS TIME.


       DISPOSITION:

CASE CLOSED.



STEPHEN J JR SABOL    # 2987
INVESTIGATING OFFICER

Exhibit 19

**Veterans Administration**                 **VOLUNTARY WITNESS STATEMENT**

.atement of _Lewin Erickson_____, Date of Birth _____

and Social Security Number _____. Given on _____

to _____, at _____

in reference to Uniform Offense Report Number _____

10-13-99 Lewis Johnson came down to
1-2B where Louis Chandler and I
were doing waxing. He had no reason to
be down there, so all three of us were
kidding around, and as he was leaving
I said to him what his own brother
say about him. I did not tell him that
as my point of view, only what his
own brothers say about him. I have
no ill feeling against Johnson. I do
not stalk him.

As far as 10-13-99 I aproached Mr.
Johnson to explain what I said, as he
walked away from me we slightly
bumped into each other. No Mallace
was intended I just wanted to explain
to him what was said.

I have read each page of this statement consisting of _____ pages(s) and I certify that the information

given is true to the best of my knowledge.

Exhbit N

_Lewin Erickson_                          _10-20-99_
(Declarant) Signature                      Date

_____                   _____
(Witness) Signature                        Date

March 25, 2000
In reply to:ORM/08E

REGISTERED MAIL

LEWIS JOHNSON
1025 HARMONY DR.
LEBANON, PA 17046

George Irvin, EEO Counselor
Dept. of VA
ORM (08E)
151 Knollcroft Rd. Bldg. #16
Lyons New Jersey 07939

Dear George Irvin, EEO Counselor,

In response to your letter, I am forwarding the following:

This complaint is against Mr. Stuckey, Mr. Kent and Mr. Kiscadden for not following the guidelines in the "Injury Compensation for Federal Employees Publication CA-810". I believe they wrongfully impede my claim because of unlawful discriminatory reasons. Reprisal and harassment. Because of prior EEO activities.

On October 26, 1999, at approximately 8:30 A. M., I arrived at the Human Resources Offices at the Lebanon Veterans Administration Hospital. I entered the office of Joseph Stuckey and stated to him, " I'm here because of what happen to me because of the assault." He replied, " You're here to put in a claim because you were assaulted?" I answered, "Yes". He, stated, " I can do that for you."

I was instructed to sit at his computer as he explained to me how "OWCP" were now using computers for submissions of claims. Mr. Stuckey indicated how the computer makes it quicker to get a claim processed. He stated, however, his computer was not yet connected but he would type the claim anyway. As well, Mr. Stuckey instructed me to enter a protected password into his computer as my signature. This he said, would insure that no one would be able to access my claim, without my permission.

Mr. Stuckey instructed me as to what to type on my claim. Immediately after typing in the information provided by Mr. Stuckey, I was instructed to enter a password. I was then instructed to sign a form CA-1, Federal Employee's Notice of Traumatic Injury. After signing the CA-1 form, I was given a Form Ca-1, Rev. Nov. 1989, which was already signed by Mr. Stuckey. Just prior to departing Mr. Stuckey's office, he, Mr.

Exhibit 21

Stuckey informed me that he would run the forms over to my supervisor, Rodney Kiscadden, for his signature.

The above procedure, utilized by Mr. Stuckey was a deliberate act to cause a delay or denial of workers compensation benefits. I have since learned that Mr. Stuckey should have given me the forms to complete and submit to my immediate supervisor. Additionally, Mr. Stuckey provided me with a Form CA-1, Rev. Nov. 1989, with his signature, with all instructions omitted. (The reverse sides blank) The use of the computer to file information, use of a password and providing blank forms with instructions omitted, and not providing me a CA-16 form to cover medical treatment and expense. I believe, were in violation of the laws and statutes as to filing for workers compensation benefits.

It is important to note that on October 21, 1999, five days before Mr. Stuckey had me file a CA-1 (Notice of Traumatic Injury), he was informed of the nature of my injury. John Snively, my therapist, at my instructions, contacted Raymer Kent, Mr. Stuckey's supervisor, and explained the nature of the injury and the recommended treatment. As such, Mr. Stuckey, knew or should have known the nature of my injury and the suggested treatment was not indicative of a traumatic injury, as would require the filing of a CA-1 (Notice Of Traumatic Injury). (Note: Mr. Snively's written comment on the initial evaluation, dated October 21, 1999, as to his telephone call to Raymer Kent) Additionally, Mr. Snively states that on October 21, 1999, he faxed a copy of the initial evaluation to Raymer Kent. (Note: Written statement provided by Phil Haven, dated December 13, 1999, as to faxed information to Raymer Kent)

On or about November 23, 1999, during a visit to Mr. Stuckey office, along with William J. Dumas, my OWCP representative, Mr. Stuckey, for the first time informed me that my claim for workers' compensation benefits was being controverted. He informed me that the controversion was " a Philadelphia OWCP controversion " and was not being controverted by the Veterans Administration. Further, Mr. Stuckey explained OWCP was controverting the claim because " something was amiss." As well, we requested to have the CA-1 withdrawn, with an explanation to OWCP and to have a CA-2 submitted for benefits. Mr. Stuckey refused to submit the CA-2.

On or about November 30, 1999, Mr. Dumas and I again had the occasion to visit Mr. Stuckey. During this meeting, Mr. Dumas requested I be given a CA-7, which had been previously denied. At this time a CA-7 was provided. As well, Mr. Stuckey again told me, "the claim was being held up by Philadelphia". When Mr. Dumas stated we would contact the

OWCP office in Philadelphia, Mr. Stuckey finally admitted he had personally controverted the claim.   At no time previous to this, had Mr. Stuckey informed me that he or the VA had controverted the claim.   Mr. Dumas reiterated his belief that CA-1 form was the incorrect form to be filed due to the nature of my claimed injury.   At this point, Mr. Stuckey stated, " I thought it may be the wrong form but its okay, there will not be a problem with that ".  During this meeting, Mr. Dumas asked Mr. Stuckey about the need for additional medical reports, at which Mr. Stuckey replied, " Lewis has failed to provide me with any additional medical reports ".   However, prior to this conversation, Mr. Stuckey had never requested any additional medical documentation.

The Federal Employees Compensation Act, states I'm suppose to be informed of any controversion of my claim in detail of why it's being controverted. Within ten days of the controversion. Mr. Stuckey told me my claim was controverted on November 30, 1999, 29 days after he controverted on November 1, 1999. According to his letter we found in my file, in his office.

On or about December 13, 1999, on learning of our right to view my records, Mr. Dumas and I again visited Mr. Stuckey's office.  I found in my records, a controversion letter, dated November 1, 1999, which was prepared and signed by Joseph Stuckey.  The controversion was not my supervisor's decision, but that of Mr. Stuckey.  My supervisor, who was in the best position to know what occurred, did not controvert the claim, as shown by his signature on the CA-1 and the subsequent CA-2.  (Note: The narrative prepared by my supervisor, Rodney Kiscadden, as indicated on the CA-1 is missing.  All information on CA-1 as proved by Mr. Kiscadden are contradicted by Mr. Stuckey) Mr. Stuckey's version of the facts concerning the racial harassment by Irvin Erickson was in no way factual but was based on his desire for reprisal and retaliation.  Most importantly, Mr. Stuckey deliberately misled, OWCP, by stating in his controversion letter that I refused to provide medical documentation as to the cause of the injury.

Mr. Stuckey indicated in his controversion letter that I failed, on several occasions, to provide him with a requested Release of Information form.  However, the records in Mr. Stuckey's possession included, a signed "Release Of Information" form, dated October 21, 1999, which was provided by the treating facility.  (Note: The Release Of Information form was stamp dated as received by the VA, October 21, 1999).  Though, the controversion letter may not have been the factor in denying me benefits, on the CA-1, the deliberate act of not obtaining and forwarding medical records was a factor.

On or about December 21, 1999, Mr. Dumas and I again visited Mr. Stuckey's office. At that time, Mr. Dumas asked Mr. Stuckey to show him a CA-2 form. When given the CA-2 form, Mr. Dumas and I immediately left Mr. Stuckey's office and proceeded to the office of my supervisor, Rodney Kiscadden. The CA-2 was partially completed by Mr. Kiscadden. Mr. Kiscadden had not yet completed his narrative. I was told to return the following day to sign all the documents. The following day, on arrival at Mr. Stuckey's office we were informed that Mr. Stuckey was not in. However, the CA-2 and attached forms were left with another employee, who instructed me to sign the CA-2. I refused to sign the CA-2 because the narrative prepared by Mr. Kiscadden was missing.

On or about December 23, 1999, during the early morning, I called Mr. Stuckey and informed him that I was concerned because Mr. Kiscadden's narrative was not included with the new CA-2. Mr. Stuckey stated Mr. Kiscadden was not in and would not return until after the holidays. Later that day, I found a message on my telephone answering machine from Mr. Stuckey, stating that Mr. Kiscadden had came in and submitted his narrative. After receiving the message, I called Mr. Stuckey's office. I was told that Mr. Stuckey had left for the day.

On December 28, 1999, Mr. Dumas and I went to Mr. Stuckey's office. Mr. Dumas and I reviewed the new CA-2 claim file, which was to be submitted to OWCP. The narrative prepared by me as well the narrative prepared by Mr. Kiscadden was missing from the claim file. When brought to Mr. Stuckey's attention, he retrieved my narrative from his desk draw and stated " Oh, I forgot to include it." Mr. Stuckey stated Mr. Kiscadden's narrative only contradicted the statement of Barbara Yeich, concerning comments made to her by Mr. Kiscadden.

I objected to Mr. Kiscadden's narrative not being included in the claim being submitted to OWCP. Additionally, Mr. Dumas and I took this objection to Mr. Kent. Mr. Kent then made the derogatory racial statement; " We have done enough for you people and will do no more."

At all times Mr. Stuckey refused to withdraw the CA-1 and re-file a CA-2 as requested. We had a "reasonable suspicion" that Mr. Stuckey was trying to empede or delay my claim. Several letters were forwarded to the agency's CEO, Charlene Szabo, in an attempt to have Mr. Stuckey file the correct form but without success. In fact, Ms. Szabo alluded to Mr. Dumas being the cause of the incorrect filing of the original CA-1. The representative statement signed by Mr. Dumas, at the behest of Mr. Kent, shows Mr. Dumas involvement in these matter beginning in mid November, 1999, a month after the original claim was filed and submitted to OWCP

On January 28, 2000, Mr. Dumas and myself visited OWCP in Philadelphia by appointment to review my CA-1 and CA-2 claim on file. We learned that "initial evaluation" information was not a part of the CA-1 claim. Also, parts of the police reports were missing.

We were able to speak with the claims examiner Mr. McFeely who processed my CA-1 claim. Mr. McFeely stated "their wasn't enough medical info to support my claim and that why it was denied." We asked if he would have received my "initial evaluation", that supported a CA-2 claim what would have happen. He explained that he would have sent it back, and directed the agency to re-file my claim as a CA-2.

As far as me not providing medical information to Mr. Stuckey. He always had a "Release of Information" form, that he could have brought to me, at anytime, to check off what he wanted. Mr. Stuckey did not do this even after we found the "Release of Information" in my file, on December 13, 1999.

Mr. Stuckey, Mr. Kent and Mr. Kiscadden have not followed the guidelines in the "Injury Compensation for Federal Employees Publication CA-810". I believe they wrongfully impede my claim because of unlawful discriminatory reasons. I believe I'm black, and EEO activities are the bases for their behavior.

Sincerely yours,

*Lewis W. Johnson*

Lewis Johnson

## Disability Benefits for Employees under the Federal Employees' Compensation Act (FECA)

The FECA, which is administered by the Office of Workers' Compensation Programs (OWCP), provides the following general benefits for employment-related occupational disease or illness:

(1) Full medical care from either Federal medical officers and hospitals, or private hospitals or physicians of the employee's choice.

(2) Payment of compensation for total or partial wage loss.

(3) Payment of compensation for permanent impairment of certain organs, members, or functions of the body (such as loss or loss of use of an arm or kidney, loss of vision, etc.), or for serious disfigurement of the head, face, or neck.

(4) Vocational rehabilitation and related services where necessary.

The first three days in a non-pay status are waiting days, and no compensation is paid for these days unless the period of disability exceeds 14 calendar days, or the employee has suffered a permanent disability. Compensation for total disability is generally paid at the rate of 2/3 of an employee's salary if there are no dependents, or 3/4 of salary if there are one or more dependents.

If an employee is in doubt about compensation benefits, the OWCP District Office servicing the employing agency should be contacted. (Obtain the address from your employing agency.)

For additional information, review the regulations governing the administration of the FECA (Code of Federal Regulations, Title 20, Chapter 1) or Chapter 810 of the Office of Personnel Management's Federal Personnel Manual.

## Privacy Act

In accordance with the Privacy Act of 1974 (Public Law No. 93-570, 5 U.S.C. 552a), you are hereby notified that:

(1) The Federal Employees' Compensation Act, as amended (5 U.S.C. 8101, et seq.) is administered by the Office of Workers' Compensation Programs of the U.S. Department of Labor. In accordance with this responsibility, the office receives and maintains personal information on claimants and their immediate families.

(2) The information will be used to determine eligibility for and the amount of benefits payable under the Act.

(3) The information may be used by other agencies or persons in matters relating directly or indirectly to the matter of the claim, so long as such agencies or persons have received the consent of the individual claimant, or complied with the provisions of 20 CFR 10.

(4) Failure to furnish all requested information may delay the process, or result in an unfavorable decision or a reduced level of benefits (disclosure of a social security number is voluntary; the failure to disclose such number will not result in the denial of any right, benefit or privilege to which an individual may be entitled).

## Receipt of Notice of Occupational Disease or Illness

This acknowledges receipt of notice of disease or illness sustained by:
(Name of injured employee)

10-20-99    Lewis Johnson

I was first notified about this condition on (Mo., Day, Yr.)

At (Location)

Bldg #1

| Signature of Official Superior | Title | Date (Mo., Day, Yr.) |
|---|---|---|
| Joseph R Stuckey Jr | Personnel Management Specialist | 12-22-99 |

This receipt should be retained by the employee as a record that notice was filed.

Exhibit 22

CA-2

## Disability Benefits for Employees under the Federal Employees' Compensation Act (FECA)

...e FECA, which is administered by the Office of Workers' Compensation Programs (OWCP), provides the following benefits for job-related traumatic injuries:

(1) Continuation of pay for disability resulting from traumatic, job-related injury, not to exceed 45 calendar days. (To be eligible for continuation of pay, the employee, or someone acting on his/her behalf, must file Form CA-1 within 30 days following the injury; however, to avoid possible interruption of pay, the form should be filed within 2 working days. If the form is not filed within 30 days, compensation may be substituted for continuation of pay.)

(2) Payment of compensation for wage loss after the 45 days, if disability extends beyond such period.

(3) Payment of compensation for permanent impairment of certain organs, members, or functions of the body (such as loss or loss of use of an arm or kidney, loss of vision, etc.), or for serious disfigurement of the head, face, or neck.

(4) Vocational rehabilitation and related services where necessary.

(5) Full medical care from either Federal medical officers and hospitals, or private hospitals or physicians, of the employee's choice. Generally, 25 miles from the place of injury, place of employment, or employee's home is a reasonable distance to travel for medical care; however, other pertinent facts must also be considered in making selection of physicians or medical facilities.

At the time an employee stops work following a traumatic, job-related injury, he or she may request continuation of pay or use sick or annual leave credited to his or her record. Where the employing agency continues the employee's pay, the pay must not be interrupted until:

(1) The employing agency receives medical information from the attending physician to the effect that disability has terminated;

(2) The OWCP advises that pay should be terminated; or

(3) The expiration of 45 calendar days following initial work stoppage.

If disability exceeds, or it is anticipated that it will exceed, 45 days, and the employee wishes to claim compensation, Form CA-7, with supporting medical evidence, must be filed with OWCP. To avoid interruption of income, the form should be filed on the 40th day of the COP period. Form CA-3 shall be submitted to OWCP when the employee returns to work, disability ceases, or the 45 days period expires.

For additional information, review the regulations governing the administration of the FECA (Code of Federal Regulations, Title 20, Chapter 1) or Chapter 810 of the Office of Personnel Management's Federal Personnel Manual.

## Privacy Act

In accordance with the Privacy Act of 1974 (Public Law No. 93-579, 5 U.S.C. 552a) and the Computer Matching and Privacy Protection Act of 1988 (Public Law No. 100-503), you are hereby notified that: (1) The Federal Emplyees' Compensation Act, as amended (5 U.S.C. 8101, et seq.) is administered by the Office of Workers' Compensation Programs of the U.S. Department of Labor. In accordance with this responsibility, the Office receives and maintains personal information on claimants and their immediate families. (2) The information will be used to determine eligibility for and the amount of benefits payable under the Act. (3) The information collected by this form and other information collected in relation to your compensation claim may be verified through computer matches. (4) The information may be given to Federal, State, and local agencies for law enforcement and for other lawful purposes in accordance with routine uses published by the Department of Labor in the Federal Register. (5) Failure to furnish all requested information may delay the process, or result in an unfavorable decision or a reduced level of benefits. (Disclosure of a social security number (SSN) is voluntary; the failure to disclose such number will not result in the denial of any right, benefit or privilege to which an individual may be entitled. Your SSN may be used to request information about you from employers and others who know you, but only as allowed by law or Presidential directive. The information collected by using your SSN may be used for studies, statistics, and computer matching to benefit and payment files.)

## Receipt of Notice of Injury

This acknowledges receipt of notice of injury sustained by:
(Name of injured employee)

_Lewis Johnson_

Which occurred on (Mo., Day, Yr.)  _10-18-99_

At (Location)

_Bldg. #1  3rd Floor_

| Signature of Official Superior | Title | Date (Mo., Day, Yr.) |
|---|---|---|
| _Joseph R Strucher Jr._ | _Personnel Management Specialist_ | _10-26-99_ |

Form CA-1
Rev. Nov. 198

 **Injured Employee's Notification of Responsibilities**

An Employee who sustains an on-the-job injury is responsible for:

1. Reporting on-the-job injury to supervisor immediately.

2. Obtain and complete the following forms from the supervisor:

   a. For Traumatic injury, Form CA-1, Federal Employee's Notice of Traumatic Injury, **- or -**
   b. For Occupational illness or disease, Form CA-2, Federal Employee's Notice of Occupational Disease, **-and-**
   c. For any accident resulting in occupational illness or injury, VA Form 2162.

3. Report to Employee Health Clinic with your supervisor. **Regardless of severity of the injury, you must report to the Employee Health Clinic for an initial evaluation in order to file an OWCP claim.** If an employee does not report to Employee Health it may/will jeopardize the claim and payment of benefits. You must return the completed Medical Capabilities form to your supervisor immediately after receiving medical treatment.

4. Hand carry the following forms to the OWCP Specialist in Human Resources Management Service (HRMS) VA-2162, CA-1/CA-2 or CA-2a during administrative shift. Failure to do so may result in a delay of receipt of benefits. Compensation may be denied if notice of injury or occupational disease is not submitted within 30 days of injury. During nonadministrative shift, leave forms in the Employee Health Clinic.

   a. Upon your reporting to the OWCP Specialist with completed forms, OWCP benefits will be explained. At this time you will select your Attending Physician and obtain authorization (Form CA-16) BEFORE you go for medical treatment to a non-VA provider. Except for emergency care, authorization may not be issued retroactively for past treatment.

   b. The physician must be located within a 25 mile radius of your home or worksite.

   c. Prior approval from OWCP must be obtained for non-emergency surgery.

   d. Chiropractors are excluded from treating work incurred injuries except in very limited circumstances. If you wish to seek treatment from a chiropractor, obtain guidance from HRMS. (If the chiropractor is excluded, the government will not pay medical expenses incurred or lost time from work.)

   e. To change physicians, a written request must be submitted to the Office of Workers' Compensation Program (OWCP). Only OWCP can approve a change of physicians except where your physician has referred you to another doctor.

   f. The first treatment or examination by the Employee Health Physician or treatment by the Medical Officer of the Day (MOD) is not considered a selection of an attending physician.

   g. If you have been examined and/or treated by the MOD, you must report to the Employee Health Clinic the next administrative workday for examination and report to the OWCP Specialist for instruction on OWCP regulations and official selection of an attending physician.

5. Promptly provide medical documentation from a private physician. Payment of medical expenses and continuation of pay (COP) is not authorized without medical documentation. Returning the CA-16 with the physician's section completed properly will give the necessary medical documentation. Other valid medical documentation are a completed CA-20, the physician's narrative statement, copies of progress notes, etc., which indicate the relationship of the medical condition to the work injury claimed and the work status of the employee, including any physical limitations imposed.

6. Employee must keep the supervisor and OWCP Specialist informed of their duty status and any physical limitations imposed by the physician. YOU ARE OBLIGATED TO RETURN TO FULL OR LIGHT DUTY WORK AS SOON AS YOUR DOCTOR ALLOWS YOU TO DO SO. Failure to report as directed will result in loss of compensation benefits.

7. Contact the OWCP Specialist in Bldg. 1, Room 32 or extension 4060 for information regarding policies, procedures and problems.

NOTE: Reimbursement for medical expenses and time lost is dependent upon acceptance of the claim by OWCP. If the claim is not accepted, the employee is responsible for payment of medical bills. All medical bills submitted to OWCP must be filed on an OWCP Form 1500.

I certify that on this date I have received a copy of "Injured Employee's Notification of Responsibilities." I hereby release any medical information pertaining to the above injury to Human Resources Management Service at Lebanon VA Medical Center for appropriate processing of my workers' compensation claim.

_Lewis M. Johnson_
NAME

**G-0496**

_10/26/99_
DATE

HUMAN RESOURCES MANAGEMENT SERVICE COPY

_Exhibit 23_

12-22-99 12:20PM   FROM PHILHVN MED RECORDS    TO 92285925              P002/002



Philhaven

283 South Butler Road
P.O. Box 550
Mt. Gretna, PA 17064
(717) 273-8871

## AUTHORIZATION FOR RELEASE OF INFORMATION

I do hereby consent and authorize Philhaven to receive from/disclose to:

| | |
|---|---|
| Name | Joe Stuckey, VA Medical Center |
| Address | 1700 S Lincoln Ave., Lebanon, PA 17042 |
| Phone Number | 272-6621, X 4060 |

Fax Number   228-5925

information from my medical record(s) related to my identity, diagnosis, prognosis and treatment (including diagnosis and/or treatment for mental health, drug/alcohol abuse and/or HIV-related information). The specific information to be received/disclosed includes:
(Please mark and X in the correct column for each document)

| Receive | Disclose | | Receive | Disclose | |
|---|---|---|---|---|---|
| ☐ | ☒ | Discharge Summary | ☐ | ☒ | Initial Evaluation/Admission Note |
| ☐ | ☐ | Social History | ☐ | ☐ | Psychological Evaluation/Summary |
| ☐ | ☐ | Immunization Record | ☐ | ☐ | Homebound Instruction Report |
| ☐ | ☐ | History & Physical | ☐ | ☐ | Patient Data Form |
| ☐ | ☐ | Outpatient Treatment Summary | ☐ | ☐ | Referral/Treatment Summary |
| ☐ | ☐ | Discharge Instructions | ☐ | ☒ | Psychiatric Evaluation/Summary |
| ☐ | ☐ | Alcohol and Other Drug Consult | ☐ | ☐ | Laboratory Reports |
| ☐ | ☒ | Other (list specific items): | | | Progress Notes; any and all records (inpatient, outpatient, day hospital) |

written/verbal communication

I understand this information is to be used for the purpose of: (check as many as apply) ☐ Diagnosis ☐ Continuity of care ☐ Treatment planning ☐ Discharge planning ☒ Other: Workman's compensation claim

*This information is being disclosed from records whose confidentiality may be protected by Pennsylvania Law, Act 63, and/or Pennsylvania P.L. 817, and/or Federal Public Law 93-282, and/or Code of Federal Regulations, 42 (Drug and Alcohol treatment records), and/or Act 148, (Confidentiality of HIV-related Information Act). I understand the nature of this release and understand that I have the right to inspect material that is to be released. I understand that I may revoke this authorization at any time by notifying Philhaven.*

*This authorization shall be effective immediately and shall expire in one year from the date hereof or on _____, 19__ and is valid for all medical record documentation during the effective period.*

I understand that I have the right to request a copy of this authorization and that I may revoke my consent at anytime by written notice Philhaven.
Check one: ☐ patient accepted copy        ☐ patient declined copy

X _Terri M. Johnson_            X _12-28-99_        X _____
Patient's Signature              Date              Relationship to Patient (to be completed only when
(or parent/guardian for child under 14 years of age)                parent/guardian or person with Power of Attorney
                                                                    authorizes release for the patient)

X _Donald R. Stuckey_           X _12-28-99_
Signature of Witness             Date                              G-0422

| |
|---|
| **THIS PORTION TO BE COMPLETED WHEN PATIENT IS UNABLE TO GIVE WRITTEN CONSENT** |

We, the undersigned, do verify that the above authorization has been read to the patient and that he/she understands the nature of the release and freely gives his/her verbal consent for release of the above information. The patient has also been informed that he/she may verbally revoke this authorization at any time.

_____          _____
Signature of Witness/Date                 Signature of Witness/Date

Auth. for Release of Info.

PC-135A      01-99

| | |
|---|---|
| Patient Name: | Lewis Johnson |
| Patient Number: | 124287 |
| Date of Birth: | 7/4/56 |

Exhll 24



**DEPARTMENT OF VETERANS AFFAIRS**
**Medical Center**
1700 South Lincoln Avenue
**Lebanon, PA  17042**

December 3, 1999                                     In Reply Refer To:  595/121

United States Department of Labor
Office of Workers' Compensation Program
Attn: Mr. Anthony McFeeley
3535 Market Street
Philadelphia PA 19104

Dear Mr. McFeeley:

On November 1, 1999 a CA-1 was submitted for Mr. Lewis Johnson, Case #03-0246931.  A letter outlining the alleged incident as well as other documentation was also submitted with the claim.

Mr. Johnson presented the enclosed Discharge Instructions to my office on December 2, 1999. After a review of those discharge notes, it appears as if Mr. Johnson has had psychiatric concerns that have been ongoing and are far beyond the scope of the alleged work related incident.

Mr. Johnson has signed a release of information and I have requested a copy of the medical records from Philhaven.  I will process those records to your office as soon as they are received. I am sure that when all of the records are presented it will provide a clear picture of Mr. Johnson's ongoing personal and family problems that are non-work related.

If I can be of further assistance, I may be contacted at (717) 272-6621, extension 4060.

Sincerely,

JOSEPH R. STUCKEY, JR
Personnel Management Specialist

Enclosure

G-0448

Exhibit 25

 Philhaven 
83 S    Butler Road
P.O. Box 550
Mt. Gretna, PA 17064
(717) 273-8871

## Discharge Instructions

*\* Please take this document to your aftercare appointments*

Program: Adult Partial | Admit Date: 10/22/99 | Discharge Date: 11/1[...]

**SUMMARY**

Presenting Problem: Lewis was referred to the Adult Partial program w DDX issues by Dr. Brinser due to stress, tension, and work related issues; evidenced by increased agitation w/ homicidal thoughts, moodswings, irritability; panic attacks, excessive worrying, and explosive anger, as well as depressive symptoms.

Course of    Lewis participated in all scheduled groups and activit[...] He identified stressors due to work related issues, family conflict, and self concept issues. He was able to address issues of self esteem anger, fears, rejection, and addiction. Lewis was able to give constructive feedback & receive support from others. Marital session addressed issues of poor communication skills and family dynamics.

Discharge Type: ☒ Regular    ☐ Against Medical Advice    ☐ Outpatient Commitment

Discharge Recommendations: Lewis' mood has improved significantly. He still struggles w/ self esteem and anger issues. Lewis should continue on medication as prescribed and follow up w/ physi[...] for med. management & outpt therapy to continue address self concept and family issues.

Discharge To: Self

Allergies & Reactions: NKDA

**MEDICATIONS**

| Name | Dosage | Directions | Date Rx. Given | # | Refills |
|------|--------|------------|----------------|---|---------|
| Celexa | 20 mg. | 1 tab p.o. HS | 11/5/15 | 1 | |
| | | | | | |
| | | | | | |
| | | | | | |
| | | | | | |
| | | | | | |
| | | | | | |
| | | | | | |

Blood Levels
Medication: | Date Drawn: | Value: | Date Due:

Medication supervision required    Yes    No

Discharge Instructions
PC-240    01-99
G:\USERS\FORMS\PC-240.WPD

G-0449

Patient Na[...]    Johnson, Lewis W.
Patient N[...]    124287
Admissi[...]    Date Of Birth: 7/4/1956
                  Admission Date: 10/22/1999

Patient A[...]
Patient Ph[...]

Special Instructions:

☐   Special Diet:

☐   Avoid driving until given permission by your physician.

☑   Avoid alcohol and drug use due to serious interactions with your medications.

☐   You may return to work/school.  Letter provided   ☐ Yes   ☐ No   ☐ N/A

Providers marked with an "X" below participated in an interagency meeting regarding aftercare.

**A F T E R C A R E   P L A N S**

Primary Therapist: _Elaine Howell_  Phone: _273-8878_

Address: _Philhaven / Mt Gretna_  Appt. Time/Date: _11/17/99  6_

Discharge letter/Summary to follow: ☑ Yes ☐

Comments:

Medication Management: _Richard Yakala MD_  Phone: _273-8871_

Address: _Mt Gretna / Philhaven_  Appt. Time/Date: _11/23   2_

Discharge letter/Summary to follow: ☑ Yes ☐

Comments:

Primary Care Physician: _____  Phone: _____

Address: _____  Appt. Time/Date: _____

Discharge letter/Summary to follow:  ☐ Yes ☐

Comments:

**S C H O O L**

Contact Person: _____  Phone: _____

School: _____

Address: _____  Discharge letter/Summary to follow:  ☐ Yes ☐

Ed Therapy Summary: Contract was made with school personnel regarding discharge plans and recommendations.  A cop
of the educational recommendations will be sent in the educational therapist's report to:

Name: _____  Phone: _____

Address: _____  Appt. Time/Date: _____

Discharge letter/Summary to follow:  ☐ Yes ☐

Comments:

If you have a problem contact _____ at _____

In an emergency contact Crisis Intervention at _____

| *The above instructions, including the effects of medications, have been reviewed with me and I understand them.* | Patient Signature: _Lewis M. Johnson_ | Date: _11-10-99_ |
| | Parent or Legal Guardian Signature: | Date: |
| | Staff Signature: _Elaine Howell_ | Date: _11/10/9_ |
| | Staff Signature: _Irwin N Jimmy_ | Date: _11/12/9_ |

Discharge Instructions
PC-240      01-99
G:\USERS\FORMS\PC-240 WPD

G-0450

Johnson, Lewis W.
124287
Date Of Birth: 7/4/1956
Admission Date: 10/22/1999





**DEPARTMENT OF VETERANS AFFAIRS**
Medical Center
1700 South Lincoln Avenue
Lebanon, PA 17042

December 29, 1999

In Reply Refer To: 595/121

United States Department of Labor
Office of Workers' Compensation Program
3535 Market Street
Philadelphia PA 19104

Dear Claims Examiner:

On October 26, 1999, a CA-1, Notice of Traumatic Injury was submitted by Mr. Lewis Johnson, SSN 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. The case number assigned to this case was 03-0246931. On December 15, 1999, Mr. Johnson received a Notice of Decision that the claim for Traumatic Injury was denied, as the medical evidence was not sufficient to establish that his condition was caused by the claimed incident. We have attached a copy of that decision for your review.

There was some confusion in communication at the time the initial claim was filed. Mr. Johnson contends that this claim should have been filed as a CA-2, Notice of Occupational Disease. Therefore we have assisted him in the completion of the attached CA-2.

We have also provided copies of the witness statements of all the individuals involved, as well as a copy of the police report that was conducted concerning the incidents on October 13, 18, and 19, 1999. After a review of Mr. Johnson's narrative and that of the witness statements, it appears as if there are some inconstancies as to what actually occurred during these incidents.

We have asked Mr. Johnson on several occasions to provide the medical documentation of the treatment that he received at Philhaven. On November 30, 1999, a letter was sent to Philhaven requesting this medical information. On December 21, 1999, a second request via telephone was made to Philhaven. I was referred to medical records and informed that the records could not be released without a consent form and that it is preferred that it be a Philhaven Release of Information Form. A form was requested and on December 23, 1999, a request was made of Mr. Johnson sign this release in order to obtain the necessary medical records. On December 28, 1999, I again explained the reason for the requested medical records and Mr. Johnson signed the Release of Information. I have forwarded these medical records for your review.

G-0710

Exhibit 26

A thorough review of the medical information strongly suggests that Mr. Johnson has a background of preexisting non-work related issues. These issues and concerns are addressed in the attached medical information.

We contend that a "causal relationship" between Mr. Johnson's current medical condition and the work environment are not supported by the medical information provided by the treating physician.

If additional information is required, I may be contacted at (717) 272-6621, extension 4060.

Sincerely,

JOSEPH R. STUCKEY, JR.
Personnel Management Specialist

Enclosures

G-0711

 

**DEPARTMENT OF VETERANS AFFAIRS**
**Medical Center**
**1700 South Lincoln Avenue**
**Lebanon, PA 17042**

November 30, 1999                    In Reply Refer To: 595/121

Philhaven
Attn: Richard S. Pakola, M.D.
283 South Butler Road.
P.O. Box 550
Mount Gretna, PA 17064

Dear Doctor Pakola:

Mr. Lewis Johnson, an employee of the Lebanon VA Medical Center, is currently receiving treatment at Philhaven. Mr. Johnson has filed a workers' compensation claim with the U.S. Department of Labor.

In an effort to evaluate the progress of treatment of Mr. Johnson, updated medical information is required. I have enclosed a Release of Information that has been signed by Mr. Johnson during a review of his benefits under the Federal Employees' Compensation Act (FECA).

Please provide the medical records of Mr. Johnson's treatment so that this information may be processed to the Department of Labor. At the present time Mr. Johnson's claim is under development and a prompt request in providing this information would expedite the adjudication of his claim.

I have also enclosed a form CA-20A, Attending Physician's Supplemental Report, requesting information on the diagnosis as well as the prognosis of Mr. Johnson's treatment.

If you have any questions concerning the aforementioned request, I may be contacted at (717) 272-6621, extension 4060.

Sincerely,

JOSEPH R. STUCKEY, JR.
Personnel Management Specialist

Enclosures

G-0454

Exhil 27

# EXHIBIT F

William J. Dumas
20 Dumas Lane
Jonestown, PA 17038

May 11, 2000

Administrative Judge Donna Nutter Rodwell
U. S. Equal Employment Opportunity Commission
The Bourse, Suite 400
21 South Fifth Street
Philadelphia, PA 19106-5848

In the matter of:      Lewis W. Johnson

v.

Togo D. West, Jr., Secretary,
Department of Veterans Affairs

EEOC Hearing No.   170-AO-8163X

Agency Case No.
98-2320

Hon. Judge Rodwell:

Pursuant to your order, in the above captioned matter, the Complainant is forwarding the case numbers and/or identifying factors of other complaints involving this complainant.

1.      ORM Case No. 200H-0542-99-5484

issues: (1)      Harassment by a fellow co-worker (white).

(2)      Management failure to take appropriate action once harassment was reported.

(3)      Failure of the Agency to provide a money award to Black employees, as given to other employees (White)

G-0806

1

2.    ORM Case No. 200H-1663

issues: *(1)*    Reprisal by agency officials in workers compensation claim procedure due to prior EEO activity.

3    Obstruction of justice by Lebanon VA police by covering up action of white employee and preventing complainant from filing charges, including with local law enforcement agencies.

4.    Employees repeating slanderous statement made by alleged unknown parties.

Respectfully submitted,

William Dumas
Complainant Representative

Reviewed and Approved,

Lewis W. Johnson
Complainant

G-0807

2

## CERTIFICATE OF SERVICE

I, William J. Dumas, in the matter of Johnson v. West, EEO Complaint No. 170-AO-8163X, do hereby certify that I served upon the parties shown, a copy of a letter dated, May 11, 2000, addressed to Administrative Judge Donna Nutter Rodwell, a letter dated May 11, 2000, addressed to Cynthia A. Williams, Law Clerk (counsel for the Agency) and a letter dated, May 11, 2000, addressed to Joseph Stuckey, Human Resources, (for the Agency), by United States, first class mail, to:

Administrative Judge Donna Nutter Rodwell
U. S. Equal Employment Opportunity Commission
The Bourse, Suite 400
21 South Fifth Street
Philadelphia, PA 19106-5848

Cynthia A. Williams, Law Clerk
VA Office of Regional Counsel (642/02)
University and Woodland Avenues
Philadelphia, PA 19104

_____
William J. Dumas

G-0808

03

UNITED STATES OF AMERICA
EQUAL EMPLOYMENT OPPORTUNITY COMMISSION
PHILADELPHIA DISTRICT OFFICE
21 South 5th Street, Suite 400
Philadelphia, PA 19106-2515

Lewis W. Johnson,
    Complainant

        v.

Togo D. West, Jr., Secretary,
Department of Veterans Affairs,
    Agency.

EEOC Hearing No.
170-A0-8163X

Agency No.
98-2320

## ORDER

The Agency is **ORDERED** to produce copies of the counselor reports and formal complaints in the following cases (filed by Complainant) pending before the Agency:

    1) ORM Case No.  200H-0542-99-5484
    2) ORM Case No.  200H-1663

Those documents must be submitted on or before June 1, 2000.

These matters will probably not be consolidated with the above-captioned case.  However, the parties are encouraged to include all pending cases in any settlement discussions/negotiations.

It is so ORDERED.

For the Commission:

DONNA NUTTER RODWELL
Administrative Judge
Telephone No. (215) 451 - 5781
Fax No. (215) 451 - 5848

## CERTIFICATE OF SERVICE

I hereby certify that the foregoing Order was sent by me by first-class mail, postage prepaid, on the _16th_ day of _May_ ,2000, to the following:

Lewis W. Johnson
1025 Harmony Hill Drive
Lebanon, PA 17046

William J. Dumas
20 Dumas Lane
Jonestown, PA 17038

Cynthia A. Williams, Law Clerk
Office of Regional Counsel (642/02)
Dept. of Veterans Affairs Medical Center
3900 Woodland Avenue
Philadelphia, PA 19104


DONNA NUTTER RODWELL
Administrative Judge

William J. Dumas
20 Dumas Lane
Jonestown, PA 17038

May 11, 2000

Joseph Stuckey
Human Resources
Lebanon Veterans Administration
Medical Center
1700 South Lincoln Avenue
Lebanon, PA 17042

Dear Mr. Stuckey,

Pursuant to our telephone conversation, held on Thursday, May 11, 2000, regarding the Agency's desire to discuss settlement in the matters pertaining to Mr. Lewis Johnson.

It is my understanding and I have explained to Mr. Johnson, the following:

1.) The Agency is suggesting that Mr. Johnson file for disability retirement, which the Agency will support.

2.) The Agency's desire to combine each and every EEO complaint filed by Mr. Johnson, as part of any settlement offer.

3.) That there is no definitive suggestion as to the OWCP matter, at this time.

4.) That Mr. Johnson submit in writing what he is seeking in any settlement agreement.

5. ) That a settlement conference be held at a date as yet unscheduled.

As you probably know, the matter of the none hire, Agency Case No. 98-2320, is presently before Administrative Judge Donna Nutter Rodwell.  In as much as this is the only matter presently assigned to an administrative judge, we are of the opinion that any settlement discussions must be in conjunction with that particular case.  Additionally, Administrative Judge Rodwell has issued an order by which settlement, consolidation of complaints, settlement authority and certain other issues, shall proceed in these matters.

Therefore, we are suggesting that the parties meet, to include Agency officials, as soon as possible, to discuss these matters, so as to be in conformity with Judge Rodwell's order.

G-0804

1

06

Additionally, that counsel for the Agency, in the matter, presently assigned to Administrative Judge Rodwell, be notified forthwith, by the Agency, as to the Agency's actions and decisions in these matters.

As always, please feel free to contact at 1-717-865-9401, should you wish to discuss this telephonically.

Thank you,

William J. Dumas
Complainant's Representative

G-0805

2

07

William J. Dumas
20 Dumas Lane
Jonestown, PA 17038


May 11, 2000


Cynthia A. Williams, Law Clerk
VA Office of Regional Counsel (642/02)
University and Woodland Avenues
Philadelphia, PA 19104


EEOC Hearing No.
170-AO-8163X

Agency Case No.
98-2320


Dear Ms. Williams,

Enclosed, please find a letter sent to Joseph Stuckey, Human Resource Office, Lebanon Veteran Administration Medical Center, dated May 11, 2000. It is my belief, that the issues discussed in this letter, can not proceed independent of the above captioned case. Further, the Administrative Judge assigned to this case, has ordered certain procedures be followed.

Though your offices have yet to respond to the complainant's past request for discussion as ordered by Administrative Judge Donna Nutter Rodwell's order, we are requesting your participation in the matters as indicated in the attached letter.

Should you wish to discuss this matter, please feel free to contact me at 1-717-865-9401.


Thank you,

William J. Dumas


G-0803


0 B



**DEPARTMENT OF VETERANS AFFAIRS**
OFFICE OF RESOLUTION MANAGEMENT
151 Knollcroft Road Building 16
Lyons NJ 07939

August 13, 1999

Mr. Samuel Alitto
EEO Manager
Department of Veterans Affairs
Medical Center
1700 South Lincoln Avenue
Lebanon, PA 17042

Dear Mr. Alitto:

This in reference to the EEO Complaint of Mr. Lewis Johnson, Case No.: 98-2320 filed on August 25, 1998, I have been assigned to investigate his complaint. I am requesting the following documents by close of business August 27, 1999.

1. Merit Promotion File of Vacancy Announcement NO. OC-98-38.
2. Merit Promotion Plan that was in effect at the time of the selections.
3. Race and Color of all the candidates that applied for the position of Housekeeping Aide under vacancy announcement OC 98-38
4. Position Description of the Housekeeping Aide vacancy in Extended Care that was filled under Announcement No. OC-98-38.
5. Position Description of the complainant's position at the time of the selection.
6. List of Housekeeping Aide vacancies in Extended Care from July 1996 through July 1998.
7. List of promotions and lateral assignments in Environmental Management Service and Extended Care broken down by Race and Color from July 1996 through July 1998.

Please ask the employee that will compile this information to certify it as well.

Please advise me of the availability of the following named emplyees the week of August 27, 1999, Alice Fidler, Suzette Flashel Umlauf, Barbara Kohr, Wanda Miller, Randall Houck, and the Chief of Education & staff Development.

Once this information has been compiled please send it to me at the address listed below via overnight mail.

09

Gregory E. Jones, Sr.
Office of Resolution Management
Lyons Field Office
Bldg 16
151 Knollcroft Rd.
Lyons NJ 07939


*Gregory E. Jones, Sr.*
Gregory E. Jones, Sr.,
EEO Investigator

*10*

were rated equally on the supervisory KSAO's. Ms. Fidler also said according to the complainant that she selected Mr. RH because she felt that he would fit better with the team and he worked better around patients. The complainant found the explanation to be false and discriminatory. Dissatisfied with the reasons for his non-selection the complainant sought EEO counseling. When EEO counseling did not result in an informal resolution, the complainant filed a formal complaint of discrimination on August 25, 1998.

### III. Issues and Basis

Was the complainant discriminated against on the bases of his Race and color (African-American, Black) when on July 15, 1998, he was not selected for a full-time position as a Housekeeping Aid WG-2, on the Extended Care Unit 19-3?

### IV. Survey of the General Environment

As of August 25, 1998, the total workforce for the Lebanon VA Medical Center was 924. There was total of 25 African-American/Black employees or 3% (see exhibit C-7). Extended Care had 181 employees, of which 6 or 3% were African-American. The Operational Section had 48 Housekeeping Aids (HKA), 3 or 6% were African-American, Extended Care did not have any African-American HKA's.

### Application Activity for Full-time Housekeeping Aid WG-2
### Announcement No. OC 98-38.

#### Race/Color

| Total Applicants | | Qualified & Not selected | | Selectee | |
|---|---|---|---|---|---|
| Employees | Race/Color | Employees | Race/Color | Employees | Race/Color |
| *1 | *AA/Black | *1 | *AA/Black | *0 | *AA/Black |
| 8 | N-AA/NB | 7 | N-AA/NB | 1 | N-AA/NB |

*Denotes Complainant's Class
AA denotes African American
N denotes non
B denotes Black
NB denotes non-Black

### Selection pattern of the Extended Care Unit Supervisor
### from July 1996 through July 1998.

| Year | Selected | | Applicants | |
|---|---|---|---|---|
| | *AA/B | N-AA/NB | AA/B | N/AA/NB |
| 1998 | 0 | 0 | 0 | 0 |
| 1997 | 1 | 8 | 1 | 16 |
| 1996 | 0 | 0 | 0 | 0 |

*Denotes Complainant Class

## V. Summary and Analysis

The complainant alleges that he was discriminated against because of his race and color when he was not selected for the position of full-time Housekeeping Aid, WG-2, announcement number OC-98-38. The complainant stated that the agency advertised for one full-time Housekeeping Aid position for which he applied. The vacancy was filled with a non-African American/white employee who had less seniority and he felt that since he (complainant) was the most senior employee, he should have been selected. The complainant stated that the selectee had worked as a part-time Housekeeping Aid for less than a year and held a full time position for less than a month (see exhibit B-1, page 14, lines 6-8).

The complainant testified that he felt he was qualified to do the job because he had worked as a full time Housekeeping Aid since March 1997 and from January through April 1998 he was detailed to the Extended Care ward, where he performed housekeeping duties such as stripping and waxing the floors (see exhibit B-1, page 10, lines 8-12, and page 14, lines 3-5).

The complainant was informed by the selecting official that the reason he was not selected was because "he probably could not work well with the patients or the team" (see exhibit B-1, page 10, lines 24-25 and page 11, lines 1-4, 7-12).

The complainant said that around August 11, 1998, Mr. Randall Houck, Nursing Assistant, told him that he heard Ms. Fidler say that "she did not want too many blacks on her ward because she was afraid of losing control" (see exhibit B-1, page 12, lines 14-17). The complainant alleged that Mr. Houck claimed that Ms. Wanda Miller, LPN-3 and Ms. Margaret Cromer, Chief of Education and Nursing Development were present when Ms. Fidler made the alleged comments. According to the complainant, Mr. Houck told him that that Ms. Cromer informed Ms. Fidler that she was "bordering on discrimination" when she made those comments" (see exhibit B-1, page 12, lines 22-23).

Ms. Margaret Cromer, (White/Caucasian), Chief of Education and Staff Development, testified that she was not personally involved in the selection process in question. She stated that the complainant mentioned to her that he was not selected for the position because of his race (see exhibit B-2, page-5, lines 1-4).

Ms. Cromer said that she did not recall hearing the statement attributed to Ms. Fidler (see exhibit B-2, page 5, lines 15-17). Ms. Cromer also said she did not hear Ms. Fidler make any disparaging remarks against African-American/Black individuals during the time the selections were made (see exhibit B-2, page 5, lines 21-25 and page 6, lines1).

Ms. Wanda Miller, (White/Caucasian), LPN-3, witness for the complainant, testified that she did not have knowledge of this complaint. Ms. Miller further stated that she does not recall Ms. Fidler making the alleged racial comment (see exhibit B-3, page 5, lines –5-9, 13-16).

3

Mr. Randall Houck (White/Caucasian), a Nursing Assistant and witness for the complainant, testified that he has worked with Ms. Fidler for seven years and recalls an incident three or four years ago when an African-American applied for a Nursing Assistant position on the ward managed by Ms Fidler. He testified Ms. Fidler said that "she did not want any more of them on the floor because we already had several of them on the floor and we did not need any more trouble" (see exhibit B-4, page 5, lines 1-7). Mr. Houck attested that Ms. Cromer and Ms. Miller witnessed this comment.

Ms. Alice Fidler (White/Caucasian), the Nurse Manager identified as Responding Management Official (RMO), testified that she was the selecting official for the position in dispute. She testified that she did not pay attention to race or color when making her selection for the Housekeeping Aid position (see exhibit B-5, page 5, lines 16-19 and page 6, lines 23-25, page 7, lines 1).

Ms. Fidler said she selected Mr. RH because she felt that he was more experienced than the complainant. She stated that she required someone who had knowledge of the reactions that would occur when mixing chemicals and the selectee had gained that knowledge through his prior military experience where he set up the Material Safety Data Sheets (MSDS) programs (see exhibit B-5, page 5, lines 22-25). She also felt that someone who taught MSDS would have a good understanding of the need to be careful with mixing chemicals, and would know what to do in the event of a spill (see exhibit B-5, page 6, line 1-5). Ms. Fidler further testified that she did not interview the candidates, but rather arrived at her final decision by evaluating the applications, KSAO's and her observations of the candidates work as they rotated through the Extended Care ward (see exhibit B-5, page 7, lines 2-6).

When asked if she made the statement that she wanted to maintain racial balance on her unit and did not want to hire African American/Blacks she said no (see exhibit B-5, page 9, lines 1-5).

Ms. Barabara Kohr (Caucasian/White), Nurse Manager, and Team Leader of the Hospice Unit, testified that she was not directly involved in the selection process but "I sat with her as we reviewed the supervisory and employee supplementals "(see exhibit B-6, page 4, lines 16-17). Ms. Kohr also said that the selectee had seventeen (17) years of Housekeeping experience (see exhibit B-6, page 7, lines 10-11). Ms. Kohr stated that in addition to the selectee's years of experience, he was more detailed in listing his experiences in the employee supplemental, especially in the area of Isolation Environment. He also had some experience working in the emergency room, Intensive Care Unit (ICU), and had conducted training classes on the safe use of chemicals (see exhibit B-6, page 8, lines 1-6).

When asked if she heard Ms. Fidler state that if she hired too many African-Americans/Blacks she would not be able to maintain racial balance, she said that neither she nor Ms. Fidler were concerned with maintaining a racial balance on the Extended Care unit (see exhibit B-6, page 8, lines 8-12).

Ms. Suzette A. Flashel-Umlauf, (Caucasian/White), Human Resource Management Specialist (HRMS), testified that the Housekeeping Aid position in question was announced under an open and continuous vacancy announcement. She said the candidates were rated, ranked and referred to the selecting official for consideration (see exhibit B-7, page 4, lines 6-10). Ms. Flashel-Umlauf stated that the selecting official was not required to interview any of the candidates, but if she interviewed one, all candidates would have to be interviewed (see exhibit B-7, page 5, lines 13-18). According to Ms. Flashel-Umlauf the selecting official followed the proper procedures when

*12*

selecting for this position. The position according to Ms. Flashel-Umlauf was a straight hire or a reassignment (see exhibit B-7, page 7, lines 17-18).

This case will be analyzed under the disparate treatment theory of discrimination.

## Prima Facie
## Disparate Treatment

In a disparate treatment case, the complainant must first present a prima facie case of discrimination. That is he must put forth facts, which, if true and unrebutted, would create an inference of discrimination. To establish a prima facie case of discrimination under the disparate treatment theory, a complainant must show:

1. He is a member of a protected class. The complainant is an African-American/Black.
2. He suffered an employment related harm for which there is a remedy. The complainant applied for and was not selected for the Housekeeping Aid position, announcement OC-98-38.
3. He can identify at least one similarly situated individual, not of his protected class who was treated more favorably. The candidate selected for the position was non African-American/non-Black.

## Burden of production

In order to dispel an inference of discrimination management is not required to prove that it did not discriminate, however, the burden of production shifts to management to articulate legitimate non-discriminatory reasons for its actions. Ms. Fidler (RMO) testified that she did not select the complainant because she felt that the selectee had the most potential to perform well, and would provide the best environment for the patients on the unit. After reviewing the applications, KSAO's and the candidates' performances, as they rotated through the Extended Care Unit, she felt that she selected the best candidate.

## Pretext

The final burden shifts to the complainant, to demonstrate that the reasons articulated by management are pretextual. The complainant may do this by direct proof of discriminatory motive, or by demonstrating that the articulated reasons are unworthy of belief. The RMO denied discriminating against the complainant because of his race. The record shows that the disparaging statement alleged to have been made by Ms. Fidler was made 3 ½ years earlier and the only one of the three employees who were reported to have been present when she made the comment, testified that the RMO had made the comment.


*Gregory E. Jones, Sr.*
Gregory E. Jones, Sr., EEO Investigator

12/17/99
Date

5

13

1

1                          CASE NO. 98-2320

2      _____

3      IN THE MATTER OF,

4      LEWIS JOHNSON

5                                        Telephonic

6                      Claimant,        Deposition of:

7

8             -vs-                       RANDALL HOUCK

9

10     LEBANON VA MEDICAL CENTER,

11

12                      Respondent.

13     _____

14             T R A N S C R I P T  of Deposition
       Proceedings held in the above-entitled matter, as
15     taken by and before SUSAN M. OLIMPAITO, a Certified
       Shorthand Reporter and Notary Public of the State of
16     New Jersey, held at the OFFICE OF RESOLUTION
       MANAGEMENT, 151 Knoll Croft Road, Building 16, Lyons,
17     New Jersey, 07939 on Friday, November 5, 1999,
       commencing at 10:55 a.m.

18

19
                        REPORTING SERVICES BY:
20
                        North Jersey Reporting
21                      113-A Johnson Avenue
                        Hackensack, N.J. 07601

22

23

24

25

2

1    A P P E A R A N C E S:

2       GREGORY JONES,
        EEO Specialist
3       Office of Resolution Management,
        151 Knoll Croft Road,
4       Lyons, NJ   07939

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

3

1    R A N D A L L   H O U C K,

2    Having first been duly sworn, testified as follows:

3    EXAMINATION BY MR. JONES:

4        Q.    Please state your full name and spell it

5    for the record?

6        A.    My full name is Randall Houck.

7        Q.    And spell it for me please?

8        A.    R-A-N-D-A-L-L   H-O-U-C-K.

9        Q.    Please state your race?

10       A.    I'm white.

11       Q.    Please state your color?

12       A.    I'm white.

13       Q.    Mr. Houck, do you have a representative?

14       A.    No.

15       Q.    How long have you been employed at the

16   Lebanon VA?

17       A.    Before I go any further I'd like to comment

18   that I'm only doing this out of courtesy to you, sir,

19   and also that the person, the victim here that's

20   being talked about, this has nothing to do between my

21   relationship and the person I'm about ready to talk

22   about.  I'm not trying to do anything out of

23   retaliation.  I'm trying to do this because the union

24   has asked me to come forth and speak the truth.

25   Okay?

PG 3 OF 8   16

4

1    Q.   Okay.  How long have you been employed at

2    the Lebanon VA?

3    A.   Fourteen years.

4    Q.   How long have you been in your present

5    position?

6    A.   Fourteen years.

7    Q.   How do you know the complainant, Mr. Lewis

8    Johnson?

9    A.   I met him through employment there at the

10   VA.

11   Q.   Were you privileged to a conversation by

12   Mrs. Alice Fiddler where she made some, allegedly

13   made some statement concerning the racial makeup of

14   her ward and wanting to keep some type of balance on

15   her ward?

16   A.   Yes I was.

17   Q.   Can you share those statements with me

18   today?

19   A.   I worked for Alice Fiddler for seven years

20   on an Alzheimer's floor and during that time there

21   was an incident that came up where a black man who

22   was a janitor wanted to put in for the position of

23   nursing assistant on our floor.

24       He was, during that time I was speaking to Alice

25   Fiddler or she was speaking to me and Wanda Miller

PG 4 OF 8      17

5

1    and referring to the fact that this fellow, this

2    black man had put in for the job.  During that time

3    she made the statement, I don't remember the exact

4    words, but the impression was quite clear to me it

5    was along the line that we didn't want any more of

6    them on the floor because we already had several of

7    them on the floor and we don't need no more trouble.

8         Q.   And when was this statement made, what year

9    approximately?

10        A.   Now you're asking for a lot.  It was three

11   or four years ago maybe.

12        Q.   Did you ever hear Mrs. Fiddler make any

13   statements in relationship to Mr. Lewis Johnson's

14   application for a position as housekeeping aid on

15   extended care?

16        A.   No.  I never heard anything about that only

17   from Lewis himself.

18        Q.   Who was in the presence of this

19   conversation taking place between Miss Fiddler and

20   yourself?

21        A.   Wanda Miller.  She was an LPN on the floor

22   at the time.

23        Q.   Was there anyone else?

24        A.   No, I don't think so.

25        Q.   In recent years have you ever heard Miss

PG 3 OF 8
18

6

1    Fiddler make any racial statements or racial slurs

2    concerning African Americans?

3        A.    Not that I can remember.

4        Q.    This concludes your testimony --

5        A.    One more thing I think is very relevant to

6    this case.  I had heard that Alice Fiddler took this

7    to one of our clinical coordinators Peggy Kroemer

8    (phonetic) and made this statement to Peggy Kroemer

9    about how she could keep this black man off her

10   floor.  Peggy Kroemer made the statement to her

11   you're about this close to discrimination so be

12   careful what you say.

13       Q.    And when did she make that statement to

14   Miss Kroemer?

15       A.    That was during the time that, you know,

16   three to five years ago that she was trying to keep

17   this black man off the floor.  So Peggy Kroemer is

18   aware of that.  I don't remember how that got back to

19   me but that did get back to me that she did talk to

20   Peggy Kroemer about keeping this fellow off.

21       Q.    Was this the position that Mr. Johnson

22   applied for or was this another position?

23       A.    No.  It was Mr. Henry Williams applied

24   for.  He was a black housekeeper at the time who was

25   applying for the nursing assistant position on our

PG __6__ OF __8__    19

7

1  floor.  Now he eventually did get the job because she

2  backed off after Peggy Kroemer warned her about the

3  position she was taking.

4      Q.  Okay.  Thank you, Mr. Houck, and this

5  concludes your testimony.

6      A.  Thank you, sir.

7           ( Whereupon statement concluded at 11

8  o'clock a.m.)

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

PG _7_ OF _8_



THE SECRETARY OF VETERANS AFFAIRS

WASHINGTON

September 22, 1999

**G-093**

## To All VA Employees

Our mission is to "serve America's veterans and their families with dignity and compassion and be their principal advocate in ensuring that they receive medical care, benefits, social support, and lasting memorials promoting the health, welfare, and dignity of all veterans in recognition of their service to this Nation." This requires a high performing workforce. Harassment, including sexual harassment in the workplace, impairs our ability to perform our mission and demeans us all. It cannot be permitted.

Harassment is defined as unwelcome verbal or physical conduct based on an employee's race, color, religion, sex, national origin, age, disability, or sexual orientation. It is unlawful if it unreasonably interferes with an individual's work performance or creates an intimidating, hostile, or abusive working environment. It also undermines the integrity of the employment relationship, weakens morale, and creates a harmful and threatening atmosphere. I embrace a *three-part fundamental principle*, which I am requiring all managers and senior executives to follow.

The *first part is prevention*. Education and deterrence are critical to preventing sexual and other forms of harassment and discrimination. VA employees must know the full meaning of harassment, its impact on the work environment, and what actions will occur should employees be found to have engaged in or suffered from it.

The *second aspect is immediate and aggressive executive action*. VA will swiftly and fully investigate complaints of harassment. Our new Office of Resolution Management (ORM) has independent authority to thoroughly investigate allegations of discrimination, including sexual harassment, and to elevate allegations of sexual harassment to the appropriate executive level. When notified by ORM of a complaint, senior VA management is responsible for 1) immediately intervening to correct the problem, 2) communicating to the victim his or her right to pursue a complaint of discrimination, and 3) providing for the victim's safety and security. VA must seek to ensure that no employee is subject to retaliation because he or she has alleged or cooperated in the investigation of alleged unlawful harassment.

Last, should an investigation reveal that misconduct occurred, *we will take appropriate disciplinary and adverse action,* up to and including the removal, against those who engage in harassing behavior or other discriminatory conduct, or who retaliate against any VA employee who cooperates, participates, or testifies in

21

Page 3.

Subject: Prevention of Workplace Harassment

access to a computer at work.  I urge each of you to obtain, read, and retain a copy of this useful resource.

Our success depends upon the willingness of each VA employee to practice fairness, respect, and tolerance.  Your full cooperation and adherence to the law is expected.

Togo D. West, Jr.

G-095

FORMAL COMPLAINT OF
DISCRIMINATION

Lewis W. Johnson
1025 Harmony Hill Drive
Lebanon, PA 17046

Mr. Lewis W. Johnson, was a member of an Environmental Management Services, " Float Group ", consisting of four men, including Louis Chandler ( black ), Irvin Erickson ( white ) and Norman ( last name unknown ), ( white ). They worked consistently together, from about August, 1997 to January, 1998. The only break in Mr. Johnson's membership with this " Float Group " was from January, 1998 to April, 1998. This break was due to a special project Mr. Johnson volunteered for. Due to the manner in which Mr. Johnson complete this special project, other departments adopted it and it is now standard operating procedure in the Medical Center. After, completion of the special project Mr. Johnson returned to the " Float Group ". Each of the four men, interchangeably, did the same job and each job was a team effort.

On several occasions, Johnson noticed an award recognition, to this group, posted in areas of the Medical Center. Mr. Johnson was proud of this recognition and spoke about in on several occasions. In fact, Johnson, himself a Vietnam Era veteran, had received other special notice for going out of his way, to help when he could. Many fellow workers commented on Johnson's award for volunteering to drive veterans, on his off time, to certain scheduled functions.

On/or about first week of September, 1999, Johnson over heard a conversation by a group of EMS employees concerning the award received by the " Float Group " and the money that came with it.

On further inquiry, Johnson obtained copies of the award and the statement for issuance of the award. The award statement single out two members of the team, the white members and totally disregard Johnson and Chandler, the black members of the team. Additionally, it has come to light that the two white members receiving the awards were instructed not to reveal said monetary awards. In fact, they may have received other awards for the same efforts put forth by the entire team.

Since questioning these acts in February, 1999, Johnson's duties were curtailed to exclude certain assignments done by the " Float Group ".

*Lewis W. Johnson*    12-16-9?
Lewis W. Johnson

G-028

23

August 3, 1998

To:  Ms. Lena Mitchell
       Office of Resolution Management
          Tel: 908-580-3511
          Fax: 908-604-5827

Re:  EEO Complaint of Louis Johnson

From:  Suzette Flashel Umlauf
          Personnel Management Specialist
       VA Medical Center
       Lebanon, PA  17042

Attached is the information request:

     * The Lebanon VAMC employs at total of 48 employees in the occupational series Housekeeping Aid (HKA).

     * Hospital-wide, three of these employees are African American.  All three are assigned to the Operations section.

     * Extended Care does not have any HKA employees who are African American.

If I can be of any assistance, please contact me at (717) 272-6621, ext. 4059.

On our Abaf 8:00am on 10/13/99 in Old 1
and Floor lobby I was racially harrassed
by Eru Eerckiaw.

As I was walking threw the lobby, I passed
Louis Chandler heading for the freight Elevator, I
was now approaching Eru E. who was standing
near the doors of the OR. Eru started in
on me by saying this statement. "Hey Lewis
do you want to hear what people are saying
about you." I put up my left hand and se
"NO!" "I don't want to hear it." I was abo
5ft from him when I said that. He then calin
call for Louis C., by saying "Hey Lou", "Hey Lou"
"Listen, I going to tell Lewis what people are
saying about him," He then put his arm and hand and
in my patie. to slow my mournent,

When he slow me down by blocking my path, he
the said. "Lewis, people calling you a white guy in
black skin." After hearing that statement, I wen
threw the doors leading to the freight Elevator. I fe
sick, I startned to shake. This man has been
harassing me since I been in EMS. I startning to

feel very fear-ful of losing my job. So I need
something done to stop this racial harassment.

Lewis W. Johnson
10/15/97

G-0667

26

**Narrative As Provided by**
**Lewis W. Johnson**

### Wednesday, October 13, 1999

8:00 AM  Johnson (black male) meets Chandler (black male) and Erickson (white male) in the hallway of building #1.  Erickson stated to Johnson, " Hey Lewis, let me tell you what people are saying about you. "  Johnson responds I don't want to hear it."  Erickson then places his body in Johnson's path to prevent him passing, shouts to Chandler, " Hey Lou, I'm going to tell Lewis what people are saying about him. "  Chandler does not respond in any manner.  Erickson then stated to Johnson, " People are saying you are a white man in a black man's skin. "  Johnson shoves his way past Erickson and walks quickly away.  As Johnson leaves he hears Erickson loudly laughing.

2:00 PM  Near the Environmental Management Services ( EMS ) office, Johnson meets Chandler in one of the tunnels.  Johnson stated to Chandler, " I am going to make a complaint on what Erickson said to me. "  Chandler replied, " You got to do what you got to do, I understand."  Johnson then stated, " Someone will probably talk to you. "  They then parted, going in different directions.

### Thursday, October 14, 1999

(7:30 AM)  During the morning Johnson met his supervisor, Rodney Kiscadden, near the EMS office.  Johnson inquires what forms were needed to make a complaint on a fellow employee.  Kiscadden indicated he did not know but would find out and let Johnson know, during the course of the day.

(1:30 PM)  Kiscadden informed Johnson that he would need a ' Point of Contact ' form to file a written complaint on an employee.

(2:00 PM)  Johnson obtained a ' Point of Contact ' form from the Nursing Station in building 1-3A.

### Friday, October 15, 1999

(2:30 PM)  Johnson met with Kiscadden in the EMS office.  Johnson explained the nature of the complaint and told Kiscadden he had a 'rough draft' that needed to be typed.  Kiscadden then left the office at which time Glenn Definbach ( a Housekeeping Aid ), who had been sitting in an adjacent office, came out and asked Johnson, " What's going on with you, Irv and Louis and this racial remark? "  Johnson asked Definbach, " What did you hear? "  Definbach explained to Johnson, he had over heard a conversation between Erickson, Chandler and Ms. Lynette Brady ( EEO personnel ), concerning a racial remark made toward Johnson.

### Monday, October 18, 1999

(8:30 AM)  While at his assigned work location, Johnson telephoned the Office of Resolution Management ( ORM ) and explained  to Ms. Mitchell, who answered  the telephone, the incident concerning the racial remark by Erickson, which occurred on October 13, 1999.  Ms. Mitchell stated she would forward the complaint to a Counselor, who would contact Johnson.

(10:20 AM)  Johnson was in building #1, ward 3A, his assigned work location, standing at the Nursing Station, holding a conversation with Ward Clerk, Barbara Yeich.  Erickson entered

G-0668

the area and from about twenty feet away shouted, "Hey Lewis. I want to talk to you." Johnson responded, "I don't want to talk to you." Johnson began walking in the opposite direction from Erickson. A few seconds later, Johnson felt a slight blow to the middle of his back. Glancing over his shoulder, Johnson realized Erickson had caught up to him and was using his shoulder to cause these blows to Johnson's back. Each blow to Johnson's back caused him, Johnson to stumble. Again, over and over, Erickson repeated, "I want to talk to you and tell you what they are saying." Each time Johnson responded, "Leave me alone, I don't want to hear it." This occurred approximately fifteen feet in one direction and fifteen feet in the opposite direction, until they again arrived at the Nursing Station. On arriving again at the Nursing Station, Johnson ran through the opening to the Nursing Station, to a nearby bathroom and locked himself in. After an unknown amount of time, Johnson existed the bathroom, figuring Erickson had left the area. On realizing Erickson was no longer in the area, Johnson telephoned Carolyn Mcguigan, his department chief and was told by her secretary to report to Mcguigan's office at 10:45 AM. After speaking to this secretary, Johnson called ORM and explained he had just been assaulted. Ms. Mitchell told Johnson someone would contact him.

(10:45 AM) Johnson met with Mcguigan and explain everything that had occurred with Erickson from October 13, 1999 up to that point. Mcguigan summoned Kiscadden into her office and Kiscadden confirmed previous complaints from Johnson regarding Erickson. Mcguigan completed a ' Point of Contact ' form and Johnson left the office.

**Tuesday, October 19, 1999**

(8:15 AM ) Johnson reported to his assigned work area, building #1, ward 3A. Johnson and Yeich discussed what occurred the previous day. Yeich, during this conversation stated she had seen everything that had occurred including Erickson hitting Johnson. Yeich went on to explain to Johnson that she was extremely upset due to a conversation she had with Kiscadden. Yeich stated the first thing asked her by Kiscadden was, " So, whose side are you taking? "

(9:30 AM) Erickson appeared in building #1, ward 3A, Johnson's assigned work location. Erickson looked directly at Johnson, stopped and smiled very broadly. Erickson then went into the work closet assigned to Johnson. Erickson existed the work closet, smiled again at Johnson and went into the shower room. Johnson went over to close the door to the work closet, which had been left open by Erickson. Erickson then came out of the shower, again smiled broadly at Johnson and left the area. Johnson noticed something in Erickson's hand but did not see what it was. Johnson immediately called the Veterans Administration Police and reported all that had occurred. Johnson was instructed to come to the police station in order to make a full report.

(9:45 AM) Johnson arrived at the VA police station and gave a full report as to every thing that had occurred, beginning October 13, 1999.

**Wednesday, October 20, 1999**

(7:45 AM) Johnson arrived at work and was informed he was assigned to building #1, ward 3, ICU. He was also informed that Erickson was assigned to the same building and was moving furniture from floor to floor. Johnson stated that's not right or words to that affect and began to cry. Johnson stated he felt sick and requested sick leave in order to go home. Kiscadden stated to Johnson, " Sit and calm down and I'll go talk to the chief about you going home on sick leave. " As Kiscadden left, Definbach, who was in the next room, came out and inquired if Johnson was okay. Kiscadden returned and told Johnson it was okay for him to go home on sick

<center>G-0669</center>

<center>28</center>

leave but "they" wanted to talk to him first. Johnson asked to be allowed to wait in his van. Prior to going to his van, Johnson called Robert Dennis, union steward, and asked him to meet him at his van because he, Johnson needed help. A few minutes later, Dennis arrived at Johnson's van, at which time Johnson explained that his supervisors were forcing him to work in the same location as Erickson. Dennis stated to Johnson he would go talk with them. Dennis returned and stated senior management had informed him that Erickson would not bother him again. At that point a VA police officer arrived at the van; the officer and Dennis escorted Johnson to building #1, ward 3-ICU. As the police officer and Dennis began to leave, Johnson was told Erickson would be coming to his assigned area to remove furniture. Johnson began to shake and asked the two men not to leave. Johnson then observed Dennis use the telephone. However, he was not made aware to whom the call was made. Nor did Johnson hear the conversation. After the telephone conversation, Dennis instructed Johnson to return with him to building # 2, where they were met by Chief of Police Dennis Herb, Chief of Operations Muratits, Chief of Support Carolyn Mcguigan and Kiscadden. Kiscadden explained to the group, in detail, what had been occurring between Erickson and Johnson, since October 13, 1999. Johnson was told the incidents were ·² very serious but however, Erickson would not bother him, Johnson again. Johnson was told he could be assigned to another building, if he so desired. Mcguigan stated to Johnson, " You can go home on sick leave but when you return I want you to sit with Mr. Erickson, talk about this, shake hands and make up."

(3:30 PM)  Johnson visited his doctor, Earl Brinser, 405 Cumberland Street, Lebanon, PA 17042. After this session with Dr. Brinser, Dr. Brinser, referred Johnson to Phil Haven Mental Health Facility. Further, Dr. Brinser gave Johnson three prescription slips, dated October 20, 1999, with his medical instructions, to wit:

1. Excused from work from October 21, 1999 through October 24, 1999 and to return to work on October 25, 1999. This slip had a notation, " Unable to work " It was signed by Dr. Brinser.

2. A prescription for medication, dated October 20, 1999, to include two refills. This was signed by Dr. Brinser.

3. A statement dated October 20, 1999, suggesting treatment, his findings and the cause. The statement as written by Dr. Brinser, " Counseling. Re: stress, tension, fear, work related issues."

### Thursday, October 21, 1999

(5:30 AM)  Telephoned EMS ( employer ) and reported off as per doctors instructions.

(10:00 AM)  Went to Phil Haven Outpatient Clinic per Dr. Brinser's, his physician, instructions. An initial evaluation was prepared by the Outpatient Department and faxed to Raymer Kent, Human Resources Manager, Lebanon, V. A.

### Friday, October 22, 1999

( 9:00 AM)  Entered Day Hospital program at Phil Haven Mental Health Facility. Johnson instructed by Dr. Pakola, his treating physician, at Phil Haven, not to return to work, in particular at the Lebanon Veterans Administration Medical Center. Treatment to be on going.

*Lewis W. Johnson*    12-21-99
Lewis W. Johnson

G-0670

29

02-02-00  WED 09:25 FAX 7172219600          Don Bailey                          002

Created by LEWIS JOHNSON Sr.
Incidents of Racism, Harassment, racial intimidation and
reprisal that I experience at the VA at Lebanon, Pa .

1. September of 1992: As a patient at the Lebanon VA
   hospital. I was harassed by a black employee who was a
   rehab tech. T he incident happened in the dinning room
   in building 18. I was standing in the food line waiting for
   it to move. When John Turner(rehab tech) approached
   me. I said something about the up coming dance to him.
   He said to me, "put this on your shoulder". The item was
   a badge with a monkey on it. I placed it between my T-
   shirt and the shirt I had on. The badge fell to the floor.
   He told me to pin it on the outside of my shirt. I did. I
   walk up the line a little more, when I come to a white
   female kitchen worker . Mr. Turner then pushed my
   shoulder with pin on it . He said to me "Tell her what's
   on your shoulder". Action taken: Mr. Turner was given a
   6 months abolishment. I received Counseling.

2. July of 1994: While working the night shift. (12mid-
   8am)About 3:30am I'm bathing a pt. when I hear a call
   bell sound off. I responded. It was acrossed the hall
   from me. Pt. bed was flooded with tube feeding. I called
   the RN in charge, told her what I found. She asked
   "whose pt is it? "I stated " its Ms. Kopenex" . I was told
   to find her and tell her. I found her sleeping in the lunch
   room. I woke her and told her about the pt. I reported
   back to RN and told her of my findings. I was told to start
   cleaning up the pt. and she'll get Ms. Kopenex. 45
   minutes later I was finished cleaning the pt. Nobody
   shows up to help me. I asked later what happen. I was
   told by the RN, that she took Ms. Kopenex out for a
   smoke to wake her up.  Action taken: I wrote a two
   page memo to my head nurse Jackie Brown. I felt like

G-0671

1

36

02/02/00  WED 09:26 FAX 7172719600        Don Bailey                      ☒003

Created by LEWIS JOHNSON Sr.

Incidents of Racism, Harassment, racial intimidation and reprisal that I experience at the VA at Lebanon, Pa .
this was reprisal for making a complaint. Because nothing happened. Her non-action hurt my feelings. The

message I got out of that was. Shut up and when I see things like that just do what you are told. And be quiet. This made me feel like I wasn't worth nothing.

3.     September 1994:I reported an incident about a pt to a LPN, Bruce Zellmen. I was brought up on patent abuse charges. I was moved to 1st shift, from nights. The LPN went to 2nd shift. I was given a slip of paper saying that It was unfounded, two months later. ACTION: I felt this was reprisal and intimidation for the complaint I made against two of my co-workers a month or two ago.

4.     June of 1995: Will working as a nurse assistant on 1-2a. I was approached by a white female co-worker Elaine Kopenex. She said to me "Mr. P. wants to know where's the nigger at."/: Action taken: I verbally reported to my head nurse Jackie Brown. I kept after it , because Ms. Brown kept giving me the run around. I felt reprisal for making the complaint.

5.     December 1995: I walked into the nurses station , when I  notice my  charge nurse , doing the "work schedule" with a nurse assistant Dennis Firestine. He stated "Let Lewis work with me , so I can work him like a slave". Action taken: 6 months abonisment.

                                                          G-0672

6.     January 1996: During that disciplinary meeting with Mr. Firestine. My head nurse Ms. Brown accused  me of not helping a fellow employee.

3/

Created by LEWIS JOHNSON Sr.
Incidents of Racism, Harassment, racial intimidation and reprisal that I experience at the VA at Lebanon, Pa .

This blatant reprisal in front of the chief of staff Ms. Hachert was shocking. I stated " I'm the one who wrote someone up for not helping out with the pt". I was grilled about the actuation placed on me by Ms. Brown. We were asked to meet again about it in a couple of days. Ms. Brown was to bring her witness RN Helen Crawford. I was asked to bring my copy of the "Point of Contact" because Ms. Brown couldn't remember me giving her one.

7.      January 1996: A couple days following that meeting that meeting with Ms. Brown. Dennis Swegert and myself were assigned to the b-side. We were on the a-side listening to that evening report. Night shift staff RN Ms. Crawford was doing her rounds on the b-side. When she returned to us, we discussed the evening report and left for the b-side. About 40 minutes into our rounds we found a Hispanic pt. laying on the floor in urine. Mr. Swegert immediately called Ms. Crawford about the pt., so we could fill out a fall report. Ms.Crawford said she knew that he was on the floor and not to worry about him.  We were very upset about what happened. Ms. Crawford never told us that he was on the floor during the evening report. We wrote the incident in the pt's chart.  I wrote up a "Point of Contact" to take to my next meeting with Ms. Brown next Tuesday.

G-0673

8.      January 1996: Tuesday present at the meeting was, Ms. Brown, Ms. Hachert and a union steward. I gave Ms. Brown the "Point of Contact" about the

3

Created by LEWIS JOHNSON Sr.
Incidents of Racism, Harassment, racial intimidation and reprisal that I experience at the VA at Lebanon, Pa .

Hispanic pt we found. Ms. Brown then passed it on to Ms. Hachert. Ms. Brown stated, she found her "Point of Contact". Ms. Hachert questioned the whereabouts of Ms. Crawford. I was told the meeting was closed. I was told months later, that the incident was placed in a quarterly report. I felt this was reprisal and intimidation from Ms. Brown, for writing a "point of contact" on Mr. Firestine for saying that "he wanted to work me like a slave".

9.    August 31, 1997, Henry Williams and myself were hired together in "EMS". That was the beginning of the belittling and harassment from Mr. Erickson and Mr. Chandler. They were telling people that we couldn't do housekeeping work as good as they could.  Mr. Williams couldn't handle it. He transferred to a NC VA In November of 1997. I volunteered for a detail to get away from them in January 1998.

10.    July 17, 1998: I went to the Human Resource office to find out who was hired for housekeeping position. Ron Hall was hired. I felt I was discriminated against because I wasn't selected for a housekeeping position on 19-3.

11.    July 20,1998: I felt  my superviser assigned me to 19-3 to rub it in my face about my non-selection to that ward. I believe this was reprisal, because I used the union to get the detail in January "97".

G-0674

12.    July 20,1998: I called the Union president, Peg Winters to ask  what I can do about the non-selection. I was told "nothing". I felt sick about that

4

33

Created by LEWIS JOHNSON Sr.
Incidents  of Racism, Harassment, racial intimidation and
reprisal that I experience at the VA at Lebanon, Pa .

answer. I went to her office. My first question to her was
about an audit of the selection. She said no. Ms. Winters
kept insisting that I couldn't do anything. Now I began
feeling very depressed. Because I'm a dues paying
union member, and I feel my union is discriminating
against me.

13.    July 21, 1998: I contacted my department union
steward William Mc Cracken. I told him what was going
on. He said I couldn't do anything. That response upset
me. I had my union contract with me. At 9:15am we went
to the union office to talk to union president and chief
steward Len Hickerd. After opening the union contract
and showing them my rights to an audit, the next 2 ½
hours, I was grilled and harassed on why I wanted an
audit. I was still denied my rights to an audit. I was told to
speak with the selecting official. I felt this was a form of
racial intimidation because I learned Mr. Hull joined the
union on the July 15, 1998. Two days before the selection
for the housekeeping job on 19-3.

14.    July:  I set up a time to talk with Ms. Fidler. We
met that afternoon around 1:15pm. She told me that we
were equal. She picked Mr. Hull because she felt he
would "fit in" with the team better than I would.  Also,
that he works well with patents better than me. That
answer angered me, because I felt I was being
discriminated out of a job because I was black. Ms.
Fidler was quoted saying "I don't want to many blacks
on the floor because I may lose control". Action taken:
EEO

G-0675

5
34

Created by LEWIS JOHNSON Sr.
Incidents of Racism, Harassment, racial intimidation and
reprisal that I experience at the VA at Lebanon, Pa.

15.  July 22, 1998: I called in sick. I couldn't handle being
put on 19-3 again, plus all the other stuff with my union. I
called ORM. I called our employee's "EAP" Allen
Burgess staff psychiatrist to help me with stress and
depression of these job related issue's that I'm having. I
left his office and went straight to my private doctor Mr.
Brinser. He prescribed medicine for stress and strain
because of job related issue's.

16.  August 1998: I canceled my vacation. I Thought my
superviser would change my schedule. They didn't. I
came in to pick up my uniforms on my day off and found
out I was AWOL the day before. I asked my superviser
Mike Brennan for al and was told OK, put in. A month went
by when, I needed to check my leave to take time off to
move into my new house. I found out that I had an "AWOL"
place in my records. I went to my foremen Dennis
Firestine and ask why didn't he tell me. His response was
"you should have check your pay stub". I was also told
that, that my foreman Mr. Firestine or supervisor Mr.
Kiscadden couldn't change the schedule while Mr.
Brennan was off. I felt sick, and very depressed.

G-0676

17.    August and September 1998, I kept writing
requests for a copy of the audit to my Union
president with a co-worker Brian Williams. She
knew I had a time restriction to put an EEO
complaint in on my non-hire. I file the EEO
complaint without the audit. I asked the Union
president for a written reason for not honoring
my request for an audit. At the next union

02/02/00  WED 09:28 FAX 7172  9600        Don Bailey                                        Ⅻ008

Created by LEWIS JOHNSON Sr.
Incidents of Racism, Harassment, racial intimidation and
reprisal that I experience at the VA at Lebanon, Pa .

meeting in September I asked her in front of the
union body, about 25 people. Ms. Winters told the
body and myself, that she would have to have a
lawyer to give me my request. This made me very
depressed. I knew then she wasn't going to help. I
felt my union was making sure that I don't get the job.
Action taken:     In October I submitted an informal
grievance. Which I created from our union contract.
My Housekeeping dept. rejected it. The union
rejected it too. I called FLRA about the audit and the
AWOL. FLRA sent me the paper work to file a
complaint against my union. The FLRA person stated,
he would have to contact AFGEE headquarters about
him sending me papers to file a complaint against
union. All of a sudden we had a meeting with the
District #3 Rep. The union president was told to fix
my problems. The AWOL was reduced to leave
without pay. I was able to review my audit at this
meeting.

18.    February 1999: I walk into our EMS office to talk
with my superviser Michael Brennan about awards. I
asked how can I put myself into position to get an award.
He said "I can't tell you that". Luckily for me Kevin W., a
work-leader spoke up for me by saying "that was a legit
question". Mr. Brennan responded "You'll have to
volunteer". From that time until the present, I haven't been
put on any waxing jobs. By waxing I can volunteer to come
in early. His actions, following that conversation, were
very stressful to me. I felt I was being punished for just
asking a question. Plus, I volunteer the whole year of 1998.

G-0677

7

36.

Created by LEWIS JOHNSON Sr.
Incidents of Racism, Harassment, racial intimidation and
reprisal that I experience at the VA at Lebanon, Pa .

19.  June 1999: I received an award for helping to
extinguish a fire in a van. I was ridiculed and harassed by
my co-worker Mr. Erickson. This happen in front of Tony
Mayberry, Bill Mc Cracken, my other co-workers and
friends. This was very humiliating to me.

20.     June 1999: I was walking threw building 17 ground
level when I notice my co-worker Mr. Erickson struggling
with some waxing and buffing equipment. I asked if I
could help. He started to ridicule and harass me on how I
can't do this kind of work. He also stated that he's been
telling people that I can't do this type of work. Action
taken: I reported immediately to my supervisor Rodney
Kiscaden. He said, "he will look into it, but why are you in
my office now." I told him I was on my break. He looked at
his watch and I left. I follow up on it the next week with him
and he said he forgot about it. This non-action when I
make a complaint made feel like I'm a nobody. I also felt
like this was reprisal and intimidation for making a
complaint about someone. I stayed away from Mr.
Erickson.

G-0678

21.   September 1999: While setting in the smoking
      shelter. A co-worker Ervin Erickson, stated that
      they(management) should change the names on
      that award posted on the bulletin board. To
      Norman and himself. Because they are the only
      one's that got some money for it. I look into it and
      found out that they did receive a "float group"
      award. I felt that I was discriminated against and
      left out of the award because I was black. There
      are two whites and two blacks in our float group.

8   37

Created by LEWIS JOHNSON Sr.
Incidents of Racism, Harassment, racial intimidation and
reprisal that I experience at the VA at Lebanon, Pa .

The two whites got the award. Plus this was a year
later that I found out about this. So it was suppose to be
a secret.


22.     October 13, 1999: I was walking threw the lobby
area from one work area to another. In building 1-ward-
2. When Ervin Erickson, put his arm out to stop my
movement to make a derogatory racial commit to me,
While I was approaching him He said " Lewis let me tell
you what people are saying about you" I said "I don't
want to hear it". Because I was trying to move away from
him, he finally cut off my path to say. "People say you are
a white guy in black skin" This commit made me sick
and depressed.


23.     October 14 and 15 1999: On three different
occasions I talk with my supervisor Mr. Kascaden about
making a complaint about another co-worker. He never
asked me what happen or anything. He just told me what
paper work to get. I felt like my problems didn't mean
anything to him. His non-action felt like reprisal and a
form of intimidation.
                                                    G-0679

24.     October 18, 1999: I called the EEO and reported
the commit said to me by Mr. Erickson around
8:00am. At 10:15am Mr. Erickson came to my work
area to assault me verbally and physically. Action
taken: I called the Chief of my department Ms.
Mcguigan. I told her what happen and that I was

9

38

02/02/00   WED 09:30 FAX 71⁷ ²19600        ?on Bailey                                    ☒011

Created by LEWIS JOHNSON Sr.
Incidents of Racism, Harassment, racial intimidation and
reprisal that I experience at the VA at Lebanon, Pa .

feeling sick and wanted to go home. I was told to fill out
a "point of contact" form and I could go.  The VA police
wasn't called and I wasn't asked to go to employee
health. I felt her non-action racist, because a black man
file a complaint of racial harassment and assault against
a white man. Action taken: EEO complaint filed.

  John Turner, Mike Brennan, and Elaine Kopenex do
not work at the VAMC Lebanon. Everyone else whose
names I mention, to my knowledge as 10-20-99 still
work at VAMC Lebanon. They can be reach threw the
Human Resource office. By contacting Ray Kent, at
(717)-272-6621 ask for his extension.
  The problems with OWCP specialist, Mr. Stuckey I
can not talk about at this time, because it started 10-21-
99 an ended 1-31-00.


_____Date_____


G-0680



10

39

Apr 13 00 01:54p  m Bailey 221 9600 p.2

## COMPLAINT OF EMPLOYMENT DISCRIMINATION

**VA** Department of Veterans Affairs

| 1 NAME (Last, first, middle initial) (Please print) | 2. MAILING ADDRESS |
|---|---|
| Johnson, Lewis W. | 1025 Harmony Hill Dr. Lebanon, PA 17046 |

2a. WORK TELEPHONE NUMBER (Include Area Code)
(717)-272-6621
Ext 4665

2b. HOME TELEPHONE NUMBER (Include Area Code)
(717) 270-0454

**4. ARE YOU:**
- [✓] A VA EMPLOYEE
- [ ] AN APPLICANT FOR EMPLOYMENT
- [ ] A FORMER VA EMPLOYEE

5a. JOB TITLE, GRADE AND SERIES
Housekeeping Aid WG-2

5b. SERVICE/SECTION/PRODUCT LINE
Environmental Management

6. NAME AND ADDRESS OF VA FACILITY WHERE DISCRIMINATION OCCURRED
Lebanon VAMC
1700 South Lincoln Ave
So. Lebanon, PA 17042

**INSTRUCTIONS:** For each employment related claim(s) that you believe was discriminatory, list the bases for your complaint: (list one or more): Race (Specify), Color (Specify), Religion (Specify), Sex (male or female), Sexual Orientation, National Origin (Specify), Age (Provide date of birth), Disability (Specify), and Reprisal for prior EEO activity or having opposed discrimination.

| 7. BASIS | 8. ISSUE(S) (What employment related claim(s) - personnel action(s), incident(s), or event(s), that caused you to file this complaint? Briefly describe what happened below. Use an additional sheet of paper if necessary.) | 9. DATE OF OCCURRENCE (Include the most recent date(s)) |
|---|---|---|
| See Attached | See Attached | See Attached |

RECEIVED APR 13 2000

10. WHAT RESOLUTION ARE YOU SEEKING?

**G-0168**

| 11a. DO YOU HAVE A REPRESENTATIVE? | 11b. IF "YES," IS HE OR SHE AN ATTORNEY? | 11c. PROVIDE THE NAME, ADDRESS, AND TELEPHONE NUMBER OF YOUR REPRESENTATIVE |
|---|---|---|
| [✓] YES [ ] NO | [ ] YES [✓] NO | William Dumas 20 Dumas Lane Jonestown, PA 17038 (717)-865-9401 |

| 12a. HAVE YOU CONTACTED AN EEO COUNSELOR? | 12b. NAME OF EEO COUNSELOR | 13. DATE OF INITIAL CONTACT WITH ORM |
|---|---|---|
| [✓] YES [ ] NO | George Irvin | 2-14-00 |

14. NOTE: If you contacted an EEO Counselor more than 45 calendar days after the Date(s) of Occurrence, item 9 above, or if this complaint is filed more than 15 calendar days after receipt of a Notice of Right to File a Discrimination Complaint from an EEO Counselor, you must explain why you were untimely in seeking EEO counseling or in filing your EEO complaint. Provide your explanation on a separate sheet of paper.

| 15a. HAVE YOU FILED A UNION GRIEVANCE ON ANY OF THE ISSUE(S) LISTED ABOVE? | 15b. IF "YES," LIST THE ISSUE(S) AND DATE GRIEVANCE FILED | 16a. HAVE YOU FILED AN APPEAL WITH THE MERIT SYSTEM PROTECTION BOARD (MSPB) ON ANY OF THE ISSUE(S) LISTED ABOVE? | 16b. IF "YES," LIST THE ISSUE(S) AND DATE MSPB APPEAL FILED |
|---|---|---|---|
| [ ] YES [✓] NO | | [ ] YES [✓] NO | |

| 17a. HAVE YOU FILED THIS COMPLAINT WITH ANYONE ELSE? | 17b. IF "YES," PROVIDE THE NAME AND ADDRESS | |
|---|---|---|
| [ ] YES [✓] NO | | DATE FILED 4/13/00 faxed rcvd cm |

| 18. SIGNATURE OF COMPLAINANT (Do not print) | 19. DATE |
|---|---|
| Lewis W. Johnson | 4-12-00 |

VA FORM
OCT 1988/81    4939

1st Form)

40



COMPLAINT OF EMPLOYMENT DISCRIMINATION
FORM 4939

Additional sheet.

Item 7.  Basis:

    1. Reprisal and retaliation due to prior EEO activities.

        On October 18, 1999, I filed an EEO complaint of harassment, verbal harassment, stalking and assault, based on race/color against Irvin Erickson, a white Lebanon VA Medical Center employee. I also alleged that management failed to take appropriate action once informed of the on-going actions of Irvin Erickson.

    2. Race

        African-American

   3. Color

        Black

    4. Sex

        Male

        The on-going acts of harassment, verbal harassment, stalking and assault, caused me to become ill and seek medical attention. As a result, I became disabled and attempted to apply for workers' compensation benefits due to a work related illness. Lebanon VA Medical Center employees, Raymer Kent, Joseph Stuckey and Rodney Kiscadden, all white, sought to prevent and/or delay the receipt of workers' compensation benefits, by circumventing the application process, due to reprisal and retaliation.

**G-0169**

Item 8. Issue(s)

    1. On or about, October 26, 1999, I arrived in the Human Resources Offices and informed Mr. Stuckey, that I wanted to apply for workers' compensation benefits, as I was instructed by Union Representative Robert Dennis. Mr. Stuckey used trickery and deception to cause me to file a CA-1 form. Mr. Stuckey well knew that the CA-1 form was for traumatic injuries occurring during a particular shift or a given day. They, management employees caused me to believe the procedures they were using for expediting the claim were at all times procedurally correct.

1(a).    On December 13, 1999, I was informed by Phil Haven Hospital staff that Mr. Kent was faxed an Initial Medical Evaluation and Release Of Information from my therapist, dated October 21, 1999, and as well the medical records revealed Mr. Kent discussed with my therapist on October 21, 1999, the nature of my medical problem and treatment, which caused them to know that my illness was not traumatic as would necessitate or require the filing of a CA-1, Notice of Traumatic Injury.   However, Mr. Stuckey, with the approval of Mr. Kent, used trickery and deceit to cause me to file a CA-1.

1(b)    As to the Initial Medical Evaluation, dated October 21, 1999, which was faxed to Mr. Kent.

(b)(1)  I was not provided nor informed by any agency employee, that this document had been received by them.

(b)(2)  I learned from my therapist that this document had been faxed to Mr. Kent at the VA Human Resource Office, attention to Ms. McGuiggan on December 13, 1999.

(b)(3)  Mr. Stuckey failed to provide this document to OWCP until December 29, 1999, with the filing of the CA-2 and attempted to make it appear to OWCP that this document was not obtained by him until December 28, 1999.

(b)(4)  Neither Mr. Kent nor Mr. Stuckey forwarded this document to my immediate supervisor nor my product line.

1(c).  I met with Mr. Kent on or about October 22, 1999 to present to Human Resources, medical documentation as to pending sick days and at that time we discussed the incidents involving the white employee.  As such, both Mr. Kent and Mr. Stuckey well knew my work related injury did not mandate the filing of a CA-1.  In fact, Mr. Kent stated at that time, I should have been able to handle the situation due to my program of recovery.  (Twelve step recovery program).

1(d).  To further deceive me into filing the incorrect form CA-1, on October 26, 1999, Mr. Stuckey indicated that the forms would be completed while in a computer.  At this point, Mr. Stuckey deliberately failed to provide me with a two sided form CA-1 ( page 2 of the CA-1).  Page 2, of the CA-1, contains the instructions for filing of the CA-1, which federal regulations require be given the employee.

1(e).  Mr. Stuckey, by not providing me with the instructions, prevented me from taking the form directly to Rodney Kiscadden, my immediate supervisor, as per the instructions, which I would have done.

1(f)  Mr. Stuckey, who is the agency's OWCP liaison, superseded the regulations, once he took on the role as my supervisor.  Mr. Stuckey took on this role as my supervisor in order to assure that he be in the position to continue to circumvent the process.

G-0170

42

 

1(g).  On November 23, 1999, which was the day of my representatives' first visit to the Human Resource Office, we asked Mr. Stuckey to file a CA-2.  Mr. Stuckey outright refused.  Mr. Stuckey also stated there was a delay because, " Philadelphia controverted the claim."  This was the very first time I was informed the claim had been controverted in any manner.

2.  On or about November 30, 1999, my representative and I requested Mr. Stuckey to withdraw the CA-1 and to file instead a CA-2.  Mr. Stuckey refused stating, " I thought it may be the wrong form but it will not be a problem at any rate. "  Mr. Stuckey also stated after reading the reports and allegations, he controverted the claim because he felt something was amiss.  He went on to state at least he did not leave it sitting on his desk.  I learned sometime later, that in the past at least one workers' compensation claim had been held up by not being processed.

3.  On December 13, 1999  we reviewed the records and found a controversion letter written and signed by Mr. Stuckey.  We also found the Release of Information.

4.  Mr. Stuckey, selectively forwarded information to OWCP, which he felt was favorable to the agency, as evidenced by his letter and attachments to OWCP dated, December 3, 1999.

5.  Though, Mr. Stuckey alleges he was unable to obtain medical records from the treating medical facility, he had in his possession a signed Release of Information Form, dated October 21, 1999.  Additionally evidence of his knowledge of this form and his need to use said form is evidenced in his letter as referenced in 4 above.

6.  Mr. Stuckey did not inform me of the need for any additional medical documentation until questioned by my representative, on November 30, 1999, where Mr. Stuckey stated, " Lewis has failed to provide me with any additional medical reports."  Mr. Stuckey also stated he had just sent a letter that morning asking me for additional medical documentation."  Mr. Stuckey had an obligation, per the regulations to inform me of the need for additional medical documentation, within ten days of the filing of the claim.

7..  I was told, by Mr. Stuckey, on October 26, 1999 to enter a confidential password on his computer system and told as such no one would be able to access nor altered the forms.  However, we found this to be untrue.  On December 23, 1999, I received a message on my home answering machine from Mr. Stuckey, to come in to sign a CA-2.  On arrival, a Mr. Tony Augustine, Personnel Management Specialist stated Mr. Stuckey had left the CA-2 to be signed with him.  After perusing the documents I refused to sign it because it did not contain all the files, in particular Rodney Kiscadden's narrative.  Several days later, December 28, 1999 we found two changes had been made to the CA-2 without my being present.

**G-0171**

7(a)    My signature was typed in and dated Dec. 20, 1999.

7(b)    My statement in item number 15 of the CA-2, ( notice was given, however ca-1 was filed erroneously on 10-18-99 as claim no. 03-0246931.) had been moved to item

**43**

Apr 13 00 01:55p    ▬on Bailey    ▬ / 221 3600    p.6

number 16.  As evidence of this, we refer to the word ' notice ' of my statement as well as in the question as asked in item number 15.  I feel this change was to accomplish two goals.  First to avoid our explanation as to the erroneous filing of the CA-1 and as explanation for the omission of my narrative. ( I found on December 28, 1999, ( CA-2 form ) my narrative was missing from the records to be sent to OWCP and I insisted it be sent.  This can be proven by Mr. Stuckey's first attempt to fax these records to OWCP ).

8.  On November 30, 1999, Mr. Stuckey was again asked to withdraw the CA-1 claim and to submit a CA-2.  Mr. Stuckey refused to file the CA-2 form, stating, " I discussed this with Philadelphia and was told it was the correct claim form."

9.  On several occasions, my representative and I sent letters to Charlene Szabo, CEO, Lebanon VA and followed up with telephone calls, in an attempt to seek her assistance in this matter, prior to filing an EEO complaint.  Ms. Szabo consistently failed to follow agency guidelines to address complaints of discrimination.  Ultimately, Ms. Szabo, in a letter dated February 6, 2000 indicated there is an EEO procedure we could use.  Said letter was received the day after the EEO complaint was made, February 15, 2000. .

10.  Mr. Stuckey, in violation of the regulations, assumed the position of my immediate supervisor, by providing a narrative of the facts in a letter dated November 1, 1999 and forwarded to Department of Labor.  This letter was not based on facts or evidence and was intended to mislead OWCP.

11.  Mr. Stuckey at all times prior to November 30, 1999, refused to provide me with a CA-7 form, indicating I had to wait until a decision was made in Philadelphia.  Mr. Stuckey provided me with the CA-7 form on November 30, 1999, when requested by my representative.

12.  During a meeting with Mr. Stuckey on or about December 20, 1999, my representative was forced to resort to subterfuge in order to obtain a CA-2 from Mr. Stuckey.  After obtaining the CA-2, my representative and I began the claim process by taking the CA-2 to Rodney Kiscadden, my immediate supervisor to have it completed.

13.  After Mr. Kiscadden completed the CA-2 and sent it to Mr. Stuckey, we reviewed it and found Mr. Kiscadden's narrative missing. ( Mr. Kiscadden had began writing his narrative while in the presence of Mr. Dumas and I )  After complaining about the missing narrative and the overall problems encountered in the claim process, Mr. Kent angrily shouted, " We have done all we are going to do for you people and we will do no more. "  Due to the subject matter and manner this was said, it was obviously a derogatory statement based on our race, Black.
( Note: According to Mr. Dumas, I became visibly ill and left the office after hearing Mr. Kent's comment )

14.  I learned on January 28, 2000 that Mr. Stuckey with the apparent approval of Mr. Kent, secreted parts of the police reports and failed to forward same to OWCP, with the original CA-1.

G-0172

44

15. On or about December 20, 1999, during a meeting with Mr. Stuckey and Mr. Kent, we, including Mr. Dumas discussed the issues involving my complaint of harassment, verbal harassment, stalking and assault against Eric Erickson. Mr. Kent stated apparently there was a misunderstanding and they did not realize that Erickson followed me around the VA after being told not to bother me. Mr. Kent also stated they would follow up with the Lebanon VA Police to correct their apparent mistakes. Several weeks later Mr. Kent informed Mr. Dumas that he had spoken to the VA Police Chief and that there would be no follow-up.

16. On February 8, 2000, in the presence of a Mr. Earl Williams, during conversations regarding medical documents, Mr. Stuckey stated to me, " I am your acting supervisor in these matters ". A letter to Rodney Kiscadden, from me and Mr. Kiscadden's subsequent response indicate Mr. Stuckey is not my supervisor. Mr. Stuckey should not have assumed this role.

17. On or about March 3, 2000, during a meeting with Mr. Kiscadden, Mr. Kiscadden stated that when he attempted to do the workers' compensation claim form in my case, he was told that he was not involved in the process. Mr. Kiscadden stated that Mr. Stuckey showed him a document indicating that only the ' superior supervisor ' would handle these matters, with Johnson. Further, Mr. Kiscadden apologized for Mr. Stuckey " screwing up " my claim.

18. On March 3, 2000, Mr. Dumas and I arrived unexpectedly at Mr. Stuckey's office and requested to review the OWCP file as pertaining to my claim for workers' compensation benefits, which were in Mr. Stuckey's possession. Mr. Stuckey removed several documents from the file prior to allowing me to review the file. At least one of the documents clearly had my name on it. When asked to see the documents or know there contents, Mr. Stuckey refused and placed them in a desk drawer.

_Lewis W. Johnson_

Lewis W. Johnson

Dated: _4/12·00_

G-0173

45

## CERTIFICATE OF SERVICE

I, Andrew J. Ostrowski, Esquire, hereby certify that I have served a true and correct copy of the foregoing document, by hand-delivery, addressed as follows:

Kate Mershimer, Esquire
Office of the United States Attorney
208 Walnut Street
Harrisburg, PA 17108

By _____
        Andrew J. Ostrowski, Esquire
        4311 North Sixth Street
        Harrisburg, PA 17110
        (717) 221-9500

Dated: July 29, 2002