# ORIGINAL

(45)

8-19-0

RW

## IN THE UNITED STATES DISTRICT COURT
## FOR THE MIDDLE DISTRICT OF PENNSYLVANIA

| | |
|---|---|
| LEWIS JOHNSON,<br>        Plaintiff | :<br>: No. 1:CV-00-1873<br>: |
| v. | :<br>: (Judge McClure) |
| ANTHONY PRINCIPI, Secretary of Veterans Affairs;<br>RODNEY KISCADDEN; ALICE FIDLER;<br>PEG WINTERS; IRVIN ERICKSON;<br>RAYMER KENT; and AMERICAN    FEDERATION<br>OF GOVERNMENT EMPLOYEES LOCAL 1966,<br>        Defendants | :<br>:<br>:<br>:<br>:<br>:<br>: |

Jones

FILED
HARRISBURG, PA

AUG 1 6 2002

MARY E. D'ANDREA, CLE
Per _____
        Deputy Clerk

### FEDERAL DEFENDANTS' RECORD IN
### SUPPORT OF THEIR MOTION FOR SUMMARY JUDGMENT:

### VOLUME III

**THOMAS A. MARINO**
**Assistant U.S. Attorney**

**KATE L. MERSHIMER**
**Assistant U.S. Attorney**
**228 Walnut St., 2nd Fl.**
**P.O. Box 11754**
**Harrisburg, PA 17108-1754**
**717-221-4482**

**Date:  June 12, 2002**

EQUAL EMPLOYMENT OPPORTUNITY COMMISSION

In the Matter of:                          )
                                           )
LEWIS JOHNSON,                             )
                                           )
                                           )  EEOC Hearing #
            Complainant                    )   170-AO-8163X
v.                                         )
                                           )  Agency Case No.
HERSHEL GOBEL, Acting Secretary            )   98-2320
DEPARTMENT OF VETERANS AFFAIRS             )
                                           )
            Agency                         )

                              Wednesday
                              July 26, 2000
                              Regional Counsel's Library
                              V. A. Medical Center
                              University & Woodlands Aves.
                              Philadelphia, Pennsylvania

     The above-entitled matter came on for hearing,
pursuant to notice at 9:00 a.m.

          BEFORE:  HON. DONNA NUTTER-RODWELL
                   Administrative Judge

APPEARANCES

**On behalf of the Agency**:

     CHRISTOPHER PERILLO, ESQUIRE
     Regional Counsel's Office
     V. A. Medical Center
     University and Woodland Avenues
     Philadelphia, Pennsylvania
     (215) 823-5800 Ext 7682

**On behalf of the Complainant**:

     WILLIAM DUMAS
     20 Dumas Lane
     Jonestown, Pennsylvania 17038

                OFFICIAL REPORTER
          Burke Court Reporting Company
               58 Woodhurst Drive
          Voorhees, New Jersey  08043
                (856) 627-7733

2

I N D E X

| WITNESSES | DIRECT | CROSS | REDIRECT | RECROSS |
|---|---|---|---|---|
| Raymer A. Kent | 10 | 40 | --- | --- |
| Randall Houck | 42 | 46 | --- | --- |
| Barbara Ann Kohr | 50 | 51 | 57 | 57 |
| Alice E. Fidler | 60 | 63 | 74 | --- |
| Lewis Johnson | 79 | --- | --- | --- |

E X H I B I T S

| EXHIBIT | IDENTIFIED | IN EVIDENCE |
|---|---|---|
| Complainant's Exhibits | | |
| C-1 | 5 | 103 |

BURKE COURT REPORTING COMPANY
856-627-7733

3

1               P R O C E E D I N G S

2                                        1:28 p.m.

3        JUDGE RODWELL:  We're on the record.  Good morning

4    everyone.  I'm Donna Nutter Rodwell.  As you know, I'm the

5    Administrative Judge presiding over the hearing in this

6    matter, which is the EEOC Complaint of Mr. Lewis W.

7    Johnson, Complainant, vs. Togo D. West, Jr., Secretary for

8    a little while longer, I guess -- is it -- who is it ...

9        MR. PERILLO:  Hershel Gobel is now the Secretary,

10   Acting Secretary of Veterans Affairs.

11       JUDGE RODWELL:  Okay.  So that is effective now.

12   Hershel Gobel, who is the Acting Secretary, Department of

13   Veterans Affairs, Agency; EEOC Hearing Number 170-A0-8163X,

14   and Agency Number 98-2320.

15            I've been assigned to conduct the hearing, of

16   course, and make a decision in this case.  Present this

17   morning, we have the Complainant, Mr. Lewis W. Johnson, who

18   is represented by Mr. William J. Demas; and we also have

19   the Agency Representative, Mr. Christopher Perillo, Counsel

20   with the Agency; and we have his Technical Assistant today,

21   Ms. Susette Flashel Umlauf -- is that -- and present today

22   for the hearings; and our Court Reporter, Mr. Jack Burke,

23   will be making the -- will be our Reporter for today and

24   will be making what will be the only official record of

25   what transpires here today.

4

1        The Complainant, Mr. Johnson, filed a Formal

2   Complaint in this matter in which he alleged that he was

3   discriminated against because of his color and race, black,

4   African-American, when on July 15, 1998, he learned he was

5   not selected for Housekeeping Aide WG-3566-2 position at

6   the Lebanon VA Medical Center; and that is the issue in the

7   case.

8        During the course of a pre-hearing conference

9   held on June 15, 2000, we discussed -- or I advised the

10  parties of their burdens of proof, the hearing procedures,

11  and, of course, my intent to issue a decision in this

12  matter.

13       My function is to serve as a presiding officer

14  and to insure an equitable, orderly, and expeditious

15  hearing and to see that the facts are developed fully on

16  which a fair decision can be made.

17       After the close of the hearing, I'll be reviewing

18  the case, the Complaint filed, the record, and I'll be

19  preparing my decision.  I will probably be issuing my

20  decision into the record at a later date by form of a

21  telephone conference.

22       The transcript of the hearing -- what will take

23  place today -- copies of the transcript will be mailed

24  directly to the parties.  In other words, Mr. Perillo and

25  Mr. Johnson or Mr. Dumas on behalf of Mr. Johnson.  I will

1   get the original of the hearing transcript.

2          The decision portion, we do a little bit

3   differently.  I'll be getting the original and the copies

4   of the transcript, at the Agency's cost, of course; but

5   I'll be getting that of the Decision; but the hearing --

6   and also when you get copies of the hearing transcript,

7   they will not have the exhibits attached to them.  The

8   original will.  It goes to the Agency's Designated

9   Official, who will be making or taking a final action or

10  order with regards to this case.  So hold on, you know, to

11  your exhibits for the -- that you have today.

12         And when I mark the exhibit, for example, the one

13  that was introduced by the Complainant, the excerpt from

14  the agreement between the Agency and the Union, make sure

15  that you mark and note what exhibit marking it has.  It

16  will, in fact, be Exhibit C-1, you know, and I will

17  introduce that into the record; and the Agency did

18  stipulate, you know, that the portion or the excerpt says

19  what it says.

20         (The Documemrnt refered to as exhibit C-1 was

21            marked for identification.)

22     JUDGE RODWELL:  And that is in Article 11 -- I m sorry

23  -- excuse me.  Article 12 on Details, Reassignments and

24  Temporary Promotions, in Section 10 which refers to

25  Reassignments.  And what I'm going to do is get -- is copy

6

1   that Article 12, which is only about 1, 2, 3, 4, 5 pages,

2   and we'll just include that.

3       MR. PERILLO: Judge, my understanding had been Article

4   12, Section 10(b).

5       JUDGE RODWELL: That's what you're stipulating -- the

6   stipulation is to Article 12, Section 10(b), but I ll

7   probably ...

8       MR. PERILLO: Understood.

9       JUDGE RODWELL: ... as I said, include the Article.

10       MR. PERILLO: Sorry about that.

11       JUDGE RODWELL: Okay. That's fine. That's good,

12   because we need to be clear that the stipulation goes to

13   what is said in that specific section, Article 12, Section

14   10(b), which is Page 34 of that. Okay?

15         So, during the course of the hearing, I approved

16   witnesses for the Complainant. I approved the Complainant,

17   Randall Houck, Ray Kent and Joan Welsh Maher. The

18   Complainant has informed me that he will not be testifying.

19   He's going to rely on the record, his affidavit and I guess

20   other statements contained in the record. Ms. Joan Welsh

21   Maher has been excused. She was going to testify regarding

22   that Exhibit C-1, which the Agency has made a stipulation

23   to what it says, and it does speak for itself as well.

24         So for the Complainant, testifying today will be

25   Mr. Kent and Mr. Houck. For the Agency will be Alice

1   Fidler and Barbara Kohr.

2          The parties have been advised several times that

3   the Complaint filed and Report of Investigation is a part

4   of the record.  Any reference to any document not contained

5   therein shall be made by identifying it -- excuse me -- any

6   reference to a document contained in that file shall be

7   referenced by the title and exhibit marking in the file.

8   References to any documents not contained in the file shall

9   be made by introducing it -- presenting a copy to the

10  opposing party, if you haven't done so, which you should

11  have done so, and presenting it to me and marking for

12  identification purposes; and if it is relevant, and there

13  are no objections, it will be entered into the record.  If

14  there are objections, I'll make rulings on those

15  objections.

16          And at this time, we're going to go on and

17  proceed with the case.  Do you wish to make an opening

18  statement?

19      MR. DUMAS:  First of all, I'd like to mention

20  something.  I do not have the top cover sheet for the

21  investigation, so I'm going to refer to the contents

22  probably by B-3 or B-4, and exactly what they are.

23      JUDGE RODWELL:  Does that copier work, Mr. -- is that

24  a copier; and does it work?

25      MR. PERILLO:  I'm sorry; what were you saying?

8

1      JUDGE RODWELL:  That front page on the right.

2      MR. DUMAS:  I need a cover sheet and the Table of

3 Contents; that's what I need, the Table of Contents.

4      MR. PERILLO:  You don't have this?

5      MR. DUMAS:  No.

6      JUDGE RODWELL:  Flip over -- it s not on the other

7 side?

8 Thank you.  Do you have this?  It doesn't look like you

9 have this either.  Ms. -- could you -- and that one, too.

10 Thank you.  He doesn't have the top page of the right side.

11      MR. PERILLO:  We'll take care of that.

12      MR. DUMAS:  Thank you.  You know something ...

13      JUDGE RODWELL:  We can go off the record.

14      (Off the record.)

15      (On the record.)

16      JUDGE RODWELL:  Are you going to make an opening

17 statement, Mr. Dumas?

18      MR. DUMAS:  Yes.

19      JUDGE RODWELL:  Okay.  You may proceed with that.

20      MR. DUMAS:  What we intend to show here this morning

21 is quite simply.  Mr. Johnson, a long-time employee with

22 the Lebanon VA, was denied a position due solely on his

23 case -- on his race, African-American, and that the

24 Selecting Official, in her decision to elect  him, took

25 into consideration his race.  We expect to show that the

9

1   Agency, in fact, was aware of this; and by their action,

2   condoned this, circumventing certain procedures to show

3   that Mr. Johnson did not obtain the particular position in

4   Extended Care 19-C -- 19-3.  And simply, we're going to

5   show this.  The record is clear.

6        JUDGE RODWELL:  I m sorry; excuse me.  You said

7   circumvented certain ...

8        MR. DUMAS:  Procedures ...

9        JUDGE RODWELL:  ... procedures ...

10       MR. DUMAS:  -- Management procedures in particular,

11  ...

12       JUDGE RODWELL:  Uh, huh.

13       MR. DUMAS:  To assure that Mr. Johnson did not get

14  that position, which Mr. Johnson was entitled to, by virtue

15  of being Employer (sic) at that VA with certain

16  entitlements; and that Mr. Johnson simply again was not

17  wanted on that floor because the Selecting Official had a

18  particular animus toward people of color.

19            Thank you.

20       JUDGE RODWELL:  Okay.  Off the record.

21       (Off the record.)

22       (On the record.)

23       JUDGE RODWELL:  We can go on the record.  I am

24  Administrative Judge Donna Rodwell presiding over the

25  hearing today, Mr. Kent; and you've been approved as a

10

1    witness.  Do you have any objection, sir, to taking an

2    oath?

3         WITNESS:  None.

4         Whereupon,

5                        RAYMER A. KENT

6    having been first duly sworn, was called as a witness

7    herein and was examined and testified as follows:

8         JUDGE RODWELL:  State your full name for the record,

9    please.

10        WITNESS:  My name is Raymer A. Kent.

11        JUDGE RODWELL:  And could you spell that, please.

12        WITNESS:  R A Y M E R; A for the middle initial; Kent,

13   K E N T.

14        JUDGE RODWELL:  Okay.  Okay, Mr. Kent.  This is Mr.

15   Dumas, Mr. Lewis Johnson's representative today.  He's

16   going to start asking you some questions, and Mr. Perillo,

17   the Agency Representative will probably have some questions

18   for you as well.

19             You may proceed, Mr. Dumas.

20                      DIRECT EXAMINATION

21   BY MR. DUMAS:

22        Q    Good morning, Mr. Kent.

23        A    Morning.

24        Q    Mr. Kent, I'm going to ask you a series of

25   questions.  I'm not an attorney.  I'm not going to use any

1  legalese.  I'm going straight to the point, and hopefully

2  you can answer those questions likewise.

3           Mr. Kent, first of all, what's your title at the

4  Lebanon VA?

5       A    Human Resources Manager.

6       Q    Mr. Kent, does that indicate that you are in

7  charge of that Agency -- that particular area of the VA?

8       A    Yes; I'm in charge of Human Resources.

9       Q    And for the most part, I would assume -- and

10 please answer this -- you are familiar with procedures in

11 hiring, firing, that sort of thing?

12      A    Yes.

13      Q    Mr. Kent -- Mr. Kent -- just to get right to the

14 nutshell of this thing, I have a document, and I d like to

15 present to you, if it's appropriate.

16      JUDGE RODWELL:  Okay.  Just tell us where it is -- at

17 the tab marking.

18      MR. DUMAS:  Okay.  That's C-3.

19      JUDGE RODWELL:  It looks like C-3 -- it looks like the

20 second page of C-3, Request for Personnel Action?

21      MR. DUMAS:  That's correct.

22      JUDGE RODWELL:  Okay.

23      Q    Mr. Kent, from your experience, can you enlighten

24 us as to what this document entails.

25      A    It's a promotion action from Housekeeping Aide

12

1   WG-1 to Housekeeping Aide WG-2.0

2       Q    Mr. Kent, what's the party's name listed on that

3   document?

4       A    Ronald Hall.

5       Q    Are you saying that this person, Mr. Hall, went

6   from one position to another; and the position he went to

7   was?

8       A    He went from Housekeeping Aide GS -- WG-1 to a

9   Housekeeping Aide WG-2 in a different Unit.

10      Q    In a different Unit?  When you say he went to a

11  different Unit, are we saying here that -- first of all,

12  let's -- let me backtrack.  The position that he went from,

13  is there anything there that would -- let's say -- like

14  distinguish Mr. Hall from a regular part -- full-time term

15  employee -- anything noticeable there?

16      A    He was a part-time, permanent employee.

17      Q    And the position he went to?

18      A    Was a full-time, permanent position.

19      Q    And Mr. Kent, if you can, can you tell us when

20  this occurred?

21      A    The effective date of record was 6/7/98.

22      Q    And on 6/7/98, this person that you mention

23  there, Mr. Hall, was employed by Lebanon VA by what -- any

24  particular Unit?

25      A    He was in Operations Section, the -- he probably

13

1    would have been in EMS, which is Environmental Management

2    Unit of Operations Section, Facilities Management Division.

3         Q    Okay.  Mr. Kent, let me ask that again, please.

4    As a part-timer, what Unit was Mr. Hall with?

5         A    Environmental Management Section of Facilities

6    Operations at the Medical Center.

7         Q    What employees, which would include Mr. Johnson,

8    are employed by that particular Unit?

9         A    Housekeeping Aides that generally do weekend work

10   in the halls and walls and central areas of the Medical

11   Center.

12        Q    Mr. Kent, you stated they generally do -- they

13   generally do weekend work.  Within the area you just

14   mentioned, and I ll re-read this, if you don t mind, EMS,

15   ...

16        A    Uh, huh.

17        Q    You mentioned weekend work.  Do those people in

18   that area also work during the week?

19        A    Certainly.

20        Q    Regular eight-hour -- seven-hour shift?

21        A    Some.

22        Q    So for the most part, are we saying that

23   generally those people are full-time or are they more part-

24   time?

25        A    There are more full-timers than there are part-

14

1 timers.

2  Q Thank you, Mr. Kent.  Mr. Kent, on the effective

3 date that you gave us, 6/7 -- June 7, '98, on the document

4 that you have in front of you, where was Mr. Hall employed?

5 What Unit was Mr. Hall employed?

6  JUDGE RODWELL:  You mean after he was selected?

7  Q On June 6, '98, where was Mr. Hall employed?

8  A June 6 or June 7?

9  JUDGE RODWELL:  The effective date ...

10  MR. DUMAS:  I stand corrected.

11  Q June 7?

12  A He was employed in Extended Care.

13  Q Is Extended Care and EMS one Unit?

14  A No.

15  Q Separate and distinct Units?

16  A Yes.

17  Q So as of June 7, Mr. Hall was no longer

18 supervised by EMS -- he was no longer employed by EMS, so

19 to speak.  He was now under the jurisdiction of Extended

20 Care; am I correct?

21  A That's what it says.

22  Q Okay.

23  MR. DUMAS:  Can I -- if we don't need that again.  I

24 may refer to it.  I just want to get it in front of me

25 here.  I apologize for doing this, but I need to refer to

15

1    it.

2        Q    Now Mr. Kent, can you tell us here what is a

3    conditional employee?

4        A    Career conditional employees are employees that

5    are -- have been hired within three years, under the normal

6    Civil Service Regulations.  After three years, they go to

7    career status.

8        Q    Would a person in that status be considered a

9    probationary employee, if that person was hired on June 7,

10   '98 ...

11       JUDGE RODWELL:  Excuse me.  Would he be considered a

12   what employee?

13       MR. DUMAS:  A probationary employee -- let me

14   backtrack again.

15       JUDGE RODWELL:  I -- I -- excuse me.

16       MR. DUMAS:  I'm sorry.

17       JUDGE RODWELL:  Excuse me.  I hate -- excuse me for

18   interrupting.  I'm trying to -- what is the relevance of

19   this?  Is Mr. Hall -- is he -- I'm just going to ask if Mr.

20   Hall was the -- well, no; go on.  I'll let you go on.  Go

21   on.

22       Q    Okay.  I should have asked you this, sir.

23            What is a probationary employee?

24       A    Under General Schedule or Excepted Employment,

25   probationary employees are in their first year of

BURKE COURT REPORTING COMPANY
856-627-7733

16

1   employment in a permanent position.

2       Q    In this respect, as of June 15, 1998, would Mr.

3   Hall have been considered a probationary employee?

4       A    Can't answer that without knowing what date he

5   started employment.

6       Q    Let me rephrase the question.

7       On June 7, 1998, in a new position, Housekeeping

8   Aide WG-2, full-time, would he have been considered a full-

9   time employee?

10      A    Not necessarily.  It's based on your initial date

11  of employment into a permanent position.

12  JUDGE RODWELL:  According -- according to this, and I

13  -- 'cause we really need to move along.  I'm trying to

14  capture the relevance of this, and I m -- the document in

15  C-3 that we were referring to shows that Mr. Hall was a

16  permanent, part-time -- this is -- I'm reading from the

17  document -- employee who was apparently changed or upgraded

18  to a permanent -- excuse me -- yes; a permanent, full-time

19  employee, effective June 7, 1998.

20      I know that he has a service computation date of

21  1991.  I don't -- that doesn't tell me when he became a

22  permanent employee.  That's just a service computation

23  date, and he apparently did have some military service,

24  according to down here.

25  WITNESS:  I think he had like 15 or more ...

BURKE COURT REPORTING COMPANY
856-627-7733

17

1      JUDGE RODWELL:  Fifteen.

2      WITNESS:  ... military ...

3      JUDGE RODWELL:  Right; so I understand your answer to

4   be whether he was a probationary employee or not depends on

5   when he became a permanent employee; is that ...

6      WITNESS:  Right; when he was initially -- initially

7   hired in a permanent position in a continuous service

8   thereafter, would meet the qualifications for the

9   conversion from a probational status to a career-

10  conditional status.

11     JUDGE RODWELL:  Now you can go on, Mr. Dumas.

12     MR. DUMAS:  Okay.  Thank you.

13     Q   Mr. Kent, according to the records, Mr. Hall was

14  hired in October 24, 1997.

15     JUDGE RODWELL:  And where are you getting this from?

16  According to what records?

17     MR. DUMAS:  Statement of -- I believe it was Alice

18  Fidler.

19     JUDGE RODWELL:  Which is ...

20     MR. DUMAS:  She may have just said October, '97; and

21  not the date.

22     JUDGE RODWELL:  Which is at B-5.

23     MR. DUMAS:  I believe it's Alice Fidler.

24     JUDGE RODWELL:  Page 7 of Exhibit B-5.  Okay.  Can I

25  ask just where you're getting at or to?

18

1      MR. DUMAS:  What we're trying to show here by the
2  document that we have here, the Personnel Action Form, has
3  nothing whatsoever to do with the hearing here.  That is
4  not the document that put Mr. Hall in the position that's
5  in question here; but it does show that it put Mr. Hall in
6  the same level as Mr. Johnson, and any position -- and this
7  position, particularly; it would have been a reassignment.
8  Reassignments are decided according to the seniority of the
9  individuals; nothing more.

10      JUDGE RODWELL:  Okay.  Well, can we -- let's kind of
11  move along toward that, then.

12      Q    Mr. Kent, again, October 24, 1997, Mr. Hall came
13  on duty.  On June 15, '98, would he have been a
14  probationary employee?

15      A    Yes.

16      Q    Do -- do probationary employees ...

17      JUDGE RODWELL:  I'm sorry; as of what date would he
18  have been a probationary employee?

19      MR. DUMAS:  June 15, '98.

20      JUDGE RODWELL:  Okay.  Go on.

21      Q    Do probationary employees, normally at the VA
22  Hospital, apply for and obtain promotions?

23      A    Yes.

24      Q    Do probationary employees normally -- can a
25  probationary employee apply for and receive reassignments?

1     A    Yes.

2     Q    Can probationary employees, in those two areas

3  that I mentioned, can they be -- can that person be

4  considered more qualified or considered for that position

5  over an individual who is a non-probationary employee?

6     A    Yes.

7     Q    Mr. Kent, we've ascertained here that Mr. Hall,

8  as of June 7, 1998, was no longer in Housekeeping EMS.

9     A    Okay.

10     Q    Are you familiar with the term, Supervisory

11  Appraisal?

12     A    Yes.

13     Q    Can you explain to us what a Supervisory

14  Appraisal is?

15     A    Yes.  Appraisal — a Supervisory Appraisal is a --

16  an evaluation by -- normally by a first-line supervisor --

17  of an employee's performance in a position.

18     Q    Are we saying that the individual indicated on

19  the supervisor form would be appraised by his or her

20  Supervisor; am I to understand that?

21     A    Yes; Supervisor of Record, however, may not be

22  the one that is immediately there on that day and time.

23     MR. PERILLO:  Excuse me, Mr. Dumas.

24     MR. DUMAS:  Yes.

25     MR. PERILLO:  If it will help you, I'm willing to

20

1   stipulate that the two finalists for the selectee and your

2   client -- and they had equal scores in the supervisory

3   appraisals.  If that will help get ...

4        MR. DUMAS:  Okay.  I appreciate that, but we're not

5   getting -- going there.

6        MR. PERILLO:  Okay.

7        MR. DUMAS:  And I thank you.

8        Q    Mr. Kent, again, I would like to show you a

9   document here -- particularly supervisory appraisal ...

10       A    It's behind Tab C-3.  You showed me Ronald Hall's

11  supervisory appraisal dated 6/15/98.

12       JUDGE RODWELL:  Okay.  Is there a question?

13       MR. DUMAS:  Yes.

14       Q    Mr. Hall -- correction -- Mr. Kent.  Mr. Kent,

15  ...

16       A    Uh, huh.

17       Q    ... you indicated that's Mr. Hall's appraisal?

18       A    Yes.

19       Q    On the very top of that form, does it indicate

20  what Unit Mr. Hall was with?

21       A    Extended Care.

22       Q    So we would immediately assume that's the

23  supervisory appraisal from the Supervisor in Extended Care?

24       A    You could assume that; but you'd be wrong.

25       Q    Uh, huh.

1     A     Because the Supervisor, in order to rate an

2   employee, the Supervisor has to supervise him for a

3   reasonable period of time, which is normally defined in the

4   records -- Regulations -- as 90 days or more.  And in this

5   case, he hadn't been in Extended Care for 90 days.

6     Q     A very long statement -- a very long statement,

7   but if I can just shorten it a bit -- at the very -- at the

8   very top of this form, left and right side, it indicates in

9   this area, someone who should complete this form.

10    A     I can point one out over this one here.

11    JUDGE RODWELL:  What are we -- excuse me, what are we

12  getting to here?

13    MR. DUMAS:  Okay.  Again, again ...

14    JUDGE RODWELL:  I m having -- the form speaks ...

15    MR. DUMAS:  This form ...

16    JUDGE RODWELL:  Let me ask ...

17    MR. DUMAS:  Yes.

18    JUDGE RODWELL:  Can you look at this and tell who

19  rated -- who filled out this form for Mr. Hall?

20    WITNESS:  Yes.  Michael Brennan.

21    JUDGE RODWELL:  Michael Brennan; okay.

22    WITNESS:  Who had been his Supervisor in Environmental

23  Management.

24    JUDGE RODWELL:  Okay.

25    Q     And one other person there.

22

1    A    Dennis Firestein, who is the next level

2  Supervisor.

3    MR. DUMAS:  It is our argument that neither of those

4  persons was at the time, June 15th, neither of those

5  persons was Mr. Hall's Supervisor.

6    JUDGE RODWELL:  And the witness has just explained

7  those situations that in order to do the supervisory

8  appraisal, normally the supervisor has to supervise the

9  employee for a reasonable period of time, and that is

10  usually 90 days or more; and that Mr. Hall had not been in

11  the new Unit for 90 days; and that these Supervisors were

12  his Supervisors in his former Unit.  That is the witness'

13  testimony.

14    MR. DUMAS:  Okay.  On the form, it indicates, for the

15  most part, if a person is not able to be super -- appraised

16  because for whatever reason, he should be given a zero.

17    JUDGE RODWELL:  Sir, you're not going to get very far.

18  You're not going to get very far with that.  I mean I can't

19  ...

20    MR. DUMAS:  But this is ...

21    JUDGE RODWELL:  This is his testimony, and that's

22  argument that you're giving.

23    MR. DUMAS:  But I'm actually going to refer to that.

24    JUDGE RODWELL:  You can save that for closing

25  argument.

1    MR. DUMAS:  I was going to ask him to refer to -- I

2    was going to ask him to refer to the statement there that

3    indicates who should complete the form.  It states clearly

4    the Supervisor completes these forms.

5    JUDGE RODWELL:  Okay.

6    MR. DUMAS:  It doesn t say a past Supervisor.  It says

7    just Supervisor.

8    JUDGE RODWELL:  I know; but ...

9    MR. DUMAS:  I don't care why they did it.

10   JUDGE RODWELL:  Can you explain -- if you can -- if

11   you can shed some light on that any more, I guess, than

12   what you've just stated.

13   WITNESS:  We would not allow a Supervisor who has not

14   supervised an employee for more than 90 days to complete

15   any rating of record; and this would be a rating that we

16   utilize in a formal process.  So therefore, in order for it

17   to be a valid rating, it needs to have someone who can

18   adequately judge that employee's performance; and we always

19   reach back, if a person has not been in a position for 90

20   days, and have the ratings done by the previous Supervisor.

21   MR. DUMAS:  Judge Rodwell, I can understand ...

22   JUDGE RODWELL:  Excuse me.  You ask questions, Mr.

23   Dumas.

24   MR. DUMAS:  Yes.

25   JUDGE RODWELL:  This is not a time to make an argument

24

1   for the case.

2        MR. DUMAS:  I'd like to ask Mr. Kent ...

3        JUDGE RODWELL:  But this is not is unusual; I mean

4   this, believe me, ...

5        MR. DUMAS:  I understand.  I want Mr. Kent to refer to

6   the form.  I'm not concerned with his testimony.  I want to

7   testify ...

8        JUDGE RODWELL:  I want to move on -- I want to move on

9   to something else, and I hope that's what you're doing.

10       MR. DUMAS:  No; I ...

11       JUDGE RODWELL:  Because we're finished with that line

12  of ...

13       MR. DUMAS:  Miss ...

14       JUDGE RODWELL:  Excuse me.  Let me speak first, and

15  you'll have an opportunity.  I want to move on to a

16  different line -- I'm instructing you to move on to a

17  different line of questioning, and we need to get away from

18  that line of questioning about why his past Supervisors

19  rated -- filled out that form.  We need to move on to

20  something else.

21       MR. DUMAS:  Okay.

22       Q    Mr. Kent, are you familiar with the position of

23  Housekeeping Aide WD-2?

24       A    Yes, sir.

25       Q    In your familiarization with that position, and

443

1    the qualifications for that position, do you recall whether

2    or not there is any type of qualifications that indicate

3    one should have any particular type of training in the

4    chemical field?

5        A    The position involves the use of hazardous

6    chemicals.

7        Q    Does the position indicate one should have

8    knowledge of MSDS, Material Safety Data Sheets?

9        MR. PERILLO:  Stipulate that it does.

10       Q    Mr. Kent, can any employee (sic) qualifications

11   (sic) -- can any prospective employee's qualifications that

12   are not -- those qualifications are not on the

13   qualification sheet for Housekeeping, can a employee be

14   considered for the position at -- those qualifications have

15   nothing whatsoever to do with the qualification sheet, if

16   you follow what I'm saying here?

17       A    Theoretically, yes; but your question you asked

18   was nothing whatsoever.  The screen-out item for

19   qualification requirement for Housekeeping Aide is the

20   ability to do the duties of the position.

21       Q    Does that include being trained -- let me

22   rephrase that.

23            Is being trained, setting up and/or teaching MSDS

24   -- is any qualification whatsoever for the position,

25   Housekeeping Aide?

1    MR. PERILLO:  Stipulate in -- stipulate that it's not

2  part of the position description as we did before.  Also

3  objection to the relevance of it.  We stipulated that your

4  client and Mr. Hall were qualified for the position.

5        Mr. Kent was not the Selecting Official.

6    Q    Mr. Kent, I'd like to ...

7    JUDGE RODWELL:  Hold on.  Hold on.  Hold on one

8  moment.  I want to state -- okay, Mr. -- the Agency,

9  through Mr. Perillo, by Mr. Perillo, has stipulated that --

10  I guess that the requirement of being trained in or

11  experience with MSDS, which is a chemical?

12    MR. PERILLO:  Material Safety Data Sheets.

13    JUDGE RODWELL:  Oh, Material Safety ...

14    MR. PERILLO:  Data Sheets.

15    JUDGE RODWELL:  I'm sorry.  Material Safety Data

16  Sheets was not a part of the qualifications listed on the

17  position or the Vacancy Announcement.  That -- that is a

18  stipulation.  And the second stipulation was that both the

19  Complainant, Mr. Johnson, and Mr. Hall were qualified for

20  the position.

21        Now is your question to this witness -- strike

22  that.

23        Are you asking this witness if a Selecting

24  Official can require or additional qualifications that

25  aren't listed Job Announcement; is that what you're asking?

1    MR. DUMAS:  Can the Selecting Official supercede the

2  qualification and add their own qualifications?

3    JUDGE RODWELL:  Mr. Kent, if you can answer that

4  question:

5        Can the Selecting Official add qualifications?

6    WITNESS:  The Selecting Official does not dictate

7  qualifications, but they do evidence preference.

8    MR. DUMAS:  I don't think that's answer (sic) the

9  question.

10    JUDGE RODWELL:  What do you mean by evidence

11  preference?

12    WITNESS:  They can make a selection based on whom they

13  feel is most qualified of the qualified candidates that are

14  referred to them meeting the basic qualifications.  Human

15  Resources screens and refers basic qualifications for the

16  position.

17    MR. DUMAS:  May I?

18    JUDGE RODWELL:  Yes.

19    Q    Mr. Kent, again, can an -- can an -- simple --

20  can a Selecting Official add their own qualifications that

21  are not listed in the qualification indicated?

22    MR. PERILLO:  Stipulate that they can t.

23    A    No.

24    MR. DUMAS:  Now I'm asking the witness.

25    JUDGE RODWELL:  And he answered the question.

28

1      WITNESS:  I said no.

2      JUDGE RODWELL:  Okay.

3          Can a Selecting Official, Mr. Kent, -- can a

4  Selecting Official look at whether or not a candidate for

5  that Housekeeping position -- or consider -- take into

6  consideration in his or her determination, whether a

7  candidate would be trained in the use or setup of this

8  Material Safety Data Sheets?

9      WITNESS:  Certainly.  They can take into consideration

10 all -- all evidence in the record, employee's file -- all

11 their skills, abilities and other characteristics that

12 would qualify them for the position.

13     JUDGE RODWELL:  Okay.

14     Q    Mr. Kent, is there anything -- anywhere, to your

15 best recollection; is there any mention, in any form or

16 fashion, that an individual should be qualified, or need to

17 be qualified, or should have any qualification whatsoever,

18 not only MSDS, but in any type of chemical training,

19 reaction to chemicals, et cetera?

20     MR. PERILLO:  Didn't we just stipulate?

21     MR. DUMAS:  I didn't -- answer my question, please.

22     JUDGE RODWELL:  Answer the question.

23     A    None in the basic qualifications.

24     Q    Mr. Kent, ...

25     JUDGE RODWELL:  Okay.  We need to move on to another

29

1   line of questioning.

2       MR. DUMAS:  Okay.

3       JUDGE RODWELL:  I just want -- you know, I just want

4   to explain that, you know, oftentimes -- oftentimes,

5   employee Selecting Officials consider different experiences

6   that candidates have that aren t necessarily set forth in

7   the qualifications; and that's a determination -- actually,

8   that is a conclusion that I'm following; but we need --

9   that's why we need to move on to a line of questioning as

10  opposed to arguing over this.

11       This -- this -- the Agency has stipulated;

12  therefore, it is an undisputed fact that whatever these

13  requirements are, were not specifically set forth in the

14  Vacancy Announcement.  That is a stipulation, and it is

15  evident; and I think it's an undisputed fact, as well, that

16  the Selecting Official took into consideration -- or at

17  least said she took into consideration, experience in those

18  areas; so we need to move on.  There's no need to argue

19  about it.  That's ...

20       Q    Mr. Kent, are you familiar with a procedure

21  whereby Management and Union rate individuals who are

22  applying for positions?

23       A    No.  The question may have been re -- miss --

24  phrased, however.  Management, including employees, and

25  most often with a Union observer, evaluate candidates for

BURKE COURT REPORTING COMPANY
856-627-7733

448

1   basic qualifications, and then rate them for consideration

2   for referral for promotion or reassignment.

3       Q    And that done, what is done with that after the

4   rating process is done?

5       A    After the rating process is done, a high-

6   qualified line is determined, the best qualified candidates

7   for promotion.  Other candidates that are rated and deemed

8   qualified for reassignment are also referred at the same

9   time to the Selecting Official for their review, either by

10  review of the records or review of the records and an

11  interview, and then selection.

12      Q    Is there any other rating process that you are

13  aware of?

14      A    Not within our internal promotion plan.

15      Q    Perhaps reassignment plan?  Do you know of any

16  other rating procedure?

17      A    There is no reassignment plan.  Reassignments are

18  an option of Management.

19      Q    Sir, I think I might have got off at the wrong

20  question asked; but what I'm trying to say is this:  Is

21  that the only -- the only way to rate employees is the

22  situation that you just elaborated?

23      A    The only way to rate employees for referral --

24  qualification and referral for promotion is the way I

25  defined it.

31

1  Q    What about actually rating the person for the

2  position vs. referral?

3  A    Are you referring to ...

4  JUDGE RODWELL:  That's what that is.

5  A    ... Supervisory appraisal?

6  Q    No; I'm not referring to Supervisory appraisal.

7  What I'm asking you, is this ...

8  JUDGE RODWELL:  Excuse me; he's answered your

9  question.

10  He's answered your question, sir.  He explained how

11  individuals are rated and referred to the Selecting

12  Official.

13  MR. DUMAS:  Okay.  I understand that.  I'm just ...

14  JUDGE RODWELL:  And that's where his job ends.  Mr.

15  Kent's job ends after it gets to the Selecting Official.

16  Normally -- is that correct?  When I say your job ends, I

17  mean ...

18  WITNESS:  I have oversight to make sure they don't do

19  something incorrect.

20  JUDGE RODWELL:  Okay.

21  WITNESS:  But normally, at that point, the Selecting

22  Official can evaluate the candidates.  They're given the

23  access to the employee personnel folders, et cetera; and

24  then it's up to them whether or not they choose to

25  interview and then make a selection.

32

1      Q    But there's no other rating process, then?

2      A    (No response.)

3      Q    A simple question.  There's no other rating

4  process?

5      JUDGE RODWELL:  What -- maybe it would help us ...

6      MR. DUMAS:  I just need that answer.

7      JUDGE RODWELL:  He's answered the question.

8      MR. DUMAS:  I'd like him to answer ...

9      JUDGE RODWELL:  I don't want him to say anymore.  He's

10  sufficiently answered that question.  I don't know what

11  you're getting at.  "Is there any other rating process?"

12      MR. DUMAS:  Is there any other rating process?  He

13  said no.  I wanted to make sure.

14      JUDGE RODWELL:  He said no; so what else do you want

15  to know.  He said no.  If that -- Are you aware of any

16  other rating process with regards to ...

17      WITNESS:  Not for referral, for promotion or

18  reassignment.  Certainly, Supervisors, who are Selecting

19  Officials, are going to review their candidates; and they

20  have their own in -- procedure that they've determined to

21  separate candidates and decide who brings the most skills

22  to the job in order to be selected.  But that's an informal

23  process.

24      JUDGE RODWELL:  Are there -- are there any

25  requirements that are imposed upon the Selecting Officials

BURKE COURT REPORTING COMPANY
856-627-7733

33

1    when it gets to the Selecting Officials -- for rating, or

2    ...

3        WITNESS:  Within -- within a list of referrals -- in

4    other words, we refer lists of reassignment candidates, a

5    list of promotion candidates; they should treat people

6    equally.  That is our own internal requirement; but beyond

7    that, none.

8        JUDGE RODWELL:  Okay.  He's answered the question, Mr.

9    Dumas.  We again need to move on.

10       Q    Mr. Kent, according to the regulations, do you

11   know of any procedure where KSOA's (sic), once completed,

12   are used in a rating process?

13       A    That is the procedure they use in the rating

14   process.  They re evaluated by a group of subject matter

15   experts, under the guidance of Human Resources and the

16   Union; ...

17       Q    Once that's ...

18       A    ... and using the KSAO's, are given a numerical

19   score relative to each other; and a rating guide; and

20   evaluated in that process.

21       Q    Is there any other procedure inasmuch the KOSOA's

22   (sic) are utilized ...

23       JUDGE RODWELL:  Okay.  Excuse me.  I need to kind of

24   cut this short.  I'm having a very difficult time.  Let me

25   -- I just have a question to ask.

34

1        If -- could you -- I'm going to ask you -- this

2   document is in Exhibit C-3, and could you just tell me what

3   that document is.

4        WITNESS:  It's a referral list for consideration for

5   promotion to the position of Housekeeping Aide WG-2 in

6   Extended Care.

7        JUDGE RODWELL:  Okay.  And is that the certificate of

8   promotion that would have been with the certificate of

9   eligibles that would have been sent to the Selecting

10  Official?

11       WITNESS:  One of maybe more than one.  This is

12  reassignment, also.  These people are all already WG-2's.

13  There may have been -- and I don't know for sure -- another

14  list of people who were in, you know, clerical jobs or

15  other jobs that wanted to get promoted to the position.

16       JUDGE RODWELL:  So there may have been a promotion

17  eligible list?

18       WITNESS:  Right; but this is the reassignment list.

19       JUDGE RODWELL:  Okay.  And the selectee and Mr.

20  Johnson are on that list; is that correct?

21       WITNESS:  Yes; they are both on the list.

22       JUDGE RODWELL:  And what does that mean, that both of

23  them are on this list?

24       WITNESS:  Both of them are qualified and should be

25  considered for reassignment to the position.

35

1    JUDGE RODWELL:  So when this list gets to the

2    Selecting Official, they are deemed both -- all of the

3    candidates on the list are deemed qualified in ...

4    WITNESS:  Correct.

5    JUDGE RODWELL:  ... for the position?  Okay.  Thank

6    you.

7    Okay.  And so we really need to move on, because

8    what this case is about is Mr. Johnson and the other

9    candidates on this list were referred to the Selecting

10   Official.  The Selecting Official made the decision then of

11   all of these qualified candidates whom she felt was best

12   qualified for the position, based on her knowledge of the

13   position.  I don't -- generally, that's how it's done.

14   That s what is expected when the list is sent to the

15   Selecting Official.

16   MR. DUMAS:  I understand, and I just need to ask two

17   more questions.

18   JUDGE RODWELL:  Mr. Kent did not select the candidates

19   -- the selectee.

20   Q    Mr. Kent, insofar as the form you just signed

21   when you -- are you familiar with this -- is there a

22   procedure called promotion?

23   JUDGE RODWELL:  What are we getting at here?  This is

24   the reassignment eligible form.

25   MR. DUMAS:  Mr. Kent mentioned that this form is for

BURKE COURT REPORTING COMPANY
856-627-7733

36

1  promotion.

2      JUDGE RODWELL:  For reassignments.  He did not say

3  that.  This is reassignment eligible form.  The one --

4  these are the individuals who are all in a current position

5  when they applied for this position.  They were WG-2

6  employees; so they were eligible for reassignment, and this

7  is what happened in this list.

8      MR. DUMAS:  I was going to ask Mr. Kent to discuss

9  reassignment and what's the qualification for reassignment.

10      MR. PERILLO:  Your, Honor, ...

11      JUDGE RODWELL:  What do you mean, "qualification for

12  reassignment"?

13      MR. DUMAS:  In a situation of reassignment, it's our

14  contention, according to the record -- to what we have

15  here, ...

16      JUDGE RODWELL:  Okay.

17      MR. DUMAS:  ... that reassignment is decided by EO --

18  entrance on duty at the Lebanon VA.  And their document in

19  the record indicates that.

20      MR. PERILLO:  Is that a question?

21      JUDGE RODWELL:  Go on; what -- what are you asking Mr.

22  Kent?

23      Q    In reassignments, Mr. Kent, what are the basic

24  qualifications for reassignment, according to the policy of

25  the Lebanon VA?

1        A      Minimum -- there's difference between minimum

2    qualifications and others.  Minimum qualifications are you

3    must be the same grade and meet the basic qualifications of

4    that type of position.  For instance, in this case, they

5    were probably Food Service workers and Housekeeping Aides

6    on there, because they could both be WG-2's.

7    Theoretically, a Laundry Worker could also be a WG-2 and be

8    on this type of register; and the would all meet basic

9    qualifications because in all three of those occupations,

10   part of their assignment is to clean.

11       Q    Mr. Kent, there are two individuals -- same title

12   -- same job -- doing the same job; and one has been an ELD

13   for five years; one has been for one year.  In a

14   reassignment, who is entitled to the position, Mr. Kent?

15       A    Anyone the Selecting Official chooses to select.

16       Q    Mr. Kent, is that written anywhere?

17       A    It's -- it's right in the Union contract that

18   you're sitting there with.  It says reassignments are an

19   exception to the Merit Promotion Policy.

20       Q    Okay.  Mr. Kent, I'd like to -- it looks like C-4

21   -- someone help me out here -- this is kinda -- the last --

22   the very last third -- fourth page from the last on the

23   Investigative Report, ...

24       JUDGE RODWELL:  Is that a letter to Lena Mitchell?

25       MR. DUMAS:  No; that's State's Seniority

38

1    Determination.

2         JUDGE RODWELL:  Okay.  This is C-4?

3         MR. DUMAS:  The last section -- the last section of

4    the folder, the first page -- it will be C-6 -- C-6.

5         JUDGE RODWELL:  Memorandum of Understanding, Seniority

6    Determinations?

7         MR. DUMAS:  Yes.

8         JUDGE RODWELL:  Is that what you're looking at?

9         MR. DUMAS:  Yes.

10        Q    Mr. Kent, what does that document indicate?

11        A    That document indicates when you are using

12   seniority for a reassignment decision, you will use this

13   definition of seniority.

14        Q    Mr. Kent, will you read the first sentence.

15        A    The parties agree that the determination of

16   seniority, when used in reassignment decision, whether for

17   the most or least senior, will follow -- definition will

18   apply.

19        JUDGE RODWELL:  It says, "When used."  It doesn't say

20   it must be used.  It says, "The parties agree that the

21   determination of seniority, when used in reassignment

22   decisions, whether for the most or least senior, the

23   following definition will apply."

24        Now was seniority used as a basis for making this

25   selection, to your knowledge?

39

 1      WITNESS:  No.

 2      JUDGE RODWELL:  Who -- who determines whether

 3  seniority will be used?

 4      WITNESS:  It's basically a Management decision.  This

 5  document was designed and negotiated by myself and the

 6  Union President to assist in assigning people who were

 7  being displaced prior to a RIFF, to positions, rather than

 8  otherwise announce them and block chances for retreat for

 9  those people without being RIFF'd.

10      JUDGE RODWELL:  And when you have a vacancy

11  announcement -- and this position was done through a

12  vacancy announcement, giving individuals an opportunity to

13  compete for the job; is that correct?

14      WITNESS:  Yes.

15      JUDGE RODWELL:  And would you normally use seniority

16  as a factor when making those selections in that case?

17      WITNESS:  May or may not be a factor.

18      JUDGE RODWELL:  How would it be a factor?

19      WITNESS:  For instance, if you had two people that

20  were equally qualified, then the Selecting Official, they

21  may use that as a tie-breaker.  In fact, this is in several

22  places in our Contract used as a tie breaker.

23      JUDGE RODWELL:  So does that mean if a Selecting

24  Official, in his or her mind, can't determine who would be

25  the best qualified, or she has two people or three people

40

1   who are at the same level, ...

2       WITNESS:  Relatively equal.

3       JUDGE RODWELL:  ... and that person has a hard time

4   making up his or her mind, it may -- could break the tie?

5       WITNESS:  We would recommend that would be the desired

6   type of tie-breaker that would be used.

7       JUDGE RODWELL:  Okay.  So. ...

8       MR. DUMAS:  No more questions.

9       JUDGE RODWELL:  Okay.  Thank you.  Do you have any

10  questions for Mr. Kent, Mr. Perillo?

                    CROSS-EXAMINATION

12  BY MR. PERILLO:

13      Q    The list of eligibles was based upon individuals

14  that fit the requirements contained in the Position

15  Description; correct?

16      A    Yes.

17      MR. PERILLO:  No further questions.

18      JUDGE RODWELL:  Okay.  Are we done with Mr. Kent?

19      MR. DUMAS:  Yes.

20      JUDGE RODWELL:  Mr. Kent, I'm going to direct that you

21  not discuss your questions or the testimony with anyone

22  outside of this hearing room.  And thank you; you may be

23  excused.

24      WITNESS:  Thank you.

25      MR. PERILLO:  Sir, you wanted Mr. ...

41

1    MR. DUMAS:  Mr. Houck.

2    MR. PERILLO:  ... Mr. Houck next.

3        Off the record?

4    JUDGE RODWELL:  Off the record; Yes.

5    (Off the record.)

6    (On the record.)

7    JUDGE RODWELL:  Back on the record.  Good morning, Mr.

8 Houck?

9    WITNESS:  Yes.

10    JUDGE RODWELL:  That's correct?  Sir, you've been

11 approved as a witness to testify in this hearing, and I am

12 Donna Rodwell, the Administrative Judge presiding over the

13 hearing.  Do you have an objection, sir, to taking an oath

14 -- to being sworn in to testify?

15    WITNESS:  No.

16    Whereupon,

17              RANDALL L. HOUCK

18 having been first duly sworn, was called as a witness

19 herein and was examined and testified as follows:

20    JUDGE RODWELL:  Thank you, sir.  State your full name

21 for the record, please.

22    WITNESS:  It s Randall L. Houck.

23    JUDGE RODWELL:  Okay.  And is that H O U C K?

24    WITNESS:  That's correct.

25    JUDGE RODWELL:  And Randall with two L's?

42

1      WITNESS:  That's correct.

2      JUDGE RODWELL:  Okay.  Thank you, sir.  I am going to

3 let the Complainant, Mr. Johnson's, Representative, Mr.

4 Dumas question you; and after that, Mr. Perillo, the

5 Agency's representative may have some questions for you as

6 well; and I may have questions, too, at some point and

7 time.

8           Mr. Dumas, you may proceed, sir.

9                 DIRECT EXAMINATION

10 BY MR. DUMAS:

11     Q    Good morning, Mr. Houck.

12     A    Good morning.

13     Q    Thank you for coming down this morning in the

14 rain and so forth.  Mr. Houck, I m going to be extremely

15 brief.  I have in front of me an Investigative Report; and

16 in that Investigative Report, there's an indication that

17 you was privy to a conversation between yourself, and I

18 believe it was Wanda Miller and Alice Fidler; and Ms.

19 Fidler is alleged to have made certain statements.  Do you

20 recall that?

21     A    I believe Wanda Miller was the other person

22 present; I m not sure.

23     Q    How long have you known Ms. Fidler?

24     A    Since 1990, I believe.

25     Q    Do you have any animosity toward her?

43

1    A    No.

2    Q    You know, Mr. Houck, let me ask you this:

3         I do understand you had conversations with

4    someone regarding this particular matter, testifying, et

5    cetera, ...

6         MR. PERILLO:  Objection.  It s not a question, Judge.

7    Q    Okay.  Mr. Houck, did you discuss testifying in

8    this matter with anyone?

9         MR. PERILLO:  Objection.

10        JUDGE RODWELL:  Excuse me, what ...

11        MR. PERILLO:  It's his witness.

12        JUDGE RODWELL:  Okay.  I'm going to overrule that

13   objection.  I don't think that is leading.  Answer the

14   question, please.

15        WITNESS:  I'm not sure I understand the question.

16        JUDGE RODWELL:  Okay.  Can you explain.

17   Q    Have you discussed the possibility of testifying

18   in any hearing, tribunal or any like entity about these

19   matters?

20   A    Have I discussed testifying?

21        JUDGE RODWELL:  Have you talked to anyone about your

22   coming here and testifying here today?

23        WITNESS:  No; I have not.

24        JUDGE RODWELL:  Okay.  Go on.

25   Q    Have (sic) anyone suggested that you were not to

44

1    testify about these matters?

2        A    I was -- I was told by the Administration of

3    Lebanon VA, by the local Union that I should be present

4    here.  I believe that's what you're searching for.

5        Q    Yes.  Mr. Houck, can you tell us the nature of

6    the conversation that you heard or that you were a party

7    to.

8        A    When?

9        Q    The conversation that's alluded to in your -- in

10    the Investigation regarding statements that's alleged to

11    have been made by Ms. Fidler regarding minorities or blacks

12    working on her floor.

13        A    Discussion that I heard -- overheard -- was back

14    in the early 90's when I worked for Ms. Fidler.  There was

15    a fellow that wanted to come from Housekeeping into

16    Nursing, and the comment I heard from Ms. Fidler was that

17    "We didn't want any more of them on this floor."

18        Q    Mr. Houck, when you -- during that conversation,

19    did it come to your mind what the term "them" meant or

20    referred to?

21        A    Do you want to know my opinion?

22        Q    Yes; I do.

23    MR. PERILLO:  Objection.

24    JUDGE RODWELL:  Overruled.

25        A    My opinion was that she meant this fellow's being

BURKE COURT REPORTING COMPANY
856-627-7733

45

1    black; because he was black.  That's the only thing I

2    gathered from it.

3        Q    Mr. Houck, do you work in -- by -- according to

4    records, you worked for Ms. Fidler for maybe seven years in

5    the Housekeeping Unit?

6        A    Yes; that s correct.

7        Q    And this is where this person was trying to be

8    employed?

9        A    Pardon me?

10       Q    This black person you are referring to?

11       A    Yes; he was in Housekeeping and was trying to get

12   into Nursing.

13       Q    And this conversation that you overheard, it was

14   a loud conversation?  Was it just a conversation in passing

15   -- or just a normal conversation -- words exchanged?

16       A    This wasn't a conversation directed at me and

17   Wanda Miller.

18       Q    Mr. Houck, a second statement that's indicated in

19   this Investigative Report refers to a situation where an

20   individual was told, "What you just stated is bordering on

21   discrimination."  Do you recall that?

22       A    Yes; I do.

23       Q    Can you enlighten us, please?

24       A    Ms. Fidler went to Peggy Cromer, who's in Nursing

25   Education to see about this fellow coming into Nursing; and

46

1  she was told by Ms. Peggy Kroomer that "You're about this

2  close to discriminating against this gentleman; so it's

3  best that you back off."

4      Q    When you said, "she", who are you referring to?

5      A    Ms. Fidler.

6      Q    Mr. Houck, you indicated that this may have taken

7  place somewhere in the early '90's.  Do you recall when in

8  the '90's?

9      A    No; I don't remember.

10     Q    What is '95 or '96; or you just don't remember at

11 this point?

12     A    I really don't remember which -- which year it

13 was.

14     MR. DUMAS:  Thank you, Mr. Houck.  I have no more

15 questions of this witness.

16     JUDGE RODWELL:  Mr. Perillo.

17                    CROSS-EXAMINATION

18 BY MR. PERILLO:

19     Q    To whom was this -- Mr. Dumas asked you a

20 question.  To whom was this conversation directed at, where

21 you allegedly overheard this remark that Ms. Fidler made?

22     A    We were in the Dayroom where the patients

23 congregate at, and she was leaning over a half-door, and

24 she was discussing this with me and Wanda Miller.

25     Q    Discussing with who?

47

1    A    Myself and Wanda Miller.

2    Q    And who?

3    A    Wand Miller who was an LPN on the floor at the

4  time.

5    Q    She was -- she had -- so this remark was directed

6  to you?

7    A    She was discussing it with us; yeah.

8    Q    It wasn't eavesdropping?

9    A    Oh, absolutely not.

10    MR. PERILLO:  No further questions.

11    JUDGE RODWELL:  I just have one question, Mr. Houck.

12  The second statement regarding Ms. Fidler going to Peggy

13  Cromer, -- that's C R O M E R, in Nursing Education.  How

14  did you know about that discussion or conversation between

15  Ms. Cromer and Ms. Fidler?

16    WITNESS:  We were in the lunchroom, and Alice came

17  back and told us what she had to say.  That's the only way

18  I would have known.

19    JUDGE RODWELL:  So Ms. Fidler came back and told you

20  what Ms. Cromer had told her?

21    WITNESS:  I was in the lunchroom, but I can't say at

22  the time who else was in the lunchroom with me.

23    JUDGE RODWELL:  So do you know whether or not Ms.

24  Fidler went to Ms. Cromer to discuss whether or not she had

25  to accept this person into her Unit?

48

1      WITNESS:  That's what I got out of her conversation,

2   that -- the way she discussed it with us -- that she went

3   to see Peggy Cromer about this; and that's how she was

4   instructed to handle it.

5      JUDGE RODWELL:  Now during the time that you worked

6   for Ms. Fidler, did you hear her make any more statements

7   regarding blacks or minorities?

8      WITNESS:  Off the top of my head, I couldn't -- I

9   couldn't say that I have.

10     JUDGE RODWELL:  Okay.  Were there any blacks or

11   minorities in the Unit at that time, prior to this

12   gentlemen coming in?

13     WITNESS:  Yes.

14     JUDGE RODWELL:  Okay.  Did the gentleman transfer into

15   the Unit?

16     WITNESS:  Yes.

17     JUDGE RODWELL:  Okay.  If you know, were there any

18   more people of color, or black employees, who were

19   reassigned into Ms. Fidler's Unit after that?  If you can

20   recall.  It's not ...

21     WITNESS:  During the time that I was with her for

22   seven years, I don t believe any more were brought in; no.

23   There were those who left.

24     JUDGE RODWELL:  When did you stop working in the Unit

25   with Ms. Fidler?

1      WITNESS:  I think it was 1997.

2      JUDGE RODWELL:  So you were with her from the early

3  '90's to 1997?

4      WITNESS:  That's correct.

5      JUDGE RODWELL:  And you believe that this statement

6  that she made regarding the gentleman who wanted to

7  transfer to her Unit was made in the early '90's?

8      WITNESS:  I believe that's correct.

9      JUDGE RODWELL:  Okay.  I don't have any other

10  questions.  I will direct that you not discuss your

11  testimony or the questions with anyone outside this hearing

12  room.

13      WITNESS:  Okay.

14      JUDGE RODWELL:  Okay.  Thank you, sir.  You may be

15  excused.

16      WITNESS:  Okay.

17      MR. PERILLO:  Judge, just to verify, this gentleman

18  may leave the site; correct?

19      JUDGE RODWELL:  Yes; you may leave, sir.  Thank you.

20      MR. PERILLO:  Thank you.  He has independent

21  transportation.

22      JUDGE RODWELL:  Okay.  Off the record.

23      (Off the record.)

24      (On the record.)

25      JUDGE RODWELL:  We can go back on the record.  Okay.

50

1   We're beginning with the Agency's case now, and Mr. Perillo

2   waived his opening statement; and we have the first

3   witness.

4           Good morning, still, Ms. Kohr.  I'm Donna

5   Rodwell, the Administrative Judge presiding over this

6   matter.  You have been approved as a witness.  Do you have

7   any objection to taking an oath, ma'am?

8       WITNESS:  No; I don't.

9       Whereupon,

10                      BARBARA ANN KOHR

11  having been first duly sworn, was called as a witness

12  herein and was examined and testified as follows:

13      JUDGE RODWELL:  State your full name for the record,

14  and spell it, please.

15      WITNESS:  Barbara Ann Kohr; B A R B A R A, A N N,

16  K O H R.

17      JUDGE RODWELL:  Okay.  Ms. Kohr, Mr. Perillo, who

18  represents the Agency, will be starting off with his

19  questions on direct; and then Mr. Dumas, the Complainant,

20  Mr. Johnson's Representative, may have questions for you as

21  well.  You may proceed, Mr. Perillo, please.

22      MR. PERILLO:  Thank you, Judge.

23                      DIRECT EXAMINATION

24  BY MR. PERILLO:

25      Q    Good morning, Ms. Kohr.

51

1 A Good morning.

2 Q Has your position changed since the time you

3 spoke with the EEO Investigator concerning this Complaint?

4 A No; it has not.

5 Q What was your involvement with the selection of

6 the Housekeeping Aide position for which Mr. Johnson and

7 Mr. Ronald Hall were the finalists?

8 A I sat with Alice Fidler and did the selection --

9 helped with the selection.

10 MR. PERILLO:  Thank you very much.  No further

11 questions.

12 JUDGE RODWELL:  Mr. Dumas?

13 MR. DUMAS:  Thank you.

14      CROSS-EXAMINATION

15 BY MR. DUMAS:

16 Q Good morning, Ms. Kohr.  Ms. Kohr, did you make

17 any recommendations to Ms. Fidler in any form or fashion?

18 A No; I did not.

19 Q You just merely sat with her and watched her as

20 she did these things?

21 A No; we used the supplemental and the KSAO and the

22 policy procedure for selecting employees; but I didn t make

23 any recommendations.

24 MR. DUMAS:  Thank you.  I have no further questions.

25 JUDGE RODWELL:  Ms. Kohr, I just have one question.

52

1   What did you do?  I mean what was your purpose for being

2   there?

3       WITNESS:  Generally, we have at least two people sit

4   in on selection of employees; and what we do is review the

5   KSAO, the Supplement from the Employee, and base the

6   position on those standards that we use.

7       JUDGE RODWELL:  And how do you do that?  How did you

8   do that?

9       WITNESS:  There's a scoring -- an established scoring,

10  like the KSAO's, there's a zero to five in those; zero,

11  being you cannot -- or you don't know anything about the

12  position, so you can't evaluate the employee; up to a five

13  being exceptional, and three being average.  And these are

14  done by the Supervisor of the employee; and then they re

15  turned in; and then the employee also does a Supplemental

16  and tells what he knows about the job, what his past

17  experience is; and we use those.

18      JUDGE RODWELL:  How did you divide up the candidates?

19  How did you assist Ms. Fidler?

20      WITNESS:  Okay.  We had both records, and we looked at

21  them both, and used the scoring as I just described to you

22  to make our selection.

23      JUDGE RODWELL:  You mean the zero to five?

24      WITNESS:  The zero to five for the KSAO, and one to

25  five for the Supplement.

53

1    JUDGE RODWELL:  Now you said the Supervisors did the

2    scoring?

3    WITNESS:  The Supervisors did the scoring on the

4    KSAO's, and they turned that into Human Resources; and

5    they, in turn, give it to the people that are making the

6    selection.

7    JUDGE RODWELL:  And did you use the Supervisor's score

8    for the KSAO?

9    WITNESS:  Yes; we did.

10   JUDGE RODWELL:  Okay.  So your scoring or rating came

11   in with the Supplemental ...

12   WITNESS:  Correct.

13   JUDGE RODWELL:  ... from the -- which was also based

14   on the KSAO s?

15   WITNESS:  No; they're on the employee's -- there are

16   certain questions that are asked on the record that the

17   employee has, and they answer those questions and submit it

18   along with the KSAO.

19   JUDGE RODWELL:  Okay.  What is the KSAO?

20   WITNESS:  The KSAO asks questions that are related to

21   the job that is being applied for?

22   JUDGE RODWELL:  What does KSAO mean, for the record;

23   do you know that?

24   (No response.)

25   JUDGE RODWELL:  Knowledge Skills and Abilities?

54

1    MR. DUMAS:  Yeah; knowledge skills and abilities and

2 standards.

3    JUDGE RODWELL:  Okay.  And that's the part the

4 Supervisors fill out?

5    WITNESS:  Correct.

6    JUDGE RODWELL:  And the Supplemental information ...

7    WITNESS:  Is done by the employee.

8    JUDGE RODWELL:  And that's the part that you and Ms.

9 Fidler scored?

10    WITNESS:  That's correct; and used scoring one to

11 five, which is what we always do.

12    JUDGE RODWELL:  Okay.  So you looked at the

13 information from the employee and scored one to five?

14    WITNESS:  That's correct.

15    JUDGE RODWELL:  Then how did you come up with a

16 decision?

17    WITNESS:  They both -- both employees had the same

18 score for the KSAO.  I believe it was a nine.  Then on the

19 Supplemental, Mr. Hall had 17 years prior experience, and

20 also had experience with working with MSDS; and we scored

21 him one extra point for that.  We also -- both these

22 employees had worked for Mrs. Fidler on a float basis in

23 the past, and Mr. Hall got an additional point in that

24 rating, also; so I think the final score was 19 to 17, if I

25 remember.

473

1    JUDGE RODWELL:  When you say that he got an additional

2    point in that rating; what do you mean?

3    WITNESS:  According to Mrs. Fidler, the experience on

4    the Unit and the cooperation and work performance of Mr.

5    Hall was -- and cooperation with staff was a little higher

6    than ...

7    JUDGE RODWELL:  Than Mr. Johnson's?

8    WITNESS:  ... than Mr. Johnson's.

9    JUDGE RODWELL:  Okay.  And that was based on her ...

10   WITNESS:  Observations; correct.

11   JUDGE RODWELL:  Okay.  Who made the decision to

12   consider experience with MSDS?

13   WITNESS:  That is part of the job.  You have to have a

14   knowledge of materials and safety for this position;

15   because the employee needs to work with various chemicals,

16   cleaning, during spillage, et cetera; so they do have to

17   have a knowledge of that; and Mr. Hall taught this in the

18   Service and did set up a program.  And he stated that in

19   his Supplemental.

20   JUDGE RODWELL:  When you say that that's a part of the

21   job, ...

22   WITNESS:  Uh, huh.

23   JUDGE RODWELL:  ... is that written anywhere, or is it

24   just a part of the day-to-day duties of the job?

25   WITNESS:  I'm not positive if it ...

56

1    JUDGE RODWELL:  Would Ms. ...

2    WITNESS:  I believe that is in part of their job

3 description.  They have to have a knowledge -- they have to

4 know where the sheets are and the information that's on

5 them; what to do in case of spillage; what chemicals not to

6 mix; what the effects would be from the different chemicals

7 that are used.

8         I couldn't tell you what paper it's written on,

9 though.

10    JUDGE RODWELL:  Okay.  Now that information that gives

11 -- strike that.

12         Is that information actually written down,

13 explaining what the different chemicals are, and the

14 effects of the different chemicals; and what chemicals

15 should and shouldn't be mixed with each other?  Is that

16 written?

17    WITNESS:  Yes; it is.

18    JUDGE RODWELL:  So is the requirement that the

19 employees know this information or that they be able to

20 read the information?

21    WITNESS:  I think basic -- basic, they should know,

22 and some they should be able to read.  On a day-by-day

23 basis, there's certain chemicals you should know, if you're

24 using it everyday.  And the others, as long as you know

25 where the data sheets are and what to do, ...

57

1      JUDGE RODWELL:  What exactly is it that Mr. Hall set

2  up?

3      WITNESS:  He set up the program in the military and

4  taught the MSDS Program.

5      JUDGE RODWELL:  Now did you and Ms. Fidler interview

6  any of these individuals?

7      WITNESS:  No; we did not.

8      JUDGE RODWELL:  Okay.  I don't have any other

9  questions.  Does anyone else have any questions for Ms.

10  Kohr?

11                    REDIRECT EXAMINATION

12  BY MR. PERILLO:

13      Q    In response to Judge Rodwell's question, you did

14  indicate that Mr. Hall objectively garnered 19 points to

15  Mr. Johnson's 17 in your formal tally; is that correct?

16      A    That's correct.

17      MR. PERILLO:  No further questions.  Thank you.

18                    RECROSS-EXAMINATION

19  BY MR. DUMAS:

20      Q    Yes; two questions.  Insofar as the MSDS

21  paperwork, who made the decision that, "I want him because

22  he has 17 years of training in setting up a program"?

23      A    No; he had 17 years of experience doing

24  housekeeping.

25      Q    Seventeen?

58

1      A      Seventeen years in the military, experience;

2   according to his Supplement.  And in addition to that, he

3   had the MSDS.  And both these facts, we felt gave him an

4   additional point.

5      Q      And you read that and concurred with that?

6      A      Yes; I concurred with that.

7      JUDGE RODWELL:  What do you mean, "Read it and

8   concurred with it?"  She's testifying to it.

9      MR. DUMAS:  I'm just -- of course, I will mention that

10  document later on.

11     JUDGE RODWELL:  But -- okay.  You mean that you read

12  his -- you're talking about Mr. Hall's qualifications that

13  they read?

14     MR. DUMAS:  Yes.  Okay.

15            Thank you.

16     WITNESS:  You're welcome.

17     JUDGE RODWELL:  Wait one moment, Ms. Kohr.  We are

18  finished, but I'm going to direct that you not discuss your

19  testimony or the questions asked with anyone outside this

20  hearing room, please.

21     WITNESS:  Okay.

22     JUDGE RODWELL:  Okay.  You may be excused, and thank

23  you.

24            Off the record.

25     (Off the record.)

59

1        (On the record.)

2        JUDGE RODWELL:  Back on the record, please.  Good

3   morning.  We still have a couple minutes of morning left,

4   Ms. Fidler.

5        WITNESS:  Yes.

6        JUDGE RODWELL:  I m Administrative Judge Donna

7   Rodwell, presiding over the hearing today, and you have

8   been approved as a witness in this matter regarding Mr.

9   Lewis Johnson.

10        Do you have an objection to taking an oath,

11   ma' am?

12        WITNESS:  No; I don't.

13        Whereupon,

14            ALICE ELIZABETH FIDLER

15   having been first duly sworn, was called as a witness

16   herein and was examined and testified as follows:

17        JUDGE RODWELL:  Ms. Fidler, I'm going to ask you to

18   state your name for the record, and spell it, please.

19        WITNESS:  Alice Elizabeth Fidler, A L I C E,

20   E L I Z A B E T H, F I D L E R.

21        JUDGE RODWELL:  Okay.  Ms. Fidler, I am going to let

22   Mr. Perillo, the Agency Representative, begin with his

23   direct examination.  After that, Mr. Dumas, the

24   Complainant, Mr. Johnson's Representative, may have some

25   questions as you -- for you, rather, as well.  Mr. Perillo.

60

1      MR. PERILLO:  Thank you, Judge.  Good morning, Ms.

2   Fidler.

3      WITNESS:  Good morning.

4                    DIRECT EXAMINATION

5   BY MR. PERILLO:

6      Q    Calling your attention to July 17, 1998, do you

7   recall making a selection of a gentleman, Ronald Hall, for

8   a Housekeeping Aide position?

9      A    Yes; I do.

10     Q    Has your position changed since that particular

11  date?

12     A    Has my position changed?

13     Q    Yes.

14     A    No; it has not.

15     Q    Calling your attention to some period in the

16  early '90's, did you have an employee by the name of Ronald

17  Houck working for you?

18     A    Randall Houck.

19     Q    Randall Houck; pardon me.

20     A    Yes.

21     Q    Do you recall an incident where you made a remark

22  that could appear to be considered racist?

23     A    No; I do not.

24     Q    Do you recall a situation where an individual in

25  the early '90's came to you and mentioned that a certain

61

1    remark verged on discriminatory?

2        A    No; I don't.

3        Q    Calling your attention to the selection process

4    for the Housekeeping Aide position we had just discussed,

5    who are the two finalists for the position to the selection

6    of Housekeeping Aide?

7        A    Lewis Johnson and Ronald Hall.

8        Q    Lewis Johnson is the gentleman sitting on your

9    left?

10       A    That's correct.

11       Q    Did you make this rating decision for the

12   finalist in conjunction with a Ms. Barbara Kohr?

13       A    Yes; I did.

14       Q    Okay.  Do you happen to recall the tally of the

15   scores of the two finalists, from an objective standpoint,

16   numerically?

17       A    I think it was 17 and 19, the totals.

18       Q    And who had the higher score, numerically?

19       A    Mr. Hall.

20       Q    And he was selected?

21       A    He was selected.

22       Q    Okay.  Now why was Mr. Hall -- and Mr. Hall is a

23   white, Caucasian male; is that correct?

24       A    This is correct.

25       Q    Selected over Mr. Johnson, and he is an African-

62

1    American gentleman?

2        A    Mr. Hall's documentation on what he had written

3    for his qualifications ...

4        Q    What do you mean by documentation; what documents

5    are called?

6        A    Each employee does a Supplemental of why they

7    want the position, and why they think they're qualified;

8    and their Supervisor does also, a form.

9        Q    On the Supervisor forms, is it correct that they

10   were equal scores, Mr. Johnson and Mr. Hall?

11       A    Yes; they were exactly the same.

12       Q    So then your objective evaluation criteria is

13   based on the Supplemental?

14       A    Supplemental by the employee.  And Mr. Hall

15   stated in his that he had 17 years experience in the Air

16   Force, cleaning buildings and that he was in charge of

17   setting up and teaching the MSDS, which is the Material

18   Safety Data Sheets.

19       JUDGE RODWELL:  Could you just explain for the record,

20   briefly, what Material Safety Data Sheets are, Ms. ...

21       WITNESS:  It will tell you what components are in a

22   product and if it can be mixed with something else; or if

23   it gets in your eyes, what you need to do with this type of

24   -- or if you have to call Poison Control or whatever.

25       Q    Were interviews conducted for the position of the

63

1    -- with the final candidates?

2        A    No.

3        Q    Why not?

4        A    It is the policy that if you interview one, you

5    have to interview everybody.  Mrs. Kohr and I have (sic)

6    looked over the qualifications and decided we could make a

7    selection without interviewing the candidates.

8        MR. PERILLO:  No further questions.

9        JUDGE RODWELL:  Okay.  Mr. Dumas, you may proceed with

10   the evidence.

                        CROSS-EXAMINATION

12   BY MR. DUMAS:

13       Q    Good morning, Ms. Fidler.

14       A    Good morning.

15       Q    Ms. Fidler, first I want to ask you, this MSDS --

16   is there a MSDS procedure specific to the VA hospital?

17       A    Yes.

18       Q    Knowing anything about MSDS, then, you would

19   concur, or perhaps not, that there is a MSDS data sheet

20   specific to the Air Force -- they are not the same entity?

21       A    But each Government -- we have an MSDS book on

22   every Unit for all the products that are used on the Unit,

23   and many of the products are housekeeping-type products,

24   like Clorox, you know, cleaning supplies and things like

25   this.

64

1     Q     But an MSDS for the Air Force ...

2     A     But I -- if he was dealing with cleaning in the

3  Air Force, he was probably using some of the same cleaning

4  agents that we use in the Medical Center.  My concern was

5  that he would be knowledgeable about certain cleaning

6  compounds.

7     Q     I see.  Ms. Fidler, where do you -- where do you

8  -- where did you pick up the idea -- and I apologize if

9  it's not coming out correct -- I'm not trying to be

10  facetious or anything -- but where did you get the idea

11  that Mr. Hall used or was involved in MSDS in a cleaning

12  capacity in the military?

13     A     Because of what he had written on his

14  Supplemental.

15     MR. DUMAS:  May I just ...

16     JUDGE RODWELL:  Yes.

17     Q     Now Ms. Fidler, ...

18     JUDGE RODWELL:  Where -- what are you getting at?

19     MR. DUMAS:  Mr. Hall -- the first page of Mr. Hall's

20  Supplemental Qualification Statement.

21     JUDGE RODWELL:  I'm going to go off the record for a

22  moment.

23     (Off the record.)

24     (On the record.)

25     JUDGE RODWELL:  We can go back on the record.

483

1        This is in C-3, and going down to Mr. Hall's

2   Supplemental.

3        MR. DUMAS:  Ten of 13.

4        JUDGE RODWELL:  Okay.  Page 10 of 13?

5        MR. DUMAS:  Yes.

6        JUDGE RODWELL:  Thank you.

7        Q    I'd like for you to read the first sentence --

8   and it may be something wrong here.  Start with the

9   beginning of the first sentence, please.

10        A    "Having served 17 years as an enlisted person, I

11   was assigned a lot of cleaning jobs in buildings for the

12   U. S. Air Force as a Training System Technician.  I had to

13   set up and control the MSDS Training Program for the DCM

14   Staff and Maintenance Squadron.

15        Q    Okay.  Ms. Fidler, what I would like for you to

16   do; see this period here?  I'd like you to read from here

17   to here, please.

18        A    "Having served 17 years as an enlisted person, I

19   was assigned a lot of cleaning jobs in the buildings for

20   the U. S. Air Force."

21        Q    Ms. Fidler, reading that, does that tell you Mr.

22   Hall was doing housekeeping work in the military; or did he

23   periodic (sic) or during his 17-period that he was there --

24   he cleaned buildings.

25        A    When you clean buildings, you use housekeeping

66

1   materials.

2       Q    Yes; you do.

3            Ms. Fidler, will you read the second sentence,

4   please.

5       A    "As a Training Systems Technician, I had to set

6   up and control the MSDS Training Program for the DCM Staff

7   and Maintenance Squadron under us."

8       Q    Now Ms. Fidler, where in that sentence is it

9   alluded to or does it state that Mr. Hall was doing MSDS in

10  a cleaning capacity in the military?

11      A    The MSDS that he's talking about pertains to the

12  cleaning area of the buildings.

13      Q    Ms. Fidler, did you discuss this matter with Mr.

14  Hall, perhaps?

15      A    No; I did not.

16      Q    At any point at all?

17      A    No.

18      Q    So you are making that assumption?

19      A    I took it from what was written here.

20      Q    Thank you.

21           Ms. Fidler, do you have any experience with MSDS

22  in any area other than the VA?

23      A    No other area than the VA.

24      Q    So everything you know, MSDS Chemicals, is from

25  the Lebanon VA program?

1     A   Or what you use at home, you know.  You have

2  Clorox, and you don't mix it with something else.

3     Q   Yes; I understand.

4       So perhaps, it's your belief that MSDS only

5  pertained to cleaning solutions?

6     A   No; and I have worked elsewhere where we had

7  MSDS, and it applies to everything in the building.  You

8  know, Nursing has supplies for MSDS, and that we make sure

9  that we know what's in these solutions we're using.

10    Q   If I said MSDS in the military is used on a

11  gunnery range, would you agree with me or would you say ...

12    A   I wouldn't have a clue.

13    Q   If I said MSDS ...

14  JUDGE RODWELL:  Okay.  You need to move on, please.

15  The witness has testified that she based on the

16  Supplemental Qualifications Statement, and what Mr. Hall

17  has written.

18    Q   Ms. Fidler, do you recall ever hiring any blacks

19  in your Unit since say perhaps 1990 -- I know that's going

20  back pretty far -- Housekeeping or Nursing or anything like

21  that?

22    A   Yes; I have.

23    Q   Do you recall the approximate period ...

24    A   I just hired an LPN -- an African-American LPN.

25    Q   Okay.  Let's go back a bit further.  Let's say

68

1    1995, '94, '93.

2        A    During those years, I did not make the selection

3    for the employees that were assigned to my Unit.  They were

4    picked by a Nursing Recruiter or Personnel or whoever, and

5    they were just assigned to the Unit.

6        Q    Ms. Fidler, at the time of this hire, did you

7    read or did you brief yourself on the qualification of a

8    Housekeeper?

9        A    Yes.

10       Q    So you well know exactly what qualification (sic)

11   were?

12       (No audible response.)

13       Q    Mr. Fidler, in your statements in the

14   investigation, you indicated what you felt -- the question

15   was asked, "Do you know the requirement (sic) for the

16   position of Housekeeper?"  You answered that question.  Can

17   you answer that question here for us?

18       A    The requirements for a Housekeeper?

19       Q    Yes.

20       MR. PERILLO:  Objection.  We've already stipulated

21   through other testimony that ...

22       JUDGE RODWELL:  I'm going to overrule.  Let her answer

23   the question.  Go on and answer the question.

24       A    You have to be able to keep the area clean.  You

25   need to know what kind of cleaning materials you're going

BURKE COURT REPORTING COMPANY
856-627-7733

487

69

1  to be able to use.  You have to have safety standards, you

2  know, to make sure you put up signs.  You need to work with

3  other people; if you need help to do something, you know,

4  that's going to take more than one person.  You need

5  infection control education so you know how to clean a Unit

6  that may have been contaminated.

7        The ultimate goal of the Housekeeping person is

8  to keep the Unit clean.

9        Q    Thank you.

10        Ms. Fidler, can you tell us what procedure that

11  you used to decide between Johnson and Mr. Hall, and I

12  believe those were the remaining candidates?

13        A    That's correct.

14        Q    What procedure did you use to decide to hire Mr.

15  Hall over Mr. Johnson?

16        A    Mrs. Kohr and I reviewed, as I said previously,

17  the KSAO's and the Supplemental the employees had written;

18  and we made a choice on the numbers we had come up with,

19  the 17 and the 19.  We chose the person that was 19.

20        Q    I think I may have lost something.  I heard

21  KSOA's and Supplemental?

22        A    KSAO is the ...

23        JUDGE RODWELL:  We know what that is.  Go on.  I'm

24  just saying we already know what that is.

25        MR. DUMAS:  Yes.

70

1    Q    I heard KSOA's and Supplemental.

2    A    And the employees' Supplemental.

3    Q    And was there anything else?

4    A    And observation of their work on the Unit -- or

5    in the areas.

6    Q    All right -- okay; I understand that you used

7    observation.  Did you observe Mr. Hall?

8    A    Yes.

9    Q    Can you tell us what period of time you observed

10   Mr. Hall?

11   A    Approximately for a night.  Two years ago --

12   time's a little mixed up.  I think he was on the Unit four

13   to six weeks prior to the job being filled.  He was in

14   there as a temporary person.

15   Q    And Ms. Fidler, what days of the week, to your

16   best recollection, did Mr. Hall work?

17   A    He worked Monday through Friday when he was doing

18   the temporary -- when he was assigned that Unit.

19   Q    Okay.  I apologize.  Ms. Fidler, let's go back in

20   time.  Now I'm not referring to most recent; I'm referring

21   to the specific time in question here; let's go to when

22   they -- when the paperwork was submitted for the jobs, and

23   you made the hire.  That would have been about -- you made

24   the hire about ...

25   JUDGE RODWELL:  What is the question?  Get to the

71

1   question.

2          Q    The question -- the question is this:

3               When did Mr. Hall -- what period did Mr. Hall

4   work -- what days of the week did Mr. Hall work?

5          JUDGE RODWELL:  Monday through Friday was her answer,

6   approximately four to six weeks, when he worked on the Unit

7   temporarily assigned to that Unit, prior to the job being

8   filled.  That was her answer.  It was asked, and it was

9   answered.

10         Q    Ms. Fidler, did Mr. Johnson -- correction, did

11  Mr. Hall work on your Unit in June of 1998?

12         A    Yes.

13         Q    Did Mr. -- did Mr. -- did Mr. Hall work on your

14  Unit as a part-timer?

15         A    He was a full-time employee at that time, if I

16  recollect correctly.

17         Q    My question, ma'am, did Mr. Hall work on your

18  Unit as a part-timer?

19         A    No; a full-timer during June.

20         Q    Ma'am, I'm going to ask you the question again.

21         JUDGE RODWELL:  She answered the question, Mr. Dumas.

22  Come on, now.

23         MR. DUMAS:  Ma'am -- ma'am ...

24         JUDGE RODWELL:  You know, I'm getting really impatient

25  with this, ...

72

1    MR. DUMAS:  I under ...

2    JUDGE RODWELL:  ... it makes it -- it has nothing to

3  do with whether you're a lawyer or not.

4    MR. DUMAS:  I understand.

5    JUDGE RODWELL:  It has to do with listening to the

6  answers.

7    Q    Okay.  Ms. Fidler, can ...

8    JUDGE RODWELL:  It doesn't -- you may not like her

9  answer, but -- or agree with her answer, but we're not here

10  to argue over the answers.  We're here for you to ask the

11  questions and get the answers.

12    Q    Ms. Fidler, I'd like to take ...

13    JUDGE RODWELL:  I mean this is -- this is ...

14    Q    Ms. Fidler, I d like to take you back to your

15  statements in the Investigative Report here.  That's going

16  to be -- Investigative Report, here ...

17    JUDGE RODWELL:  It's under B-5.

18    MR. DUMAS:  Okay.  That's going to be on Page 7, Ms.

19  Fidler's statements.

20    JUDGE RODWELL:  Okay.

21    MR. DUMAS:  At Line 13.

22    MR. PERILLO:  Stipulate it says what it says.  It s

23  part of the record.

24    MR. DUMAS:  I appreciate that, but I'd like her to ...

25    JUDGE RODWELL:  I don't want her to read it.  If you

491

1    have a question, you can ask her.  I can read.

2         MR. DUMAS:  Okay.

3         Q    Ms. Fidler, do you recall being asked the

4    question, during your deposition, as to how long Mr. Hall

5    was signed on to your Unit?

6         A    No; I don t recall.  That was two years ago.

7         Q    Ms. Fidler, ...

8         JUDGE RODWELL:  She answered the question, she does

9    not recall.  Move on to the next question.

10        MR. DUMAS:  Okay.

11        Q    Ms. Fidler, do you work on weekends?

12        A    No.

13        Q    Ms. Fidler, did you observe Mr. Hall on weekends

14   as a worker?

15        A    I observed him during the week as a worker.

16        Q    During the week?  Did you observe Mr. Johnson

17   during the week, Ms. Fidler?

18        A    Yes.

19        Q    Do you recall what period of time?

20        A    Approximately I would say four weeks -- four to

21   six.

22        Q    Ms. Fidler, when you hired Mr. Hall, did you have

23   available to you his records?

24        A    What records?

25        Q    Personnel records?

1      A    No.

2      JUDGE RODWELL:  Excuse me, Ms. Fidler, did you -- did

3  you testify that you also observed Mr. Johnson for about

4  four to six weeks as well?

5      WITNESS:  I think it was approximately that length of

6  time.

7      JUDGE RODWELL:  And what time period would that have

8  been?

9      WITNESS:  I'm not sure; maybe from February to June.

10  He was detailed to our Product Line to help with coverage

11  and to help with project cleaning.

12      MR. DUMAS:  Judge, I have no other questions of this

13  witness.

14      MR. PERILLO:  A couple of redirect, Judge.

15      JUDGE RODWELL:  Okay.  Go on, Mr. ...

16                    REDIRECT EXAMINATION

17  BY MR. PERILLO:

18      Q    Did you speak to Mr. Johnson post-selection with

19  regard to answering his question regarding why he was not

20  selected?

21      A    He came to my office one day to see me, and he

22  said to me, "Alice, can I speak to you off the cuff?    And

23  I said he could.

24      Q    What happened?

25      A    And he asked me why he wasn't selected, and I

1    told him at that time that I felt I had selected the best

2    qualified person.

3         Q    Did you give him any reasons?

4         A    No; not that I can recall.

5         MR. PERILLO:  Okay.  Nothing else.  Thank you.

6         JUDGE RODWELL:  Okay.  Ms. Fidler, I have a couple of

7    -- a few questions myself.

8              You said that you also based your determination

9    on your observations of both Mr. Hall and Mr. Johnson's

10   work; is that correct?

11        WITNESS:  That's correct.

12        JUDGE RODWELL:  What was it about Mr. Hall's work that

13   you observed that made you determine that he was more

14   qualified than Mr. Johnson?

15        WITNESS:  He found a curtain rod that had come loose

16   from the ceiling, and he went to the Secretary and told her

17   what room, and so forth; and went ahead and took care of

18   having it repaired, reported, without coming to me to okay

19   this; and I thought this was good observation.

20        JUDGE RODWELL:  Is that the only thing about the

21   observation of the performance that made you determine that

22   one was more qualified than the other?

23        WITNESS:  I also felt that Mr. -- this is a demented

24   Unit where we have patients that void in the waste cans,

25   you know, and smear feces on the wall and so forth.  Mr.

1  Hall would clean it up and, you know, just realizing that

2  this was part of the job.

3        Mr. Johnson would always clean it up, but he

4  wanted the staff to try to retrain the patients; and most

5  of these patients, you cannot retrain or redirect.

6        JUDGE RODWELL:  What about the -- regarding the use of

7  the MSDS and hazardous chemicals and cleaning chemicals?

8  Did you make observations about the use of those materials

9  and data sheets?

10       WITNESS:  There was -- Lewis was doing Project

11  Cleaning at that time, and he was using wax stripper and

12  waxing the floors; and he used everything appropriately.

13       JUDGE RODWELL:  Okay.  So was your determination that

14  Mr. Hall was more qualified regarding the use of hazardous

15  materials or cleaning products based on what you read in

16  his employee statement solely, or based on that and your

17  personal observation?

18       WITNESS:  Based on his -- what he had written and on

19  my personal observations.  He was very careful to make sure

20  that his cart was not left in the hallway where patients

21  could get anything that would be dangerous to them.  He

22  always locked his cart in the closet and didn't leave it in

23  the hall.

24       JUDGE RODWELL:  You mean leaving it in the hall

25  unattended?

77

1        (No audible response.)

2        JUDGE RODWELL:  Okay.  Did you ever observe Mr.

3   Johnson leave his cart in the hall unattended?

4        WITNESS:  He had a -- yes; Yes.

5        JUDGE RODWELL:  What were you going to say -- he had a

6   ...

7        WITNESS:  Well, he was waxing, and he had a much

8   larger cart, and it would have been more difficult for him

9   to try to push it into a closet.  He would have had to

10  totally take it off the Unit.

11       JUDGE RODWELL:  Okay.

12       WITNESS:  He tried to secure it.

13       JUDGE RODWELL:  Now the testimony is that -- in the

14  record -- I believe -- reflects that Mr. Hall received two

15  more points than Mr. Johnson; and -- and what were those

16  two additional points for, if you recall?

17       WITNESS:  One was for the content of the Supplemental,

18  and the other one was for work observation.

19       JUDGE RODWELL:  Are there any more questions for Ms.

20  Fidler?

21       MR. PERILLO:  None.

22       MR. DUMAS:  I have none.

23       JUDGE RODWELL:  Okay.  Ms. Fidler, I direct that you

24  not discuss your questions or the responses with anyone

25  outside this hearing room, and you may be excused.  Thank

496

78

1   you.

2        WITNESS:  Thank you.

3        JUDGE RODWELL:  We may go off the record.

4        (Off the record.)

5        (On the record.)

6        JUDGE RODWELL:  Back on the record.  Okay.  Mr.

7   Johnson wishes to make -- give testimony in rebuttal to the

8   Agency testimony, and I'm going to allow Mr. Johnson to do

9   that in this matter.  Mr. Johnson, do you have any

10  objection to taking an oath?

11       WITNESS:  No; I don't.

12       Whereupon,

13                         LEWIS JOHNSON

14  having been first duly sworn, was called as a witness

15  herein and was examined and testified as follows:

16       JUDGE RODWELL:  Okay.  I'm going to ask you to speak

17  up a little bit and to turn the mike -- either sit in that

18  chair -- you can sit -- sit on the end.  Okay.  And Mr.

19  Johnson, you are Lewis Johnson?

20       WITNESS:  Yes.

21       JUDGE RODWELL:  The Complainant in this case?

22       WITNESS:  Yes.

23       JUDGE RODWELL:  And you may proceed.

24

25

1                    DIRECT EXAMINATION

2    BY MR. DUMAS:

3        Q    Okay.

4        JUDGE RODWELL:  And I am going to allow -- excuse me -

5    - Mr. Johnson, you're going to make a statement; right?

6    You're not going to be asked questions by Mr. Dumas?  How -

7    - how do you want to do this?  Do you want to just make a

8    statement, or do you want Mr. Dumas to ask you questions?

9        WITNESS:  He can ask me questions.

10       JUDGE RODWELL:  Okay.

11       MR. DUMAS:  I think Mr. Johnson would like to make

12    that decision.

13       Q    Mr. Johnson, how long have you worked for the VA

14    -- Lebanon VA?

15       A    Lebanon VA Hospital, February, 1993.

16       Q    What was your original capacity?

17       A    Nursing Assistant.

18       Q    And your second capacity?

19       A    Housekeeping Aide.

20       Q    Mr. Johnson, when you started at the VA as a

21    Housekeeper, were you given any training?

22       A    Yes.

23       Q    Were you trained in the use of chemicals?  And if

24    so, would you explain.

25       A    Yes; I was trained with the use of chemicals in

1   Nursing.  There were certain chemicals we used in the

2   Nursing Unit, and there was -- what you would call the kind

3   of training -- we have the person that assist us -- we used

4   to call them a certain name -- anyway, we would work with

5   one person; they would train us, and we would fill out the

6   sheets of the stuff that we did and the chemicals we used;

7   and I was taught this particular stuff.

8        In Housekeeping, I was -- the Supervisor would

9   train -- was training me, and he would assign another

10  employee to train me, and we were working with particular

11  chemicals, and I was directed to know where -- was told

12  where the MSD forms were located.

13  JUDGE RODWELL:  You were told where they were located?

14  WITNESS:  I was told where they were located.

15  Q    Mr. Johnson, was this training -- was this

16  training just for you?  Is there some policy or procedures

17  on that?

18  A    Well, it's required training coming into

19  Housekeeping.  You didn't have to be a Housekeeper to be

20  trained how to learn how to do Housekeeping work, you know.

21  You was hired.  They would train you in that position to do

22  that type of work.

23  Q    I see.  Mr. Johnson, when you -- you did, if I

24  recall, go to Alice Fidler ...

25  A    Yes.

81

1    Q    ... and discuss with her that you was not

2    selected?  Was it mentioned to you that perhaps there might

3    be something else you might want, versus this position?

4    A    Yes.

5    Q    Were you interested in that position?

6    A    No.

7    JUDGE RODWELL:  What else -- go on -- no; go on.  I'm

8    sorry; go on.

9    Q    Mr. Johnson, from your experience at the Hospital

10   and the on-going situation as we sit here, is there a

11   policy, to your best knowledge, regarding reassignments and

12   seniority?

13   A    Yes; I believe there's a policy of understanding.

14   There was an agreement between Management and the Union.

15   Q    And what is that agreement, Mr. Johnson, if you

16   know?

17   A    I can't recall it off the top of my head, but it

18   was based on time on the duty station; in reassignment

19   decisions and other kind of situations, that's off the top

20   of my head -- there's a policy there.

21   Q    Mr. Johnson, -- I'm not going to ask you any more

22   questions.

23   JUDGE RODWELL:  Mr. Perillo?

24   MR. PERILLO:  Nothing; thank you.

25   WITNESS:  Can I ...

1      JUDGE RODWELL:  Yes.

2      WITNESS:  ... have a statement?  Well, according to

3  the way we applied for this job, they was asked the

4  question about our ability and knowledge about in the

5  KSOA's, and from -- well what I see he answered, he never

6  answered the questions in the KOSA s about the 17 years

7  experience.  If you're on C-3 -- can I -- the one we was

8  referring to was him having 17 years.  The question was

9  knowledge of proper cleaning procedures and proper use of

10  very -- of cleaning and sanitizing solutions.

11      Having served 17 years as an enlisted person

12  actually doesn't answer that question.  If you've heard my

13  answer to the same question, in my testimony -- what page

14  is that on for me?

15      JUDGE RODWELL:  I think it's Page 10 -- no; that's Mr.

16  Hall.

17      WITNESS:  I answered the same question ...

18      JUDGE RODWELL:  I'm sorry; what page is that?

19      WITNESS:  It's 7 of 13.

20      In this same answer to that question, explains

21  the proper procedure of -- the knowledge of proper cleaning

22  procedures and proper use of various cleaning equipment.

23  His does not even go into any detail on that, but he had

24  scored higher on the KOSA for answering these questions.

25      And I answered the same questions -- the same as

1   his, and all the questions are being -- I answered them

2   according to the question I was asked, and his doesn't --

3   the first one doesn't even answer the question in which he

4   was actually graded on and basically given the higher

5   points for.

6           As far as working with Alice Fidler, I worked

7   with her from -- on the detail from January 5th to April

8   24th.  The purpose of that detail was to see if a Floater

9   could perform the duties in that particular Product Line to

10  alleviate -- to see if it was possible for that to work

11  because of the -- because of the time off and everything,

12  and them calling over to EMS Department, calling for

13  people.  In that capacity I worked for her -- I worked for

14  Ms. Fidler on a regular basis.  I reported to her.  She

15  observed my work.  We coordinated time to schedule --

16  getting things done; coming in early.

17          When there was -- as a matter of fact, I worked

18  on five different Units of the Product Line of Extended

19  Care.  When somebody would call up, it was my report there

20  and find out if someone was there and report it back to Ms.

21  Fidler.

22          When there was damages or something break (sic);

23  it was my responsibility to go ahead -- I did report

24  damages that needed to be repaired.  I did have work orders

25  done on a regular basis, you know.

84

1      JUDGE RODWELL:  Without going to Ms. Fidler?

2      WITNESS:  Without going to Ms. Fidler.  You know --

3  and a lot of times, you know, working in that particular

4  Unit, Ms. Fidler -- in that particular job, she actually

5  told me in our meeting that she had discussed that we had,

6  that I did do a good job, you know; and she told me -- when

7  I asked her the question, why I wasn't selected, she said,

8  "On paper, we were both equal, and she selected Mr. Hall

9  because he fit well with the team, and he works better with

10 the patients."

11          And with that, I decided that wasn't the criteria

12 for selecting the Housekeeper.  Also, according to the

13 investigation, Ms. Fidler said she observed this gentleman.

14 This gentleman worked weekends, and she couldn't have

15 possibly have observed him during the week.

16     JUDGE RODWELL:  It's your testimony that Mr. Hall did

17 not work during the week?

18     WITNESS:  Maybe a week or two; something like four or

19 five months -- three or four months apart.

20     JUDGE RODWELL:  How do you know that?

21     WITNESS:  Because I worked out of EMS Department, and

22 we was all dispatched to different Units at the same time

23 in the EMS Department.

24     JUDGE RODWELL:  Okay.  What about when Mr. Hall left

25 the EMS Department and went to Extended Care on a full-time

BURKE COURT REPORTING COMPANY
856-627-7733

503

85

1  basis?

2      WITNESS:  Well, he worked -- he got hired June 7th.

3  Th posting of this job was June 10th.  He was on full-time

4  for three days.

5      JUDGE RODWELL:  That was the posting of the job.

6      WITNESS:  The posting of the job -- well, we both

7  applied for the job on June 10th.

8      JUDGE RODWELL:  The individual was selected on or

9  about -- according to the document, the Certification of

10  Position, dated July 8th, in the file under C-3, at the

11  bottom of that, there's a part where the Selecting Official

12  indicates who they selected; and that date is June 15,

13  1998; so that's over a month after he was hired into that

14  Unit.

15      WITNESS:  Uh, huh.

16      JUDGE RODWELL:  That is probably correct; Yes.

17      MR. DUMAS:  May I have this?

18      JUDGE RODWELL:  No; you may not.

19      MR. DUMAS:  I just really need to correct you

20  something there.

21      JUDGE RODWELL:  What do you need -- you don't need to

22  correct me on anything.

23      MR. DUMAS:  I'm sorry; but ...

24      JUDGE RODWELL:  But that -- if you have a question for

25  Mr. Johnson, you may ask him a question.

86

1      Q    Mr. Johnson, according to the Personnel Action

2  Form that is part of the Investigation Report, when was Mr.

3  Johnson -- correction, when was ...

4      JUDGE RODWELL:  Excuse me, sir; I know that.  I have

5  the paper, and I know what's on that paper.

6      MR. DUMAS:  Uh, huh.

7      JUDGE RODWELL:  And that is what is -- I know what is

8  on that paper.  The Personnel Action Form, the effective

9  date was June 7, 1998.  The selection was made in July of

10  1998.

11     MR. DUMAS:  The selection was ...

12     JUDGE RODWELL:  This is based on the record; this is

13  ...

14     MR. DUMAS:  The selection was made on July 15th.  The

15  documents for the position went in and were signed on June

16  15th.  And they made their decision on the documents from

17  June 15th; not what he was doing between that period.

18     JUDGE RODWELL:  But sir, we need to go on; okay?  I'm

19  actually doing what I shouldn't be doing, and that is

20  drawing conclusions; and I will do that -- I don't need you

21  -- I will do that.  Because the record speaks for itself.

22     WITNESS:  In essence, I felt that I may have been

23  discriminated against because I was black at the time when

24  she told me that, because I knew I had more time in; I had

25  more experience in Housekeeping, and I didn't have to be

505

1    trained for the job.

2         I believe Mr. Hall was trained for the 19-3 job,

3    and I didn't have to be trained.  Other than that, I

4    believe that's all I have to say.  Anybody have any

5    questions?

6         JUDGE RODWELL:  Okay.  Do you have any questions, Mr.

7    Perillo?

8         MR. PERILLO:  I don't.

9         JUDGE RODWELL:  When -- when -- during your

10   discussion, after the selection, with Ms. Fidler, did she

11   ask you or mention that there might be another job you'd be

12   interested in?  Was that the case?

13        WITNESS:  She said, "Mr. Lewis, the Floater job is

14   available, because Mr. Hall got the permanent job."  I said

15   ...

16        JUDGE RODWELL:  The what job is available?

17        WITNESS:  The Floater ...

18        JUDGE RODWELL:  Okay.

19        WITNESS:  The job that I actually demonstrated -- they

20   created a job, and they gave it to him.  And I told them I

21   wasn't interested, because I wanted a permanent work

22   station; because the Floater jobs takes you all over the

23   Hospital, and you really don't know where you're going to

24   be at when you come in that day; and that's why I didn't

25   care for that job.

88

1      JUDGE RODWELL:  And at the time of the selection, you

2  were already in a Floater job?

3      WITNESS:  Yes; I was.

4      JUDGE RODWELL:  Are you still in a Floater job?

5      WITNESS:  I would say so.

6      JUDGE RODWELL:  What do you mean by you would say so?

7      WITNESS:  Right now, I'm currently not -- I'm not

8  working at the VA right now; I'm off sick, per doctor's

9  orders.

10      JUDGE RODWELL:  Okay.  Do you plan on returning to the

11  VA?

12      WITNESS:  Yes.

13      JUDGE RODWELL:  Do you know when you'll be returning

14  to the VA?

15      WITNESS:  When doctor says -- six months to a year --

16  that's -- he gave me that last week -- week and a half.

17      JUDGE RODWELL:  Okay.  Is it your desire to have -- is

18  it still your desire, upon your return to the VA to have a

19  position -- you have a full-time position; is that correct?

20      WITNESS:  Uh, huh.  Yes; I do.

21      JUDGE RODWELL:  Okay.  But it's your desire to have a

22  permanent position -- in other words, a position in a

23  particular Unit that you report to the same Unit every day?

24      WITNESS:  Yes.

25      JUDGE RODWELL:  Okay.  I don't have any other

BURKE COURT REPORTING COMPANY
856-627-7733

1    questions.

2    I don't believe.  I just want to check.  We're going to go

3    off the record a moment.  I just want to check one thing.

4         (Off the record.)

5         (On the record.)

6         JUDGE RODWELL:  We can go back on the record.

7              Mr. Johnson, how long have you been working at

8    the VA -- I mean working for the VA?

9         WITNESS:  October 20th.

10        JUDGE RODWELL:  Of '99?

11        WITNESS:  '99.

12        JUDGE RODWELL:  Okay.  Did -- at the time of the

13   selection process, were there any black Housekeeping Aides

14   working on Ms. Fidler s Unit?

15        WITNESS:  Well, they would work on a Unit as they

16   would float through as an assignment.  Someone call off --

17   the ones we had there was Floaters; and yes; they was

18   assigned to that Unit; they would work on that Unit as a

19   Floater.

20        JUDGE RODWELL:  Who made the assignments for the

21   Floaters?

22        WITNESS:  The Supervisor that was in charge that day.

23        JUDGE RODWELL:  Of the Unit?

24        WITNESS:  Of our particular EMS Unit; Yes.  What would

25   occur is if the Product Line would call and say certain-

90

1    certain would call in sick; and they would just assign

2    somebody to go over there.

3        JUDGE RODWELL:  And so, for example, Ms. Fidler's Unit

4    might call up and say we need a replacement; someone's off

5    today, ...

6        WITNESS:  Right.

7        JUDGE RODWELL:  ... and your Unit Supervisor for that

8    day would assign someone to go down?

9        WITNESS:  Yes.

10        JUDGE RODWELL:  Okay.  Do you know how many permanent

11    Housekeeper positions were in Ms. Fidler's Unit?

12        WITNESS:  In her Product Line?

13        JUDGE RODWELL:  Right.

14        WITNESS:  Two, four, five, seven.

15        JUDGE RODWELL:  Seven permanent ones?

16        WITNESS:  Yes.

17        JUDGE RODWELL:  Including the one that Mr. Hall

18    filled?

19        WITNESS:  Yes.

20        JUDGE RODWELL:  Okay.  And were there -- were any of

21    those black individuals?

22        WITNESS:  No; they weren't.

23        JUDGE RODWELL:  I don't have any other questions.  I'm

24    going to direct that you not discuss your testimony with

25    anyone outside of this hearing room as well; and you may be

91

1    excused.  Were there -- there weren't -- were there any

2    more questions?

3         MR. PERILLO:  No.

4         JUDGE RODWELL:  Okay.  You may be excused.

5              At this time, we will have closing arguments or

6    closing statements.  Do you, Mr. Perillo or Mr. Dumas need

7    any additional time or a few minutes to prepare for your

8    closing statements?

9         MR. PERILLO:  I don't.

10        MR. DUMAS:  No.

11        JUDGE RODWELL:  Okay.  You may proceed, Mr. Dumas,

12   with your closing.

13        MR. DUMAS:  Thank you, Judge.  Judge, from what I can

14   see, this entire hearing goes to the credibility of the

15   witness; whether or not the witness testified in a

16   believable fashion.  And very simply, Judge, I only saw one

17   person come in today that I can believe, other than Mr.

18   Johnson, and that person testified truthfully.  That was

19   Mr. Houck.

20             He had nothing to gain.  In fact, Mr. Houck had

21   more to lose, because he's making enemies at his workplace

22   against himself; but he was put in a situation where he

23   felt he had to do the right thing.  For whatever reason,

24   actual or otherwise, he felt he had to do the right thing.

25             Insofar as Mr. Kent, Mr. Kent makes -- made

92

1   several self-serving statement (sic) to make certain that -
2   - and in fact, he never answered a question.  He answered
3   in a way that you can't dispute him, because it seems to me
4   like -- hey, perhaps he used (sic) to doing this sort of
5   thing, and that's the way he work (sic) -- that's the way
6   he get his program across to try and convince everyone, "I
7   got it on the top of my head; I know this."

8           Okay.  But he embarrassed me.  I'm not -- I'm not
9   good at this thing with a person like him, because it's
10  obvious, he's a professional at it.  And sometime when
11  you're a professional at something, you do it so well, then
12  you become suspect.

13          Now other people that come -- that came in here -
14  - notice particularly Ms. Fidler.  I say if a person does
15  not tell the truth in their sworn testimony, and you see
16  that; then anything else that person says is suspect.  The
17  investigation clearly shows Ms. Fidler was asked, "How
18  could you observe him if you do not work on weekends?"  To
19  which she replied, "Oh, I mean when I come in on Mondays;
20  and then I see what he's done."

21          But the situation -- by the time she comes on
22  Mondays at 7:30, the Housekeeper s been already there,
23  doing the job.  The record clearly shows that Mr. Hall
24  worked, at the time they was applying for these positions
25  and they submitted the documents, Mr. Hall had been a full-

93

1    time Housekeeper from June 9th to June 15th.

2         Additionally, they stuck a form in the records

3    here, in the investigative records, to try and -- try and

4    trick us here -- let us see the correct form that caused

5    Mr. Hall to get the job.  This form didn't -- had no parts

6    in this record.  Had absolutely no parts.  The true record

7    shows that Mr. Hall was reassigned this position; and at

8    the VA Medical Center in Lebanon, seniority decides on

9    reassignments, regardless of how Mr. Kent try to circumvent

10   the truth.

11        That's it in a nutshell.  Mr. Johnson was

12   entitled to the job, regardless of how Ms. Fidler may have

13   felt about him or other men of color.  Mr. Houck came in,

14   and he said -- and he was reluctant to testify.  He said,

15   this is what she said.  I mean it looks like -- why do you

16   want me?  I don't want to be a part of this, but this is

17   what she said.  And to me, he was very credible.  It was

18   obvious, some sort of statement was made.  The record bears

19   it out.

20        Mr. Johnson stated, since he's been there, seven

21   people in Extended Care.  Not one minority.  To come in

22   here and say, `I recently hired a black;` it s not enough.

23   It is certainly not enough.  And I understand she may have

24   said this back in `95; `92 or `93; somewhere in that

25   period, but it's evident to me today in dealing with this

94

1   matter, the situation still exists.

2        The black man that we heard about here today was,

3   in fact, hired.  Everybody knows about his entire

4   situation.  He was hired; and apparently Ms. Fidler was put

5   in a situation where she has to hire blacks now; but that

6   does not relieve her of her past conduct.  It certainly

7   doesn't relieve her.  It's a horrendous situation; and when

8   a person like that in authority position can do something

9   like this, she sets a pattern.  Other see it.  She sets a

10  pattern, and here come the Agency backing her up.

11       What does it tell anyone else?  You are allowed

12  to do the same thing; therefore the problem you have at the

13  Lebanon VA.

14       It's time to say to them, "You gotta stop what's

15  going on out there.

16       Thank you.

17  JUDGE RODWELL:  Mr. Perillo.

18  MR. PERILLO:  Thank you, Judge.  Mr. Dumas, Mr.

19  Johnson, there was testimony presented to rebut the *prima*

20  *facie* case they presented.  Ms. Kohr and Ms. Fidler, the

21  Selecting Officials, the folks involved in the process.  We

22  had already stipulated that Mr. Johnson was a qualified

23  finalist, along with Mr. Hall.

24       The testimony was consistent with the testimony

25  given to the EEO Investigator on the reasons for the

95

1    selection.  Namely, Ms. Fidler testified with a degree of

2    credibility that really was not dented on any cross-

3    examination or examination question from the Judge.  It was

4    based on objective analysis of written qualifications.

5    Specifically, it appears the Supplemental qualifications

6    was the tie-breaker.

7           Now it appears as though the case brought by the

8    Complainant was based on an interpretation of semantics on

9    the Supplemental Qualifications vis-a-vis each candidate.

10   Regardless of the interpretation put on it, there was no

11   evidence whatsoever admitted here at the hearing or that

12   appears in the record that there was any racial motivation

13   behind that interpretation of the Supplemental

14   Qualifications.

15          Even taking Mr. Johnson's monologue at the end of

16   the hearing as credible, and accepting his argument;

17   there's still no evidence of a race-based interpretation of

18   the Supplemental Qualification statement, which really cuts

19   to the heart of this case under the circumstances.

20          The case law is replete with situations of

21   individuals, Selecting Officials and otherwise, that have

22   been accused of discrimination who have made racial remarks

23   in the past -- one or two stray remarks in the past.

24          Now we saw credibility determinations that have

25   to be made by the Judge here on testimony by Ms. Fidler

514

1  that denied making that statement several years ago.  Yet

2  there's still no evidence admitted here, as of record,

3  which will have to be interpreted by the Judge, under her

4  Decision, to indicate that even if that remark was made, it

5  had anything to do with this selection process.

6          Therefore, under the state of the law, there's no

7  basis for finding discrimination.  The Agency so asks that

8  that judgment be made.

9          Thank you.

10     JUDGE RODWELL:  Okay.  I have -- I have -- I'm going

11  to go off the record a moment.

12     (Off the record.)

13     (On the record.)

14     JUDGE RODWELL:  We're back on the record, and I have

15  called Ms. Fidler back in; and Ms. Fidler, you're still

16  under oath, ma'am.

17     Whereupon,

18                    ALICE E. FIDLER

19  having been previously sworn, was recalled as a witness

20  herein and was examined and testified as follows:

21     JUDGE RODWELL:  I have a few questions for you for

22  clarification for myself, kind of as thinking as Mr. Dumas

23  was ...

24     MR. PERILLO:  Judge, I'm sorry to interrupt, just *pro

25  forma* I have to object.

97

1    JUDGE RODWELL:  Okay.  Objection is overruled.

2    MR. PERILLO:  Thank you.

3    JUDGE RODWELL:  Okay.  I am calling you Ms. Fidler.  I

4  -- you know, I was thinking back over questions that Mr.

5  Dumas was asking; and in response to my questions, et

6  cetera, and I just wanted some clarification on a certain

7  point.

8        With regards to Mr. Hall, his request for

9  personnel action, which was effective June 2, 1998, under

10  Tab C-3 reflects that he was transferred from the EMS

11  Operations as a Housekeeping Aide, permanent, part-time; to

12  WG-1 to a WG-2 into the Housekeeping -- into the Extended

13  Care Unit.  Would that have been your Unit?

14    WITNESS:  He was a float person, I think that was the

15  -- I'm not sure; but I think it was the float position that

16  was available; and at that time, the person I had on half

17  of my Unit was transferred to the Maintenance Department,

18  so he spent most of his floating time being the Relief

19  Janitor on 19-3.

20    JUDGE RODWELL:  And that -- that was a float position?

21    WITNESS:  Yes.

22    JUDGE RODWELL:  Okay.  Was that a float position in

23  your Unit?

24    WITNESS:  It was a float position in the Product Line.

25    JUDGE RODWELL:  What does that mean, "in the Product

98

1   Line"?

2      WITNESS:  We are an Extended Care Product Line.  There

3   are seven Units in the Product Line, and part of my

4   responsibility as a Team Leader was to supervise the

5   Housekeeping people in that Product Line.  I didn't do

6   their performance appraisals.  I just assigned them to the

7   areas that needed help, granted their annual leave, their -

8   - if they had any special requests.

9      JUDGE RODWELL:  So you didn't do performance

10  appraisals?

11     WITNESS:  Only on the employees that I had on my own

12  Unit that were assigned to me.

13     JUDGE RODWELL:  What was your Unit?

14     WITNESS:  Mine is 19-3.

15     JUDGE RODWELL:  And that is an Extended Care Unit?

16     WITNESS:  Yes.

17     JUDGE RODWELL:  Okay.  So Mr. -- in June -- on June 7,

18  1998, Mr. Hall was assigned as a Floater to your Unit or as

19  a Floater to the whole Product Line?

20     WITNESS:  He was a Floater to the whole Product Line,

21  but I had a vacancy there; because somebody had been

22  transferred to the Engineering Maintenance Department.

23     JUDGE RODWELL:  So you had a Floater position -- okay;

24  what does that mean?

25     WITNESS:  Floater -- the Floater position was to help

99

1   cover annual leave, unplanned leave; to help do project

2   cleaning, like waxing and cleaning wheel chairs; and to

3   help clean the area in 19-1, which was a large area.

4       JUDGE RODWELL:  Okay.  So during that time period from

5   June 7 -- first of all, let me ask this:

6           Do you recall when you made the selection of Mr.

7   Hall for the position?

8       WITNESS:  I think it was August, but I do not

9   remember.  What are you -- are you asking me originally for

10  that position?

11      JUDGE RODWELL:  Yes.

12      WITNESS:  I did not make the selection of Mr. Hall for

13  the original position.  Beulah Hadrick hired him for the

14  Float position in this Extended Care Product Line.

15      JUDGE RODWELL:  Now for the position that we're here

16  for today, ...

17      WITNESS:  Right.

18      JUDGE RODWELL:  ... what -- do you recall when you

19  hired him or selected -- made the selection?

20      WITNESS:  No; I don't remember, exactly.

21      JUDGE RODWELL:  Okay.  Now when you make a selection,

22  what -- what would you normally do?  How would you indicate

23  the selection to the Agency?

24      WITNESS:  I -- there are forms to fill out, and you

25  put on the form the person you have selected, then you send

1    it to Human Resources.

2        JUDGE RODWELL:  Now at the time you fill out that

3    form, the person you selected; do you date the form that

4    you filled out the form?

5        WITNESS:  I think so.

6        JUDGE RODWELL:  Do you know if that would have been

7    the date you made the selection?

8        WITNESS:  It should -- it should have been

9        JUDGE RODWELL:  Okay.  Now when Mr. Hall was a Floater

10   in your Unit, when -- when did he normally work in that

11   Unit?

12       WITNESS:  He would have worked Monday to Friday, 6:00

13   a.m. to 2:30.

14       JUDGE RODWELL:  As a Floater?

15       WITNESS:  As a -- as a Floater, because he was placed

16   into a position that was empty -- that was vacant,

17   temporarily, until we got this position posted and filled.

18       JUDGE RODWELL:  Oh, I'm -- okay -- so you're saying

19   that he was a Floater, and there was a permanent

20   Housekeeping position that was open or left vacant?

21       WITNESS:  Right.

22       JUDGE RODWELL:  And that he floated, let's say, into

23   that position for that time period?

24       WITNESS:  That's correct.

25       JUDGE RODWELL:  And that was Monday through Friday?

1   WITNESS:  That's correct.

2   JUDGE RODWELL:  Okay.  And during that time period,

3 you were able to observe his performance?

4   WITNESS:  That's correct.

5   JUDGE RODWELL:  Okay.  Now there's been some testimony

6 in the record that -- that you felt that Mr. Hall was a

7 better team player.  Now that may not be the specific

8 testimony, but would fit into the Unit better.  What did

9 you mean by that?

10   WITNESS:  Mr. Johnson came to see me after this was

11 completely over, and he asked me if he could see me "off-

12 the-cuff", and discuss this.  And at that time, I told him

13 that I picked the person that I felt was better -- the best

14 qualified and who would best fit into the team; but there

15 would also be a Float position available in Extended Care

16 Product Line, and I felt he would be qualified for that.

17    Mr. Johnson did well, going from Unit to Unit.

18 He had an outgoing personality, and he seemed to work well

19 with the people in most all of the areas.

20   JUDGE RODWELL:  So why did you think that Mr. Hall

21 would fit into your team better, or your Unit better?

22   WITNESS:  He seemed to get along with the team that I

23 have.  He just seemed to fit in better and to be able to

24 work with the staff.

25   JUDGE RODWELL:  Now when Mr. Johnson had an

102

1  opportunity to work in your Unit as a Floater, did he ever

2  work in your Unit during the week?

3      WITNESS:  Yes; Yes.

4      JUDGE RODWELL:  Now Mr. Hall's seeming to fit in

5  better with the staff; is that just a feeling that you had,

6  or ...

7      WITNESS:  He seemed to understand the demented patient

8  and how they could be uncooperative and, you know, void

9  inappropriately or be -- maybe get in his way and move his

10  signs or things like this.

11      JUDGE RODWELL:  Okay.  I don't have any other

12  questions, and I primarily wanted to get some clarification

13  on Mr. Hall's work status in the Unit, once he came in --

14  into the Unit itself.

15          Are there any questions from anyone else?

16      MR. PERILLO:  No.

17      JUDGE RODWELL:  You have an opportunity.

18      MR. DUMAS:  Just simply, from what period did you

19  observe Mr. Hall?

20      JUDGE RODWELL:  I think he was there approximately

21  four to six weeks.

22      MR. DUMAS:  What period ...

23      JUDGE RODWELL:  As a Float?

24      WITNESS:  That would have been -- he was hired as a

25  Float for me full-time, and he was on the Unit most of that

BURKE COURT REPORTING COMPANY
856-627-7733

521

103

1    time as a Floater.

2         MR. DUMAS:  From what period of time?

3         WITNESS:  I don't remember, sir.

4         JUDGE RODWELL:  The effective date is in the record on

5    C-3 when he was hired into that position, 6/7/98.  That's

6    according to the record.  Okay.  Okay.  That's the

7    effective date.  Okay.  That's all that I have.  Thank you

8    again.  And again, do not discuss the testimony with anyone

9    Ms. Fidler.

10        Off the record.

11        (Off the record.)

12        (On the record.)

13        JUDGE RODWELL:  On the record.  Okay.  We've concluded

14   with the hearing, but I'm going back on the record.  I just

15   want to make sure.  I think I introduced these, but I'm

16   admitting into the record Hearing Transcript Exhibit C-1,

17   and that is the Article 12 excerpt from the Master

18   Agreement between the VA and the American Federation of

19   Government Employees dated 1997.  That is admitted into the

20   record, and the parties are, you know, again instructed to

21   keep their copies of this.  They won't be attached to the

22   copies of the transcript, only the original transcript.

23

24        (The document previously markd for identification

25        as exhibit C-1 was edmitted into evidence)

BURKE COURT REPORTING COMPANY
856-627-7733

104

1          Thank you.  Off the record.

2          (Off the record)

3          (Whereupon, the hearing was concluded)

4

BURKE COURT REPORTING COMPANY
856-627-7733

105

1           <u>REPORTER'S CERTIFICATE</u>

2

3    DOCKET NUMBER:  EEOC COMP. No. 170-AO-8163X

4    AGENCY NUMBER:  98-2320

5    CASE TITLE:  Lewis Johnson v. Hershel Gobel, Acting

6    Secretary, Department of Veterans Affairs

7    HEARING DATE:  July 26, 2000

8    LOCATION:  Philadelphia, Pennsylvania

9

10          I hereby certify that the proceedings and

11   evidence herein are contained fully and accurately on the

12   tapes and notes reported by me at the hearing in the above

13   case before

14          THE HONORABLE DONNA NUTTER-RODWELL

15          THE EQUAL EMPLOYMENT OPPORTUNITY COMMISSION

16   and that this is a true and correct transcript of the case.

17

18                           Date: 8/1/00

19

20

21          _____

22                 Official Reporter

BURKE COURT REPORTING COMPANY
856-627-7733

524

# IN THE UNITED STATES DISTRICT COURT
## FOR THE MIDDLE DISTRICT OF PENNSYLVANIA

LEWIS JOHNSON,                :
       **Plaintiff**              :      **No. 1:CV-00-1873**
                        :
          **v.**                 :      **(Judge McClure)**
                        :
ANTHONY PRINCIPI, Acting Secretary of   :
Veterans Affairs; et al.,          :
       **Defendants**          :

## CERTIFICATE OF SERVICE

The undersigned hereby certifies that she is an employee in the Office of the United States Attorney for the Middle District of Pennsylvania and is a person of such age and discretion to be competent to serve papers.

That this 16th day of August, 2002, she served a copy of the attached

## FEDERAL DEFENDANTS' RECORD IN
## SUPPORT OF THEIR MOTION FOR SUMMARY JUDGMENT:
### VOLUME III

by placing said copy in a postpaid envelope addressed to the person hereinafter named, at the place and address stated below, which is the last known address, and by depositing said envelope and contents in the United States mail at Harrisburg, Pennsylvania.

Addressee:

Andrew J. Ostrowski, Esquire
4311 North Sixth Street
Harrisburg, PA 17110

_____
KATE L. MERSHIMER
Assistant U.S. Attorney